No. 21-15295

# In the United States Court of Appeals for The Ninth Circuit

APACHE STRONGHOLD,
Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA, ET AL.,
Defendants-Appellees.

Appeal from the United States District Court
for the District of Arizona
Honorable Steven P. Logan
(2:21-cv-00050-PHX-SPL)

## EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL UNDER CIRCUIT RULE 27-3 RELIEF REQUESTED BY MARCH 2, 2021

MICHAEL V. NIXON
101 SW Madison Street #9325
Portland, OR 97207
(503) 522-4257
*michaelvnixon@yahoo.com*

CLIFFORD LEVENSON
5119 North 19th Street, Suite K
Phoenix, AZ 85015
(602) 544-1900
*cliff449@hotmail.com*

LUKE W. GOODRICH
  *Counsel of Record*
MARK L. RIENZI
DIANA M. VERM
JOSEPH C. DAVIS
CHRISTOPHER PAGLIARELLA
DANIEL D. BENSON
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*lgoodrich@becketlaw.org*

*Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Apache Stronghold is an Arizona nonprofit corporation with no parent company or stock.

## CIRCUIT RULE 27-3 CERTIFICATE

The undersigned counsel certifies the following:

**(i) Attorneys' names and contact information**

Plaintiff-Appellant Apache Stronghold is represented by:

LUKE W. GOODRICH
  *Counsel of Record*
MARK L. RIENZI
DIANA M. VERM
JOSEPH C. DAVIS
CHRISTOPHER PAGLIARELLA
DANIEL D. BENSON
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
(202) 955-0095
*lgoodrich@becketlaw.org*

MICHAEL V. NIXON
101 SW Madison Street #9325
Portland, OR 97207
(503) 522-4257
*michaelvnixon@yahoo.com*

CLIFFORD LEVENSON
5119 North 19th Street, Suite K
Phoenix, AZ 85015
(602) 544-1900
*cliff449@hotmail.com*

Defendants-Appellees United States of America, et al., are represented by:

KATELIN SHUGART-SCHMIDT
JOAN M. PEPIN
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 353-1834
*katelin.shugart-schmidt@usdoj.gov*
*Joan.Pepin@usdoj.gov*

**(ii) Facts showing the nature and existence of the emergency**

The Apache peoples have used Chi'chil Biłdagoteel, known in English as Oak Flat, as a sacred religious ceremonial ground since time immemorial. The district court found that "[t]he spiritual importance of Oak Flat to the Western Apaches cannot be overstated." ER.11.

Yet on March 11, 2021, the United States is scheduled to transfer control over Oak Flat to a mining company, Resolution Copper, which will construct a mine collapsing and destroying the sacred site in a nearly two-mile-wide, 1,100-foot-deep crater. As the Forest Service said in its Final Environmental Impact Statement (FEIS), the "physical" impact on "tribal sacred sites" caused by the mine will be "immediate," "permanent," and "[i]rreversible"—"permanently affect[ing] the ability of tribal members" to use "known" sacred sites "for cultural and religious purposes." FS Resolution Copper Project and Land Exchange Environmental Impact Statement, 2 FEIS at 790 (U.S.D.A. 2021), available at

https://www.resolutionmineeis.us/documents/final-eis.

This irreversible destruction of one of the most sacred indigenous sites in the country violates both the Religious Freedom Restoration Act (RFRA) and the Government's trust and fiduciary duties to the Apache tribes and members. Thus, Apache Stronghold seeks an emergency injunction pending appeal to preserve Oak Flat while this appeal proceeds.

Before filing this motion, Apache Stronghold asked the Government if it would agree to a 60-day stay of the land transfer (until May 10, 2021) so that this Court could consider the request for relief on a less compressed schedule. The Government refused. Thus, Apache Stronghold requests relief by March 2, 2021, so that if this Court denies relief, it can seek relief from the Supreme Court by March 10, 2021. To that end it proposes the following briefing schedule:

- February 23: Apache Stronghold's motion
- February 28: Defendants' response
- March 1: Apache Stronghold's reply
- March 2: Court's decision

**(iii) Why the motion could not have been filed earlier**

Apache Stronghold filed this lawsuit on January 12, 2021, seeking a TRO to prevent the Forest Service from issuing the FEIS and completing the land transfer. The district court then held a preliminary-injunction hearing on February 3, 2021 (ECF 37), and issued its opinion denying a preliminary injunction on February 12, 2021 (ECF 57, ER.1-23).

Apache Stronghold filed its Notice of Appeal the same day it retained new appellate counsel—February 18, 2021—who immediately began preparing motions for injunctions pending appeal for the district court and this Court. Apache Stronghold filed its district court motion the next day, February 19, 2021. That motion was denied on February 22, 2021, and Apache Stronghold filed this emergency motion the next day, February 23, 2021.

**(iv) Notice and service on the opposing parties' counsel**

In compliance with FRAP 8(a)(2), Apache Stronghold's notice of appeal and motion for injunction pending appeal in the district court gave Defendants advance notice of this motion. Apache Stronghold also notified Defendants' counsel by email on February 19, 2021, of its intent to file this motion. Apache Stronghold's counsel will email a PDF copy of this motion to Defendants' counsel immediately after it is filed.

**(v) Whether relief was first sought in the district court**

Apache Stronghold filed a motion for injunction pending appeal in the district court on February 19, 2020, and that motion was denied on February 22, 2021.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

CIRCUIT RULE 27-3 CERTIFICATE .......................................................i

TABLE OF AUTHORITIES ................................................................vii

INTRODUCTION ................................................................................ 1

BACKGROUND ................................................................................. 3

    A. The Apaches and Oak Flat ................................................. 3

    B. Mining Interests ............................................................... 9

    C. The Land Exchange ......................................................... 10

    D. The Mine ......................................................................... 12

    E. District Court Proceedings .............................................. 14

ARGUMENT .................................................................................... 15

I.    The Government's actions violate RFRA. ........................ 15

    A. The destruction of Oak Flat imposes a substantial burden........ 16

    B. The Government has not even attempted to satisfy
       strict scrutiny. ............................................................... 23

II.   The Government's actions violate the Free Exercise Clause. ......... 24

III. The Government's actions violate its trust obligation to
    the Apaches. ..................................................................... 25

    A. *Herrera* and *McGirt* establish Plaintiffs' interest. ...................... 25

    B. Congress did not abrogate the trust relationship. ...................... 26

IV. The other injunction factors are met. ................................ 28

CONCLUSION ................................................................................. 29

CERTIFICATE OF COMPLIANCE.......................................................30

CERTIFICATE OF SERVICE...............................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011)......................................................15, 28

*Church of the Lukumi Babalu Aye v. City of Hialeah,*
    508 U.S. 520 (1993).................................................................24

*Comanche Nation v. United States,*
    No.CIV-08-849-D, 2008 WL 4426621
    (W.D. Okla. Sept. 23, 2008) .............................................18

*Employment Division v. Smith,*
    494 U.S. 872 (1990).................................................................24

*Greene v. Solano Cnty. Jail,*
    513 F.3d 982 (9th Cir. 2008).......................................17, 22

*Haight v. Thompson,*
    763 F.3d 554 (6th Cir. 2014).............................................17

*Herrera v. Wyoming,*
    139 S. Ct. 1686 (2019)..........................................25-26, 28

*Holt v. Hobbs,*
    574 U.S. 352 (2015).........................................................16, 19

*Int'l Church of Foursquare Gospel v. City of San Leandro,*
    673 F.3d 1059 (9th Cir. 2011) ............................................18

*Koger v. Bryan,*
    523 F.3d 789 (7th Cir. 2008)..............................................17

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
    485 U.S. 439 (1988)..............................................16, 20, 21

*McGirt v. Oklahoma,*
    140 S. Ct. 2452 (2020)......................................................26, 28

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Review*,
  460 U.S. 575 (1983)............................................................24

*Murphy v. Mo. Dep't of Corr.*,
  372 F.3d 979 (8th Cir. 2004)............................................17

*Nance v. Miser*,
  700 F.App'x 629 (9th Cir. 2017)...............................17, 19

*Navajo Nation v. USFS*,
  535 F.3d 1058 (9th Cir. 2008).........................15, 19, 20, 22

*Roman Catholic Bishop of Springfield v. City of Springfield*,
  724 F.3d 78 (1st Cir. 2013) ..............................................24

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020)..........................................................28

*Sherbert v. Verner*,
  374 U.S. 398 (1963)...........................................................16

*Shrum v. City of Coweta*,
  449 F.3d 1132 (10th Cir. 2006).........................................25

*Snoqualmie Indian Tribe v. FERC*,
  545 F.3d 1207 (9th Cir. 2008)...........................................21

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  No. 16-1534, 2017 WL 908538 (D.D.C. 2017)...................21

*Tanzin v. Tanvir*,
  141 S. Ct. 486 (2020)........................................................17

*Trinity Lutheran Church of Columbia v. Comer*,
  137 S. Ct. 2012 (2017)......................................................16

*United States v. Carlson*,
  900 F.2d 1346 (9th Cir. 1990)...........................................23

*United States v. Mitchell*,
  463 U.S. 206 (1983)...........................................25, 26, 27

*United States v. Navajo Nation,*
  537 U.S. 488 (2003) ...................................................................... 27

*United States v. Renzi,*
  769 F.3d 731 (9th Cir. 2014) ........................................................ 11

*United States v. Winans,*
  198 U.S. 371 (1905) ...................................................................... 26

*Valle del Sol v. Whiting,*
  732 F.3d 1006 (9th Cir. 2013) ...................................................... 28

*Warsoldier v. Woodford,*
  418 F.3d 989 (9th Cir. 2005) ................................................... 17, 28

*Wisconsin v. Yoder,*
  406 U.S. 205 (1972) ...................................................................... 22

*Yellowbear v. Lampert,*
  741 F.3d 48 (10th Cir. 2014) ........................................................ 17

**Statutes**

16 U.S.C. §539p ........................................................................ 24, 25

42 U.S.C. §2000bb-1 ................................................................. 15, 22

42 U.S.C. §2000cc-3 ......................................................................... 16

National Defense Authorization Act, P.L. 113-291 (2014) ......... 10, 11, 12

**Other Authorities**

20 Fed. Reg. 7319 (Oct. 1, 1955) ........................................................ 10

36 Fed. Reg. 18,997 (Sept. 25, 1971) ................................................. 10

*Resolution Copper: Hearing,*
  112th Cong., 4 (2012) ................................................................... 25

Stephanie Barclay & Michalyn Steele,
    *Rethinking Protections for Indigenous Sacred Sites*,
    134 Harv. L. Rev. 1294 (2021). .....................................................22-23

Eric Lipton*, In Last Rush, Trump Grants Mining and
    Energy Firms Access to Public Lands*,
    N.Y. Times (Dec. 19, 2020) ................................................. 12

Katharine E. Lovett, *Not All Land Exchanges are Created
    Equal: A Case Study of the Oak Flat Land Exchange*,
    28 Colo. Nat. Res., Energy & Envt'l L. Rev. 353 (2017).................... 11

Annette McGivney, *Revealed: Trump officials rush to mine
    desert haven native tribes consider holy*,
    Guardian (Nov. 24, 2020) ........................................... 10, 12

Lydia Millet, *Selling Off Apache Holy Land*,
    N.Y. Times (May 29, 2015) ................................................. 11

John R. Welch, *Earth, Wind, and Fire: Pinal Apaches,
    Miners, and Genocide in Central Arizona, 1859-1874*,
    SAGE Open (2017).......................................................... 9, 10

# INTRODUCTION

Western Apaches have centered their religious practices on Chi'chil Biłdagoteel—"Emory Oak Extends on a Level," or "Oak Flat"—since time immemorial. As the district court found, "[t]he spiritual importance of Oak Flat to the Western Apaches cannot be overstated." ER.11. Yet in 16 days, the federal government plans to transfer this sacred site to a third party for the express purpose of constructing a mine that all parties agree will destroy the site.

In a typical injunction case, a court might wonder whether the threatened harm is imminent or irreparable. Here, however, the Government has already attested to those facts. It concedes that upon transfer, Oak Flat will immediately "become private property and no longer be subject to [laws] or Forest Service management that provides for tribal access," which is a serious "adverse impact on resources significant to the tribes." 3 FEIS at 824. And construction of the mine—the avowed and only purpose of the transfer—will result in "immediate," "permanent," and "[i]rreversible" destruction of the site, forever ending religious practices at Oak Flat. 2 FEIS at 789-90. The district court expressed no disagreement.

Instead, the court denied relief based on its view of the merits of Plaintiffs' RFRA, free exercise, and trust claims. But in doing so, it made several legal errors. First, in rejecting the RFRA claim, the court held that Plaintiffs can show a "substantial burden" on their religious exercise only if they suffer denial of a government benefit or threat of sanctions—not

destruction of their site. ER.17. Thus, if the Government merely fenced off the site and sanctioned Plaintiffs for trespassing, they would face a "substantial burden"; but if the Government destroys the site—rendering Plaintiff's religious practices impossible—they do not. This holding defies both precedent and common sense. And since the project arises from the Government's specific targeting of Oak Flat, it violates the Free Exercise Clause too.

Second, in rejecting Plaintiffs' trust claim, the court held that only a tribal government, not individual members, may assert the tribe's trust interest. That ruling directly contravenes multiple cases allowing individual tribal members to invoke tribal rights and treaties to protect individual interests. The court also held that the trust was nonexistent or abrogated by the land-transfer statute. But that contradicts precedent on how trusts are formed in the Indian-law context, and the rule that a statute abrogating treaty rights must do so expressly—which did not happen here. Thus, the transfer cannot proceed without violating the trust.

\*        \*        \*

The United States Government has a tragic history of destroying Apache lives and lands for the sake of mining interests. This time, the Apaches simply ask that they be heard in court before their land is transferred beyond federal control and destroyed forever.

# BACKGROUND

## A. The Apaches and Oak Flat

Since before recorded history, Western Apaches have lived, worshipped on, and cared for Oak Flat and surrounding lands. They believe that Usen, the Creator, gave life to all things. ER.65. Thus, everything has life, including air, water, and Nahagosan—Mother Earth herself. ER.93. The Apaches strive to remain "intertwined with the earth, with the mother" so they can "communicate with what [is] spiritual, from the wind to the trees to the earth to what [is] underneath." ER.82.

Central to this connection are the Ga'an, who are "guardians" and "messengers" between the Creator and people in the physical world (ER.75)—roughly comparable to angels in Christianity. Usen created the Ga'an as "the buffer between heaven and earth" and created specific "blessed places" for the Ga'an to dwell. ER.81, 95.

One of the most important of the Ga'an dwelling places is Oak Flat—a 6.7-square-mile traditional cultural property between Apache Leap on the west and Ga'an Canyon (called Devil's Canyon by non-Indians) on the east. The central sacred area of Oak flat is depicted here:



The terrain of Oak Flat includes jagged cliffs, boulder fields, grassy basins, Emory oaks, and perennial waters used by songbirds, mountain lions, fox, bear, and deer:



ECF 1 at 3 © *Russ McSpadden, Center for Biological Diversity*


ECF 1 at 19 © Robert A. Witzeman, Maricopa Audubon Society

Apaches have held Oak Flat sacred since before recorded history. It is "uniquely endowed with holiness and medicine," and neither "the powers resident there, nor [the Apache] religious activities that pray to and through these powers can be 'relocated.'" ER.225. Only there can their "prayers directly go to [the] creator." ER.65.

As the "direct corridor to [their] Apache religion," Oak Flat is the site of key religious practices "that must take place there." ER.65, 225. These include the Sunrise Ceremony, Holy Ground ceremonies, sweat lodge ceremonies, the gathering of "sacred medicine plants, animals, and minerals essential to [those] ceremonies," ER.225, specific prayers and songs, and the use of "the sacred spring waters that flows from the earth with healing powers not present elsewhere." *Id.*

The Sunrise Ceremony takes several days, marking an Apache girl's transition into womanhood. To prepare, the girl gathers plants from Oak Flat that contain "the spirit of Chi'chil Biłdagoteel"; plants picked elsewhere don't "have the spirit that resonates." ER.65-67. As she gathers, she speaks to the spirit of Oak Flat, thanking it for providing the acorns, yucca, cedar, and other plants. ER.66-67.

After her godmother dresses her in "the essential tools of…becoming a woman," tribal members surround her and sing, dance, and pray. ER.71.



*ER.131 © Photograph with family permission*

In the night, the Ga'an at Oak Flat enter Apache men called crown dancers. ER.74. The Ga'an bless the girl, who joins the dance. *Id.*



*ER.144 © Robin Silver Photography*

On the final day, one of the Ga'an dancers paints the girl with white clay taken from the ground at Oak Flat, "mold[ing] her into the woman she is going to be." ER.72-73. When her Godmother wipes the Oak Flat clay from her eyes, "she's a new woman" forever "imprint[ed]" with the spirit of Oak Flat. ER.73.



*ER.133 © Photograph with family permission*

## B. Mining Interests

Unfortunately, the Government has a tragic history of destroying Apaches' lives and land for the sake of mining interests. In the 1852 Treaty of Santa Fe, the United States promised the Apaches it would "designate, settle, and adjust their territorial boundaries" and "pass and execute" laws "conducive to the prosperity and happiness of said Indians." ER.205. Although the formal designation of boundaries never took place, the earliest map, prepared by the Smithsonian Institution, shows Oak Flat as Apache, not U.S., territory. ER.110-11. Dr. John Welch, an expert in Apache anthropology and archaeology, testified there is "no evidence that the United States compensated the Apache treaty rights holders for Chi'chil Biłdagoteel," and "Oak Flat is Apache land." ER.154.

After the treaty, as settlers and miners entered the area, U.S. soldiers and civilians committed numerous massacres of Apaches. 3 FEIS at 827. In 1862, U.S. Army General James Carleton "ordered Apache men to be killed wherever found."[1] When miners discovered gold and silver nearby, General Carleton ordered "removal to a Reservation or...utter extermination" of the Apaches to make way for the "search of precious metals." Welch at 8. The General Mining Act of 1872 authorized miners to take Apache land, and by 1874, the U.S. government had forced some 4,000

---

[1] John R. Welch, *Earth, Wind, and Fire: Pinal Apaches, Miners, and Genocide in Central Arizona, 1859-1874*, SAGE Open (2017) (35 lethal attacks from 1859-74), at 7 (hereinafter "Welch").

Apaches onto the San Carlos Reservation, nicknamed "Hell's 40 Acres" because it was a barren wasteland. 3 FEIS at 827; ER.128. Apache ancestral lands were decimated "by miners' picks, shovels, drills, and dynamite blasts." Welch at 11.

## C. The Land Exchange

Still, the Government has long recognized Oak Flat's centrality to Apache worship. In 1955, President Eisenhower reserved 760 acres of Oak Flat for "public purposes" to protect it from mining. 20 Fed. Reg. 7319, 7336-37 (Oct. 1, 1955). President Nixon renewed the protection in 1971. 36 Fed. Reg. 18,997, 19,029 (Sept. 25, 1971). The National Park Service placed Oak Flat in the National Register of Historic Places, concluding "that Chi'chil Biłdagoteel is an important feature of the Western Apache landscape as a sacred site, as a source of supernatural power, and as a staple in their traditional lifeway."[2]

But mining companies covet Oak Flat. In 1995, miners discovered a large copper deposit 7,000 feet beneath the sacred ground.[3] From 2005 to 2013, congressional supporters of Resolution Copper introduced thirteen

---

[2] NRHP Registration Form at 8-9, https://perma.cc/4Y38-XQQE.

[3] Annette McGivney, *Revealed: Trump officials rush to mine desert haven native tribes consider holy*, Guardian (Nov. 24, 2020), https://perma.cc/LE9H-RAZ6.

different bills to give Oak Flat to Resolution Copper in a land exchange.[4] Each bill failed. One bill sponsor, Representative Rick Renzi, was convicted for soliciting a bribe from Resolution Copper to support the land-transfer. *See United States v. Renzi*, 769 F.3d 731, 739-40 (9th Cir. 2014).

In 2013, Resolution Copper published a "General Plan of Operations" for a mine at Oak Flat. 1 FEIS 1.1. The next year, a looming government shutdown gave mine proponents their chance. Minutes before the midnight deadline for the must-pass National Defense Authorization Act, Arizona Senators McCain and Flake attached a rider authorizing transfer of a 2,422-acre parcel including Oak Flat to Resolution Copper in exchange for about 6,000 acres elsewhere. P.L.113-291 §3003(b)(2), (4); (c)(1). Rio Tinto, the majority owner of Resolution Copper, was a regular donor to McCain's campaigns.[5] Flake had worked as a Rio Tinto lobbyist.[6]

The rider revoked the presidential orders protecting Oak Flat from mining, §3003(i)(1)(A), and directed the transfer of Oak Flat to Resolution Copper "[n]ot later than 60 days after the date of publication of the final environmental impact statement." §3003(c)(10).

The Forest Service estimated that the FEIS would not be ready until

---

[4] Katharine E. Lovett, *Not All Land Exchanges are Created Equal: A Case Study of the Oak Flat Land Exchange*, 28 Colo. Nat. Res., Energy & Envt'l L .Rev. 353, 366-67 (2017).

[5] Lydia Millet, *Selling Off Apache Holy Land*, N.Y. Times (May 29, 2015), https://perma.cc/VAQ8-SH4W.

[6] *Id.*

summer 2021.[7] But that timeline changed after President Trump lost. In December 2020, the Department of Agriculture announced the FEIS would be published the following month.[8] Officials admitted they pushed up the deadline because of "pressure from the highest level at the Department of Agriculture."[9] The FEIS was published January 15, 2021, triggering a deadline to complete the transfer no later than March 16, 2021. P.L.113-291 §3003(c)(10). The Government says it may transfer the land as early as March 11. ER.2.

**D. The Mine**

The FEIS acknowledges that the mine will cause "immediate, permanent, and large[-]scale" destruction of "archaeological sites, tribal sacred sites, [and] cultural landscapes." 2 FEIS at 789. The loss of Oak Flat will "be an indescribable hardship to [native] peoples." 1 FEIS at ES-29.

The copper exists 7,000 feet below the surface. 1 FEIS at 10. To mine it, Resolution Copper would tunnel below the ore, fracture it with explosives, and remove it from below. *Id.* After the ore is removed, the land above will collapse (or "subside") into a massive crater approximately 2 miles across and 1,100 feet deep, destroying Oak Flat forever. *Id.*

---

[7] Eric Lipton*, In Last Rush, Trump Grants Mining and Energy Firms Access to Public Lands*, N.Y. Times (Dec. 19, 2020), https://perma.cc/YWX2-D4NS.

[8] *Id.*

[9] McGivney, *supra* n.3.

This map shows the projected subsidence crater in relation to the central sacred area:



*Cf.* 1 FEIS 61.

The FEIS notes that the entire "NRHP-listed Chi'chil Biłdagoteel Historic District [Traditional Cultural Property] would be directly and permanently damaged by the subsidence area at the Oak Flat Federal Parcel." 1 FEIS at ES-28. This includes the permanent, physical destruction of the sacred sites used for the Sunrise Ceremony, Holy Ground ceremonies, and sweat lodge ceremonies, ER.68, ER.130, ER.91, ER.93, ER.122; the destruction of old-growth oak trees and sacred medicine plants essential to core religious practices, 1 FEIS at ES-29; the destruction of sacred springs with healing powers present nowhere else, 2 FEIS at 790; ER.65,

ER.142, ER.229; and the destruction of burial grounds and ancient religious and cultural artifacts, including many fragile petroglyphs. ER.142; 3 FEIS at 843, 846. According to the FEIS, these effects are "immediate, permanent, and large in scale." 3 FEIS at 856. "Mitigation measures cannot replace or replicate the tribal resources and traditional cultural properties that would be destroyed." *Id.* As Apache Stronghold members testified, this would render their core religious practices impossible. ER.65, ER.68, ER.122, ER.131-32, ER.145-46.

Upon transfer, Oak Flat will also "become private property and no longer be subject to [laws] or Forest Service management that provides for tribal access." 3 FEIS at 824. The FEIS thus deems the transfer to have an immediate "adverse impact on resources significant to the tribes," "regardless of the plans for the land," because it places the land beyond the reach of key laws and judicial remedies. *Id.*

The transfer would also immediately prevent specific planned religious ceremonies from taking place, including critical coming-of-age Sunrise Ceremonies. ER.130-34, 122 ¶10. Apaches and members of other tribes would be unable to pray on the land. ER.122 ¶12. And they would be subject to criminal trespassing liability on their own sacred, ancestral land.

### E. District Court Proceedings

Plaintiff Apache Stronghold is an Arizona nonprofit founded by Dr. Wendsler Nosie, former Chairman of the San Carlos Apache Tribe, to

unite Western Apaches with other allies to preserve indigenous sacred sites. It sued on January 12 and immediately sought a temporary restraining order and preliminary injunction to stop publication of the FEIS and land transfer. After a hearing, the district court on February 12 denied a preliminary injunction. This appeal followed.

## ARGUMENT

An injunction pending appeal is appropriate when the plaintiff shows (1) likelihood of success on the merits, (2) likelihood of irreparable harm absent relief, (3) the equities favor relief, and (4) relief is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011). If "the balance of hardships tips sharply in the plaintiff's favor," plaintiff need show only "serious questions going to the merits." *Id.* at 1134-35. Here, all four factors favor relief. We start with the merits.

## I. The Government's actions violate RFRA.

RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion" unless it satisfies strict scrutiny. 42 U.S.C. §2000bb-1(a)-(b). Under RFRA, plaintiffs must first show their "exercise of religion" has been "substantially burdened." *Navajo Nation v. USFS*, 535 F.3d 1058, 1068 (9th Cir. 2008) (en banc). Then "the burden of persuasion shifts to the government" to prove the burden is "the least restrictive means" of furthering a "compelling governmental interest." *Id.* Here, the Government has imposed a substantial burden by authorizing transfer and destruction of Plaintiffs' sacred site. And it has not even

tried to satisfy strict scrutiny.

**A. The destruction of Oak Flat imposes a substantial burden.**

Under RFRA, the term "substantial burden" must "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by [its] terms...and the Constitution." 42 U.S.C. §2000cc-3(g).

The Supreme Court has long held that both "indirect" penalties and "outright prohibitions" can be a substantial burden. *Trinity Lutheran Church of Columbia v. Comer*, 137 S. Ct. 2012, 2022 (2017) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988)). An example of an "indirect" burden is *Sherbert v. Verner*, where a state denied unemployment compensation to a Seventh-day Adventist who declined to work on her Sabbath. 374 U.S. 398, 399-401 (1963). This imposed a substantial burden because it forced her "to choose" between either "abandoning one of the precepts of her religion" or else "forfeiting benefits." *Id.* at 403-04; *see also Holt v. Hobbs*, 574 U.S. 352, 357, 361 (2015) (putting Muslim prisoner to "choice" of shaving his beard or facing discipline "easily satisfied" substantial burden test).

But in some cases, the Government is even more coercive. Instead of offering a "choice," it makes the religious exercise impossible. Where the Government *"prevents* the plaintiff from participating in a[] [religious] activity," giving the plaintiff no "degree of choice in the matter," the "coercive impact" of the government action "easily" imposes a substantial

burden. *Yellowbear v. Lampert*, 741 F.3d 48, 55-56 (10th Cir. 2014) (Gorsuch, J.) (emphasis added). Put differently, "[t]he greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice)." *Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014). Thus, as the Supreme Court recognized last year, government prevention of religious exercise through physical force—such as "*destruction of religious property*"—can constitute a "RFRA violation[]." *Tanzin v. Tanvir*, 141 S. Ct. 486, 492 (2020) (emphasis added).[10]

That is just what has happened here. The Government offers Plaintiffs no "choice"—such as allowing them to use the sacred site subject to penalties. Instead, the Government has authorized the destruction of the

---

[10] *See also*:

- *Greene v. Solano Cnty. Jail*, 513 F.3d 982, 988 (9th Cir. 2008) ("little difficulty" finding that prison's "outright" refusal to allow inmate to attend worship services was a "substantial burden");

- *Warsoldier v. Woodford*, 418 F.3d 989, 996 (9th Cir. 2005) (government conceded that "physically forc[ing an inmate] to cut his hair" would constitute a substantial burden);

- *Nance v. Miser*, 700 F.App'x 629, 631-32 (9th Cir. 2017) (prison's denial of religious oils constituted substantial burden);

- *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008) ("substantial burden" if government renders a religious exercise "effectively impracticable");

- *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004) ("substantial burden" if government "significantly inhibit[s]" "person's ability to…engage in [religious] activities") (cleaned up).

site, barring Plaintiffs from engaging in their religious practices altogether. This is an *a fortiori* case.

This Circuit has applied the same principle to religious property cases. In *International Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1066-70 (9th Cir. 2011), the Government refused to let plaintiffs build a church at the only site in the city that would accommodate their religious practices. This Court recognized that the right to "a place of worship…consistent with…theological requirements" is "at the very core of the free exercise of religion." *Id.* (citation omitted). Thus, preventing the plaintiff from building a place of worship could constitute a substantial burden. *Id.* at 1061, 1070.

The same principle applies to use of sacred sites on government-controlled land. In *Comanche Nation v. United States*, the Army planned to build a warehouse on federal land near Medicine Bluffs, a sacred site. No.CIV-08-849-D, 2008 WL 4426621, at *17 (W.D. Okla. Sept. 23, 2008). But the warehouse would have occupied "the precise location" where Native Americans stood for worship near the Bluffs—making their traditional religious practices impossible. *Id.* at *7, *17. The court held that this physical interference with plaintiffs' religious exercise "amply demonstrate[d]" a "substantial burden." *Id.*

Here, the Government admits that the mine will obliterate Oak Flat, leaving a nearly two-mile-wide, 1,100-foot-deep crater behind—destroy-

ing the sacred trees, eradicating the sacred springs, annihilating the ancient graves, and rendering Plaintiffs' religious practices impossible. As the FEIS says, this "[p]hysical" destruction of "tribal sacred sites" will be "immediate," "permanent," and "[i]rreversible." 2 FEIS at 789-90. Cultural destruction on the scale of the Bamiyan Buddhas makes this an easy case.

The district court failed to grapple with this straightforward analysis. Instead, it found no substantial burden based on three arguments, each meritless.

**First**, it tried to distinguish some of Plaintiffs' cases by saying they involved RLUIPA, not RFRA. ER.15 n.8. But that doesn't apply to *Tanzin* or *Comanche Nation*. More importantly, the Supreme Court and this Court have held that RLUIPA and RFRA impose "the same standard," *Holt*, 574 U.S. at 358; *Nance*, 700 F.App'x at 630—which makes sense, given that the operative text is identical.

**Second**, the court said that under *Navajo Nation* and *Lyng*, there is no substantial burden "[e]ven where land is physically destroyed." ER.17. But neither *Navajo Nation* nor *Lyng* involved physical destruction of a sacred site; in fact, both cases acknowledged the outcome would have been different otherwise.

In *Navajo Nation*, plaintiffs challenged the use of treated wastewater to make artificial snow for a ski area on a sacred mountain. 535 F.3d at 1062-63. In finding no substantial burden, this Court emphasized that

the snow would have *no physical impact* on the area: "no plants, springs, natural resources, shrines with religious significance, or religious ceremonies…would be physically affected[;] [n]o plants would be destroyed or stunted; no springs polluted; no places of worship made inaccessible, or liturgy modified." 535 F.3d at 1063. The plaintiffs remained free to engage in all of their prior religious practices; "the sole effect of the artificial snow is on the Plaintiffs' *subjective spiritual experience*." *Id.* (emphasis added).

Here, by contrast, "plants *would* be destroyed"; "shrines with religious significance [and] religious ceremonies…*would* be physically affected"; and a place of worship *would* be made not just "inaccessible" but utterly destroyed. The claim isn't just about "subjective spiritual experience"; it's about complete physical destruction that annihilates core Apache religious practices forever.

Similarly, in *Lyng*, the Court emphasized that the Government "could [not] have been more solicitous" toward Native American religious practices. 485 U.S. at 454. It chose a route that was "the farthest removed from contemporary spiritual sites," and "provided for one-half mile protective zones around all the religious sites." *Id.* at 454, 443. This ensured that "*[n]o sites where specific rituals take place [would] be disturbed.*" *Id.* at 454 (emphasis added).

The district court cited the *Lyng* plaintiffs' claim that the road would "virtually destroy" their "ability to practice their religion." ER.16. But

that claim was not based on physical destruction of their sacred site; it was based solely on the effect of the road on their subjective "spiritual development." *Lyng*, 485 U.S. at 451. Accordingly, the Court held that the existence of a substantial burden "cannot depend on measuring the effects of a governmental action on *a religious objector's spiritual development.*" *Id.* (emphasis added). But the Court acknowledged that "prohibiting the Indian [plaintiffs] from *visiting* [their sacred sites] would raise a different set of constitutional questions." *Id.* at 453 (emphasis added).

Here, Plaintiffs' sacred site will not just be "disturbed," *id.* at 454, but destroyed. They will not just be prevented from "visiting" their site, *id.* at 453, it will be gone, forever. And far from being maximally "solicitous" of Plaintiffs' religious practices, *id.*, the Government is being maximally destructive.[11]

**Lastly**, citing *Navajo Nation*, the district court said Plaintiffs can establish a "substantial burden" only if they face one of "two narrow situa-

---

[11] The same distinction of *Navajo Nation* and *Lyng* applies to the two other cases the district court cited. *See Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1210-11 (9th Cir. 2008) (plaintiffs could still access the sacred falls, and the relicensing increased water flow); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-1534, 2017 WL 908538, at *9 (D.D.C. 2017) (no claim that Government destroyed a sacred site—only that it rendered lake "ritually [im]pure" by allowing pipeline to be built underneath).

tions": (1) they are "deprived [of] a government benefit" due to their religious practices, or (2) they are "coerced into violating their religious beliefs" by threat of "civil or criminal 'sanction.'" ER.17. In other words, if the Government merely fenced off the site and threatened "sanctions" for trespassing, Plaintiffs would face a "substantial burden"; but if the Government obliterates the site—rendering Plaintiff's religious practices forever impossible—they do not.

That is absurd. *Navajo Nation* says that "[a]ny burden imposed on the exercise of religion *short of*" losing a government benefit or suffering a criminal or civil sanction is not a "'substantial burden' within the meaning of RFRA." 535 F.3d at 1069-70 (emphasis added). In other words, loss of benefits or threat of sanctions is the *minimum* government action needed to establish a substantial burden; it is not the *universe* of substantial-burden claims. If government action is *worse*, courts have "little difficulty" finding a substantial burden. *Greene*, 513 F.3d at 988.

Any other reading of *Navajo Nation* produces grotesque results. In *Wisconsin v. Yoder*, for example, the Supreme Court held that imposing a $5 criminal fine on Amish families for violating compulsory schooling laws was a substantial burden. ER.14 (citing 406 U.S. 205 (1972)). But under the district court's reasoning, forcibly rounding up Amish children and sending them to a public boarding school—as the Government did to Apache children in the 1800s—would not be. Stephanie Barclay & Michalyn Steele, *Rethinking Protections for Indigenous Sacred Sites*, 134

Harv. L. Rev. 1294, 1332 (2021). Indeed, as long as the Government acted without threatening a penalty or denying benefits, it could impose a variety of troubling burdens without any consequence under RFRA—such as padlocking the doors of a church to prevent worship, confiscating religious relics, performing autopsies against the religious beliefs of surviving family, or forcibly removing religious clothing. *Id.* at 1332, 1338 (collecting cases).

Finally, even accepting the lower court's misreading of *Navajo Nation*, the land transfer *does* subject Plaintiffs to penalties: for trespassing on now "private" land. *See* ER.67. And it *does* deny them a "governmental benefit": the use and enjoyment of "government" land for religious exercise. Of course, it is "government" land only because it was taken from the Apaches by force. And many would say practicing religion at an ancestral sacred site is a human right, not a government benefit. But even assuming it is "government" land (which Plaintiffs dispute) and liberty to worship there is merely a "benefit" given by an indulgent government, Plaintiffs have been deprived of it, and therefore substantially burdened.

## B. The Government has not even attempted to satisfy strict scrutiny.

Because the Government has imposed a substantial burden on Plaintiffs' religious exercise, it bears the burden of satisfying strict scrutiny. 42 U.S.C. §2000bb-1(b). But it offered no argument on this issue below

and cannot do so for the first time on appeal. *United States v. Carlson*, 900 F.2d 1346, 1349 (9th Cir. 1990).

## II. The Government's actions violate the Free Exercise Clause.

The Government's actions separately violate the Free Exercise Clause, for two reasons. First, *Employment Division v. Smith* protects from strict scrutiny only those burdens arising from a "valid and neutral law of general applicability." 494 U.S. 872, 879 (1990). But a law is not generally applicable if it applies to only one piece of land. *See, e.g., Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 92, 98 (1st Cir. 2013) (Lynch, J.) (law "designed to apply only to the Church" not generally applicable under *Smith* because its "purpose" was to address "particular properties"); *cf. Minneapolis Star & Tribune Co. v. Minn. Comm'r of Review*, 460 U.S. 575, 581 (1983) ("special tax that applies only to certain publications" was not "generally applicable"). Here, the law applies to only one piece of land and therefore is not generally applicable. *See* 16 U.S.C. §539p.

Second, the law here "targets religious conduct for distinctive treatment" and is therefore not neutral. *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534, 546 (1993). Targeting is measured by whether "the effect of [the] law in its real operation" accomplishes a "gerrymander." *Id.* at 535. Here, the statute, legislative history, and FEIS all show that the Government knew exactly what it was doing: destroying

an Apache religious site forever. *See* 16 U.S.C. §539p(c); *Resolution Copper: Hearing,* 112th Cong., 4 (2012) (Sen. McCain: "this Indian tribe is preventing them"); 1 FEIS at 40. It is immaterial that the Government claims to bear the Apaches no ill will: "Proof of hostility or discriminatory motivation may be sufficient to prove that a challenged governmental action is not neutral, but the Free Exercise Clause is not confined to actions based on animus." *Shrum v. City of Coweta*, 449 F.3d 1132, 1145 (10th Cir. 2006) (McConnell, J.) (citation omitted). That the Government may be motivated by greed or indifference rather than animus is cold comfort to the Apaches; their holy place will still be destroyed.

## III. The Government's actions violate its trust obligation to the Apaches.

Plaintiffs are also likely to prevail on their treaty claim. The Supreme Court has held that members of a Tribe may assert treaty protections against individual injury. Here, the treaty created a trust—in addition to the "general trust relationship between the United States and the Indian people"—to preserve those rights necessary to the Apaches' continued "prosperity and happiness." *United States v. Mitchell*, 463 U.S. 206, 225 (1983); ER.205. Plaintiffs may assert that trust interest here.

### A. *Herrera* and *McGirt* establish Plaintiffs' interest.

Treaty provisions protecting tribes may be asserted in support of individual interests. In *Herrera v. Wyoming*, a tribal member successfully asserted a right against prosecution based on a treaty that memorialized

"*the Tribe's* right to hunt off-reservation." 139 S. Ct. 1686, 1693 (2019) (emphasis added). Likewise, in *McGirt v. Oklahoma*, a tribal member asserted "personal interests" that turned on asserting the tribe's rights: that "the Creek Reservation persists today," and was not disestablished. 140 S. Ct. 2452, 2460-62 (2020). *See also United States v. Winans*, 198 U.S. 371, 378 (1905) (fishing right "secured to said confederated tribes and bands of Indians" protected individuals).

The district court's passing distinctions of these cases miss the individual injury. It said *Herrera* and similar cases could be ignored because "sovereign nations cannot fish or hunt," wrongly implying that only individuals enjoy such rights. ER.6 n.2. It likewise dismissed *McGirt* as relating to "individualized injury" that implicated a treaty question. ER.5 n.1. But Plaintiffs *do* assert an individualized injury: their individual religious practices, which the Government's action will make impossible. Cases antedating *Herrera* and *McGirt* are thus irrelevant.

**B. Congress did not abrogate the trust relationship.**

It is "undisputed" that there exists "a general trust relationship between the United States and the Indian people" arising from a "distinctive obligation" to those the Government has made "dependent and sometimes exploited." *Mitchell*, 463 U.S. at 225. Thus "where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists," *even where* "nothing is said expressly in the authorizing or underlying statute." *Id.* (cleaned up).

Here, the 1852 Treaty sets forth a trust and specific incident obligations: that "the government of the United States" will "designate, settle, and adjust their territorial boundaries, and pass and execute" laws governing that territory "conducive to the prosperity and happiness of said Indians." ER.205. This is exactly the sort of beneficiary language long understood to create an enforceable trust in the unique federal-tribal context. *See Mitchell*, 463 U.S. at 224-25 (requirement to consider "needs and best interests" of Indian beneficiaries in lumber decisions supported trust); *United States v. Navajo Nation*, 537 U.S. 488, 507-08 (2003) (explaining *Mitchell*). And the treaty here goes further in advocating a "liberal construction…as to secure the permanent prosperity and happiness" of the Apaches. ER.205.

The district court misconstrued Plaintiffs' trust claim as a claim for formal title. ER.7. And the district court offered no authority for the notion that the Government's failure to define territory obviated its trust responsibility to serve the Apaches' wellbeing as dependent beneficiaries. Such a reading conflicts not only with *Mitchell*, but with the ordinary "rule that…treaty rights are to be construed in favor [of], not against, tribal rights." *McGirt*, 140 S. Ct. at 2470.

The court's alternative one-paragraph determination that "Congress made clear its intent to extinguish that trust relationship by passing Section 3003" runs squarely into *Herrera* and *McGirt*. ER.11. "If Congress seeks to abrogate treaty rights, 'it must clearly express its intent to do

so.'" *Herrera*, 139 S. Ct. at 1698; *see also McGirt*, 140 S. Ct. at 2469. Section 3003 fails to acknowledge the 1852 Treaty at all.

## IV. The other injunction factors are met.

Besides likelihood of success (or a serious question) on the merits, the Court must also consider the likelihood of irreparable harm absent relief, the balance of equities, and the public interest. *All. for the Wild Rockies*, 632 F.3d at 1135. Here, each element sharply favors Apache Stronghold.

First, Plaintiffs need show only "a colorable First Amendment claim" to establish "irreparable injury." *Warsoldier*, 418 F.3d at 1001 (cleaned up). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). Here, the Government admits that the harm is irreparable. 2 FEIS at 789.

Second, the equities and the public interest weigh heavily in Plaintiffs' favor. The land transfer was proposed 15 years ago and authorized by statute 7 years ago, but the FEIS was published just last month. After so much delay, the Government cannot "hurry up" at the expense of religious exercise. By contrast, the detriment to Plaintiffs' religious exercise is immediate, permanent, and irreversible. As the district court held, it "will completely devastate the Western Apaches' spiritual lifeblood." ER.12. "It is clear that it would not be equitable or in the public's interest" to permit the Government "to violate the requirements of federal law." *Valle del Sol v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (brackets

omitted). Indeed, a slight delay protecting the *status quo* costs the Government nothing; rushing forward costs Plaintiffs everything.

## CONCLUSION

The Court should enjoin the transfer and destruction of Oak Flat pending appeal.

Respectfully submitted,

*/s/ Luke W. Goodrich*

| | |
|---|---|
| MICHAEL V. NIXON | LUKE W. GOODRICH |
| 101 SW Madison Street #9325 |   *Counsel of Record* |
| Portland, OR 97207 | MARK L. RIENZI |
| (503) 522-4257 | DIANA M. VERM |
| *michaelvnixon@yahoo.com* | JOSEPH C. DAVIS |
| | CHRISTOPHER PAGLIARELLA |
| CLIFFORD LEVENSON | DANIEL D. BENSON |
| 5119 North 19th Street | THE BECKET FUND FOR |
|   Suite K |   RELIGIOUS LIBERTY |
| Phoenix, AZ 85015 | 1919 Pennsylvania Ave. NW |
| (602) 544-1900 |   Suite 400 |
| *cliff449@hotmail.com* | Washington, DC 20006 |
| | (202) 955-0095 |
| | *lgoodrich@becketlaw.org* |

February 23, 2021

# CERTIFICATE OF COMPLIANCE

This motion complies with the requirements of Fed. R. App. P. 27(d) and Circuit Rules 27-1(1)(d) and 32-3(2) because it has 5,520 words.

This motion also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Luke W. Goodrich*
Luke W. Goodrich


Dated: February 23, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that on February 23, 2021, the foregoing emergency motion for an injunction pending appeal was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system and that a PDF copy of this motion will be emailed to opposing counsel immediately after it is filed.

*/s/ Luke W. Goodrich*
Luke W. Goodrich