# In the United States Court of Appeals for The Ninth Circuit

APACHE STRONGHOLD,

Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA, ET AL.,

Defendants-Appellees.

Appeal from the United States District Court
for the District of Arizona
Honorable Steven P. Logan
(2:21-cv-00050-PHX-SPL)

## EXCERPTS OF RECORD

MICHAEL V. NIXON
101 SW Madison Street #9325
Portland, OR 97207
(503) 522-4257
michaelvnixon@yahoo.com

CLIFFORD LEVENSON
5119 North 19th Street, Suite K
Phoenix, AZ 85015
(602) 544-1900
cliff449@hotmail.com

LUKE W. GOODRICH
  Counsel of Record
MARK L. RIENZI
DIANA M. VERM
JOSEPH C. DAVIS
CHRISTOPHER PAGLIARELLA
DANIEL D. BENSON
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
lgoodrich@becketlaw.org

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

| Doc. | Date | Document Description | Page |
|------|------|---------------------|------|
| 57 | 2/12/2021 | Order regarding Temporary Restraining Order and Preliminary Injunction | ER001 |
| | 2/03/2021 | Transcript of Hearing on Motion for Preliminary Injunction | ER024 |
| 7-1 | 1/14/2021 | Declaration of Cranston Hoffman Jr. | ER120 |
| 7-2 | 1/14/2021 | Declaration of Clifford Levenson | ER123 |
| 7-3 | 1/14/2021 | Declaration of Naelyn Pike | ER125 |
| 7-4 | 1/14/2021 | Declaration of Wendsler Nosie, Sr., Ph.D. | ER136 |
| 15-1 | 1/20/2021 | Declaration of John R. Welch, Ph.D. | ER149 |
| 18-1 | 1/21/2021 | Ex. A - Declaration of Tracy Parker | ER194 |
| 18-2 | 1/21/2021 | Ex. B - Second Proclamation of the Tonto National Forest | ER198 |
| 18-3 | 1/21/2021 | Ex. C - July 1, 1852 Treaty with the Apaches | ER202 |
| 41 | 2/03/2021 | Witness List | ER208 |
| 42 | 2/03/2021 | Exhibit List | ER209 |
| 43 | 2/03/2021 | Exhibit List | ER210 |
| 56-1 | 2/11/2021 | Ex. A - November 13, 2020 Letter to Director Fowler | ER211 |
| 56-2 | 2/11/2021 | Ex. B - February 10, 2021 Statement from International Council of Thirteen Indigenous Grandmothers | ER228 |

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Apache Stronghold, | ) | No. CV-21-00050-PHX-SPL |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| | ) | |
| United States of America, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I.     BACKGROUND

In 2014, Congress passed the National Defense Authorization Act for Fiscal Year 2015 (hereinafter "NDAA"). PL 113-291, available at https://www.congress.gov/113/plaws/publ291/PLAW-113publ291.pdf (last visited February 12, 2021). Section 3003 of the NDAA, known as the Southeast Arizona Land Exchange and Conservation Act, authorizes the exchange of land between the United States Government and two foreign mining companies (known collectively as "Resolution Copper"). 16 U.S.C.A. § 539p. The 2,422-acre parcel of Arizona land which the Government will convey to Resolution Copper, located within the Tonto National Forest, includes a sacred Apache ceremonial ground called Chi'chil Bildagoteel, known in English as "Oak Flat." (Doc. 1 at ¶ 3). Congress's stated purpose for authorizing the exchange is to "carry out mineral exploration activities under the Oak Flat Withdrawal Area." 16 U.S.C.A. § 539p(6)(i).

On January 12, 2021, Plaintiff Apache Stronghold, a nonprofit organization seeking

to prevent the colonization of Apache land, filed a Complaint in this Court seeking to prevent the land exchange. (Doc. 1 at ¶ 11). Plaintiff argues the land is held in trust by the United States for the Western Apaches by way of an 1852 Treaty. (Doc. 1 at ¶ 7). Plaintiff further alleges the mine will desecrate Oak Flat in violation of the Apaches' religious liberties and will constitute a breach of the trust. (Doc. 1 at ¶ 10).

On January 14, 2021, Plaintiff filed a Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI") seeking to prevent the United States Department of Agriculture from publishing a Final Environmental Impact Statement ("FEIS"), a document that "describes the potential environmental effects" of the mine and "includes detailed mitigation measures to minimize impacts." (Doc. 7); USDA Forest Service, *Resolution Copper Update*, available at https://www.fs.usda.gov/detail/r3/home/?cid=FSEPRD858166 (last accessed February 12, 2021). The FEIS was set for publication on the following day, January 15. (Doc. 7 at 3). Plaintiff alleges Defendants "nefariously" moved up the timeline of the FEIS publication, which was previously set for April of 2021, so the land transfer could finalize before President Biden's inauguration and without adequate time for Plaintiff to contest the sale. (Doc. 1 at ¶ 33, 36-39).

On January 14, 2021, this Court denied the Motion to the extent it sought an emergency TRO because Plaintiff could not show immediate and irreparable injury. (Doc. 13). Specifically, because Plaintiff could not show the land conveyance would occur immediately upon the publication of the FEIS, and in fact Defendants would have 60 days from the publication to complete the exchange, a TRO without notice and opportunity for response was unwarranted. (Doc. 13 at 4). The FEIS was published on January 15, 2021 as scheduled, starting the 60-day clock. *See* USDA, FINAL Environmental Impact Statement, Resolution Copper Project and Land Exchange, available at https://www.resolution mineeis.us/sites/default/files/feis/resolution-final-eis-vol-1.pdf (last visited February 12, 2021). The parties then fully briefed the Motion. (Docs. 7, 18, & 30). In their Response, the Government indicate that the land sale would not take place until 55 days after the publication of the FEIS (*i.e.*, no earlier than March 11, 2021). (Doc. 18-1 at 3-4). The Court

held a hearing on the PI on February 3, 2021. (Doc. 37).

## II.   LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Titaness Light Shop, LLC v. Sunlight Supply, Inc.*, 585 F. App'x 390, 391 (9th Cir. 2014) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). An injunction may be granted only where the movant shows that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc*., 736 F.3d 1239, 1247 (9th Cir. 2013) (quoting *Winter*, 555 U.S. at 20). However, the four factors may be evaluated on a sliding scale under this Circuit's "serious questions" test: "[a] preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1134-35 (9th Cir. 2011) (citing *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)) (internal quotations omitted).

"Likelihood of success on the merits is the most important *Winter* factor; if a movant fails to meet this threshold inquiry, the court need not consider the other factors in the absence of serious questions going to the merits." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (internal citations and quotations omitted); *see also, e.g.*, *Krieger v. Nationwide Mut. Ins. Co*., No. CV-11-1059-PHX-DGC, 2011 WL 3760876, at *1 (D. Ariz. Aug. 25, 2011) ("Because Plaintiff has failed to show a likelihood of success on the merits or the existence of serious questions, the Court will not issue a preliminary injunction. The Court need not address the other requirements for preliminary injunctive relief.").

## III.   DISCUSSION

For the following reasons, the Court finds that Plaintiff has not demonstrated a likelihood of success on, or serious questions going to, the merits of its claims.

ER003

1    **A.  Breach of Trust/Fiduciary Duties**

2         *i.  Standing*

3         Plaintiff alleges the land at issue is managed by the Government in trust for the

4    Western Apaches "as a result of official U.S. Government support of actions unilaterally

5    removing the Western Apaches from that land and forcing them to struggle to continue to

6    maintain their relationships to their land." (Doc. 1 at ¶ 51) (Count 3). Thus, Plaintiff argues

7    the conveyance to Resolution Copper is in breach of the Government's trustee and

8    fiduciary duties.

9         As an initial matter, Plaintiff Apache Stronghold lacks standing to bring the breach

10   of trust claim. The "irreducible constitutional minimum of standing consists of three

11   elements . . . [t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly

12   traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed

13   by a favorable judicial decision." *Spokeo v. Robins*, ___ U.S. ___, 136 S.Ct. 1540, 1547

14   (2016) (internal punctuation omitted) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

15   560 (1992); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167,

16   180–81 (2000)). Closely related to the constitutional standing requirement that a plaintiff

17   must suffer a personal injury is the prudential requirement that a plaintiff "cannot rest his

18   claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S.

19   490, 499 (1975). This limitation serves an important function: It prevents "the adjudication

20   of rights which those not before the Court may not wish to assert" and seeks to ensure "that

21   the most effective advocate of the rights at issue is present to champion them." *Duke Power

22   Co. v. Carolina Envtl. Study Grp., Inc*., 438 U.S. 59, 80 (1978).

23        But "since the prohibition against a party asserting the legal rights of another is

24   prudential—not constitutional—the Supreme Court may 'recognize[ ] exceptions to this

25   general rule.'" *Al–Aulaqi v. Obama*, 727 F.Supp.2d 1, 15 (D.D.C. 2010) (alteration in

26   original) (quoting *Coal. of Clergy, Laws., & Professors v. Bush*, 310 F.3d 1153, 1160 (9th

27   Cir. 2002)). For example, an organization may have standing to sue on behalf of its

28   members—but only if "its members would otherwise have standing to sue in their own

4

right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000). The issue here, then, is whether Apache Stronghold's members have standing.

Apache Stronghold argues "[t]here were no tribes in 1852 in any formal sense" and that, instead, there were "leaders representing . . . dozens of groups of Apaches." (Doc. 47 at 25). Accordingly, Plaintiff argues "the Treaty of 1852 was between the United States and the Western Apache peoples, not with any particular Tribe." (Doc. 30 at 3). By extension, then, Apache Stronghold argues its individual members have standing to assert the Western Apaches' treaty rights because they are direct descendants of Mangas Coloradus, "one of the Apache signatories to the 1852 Treaty," since they "are among the intended beneficiaries of [their] direct ancestor's agreement with the United States." (Doc. 30 at 3).[1] Plaintiff's arguments are unavailing.

"[T]he existence of a trust relationship between the United States and an Indian or Indian tribe includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting from a breach of the trust." *United States v. Mitchell*, 463 U.S. 206, 226 (1983). However, a treaty, by its very definition, "is 'essentially a contract between two sovereign nations,'" not between individuals. *Herrera v. Wyoming*, 587

---

[1] Plaintiff also argues that the recent Supreme Court case *McGirt v. Oklahoma* "made it abundantly clear that even a single individual Native American and enrolled member of a federally recognized Indian tribe can assert his treaty rights and the aboriginal land title rights of his people." (Doc. 30 at 4) (citing *McGirt v. Oklahoma*, 591 U.S.___, 140 S.Ct. 2452 (2020)); *see also* (Doc. 47 at 77) (Plaintiff's counsel stating he "didn't believe it was necessary" to join the Western Apache tribes as plaintiffs "in light of the Supreme Court's recent decision in *McGirt v. Oklahoma*, where an individual asserted and vindicated his entire tribe's treaty rights to a vast part of the state of Oklahoma"). But in *McGirt*, the plaintiff did not assert or seek to enforce tribal treaty rights. Rather, he suffered individualized injury belonging to him, not the tribe—he had been tried and convicted of a crime by the state of Oklahoma despite committing the crime on federal Indian land. The Court had to adjudicate the tribal land issue before it could adjudicate McGirt's individual rights. Here, at least as it relates to the breach of trust claim, the individual Apache Stronghold members assert no such personalized right. Accordingly, *McGirt* is not instructive here.

ER005

U.S. ___, 139 S. Ct. 1686, 1699 (2019) (citing *Washington v. Wash. State Com. Passenger Fishing Vessel Assn.*, 443 U.S. 658, 675 (1979)). Accordingly, in most situations, "[r]ights, enumerated under treaties, are reserved to communities or 'tribes' rather than to individuals." *United States v. State of Or.*, 787 F. Supp. 1557, 1566 (D. Or. 1992), *aff'd*, 29 F.3d 481 (9th Cir. 1994), *amended*, 43 F.3d 1284 (9th Cir. 1994).[2]

Where a treaty grants rights to an entire tribe rather than to individual tribal members, "[o]nly the tribe that signed the treaty, or the signatory tribe, can exercise treaty rights." *State v. Posenjak*, 127 Wash. App. 41, 49, 111 P.3d 1206, 1211 (2005) (citing *United States v. Washington*, 641 F.2d 1368, 1372 (9th Cir. 1981) ("The appellants seek to exercise treaty rights as tribes. They may do so only if they are the tribes that signed the treaties.")). And "[i]ndividual Indians do not have any treaty rights, *even if they are descendents* [sic] *of the signers of the treaty*, because a treaty is a contract between sovereigns, not individuals." *Posenjak*, 127 Wash. App. at 49 (emphasis added) (rejecting plaintiff's argument that "he has treaty rights because his great-great-great-grandfather signed the Point Elliott Treaty" since "[t]reaty rights are rights of signatory tribes, not individual Indians.") (citing *Washington*, 443 U.S. at 675).[3]

---

[2] Plaintiff urges the Court to consider cases like *United States v. Winans* in which courts have found individual Indian fishing and/or hunting rights reserved in treaties. (Doc. 51 at 3-4) (citing 198 U.S. 371). But sovereign nations cannot fish or hunt. They can, however, hold title to land. *Compare, e.g.*, *Bess v. Spitzer*, 459 F.Supp.2d 191, 196 (E.D. N.Y. 2006) (finding that "individual Indians lack standing to sue under the Treaty of Fort Albany of 1664 because that Treaty secures rights for 'tribes and bands of Indians' rather than individuals") *with, e.g.*, *United States v. State of Wash.*, 384 F. Supp. 312, 399 (W.D. Wash. 1974), *aff'd and remanded*, 520 F.2d 676 (9th Cir. 1975) (individual Indians had standing to enforce treaty rights because the treaties at issue had individually enforceable provisions guaranteeing the right of the individual Indians to fish on the land). The line of cases in which individual Indians sought to enforce their individual treaty rights to fish or hunt on aboriginal land is inapplicable here.

[3] Although decisions from the Washington Court of Appeals are not binding on this Court, the Ninth Circuit affirmed the *Posenjak* decision, holding in relevant part that "*Posenjak* also claims treaty rights as an individual, but the Point Elliott Treaty reserves rights to tribes as communities, not to American Indians as individuals." *Posenjak v. Dep't of Fish & Wildlife of State of Wash.*, 74 F. App'x 744, 746 n.2 (9th Cir. 2003).

ER006

Here, it is immaterial that Apache Stronghold's members are direct descendants of the signatories to the 1852 Treaty because the Treaty only grants tribal rights, not individual rights. Although Plaintiff argues the Apache people were not a "tribe" when the Treaty was signed, it is clear from the plain language of the Treaty that the signors bound the Western Apache people as a whole. The Treaty consistently refers to the Apaches as a "nation or tribe" in the Treaty. In the preamble, the Treaty provides that the individual Apache signatories were "acting on the part of the Apache Nation of Indians." Treaty with the Apache preamble, July 1, 1852, 10 Stat. 979. Further, Article I of the Treaty states "[s]aid *nation or tribe* of Indians *through their authorized Chiefs*" submit to U.S. jurisdiction. *Id.* at art. 1 (emphasis added). The Treaty continuously refers to the "*nation or tribe* of Indians" as the party bound to the agreement. Even reading the language of the 1852 Treaty with a liberal construction in favor of Plaintiff's members' interests as Indians, the Court cannot infer an enforceable trust duty as to any individual Indians. *See Herrera*, 139 S. Ct. at 1699 (describing canon of construction requiring courts to interpret treaties in favor of the Indians). Stated differently, Plaintiff has not shown the Treaty—or any other source of law—creates an *individual* trust duty the United States breached by authorizing the land exchange. The individual Western Apache members therefore lack standing to assert a breach of the trust.

### ii.   Merits

Even if Apache Stronghold had standing to assert the breach of trust claim, it is unlikely to succeed on the merits. Plaintiff does not point to any specific trust language regarding the land at issue, in the 1852 Treaty or elsewhere. Plaintiff has alluded to a trust duty arising from the relationship between the Government and the Indians generally. *See* (Doc. 36 at 5, n.3) (citing the general "federal-Tribe trust relationship" and "the United States' trust responsibility to all federally recognized Indian tribes and individual Indian beneficiaries"); *see also* (Doc. 47 at 86) ("The notion of a trust, to me, involves an obligation on the part of the United States to . . . act for the happiness and . . . prosperity, of the Apaches."). However, at the PI hearing, Plaintiff's expert witness Dr. John R. Welch

7

testified that he is "not aware of any sort of codified or written-down trust associated with the totality of the Western Apaches or the Eastern Apaches territory referenced in [the] 1852 Treaty." (Doc. 47 at 86).

In 1983, the United States Supreme Court held that "where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) *even though* nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection." *United States v. Mitchell*, 463 U.S. 206 (1983) (emphasis added) (citing *Navajo Tribe of Indians v. United States*, 624 F.2d 981, 987 (Ct. Cl. 1980)). In *United States v. Jicarilla*, however, the Court clarified the "general trust" relationship between the Government and the Indians. 564 U.S. 162 (2011). The Court acknowledged that a general trustee/beneficiary analogy applied to the Government's relationship with the Indians "in limited contexts." *Id.* at 173. However, the Court explained that, although "relevant statutes denominate the relationship between the Government and the Indians as a 'trust,' that trust is defined and governed by statutes rather than the common law." *Id.* Accordingly, "the [trust] analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003).

The requirement that Congress create a specific trust duty by statute derives from Congress's plenary authority over Indian affairs. "[T]he organization and management of the trust is a sovereign function subject to the plenary authority of Congress." *Id.* With this plenary power in mind, the Government "has often structured the trust relationship to pursue its own policy goals." *Jicarilla*, 546 U.S. at 176. Although the Government's trust relationship with the Indians "relat[es] to the welfare of the Indians," it remains "distinctly an interest of the United States" subject to congressional control. *Heckman v. United States*, 224 U.S. 413, 437 (1912). For example, in *Heckman*, the Government sued to prevent certain conveyance of lands by members of an Indian tribe because the conveyances violated restrictions on alienation imposed by Congress. *Id.* at 445–46. The Government

8

sued as the representative of the very Indian grantors whose conveyances it sought to cancel because, while it was formally acting as trustee, the Government was in fact asserting its own sovereign interest in the disposition of the Indian lands. *Id.* at 445. "Such a result was possible because the Government assumed a fiduciary role over the Indians not as a common-law trustee but as the governing authority enforcing statutory law." *Jicarilla*, 546 U.S. at 176.

It is undeniable that the Government "has charged itself with moral obligations of the highest responsibility and trust" to Indians, *Seminole Nation v. United States*, 316 U.S. 286, 296–97 (1942), obligations "to the fulfillment of which the national honor has been committed," *Heckman*, supra, at 437. Nonetheless, this Court must follow Supreme Court precedent. And the Supreme Court tells us that when "the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, . . . neither the Government's 'control' over [Indian land] nor common-law trust principles matter." *United States v. Navajo Nation*, 556 U.S. 287, 302 (2009). "The Government assumes Indian trust responsibilities *only* to the extent it expressly accepts those responsibilities by statute." *Jicarilla*, 546 at 177 (emphasis added).

Here, Mexico ceded the land at issue in this case to the United States via the Treaty of Guadalupe Hidalgo in 1848, four years before the 1852 Treaty was executed. *See* Map of the United States Including Western Territories (scanned map), *in* NATIONAL ARCHIVES CATALOG (1848), available at https://catalog.archives.gov/id/2127339 (last accessed February 12, 2021). At that point, the United States took legal title to the land. This Court has carefully examined the 1852 Treaty and supporting documentation in this case and finds no evidence that the United States ever forfeited that title, or that Congress intended the Government to hold the land in trust for the Western Apaches.

The 1852 Treaty certainly did not create a trust relationship. The parties merely agreed that they would, at a later date, designate territorial boundaries. *See* Treaty with the Apache art. 8, July 1, 1852, 10 Stat. 979 (stating that "the government of the United States shall at its earliest convenience designate, settle, and adjust their territorial boundaries").

9

When courts have considered such language in the past, they have consistently held it did not give rise to a trust relationship. For example, in *Robinson v. Salazar*, 838 F. Supp. 2d 1006, 1022 (E.D. Cal. 2012), the treaty at issue could "not be said to recognize Indian title" because, by its terms, it did not "designate, settle, adjust, define, or assign limits or boundaries to the Indians" and instead left "such matters to the future." *Id.* The language in the *Robinson* treaty is identical to the language in the 1852 Treaty at issue here. *Id.* (treaty stating that "the aforesaid Government shall, at its earliest convenience, designate, settle, and adjust their territorial boundaries"); *see also Uintah*, *Uintah Ute Indians v. United States*, 28 Fed. Cl. 768, 789 (1993) (finding no trust created based on identical language). And here, Plaintiff concedes that, while there were various efforts to designate those boundaries, those efforts ultimately failed. (Doc. 47 at 87).[4] The 1852 Treaty simply provides no indication that the United States is holding the land in trust for the Apaches.[5]

---

[4] Although Plaintiff provides the Court with maps indicating territorial boundaries, the maps were created decades after the signing of the Treaty by the Smithsonian Institute based on anthropologists' "best interpretation of what the United States and the parties to the 1852 treaties *would have* agreed to as [sic] the time as being Western Apache's . . . treaty territory." (Doc. 47 at 87-88) (emphasis added). They do not change the conclusion that no government document created a trust.

[5] Plaintiff also references the Western Apaches' aboriginal title to the land. *See, e.g.*, (Doc. 7 at 7) ("[T]he Federal Government . . . attempted to 'quiet' Apaches' reserved treaty rights *or aboriginal land title*"). But Apache Stronghold would run into the same standing issue if it sought to assert aboriginal title to the land. *See United States v. Dann*, 873 F.2d 1189, 1195 (9th Cir. 1989) (finding that "individual Indians do not even have standing to contest a transfer of tribal lands" because "[t]he common view of aboriginal title is that it is held by tribes"). Additionally, any aboriginal title the tribes may have had was extinguished in 1873. *See* The San Carlos Apache Tribes of Arizona, *et al*. v. United States, 21 Ind. Cl. Comm 189, 219 (June 27, 1969) (findings of fact), available at https://portal.azoah.com/oedf/documents/17-001-WQAB/SCAT-3-IndianClaimsComm'n .1969.Bates.pdf (last accessed February 12, 2021). ("May 1, 1873 marks the date on which the United States took from the Western Apache Indians their Indian title to all of their aboriginal lands."); *see also United States v. Santa Fe Pac. R. Co*., 314 U.S. 339, 347 (1941) ("The exclusive right of the United States to extinguish Indian title has never been doubted. And whether it be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, its justness is not open to inquiry in the courts.") (internal quotations omitted).

ER010

Finally, even assuming the 1852 Treaty did create a trust relationship, Congress made clear its intent to extinguish that trust relationship by passing Section 3003 of the NDAA, and this Court cannot disturb that decision. "It is well settled that an act of [C]ongress may supersede a prior treaty, and that any questions that may arise are beyond the sphere of judicial cognizance and must be met by the political department of the government." *Thomas v. Gay*, 169 U.S. 264, 271 (1898). "Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government." *Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903); *see also Cherokee Nation v. Hitchcock*, 187 U.S. 294, 308 (1902) ("The power existing in Congress to administer upon and guard the tribal property, and the power being political and administrative in its nature, the manner of its exercise is a question within the province of the legislative branch to determine, and is not one for the courts"); *Winton v. Amos*, 255 U.S. 373, 391 (1921) ("Congress has plenary authority over the Indians and all their tribal relations, and full power to legislate concerning their tribal property.")

In 1971, President Nixon authorized Oak Flat to be mined if it were first conveyed to a private entity, and in 2014, Congress authorized that conveyance. (Doc. 7 at ¶ 21). This Court's hands are tied both by Congress and by the Constitution. *Skoko v. Andrus*, 638 F.2d 1154, 1158 (9th Cir. 1979) ("The courts cannot interfere with the administration of public property as arranged by the Congress and the Executive, so long as constitutional boundaries are not transgressed by either branch."). The breach of trust claim must fail.

### B. RFRA and First Amendment Free Exercise Clause (Substantial Burden)

Although the court cannot find any codified trust, the evidence before the Court shows that the Apache peoples have been using Oak Flat as a sacred religious ceremonial ground for centuries. *See* (Doc. 47 at 41) ("[T]he stories from my great-grandmother and her people, [Oak Flat]'s where she came from. And so those stories that my grandfather who taught my mother, who taught me, I am fourth generation of, I guess prisoners of war."). The spiritual importance of Oak Flat to the Western Apaches cannot be overstated

11

and, in many ways, is difficult to put into words. The importance was immediately apparent at the PI hearing in the sometimes-tearful testimony of Apache Stronghold members Wendsler Nosie and Naelyn Pike. Nosie, co-founder and spokesperson of Apache Stronghold and a member of the San Carlos Apache Tribe, testified that the Apache people grew up with a "fear of military presence" from the U.S., which created a "suppressed way of life." (Doc. 47 at 58). The Apaches, armed with a promise from the U.S. that they "would be able to return to [their] holy and sacred places if [they] conform to being assimilated," were deeply troubled by the forced assimilation. (Doc. 47 at 58). But the Apaches did everything they could to remain connected to their spirituality, remaining "tied to the earth," and "intertwined with the earth, with the mother." (Doc. 47 at 59).

Naelyn Pike, Nosie's granddaughter, testified that, despite the turmoil and threatened ouster, the Apaches have maintained their spiritual connection to the land. Today, the Apache people believe "Usen, the Creator, has given life to the plants, to the animals, to the land, to the air, to the water." (Doc. 47 at 42). Because of this, the Apaches view Oak Flat as a "direct corridor" to the Creator's spirit. (Doc. 47 at 42). The land is also used as a sacred ceremonial ground. Many of the young Apache women have a coming of age ceremony, known as a "Sunrise Ceremony," in which each young woman will "connect her soul and her spirit to the mountain, to Oak Flat." (Doc. 47 at 42, 48). Apache individuals pray at the land and speak to their Creator through their prayers. The Apache people also utilize the land's natural resources, picking acorns, berries, cactus fruit, and yucca to use for consumption. (Doc. 47 at 42). Because the land embodies the spirit of the Creator, "without any of that, specifically those plants, because they have that same spirit, that same spirit at Oak Flat, that spirit is no longer there. And so without that spirit of Chi'Chil Bildagoteel, it is like a dead carcass." (Doc. 47 at 42). If the mining activity continues, Naelyn Pike testified, "then we are dead inside. We can't call ourselves Apaches." (Doc. 47 at 45). Quite literally, in the eyes of many Western Apache people, Resolution Copper's planned mining activity on the land will close off a portal to the Creator forever and will completely devastate the Western Apaches' spiritual lifeblood.

12

In light of the Western Apaches' deep connection to Oak Flat, Apache Stronghold alleges in this lawsuit that conveying the land to Resolution Copper "puts government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs" in violation of the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.* (Doc. 1 at ¶¶ 65, 73). Defendants "do not question the sincerity of Plaintiff's religious and historical connection to the lands at issue" and instead argue "Plaintiff has not alleged a government action that 'substantially burdens' their religious exercise." (Doc. 18 at 15, 27).[6]

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const., amend. I. In *Employment Division v. Smith*, the Supreme Court held that the Free Exercise Clause does not bar the Government from burdening the free exercise of religion with a "valid and neutral law of general applicability." 494 U.S. 872, 879 (1990). However, Congress thereafter enacted the Religious Freedom Restoration Act ("RFRA") because the *Smith* decision "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral towards religion." 42 U.S.C. § 2000bb(a)(4) (citing *Smith*, 494 U.S. at 872). Thus, the RFRA "created a cause of action for persons whose exercise of religion is substantially burdened by a government action, regardless of whether the burden results from a neutral law of general applicability." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (citing 42 U.S.C. § 2000bb-1). In other words, RFRA is limited to situations in which Congress has passed a religiously

---

[6] Defendants also argue that construction on public land cannot, as a matter of law, constitute a "substantial burden" on religion. (Doc. 18 at 30- 35). While this Court need not reach this argument, the Court notes that the Ninth Circuit has indicated it would reject this argument. In *Navajo Nation*, the Ninth Circuit assumed, without deciding, "that RFRA applies to the government's use and management of its land" and the dissenting opinion explained that "[i]t is hardly an open question whether RFRA applies to federal land. . . . There is nothing in the text of RFRA that says, or even suggests, that such a carve-out from RFRA exists. No case has ever so held, or even suggested that RFRA is inapplicable to federal land." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1095 (9th Cir. 2008) (Fletcher, J., dissenting).

ER013

neutral law of general applicability, but nonetheless must provide exemptions under that law for certain religious practices if not doing so would substantially burden them.

      The law at issue here here—Section 3003 of the NDAA—is a neutral law of general applicability. It merely authorizes the exchange of land with a mining company, and, although it will affect the Apaches' religious practices deeply, that is not its purpose.[7] In the Ninth Circuit, where courts consider a neutral law of general applicability, Free Exercise violations are found only in very limited situations. "Under RFRA, a 'substantial burden' is imposed *only when* individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*)." *Navajo Nation*, 535 F.3d at 1058 (emphasis added) (citing *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)). In *Yoder*, "the application of the compulsory school-attendance law" to the Amish plaintiffs violated the RFRA because it "affirmatively compel[led them], under the threat of criminal sanction, to perform acts undeniable at odds with fundamental tenets of their religious beliefs." *Id.* (citing *Yoder*, 406 U.S. at 218). In *Sherbert*, the plaintiff refused to work on Saturdays, her faith's day of rest, but was denied government unemployment benefits for failing to accept work without good cause. *Id.* (citing *Sherbert*, 374 U.S. at 399). The state's conditioning of unemployment benefits on the plaintiff's ability to work on Saturdays unconstitutionally forced her "to choose between following the precepts of her religion and forfeiting benefits." *Sherbert*, 374 U.S. at 404. In *Navajo Nation*, the Ninth Circuit held that "[a]ny burden imposed on the exercise of religion short of that described by *Sherbert* and *Yoder* is not a 'substantial burden' within the meaning of RFRA, and does not require the application of the compelling interest test set forth in those two cases." *Navajo Nation*, 535 F.3d at 1070.[8]

---

[7] Apache Stronghold argues the law is in fact intentionally discriminatory. *See* (Doc. 1 at 28). The Court considers that argument more thoroughly *infra* Section (III)(C).

[8] The Court is in receipt of the Amicus Brief filed in this case (Doc. 56), and has considered the arguments and cases cited therein. The Brief urges the Court to find that the limited *Yoder*/*Sherbert* scenarios merely "constitute a floor for substantial burden claims,

1    The facts of this case are similar to those of *Navajo Nation*. There, the Government

2    released plans to use artificial snow containing treated sewage water to expand the Arizona

3    Snowbowl Ski Resort, located within sacred government-owned Navajo land in northern

4    Arizona. *Id.* at 1063. The plaintiffs, the Navajo Tribe and its members, argued the use of

5    the sewage water would "spiritually contaminate the entire mountain and devalue their

6    religious exercises" in violation of the Free Exercise Clause. *Id.* The Ninth Circuit held that

7    the plaintiffs could not maintain an RFRA action because they could not show "substantial

8    burden." *Id.* The Ninth Circuit acknowledged the land's "long-standing religious and

9    cultural significance to Indian tribes." *Id.* at 1064. The Navajo people believed the

10   mountains were "a living entity," conducted religious ceremonies on them, and collected

11   plants, water, and other materials from them. *Id.* Nonetheless, bound by precedent, the

12   Ninth Circuit held "there is no showing the government has coerced the Plaintiffs to act

13   contrary to their religious beliefs under the threat of sanctions, or conditioned a

14   governmental benefit upon conduct that would violate the Plaintiffs' religious beliefs, there

15   is no 'substantial burden' on the exercise of their religion." *Id.* at 1063; *see also, e.g.*,

16   *Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207, 1213–15 (9th Cir. 2008) (rejecting

17   tribe's RFRA claim because "[t]he Tribe's arguments that the dam interferes with the

18   _____

19   not a ceiling for the type of government coercion that could lead to a finding of substantial
     burden." (Doc. 56 at 24). However, all of the cases cited in the brief interpret what is
20   required for "substantial burden" under the Religious Land Use and Institutionalized
     Persons Act ("RLUIPA"), which applies to prisoners' rights and state land use laws, not
21   the RFRA. And while it is true that each statute uses "the same standard," *see Holt v.
     Hobbs*, 135 S. Ct. 853, 860 (2015), this merely means that both statutes require the
22   government to pass a strict scrutiny analysis where the law in question imposes a
23   "substantial burden" on religious rights. What constitutes a "substantial burden," however,
     has evolved differently under each statute. *See Navajo Nation*, 535 F.3d at 1078 (expressly
24   rejecting plaintiffs' reliance on RLUIPA cases because "instead the 'substantial burden'
25   question must be answered by reference to the Supreme Court's Pre-*Smith* jurisprudence,
     including *Sherbert* and *Yoder*, that RFRA expressly adopted. Under that precedent, the
26   Plaintiffs have failed to show a 'substantial burden' on the exercise of their religion").
27   Under current Ninth Circuit RFRA precedent, Section 3003 does not impose a substantial
28   burden.

15

ability of tribal members to practice religion are irrelevant to whether the hydroelectric project either forces them to choose between practicing their religion and receiving a government benefit or coerces them into a Catch-22 situation: exercise of their religion under fear of civil or criminal sanction.").

To be sure, the *Navajo Nation* court found no substantial burden in part because there were "no plants, springs, natural resources, shrines with religious significance, or religious ceremonies that would be physically affected by the use of such artificial snow. No plants would be destroyed or stunted; no springs polluted; no places of worship made inaccessible, or liturgy modified." *Navajo Nation*, 535 F.3d at 1063. Instead, "[t]he only effect of the proposed upgrades is on the Plaintiffs' subjective, emotional religious experience." *Id.* at 1070. And this Court recognizes that the burden imposed by the mining activity in this case is much more substantive and tangible than that imposed in *Navajo Nation*—the land in this case will be all but destroyed to install a large underground mine, and Oak Flat will no longer be accessible as a place of worship. *See, e.g.*, FEIS at 84 (finding that the "[c]onstruction and operation of the mine would profoundly and permanently alter . . . Chí'chil Biłdagoteel (Oak Flat) . . . through anticipated largescale geological subsidence"); FEIS at 25 ("the proposed mine would disturb large areas of ground and potentially destroy native vegetation").

However, the Ninth Circuit also explained that the Supreme Court *Lyng* decision would have compelled it to reach the same result even if the use of artificial snow would "virtually destroy the . . . Indians' ability to practice their religion." *Navajo Nation*, 535 F.3d at 1072. In *Lyng*, the plaintiffs, Indian tribes, challenged the U.S. Forest Service's approval of plans to construct a road on a ceremonial tribal ground. *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988). The tribes alleged the construction would interfere with their free exercise of religion by disturbing a sacred area. *Id.* at 442–43. The area was an "integral and indispensable part" of the tribes' religious practices, and a Forest Service study concluded the construction "would cause serious and irreparable damage to the sacred areas." *Id.* at 442 (citations and internal quotation marks omitted).

ER016

Nonetheless, the Supreme Court rejected the Indian tribes' Free Exercise Clause challenge. The Court held that, although the government's plan would "diminish the sacredness" of the Indian land and would "interfere significantly" with their ability to practice their religion, it did not impose a "heavy enough" burden to violate their Free Exercise Clause rights. *Id.* at 447-49. Because the plaintiffs were not "coerced by the Government's action into violating their religious beliefs" nor did the "governmental action penalize religious activity by denying [the plaintiffs] an equal share of the rights, benefits, and privileges enjoyed by other citizens," they could not make out an RFRA claim. *See id.* at 449. Even where land is physically destroyed, the government action must still fall within those two narrow situations to make out a Free Exercise violation under RFRA.[9]

Apache Stronghold runs into the same problem as plaintiffs in both *Navajo Nation* and *Lyng*, each of which is still good law and binding upon this Court: Plaintiff has not been deprived a government benefit, nor has it been coerced into violating their religious beliefs. The Court does not dispute, nor can it, that the Government's mining plans on Oak Creek will have a devastating effect on the Apache people's religious practices. To that same end, the Western Apache peoples no doubt derive great "benefits" from the use of Oak Flat, at least in the common sense of the word. However, Oak Flat does not provide the type of "benefit" required under RFRA jurisprudence: It isn't something the Government gave to the Western Apaches, like unemployment benefits, and then took away because of their religion. Similarly, building a mine on the land isn't a civil or criminal "sanction" under the RFRA. *See* SANCTION, Black's Law Dictionary (11th ed.

---

[9] Plaintiff urges this Court to apply what it considers a "much more lenient test to prove substantial burden than the *Navajo Nation* test" as set forth in *Little Sisters of the Poor Saints Peter and Paul Home*, 140 S.Ct. 2367 (2020). (Doc. 30 at 12-14). Plaintiff urges the Court to instead consider whether "the government puts substantial pressure on [the Apaches] to substantially modify [their] behavior and to violate [their] beliefs." (Doc. 30 at 13). But the *Little Sisters* case did not abrogate the test set forth in *Lyng* and *Navajo Nation*—it did not reconsider the "substantial burden" standard at all. And in fact, the Ninth Circuit has applied the *Yoder/Sherbert* framework set forth in *Lyng* and *Navajo Nation* recently as July 20, 2020. *See, e.g.*, *Fazaga v. Fed. Bureau of Investigation*, 965 F.3d 1015, 1061 (9th Cir. 2020).

ER017

2019) (defining a "sanction" as a "provision that gives force to a legal imperative by either rewarding obedience or punishing disobedience"). "Just as the Ninth Circuit and other courts must follow *Lyng* until the Supreme Court instructs otherwise, this Court must do the same." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 94 (D.D.C. 2017). Accordingly, Plaintiff's RFRA and Free Exercise claims must fail.[10]

### C. First Amendment Free Exercise Clause (Intentional Discrimination)

At the PI hearing, Plaintiff indicated that "for the purposes of the preliminary injunction, the only two issues before the Court . . . are the Treaty rights and the serious question of who owns that land, and the Religious Freedom Restoration Act rights that have been violated." (Doc. 47 at 80). However, the Court notes that Plaintiff has not demonstrated a likelihood of success on, or serious questions going to, the merits of its other claims.

Plaintiff alleges Section 3003 intentionally discriminates against the Western Apaches because the Government "designed" the land conveyance "in a way that made it impossible for Plaintiffs to comply with [] their religious beliefs" and further promulgated the sale "in order to suppress the religious exercise of Plaintiff Apache Stronghold and its Western Apache members." (Doc. 1 at ¶ 84).

---

[10] Plaintiff cites *Burwell v. Hobby Lobby* for the proposition that the RFRA cannot be read "as restricting the concept of the 'exercise of religion' to those practices specifically addressed in our Pre-*Smith* decisions." 573 U.S. 682, 714 (2014); *see also* (Doc. 47 at 12) (Plaintiff arguing that the *Hobby Lobby* decision "admonished the lower courts not to narrowly follow the 'specific' holdings of its pre-Smith 'ossified' cases to limit religious believers' RFRA claims"). But in *Hobby Lobby*, the Court considered the discrete issue of whether corporate entities could be considered "persons" under the RFRA, not the type of government activity that would cause a "substantial burden." *See Hobby Lobby*, 573 U.S. at 715-716 ("[T]he results would be absurd if RFRA merely restored this Court's pre-*Smith* decisions in ossified form and did not allow a plaintiff to raise a RFRA claim unless that plaintiff fell within a category of plaintiffs one of whom had brought a free-exercise claim that this Court entertained in the years before Smith."). The *Hobby Lobby* decision did not amend the previous "substantial burden" standard set forth in *Lyng*, and it does not change that analysis here.

18

As explained above, the Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]," U.S. Const., amend. I. The right to freely exercise one's religion, however, "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Emp. Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (quoting *United States v. Lee*, 455 U.S. 252 (1982) (Stevens, J., concurring in judgment)). Under the governing standard, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

In assessing neutrality and general applicability, courts evaluate both "the text of the challenged law as well as the effect . . . in its real operation." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015) (ellipsis in original) (internal quotation marks omitted). "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Lukumi*, 508 U.S. at 533. Even if a law is facially neutral, it may nonetheless fail the neutrality test if "[t]he record . . . compels the conclusion that suppression of [a religion or religious practice] *was the object* of the ordinances." *Id*. at 534, 542 (emphasis added); *see also Selecky*, 586 F.3d at 1130 ("[I]f the *object* of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral.") (emphasis added) (quoting *Lukumi*, 508 U.S. at 533).

The Southeast Arizona Land Exchange and Conservation Act is facially neutral, and Plaintiff has provided no evidence of any discriminatory intent behind its passage. At the PI hearing, when asked what evidence of discriminatory intent Apache Stronghold has, Plaintiff's counsel could not directly answer the question. (Doc. 47 at 91-92). Instead, Plaintiff argued Apache Stronghold's members "presented repeatedly before the introduction of the National Defense Authorization Act Section 3003 rider, about the central religious importance of this place, Oak Flat" but that "there's no deliberate regard

for it" in the Act, "much less an utterance that there's a compelling government interest" to convey the land to Resolution Copper. (Doc. 47 at 92). But a lack of deliberate regard for the Apaches religious ties to the land, as disappointing and inappropriate as it may be, in no way shows that the law was passed with the objective to discriminate against them. *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("[E]ven if a neutral law has a disproportionately adverse effect . . ., it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose.").

Because Section 3003 is neutral, Plaintiff is unlikely to succeed on its Intentional Discrimination claim. A neutral law need only be "rationally related to a legitimate government purpose." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075-76 (9th Cir. 2015). The Court finds, at this juncture, that the governmental interest in supporting economic development of mineral resources is likely more than sufficient to withstand rational basis review. *See, e.g.*, *Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008) (noting the "relatively easy standard of rational basis review"). Accordingly, Plaintiff is unlikely to succeed on the Free Exercise Clause Intentional Discrimination claim.

**D. Due Process and Petition Clause Claims**

*i.   Standing*

Plaintiff's Due Process and Petition Clause claims are based only on the publication of the FEIS. (Doc. 47 at 80). As an initial matter, Plaintiff likely lacks standing to contest the publication of the FEIS because Plaintiff cannot show that a favorable decision from this Court would redress its alleged injury. As the Court stated in its Order denying the TRO, Plaintiff's alleged injury stems from the land exchange, not the FEIS publication. (Doc. 13 at 3). But the land exchange, and subsequent mining activity, can still occur even if the FEIS was not published or is somehow otherwise rescinded. *See* 16 U.S.C. § 539p(B) (stating that the FEIS "shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations" but not requiring that it be published before the exchange can occur). Although the NDAA indicates that the land exchange would occur within 60 days of the FEIS publication, Plaintiff has not shown the

20

publication was a *requirement* to proceed with the land exchange. From the plain text of the FEIS, it doesn't appear so. Accordingly, Apache Stronghold hasn't demonstrated its standing to bring the Due Process and Petition Clause claims.

     *ii.   Merits*

Even if Apache Stronghold had standing to assert the Due Process and Petition Clause claims, it is unlikely to succeed on the merits of those claims. Per Plaintiff's own timeline, on January 4, 2021, Reuters reported that the Forest Service was set to publish the FEIS on January 15, 2021. (Doc. 1 at 12). Plaintiff alleges this eleven-day window did not provide sufficient time for Plaintiff to challenge the FEIS publication and protect their "treaty rights, property rights, religious freedom rights, and other legal rights." (Doc. 1 at ¶ 44). But Plaintiff had much longer than eleven days to contest the FEIS and land exchange.

"The Due Process Clause of the Fifth Amendment prohibits the United States . . . from depriving any person of property without 'due process of law.'" *Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *see also* U.S. Const. amend. XV. "[D]ue process requires the government to provide 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Jones v. Flowers*, 547 U.S. 220, 226 (2006) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). Similarly, the First Amendment Petition Clause protects "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. However, the Petition Clause "does not impose any affirmative obligation on the government to listen, to respond to or . . . to recognize" those grievances. *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 465 (1979). Plaintiff is unlikely to succeed on the Due Process and Petition Clause claims because it received sufficient notice of, and opportunity to contest, the FEIS and the land exchange itself.

"Publication in the Federal Register is legally sufficient notice [under the Fifth Amendment] to all interested or affected persons regardless of actual knowledge or

ER021

hardship resulting from ignorance." *State of California ex rel. Lockyer v. F.E.R.C.*, 329 F.3d 700, 707 (9th Cir. 2003) (citing *Camp v. U.S. Bureau of Land Mgmt.*, 183 F.3d 1141, 1145 (9th Cir.1999)); *see also* 44 U.S.C. § 1507 (providing that Federal Register publication generally "is sufficient to give notice of the contents of the document to a person subject to or affected by it"). Here, Defendants—specifically the Forest Service—published the "Notice of intent to prepare an Environmental Impact Statement for approval of a plan of operations for the Resolution Copper Project and associated land exchange; request for comments; and notice of public scoping" on the Federal Register on March 18, 2016. *See* Federal Register, Tonto National Forest; Pinal County, AZ; Resolution Copper Project and Land Exchange Environmental Impact Statement, available at https://www.federalregister.gov/documents/2016/03/18/2016-05781/tonto-national-forest-pinal-county-az-resolution-copper-project-and-land-exchange-environmental (last visited January 26, 2021). The Forest Service received comments for two months following publication. Commentors were invited to send written comments by P.O. box or email, submit comments on USDA's Resolution Copper website, submitting verbal messages to a phone number, or submitting written or oral comments during open house held by the Forest Service on four separate dates.

Although January 4th may have been the first notice of the January 15th date of publication, it is not the first notice Plaintiff had of the land exchange. To the contrary, Apache Stronghold alleges its members "have repeatedly pleaded with Defendants directly in person and in correspondence, publicly and privately—including numerous appearances and presentation of testimony before Congress over the past several years—and participating in various federal agency and Forest Service administrative processes, asserting their Apache land rights and requesting Defendants to comply with their obligations and to recognize and honor their Apache land rights." (Doc. 1 at ¶ 11). And at the PI hearing, Wendsler Nosie presented a book, over an inch thick, detailing Apache Stronghold's "Comments on the Resolution Copper Project and Land Exchange Draft Environmental Impact Statement submitted by the Apache Stronghold." (Doc. 47 at 63).

22

Nosie further testified that he presented testimony to Congress before the passage of the NDAA "many [m]any times." (Doc. 47 at 65). In fact, Nosie "visited all of the Congressional agencies, leaders, you know, to express the concerns and positions of the tribe," testimony which was "specifically in regard to the religious importance of Oak Flat and what was being proposed in terms of a copper mine." (Doc. 47 at 65). Although Congress disagreed with, or perhaps even disregarded, Apache Stronghold's pleas, Apache Stronghold was not denied a voice—at least not under the law. Plaintiff is therefore unlikely to succeed on its Due Process or Petition Clause claims.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff has not identified a likelihood of success on, or serious questions going to, the merits of its claims. Accordingly, the Court need not address the remaining *Winter* factors. The Court cannot grant the preliminary injunction requested.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 7) is **denied**.

Dated this 12th day of February, 2021.

Honorable Steven P. Logan
United States District Judge

ER023

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Apache Stronghold,                    )
                                      )
            Plaintiff,                )    CV-21-0050-PHX-SPL
                                      )
      vs.                             )    Phoenix, Arizona
                                      )    February 3, 2021
United States of America, et al.,)         9:09 a.m.
                                      )
            Defendants.               )
_____)


      BEFORE:  THE HONORABLE STEVEN P. LOGAN, JUDGE


      REPORTER'S TRANSCRIPT OF PROCEEDINGS

   HEARING ON MOTION FOR PRELIMINARY INJUNCTION

Official Court Reporter:
Elva Cruz-Lauer, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003-2151
(602) 322-7261

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    A P P E A R A N C E S

2     For the Plaintiff:

3             Michael V. Nixon, J.D.
              By:  MICHAEL V. NIXON, ESQ.
4             101 SW Madison Street #9325
              Portland, Oregon  97207
5     and

6             Clifford Levenson Attorney at Law
              By:  CLIFFORD IRWIN LEVENSON, ESQ.
7             5119 North 19th Avenue, Suite K
              Phoenix, AZ  85015
8
      For the Defendants:
9
              United States Attorney's Office
10            Department of Justice
              Environmental and Natural Resources Section
11            By: REUBEN S. SCHIFMAN, ESQ.
                  TYLER M. ALEXANDER, ESQ.
12            150 M Street NE, Third Floor
              Washington, D.C.  20002
13

14

15

16

17

18

19

20

21

22

23

24

25

ER025

| SUMMARY OF PROCEEDINGS | | | Pg. |
|---|---|---|---|
| Opening Statement by Mr. Nixon | | | 9 |
| Opening Statement by Mr. Schifman | | | 15 |

WITNESSES

| PLAINTIFF WITNESSES: | Direct | Cross | Redirect |
|---|---|---|---|
| John R. Welch, Ph.D. | 22 | 35 | 39 |
| Naelyn Pike | 40 | | |
| Wendsler Nosie, Sr., Ph.D. | 54 | 75 | |

EXHIBITS

| PLAINTIFF'S EXHIBITS: | Pg. |
|---|---|
| No. 1    (Map 1 – Declaration of John R. Welch, Ph.D.) | 22 |
| No. 2    (Map 2 – Declaration of John R. Welch, Ph.D.) | 22 |
| No. 3          (Detail (enlarged) of Map 2) | 22 |
| No. 4       (Photos – Declaration of Naelyn Pike) | 22 |
| No. 5 (Photos – Declaration of Wendsler Noise, Sr., Ph.D.) | 22 |
| No. 6  (Images of expected Oak Flat subsidence crater | 22 |
|         from USFS/Resolution Final EIS Vol. 1) | |
| No. 6A (Image of the Barringer Arizona Meteor Crater | 22 |
|          (for comparative scale reference.) | |

| DEFENDANTS' EXHIBITS: | |
|---|---|
| No. 101    (July 1, 1852 Treaty with the Apaches) | 22 |
| No. 102    (June 27, 1969 Findings of Fact by the ICC) | 22 |
| No. 103    (September 12, 1972 Findings of Fact by ICC) | 22 |

ER026

1                   P R O C E E D I N G S

2          THE CLERK:  Civil case 21-050, Apache Stronghold

3   versus United States of America.

4          This is the time set for hearing on motion for

5   preliminary injunction.

6          Please announce your presence for the record.

7          THE COURT:  Plaintiffs, please announce.

8          MR. LEVENSON:  Good morning, Your Honor.  Clifford

9   Levenson appearing on behalf of and with plaintiffs Apache

10  Stronghold.

11         MR. NIXON:  Good morning, Your Honor.  Michael Nixon

12  also counsel for Apache Stronghold with the plaintiff.

13         THE COURT:  Good morning to both of you.  Who do you

14  have behind you there?

15         MR. LEVENSON:  Your Honor, to my right --

16         THE COURT:  Sir, I need you to pick one of the

17  microphones and speak into it, please.

18         MR. NOSIE:  Wendsler Nosie, Sr., San Carlos Apache,

19  Chiricahua.

20         MR. WELCH:  Good morning, Your Honor.  My name is John

21  Welch.

22         THE COURT:  Good morning.

23         MS. PIKE:  Good morning.  My name is Naelyn Pike,

24  Apache Stronghold.

25         THE COURT:  Good morning.

1          MR. HOFFMAN:  Morning, Your Honor.  My name is

2    Cranston Hoffman on behalf of Apache Stronghold.

3          THE COURT:  Good morning to you as well.

4          Defense.

5          MR. SCHIFMAN:  Good morning, Your Honor.  My name is

6    Ben Schifman for the federal defendants.  On the line with me

7    is Tyler Alexander, my colleague, also with the United States

8    Department of Justice, Environment and Natural Resources

9    Division, on behalf of the federal defendants.

10          THE COURT:  Counsel, good morning to you as well.  I

11   am going to ask you to move closer to your phone.  You sounded

12   really muffled.  I could barely understand what you were

13   saying.

14          So during the course of the hearing, I need you to

15   make sure you speak clearly so we have an accurate record of

16   everything that's going on.

17          Let the record reflect I have had a chance to review

18   all of the documents that are part of the case file.

19          Specifically, I have with me this morning document

20   number 29, which is the joint prehearing statement.  I have

21   document number 7, which is the motion for temporary

22   restraining order and preliminary injunction.

23          I have document number 15, which is the notice of

24   erratum.  I have document number 18, which is the opposition to

25   plaintiff's motion for a preliminary injunction.

1    I have document number 30, which is the amended reply

2  memorandum in support of the motion for a preliminary

3  injunction.  I also have document number 28, which is the

4  notice of filing of defendants' proposed findings of fact and

5  conclusions of law.

6    And I have document number 1, which is the jury trial

7  demand for violations of treaty rights; trust responsibility

8  and fiduciary duty; the Religious Freedom Restoration Act;

9  First Amendment rights to free exercise of religion, and to

10  petition and for remedy; and Fifth Amendment Right to due

11  process.

12    What I am missing is findings of fact and conclusions

13  of law from the plaintiffs.  I have never had a case where

14  plaintiffs have filed papers such as these and failed to meet a

15  simple deadline for conclusions of law -- I mean facts and

16  conclusions.  So what happened?

17    MR. NIXON:  Yes, Your Honor.  Michael Nixon for the

18  plaintiffs.  I take full responsibility for that.

19    We have approached and undertaken the task with ardor

20  given the complexities of both our complaint and motion as well

21  as the response and the need for our reply to create the basis

22  for presenting you with findings of fact, which are quite

23  detailed, and the conclusions of law, which are very focused.

24    And I had hoped to have them in on Monday as I

25  represented to the Court's deputy clerk.  Unfortunately, that

1   was not possible.  I can get them into the court before close

2   of business today.  I just have a few things to clarify and

3   make clear, and so I beg the Court's indulgence and grace on

4   that.

5           One other note, I apologize for the misspelling of

6   your name.  For someone with a middle name that begins with V,

7   I sincerely apologize for giving you a P-H.

8           THE COURT:  Mr. Levenson, just make sure, if you ever

9   have any -- I am sorry --

10          MR. NIXON:  Mr. Nixon.

11          THE COURT:  Mr. Nixon.  My apologies.  Mr. Nixon, if

12  you ever find yourself in this position again where you have

13  business with this court, deadlines mean everything.  We have

14  deadlines for a reason; just like you, everyone that I work

15  with, we have different deadlines and things we must do.

16          If every single case that I had, had a litigant who's

17  late by days, I would never be in a position to resolve

18  anything.  I don't know what's generally your practice, but you

19  need to take better steps to make sure your client is

20  represented.  And as part of that representation, is when

21  there's a deadline, you need to meet it, okay, sir?

22          MR. NIXON:  Yes, Your Honor.  And I take that very

23  seriously and fully understand, as a former judge's clerk and a

24  judge who was also a commanding general of the state Air

25  National Guard at the time, I certainly would never want to

1    disappoint, much less frustrate, any judge, and it's the first

2    time in my career that I have ever missed a deadline.  And I

3    sincerely apologize.

4         THE COURT:  Well, Mr. Nixon, I certainly appreciate

5    you placing that on the record.  And there's no need to have a

6    contempt hearing, so we will move forward.

7         Plaintiffs, do you have some type of opening statement

8    that you would like to place on the record?  If you do, I will

9    give you ten minutes to do that, and you can remain in counsel

10   chair.  Just pull the microphone close.

11        And for those of you that are listening to this

12   hearing right now, my apologies that we didn't have room to

13   have all of you sit in the courtroom.

14        Because of this pandemic situation that we are

15   currently under, it would be irresponsible for me to allow

16   attendees in this courtroom and subject you all to potentially,

17   not only contracting the virus, but spreading the virus, and

18   that goes for all parties.  Please exercise your social

19   distance as much as you can.

20        And plaintiffs, you have ten minutes.

21        MR. NIXON:  Thank you, Your Honor.  Michael Nixon for

22   plaintiff Apache Stronghold.

23        First, for the Court's benefit, and for the benefit of

24   defense counsel, there's a housekeeping note I would like to

25   mention regarding our reply memo.

1    First of all, we had a corrected amended reply memo

2    lodged with the clerk for your consideration where we cleared

3    up some typographical errors.  And so subsequent to the

4    hearing, if -- to please refer to that document, there is a non

5    sequitur on page 9, I believe.

6    THE COURT:  And Mr. Nixon, my apologies for

7    interrupting.  When was that filed?

8    MR. NIXON:  I think it was Monday.  It was late -- it

9    might have been early Tuesday morning, like maybe 5:30 in the

10   morning.  I can't remember.

11   THE COURT:  Thank you very much.  Go ahead, please.

12   MR. NIXON:  The other housekeeping note is in regards

13   to our reply memo.  We misconstrued the dissent in the Hobby

14   Lobby case and the Little Sisters of the Poor case, Your Honor,

15   and its regard of the Third Circuit's test that was used by the

16   Third Circuit in that case.

17   We had presented our reply memo as an either-or test,

18   but in fact, it is -- close reading, it's clear that it's an

19   "and" test, so it is a conjunctive first and second part test.

20   So I just wanted to clarify that, especially for defense

21   counsel's sake as well going forward.

22   So may it please the Court, RFRA does not define

23   substantial burden.  RFRA being the Religious Freedom

24   Restoration Act.

25   The Supreme Court has defined the term by stating that

ER032

1  a governmental action which substantially burdens a religious

2  exercise is one where --

3      THE COURT:  Mr. Nixon, my apologies again.  Because of

4  the mass -- the nature of the proceeding, sometimes people will

5  read really fast.  I want to make sure that I can take in

6  everything that you say.  Every word is important to me, and I

7  need to make sure that I can take notes and understand what you

8  are saying, so please slow down.

9      MR. NIXON:  Thank you, Your Honor.  And just as a

10  preview, I did not expect to take the full ten minutes.

11      So the Religious Freedom Restoration Act does not

12  define a substantial burden.  The Supreme Court has defined the

13  term by stating that a governmental action which substantially

14  burdens a religious exercise is one where, quote, the

15  noncompliance has substantial adverse practical consequences.

16      And that is from Burwell versus Hobby Lobby,

17  Incorporated, 573 U.S. at 720 to 723.

18      And the compliance causes -- and, quote, the

19  compliance causes the objecting party to violate its religious

20  beliefs as it sincerely understands them.

21      That's Hobby Lobby at 723, 726.  As cited by Little

22  Sisters of the Poor Saints Peter and Paul Home versus

23  Pennsylvania, which we will refer to as the Little Sisters or

24  Little Sisters of the Poor case.

25      And that is from Judge Alito's concurring opinion in

ER033

1   Little Sisters.

2        That case regarded applying an agency rule, but more

3   appropriate definition for this situation in our case is the

4   definition that almost mirrors the Little Sisters definition

5   that was applied in the case below in the Third Circuit.

6        That case defines substantial burdening as, quote, the

7   government puts substantial pressure on an adherent to

8   substantially modify his behavior and to violate his beliefs.

9        That's a quote from Pennsylvania versus President of

10  the U.S., which I will refer to as "Pennsylvania case,"

11  930 F.3d 543 at 572, which was reversed on other grounds in

12  Little Sisters just last year in May.

13       Now, in this proceeding, the defendants argue for a

14  much narrower definition, which requires the affected party to

15  lose a benefit or to have some threat of legal coercion occur

16  because of the person exercising her religious beliefs.

17       And they cite Navajo Nation versus U.S. Forest

18  Service, a Ninth Circuit 2008 case at 535 F.3d 1058, 1070, and

19  cert was denied by the U.S. Supreme Court in 2009 at 556, 1281.

20       As it may appear, and as the defendants argue, this

21  court would normally follow Navajo Nation's definition as

22  controlling law for determining the Religious Freedom Act

23  substantial burden test.

24       The Navajo Nation's test relies solely on the two

25  pre-Smith cases of Sherbert v. Verner and Wisconsin v. Yoder.

1    And the Smith cases are -- the Smith case is the Oregon

2    Employment Division versus Smith, which was the case decided a

3    couple years after Lyng versus Northwest Indian Cemetery

4    Protective Association.

5         However, since Navajo Nation, the Supreme Court has

6    admonished the lower courts to not narrowly follow the, quote,

7    specific, closed quote, holdings of its pre-Smith, quote,

8    ossified, closed quote, cases to limit religious believers'

9    RFRA claims.

10        And that is the Supreme Court speaking in Burwell

11   versus Hobby Lobby at page 716, in 2014.

12        The Hobby Lobby Court also notes that the amendment of

13   RFRA went further, providing that the exercise of religion

14   shall be construed in favor of a broad protection of religious

15   exercise to the maximum extent permitted by the terms of this

16   chapter, meaning the chapter of the U.S. Code where RFRA is

17   codified, and the Constitution.

18        That's Hobby Lobby at 714.

19        Also in Hobby Lobby, the Court expanded the

20   traditional class of persons protected from their religious

21   beliefs because their entities were not traditional religious

22   organizations but closely held businesses.

23        If the Court were to follow Navajo Nation here, it

24   would be perpetuating the use of the ossified cases, as the

25   Supreme Court characterized them, to narrow religious

ER035

1  protections that the Supreme Court admonished against.

2          Therefore, in this instance, with the proposed

3  conveyance of the land in question to a private business, which

4  is not required to abide by the Religious Freedom Restoration

5  Act by the terms of the law, and the ultimate planned and

6  expected total destruction of the sacred site, this Court must

7  hold that the appropriate current substantial burden protection

8  shall be the one found in that case defining substantial

9  burdening as, quote, the government put substantial pressure on

10  an adherent to substantially modify his behavior and to violate

11  his beliefs.

12          Again, that's the Pennsylvania versus President of the

13  U.S. case, 930 F.3d 543 at 572, the Third Circuit's 2019

14  opinion that was reversed on other grounds.  And we can refer

15  to this as the Pennsylvania slash -- or Pennsylvania Little

16  Sisters of the Poor test.

17          That is, the government action would significantly

18  burden the plaintiff's religious belief, if that conduct put

19  substantial pressure on the religious follower to substantially

20  modify their behavior and to violate their beliefs.

21          In addition, the Ninth Circuit case of Mockaitis

22  versus Harcleroad at 104 F.3d 1522, in the Ninth Circuit, 1996,

23  which was overturned on other grounds by the City of Boerne v.

24  Flores, 521 U.S. 507, is relevant here.

25          There a Catholic priest was recorded in one of his

1  sacraments he performed with a prisoner by a jailer.  While

2  Mockaitis was a First Amendment free exercise of religion case,

3  it further justifies the Pennsylvania Little Sisters of the

4  Poor test.

5        The Mockaitis holding indicates that the harm was to a

6  higher church official rather than the lay practitioner or

7  priest, and that there was no benefit lost or coercion applied

8  to that official; rather it was an affront on the religious

9  practice itself.

10        This further supports a finding of a definition that

11  is greater than the passé Navajo Nation definition.

12        So under RFRA, if a prima facie case is shown, the

13  burden shifts to the government to demonstrate that the

14  application of the burden to the person is one in furtherance

15  of a compelling government interest; and two, is the least

16  restrictive means of furthering that government -- compelling

17  governmental interest.  The government must satisfy this burden

18  by a preponderance of the evidence.

19        That's from the case Gonzales v. O Centro, and -- I

20  don't have the full cite here in my notes.  Gonzales v. O

21  Centro at 429.

22        Plaintiff's RFRA allegations emphasizes that Oak Flat

23  has historically been the focus of sacred Apache traditional

24  religious practices and it continues to have religious

25  significance at the present time.

1    More specifically, plaintiff contends that the entire

2 National Historic District of Chi'Chil Bildagoteel, Oak Flat as

3 it is known, has traditionally been an area in which religious

4 practitioners gather to pray, gather plans for use in healing

5 and religious ceremonies, and engage in sacred observances.

6    Defendants argue that the land exchange, especially as

7 to those lands that are within the historic district, does not

8 substantially burden plaintiff's members ability to exercise

9 their religious beliefs.

10    They try to base their argument on the fact that

11 plaintiff's members will not lose a benefit or be coerced by a

12 threat of a civil or a criminal penalty in any form.

13    Again, the passé Navajo Nation list.  That is a

14 terribly cynical and twisted view today.

15    The real and truthful view is this, it is indisputable

16 that a two-mile-wide, 1,000-foot-deep crater of Oak Flat and

17 its holy ground is the loss of a benefit, a benefit that is of

18 and runs with the land since time immemorial and that is

19 reserved and preserved to the Apaches by the 1852 Treaty of

20 Sante Fe.  Thank you, Your Honor.

21    THE COURT:  Mr. Nixon, thank you very much.

22    Mr. Schifman, do you want to the utilize your 10

23 minutes?

24    MR. SCHIFMAN:  Yes.  This is Ben Schifman for the

25 federal defendants.  I will speak shortly in response.  Your

1    Honor, plaintiff has not established entitlement to the

2    extraordinary injunctive relief that it seeks.

3         The land exchange that plaintiff challenges was

4    approved by Congress in 2014 and was found by Congress to be in

5    the public interest, placing thousands of acres of land into

6    conservation and federal stewardship, but also generating

7    valuable minerals jobs and economic development in Arizona.

8         Plaintiff waited more than six years after the law was

9    passed to bring suit, and yet any mining on the property is

10   still years away.  But most significantly, plaintiff has not

11   demonstrated a chance of success on the merits of their legal

12   claim.

13        Each of these claims fail on the merits, and

14   plaintiffs also lack standing to pursue several of their

15   claims.  This is fatal to plaintiff's request for injunctive

16   relief.

17        Since plaintiff has limited their discussion on the

18   merits to the RFRA claim, I will also discuss that, unless Your

19   Honor has any questions as to the other claims.

20        So turning to the Religious Freedom Restoration Act

21   claim, in order to prevail on this claim, plaintiffs must show

22   that the government has, quote, substantially burdened their

23   religious exercise.

24        However, the Supreme Court has held in the Lyng case,

25   L-Y-N-G, that plaintiff has not discussed today, that the

UNITED STATES DISTRICT COURT

1    government's management of its own property cannot as a matter

2    of law constitute a substantial burden of plaintiff's religious

3    exercise, which is not the case, Your Honor.

4          Every action the government took with its own

5    property, so that could be using -- doing a land exchange, as

6    is the case here, or it could be a timber sale, or it could be

7    anything with even a government federal building, anything

8    could be subject to suit by an unlimited parade of religious

9    objectors.

10         THE COURT:  Just one -- Mr. Schifman, just one moment.

11         Mr. Nixon, I couldn't help but notice that you are up

12   and down and walking out of the courtroom and walking back in

13   during an open session of court.  Are you having some medical

14   episode?  Are you okay?

15         MR. NIXON:  I was thirsty, Your Honor.  We don't have

16   any water at the table.

17         THE COURT:  Okay.  I am sure you received information

18   that you could have brought some bottled water into the

19   courtroom.

20         But go ahead, Mr. Schifman.

21         MR. SCHIFMAN:  Thank you, Your Honor.  Ben Schifman

22   for the federal defendants, continuing here.

23         So, Your Honor, the Supreme Court's Lyng decision has

24   been repeatedly affirmed, and that's a decision concerning the

25   federal government's management of its own property not being a

1    substantial burden to anyone else's religious exercise.  That

2    has been repeatedly affirmed.  It has been reaffirmed in

3    circuits throughout the country, and, of course, in this

4    circuit as well.

5            For instance, the Snoqualmie Indian Tribe versus

6    Federal Energy Regulatory Commission case that is discussed in

7    our briefs.  That's a prime example.

8            In that case, the plaintiffs allege that a proposed

9    hydroelectric dam would deny them access to waterfalls

10   necessary for their religious experience.  That citation,

11   excuse me, for that case is 545 F.3d, and I would like to cite

12   from page 1213.

13           Ninth Circuit found that, quote, the tribe's arguments

14   that the dam interferes with the ability of tribal members to

15   practice religion are irrelevant to whether the hydroelectric

16   project forces them to choose between practicing their religion

17   and receiving the government benefit, or coerces them into a

18   catch-22 situation of exercising their religion under fear of

19   civil or criminal sanctions, end quote.

20           And that, Your Honor, is the applicable standard

21   affirmed in that Ninth Circuit case I just discussed, and in

22   Navajo Nation that plaintiff's counsel referred to.

23           Plaintiffs must identify either a forced choice

24   between practicing religion or receiving a government benefit,

25   or between practicing religion and facing a criminal sanction.

1  Plaintiff has alleged neither, and this is fatal to the

2  plaintiff's RFRA claim.

3          Now, plaintiff discussed the Hobby Lobby versus

4  Burwell decision, but frankly, Your Honor, plaintiff is

5  seriously misreading the case.

6          Hobby Lobby did not concern the definition of

7  substantial burden.  It certainly didn't concern the

8  government's management of its own national forest land or

9  other resources, and it didn't explicitly or even implicitly

10 overturn Lyng.

11         Really, Hobby Lobby -- the portions of Hobby Lobby

12 that plaintiff is discussing concerned a question whether a

13 corporation, Hobby Lobby, could sue under RFRA, and the Court

14 rejected as, quote, absurd, the argument that just because no

15 earlier Supreme Court case had squarely held that a for-profit

16 corporation has free-exercise rights, that RFRA does not confer

17 that protection.

18         But that argument has no bearing on this case, and the

19 court's larger opinion does indeed fit squarely within the

20 framework that I just discussed above from Navajo Nation and

21 from the Supreme Court's earlier decisions.

22         So -- and to be clear about how it falls into the

23 framework, that is how the Hobby Lobby case concerned an

24 entity, the Hobby Lobby company having to choose between its

25 religious exercise and receiving a benefit or facing a penalty.

ER042

1    In Hobby Lobby, the contraceptive mandate that was at issue in

2    that case forced the company to pay what the Court called an

3    enormous sum of money, as much as $475 million per year if they

4    essentially did as they thought was complying with their

5    religious exercise.

6         So that's very clearly the kind of sanction that fits

7    squarely within the RFRA case law.

8         Plaintiffs are not being fined.  They are not being

9    criminally sanctioned.  They are not being forced to choose

10   between receiving a benefit and practicing their religion.

11        Indeed, this case is squarely in line with Navajo,

12   Lyng, Snoqualmie, and others that holds that the government's

13   management of its own property cannot be a substantial burden

14   on plaintiff's religious exercise.

15        So I will end my discussion of the merits there,

16   unless Your Honor has questions, and turn briefly to the other

17   two factors.

18        So in order to prevail on the extraordinary injunctive

19   relief that plaintiffs seek, they not only have to demonstrate

20   a likelihood of success on the merits, but they also have to

21   show that the harm that they allege is imminent and

22   irreparable.

23        And we've indicated that the mining activity on the

24   land is not going to occur for some six years, so that's

25   clearly not imminent harm.  And additionally, plaintiff's

1    delaying and waiting some years since the law was passed also

2    indicates that perhaps this isn't as imminent as they are now

3    claiming.

4           Turning very briefly now to the equities.

5           THE COURT:  Counsel.  Counsel.  Mr. Schifman, you have

6    30 seconds.  Go ahead.

7           MR. SCHIFMAN:  Okay.  Yes.  So just one quick

8    statement on the equities, which is that Congress found when it

9    passed the law that led to this, you know, land exchange in

10   2014 that it would be in the public interest, and I think

11   that's a good indication that it is indeed in the public

12   interest.  So I will conclude there and urge Your Honor to deny

13   the injunctive relief that plaintiffs request.  Thank you.

14          THE COURT:  Mr. Schifman, I have seven exhibits from

15   the plaintiffs -- actually, six and a 6A; do you have any

16   objections to the Court receiving those?

17          MR. SCHIFMAN:  Yes, Your Honor.  We've noted our

18   objections in the prehearing statement.  I can repeat those

19   now.  Obviously it might be easier to do it as plaintiffs

20   introduce or talk about each exhibit, but I can briefly state

21   our objections now if you'd like.

22          THE COURT:  No, I've read through your papers.  I am

23   very, very familiar.  I just wanted to place that on the live

24   record that we have right now.  Your objections will be

25   overruled.  Plaintiff Exhibits 1 through 6 and 6A will be

1    received.

2              (Plaintiff's Exhibits 1 through 6A are received.)

3              THE COURT:  Mr. Nixon, do you have any objections to

4    the defendants' three exhibits?

5              MR. NIXON:  No, Your Honor.

6              THE COURT:  They are all received as well.

7              (Defendants' Exhibits 101 through 103 are received.)

8              THE COURT:  Mr. Nixon, please call your first witness.

9              MR. NIXON:  Mr. Levenson will be conducting the

10   witness examination, Your Honor.

11             THE COURT:  Thank you very much.

12             Mr. Levenson, go ahead, please, sir.

13             MR. LEVENSON:  Thank you, Your Honor.  We would call

14   Dr. John Welch.

15             THE COURT:  Dr. Welch, what I am going to ask you to

16   do, this gentleman that just stood up, just sit in his chair.

17   Make sure you have a microphone.  Please stand and raise your

18   right hand to be sworn.

19             **JOHN WELCH, Ph.D., PLAINTIFF'S WITNESS, SWORN**

20             THE COURT:  Dr. Welch, go ahead and have a seat there.

21             Mr. Levenson, you may begin direct examination.

22             MR. LEVENSON:  Thank you, Your Honor.

23                          DIRECT EXAMINATION

24   BY MR. LEVENSON:

25   Q.  Good morning, Dr. Welch.

ER045

1    A.   Good morning.

2    Q.   First of all, would you describe your background in

3    addressing the natural human history, geography, and management

4    of the American Southwest?

5    A.   Yes.  I am an anthropologist and an archeologist with

6    lifelong interest in Apache peoples and especially Apache

7    people and land in Arizona.

8    Q.   All right.  Are you a registered professional archeologist?

9    A.   I am.

10   Q.   All right.  Do you have degrees in anthropology?

11   A.   I do.  Both of my advanced degrees are anthropology from

12   the University of Arizona, master's degree and a Ph.D.

13   Q.   Thank you, sir.

14        And could you describe briefly your employment with

15   Western Apache tribes?

16   A.   I have worked for and with the Western Apache tribes in

17   Arizona, principally the San Carlos Apache tribe and the White

18   Mountain Apache tribe, since 1984.

19        When I was an employee of the University of Arizona, I

20   helped run archeological field schools on White Mountain Apache

21   tribe lands.  From there, I began a consulting career working

22   in various parts of central and east central Arizona in the

23   mountains to the east of Phoenix as a consultant for a couple

24   of different companies.

25        And then went to work for the federal government

ER046

1    itself, first for the Bureau of Land Management in Safford,

2    Arizona, and then for the Bureau of Indian Affairs in White

3    River, Arizona, at which time I was also the historic

4    preservation officer from 1996 to 2005 for the White Mountain

5    Apache tribe.

6          I have continued since that time working closely with

7    especially the White Mountain Apache tribe, but also the San

8    Carlos Apache tribe in various capacities, including helping to

9    run a nonprofit organization called the Fort Apache Heritage

10   Foundation that's a nonprofit owned by the White Mountain

11   Apache tribe.

12   Q.  Thank you, Doctor.

13         During the course of your employment and study, have

14   you become familiar with the 1852 Treaty of Santa Fe?

15   A.  I have.

16   Q.  Okay.  Does that -- who are the parties to that Treaty?

17   A.  So the parties really just on the part of the United

18   States, both civilian authority and military authority signed

19   that Treaty, which was then ratified and duly proclaimed by

20   President Pierce.

21         On the Apache side there's six signatories.  Five

22   are -- that signed the Treaty on the 1st of July in 1852 in

23   Santa Fe, and then Mangas Coloradus, the principal leader of

24   the Western Apaches signed it on behalf of the Western Apaches

25   at Acoma Pueblo on the 11th of July in 1852.

1    Q.  So the parties are in fact the Apache people rather than

2    any particular tribe; is that correct?

3    A.  That's correct.  There were no tribes in 1852 in any formal

4    sense.  There were coalitions of leaders and Magnas ascended to

5    replace predominant and transcendent importance in terms of the

6    span of his authority and allegiance, I guess I'll say, on the

7    part of his followers to the place where he could sign on

8    behalf of all of the Apaches -- by "Western Apaches," in this

9    context, Your Honor, I am referencing the Apaches who live to

10   the west side of the Rio Grande.  The western bands, and so,

11   yes, no tribes.  Yes, leaders representing dozens of groups of

12   tribes -- dozens of groups of Apaches, excuse me.

13   Q.  And did this Treaty concern land including the land we are

14   discussing here today, the Oak Flat area?

15   A.  It is ambiguous in the Treaty.

16        Your Honor, in fact, the Treaty makes multiple

17   references, as you are probably aware, to "treaty territory"

18   Apache territory, and Apache territories, referencing the fact

19   there's different Apache groups with different territory.

20        The territory of the Western Apaches certainly

21   extended to include the Pinal Mountains, the entirety of the

22   Tonto National Forest, and areas even to the west of that.

23        So the short answer is yes.  That territory is

24   included in the provisions of the Treaty, but it's not -- it

25   doesn't specifically say, yes, you know, the Pinal Mountains or

1    the area including Oak Flat is part of this Treaty.

2    Q.  But just to clarify, the Treaty land -- the lands that the

3    Treaty addresses is a larger area than Oak Flat?  Oak Flat is

4    contained within the lands addressed in the Treaty?

5    A.  That's absolutely true, from my point of view, yes.

6    Q.  You heard the lawyer for the United States refer to Oak

7    Flat as, and I quote, its own property.

8            Does the Treaty of 1852, or any other document of

9    which you are aware, make Oak Flat the property of the United

10   States?

11   A.  It does not.  The Treaty recognizes jurisdiction of the

12   United States in Apache Treaty Territory.  It certainly does

13   not recognize anything like ownership of Apache territory.

14   Q.  All right.  So the United States management of the area

15   including Oak Flat, by management of the Tonto National Forest,

16   is consistent with the trust responsibility of the United

17   States for Apache land; is that correct?

18   A.  I would say that that's true, yes -- yes.

19   Q.  Okay.  There has been some discussion of proceedings before

20   the Indian Claims Commission having some effect on the issues

21   before the Court today.

22           Are you familiar with those discussions?

23   A.  I am.

24   Q.  Okay.  What -- have you reviewed the Indian Claims

25   Commission actions in this regard?

ER049

1   A.  I have reviewed some of them.  It is a long, complex

2   litigious history of documents in matters pertaining to Docket

3   22-D that the Apache tribes brought to the Indian Claims

4   Commission.  I read as much as I can put my mitts on, but you

5   can't find it easily.

6           THE COURT:  Mr. Levenson, my apologies for

7   interrupting you, sir.

8           Dr. Welch, I want to point your attention to Defense

9   Exhibit Number 1, which is the Treaty.  I am sure the lawyers

10  have a copy of that in front of you.  And I want you to read

11  Article 9.

12          Do you all have that?  Defense Exhibit 1?

13          THE WITNESS:  I had a copy on my computer.  I just put

14  my computer down.  So I can take a minute and call it back up.

15          THE COURT:  The lawyers don't have copy of Defense

16  Exhibit 1?

17          MR. NIXON:  Not any quicker than he can get it for

18  you, Your Honor.

19          THE COURT:  All right.  Thank you very much,

20  Mr. Nixon.

21          Dr. Welch, take your time.

22          And again, Mr. Levenson, my apologies for interrupting

23  you.

24          MR. LEVENSON:  Thank you, Your Honor.  It is quite all

25  right.

ER050

1          THE WITNESS:  Okay.  I'm looking for the Treaty, and

2     you would like me to read Article 1; is that correct, sir?

3          THE COURT:  No, Doctor, Article 9, if you would,

4     please.

5          THE WITNESS:  Article 9, thank you.

6          THE COURT:  And if you would, after you read that,

7     tell me what in your professional opinion you believe that

8     means.

9          THE WITNESS:  Okay.  Article 9:  Relying confidently

10    upon the justice and the liberality of the aforesaid

11    government, and anxious to remove every possible cause that

12    might disturb their peace and quiet, it is agreed by the

13    aforesaid Apaches that the Government of the United States

14    shall at its earliest convenience designate, settle, and adjust

15    their territorial boundaries, and pass and execute in their

16    territory such laws as may be deemed conducive to the

17    prosperity and happiness of said Indians.

18          That's the end of Article 9.

19          My interpretation of this article, thank you for

20    asking, Your Honor, is that the parties agreed and the Apaches

21    were in fact petitioning for the Government of the United

22    States of America to set aside and secure their territorial

23    boundaries for them in order to disable any further incursions,

24    unwanted incursions, into their vast territory.

25          Apache leaders were famous for their broad cognizance

ER051

1    of the comings and goings within their lands, and they were

2    disturbed to find -- well, let me back up for one minute.

3         They were at first very encouraged to find the United

4    States as an ally in their long-standing conflict against Spain

5    and then Mexico.

6         Beginning in 1840s and -- they saw the United States

7    as -- incoming as an ally to assist them in securing their

8    territory from further assaults by Spain and Mexico.  And so

9    the Apaches were very glad to sit and treat with the United

10   States of America.

11        Beginning shortly after the Treaty of Guadalupe

12   Hidalgo in 1848, however, the Apaches had misgivings because

13   the original arrangement between the Apaches and the United

14   States deteriorated on the basis of incoming miners and people

15   doing things in their territory that they did not condone or

16   approve of.

17        And the Apaches were also cognizant of the fact that

18   military forces of the United States would very often support

19   those uncondoned activities.  They wanted to bring that to a

20   close.  And they were appealing to the federal government to

21   recognize these territories, to make it so that they could not

22   be violated any further.

23        The United States agreed to do that, and, in fact, in

24   the years immediately following this Treaty, the United States

25   set out precisely to do that and initiated through the next

ER052

1    governor of the territory of New Mexico, a fellow named

2    David Meriwether, a variety of negotiations with multiple

3    tribes, both eastern Apaches on the east side of the Rio Grande

4    and western Apaches, to do just that, to designate and settle

5    the territories.

6            What happened, however, was that, quote, unquote,

7    settlers, nonIndians, intervened in these matters.  They

8    disturbed the proceedings and oftentimes even -- well,

9    oftentimes -- in a number of instances actually sent armed

10   groups in order to evict Apaches from the lands that had been

11   promised to them while these treaties were on their way through

12   the administrative system of the executive branch towards the

13   legislative branch.

14           In part because of those interventions by citizens of

15   the United States, or people in the United States, those

16   treaties were never ratified.  The Senate refused to adopt and

17   enact those treaties, leaving the Apaches confused and bereft

18   frankly.

19           They had pressure from the civilian and the military

20   authorities on them to settle down and get on their

21   territories.  And when they tried to do that, they were

22   prevented from doing so.  This led to what gets called the

23   Apache wars.  Mangas Coloradus was murdered, you know,

24   basically while in care of the United States Army in 1863.

25           Later that same year -- well, no, excuse me -- not too

ER053

1   different of a time in that same year, another principal

2   leader, Cochise, was also kept hostage and mistreated by the

3   federal government, even as he was effectively enacting this

4   Treaty, abiding by this Treaty, by protecting the Butterfield

5   Stagecoach line across southern Arizona and southern New

6   Mexico.

7           This was perceived as being duplicitous and contrary

8   and made the Apache people lose a great deal -- many Apaches,

9   not all of them, lose a great deal of confidence in the United

10  States.

11          THE COURT:  Doctor, I really appreciate that.  Thank

12  you.

13          Mr. Levenson, please continue, sir.

14          MR. LEVENSON:  Thank you.

15                      DIRECT EXAMINATION

16  BY MR. LEVENSON:

17  Q.  Dr. Welch, your review of Indian Claims Commission

18  proceedings, does that lead you to conclude that any of those

19  proceedings led to a diminished -- I'm sorry -- diminishment of

20  the Apache people's reserve treaty rights?

21  A.  No.

22  Q.  Thank you, Doctor.  I am going to move on to a discussion

23  of the role of Oak Flat in Western Apache religious practice.

24          You are familiar with as much as a non-Apache can be

25  with Western Apache religious practices?

ER054

1    A.  I have listened diligently as an outsider, that's correct,

2    and have done my best to study it as an outsider.

3    Q.  All right.  Is it your opinion that Apache religious

4    practice requires that Oak Flat remain intact?

5    A.  It is.

6    Q.  And by "intact," can you please describe what that means,

7    in terms of, you know, do they need access or does the land

8    have to remain undeveloped?

9    A.  I will with respectful deference to Dr. Nosie offer very

10   brief comment on this, and that is that Apache religion is

11   centered in many ways on the fundamental precept of the

12   importance of the integrity of the natural world.  That the

13   Creator put things the way they are for a number of very good

14   reasons, and all of those things must continue to unfold with

15   respectful deference, and only the most kind of benign type of

16   intervention by human beings.  And that it's only through

17   showing that respect to the natural world and all of its

18   elements, that creation and all of the powers of those elements

19   will continue to bestow its blessings on human beings, and that

20   means that religious practice does not, with very few

21   exceptions, remove anything without a special petition.  It

22   does not add anything without very due consideration.  And so

23   any form of industrial intrusion, and certainly anything on the

24   scale of a mine affecting a place of outstanding importance in

25   Apache religion, is so dangerous it is hard to even describe --

ER055

1    to everybody, not just Apaches, to all of us.

2    Q.  Do the actions that Apache Stronghold seeks to enjoin taken

3    by the defendants, do those actions impose a substantial burden

4    on Apache religious practice at Oak Flat?

5    A.  I would think that they --

6         MR. SCHIFMAN:  This is Ben Schifman for the federal

7    defendants.  Sorry.  I would like to object to that question on

8    the grounds of relevance.

9         THE COURT:  On the grounds of what, Mr. Schifman?

10        MR. SCHIFMAN:  On the grounds of relevance, Your

11   Honor.  I believe he is offering a legal conclusion as to the

12   definition of substantial burden, and so I am objecting on

13   that.

14        THE COURT:  That's overruled.

15        You may answer.

16        THE WITNESS:  Sorry, can you repeat?  I am having such

17   a hard time hearing the defense, Your Honor, I get distracted.

18        MR. LEVENSON:  Thank you, Doctor.  I will try to

19   rephrase the question.

20   BY MR. LEVENSON:

21   Q.  In your opinion, are the actions that the plaintiff's seek

22   to enjoin in this case, those actions by the U.S. Government,

23   do those constitute a burden on the religious practices of the

24   Western Apache?

25   A.  The religious practices of the Western Apache people, and

ER056

1  especially the Western Apache people who make use of, pray to

2  and through Oak Flat, have already been disturbed and

3  encumbered by the United States in just preparing for and doing

4  the initial drilling for prospecting for this ore body, and

5  certainly the unfolding of the mine involves an incalculable

6  burden, a huge burden, yes.

7  Q.  Doctor, something you said struck me.  You said, "Religious

8  practices at and through Oak Flat."  Can you expand on the

9  particular nature of place in Western Apache religious

10  practices?

11  A.  Many, many Apache prayers and spiritual singing, other

12  types, whether they are enunciated or said silently, recited in

13  individuals' heads, are petitions to specific places and the

14  powers that are associated with and sort of dwell within those

15  places.

16       Those powers are not meant to be disturbed.  They are

17  meant to be deferred to and given utmost respect and left just

18  the way they are.  And so it's important for Apaches to be able

19  to know that those places are being respected and treated

20  properly so that the powers that are there will continue to

21  bestow blessings and allow the world to be good.

22  Q.  Thank you, Doctor.

23       MR. LEVENSON:  That's all the questions I have at this

24  time.  Thank you, Your Honor.

25       THE COURT:  You are very welcome.

**ER057**

1              Mr. Schifman, do you have any questions for Dr. Welch?

2              MR. SCHIFMAN:  Yes, Your Honor, a few short questions.

3              THE COURT:  And Mr. Schifman, we are having difficulty

4      here in court hearing you, so I am going to ask you to speak a

5      little slower.

6              MR. SCHIFMAN:  Okay.  I apologize, Your Honor.  I am

7      speaking into my cell phone.  It's not on speaker or anything

8      of that nature, and I will just send a thought to the Verizon

9      infrastructure and hope that it carries my voice as clearly as

10     possible, and I will speak slowly.

11                           CROSS-EXAMINATION

12     BY MR. SCHIFMAN:

13     Q.  Dr. Welch, I just want to ask you a few quick questions

14     here.  The first is just to confirm that you are not trained as

15     an attorney; is that correct?

16     A.  That's correct.

17     Q.  And you did not attend law school?

18     A.  I did not.

19     Q.  And so you didn't receive training in legal research; is

20     that correct?

21     A.  I am not a trained legal researcher.

22     Q.  You are not trained to provide legal interpretation of

23     statutes passed by Congress; is that correct?

24     A.  I am not trained to provide that interpretation.

25     Q.  You are not trained to provide legal interpretation of

ER058

1    treaties passed by Congress and signed by the President; is

2    that correct?

3    A.  Yes.  I have not been to law school.

4    Q.  And you are also not trained to adjudicate property

5    disputes; is that correct?

6    A.  I am sorry, I think you said, I am not trained to review

7    property disputes?

8    Q.  I said, "adjudicate" property disputes.

9            THE WITNESS:  I'm sorry, Your Honor, I can't hear.

10           THE COURT:  He said, "adjudicate" property disputes.

11           THE WITNESS:  Oh, yes.  No, I am not a judge.

12   BY MR. SCHIFMAN:

13   Q.  Thank you.  And I am sorry I am not coming through as

14   clearly as possible.  I will continue to speak slowly.

15           Doctor, I would like you to direct your attention to

16   the -- actually, let me back up.

17           So earlier you talked about the Indian Claims

18   Commission and Docket 22-D; is that correct?

19   A.  Yes -- well, I referenced Docket 22 and Docket 22-D, of

20   course, is the docket for the Western Apache -- primarily the

21   San Carlos and White Mountain Apache.

22   Q.  Okay, thank you.

23           Now I would like to direct your attention to

24   defendants' second exhibit.  I am not sure you have that in

25   front of you or if you -- so could you let me know when you

ER059

1    have that in front of you.

2    A.   I am sorry.  Could you -- I am not sure I have them

3    numbered properly.  Is this the affidavit of Tracy Parker?  Oh,

4    no, I think it's the map.  Is that it?

5          THE COURT:  Mr. Schifman, just one moment, please.  I

6    have an extra copy of the defendants' exhibits.

7          Mr. Levenson, if you will walk up here and take this

8    binder, I am sure that will hip the plaintiffs.

9          MR. SCHIFMAN:  Thank you, Your Honor.

10         THE COURT:  You are very welcome.

11         THE WITNESS:  I am looking for Defense Exhibit Number

12   2; is that correct, Your Honor?

13         THE COURT:  Yes, the second one in the binder.  It's

14   most likely labeled as "102," I believe.

15         THE WITNESS:  Uh-huh.  Okay.

16         So just to confirm, Mr. Schifman, we are talking about

17   the findings of fact for Docket 22-D dated or decided June 22nd

18   1969?

19   BY MR. SCHIFMAN:

20   Q.   Yes, that's correct.

21   A.   Okay.

22   Q.   So -- this is more confirmation, but just to be sure, the

23   caption of the document Defense Exhibit 102, the caption reads,

24   Before the Indian Claims Commission; is that right?

25   A.   Yes.

ER060

1    Q.  And it says on the right side, Docket No. 22-D; is that

2    correct?

3    A.  Yes.

4    Q.  And one of the plaintiffs, so the parties listed on that

5    left side, is, quote, the Western Apache and each group and

6    band thereof; is that right?

7    A.  Yes.

8    Q.  And the defendant is the United States; is that right?

9    A.  Yes.

10   Q.  Okay.  So you reviewed these proceedings to prepare for

11   your testimony; is that correct?

12   A.  I reviewed this document, yes.

13   Q.  And so you agree or concluded from reviewing this that the

14   United States took from the Western Apache their Indian title

15   to all of their aboriginal lands; is that right?

16   A.  I don't agree that the United -- that that's the final

17   ruling on the taking of the United States of the aboriginal

18   territory.

19        I believe that there are rights reserved in the 1852

20   Treaty.  The United States identified and -- through the Indian

21   Claims Commission and came up with a series of negotiated

22   stipulations between the parties.  That was the Indian Claims

23   Commission's job.  I don't think it necessarily has final word

24   on title.

25   Q.  Okay.  Thank you, Doctor.

ER061

1          I would like to now direct your attention to paragraph

2     12 of this same exhibit that you have in front of you.  That's

3     on page 219.

4     A.  I am finding that.  One more minute, please, or a few more

5     seconds.  Here we go.  Yes, I see it.

6     Q.  Okay.  So that paragraph 12 on page 219 of Defense Exhibit

7     102 says that as of 1873, quote, the United States took from

8     the Western Apache their Indian title to all of their

9     aboriginal lands; did I read that correctly?

10    A.  Yes.

11    Q.  Okay.

12          MR. SCHIFMAN:  I have no further questions.

13          THE COURT:  Mr. Levenson, do you have any redirect of

14    the doctor?

15          MR. LEVENSON:  Just a couple.  Thank you, Your Honor.

16                    REDIRECT EXAMINATION

17    BY MR. LEVENSON:

18    Q.  Dr. Welch, are you a trained historian?

19    A.  I am not trained in history, no.  Trained in anthropology

20    and have made extensive use of historical documents in my

21    anthropological and archeological studies.

22    Q.  Okay.  So part of the discipline of anthropology includes

23    review and interpretation of historical documents?

24    A.  Emphatically, yes.

25    Q.  Okay.  And just one more question.  You -- the plaintiffs

1    submitted your declaration as an attachment to their motion for

2    a preliminary injunction.  Is that declaration -- is there

3    anything in there that you'd correct, or is that still true and

4    correct to the best of your knowledge?

5    A.  What's in there is true and correct.  I am looking forward

6    to the opportunity to amplify matters that I think are

7    important to the Court.

8    Q.  All right.

9            MR. LEVENSON:  I have no further questions, Your

10   Honor.  Thank you.

11           THE COURT:  Mr. Levenson, please call your second

12   witness.

13           MR. LEVENSON:  Your Honor, we call Naelyn Pike.

14           THE COURT:  Ms. Pike, how do you spell your first

15   name?

16           THE WITNESS:  N-A-E-L-Y-N, Naelyn.

17           THE COURT:  Thank you.  Please swear the witness in.

18           **NAELYN PIKE, PLAINTIFF'S WITNESS, SWORN**

19           THE COURT:  Mr. Nixon, you can begin your examination.

20                   DIRECT EXAMINATION

21   BY MR. NIXON:

22   Q.  Naelyn, can you please tell us and tell the Judge how you

23   come to know of Oak Flat, and what it is to you?

24   A.  First (speaking in Apache).

25           Thank you for hearing our voice.

1          Chi'chil Bildagoteel, which is Oak Flat, it's a place

2     where I used to go to since I was a little girl.  My mom and my

3     dad would take me to go pick the acorn field.  But as I got

4     older, the stories from my great-grandmother and her people,

5     that's where she came from.  And so those stories that my

6     grandfather who taught my mother, who taught me, I am fourth

7     generation of, I guess prisoners of war.

8          And so when I would go to Oak Flat -- and because San

9     Carlos, our Apache reservation, is two hours east from Phoenix,

10    Oak Flat is in between that.  And so we would go and pray.

11    Every time we drive by, I go and pray.

12         And so Chi'chil Bildagoteel is a place where we

13    practice our ceremonies, where I learn to be an Apache woman,

14    and to have that understanding, and to be able to take the

15    medicine and use that in our everyday life.

16         It is not a place where, you know, you go here and

17    there, or it's a seasonal thing.  Chi'chil Bildagoteel is every

18    day.  And so when my -- sorry.

19         When my grandfather and my mom and all my family -- we

20    always go there, and same as other families in San Carlos or,

21    you know, just bringing people there because it's a sacred

22    place.  It's something that's been time immemorial in our

23    stories.  The petroglyphs that are there tell that story.

24    Q.  Naelyn, can you do that anywhere else other than Oak Flat?

25    A.  So Chi'chil Bildagoteel, that land, and that land around

ER064

1   it, is a spirit.  So in Apache religion, we believe that Usen,

2   the Creator, has given life to the plants, to the animals, to

3   the land, to the air, to the water.  And even what's underneath

4   it is a living being.

5          And because Chi'chil Bildagoteel, Oak Flat, is that

6   direct corridor to our Apache religion, and to be able to speak

7   to our creator.  So when I go there, and I am praying there, my

8   prayers directly go to our creator, and I can't have it

9   anywhere else.

10         On that land we are able to pick the acorn and the

11  (speaking Apache) which is the berries, and we make juice.  Or

12  we can get (speaking Apache) the saguaro cactus fruit, or the

13  yucca for our rope or for our wickiup, where we build our

14  homes.  And as young girls, we are able to build our homes.

15         And in our coming of age ceremony, that's a huge part,

16  to show the people that we are able to provide, and that's what

17  Oak Flat gives us.  It gives us all of that.

18         But without any of that, specifically those plants,

19  because they have that same spirit, that same spirit at Oak

20  Flat, that spirit is no longer there.  And so without that

21  spirit of Chi'chil Bildagoteel, it is like a dead carcass.

22         And so the prayer is from my ancestors, from when they

23  were free -- to my ancestors that were prisoners of war, to us

24  being able to leave the reservation, and to me, that is a place

25  where it has that same exact spirit.  And so my prayers go up

ER065

1    and they get heard by the Creator.  Everything that I was able

2    to do and that my family and my sisters were able to do, have

3    that spirit.

4             And so in Apache tradition, we have oral history, and

5    we have to physically show the people, this is how you tie the

6    rope, this is how you pick the acorn, and it gives us a sense

7    of like -- of life and understanding and not taking anything

8    for granted and being able to respect what's around you.

9    Because without all of that, then it's gone.

10            And so all those teachings, that molds us into the

11   people we are today, are through the land base and through the

12   spirit of the Creator and of the red Ga'an and of the plants

13   and the animals, in that place Chi'chil Bildagoteel.

14   Q.  Thank you.  Is it because of that, which is related to Oak

15   Flat and everything there as it is, is that why you can't do

16   any of that anywhere else, like what if there is an Oak Tree

17   next to the cathedral in downtown Phoenix, isn't that adequate?

18   A.  Chi'chil Bildagoteel -- the acorn, as I said before, if it

19   is anywhere else, it is picked; however it doesn't have the

20   spirit that resonates.

21            When we go to Oak Flat, it is like a corridor, so we

22   enter it, in a good way.  And we go and we pick it.  We go to

23   the tree, and we talk to it and say, thank you (speaking

24   Apache) for giving me this so that I can feed my family, and we

25   talk to the spirit of Oak Flat.  Thanking it for offering it to

1    us and giving it to us so that we can give it to our family.

2    And that's what brings that good medicine.  That's what brings

3    the spirit into our homes, into our hearts, into our mind and

4    our soul, is the spirit within the acorn, within the (speaking

5    Apache) within the rope of the yucca, within the cedar, within

6    it all.  It is all there, but it is provided through the spirit

7    of Chi'chil Bildagoteel, Oak Flat.

8    Q.  So if that all would fall into a crater a thousand feet

9    deep in a hole in the earth that the copper mine will

10   eventually create two miles wide, would you consider that the

11   loss of a benefit?

12   A.  Yes, deeply.

13   Q.  Would you consider that a penalty?

14   A.  Yes.  Without Chi'chil Bildagoteel --

15            THE COURT:  I'm sorry, Mr. Nixon.

16            Mr. Levenson, can you give the witness the box of

17   tissues behind you, sir?  Thank you very much.

18            THE WITNESS:  Thank you, Your Honor.

19            THE COURT:  Ma'am, just take a moment.

20            THE WITNESS:  I can only explain it like this.  I am

21   the oldest of 28 grandchildren, my maternal and paternal side

22   of the family.

23            I have -- my mom has four girls.  I am the oldest of

24   three younger sisters.  My sister Nizhoni had her Sunrise

25   Ceremony there.  Our Sunrise Ceremony is our coming of age

ER067

1    ceremony.  So when we have our first menstrual, it means that

2    we can have children, and it also represents the creation story

3    of the white painted woman.

4         And so we do this ceremony, and this ceremony is a

5    four-day ceremony.  It is like a reborn, you know.  In our

6    creation story, she came from underneath the ground, and she is

7    painted in white, and that's one of the photos in my

8    declaration.  And it is of my sister Nizhoni.  And so she had

9    her dance there.

10        In that ceremony, you are reborn, your transformation

11   into womanhood, and we are symbolizing what it means to give

12   life and what it is for our future as a people.  And when these

13   girls have these Sunrise ceremonies, their connection to the

14   land is direct.  Their life span is direct.

15        And so when we talk about Oak Flat being gone, it's

16   cutting a tie to my sister's life and to all of the girls'

17   past, present, who have had their Sunrise Ceremony there.  The

18   connection to Chi'chil Bildagoteel is gone.  It is taken away

19   from them, stripped away from them, and that's only that.

20   That's not including our stories, our medicine, our connection,

21   everything will put a burden -- the wind is so important to our

22   Apache tradition.  And if we don't have that connection to

23   Nahgosan, the earth, and to Oak Flat, then we are dead inside.

24   We can't call ourselves Apache.

25        The people, that real life, that soul, that spirit,

1   everything that is given to us by our Creator is taken away

2   from us.  It's gone.  And that's why we have to fight so hard,

3   because it is our people, our generation past, present, and

4   future, that's going to be taken away.

5   Q.  Thank you, Naelyn.  Take a moment.  Here is some water.

6          You refer to your declaration.  And so I have the

7   photographs from the declaration, and for the benefit of

8   defense counsel and for the Court, why don't we just take a

9   moment and you can explain the significance of the photos,

10  okay?

11  A.  Okay.

12  Q.  And that's about the Sunrise Ceremony that takes place in

13  Oak Flat.  And these are photographs from one of the ceremonies

14  there several years ago; is that correct?

15          THE COURT:  Mr. Nixon, one moment.

16          Are you using my hard copies of the exhibits?

17          MR. NIXON:  No, Your Honor.

18          THE COURT:  If you can hand those to Lisa, please.

19  Thank you very much.

20  BY MR. NIXON:

21  Q.  Okay.  So while the Judge is getting his copy of the

22  exhibits back, I am going to refer to Plaintiff Exhibit Number

23  4-2, which is the second photo.  The first photo is a picture

24  of you.  And while I mention it, where is this first photo

25  taken, Exhibit 4-1?  That's a photograph of you.  Where are

**ER069**

1    you?

2    A.   So that's a photo of me in Standing Rock, and that photo,

3    why we had went to Standing Rock is because of -- their sacred

4    site was going to be destroyed, and so what we did was, my

5    family took the Mount Graham water from Dzil Nchaa Si'An and

6    the water from Oak Flat to gift it to them so that they have

7    our prayers too.

8    Q.   Okay.  I am going to hand you Plaintiff Exhibit Number 4-2,

9    which is the next photo.  If you could describe for defense

10   counsel in Washington, D.C. on the telephone who has a copy of

11   that there --

12          And counsel, have you been able to pull that up for

13   yourselves, 4-2?

14          MR. SCHIFMAN:  Yes, I have.  Thank you.

15          MR. NIXON:  Okay.  Certainly.

16   BY MR. NIXON:

17   Q.   Can you tell the Court and defense counsel what that

18   picture depicts?  Who the people are?

19   A.   Okay.  In that photo, the left is my sister Nizhoni Pike,

20   and her Godmother Michelle Antonio.  And this is them starting

21   off their Sunrise Ceremony.  And Nizhoni is about to get

22   dressed into her buckskin.  So this is the first day of the

23   ceremony where the Godmother, the chosen person, dresses her

24   into -- putting on like her feather, her abalone shell, her

25   buckskin, and those are all essential parts of the beginning of

1    the story.

2            Because in this moment, Nizhoni is starting to connect

3    her soul and her spirit to the mountain, to Oak Flat.  And that

4    is the start-off and the kick-off of the beginning of the

5    ceremony where she's not my sister no more, she's the changing

6    woman.  She's becoming what we said, how she resembles the

7    white painted woman, our creation story.

8    Q.  Okay.  Thank you.  I am going to hand you Plaintiff Exhibit

9    Number 4-3, which is another photograph.

10           If you could describe who the people are and what is

11   happening there?

12   A.  So in this photo, it's of that same day, and now you see

13   that the Godmother is putting on her feather, her buckskin, and

14   all of the essential tools of beginning her first day as

15   becoming a woman.

16           And the people surrounding her are also members of our

17   tribe in San Carlos, and they come and they sing.  They sing

18   the songs for her.  They dance and participate and they pray.

19   And so this is at Oak Flat, too.  And in this, I was her

20   partner.

21   Q.  Okay.  Thank you.  I am going to hand you Plaintiff Exhibit

22   Number 4-4, which is the next one in the series.

23           If you could describe what's going on there for

24   everyone's benefit.  Thank you.

25   A.  In this one, the medicine man, who is in front of my

ER071

1    sister, is praying to her and talking to her about what she is

2    going to be doing and the role she is going to take because she

3    blesses the people.  Her and the spirit that is within her.

4    They bless and they provide for the people.

5            And next to her are her Godparents, which is Michelle

6    Antonio, Alvin Antonio, and her medicine man, Leroy Kenton,

7    which are all members of the San Carlos Apache tribe here at

8    Oak Flat.

9            THE COURT:  Mr. Nixon, just one moment.

10            Go ahead, sir.

11   BY MR. NIXON:

12   Q.  So the next photo from your declaration, which we have

13   marked Plaintiff Exhibit 4-5, can you describe for us who that

14   is and at what point in the ceremony that is and anything else

15   you can tell us?

16   A.  Okay.  So in this photo, it's Nizhoni on the third day.

17   And on this day of the Sunrise Ceremony is when she gets

18   painted with the white clay.

19            And all the tools that were used here in the ceremony

20   like the teepee and the trees that -- it's like four trees.

21   It's a circle, and there's one tree in front of another and

22   side to side like, and those all came from Oak Flat.  And

23   that's the most important part about this, is that everything

24   that we are able to use for the ceremony comes from Chi'chil

25   Bildagoteel, Oak Flat.

ER072

1          And she is painted in this white clay.  It molds her

2     into the woman she is going to be from now on.  And this is my

3     favorite part of the Sunrise Ceremony, because when she is

4     being painted by what I can call is like our angels, our

5     messengers, the Ga'an people, which is on the arm of his shirt,

6     it is like a patch of a God.  So they come and they come from

7     the mountains, and the spirit of the red Ga'an is there at Oak

8     Flat, and what they do is they bless her, and her Godfather

9     bless her, and they mold that into her.  It is like glue, you

10    mold it and it sticks with the prayers of the people, of what

11    she is praying for, the medicine man, and it also represents

12    our creation story.

13         And when -- the favorite part of mine is her eyes are

14    closed throughout this whole process when they paint her.  And

15    when the God -- at the last song, the Godmother will have a

16    handkerchief and wipe her eyes.  And in that moment when she

17    opens her eyes, she's a new woman, she's a new girl.  That

18    spirit is in her.  That's why she is and that's why she will be

19    for the rest of her life.  It is that confirmation to the world

20    that she took her imprint at Chi'chil Bildagoteel and on the

21    world.  And so that's what that represents.

22    Q.  Thank you, Naelyn.  Then the last photo from your

23    declaration we have marked Plaintiff Exhibit Number 4-6.  It

24    may be misnumbered in the set that was sent, it may also have

25    4-5 on it.

ER073

1       Defense counsel, do you have that handy?

2       THE COURT:  Mr. Nixon, during your examination, if

3  Mr. Schifman doesn't have the document, I'm pretty sure he will

4  let me know.

5       MR. NIXON:  Thank you, Your Honor.

6  BY MR. NIXON:

7  Q.  If you could tell us what is going on in that photo, who

8  the people are and where that is, et cetera?

9  A.  Okay.  So this one is of a photo of Lauren Pina.  She had

10 her Sunrise Ceremony at Oak Flat too.  And this is on the

11 second day in the night.  And the girls behind her show that --

12 they also had their Sunrise Ceremony, and so these girls dance

13 to the crown dancers.

14      And so on Saturday night, the Ga'an people, our

15 messengers, come from the mountains, and they dance and they

16 bless the people and they bless her, and that's what they

17 bring.

18      So in this photo, they are dancing in a line waiting,

19 because what happens is that the Ga'an will come and do their

20 prayers, and then when they are done finishing their prayers,

21 the girls will come up behind them and we in a sense shadow

22 them, we follow them, and this is all a part of our ceremony

23 that happened at Oak Flat.

24 Q.  So one last question.  When you mention the Ga'an and you

25 refer to them as the Ga'an or the spirit dancers or the crown

ER074

1    dancers, are those actual spirits?

2    A.   Yes.   The Ga'an people are spirits, are messengers between

3    Usen, the Creator, and us here in the physical world.   And

4    those spirits come from the mountain.   They come from the

5    ground, and they come into what -- the people in the physical

6    world, which would be the men, the five men.   And specifically,

7    the red Ga'an has made its imprint, its spirit on Chi'chil

8    Bildagoteel, on Oak Flat.

9         MR. NIXON:   I do have one last question, Your Honor,

10   to help us understand.

11   Q.   Two-part question.   First, are you familiar with the

12   concept of angels in Judeo-Christian religion?

13   A.   Yes.

14   Q.   How are the Ga'an -- are the Ga'an like angels?

15   A.   That's the closest interpretation that I could put it.   The

16   Ga'ans are guardians.   They all have a specific meaning.   They

17   may not look like it -- and what's so amazing -- the sadness

18   about this part is that there's Devil's Canyon right next to

19   Oak Flat.   But to us, we call it Ga'an Canyon, because when the

20   settlers were first coming in, they felt -- they heard and they

21   would see the spirit of the Ga'an people, and they were scared

22   because they have these huge crowns, and they are painted and

23   they don't look human.

24        And so what the settlers would say, you know, when

25   they would try to come in is, oh, those are devils, and they

1    would be afraid, and that was Devil's Canyon.

2         But my grandfather and I, my family, we pray at Ga'an

3    Canyon because that's where the imprints of the Ga'ans.  They

4    are not devils to us.  They are angels, they're blessings,

5    they're guardians.  They shield us from evil.  And that's there

6    at Oak Flat, and that's all a part of the spirit of Chi'chil

7    Bildagoteel.  And without the spirit, then there's nothing.

8    There's nothing at all, and that cannot be taken away.  It

9    cannot be destroyed.

10        THE COURT:  Mr. Nixon, this is actually a perfect time

11   to take our morning recess.  Court will be in recess until

12   10:45.

13        Hold on just one second.

14        (Discussion held between Court and courtroom deputy.)

15        THE COURT:  The court is in recess until 10:45.

16        (Recess taken at 10:29 a.m.; resume at 10:50 a.m.)

17        THE COURT:  This court will come to order.  All

18   parties present when the court last closed are present again.

19        Mr. Nixon, please continue.

20        MR. NIXON:  Yes, thank you, Your Honor.  I believe

21   that I concluded my question, and I was just going to let

22   Ms. Pike know that the Court or defense counsel may have some

23   questions for her now.

24        THE COURT:  Yes.

25        Mr. Schifman, do you have any questions for Ms. Pike?

ER076

1          MR. SCHIFMAN:  This is Mr. Ben Schifman for the

2     federal defendants.  We have no questions at this time, Your

3     Honor.

4          THE COURT:  Ms. Pike, thank you so much for your

5     testimony this morning.

6          Mr. Nixon, please call your -- I'm sorry, Ms. Pike,

7     were you trying to tell me something?

8          THE WITNESS:  I just wanted to say thank you.

9          THE COURT:  You are very welcome.

10         Mr. Nixon, please call your next witness.

11         MR. NIXON:  Yes.  Our next witness is our last

12    witness, Your Honor, it's Dr. Wendsler Nosie, Sr.

13         THE COURT:  Sir, for the record, please, if you can

14    spell your name.

15         THE WITNESS:  It's Wendsler, W-E-N-D-S-L-E-R.  Nosie,

16    N-O-S-I-E.  Sr., S-R.

17         THE COURT:  I'm sorry, what's your last name again?

18         THE WITNESS:  Nosie, N-O-S-I-E.

19         THE COURT:  Sir, welcome to our courtroom.

20         Lisa, if you would please swear the witness.

21    **WENDSLER NOSIE, SR., PLAINTIFF'S WITNESS, SWORN**

22         THE COURT:  Go ahead, Mr. Nixon.

23                    DIRECT EXAMINATION

24    BY MR. NIXON:

25    Q.  Dr. Nosie, could you please introduce yourself in terms of

**ER077**

1   your education and your position with Apache Stronghold?

2   A.   Again, my name is Wendsler Nosie.  I graduated from Globe

3   Arizona, Globe High School.  I also hold a bioethics

4   sustainability in global health -- global public health, Ph.D.

5   from American University of Sovereign Nations.

6        And I am also a former chairman of the San Carlos

7   Apache tribe, as well as tribal council.  I have served in the

8   tribal government for 29 years.

9        I also hold a Certificate in the Arizona Banking

10  Academy.  So -- I am also, I guess you would say, the founder

11  of the Apache Stronghold that we currently have right now.

12  Q.   And where are you currently living?

13  A.   Over a year a half ago, I vacated the reservation of San

14  Carlos.  I am in -- a tribal member of San Carlos Apache tribe.

15  Over a year ago, I went to the United States and -- to the

16  agricultural department and also informed Congress that I was

17  vacating the reservation and moving into Oak Flats, based on

18  the negligence of the trust responsibility they were to hold

19  with our tribe.  And so I had returned back to Oak Flats and

20  have been there since November 18 of 2020 -- '19, yeah, a year

21  ago.

22  Q.   You just mentioned that -- because of a violation of trust

23  responsibility.  Can you explain what you are referring to,

24  please?

25  A.   Well, as a tribal chairman at that time, and also being

1  involved with the argument on day one, was the NEPA, the

2  National Environment Policy and our argument to ask the United

3  States to follow the NEPA process.  And for several years, you

4  know, we did have the Tonto National Forest agreeing with the

5  tribe, that it was very –– that the land was very important to

6  the Apaches, not until the rider that gave exemptions to

7  Resolution Copper that the whole tide turned.

8        And so since that time, you know, we have been facing

9  that argument and continue to ask the United States to follow

10  the NEPA process.  And so it just led on to the arguments that

11  the Apaches had years ago.  In the early '60s, when I was

12  growing up at that time with my grandfather my uncles, my

13  dad –– when they were alive, you know, they talked about the

14  promises that the United States made and being a Chiricahua

15  Apache, being brought in as a prisoner of war from that time,

16  of what my family had experienced, was that we were waiting to

17  return back to our ancestorial homelands.

18        And at that time, they talked about the treaties that

19  were made and that –– the disappointment, because none of that

20  was fulfilled.  Because as the people of San Carlos were held

21  as prisoners of war, there was no way to leave the reservation.

22  So it was a very disappointing life that they lived, and I grew

23  up in that.

24        And so as a young six, seven-year-old, telling my

25  uncles that one day I will return –– and they used to cry and

ER079

1    laugh and say, you know, when you do, we will go with you.

2        And being a Chiricahua, you know, they were talking

3    about these treaties that were made.  And my grandfather -- my

4    great-grandfather was one that argued the point about these

5    areas of indigenous lands of holiness to the people.  So I grew

6    up in that arena, in that era, and was totally affected by how

7    our people were being treated.

8        And so on that side of the -- on the other side of the

9    token being brought up traditionally with holy ground and how

10   that played a really important part about sustainability, about

11   surviving in a prison and what it meant to us, but yet, you

12   know, there was a lot of social illness, social -- seeing our

13   people not develop the way we should be developing with -- and

14   with the promises never that were fulfilled.

15       THE COURT:  I'm sorry, Doctor.  My apologies for

16   interrupting you.

17       Can you give me some examples of how -- you just made

18   a comment that -- socially seeing our people not developing the

19   way they should be developing -- what do you mean by that?

20   A.  Well, what I mean by that is it was a new change, a change

21   came.  And if you can imagine a way of life coming to a

22   complete stop and not knowing what the next day was to be and

23   how it was formenting.  And from -- say an economic base, a

24   social base, and a religious base.  These were all being

25   affected by a -- just like a car coming to a complete stop, and

ER080

1    not being really informed and well informed what our people was

2    facing.  And so it really created a lot of social illness to

3    where, how do we deal with this?

4         But one of the things that the people held on to was

5    the religious base.  And the religious base –– because we

6    didn't know what was happening.  My dad, my uncles, my

7    grandfather, you know, it was hard to tell the child what you

8    were going to be.

9         And so since a lot of our people grew up like that, in

10   the fear –– because our parents still had the fear of military

11   presence, and they felt that with Indian health and BIA because

12   at that time, in the '60s, they could still dress up in

13   military uniform.  So there was a suppressed way of life still

14   happening to them.

15        But the crucial part was the religious part of why it

16   was so important that we hang on to that.  Because there was a

17   saying that we would be able to return to our holy and sacred

18   places if we conform to being assimilated.  And that really

19   scared the people, because we –– in our religion, we are tied

20   to the earth.  We are tied to the mother.

21        And these special places is where the –– well, what

22   people know him as is God, gave these blessed places a unique

23   way for us to communicate.  And that's where, in Apache, we

24   call them Ga'an, but they are deities.  They are actually

25   spirit people.

ER081

1          And so anyway, growing up in that time and then

2    eventually becoming a tribal leader and reading a lot of these

3    documents, and, you know, having it all before me and see what

4    was happening to our people.

5          And one of the most important thing was to return and

6    to once again exercise our religion within those boundaries of

7    what is holy, and to come to find that a lot of our people

8    prior escape the reservation to go to the prayer and return

9    back as quick as they can because of the fear.

10         THE COURT:  Now, Doctor, do you -- and maybe you can't

11   answer this question.  When you spoke of assimilation minutes

12   ago, do you believe that your relatives from the past were

13   being asked to give up what they believed to be most sacred of

14   the Apache people?

15         THE WITNESS:  They were being forced.  There was an

16   attempt to force our people to give up everything that they

17   were, but they couldn't.  It was not going to happen.  Because

18   in the religion, that's who we are.  We are intertwined with

19   the earth, with the mother.

20         THE COURT:  When you say, everything that they were,

21   tell me what the "everything" is?

22         THE WITNESS:  Everything that they were was that they

23   could communicate with the world.  They could communicate with

24   what was spiritual, from the wind to the trees to the earth to

25   what was underneath.  And they knew how the spirituality tied

1    to everything to make us who we are.  And that was important

2    because that created the integrity and the character of the

3    people.

4            And like my mother would tell me that prior to the

5    territory -- the area changing, that the people were very

6    religious and very holy.  You know, if we would -- if we were

7    really mean people, then the outcome would have been different,

8    but we are all intertwined.  That's why our language is so

9    important.  Our language ties, it communicates with the spirit,

10   of what Naelyn was talking about.  And it contains the key time

11   immemorial how the world came to be and how the oldest religion

12   came to be what it is today.

13           And I tell many people around the world, when they are

14   trying to understand and identify this, I say, that's no

15   different than the Old Testament or the one before the old

16   testament, when they talked about life in the beginning.  I

17   said, here we still hold on to that strongly, because that was

18   the greatest gift that was given the world.

19           And that's why these deities that we are talking about

20   that are Ga'an people, they are a crucial part to our personal

21   being of who we are and -- as a community and as what we can

22   give to the rest of the world.

23           But in this place, it's the only area that has this

24   place, and that's why it's so crucial, like Naelyn was talking

25   about, that if it subsides and it falls, it is gone forever.

1          And for me being a tribal leader, you know, to have

2     that experience and know how the federal government works, you

3     know, we have the Constitution of the United States that talks

4     about the freedom of religion.  Well, how come we are not

5     afforded that?

6          Because I can go way back, in working with the tribe

7     and prior to the tribe, of how much our people relied on the

8     Bureau of Indian Affairs, how they relied on the ones before

9     the Bureau of Indian Affairs, and then how we relied on the

10    Forest Service and giving them all this information.

11         All the things that, you know, I'm talking about

12    today, they have it.  And it is saddening because our people

13    gave a lot of trust into this and gave information and was, you

14    know, it never developed into that relationship that we were

15    told it was going to be.

16         So, you know -- and that's one of the big reasons why

17    I had to go back.  I had to go back to defend one of the last

18    holy places that are tied -- that we are tied to.  Because if

19    this subsides and is gone forever, then what does it mean to

20    our children that have yet to be born?

21         I mean, how would -- if they found silver, gold,

22    copper under Mount Sinai and they did that to it, what would it

23    mean to the biblical?  What would it mean to their stories?  So

24    it's identical to -- you know, if they did it there.

25         And so this place is very important.  So as a tribal

ER084

1    leader, as a tribal member, it's -- and just being who I am,

2    it's always been spiritual.  And we had been told that one of

3    the last things that will probably be taken from us would be

4    our religion.

5           And it saddens me because with the U.S. Forest

6    Service, you know, they know all of these things.  They know.

7    And like for me living there a whole year, the federal policies

8    for the Forest Service says you have to vacate out of there in

9    13 days.  And I have been there.  You know, they know it.

10          And when this past summer, when there was a huge fire

11   and they were vacating everybody, the only one they didn't

12   vacate was me.  Because they know what I was doing there, to

13   take care of what was neglected.  And so as far as me being a

14   person and being brought up, those are my responsibility,

15   religiously, you know, that's who I am.

16   BY MR. NIXON:

17   Q.  Dr. Nosie, you mentioned that the Forest Service knew and

18   that they had been told.  To help us all understand, I am going

19   to refer to that National Defense Authorization Act of 2015,

20   which was passed in December of 2014.  That's what you referred

21   to earlier as the rider, correct?

22   A.  Yes.

23   Q.  Okay.  And you brought a book with you today.

24          I am not going to introduce it into evidence, Your

25   Honor.  And defense counsel, please excuse me.  Just if you

ER085

1  would indulge me for a moment, I will place this in the proper

2  order in terms of a point of order for the courtroom, Your

3  Honor.

4          This document, can you read the cover sheet you have

5  there?

6          And I did not ask you to bring this, did I?

7  A.  No.  No, you did not ask me.  I brought it.  Chi'chil

8  Bildagoteel, Oak Flats, Comments on the Resolution Copper

9  Project and Land Exchange Draft Environmental Impact Statement

10  submitted by the Apache Stronghold October 2019.

11  Q.  How thick is that book?

12  A.  It's a good -- a little over an inch.

13  Q.  Okay.  And I mention this -- defense counsel, just in

14  noting in the response reference to participating in any

15  administrative processes.

16          And so I would suggest, and I am not asking for a

17  ruling today, and I would definitely, of course, have defense

18  have any opportunity it needs, but perhaps it would not be

19  improper for judicial notice of that document.  And that is a

20  suggestion, and I could make the motion if it's favored by the

21  Court.

22          THE COURT:  Well, I would like to see what you have

23  there at counsel table.  If one of you could walk it up to

24  Lisa, that would be helpful.

25          MR. NIXON:  I may ask a question to help, Your Honor

1   --

2            THE COURT:  Just one moment, please.

3            MR. NIXON:  Okay.

4            THE COURT:  Mr. Nixon, I note this was signed off, the

5    initial letter was signed by Mr. Rambler; is that correct?

6            THE WITNESS:  Yes, it was.

7            THE COURT:  You may approach.

8            Go ahead, Mr. Nixon.

9            MR. NIXON:  I just -- in regards to this document, I

10   just would point the Court and defense counsel to a reference

11   in our corrected amended reply, that this case is not brought

12   before the Court in accordance with the Administrative

13   Procedures Act.  We are not seeking any judicial review of any

14   administrative action taken in compliance with that act.  But

15   this was just to point out that indeed Apache Stronghold had

16   participated in that external process.

17           THE COURT:  And that will be noted for the record.  I

18   had an opportunity to see that the witness on the stand right

19   now made several appearances in Washington, D.C. at various

20   committees.  And there appears to be newspaper articles and

21   other miscellaneous photographs about Oak Creek (sic) and some

22   of the things that we've talked about this morning.

23           MR. NIXON:  Thank you, Your Honor.

24           THE COURT:  You're welcome.  Please continue.

25

ER087

1   BY MR. NIXON:

2   Q.  When you refer to the Forest Service having known about

3   these things, did you mean also before the National Defense

4   Authorization Act was passed in December of 2014, were they

5   told anything or did they know anything, in your opinion?

6   A.  It was way before that event that took place, 2002.  As a

7   tribal council at that time, having a meeting with the Forest

8   Service and the tribe expressing their concern, and at that

9   time, not getting too much of anything back from the Forest

10  Service, and not really telling us directly what was already

11  moving.  But they were informed -- well informed by a tribal

12  resolution that was passed by the tribe.

13  Q.  And had you had any opportunity and did you present any

14  testimony to Congress prior to December of 2014?

15  A.  Many times.  I have been before Congress.  I have visited

16  all of the Congressional leaders, agencies, you know, to

17  express the concerns and positions of the tribe.  And at that

18  point in time, a lot of it was well received until the NDAA,

19  the late night rider that took place.

20  Q.  And just to be clear, that testimony you presented to

21  Congress was specifically in regard to the religious importance

22  of Oak Flat and what was being proposed in terms of a copper

23  mine?

24  A.  Yes, of course, because the people of San Carlos were

25  looking at the religious impacts that it would take on our

ER088

1    future children.

2         And then again, with the environmental impacts, it

3    would also hurt the region, especially when the exemption was

4    passed and didn't allow Arizona to see the total report, the

5    pros and cons and for Arizona to make -- Arizona people to make

6    that decision.  And so, yes, made those attempts.

7    Q.  You had mentioned your ancestors, your grandfather, can you

8    please tell the Court what relationship, if any, you have to

9    Mangas Coloradus, the -- one of the signatories of the 1852

10   Treaty at Sante Fe between the United States and Apache

11   Nations?

12   A.  Within our family, we come from the Chiricahuas on my

13   father, and my father through his father Willy, and his father

14   through John, who goes into the 1800s and -- tied into with --

15   at that time, with Geronimo Cochise and Mangas, and this is why

16   my grandfather, great-grandfather, John Nosie, knew of the

17   treaties that were taking place and why he became very

18   displeased.

19        And when the tribe was -- the tribal leaders at that

20   time were arguing about the land base that was being taken and

21   what was agreed upon between the Western Apaches, the

22   Chiricahuas, and that's when I was saying in an earlier

23   statement, that's where I am rooted from and why, when I became

24   a tribal leader, it was very important for me to look at what

25   occurred on our people and why are we living in the conditions

**ER089**

1    we were living in.

2         And again, looking -- as a leader, looking at the

3    environmental impacts that would take place, and the effects

4    that it would affect in the Southwest, and -- you know, so it

5    was from that descendant blood that I come from that was very

6    important, as well as my mother being a very -- person who

7    prayed and who -- in her time, lived in the area of Oak Flats

8    and why that was sacred, you know, both to my parents.  Because

9    my mom resided in the area, but you know, through my dad I was

10   a Chiricahua Apache.

11   Q.  You mentioned your great-grandfather John Nosie.  Can you

12   tell us when did he live, approximately?

13   A.  Well, from records that showed, you know, he -- well, he

14   lived up -- John Nosie was in the early -- well, late 1800s,

15   early 1800s, when he was a young boy, they'd tell me around

16   1854 -- no, I am sorry, 1844, around that area, when he was a

17   young man and growing up in that time.

18        So that was my grandfather.  Then eventually to my

19   father -- grandfather Willy Nosie.  And then my father who was

20   born in 1928.  And then from there me, born in 1959.

21   Q.  So to be clear then, Chief John Nosie lived in the second

22   half of the 19th Century and into the early years of the 20th

23   Century; is that correct?

24   A.  What was that again?

25   Q.  The latter half of the 19th Century, the 1800s and into the

1    early part of the 20th Century, the early 1900s?

2    A.  Yes.

3    Q.  Okay, thank you.

4         I am going to hand you Plaintiff Exhibit 5.1.  These

5    are the first of three photographs that were in your

6    declaration.  If you could kindly tell the Court what that is a

7    photograph of and where it's at and why it was in your

8    declaration?

9    A.  This exhibit here, you see -- in Apache, we call it --

10   (speaking Apache) and it's a sweat lodge, I guess in the

11   English word.  And this one here is a ceremony that takes place

12   for our young boys that are coming into manhood, and that's

13   when their choices change.

14        And just like Naelyn was talking about, about what a

15   young lady goes through, a young man goes through this

16   ceremony.  And it teaches him patience.  It teaches him to

17   think.  And he is taught by his elders.  The elders that are

18   within the sweat lodge.

19        And really, it's a womb of Mother Earth.  Your Honor,

20   I am sorry, I -- these kind of things are really hard to talk

21   about, because as a young man, our -- us, we are taught to be

22   careful what we say out there, because we always see our ways

23   being destroyed.

24        And so forgive me and Naelyn, you know, we are giving

25   you a lot more than anybody has ever gotten, and that's what I

ER091

1    am doing today.  But it does hurt me, because it's like our

2    religion is being on trial.  And it goes back to what our

3    prophecy would say to us, that one day we will be put on trial,

4    and this is not right.   But I will do my best.

5            This (speaking Apache) is a womb of Mother Earth.  And

6    because a woman goes through menstrual once a month, she

7    cleanses herself, but men, we don't.  So to be in balance and

8    understand life, we have to take our sons, elder men, medicine

9    people, take men into this so we can purify ourselves once a

10   month.  And so that we can understand and know the balance of

11   life.

12           And so this (speaking Apache) is done ---- I am so

13   happy because it's finally back to where it originated from.

14   And so this is at Oak Flat, one of the areas that our medicine

15   man here, Cranston, you know, he holds his ceremonies there

16   because it brings, you know, what it was before we were

17   removed -- forcefully removed from the area.

18           But this is the (speaking Apache) for the men.  And as

19   Naelyn spoke, the question of the Ga'an people.  Well, with the

20   Ga'an people, the men have to go through a purification in

21   order to do that sacred dance, that holy dance.  And in the

22   very end, they come together as one, the spirit and the human.

23   And those are the ones that bless at the Sunrise Ceremony.

24           But this (speaking Apache) is a very important part of

25   the ceremony.  I mean, it is not just one thing.  It is so many

ER092

1 things that is within that time period of when the ceremony is

2 going to take place.

3        So actually, when you are a father or a parent, you

4 have a daughter, and the daughter is born, you have that 12

5 years to prepare.  And when it's a young man, he has that 14 --

6 he has that 13 to 14 years to prepare.  So it is a continuation

7 of preparing for that ceremony to take place.  It is just not

8 something you put up.

9        And that's why in this first exhibit, it's very

10 crucial because it's not -- you know, the women part is very

11 important because it gives life, but the men, it gives us the

12 understanding of why we are supposed to protect Nahagosan,

13 meaning the Mother Earth.  And -- but we have to go back into

14 the earth to understand and continue to understand what a woman

15 is, because a woman is very crucial in the world.  And so men

16 have to have that discipline.  So it's really something that --

17 now that we vacated and able to do the ceremony openly and not

18 afraid has been the biggest difference.

19 Q.  When you said that (speaking Apache) or the sweat lodge

20 originated there, you meant at Oak Flat?

21 A.  At this holy place, yes.  That's where everything is

22 originated from.

23 Q.  Okay.  I am going to hand you Plaintiff's Exhibit Number

24 5-2.

25        If you could describe for the Court's benefit and for

ER093

1   defense counsel what that is a photograph of?

2   A.   Thank you, Your Honor.  I just pause because this is our

3   Angel.  It is not something to just really talk about.  You

4   know, I tell people that, you know, things are the way they are

5   in Europe and the way the world changed through what is

6   capitalism.

7        But when you come to America, and especially in the

8   southwest of Arizona, we describe it as a rattlesnake.  The

9   coil, the last coil is really the last place.  And when you

10  come to our area, it's really the last place about what is holy

11  and what is sacred.

12       And not that any of the other places are not, it's

13  just what I am referring to is that so many of these places

14  have been attacked.  And so when you describe what this is, you

15  know, I just ask that it be accepted respectfully, because when

16  you look at the crown, it's a halo.  The real terminology in

17  English, it's a halo.

18       And that halo, it describes the reason why we are here

19  and what we got to maintain.  So the holy people put the

20  designs into the crown to remind the people of the importance

21  of the world.

22       And then the marking on his body also describes the

23  identity of who this person is.  And it's really tough to put

24  it out there, because the way things are today, there's animals

25  being killed, and it referenced a certain species, and it's

ER094

1    scary to really put it out there, because we see them being

2    killed, and we don't want to put a whole lot of information out

3    there.

4         But these are spirit people, that is the buffer

5    between heaven and earth, and they are the communicators to us.

6    And they bring the message through the Creator, and that's why

7    they are the ones that do all of the blessings.

8         And as it was told to me, that because we have touched

9    capitalism, that we have become dirty from the mother.  So we

10   have to be obedient by doing the things that we need to do, and

11   that's why it's so important that our people go through the

12   sweat, our young men go through the sweat, because we ask for

13   forgiveness so that the spirit and the human body can come

14   together as one.

15        And these are deities.  These are holy angels.  And

16   these are the ones that we say, you know, live in the area of

17   Oak Flats.  And it's really hard for us to tell where they

18   live, because in history, when the exchange between Mexico and

19   the United States, a lot of these places were being exploded

20   and collapsed, and it really feared the Indian people to really

21   tell any more than what they wanted to tell.

22        And -- but this, what we are talking about here, you

23   know, is -- this deity, you know, resides in the area, and

24   that's what my granddaughter was saying, it's the red deity

25   that is there.  And this is what we're saying that it's going

**ER095**

1    to be totally annihilated by the collapse of this place if

2    Resolution continues to move forward and get what they want.

3            But this is why it's so crucial to us.  It's going to

4    be an everlasting effect.  But this is our deity.

5    Q.  Thank you.  I'm going to hand you Plaintiff Exhibit Number

6    5-3.  And can you tell us -- that's a photograph of you

7    somewhere in Oak Flat, correct?

8    A.  Your Honor, you know, I -- excuse me.  This -- I get

9    emotional because this is the oak tree.  It takes 100 years

10   before an oak tree can produce an acorn.

11           If you could look at a -- one pound of a coffee can

12   acorn grinded into powder, that could feed up to 3- to 400

13   people.  And if it's just a family of five, it could last them

14   four months; two cans will last them a whole year.

15           And this is very crucial to our survival and as well

16   as our ceremony.  Because where Emory Oak is at, there's an

17   abundance of water.  And it's not that all Emory Oak gives is

18   acorn.  There's only -- several.

19           So when I was able to vacate the reservation and go

20   back to Oak Flats, it's the first time since one of my people

21   has ever had the four seasons to live that life again.  And it

22   hurt, because a lot of our prayers and our songs relate to what

23   my granddaughter was saying, and to the spirit.  And so I have

24   miners who disagree.

25           And one stopped by and said to me, you better check,

ER096

1   because the first thing they are going to attack is the Emory

2   Oak.  They are going to cut all of the oak trees.  If they can

3   kill all the oak trees, then they solve the Indian problem, the

4   Indian people won't be there.

5        But the thing about it is that I got to see the birth

6   of an acorn.  I got to see my grandkids come and pick the acorn

7   for ceremony.  And then on top of that, I got to see dozens and

8   dozens of my people come back to pick the acorn, because they

9   felt the security that they weren't going to be kicked off

10  anymore.

11       And I stand there with all of the pressure of the

12  government, Resolution Copper, and trying to defend them off so

13  that our people can have what is rightfully theirs, the

14  ceremony for their families, for their children, for the world.

15       But this is the acorn tree.  And, you know, they are

16  facing death.  You know, they are human beings too.  They have

17  a spirit too.  But -- I am in the center of the area where it

18  is going to subside.  That is where I am at.

19  Q.  Thank you, Dr. Nosie.

20       Have you recently checked the price of copper on the

21  market?  And what was the price the last time you looked and

22  when was that?

23  A.  The last time I looked, a pound of copper was like $3.14.

24  Q.  And what would be the price of a pound of acorn from Oak

25  Flat, approximately?

ER097

1    A.  It's going for $60.

2    Q.  Thank you.

3            MR. NIXON:  No further questions.

4            THE COURT:  Mr. Schifman, do you have any

5    cross-examination for Dr. Nosie?

6            MR. SCHIFMAN:  Yes, Your Honor, I have one brief line

7    of questioning.

8            So my question is, is everyone able to hear me okay?

9    Just before I continue here.

10           THE COURT:  Yes.

11           MR. SCHIFMAN:  Okay.  Thank you.

12                      CROSS-EXAMINATION

13   BY MR. SCHIFMAN:

14   Q.  So my question is, are you here on behalf of the San Carlos

15   Apache Tribal Government?

16   A.  Am I here on behalf of the San Carlos Tribal Government?

17   Is that the question?

18           THE COURT:  Yes.

19           THE WITNESS:  I am here on behalf of the Apache people

20   of San Carlos.

21   BY MR. SCHIFMAN:

22   Q.  Okay, thank you.  But not as a representative of the San

23   Carlos Apache Tribal Government; is that right?

24   A.  No, I am not here -- my document does show the concurrence

25   of the tribal chairman on all of the work that the Apache

1    Stronghold has been doing.  Thank you.

2    Q.  Okay.

3            MR. SCHIFMAN:  No further questions, Your Honor.

4            THE COURT:  Mr. Nixon, in light of those two

5    questions, do you have any redirect for your witness?

6            MR. NIXON:  No, Your Honor.

7            THE COURT:  Do you have any additional witnesses?

8            MR. NIXON:  No, Your Honor.

9            THE COURT:  Dr. Nosie, thank you for testifying this

10   morning.

11           Do you have any additional evidence that you would

12   like to provide to the Court for consideration, Mr. Nixon, or

13   Mr. Levenson?

14           MR. LEVENSON:  No, Your Honor.  Thank you.

15           THE COURT:  Mr. Schifman, do you have any witnesses

16   you plan to present?

17           MR. SCHIFMAN:  No, Your Honor, we do not plan to call

18   any witnesses.

19           THE COURT:  Do you have any additional evidence that

20   the Court hasn't received?

21           MR. SCHIFMAN:  Nothing further, Your Honor, other than

22   the exhibits, which we have previously filed.

23           THE COURT:  Okay.  I have some questions for the

24   plaintiffs.

25           First question is, why isn't the Western Apache tribe

ER099

1    named as a plaintiff?

2           MR. NIXON:  I can answer that question, Your Honor.

3           THE COURT:  Yes, please, Mr. Nixon.  Why don't you

4    remain seated and pull the microphone closer so we can all hear

5    you.

6           MR. NIXON:  Okay.  It just felt good to stretch my

7    legs.

8           THE COURT:  Oh, that's fine, if you want to do that

9    also.  Just speak up.

10          MR. NIXON:  Your question why isn't the Western Apache

11   tribe joined as a plaintiff, I take it that you meant why isn't

12   one of the four Western Apache tribes joined as a plaintiff;

13   for example, the San Carlos Apache tribe itself?

14          THE COURT:  You are correct.

15          MR. NIXON:  We didn't believe it was necessary, Your

16   Honor, especially in light of the Supreme Court's recent

17   decision in McGirt versus Oklahoma, where an individual

18   asserted and vindicated his entire tribe's treaty rights to a

19   vast part of the state of Oklahoma.

20          However, in regards to the standing defense raised by

21   the defense, if that is essentially what Your Honor's question

22   goes to, I would say that if there is any doubt that the Apache

23   Stronghold has standing here in this matter, we would gladly

24   join the tribes.  We could implead them.

25          There is no sovereign immunity at issue in that case

1  because -- or in this case because we are talking about land

2  and land rights, which would be subject to the immovable

3  property rule, and therefore sovereign immunity does not

4  withstand the power and the effect of the immovable property

5  rule, which was recently the subject of a Supreme Court case,

6  an argument in the Upper Skagit Tribe versus Lundgren, a case

7  that was remanded to the Washington State Supreme Court,

8  because that issue was first presented in that case after

9  certiorari was granted and at oral argument at briefing before

10  the Supreme Court.  And that case subsequently settled.

11       That was a case involving suit for quiet title brought

12  by the tribe against a couple who had bought some land that the

13  tribe felt was adversely possessed but not within -- or beyond

14  the statute of limitations.

15       But the immovable property rule is the central subject

16  of the oral argument per the brief submitted by the Lundgrens.

17       THE COURT:  Mr. Nixon, I want to take a step back to

18  the actual Treaty, which I know you have read several times

19  now.

20       Do you believe that the language in the Treaty

21  indicates that the chiefs who signed were signing on behalf of

22  the entire tribe?

23       MR. NIXON:  Well, as Dr. Welch made a point of

24  clarifying, there were no such things as tribes.  That's an

25  artificial construct created later by the American Government

1    to try to develop an organizational system or even to be able

2    to classify these different groups of people, these nations of

3    native peoples.

4           The title of --

5           THE COURT:  What word would you use besides "tribe"?

6           MR. NIXON:  Well, it's in the title of the Treaty

7    itself.  It's the 1852 Treaty between the United States and the

8    Apache Nations, of which there are Eastern Apaches and Western

9    Apaches.  So it is all the people.

10          They lived in places.  They had family relationships,

11   but they didn't have a, quote, unquote, tribe, and they didn't

12   have political boundaries and borders that you crossed or

13   didn't.  It was all people within the landscape stretching from

14   west Texas to throughout Arizona.

15          THE COURT:  Okay.  Well, let's go back to my question.

16   Do you believe the language in the Treaty is indicative of the

17   chiefs who signed it, signing on behalf of the Apache Nation?

18          MR. NIXON:  Yes, indeed.  Every single Apache.

19          THE COURT:  Mr. Nixon, do you or Mr. Levenson have any

20   case law that supports the proposition in your briefing that

21   the descendants of chiefs who signed the Treaty have standing

22   to enforce the Treaty rights?

23          MR. NIXON:  Not off the top of my head, Your Honor,

24   but we could provide that briefing of citation to any cases

25   that would exist to that effect.

1       THE COURT:  Well, will one of you gentlemen please

2  take notes of that question, because I will allow your closing

3  arguments in writing, and we will talk about that later this

4  morning.

5       Again, Mr. Nixon, are your due process and petition

6  clause claims based only on the publication of the FEIS?

7       MR. NIXON:  Yes, Your Honor.  And I'd also like to

8  point out that for the purposes of the preliminary injunction,

9  the only two issues before the Court for the purpose of the

10  preliminary injunction hearing today, are the Treaty rights and

11  the serious question of who owns that land, and the Religious

12  Freedom Restoration Act rights that have been violated as we

13  have alleged.

14       THE COURT:  Mr. Schifman, I have a question for you.

15  To what extent has the government complied with its obligation

16  to consult with the Western Apaches before completing the

17  exchange?

18       MR. SCHIFMAN:  Your Honor, you are asking about the

19  obligation within the -- what we're calling the "rider"; is

20  that correct?

21       THE COURT:  That is correct.

22       MR. SCHIFMAN:  The citation -- perfect.  Okay.  Well,

23  the document that is at issue here, the Final Environmental

24  Impact Statement, discusses the consultation that has occurred.

25  And we believe that consultation has been, you know, as

1    contemplated by the law.

2          I can refer to that document if you give me a second

3    to bring it up and point to some of the specific instances of

4    consultation.  But just off the top of my head, there was a

5    scoping period and comment period where interested parties,

6    including the tribes, could be heard and indeed were heard.  So

7    that's an answer in a nutshell.

8          MR. NIXON:  If I may, Your Honor?

9          THE COURT:  Yes, please, Mr. Nixon.

10         MR. NIXON:  Okay.  First of all, that's -- your

11   question was in regard to the National Defense Authorization

12   Act consultation requirement; is that correct?

13         THE COURT:  Correct.

14         MR. NIXON:  And the tribe itself has its own lawsuit,

15   which it filed shortly after hours, as the Court is probably

16   aware.  And among the claims presented in that complaint under

17   the Administrative Procedures Act, includes the National

18   Environmental Policy Act process, but also the National

19   Historic Preservation Act process.

20         And I think -- I would be doing the Court a favor to

21   advise or caution on the meaning of the word "consultation,"

22   because it is undefined in the law.  There's no statutory

23   definition.  There's no regulatory definition.  It is kind of

24   like a common English definition of consultation, but it can

25   mean many different things.

1       So just having a meeting is often listed by the U.S.

2  Forest Service, not just in this case, but regularly, it's kind

3  of a pattern of practice, a meeting with Indians or anybody

4  will equal consultation for their purposes of satisfying

5  consultation requirements under NEPA, the National Historic

6  Preservation Act, or specialized statutes such as the National

7  Defense Authorization Act.

8       But I would point out, I think, that Dr. Welch cited

9  one of his articles called Discretionary Desecration, in which

10  he talks about, what is consultation and the quality of it, not

11  just the frequency of a meeting or the mere fact of a meeting,

12  like what consultation really is and what it isn't.

13       And so I would just note that and say that I've been

14  to many consultation meetings, so-called consultation meetings,

15  in other cases over the years involving the Apaches and the

16  Forest Service.  And basically, it is just a listening session,

17  and nothing of substance takes place, in terms of true

18  consultation when you consult with somebody, like consult with

19  a doctor.  It is nothing like that.

20       THE COURT:  Well, Mr. Nixon, because the FEIS has

21  already been published, how will a favorable decision from me

22  on your due process and petition clause claims redress your

23  injury?

24       MR. NIXON:  Because that FEIS making available to the

25  public and we do not concede it was published under the law as

1   the law requires or defines publication for -- and again, we

2   are not here under the Administrative Procedure Act, but

3   constitutionally, for terms of adequate effective notice and

4   due process in regards to the consequential effect of that act

5   of so-called publishing, it began the march of a 60-day

6   mandate, which will then result in an attempted conveyance of

7   this land whose ownership is in serious question.

8         I mean, whether or not you believe we've proved it's

9   Apache land now, certainly the government has never proved it

10  is theirs, or how much of an interest in it they have.  Do they

11  have a total fee interest?  Nobody knows.  They certainly

12  don't, because they don't even have a legal description in the

13  FEIS, the draft EIS.  It is to be provided later.

14        You look at the maps they have for the FEIS and the

15  DEIS, and the legal description is to be provided later, and

16  it's a map from a few years ago, I think March of a few years

17  ago.

18        THE COURT:  Just one moment.

19        Olivia.

20        (Discussion held between Judge and Law Clerk.)

21        THE COURT:  Mr. Schifman, I have a question for you.

22  Do you contest plaintiff's standing to bring the First

23  Amendment free-exercise claims and the RFRA claim?

24        MR. SCHIFMAN:  We -- so as to the R-F-R-A, RFRA

25  claims, we do not contest plaintiff's standing to bring that.

1    That's not needing to be asserted on behalf of the tribe.  And

2    the same goes for plaintiff's free exercise of religion claim.

3            THE COURT:  Mr. Schifman, in your papers you cited

4    that where individual tribe members lack standing to assert

5    treaty rights under the Nonintercourse Act, can the same

6    reasoning from those cases be extended to other claims not

7    brought under that act?

8            MR. SCHIFMAN:  Yes, that's correct, Your Honor.  I

9    believe you are referring to the -- I am going to struggle to

10   pronounce this, so I won't do it, but the first of the cases

11   that we cite in our brief on page 6, Golden Hill Paugussett,

12   which I might not be pronouncing correctly, that was a

13   Nonintercourse claim, if I remember them correctly, and I

14   believe that some of the other cases were.

15           But the general principle that a treaty is between two

16   governments, so the United States Government and a government

17   of a federally recognized tribe, such as the San Carlos Apache

18   tribe, that principle stands for more than just cases brought

19   under the Nonintercourse Act.

20           So just as I as a citizen of the United States can't

21   go to the country of Italy and try to bring up treaties between

22   the United States Government and Italy, so too with tribal

23   members and the United States Government.  The tribes -- the

24   treaties are between the tribal government and the United

25   States Government as part of a government-to-government

1    relationship.

2          THE COURT:  Mr. Schifman, again, the -- in the papers,

3    plaintiffs argue that the RFRA and free exercise claim should

4    be analyzed under an alternative framework set out in the

5    Supreme Court Little Sisters case.  How does that framework

6    differ from the framework set out in the Ninth Circuit Navajo

7    Nation case?

8          MR. SCHIFMAN:  Well, Your Honor, the Little Sisters

9    case that plaintiffs want to take the framework from, I believe

10   they are not citing the Supreme Court case but in fact citing a

11   Third Circuit case that was being decided on other grounds by

12   the Supreme Court.

13         So I think that's an important distinction that the

14   Supreme Court has never altered the substantial burden as

15   plaintiffs seem to be suggesting.

16         So I don't think it differs, but the -- another

17   important aspect of the substantial burden inquiry goes to the

18   Lyng case, and certainly no Supreme Court case that plaintiffs

19   have cited has either directly or indirectly called into

20   question the holding of that case, which is that the

21   government's management, use, disposition of its own property

22   cannot be a substantial burden.

23         THE COURT:  Mr. Nixon, do you agree with defense

24   counsel's proposition just placed on the record?

25         MR. NIXON:  Absolutely not.  That's incorrect.  I can

1  give the point of clarification with regards to the Little

2  Sisters of the Poor and the underlying reasoning in the Third

3  Circuit that we were spotlighting for you, if I may?

4          And I have some notes on it.  I will just -- I was

5  prepared for this point --

6          THE COURT:  Well, I'll tell you what, let's do this.

7  While you gather your notes, I have a question for Dr. Welch.

8          Dr. Welch, if you could move back to counsel table and

9  help me, please.

10         Sir, if you know, what specific language in the 1852

11 Treaty, or any subsequent document, indicates that a trust was

12 formed between the United States and the Western Apaches

13 regarding the land in issue?  That's if you know.

14         THE WITNESS:  I am not aware of any sort of codified

15 or written-down trust associated with the totality of the

16 Western Apaches or the Eastern Apaches territory referenced in

17 that 1852 Treaty.

18         The notion of a trust, to me, involves an obligation

19 on the part of the United States to designate those treaties

20 and to legislate and act for the happiness and, I think the

21 word is prosperity, of the Apaches affected by that treaty.

22         THE COURT:  Well, Doctor, as you are well aware, the

23 1852 Treaty states in pertinent part the parties would later

24 designate boundary lines.

25         Do you know, in your research, if that was ever done?

1          THE WITNESS:  I noted that there were various efforts

2     to designate the territories, and that those ultimately

3     floundered and failed for want of ratification at the Senate

4     level.

5          THE COURT:  So the maps that are part of the record,

6     you don't believe created any type of trust relationship?

7          THE WITNESS:  The maps you are referencing being of

8     course the main big map of Arizona and New Mexico, map 1?

9          THE COURT:  And the designated boundary lines, that's

10    correct.

11         THE WITNESS:  Your question is whether or not those

12    lands were placed into trust; is that correct?

13         THE COURT:  Yes, if the maps that we have, that have

14    been received into evidence, do you think that created some

15    sort of trust relationship?

16         And Mr. Nixon, you can help the Doctor with my

17    question.

18         THE WITNESS:  There are three maps from the plaintiffs

19    of course, and the only really two relevant ones are the first

20    one and the second one.

21         The first one being the conjoined maps produced in

22    1899 by Charles Royce.  And they identify a polygon in there.

23    It's a big greenish area that encompasses southwestern New

24    Mexico and most of eastern -- excuse me -- central Arizona.

25         And that's polygon like 689, I believe, and that's

```
1    what's identified as the Western Apaches territory as
2    interpreted by Charles Royce.  He, like I, as an anthropologist
3    and as the defense pointed out, we are not judges, this was his
4    interpretation based on the records that he reviewed in the
5    1880s, and I am adopting that as my best interpretation of what
6    the United States and the parties to the 1852 treaties would
7    have agreed to as the time as being Western Apache's treaty --
8    treaty territory, yes.
9             THE COURT:  Dr. Welch, thank you very much.
10            MR. NIXON:  And that Royce map is an official U.S.
11   Government document, correct?
12            THE WITNESS:  Yes.
13            MR. NIXON:  How so?
14            THE WITNESS:  It was produced while Charles Royce was
15   in the employ of the Smithsonian Institution.  One part of that
16   Smithsonian Institution called the Bureau of American
17   Ethnology.
18            THE COURT:  Doctor, I appreciate your answers to my
19   questions.
20            Mr. Nixon, if I find that there's no trust
21   relationship, does that impact any of your other claims, other
22   than the breach of trust claim?
23            MR. NIXON:  No, Your Honor.  The trust relationship,
24   the trust duty and responsibility, the fiduciary duty to which
25   we are referring is a basic principle of constructive trust
```

```
 1   based on the behavior of the United States Government in
 2   usurping that land and based on the nature of the relationship
 3   per the law of the land in federal Indian law in America
 4   tracing back to Justice Marshall's opinion in Johnson v.
 5   McIntosh, whereby Indian nations are considered to be domestic
 6   dependent nations and essentially a ward of the United States
 7   in that perspective.
 8           There is an overarching trust duty based on the very
 9   basic principles of constructive trust besides any voluntary
10   trust duty the United States would ever decide to give to
11   itself by statute or by regulation or other means.
12           And I do have an answer to your question, not from my
13   notes but just from my memory, in regards to that issue about
14   the Little Sisters of the Poor case looking at that Third
15   Circuit test.
16           And defense counsel characterized it from their
17   perspective.  What I would say is that is an inaccurate
18   characterization and tends to gloss over what actually happened
19   there.
20           When you look at the Hobby Lobby decision, which is a
21   long opinion and very complex, it was a landmark case.  And it
22   has progeny, of which Little Sisters of the Poor is one of the
23   most recent Supreme Court progeny.
24           There's a Second Circuit case just from the results of
25   the COVID-related pandemic strictures on churches and
```

1    synagogues in New York City, which tracks along with this.  And

2    it may or may not end up in the Supreme Court; it remains to be

3    seen.

4           However, in the Little Sisters of the Poor case, just

5    like the Pennsylvania versus President of the United States

6    case, what the Supreme Court did was -- what took six pages in

7    an opinion on Justice Alito, I believe, a concurring opinion in

8    Hobby Lobby, they distilled it down, utilizing some of the

9    principles that the Third Circuit did, but they never rejected

10    the Third Circuit's improved test or the application of it or

11    its significance.

12           They were able to, after reiterating it in a more

13    simplified and more easily understandable way, found that they

14    could resolve the issue in that particular case by looking

15    elsewhere and different aspects of RFRA.

16           THE COURT:  Mr. Nixon, why did you wait six years from

17    when the Southeast Arizona Land Exchange and Conservation Act

18    was signed into law to bring this claim?

19           MR. NIXON:  It didn't become real until they published

20    the FEIS.  They didn't have to publish that on January 15th.

21    It could have taken another 10 years.  It was indefinite.

22    There was no mandate on the publication date of the FEIS.

23           And what we are attacking is the law as applied.  It

24    is a very gigantic undertaking, Your Honor, to launch a case

25    like this.  And we have three lawsuits right now in this

1   district that have appeared, ours -- a few days before the FEIS

2   got published, and two immediately thereafter.

3         And so whether we are -- we are not attacking the

4   direct constitutionality of the passage of the NDAA, but we are

5   certainly attacking and defending against its unconstitutional

6   application at this time, which just started less than a month

7   ago.

8         THE COURT:  Mr. Nixon, the FEIS states that a surface

9   crater is not expected to break through on the land until six

10  years after the mining process begins.

11        In light of this, what immediate irreparable harm will

12  you suffer from the land exchange?

13        MR. NIXON:  RFRA would no longer apply to that land,

14  and all the protections provided by Congress to the Apache

15  religious believers and livers would evaporate in an instant,

16  if in fact the U.S. Government even owns any legal interest in

17  that land, which we dispute and they certainly haven't proved.

18        THE COURT:  Well, what evidence do you have of

19  discriminatory intent behind the land exchange, separate from

20  its discriminatory impact?

21        MR. NIXON:  Just this morning, Your Honor, you heard

22  directly from Dr. Nosie himself who in various capacities, as

23  an individual, as member of Apache Stronghold, and in his prior

24  official capacities as tribal councilman and tribal chairman,

25  presented repeatedly before the introduction of the National

1    Defense Authorization Act Section 3003 rider, about the central

2    religious importance of this place, Oak Flat.

3            And the government, Congress, when it passed that

4    law -- you can't read in that law.  We recognize the central

5    religious importance -- there's no deliberate regard of it,

6    much less an utterance that there's a compelling government

7    interest to have some Australian and English copper mining

8    companies take the copper ore out of here and take it overseas

9    and make some copper wire out of it.  There's nothing like

10   that, and so that's why.

11           You know, for years, from the get-go, we are talking

12   now almost 18 years ago or more, the Apaches have been doing

13   everything they possibly can with the system we have.  So this

14   brings us to court because it's inevitable the march went on

15   this way and it brought us here for which we are grateful to

16   have the opportunity, and this is where we, I say "we" as a

17   representative legal counsel for Apache Stronghold and its

18   members, are taking their stand because they have to do it

19   here.

20           THE COURT:  Mr. Schifman, in light of the Court's

21   questions, the last four questions, do you have anything that

22   you would like to place on the record?

23           MR. SCHIFMAN:  Your Honor, I would like to make one

24   brief clarification as to the questions about title and the

25   United States' ownership of the land that plaintiff's counsel

1   has just brought up, just very briefly.

2          I would direct the Court -- Your Honor, we didn't

3   brief this, but if Your Honor has questions, we could elaborate

4   on this further.

5          But if plaintiffs are correct that the tribes at one

6   time had aboriginal title, the United States could extinguish

7   that title, and I would direct Your Honor's attention to a case

8   called Havasupai Tribe -- and I will spell that,

9   H-A-V-A-S-U-P-A-I, versus United States, 752 F. Supp. 1471,

10  which is a District of Arizona case that was then affirmed by

11  the Ninth Circuit.

12         And that case stands for the proposition, excuse me,

13  and I will quote, reservation of land for forest purposes

14  (silence on the line) whatever the questions of title and

15  whether the tribe had aboriginal title might have been, at the

16  time that the forest was placed into forest reserve, which you

17  know, occurred, I believe, over 100 years ago, at that time,

18  any title question would have been settled.

19         So that's the only thing I would like to clarify, at

20  this point, Your Honor.

21         MR. NIXON:  Your Honor, if I may?

22         THE COURT:  Yes, Mr. Nixon, go ahead.  I will give you

23  a minute.

24         MR. NIXON:  That's very presumptive, you know, and

25  certainly, for one thing, it would violate a trust

1   responsibility to make such a declaration.  Certainly in this

2   case.

3           Whatever happened in that case, in regards to that

4   national forest and that tribe and its treaty history and its

5   Indian Claims Commission history, which by the way, Indian

6   Claims Commission decisions, which are administrative

7   procedures, do not have the effect and power or the authority

8   explicitly to extinguish aboriginal title.

9           One thing is for sure in this case, Western Apache

10  aboriginal title to the area that includes Oak Flat has never

11  ever been extinguished.  It has never been given away by the

12  Apaches, never yielded.  And so that case and that conclusion

13  is just inapplicable on the facts and the law.

14          THE COURT:  Mr. Nixon, I will give you until 5:00

15  today to file your findings of fact and conclusions of law.

16          MR. NIXON:  Thank you, Your Honor.

17          THE COURT:  You're welcome.

18          We will not have closing arguments today.  What I will

19  allow the parties to do is by close of business this coming

20  Friday, which is the 5th of February, by 5:00 p.m. Arizona

21  time, I need your written arguments.

22          They will not be more than 10 pages.  That's including

23  any attachments you may have, and I will issue an order on the

24  matter no later than next Friday, which is -- what is that, the

25  13th?

1    Whatever next Friday is by 5:00 p.m -- the 12th.

2    MR. NIXON:  Point of clarification, Your Honor?

3    THE COURT:  Yes.

4    MR. NIXON:  The written arguments, 10 pages total

5    including any attachments, what particular points of concern or

6    --

7    THE COURT:  Whatever you believe helps your client the

8    most with what you are asking this Court to rule?

9    MR. NIXON:  Very well.  Thank you, Your Honor.

10   THE COURT:  You're very welcome.

11   Is there anything else from the plaintiffs?

12   MR. NIXON:  No, Your Honor.

13   MR. LEVENSON:  No, Your Honor.  Thank you.

14   THE COURT:  Mr. Schifman, is there anything from you?

15   MR. SCHIFMAN:  Nothing from the federal defendants,

16   Your Honor.

17   THE COURT:  This hearing is adjourned.  Everyone be

18   safe.  Thank you for your time.

19   (Proceedings conclude at 12:02 p.m.)

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                    C E R T I F I C A T E

2

3          I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 4th day of February,

12   2021.

13

14                              s/Elva Cruz-Lauer
                            Elva Cruz-Lauer, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25

Michael V. Nixon (OR Bar # 893240) (*pro hac vice* application pending)
101 SW Madison Street # 9325
Portland, OR 97207
Telephone: 503.522.4257
Email: michaelvnixon@yahoo.com

Clifford Levenson (AZ Bar # 014523)
5119 North 19th Avenue, Suite K
Phoenix, AZ 85015
Telephone: 602.258.8989
Fax: 602.544.1900
Email: cliff449@hotmail.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Apache Stronghold,<br>a 501(c)(3) nonprofit organization,<br><br>Plaintiff,<br><br>v.<br><br>United States of America,<br><br>Sonny Perdue, Secretary, U.S. Department<br>of Agriculture (USDA),<br><br>Vicki Christensen, Chief, Forest Service,<br>USDA,<br><br>Neil Bosworth, Supervisor, Tonto National<br>National Forest, USDA,<br><br>And<br><br>Tom Torres, Acting Supervisor, Tonto<br>National Forest, USDA,<br><br>Defendants. | No. CV-21-_____<br><br>**DECLARATION OF<br>CRANSTON HOFFMAN JR.** |

1

DECLARATION OF CRANSTON HOFFMAN JR.

Under the penalties of perjury in accordance with the laws of the United States of America, I hereby declare:

1.  I, Cranston Hoffman Jr, am an enrolled member of the San Carlos Apache Tribe.

2.  I was born on May 31, 1952 in San Carlos, Arizona.

3.  I am of the Tanasgizin Clan ("Washed People") on my mother's side and born for the Tiis tu ayeh Clan ("Cottonwood Sticking in the Water") on my father's side.

4.  I am a Veteran. I served in Desert Storm in the Persian Gulf.

5.  I am an Apache Traditional Practitioner and Medicine Man who conducts the Apache Holy Grounds Ceremony.

6.  I was raised by parents who taught me and my siblings about the Apache way of life.

7.  When I was a child, I remember early memories of Chi'Chil Biłdagoteel ("Oak Flat") when my family stopped to pick acorn at Oak Flat. I also remember picking medicine in the area too. My family and I drove around in the nearby Pinto Creek where there were plenty of cottonwood and acorn trees along the creek. This whole region we visited at different seasons of the year.

8.  Chi'Chil Biłdagoteel ("Oak Flat") is a holy place. It is part of Western Apache lands. Today there are living descendants of our ancestors whose clans come from this territory. Many of the living descendants are enrolled tribal members from the San Carlos Apache Tribe. In early history, the United States Government prevented us from freely roaming through these lands because the lands were rich in natural resources. During this time and for many years, the Government also restricted Apaches from freely practicing their traditional ceremony, both on and off the reservation. Instead of stopping our religious practices we had our ceremonies in secluded areas. The Government laws were strict and our ceremonies were hidden but we kept conducting them, even at Chi'Chil Biłdagoteel.

9.  I was taught and learned the ways of the Holy Ground ceremony from the Hoffman side of my family. The stories, songs, and prayers from the Holy Ground ceremony have been passed down for

2

DECLARATION OF CRANSTON HOFFMAN JR.

many generations within my family line.  In return, I am teaching the next generation so they will be able to teach the future generations about the Holy Grounds ceremony.

10.    The Holy Grounds Ceremony is a blessing and a healing ceremony.  At Chi'Chil Biłdagoteel ("Oak Flat") the Holy Ground ceremony is conducted for people who are sick, have ailments or seek guidance.  The Holy Grounds ceremony is also a ceremony to pray for elements that are part of the eco-system, like rain, so water can rain down upon the People (the Apache), the animals, medicines, minerals, and trees.  Oak Flat is a holy place for healing.

11.    I have conducted the Holy Grounds ceremony at Chi'Chil Biłdagoteel ("Oak Flat") for many years.  The Holy Ground ceremony at Oak Flat supports life, and the emotional, physical and spiritual well-being of our People (the Apache).  It is a ceremony that should not be recorded or shared in social media or newspapers as it is very personal.

12.    To have a land exchange occur at Oak Flat and to have destruction of this spiritual place by mining—these actions will have a direct, negative effect on me and members of the Holy Ground group who assist me in conducting these ceremonies.  The prayers we have offered will be disrupted, the negative things extracted will resurface and we believe that these negative elements will come back to hurt us, our loved ones, and/or our tribal community.  Our religious beliefs in the good that we do by conducting prayers at a special, holy place will be broken.  We do not want this for our People, for our Future and for Ourselves.  Just as I served to defend this Country as a soldier in the Army, I serve my People to defend our traditional Apache Way of Life as an Apache Medicine Man who conducts the Apache Holy Grounds Ceremony at Oak Flat.  I request that our declarations be heard and considered fairly and in good faith.

Respectfully submitted,

Dated: January 10, 2021

Cranston Hoffman Jr.

3

DECLARATION OF CRANSTON HOFFMAN JR.

Michael V. Nixon (OR Bar # 893240) (*pro hac vice* application pending)
101 SW Madison Street # 9325
Portland, OR 97207
Telephone: 503.522.4257
Email: michaelvnixon@yahoo.com

Clifford Levenson (AZ Bar # 014523)
5119 North 19th Avenue
Suite K
Phoenix, AZ 85015
Telephone: 602.258.8989
Fax: 602.544.1900
Email: cliff449@hotmail.com
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
Phoenix Division

| | | |
|---|---|---|
| Apache Stronghold, a 501(c)(3) nonprofit organization, | ) ) ) | No. 2:21-cv-00050-CDB |
| Plaintiff, | ) ) | **DECLARATION OF CLIFFORD LEVENSON** |
| v. | ) ) | |
| United States of America, | ) ) | |
| Sonny Perdue, Secretary, U.S. Department of Agriculture (USDA), | ) ) ) | |
| Vicki Christensen, Chief, Forest Service, USDA, | ) ) ) | |
| Neil Bosworth, Supervisor, Tonto National Forest, USDA, | ) ) ) | |
| And | ) ) | |
| Tom Torres, Acting Supervisor, Tonto National Forest, USDA, | ) ) ) | |
| Defendants. | ) ) | |

**ER123**

I, Clifford Levenson, under the penalties of perjury in accordance with the laws of the United States of America, hereby declare:

1.   I am counsel of record for the Plaintiff, Apache Stronghold, in the above captioned matter.

2.   On January 13, 2021, at approximately 10:30am, I called the U.S Attorney's Office in Flagstaff, Arizona, and identified myself as counsel for Apache Stronghold in its lawsuit against the United States. I provided the receptionist with the case number, and my contact information, and indicated that I wished to provide the U.S. Attorney's Office with a copy of the lawsuit, and to discuss the matter.  The receptionist indicated that my contact information would be provided to an attorney from the civil division in Phoenix, and that I would get a return call. I did not receive a return call.

3.   On January 13, 2021, at 4:23pm, I called the U.S. Attorney's Office in Phoenix. There was no answer, and there was no voice mail available.

4.   I have provided a certified process server with copies of all pleadings filed by the Plaintiff in this matter, and the process server has been directed to serve the documents on the U.S. Attorney's Office in Phoenix on the morning of January 14, 2021.

Respectfully submitted,

/s/Clifford Levenson                                  Date: January 13, 2021
Clifford Levenson

Michael V. Nixon (OR Bar # 893240) (*pro hac vice* application pending)
101 SW Madison Street # 9325
Portland, OR 97207
Telephone: 503.522.4257
Email: michaelvnixon@yahoo.com

Clifford Levenson (AZ Bar # 014523)
5119 North 19th Avenue
Suite K
Phoenix, AZ 85015
Telephone: 602.258.8989
Fax: 602.544.1900
Email: cliff449@hotmail.com
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
Phoenix Division

| | | |
|---|---|---|
| Apache Stronghold,<br>　a 501(c)(3) nonprofit organization, | ）<br>）<br>） | No. 2:21-cv-00050-CDB |
| 　　　　　　Plaintiff, | ）<br>） | **DECLARATION OF**<br>**NAELYN PIKE** |
| 　v. | ）<br>） | |
| United States of America, | ）<br>） | |
| Sonny Perdue, Secretary, U.S.<br>　Department of Agriculture (USDA), | ）<br>）<br>） | |
| Vicki Christensen, Chief, Forest Service,<br>　USDA, | ）<br>）<br>） | |
| Neil Bosworth, Supervisor, Tonto<br>　National Forest, USDA,　　　　　 | ）<br>） | |
| 　　　And | ）<br>）<br>） | |
| Tom Torres, Acting Supervisor, Tonto<br>　National Forest, USDA, | ）<br>）<br>） | |
| 　　　　　Defendants. | ） | |

**ER125**

I, Naelyn Pike, under the penalties of perjury in accordance with the laws of the United States of America, hereby declare:

1.   I am a member of the San Carlos Apache Tribe and reside on the San Carlos Apache Reservation in rural Southeast Arizona. I am Chiricahua Apache, and my family has lived in what is now Southeastern Arizona since time immemorial.

2.   Chi'Chil Biłdagoteel ("Oak Flat") is Apache sacred and religious land and has been since time immemorial. I exercise my religion there and my religious beliefs are centered in and on the land of Oak Flat.

3.   I make this Declaration today to advocate for the protection of my Apache peoples' land, our Apache religion, our Apache religious beliefs, and our traditional Apache homeland on behalf of the next generation and the generations yet to come, and to stop the terrible plans of the foreign mining corporations Rio Tinto, BHP Billiton, and their new local company Resolution Copper, to take and destroy Oak Flat and destroy our Apache religious lives.



Naelyn Pike (Photo: Apache Stronghold).

4.   The essence of an Apache woman is our traditional land and our religious connection to to Nahgosan, Mother Earth, which includes the sacred places like Oak Flat.

5.   At least eight Apache clans and two Western Apache bands have documented history in what is today known as Oak Flat and Apache Leap. Apache people are deeply connected to our traditions and to the land that we have called home since first put here by Usen, the Creator.  Our religious beliefs entwine with land, water, plants, and animal. My people have lived, prayed, and died in Oak Flat and Tonto National Forest for centuries.

6.   The United States Calvary had forced my people from the land and onto the reservation in the late 1800s as prisoners of war. While we had to leave our sacred places at gunpoint, these areas still retain their spiritual, cultural, and historical connection to the

Apache people. Today we continue cultural and religious practice and have the right to continue our religious freedom now, and in the future, as it was given to us by Usen.

7.    Just the other day, the Forest Service publicly stated for the first time that the Forest Service will publish the Final Environmental Impact Statement ("Final EIS" or "FEIS") for the Southeast Arizona Land Exchange and Resolution Copper Mine ("SALE-RCM") on this coming Friday, January 15, 2021.[1]

8.    We have the right to go back to these places because San Carlos is where we were forced to by the U.S. Army and placed as prisoners of war after the Apache defense of our homeland in the 1800s. San Carlos—that's not my Apache home. My ancestors that were forced to leave home were placed in Old San Carlos, where settlers from back east called "Hell's 40 Acres" because it was a place where no human beings could live. This was a place for my ancestors to live the rest of their lives as prisoner and now that name is called tribal member. My ancestors lived and roamed in Oak Flat and Mount Graham before law was created and boundaries were set not allowing them to go back. I am a descendent of those who were prisoners that continues to fight for the freedom to pray and be free just as those before me since time immemorial.

---

[1] "Trump To Approve Land Swap For Rio Tinto's Resolution Copper Project," Ernest Scheyder, Reuters (January 4, 2021) ("The U.S. Forest Service will publish a final environmental impact statement for the mine on Jan. 15, a necessary step to complete the land exchange, said Tom Torres, acting supervisor of the Tonto National Forest, where the mine would be built."). Article accessed on January 10, 2021, for citation at https://www.msn.com/en-gb/news/world/trump-to-approve-land-swap-for-rio-tintos-resolution-copper-project/ar-BB1ct2gu .
.

9.    That is why I'm fighting for my Apache home, for **Chi'Chil Biłdagoteel** ("Oak Flat") and Dzil Nchaa Si'An (known to settlers and their descendants today as "Mount Graham").

10.    I am fighting for those Apache places because those places—you can be born there, you can live there, take the medicinal plants, eat the food and drink the water, have Apache religious ceremonies, and be free, and live that essence of life of who we are—is a God-given gift that our creator has given to us for sacred religious purposes that we believe in as we must as God expects us to, and it must be protected for that reason. And also that the future of our children can still have the ability to pray where they should and to be able to still believe in the spiritual things that live there and know we can connect to Usen, as it was taught to me by my great-grandmother.



Apache Religious Sunrise Ceremony at Oak Flat
(Photograph with family permission ©).

11.   In Apache religion, Usen gives the gift of life and the bearing of children to the female. In this gift our people celebrate the beginning, and the first women who gave life to our people. This is the Sunrise Ceremony that our young Apache girls do when they have their first menstrual. This is what I did on Mount Graham and my sister, Nizhoni Pike did at Oak Flat. The sunrise ceremony is given to us as a right of passage that sets a path for our life in the future. It doesn't just bring life and blessing to the girls but for all of Usen's creation.



Apache Religious Sunrise Ceremony at Oak Flat
(Photograph with family permission ©).

12.   We believe that the place the ceremony takes place is the life thread forever

connecting the place and the girls who have their ceremony there, and their direct

connection to the land. The destruction of Oak Flat will not only destroy the land, water,

DECLARATION OF NAELYN PIKE                7

plants, animals, cultural history, historical artifacts, and Apache religious beliefs seated there, but it will also harm these girls' life and their connection to their rebirth.



Apache Religious Sunrise Ceremony at Oak Flat
(Photograph with family permission ©).



Apache Religious Sunrise Ceremony at Oak Flat
(Photograph with family permission ©).

13.   True unity is accepting one another's diversity, because each and every one of us is beautiful as the Creator has made us in His image. We all have a story. I have my own story. My mom has her story. Those before us have a story. This mine will not allow the future to have a story. But, as long as we understand each other's stories and we accept that beautiful diversity in all people, because we are human beings in this world, the one thing we can understand is that we all have one issue on which we can relate: living in peace together.



Traditional Apache Religious 'Changing Woman' Sunrise Dance Ceremony at Chi'Chil Biłdagoteel ("Oak Flat")
(Photograph with family permission. © Robin Silver Photography).

Respectfully submitted,


<u>/s/Naelyn Pike</u>                    Date:  January 10, 2021
Naelyn Pike

Michael V. Nixon (OR Bar # 893240) (*pro hac vice* application pending)
101 SW Madison Street # 9325
Portland, OR 97207
Telephone: 503.522.4257
Email: michaelvnixon@yahoo.com

Clifford Levenson (AZ Bar # 014523)
5119 North 19th Avenue, Suite K
Phoenix, AZ 85015
Telephone: 602.258.8989
Fax: 602.544.1900
Email: cliff449@hotmail.com
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
Phoenix Division

| | |
|---|---|
| Apache Stronghold, <br>     a 501(c)(3) nonprofit organization, ) <br> ) <br>                   Plaintiff, ) <br> ) <br>   v.                      ) <br> ) <br> United States of America,     ) <br> ) <br> Sonny Perdue, Secretary, U.S.   ) <br>   Department of Agriculture (USDA), ) <br> ) <br> Vicki Christensen, Chief, Forest Service, ) <br>     USDA,             ) <br> ) <br> Neil Bosworth, Supervisor, Tonto  ) <br>     National Forest, USDA,    ) <br> ) <br>     And               ) <br> ) <br> Tom Torres, Acting Supervisor, Tonto ) <br>     National Forest, USDA,    ) <br> ) <br>              Defendants.   ) <br> _____ ) | No. 2:21-cv-00050-CDB <br><br><br> **DECLARATION OF** <br> **WENDSLER NOSIE, SR., Ph.D.** |

DECLARATION OF WENDSLER NOSIE, SR., Ph.D.        1

I, Wendsler Nosie, Sr., under the penalties of perjury and in accordance with the laws of the United States of America, hereby declare:

1.   Chi'Chil Biłdagoteel ("Oak Flat") is Apache sacred land and a Western Apache traditional cultural property and religious ground where my religious beliefs are seated and are freely exercised, as it has been for Western Apaches since time immemorial. It is still Western Apache land by the 1852 Treaty of Santa Fe and belongs to all Western Apaches. Oak Flat does not belong to the United States of America and so the United States has no authority to sell it, exchange it, or otherwise convey it or give it away.

2.   Even though the United States has tried to steal Oak Flat away from us, we have never given up or sold that Treaty land. Our traditional Apache religion does not even allow us to do such a bad thing as that. Oak Flat is ours and always has been since time immemorial, long before the United States of America ever existed.



Wendsler Nosie, Sr. standing alongside an Apache ceremonial sweat lodge frame at Chi'Chil Biłdagoteel ("Oak Flat") (Photo by Eli Imadali, Arizona Republic).

3.    I was born in July 1959, on the San Carlos Apache Reservation. I was raised in a traditional Apache way of life. I graduated from the Globe High School in May 1978 and attended Merritt College in Oakland, California, attended Phoenix College in Phoenix, Arizona, and completed the State of Arizona Banking Academy. On February 26, 2016, I received my title as AUSN Professor in the Practice of indigenous Knowledge from the American University of Sovereign Nations and on June 13, 2018 received my PhD, a Doctorate in Bioethics, Sustainability and Global Public Health from the American University of Sovereign Nations.

4.    I am the son of the late Elvera Ward Nosie and the late Paul Nosie Sr. My mother, Elvera Nosie was born in Old San Carlos as a Prisoner of war. Her father was

George Ward and her mother Maria Galvan. My grandfather George Ward, the son on Hiram Ward and Altisa were among the first Yavapai prisoners at Old San Carlos, driven from the Pinal Mountains and Oak Flat area, and Camp Verde areas to Old San Carlos.  My father Paul Nosie Sr. was the son of William Nosie and April Logan, the descendants of Chief John Nosie of the Chiricahuas. April Logan was the Daughter of Walter and Ella Mary Logan, the family of Abraham Logan, the keeper of the Holy Ground in Seven Mile, San Carlos.AZ My clan is Stiniye and I am a descendent of the Bedonkohe band of Apaches, the band of Geronimo.

5.    Naelyn Pike is my granddaughter. I have read her Declaration in this case and I adopt it and incorporate her words here into my Declaration, too. We have come a long way together through this struggle to protect our ancestral homelands, and I am thankful for her never-ending support and courage, especially during the most difficult times. Her powerful voice and determination to help protect the things we hold dear are a constant reminder that we must do so for future generations as Apache people.

6.    I have been elected and served in the government of the San Carlos Apache Tribe as a Councilman (1989-92; 2004-2006; 2010-2012; 2012- 2016) and as Chairman (2006-2010).

7.    I am the co-founder and spokesperson of Apache Stronghold, a 501(c)(3) not-for-profit organization registered in Arizona, and headquartered in the town of San Carlos in the San Carlos Apache Tribe's reservation land, bordered by the White Mountain Apache Tribe, the Navajo Tribe, the State of Arizona, and some federally-managed lands of the United States.

8.   For over a decade our Tribe fought to stop the Southeast Arizona Land Exchange ("Land Exchange"), a proposal to transfer approximately 2,422 acres of our ancestral homelands in the Tonto National Forest ("TNF") to foreign mining conglomerates, Rio Tinto and BHP, to dig a questionable and vast copper mine beneath lands we hold as sacred. Thanks to the vocal opposition of more than 400 Native Nations and tribal organizations the House of Representatives pulled the Land Exchange from floor consideration twice during the 113th Congress (January 3, 2013, to January 3, 2015) due to lack of support.

9.   Despite this nationwide opposition, the Land Exchange was buried on page 1,103 of a 1,700-page National Defense Authorization Act ("NDAA") that was unveiled on December 13, 2014, just minutes prior to midnight, the evening before votes.[1] This despicable action is the antithesis of democracy and has threatened to forever destroy our way of worship and life, yet the United States and its Forest Service leaders persist, now rushing this week to publish a Final Environmental Impact Statement ("FEIS") so it can trigger the provision in Section 3003 of the NDAA that allows the Forest Service to immediately do the Land Exchange to transfer ownership to Resolution Copper.

---

[1] "Senate passes spending bill, ends government shutdown threat," By David Lawder and Amanda Becker, Reuters (December 13, 2014) https://www.reuters.com/article/us-usa-congress-budget/senate-passes-spending-bill-ends-government-shutdown-threat-idUSKBN0JR0I820141214. See also, "Crowd protests copper mine on sacred lands," Apache Messenger/Indianz.com (December 22, 2014) https://www.indianz.com/News/2014/015978.asp.

10.  This past week, as we suddenly learned without any prior official notice—even though we have been actively involved in the process directly with the U.S. Forest Service and the other federal agencies working with the Forest Service on the proposed Oak Flat Land Exchange, such as the President's Advisory Council on Historic Preservation ("ACHP")—that as the Forest Service publicly stated to a news reporter[2] that they will publish the FEIS this Friday, January 15, 2021, setting up the stage for the Land Exchange of Oak Flat—which could then happen the very same day as the publication of the FEIS.

11.  There is nothing mandating that the Forest Service must publish the FEIS on January 15, 2021, or even any day this month or next. In fact, there is no FEIS publication date mandated in the NDAA at all.

12.  If the Land Exchange is permitted to move forward through finalization of a flawed Draft Environmental Impact Statement ("DEIS") process, the mining corporation and TNF, both acknowledge that the mine will cause a vast subsidence in the earth, destroying our Sacred Oak Flat, our religion, and with that, destroying our ability to have and preserve our traditional Apache way of prayers, our religious beliefs and ceremonies, and our religious Apache way of life.

---

[2] "Trump To Approve Land Swap For Rio Tinto's Resolution Copper Project," Ernest Scheyder, Reuters (January 4, 2021) ("The U.S. Forest Service will publish a final environmental impact statement for the mine on Jan. 15, a necessary step to complete the land exchange, said Tom Torres, acting supervisor of the Tonto National Forest, where the mine would be built."). Accessed on January 10, 2021 via https://www.msn.com/en-gb/news/world/trump-to-approve-land-swap-for-rio-tintos-resolution-copper-project/ar-BB1ct2gu

13.   We said for years, Resolution Copper's mining operations will have

devastating impacts

on our history, our culture, our religious practices, and the natural resources and

environment of this area, especially the region's water supply. For years, proponents of

Resolution Copper ignored these harsh realities and insisted that the benefits of jobs,

which were greatly exaggerated and fluctuated frequently, were worth the toll to the

environment and life of the surrounding communities. Yet, the DEIS confirmed in large

part the permanent damage and losses we already knew would occur to the broader

physical environment, and our places of religious worship and cultural reverence should

the project be allowed to proceed.

14.   The proposed mine would directly, adversely and permanently affect and

destroy numerous cultural artifacts, sacred seeps and springs, traditional ceremonial

areas, resource gathering localities, burial locations, and other places of high spiritual

value to tribal members.

15.   The analysis of the Tribal Values and Concerns focuses the impacts of the

proposed Land

Exchange and Resolution Copper Mine on the past without recognizing the current

presence of religious and cultural practices that have endured at Oak Flat for centuries.

This erasure of Native Americans in contemporary terms perpetuates the genocidal

history of America.[3]

---

[3] See, e.g., "Earth, Wind and Fire: Pinal Apaches, Miners, and Genocide in Central
Arizona, 1859-1874," Welch, John R., Sage Open Journal, vol.7, no.4 (October-

16.   What was once gunpowder and disease is now replaced with bureaucratic negligence and mythologized past that treats us, as Native people, as something invisible or gone. We are not. We are still a vibrant and vital part of our Nation's fabric despite repeated attempts to relegate our cultures as artifacts in museums or blubs in history books. However, the permanent damage that will be caused by the Resolution Copper Mine is something that will contribute to this genocidal narrative continuing now and well into the future.

December 2017). Available online at
https://journals.sagepub.com/doi/full/10.1177/2158244017747016.



Ga'an Mountain Spirit Dancer, Western Apache Sunrise Religious Ceremony
at Oak Flat (May 19, 2012) Photograph with family permission.
© Robin Silver Photography.

17.   It is important to understand that we have never lost our relationship to

Chi'Chil Bildagoteel. Despite the violent history of the U.S. Government's exile, forced

march and imprisonment of Native people on reservations, and the efforts by the U.S.

Government to discourage, impede, or fully disallow us from coming to this holy area,

we have our own legacy of persistence and never letting go of this place.

DECLARATION OF WENDSLER NOSIE, SR., Ph.D.                    9

18.   Chi'chil Bildagoteel's religious value to our prayers, our ceremonies, and in our family histories cannot be overstated. Native religion was the first religion practiced in this area.

19.   We have established an encampment to protect the Holy Ground at Chi'chil Bildagoteel with its four crosses, which represent the entire surrounding Holy and Sacred area, including its water, animals, oak trees, and other plants central to our Western Apache tribal identity.

20.   It is important to note that Chi'chil Bildagoteel is listed in the National Park Service's National Register of Historical Places ("NRHP") as a Historic District and Traditional Cultural Property ("TCP").[4] Emory oak groves at Oak Flat used by tribal members for acorn collecting are among the many living resources that will be lost along with more than a dozen other traditional plant medicine and food sources. Other unspecified mineral and plant collecting locations and culturally important landscapes will also be affected.

21.   Development of the Resolution Copper Mine would directly and permanently damage Chi'chil Bildagoteel, our sacred holy ground that is vital to us, which is why we strongly oppose this operation. The impacts that will occur to Oak Flat will undeniably prohibit the Apache people from practicing our ceremonies at our Holy site. Construction

---

[4] U.S. Department of Agriculture Tonto National Forest (2015) National Register nomination for the Chi'chil Biłdagoteel National Historic District, Pinal County, Arizona (U.S. National Park Service, National Register of Historic Places, approved March 4, 2016). Retrieved from
http://bloximages.chicago2.vip.townnews.com/tucson.com/content/tncms/assets/v3/editorial/8/b1/8b10c3b0-77ed-560b-bd5f-bc0552df7e7c/56e363c6b87ba.pdf.pdf

of the mine would cut off access and once the mine has been completed, the destruction will create a permanent barrier preventing Apache ceremonies from taking place.

22.   Our connections to the Oak Flat area are central to who we are as Apache people. Numerous people speak of buried family members. Most of them include childhood memories. Everyone speaks to the deep spiritual and religious connection that Apaches have to the land, water, plants and animals at Oak Flat that would be permanently destroyed by this proposed action.

23.   The destruction to our lands and our sacred sites has occurred consistently over the past century in direct violation of treaty promises and the trust obligation owed to Indian tribes.

24.   Please keep in mind that the Land Exchange was achieved through a backroom agreement, literally at midnight the evening before attaching it to the NDAA. We would not be in this position today had the Land Exchange gone through regular order and been subject to meaningful and honest debate.

25.   It always has been told and taught to us for generations by our parents, our elders, our traditional Apache religious leaders —and it is embedded in our way as passed down from our Apache ancestors—that this place, Oak Flat, is special and holy and sacred. This is a unique and special sacred place as we believe in the spiritual forces of God the Creator that he put there for us and for us to protect and honor in the humble exercise of our traditional Apache religious lives.

26.   When our families gather at Oak Flat to celebrate our religious beliefs, we are no different

than our Christian brothers and sisters who gather at their respective churches on Sundays and other holy days. The only difference is our permanent place of prayer and worship is under attack and will be destroyed if the FEIS is published this Friday, January 15, and the transfer of possession of Oak Flat to Resolution Copper takes place.

27.   This case is for the survival and protection of our Apache religion, and the Forest Service must be stopped from publishing that FEIS this Friday, January 15, because there is no compelling reason for them to do that so suddenly and right now.

28.   The publication of the FEIS on January 15, 2021, would violate our Due Process rights under the Fifth Amendment to the U.S. Constitution which guarantees us the right to have adequate and effective notice of government acts that will affect our legal rights. Ten (10) days' notice is utterly inadequate for such a momentous decision having such catastrophic adverse effects on our First Amendment Rights to our religious beliefs and the free exercise of our Apache religion, and prejudices and harms our First Amendment Rights to Petition the Government for Redress of Grievances and the corresponding Right to Remedy included within the Petition Clause of the First Amendment.

29.   Oak Flat is Apache land and we must be allowed to protect our land and our religious beliefs and religious freedom rights before the harms increase and accelerate with the Forest Service's publication of the FEIS this coming Friday, just four (4) days from now.

30.   Neither Apache Stronghold, nor myself or any Apache officials received direct or adequate notice that the Forest Service has suddenly decided to make the

publication of the FEIS on January 15, 2021 until it was revealed to us only by us seeing

that online news report by Reuters the other day. This FEIS publication is also a

precursor genocidal act and this Court must not allow it.



Wendsler Nosie, Sr., at Chi'Chil Biłdagoteel ("Oak Flat") (Photo by Adriana Zehbrauskas for The New York Times)

Respectfully presented,

/s/ Wendsler Nosie                                    Date:  January 11, 2021
Wendsler Nosie, Sr., Ph.D.

DECLARATION OF WENDSLER NOSIE, SR., Ph.D.                    13

Michael V. Nixon (OR Bar # 893240) (*pro hac vice* application pending)
101 SW Madison Street # 9325
Portland, OR 97207
Telephone: 503.522.4257
Email: michaelvnixon@yahoo.com

Clifford Levenson (AZ Bar # 014523)
5119 North 19th Avenue, Suite K
Phoenix, AZ 85015
Telephone: 602.258.8989
Fax: 602.544.1900
Email: cliff449@hotmail.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Apache Stronghold,<br>    a 501(c)(3) nonprofit organization,<br><br>                   Plaintiff,<br><br>    v.<br><br>United States of America,<br><br>Sonny Perdue, Secretary, U.S. Department<br>    of Agriculture (USDA),<br><br>Vicki Christensen, Chief, Forest Service,<br>    USDA,<br><br>Neil Bosworth, Supervisor, Tonto National<br>    National Forest, USDA,<br><br>    And<br><br>Tom Torres, Acting Supervisor, Tonto<br>    National Forest, USDA,<br><br>               Defendants. | No. CV-21-_____<br><br><br>**DECLARATION OF**<br>**JOHN R. WELCH, Ph.D.** |

Under the penalties of perjury in accordance with the laws of the United States of America, I hereby declare:

1.   I, John R. Welch, am a tenured full professor, jointly appointed in the Department of Archaeology and in the School of Resource and Environmental Management, at Simon Fraser University, British Columbia, Canada. I also direct research and outreach activities in my capacities and the director of the nonprofit Archaeology Southwest's Landscape and Site Preservation Program.

2.  I have a lifelong interest in the natural and human history, geography, and management of the American Southwest and earned my graduate degrees in anthropology (MA, 1985; PhD, 1996) from the University of Arizona, Tucson.

3.  I am a registered professional archaeologist (RPA 10027) and, over the last 36 years, have been employed by private consulting firms, by the University of Arizona, by the U.S. Department of the Interior, by the White Mountain Apache and San Carlos Apache Tribes, by Archaeology Southwest, and by Simon Fraser University.

4.  I began working with Western Apache (Ndee) lands and leaders in 1984, while a graduate student, and from 1992 to 2005 served as the archaeologist and historic preservation officer for the White Mountain Apache Tribe. My work during this period included documenting, assessing the significance of, and protecting archaeological and cultural resource sites, training crews of Apache foresters and resource technicians to do the same, and assisting in the planning and implementation of land alteration and forest treatment projects. I also advised Apache elected and cultural leaders regarding their participation in the implementation of the Native American Graves Protection and Repatriation Act (NAGPRA). I also advised Apache leaders in their consultations with federal agencies, including the U.S. Forest Service and the Tonto National Forest, as those agencies attempted to comply with the National Historic Preservation Act and the National Environmental Policy Act.

5. My work on Western Apache archaeology and land use has involved close collaborations with recognized Western Apache experts in history and culture. Those collaborations have allowed me to acquire knowledge of changes in the use, occupation, and management of Western Apache ancestral

lands, including the area containing Chí'chil Biłdagoteel ("Emory Oak Extends on a Level," widely known as "Oak Flat"). I have endeavored to translate the privileges flowing from my collaborations with Western Apache people and their lands into useful and informative publications about regional history, archaeology, and persistent Apache interests in their lands and places within and beyond reservation boundaries. A full chronicle of these publications and my employment and research funding histories are presented in my curriculum vitae, which is attached hereto and incorporated herein by this reference.

6.  In February 2018, relying on the same expertise I outlined above, I gave sworn expert testimony on behalf of the San Carlos Apache Tribe before the Arizona Department of Environmental Quality in Administrative Hearing No. 17-001-WQAB.

7. Reviewing all of the information presented herein, including the history of the 1852 Treaty between the Apache Nation and the United States, the proceedings of the Indian Claims Commission, and all relevant federal executive orders and agency decisions, I have reached an opinion regarding tenure of the land now known as Oak Flat.  That opinion is that Oak Flat is Western Apache ancestral land contained within the Western Apaches' Treaty Territory and cannot be owned by the United States of America or any other entity or person. The information that I have relied on is the kind of information that an archaeologist and historian would rely on to determine the opinions that I have formed here

8.  I have, over the decades, heard stories from many Western Apache leaders and colleagues to the effect that U.S. Army forces attacked the camps of their forebears, killing their families, evicting them from most of their ancestral lands, and concentrating the survivors at San Carlos and Fort Apache. The results of my 2017 peer-reviewed study on this deeply disturbing facet of Arizona history are freely available as "Earth, Wind, and Fire: Pinal Apaches, Miners, and Genocide in Central Arizona, 1859-1874" (Sage Open [October-December]:1-19).[1]

9.  That research into the Pinal Apache Genocide and related aspects of Western Apache-U.S. relations prompted further inquiry into the use and tenure of Western Apache ancestral lands not included

---

[1] Available online at: https://journals.sagepub.com/doi/full/10.1177/2158244017747016

within the U.S. Government-designated boundaries of Western Apache tribal trust lands (i.e., the Camp Verde, San Carlos, Tonto, and White Mountain Apache reservations).

10.  In later 2018 and continuing through 2020, I took a particular interest in the 1852 Treaty between the U.S. and the Apache Nation of Indians (sometimes referenced as the Treaty of Santa Fe), (herein "1852 Treaty"). That 1852 Treaty was signed by representatives of Apache peoples living both to the east of the Rio Grande (that is, Eastern Apaches—the Plains and Mescalero Apache) and west of the Rio Grande (that is, the Western Apaches—the Chiricahua and Western Apache).[2] The 1852 Treaty was duly ratified by the U.S. Senate and proclaimed by President Pierce on March 25, 1853. I did not find evidence that the 1852 Treaty was ever amended or rescinded. This research has resulted in a draft manuscript being prepared by me for professional, peer-reviewed publication.

11.  My research investigated the articles of that 1852 Treaty, the boundaries of the Apache lands covered by that agreement, which I refer to as the Western Apaches' Treaty Territory, and the Treaty's signatories, application, and enforcement. My review of the 11 articles of the 1852 Treaty identified found several articles that recognize Apache territory through direct and indirect references. Article 7 of the 1852 Treaty affirms that the "people of the United States of America shall have free and safe passage through the territory of aforesaid Indians." In Article 8, the parties agree that, "to preserve tranquility and to afford protection to all the people and interests of the contracting parties, the government of the United States will establish such military posts and agencies, and authorize such trading houses at such times and places as the said government may designate." Article 9 affirms "that the government of the United States shall at its earliest convenience designate, settle, and adjust their territorial boundaries, and pass and execute in their territory such laws as may be deemed conducive to the prosperity and happiness of said Indians." In Article 11, the parties agree the "Treaty shall be binding [and] … the government of the United States shall so legislate and act as to secure the permanent prosperity and happiness of said Indians."

---

[2] Kappler, Charles J., Compiler and Editor (1904). *Indian Affairs: Laws and Treaties*, Vol. II (Treaties). Washington DC: Government Printing Office, pages 598-600.

12.  My investigation of the 1852 Treaty found that the U.S. Smithsonian Institution, Bureau of American Ethnology, mapped and published what I refer to as the Western Apaches' Treaty Territory to encompass most of the southern half of New Mexico Territory (present day New Mexico and Arizona) west of the Rio Grande (Figure 1, Map Area 689).[3] Map 1, below shows cropped portions of two maps, "Arizona 1" and "New Mexico 1" conjoined to depict the 1852 Western Apaches' Treaty Territory (central greenish area "689"). The red arrow points to the approximate location, within the Western Apaches' Treaty Territory, of the Apache place known as Chí'chil Biłdagoteel (Oak Flat).



**MAP 1**

13. My research has also included a review of U.S. Federal Government actions—including those of the Legislative, Executive, and Judicial branches—purporting to alter or transfer ownership or control

---

[3] Royce Charles C. (1899). *Indian land cessions in the United States* (Arizona and New Mexico map No. 1, pp. 922-923) (Eighteenth annual report of the Bureau of American Ethnology). Washington, DC: Smithsonian Institution. From https://lccn.loc.gov/13023487, accessed October 20, 2020.

of the Western Apaches' Treaty Territory. I found dozens of such actions affecting millions of acres within the Western Apaches' Treaty Territory. I have yet to discover a single instance in which the legal authority for the action by the United States—whether act of Congress, executive order, or court decision—explicitly recognizes either the 1852 Treaty or the effect and apparent impingement of those Federal actions on the Treaty and the Western Apaches' Treaty Territory and associated Treaty rights.

14. I investigated the proceedings of the Indian Claims Commission for Docket 22, addressing claims to compensation for lands taken by the United States from tribes representing Apache, Yavapai, and Navajo plaintiffs. The Docket 22 records are scattered, and the Indian Claims Commission ultimately partitioned Docket 22 into multiple proceedings, but I examined Docket 22 materials in libraries and the U.S. National Archives Record Group 279. I gave particular attention to the following: testimonies provided by tribal elders, reports of subject matter experts regarding claimant tribes' histories and land uses, and Findings of Fact and legal decisions of the Indian Claims Commissioners. I followed these related lines of inquiry to learn where and under what circumstances the Federal Government, through the Indian Claims Commission, may have attempted to "quiet" Apaches' reserved treaty rights or aboriginal land title, principally through providing compensation for or refusing to provide compensation for aboriginal lands, defined by the Indian Claims Commission as lands subjected to "exclusive tribal use and occupation from "time immemorial.""[4]

15.  I found no evidence, in the proceedings of the Indian Claims Commission or elsewhere, of any change or diminishment in the Apaches' reserved treaty rights to the Western Apaches' Treaty Territory. I found no evidence that the United States compensated the Apache treaty rights holders for Chí'chil Biłdagoteel (Oak Flat). Oak Flat is Apache land, as it has been for centuries and is not owned by the United States of America or any other entity or person.

---

[4] United States Indian Claims Commission (1979). *Final Report, August 13, 1946-September 30, 1978*. U.S. Government Printing Office: 1979-271-733 (the quotation appears on page 10). The map of aboriginal land areas adjudicated by the Indian Claims Commission is available at https://pubs.er.usgs.gov/publication/70114965, accessed April 1, 2020. For an account of aspects of the adjudication of Docket 22, see Lieder, Michael, and Jake Page (1997). *Wild Justice: The People of Geronimo Vs. the United States*. New York, Random House.

16.  With specific reference to the proposed Resolution Copper mine and the land area slated for mechanical, hydrological, and atmospheric impacts (see Map 2, below), I learned that Western Apache and Yavapai people living in the period prior to sustained contact with Americans (that is, during the Pinal Apache Genocide, 1859–1874) agreed on at least two fundamental aspects of land tenure history.

17.  First, they agreed that the crest of the Mazatzal Mountains and Pinal Mountains constituted a general dividing line between the Western Apache and Yavapai ancestral territories.

18.  Second, they agreed that line of division was permeable. The generally peaceful relations between the two peoples allowed family groups to cross that boundary whenever it was convenient or useful for them to do so, even without permission from those on the other side of the divide. These crossings typically occurred as Apache and Yavapai family groups pursued seasonally and spatially distributed concentrations of wild plant foods, including cactus fruits and nut masts. Apache and Yavapai groups, especially those groups located close to the Mazatzal-Pinal boundary, shared information and land use, also occasionally intermarrying, camping nearby, and cooperating in defense of their territories.

19.  These agreed-upon facts from the Indian Claims Commission Docket 22 proceedings are further affirmed in results from investigations and tribal consultations undertaken by the U.S. Forest Service concerning the proposed Resolution Copper Mine, as required by federal environmental and historic preservation laws and by Section 3003 of the National Defense Authorization Act of 2015.[5]

20. The two maps, included below, show that the impact area for the proposed Resolution Copper mine extends across westerly portions of the Western Apache (Docket 22-D) aboriginal lands, as judicially established by the Indian Claims Commission (ICC map areas 140 and 141, see Map 2), and across easterly portions of Yavapai (Docket 22-E, ICC area 146) and Pima-Maricopa (Docket 228, ICC area 147) aboriginal lands. Map 2 provides a regional view; Map 3 provides a more detailed view of the Resolution Mine potential impact area, with Chí'chil Biłdagoteel (Oak Flat) at the center of the impacts.[6]

---

[5] In particular, see Maren P. Hopkins, Chip Colwell, T.J. Ferguson, and Saul L. Hedquist (2015) Ethnographic and Ethnohistoric study of the Superior area, Arizona, prepared for Resolution Copper Mining by Anthropological Research, L.L.C.

[6] Professional cartographers prepared Map 1 and Map 2 under the direction of John R. Welch using information



**MAP 2**

from the U.S. Forest Service and spatial data publicly available through national cartographic data bases.

21.  Map 2 depicts the original "White Mountain Reservation," the San Carlos Reservation and Fort Apache Reservation divisions (1897) of that original reservation, and the various tracts excluded from those reservations by unilateral U.S. Federal Government actions, none of which reference or comport with the articles of the 1852 Treaty. Map 2 and Map 3 both show the conjoined turquoise blue and red lines depicting most of the boundary between the Western Apache and Yavapai lands along the crest of the Mazatzal and Pinal Mountains and the area of concern, Chí'chil Biłdagoteel (Oak Flat), on the west side of that boundary, near the southern edge of Yavapai aboriginal lands (Docket 22-E, ICC map area 146, delineated in turquoise blue). These two maps also show that the impact area for the proposed Resolution Copper mine affects Western Apache, Yavapai, and Pima-Maricopa aboriginal lands and a tract south and southeast of Yavapai and Western Apache aboriginal lands. Because the rules adopted by the Indian Claims Commission prohibited the recognition of tracts used by multiple Indian peoples as the aboriginal lands of any single claimant group, the Commission did not identify this tract aboriginal lands. No Tribe received compensation for the "every man's lands" south of Yavapai aboriginal lands.[7]

22. The Indian Claims Commission proceedings in Docket 22-D resulted in compensation to the San Carlos and White Mountain Apache Tribes for the taking by the U.S. of millions of acres of Apache lands. The lands for which the Western Apache tribes received compensation did not include Chí'chil Biłdagoteel (Oak Flat) or other lands for which the Yavapai tribes apparently received compensation pursuant to Docket 22-E.

---

[7] U.S. Indian Claims Commission (1965). Findings of Fact in Docket 22-E (15 Ind. Cl. Comm., March 3, 1965), Records Group 279, Entry 11UD. Washington, DC: National Archives. U.S. Indian Claims Commission (1969). Findings of Fact in Docket 22-D (21 Ind. Cl. Comm., June 27, 1969), Records Group 279, Entry 11UD. Washington, DC: National Archives.

DECLARATION OF JOHN R. WELCH, Ph.D.                    9



**MAP 3**

23.  The cartographic, documentary, and archaeological materials that I have investigated are part of the information that form the basis of my expert opinions that (a) Western Apaches retain reserved treaty rights to Chí'chil Biłdagoteel (Oak Flat); (b) Indian Claims Commission decisions in Docket 22-D (San Carlos and White Mountain [Western Apache] Tribes) and Docket 22-E (Yavapai Tribes) never affected or otherwise diminished Western Apaches' reserved treaty rights, including those of the San Carlos Apache Tribe and its members created by the 1852 Treaty, and (c) because of the evidence presented in Indian Claims Commission Docket 22 proceedings and in the nomination of Chí'chil Biłdagoteel to the U.S. National Register of Historic Places (see below), the Indian Claims Commission should not have recognized Chí'chil Biłdagoteel (Oak Flat) as land exclusively used and occupied by

Yavapai. Yavapai and Apache customary practice includes the sharing of food gathering areas. Yavapai and Apache oral traditions include specific references to sharing acorn gathering areas and Oak Flat. The Chí'chil Biłdagoteel National Register District includes abundant archaeological evidence of Apache use and occupation of the Chí'chil Biłdagoteel District.

24.  Chí'chil Biłdagoteel is a place of extraordinary and axiomatically unique importance in Western Apache culture, spirituality, and history, with special reference to the Pinal Apache Genocide.

25.  While my academic training, research interests, and expertise do not extend to or include Apache religion or spiritual practice, many breakthroughs in my understanding of Apache archaeology and land use have come from intently listening to Western Apache cultural practitioners explain the importance of places and their roles in Western Apache history, spirituality, and metaphysics.

26.  Four lessons from my listening to Western Apache knowledge keepers are pertinent to this declaration: (a) Western Apache conceptions of time, space, power, history, and human interrelations with these are distinct from Western conceptions (including those I was brought up with); (b) Western Apache people perceive, learn from, and act with profound respect in relation to places, including the big places often referenced as landscapes, in ways that are both culturally shared and intensely personal; (c) Non-Apaches, myself included, should generally leave it to knowledgeable Western Apache people to interpret or comment upon Western Apache religious places in general, and upon specific places, like and including Chí'chil Biłdagoteel, that are known to be holy places; and (d) Notwithstanding these concerns, there are occasional appropriate roles for non-Apaches to offer technical support (for example, archaeological or cartographical) and external comments as means to bridge the vast chasms between Western Apache and non-Apache regard for and treatment of place and places.[8]

27.  Specifically, the lovely, 40-acre grove of old-growth Emory oaks most widely known as Oak Flat, is a primary activity area for a much larger cultural landscape. Apache cultural experts, knowledge holders representing other regional tribes, and professional archaeologists from diverse backgrounds have

---

[8] The essential book corroborating these points is Basso, Keith H. (1996). *Wisdom Sits in Places: Landscape and Language Among the Western Apache*. Albuquerque: University of New Mexico Press.

recognized as Oak Flat a local hub for at least 10 centuries of residence, food gathering, and ceremonial activity.[9] Pottery fragments, engravings on boulders and cliff faces, roasting areas, and remnants of diverse house structures and other activity areas surround the grove and contribute to Chí'chil Biłdagoteel historical significance, sense of place, and what I refer to here as potency.

28. Converging lines of evidence from multiple tribes' oral histories, historical documents, and archaeological studies obliged the U.S. Forest Service to nominate, and the Keeper of the U.S. National Register to list, Chí'chil Biłdagoteel in the National Register of Historic Places. Chí'chil Biłdagoteel's landforms, springs, woodlands, canyons, and religious sites collectively embody and define a 4,309-acre cultural landscape of past and ongoing use by and high significance to Western Apache people.[10]

29. The 4,309-acre National Register District encompasses the entirety of the 2,422-acre parcel of the Western Apaches' Treaty Territory and Western Apache ancestral land proposed for the land exchange. The Chí'chil Biłdagoteel in the National Register District is essential both in the practice of Western Apache religion and in the implementation current proposal for the Resolution Copper mine.

30. As to the question of cultural and religious significance of Chí'chil Biłdagoteel, only Western Apache people with Western Apache religious beliefs and who conduct Western Apache religious practices are fully qualified to answer. I will say, nonetheless and with utmost deference, that many Western Apache people view the desecration, or even disrespect, of holy places, most especially in pursuit of profit or other individual gain at others' cost, as an affront to all that is right and good. Many Western Apache people also view such reckless behavior as extremely dangerous intrusions of secular concerns into highly sensitive and sacred domains of limitless natural and supernatural forces.

---

[9] Hopkins, Maren P., Colwell, Chip, Ferguson, T. J., & Hedquist, Saul L. (2015). Ethnographic and Ethnohistoric study of the Superior area, Arizona. Prepared for Resolution Copper Mining. Tucson, AZ: Anthropological Research, L.L.C.

[10] U.S. Department of Agriculture Tonto National Forest (2015) National register nomination for the Chi'chil Biłdagoteel national register historic district, Pinal County, Arizona (U.S. National Park Service, National Register of Historic Places, approved March 4, 2016). Retrieved from http://bloximages.chicago2.vip.townnews.com/tucson.com/content/tncms/assets/v3/editorial/8/b1/8b10c3b0-77ed-560b-bd5f-bc0552df7e7c/56e363c6b87ba.pdf.pdf

31. The late Nick Thompson, a Western Apache resident of Cibecue, White Mountain Apache Tribe lands, and a knowledgeable authority on Western Apache places, culture, and religion, made this point in an interview many years ago with Keith H. Basso using terms I would never attempt to improve upon: "If you hurt one of these holy places, it's very, very bad. You will hurt yourself and all your people if you do that. You must always show respect and take care of those holy places. Each one helps us in some way. We depend on them to help us live right, to live the way we should. So we leave them alone except when we really need them. We pray to them to help us. If we hurt them they would stop helping us – and we would only know trouble."[11]

Respectfully submitted,

*John R. Welch*

Dated: January 11, 2021

John R. Welch, Ph.D.

_____

[11] Hon. Terry Rambler (2019). Comment on behalf of San Carlos Apache Tribe on the Draft Environmental Impact Statement for the Resolution Copper Project and Land Exchange, submitted to U.S. Department of Agriculture Tonto National Forest, December 23, 2019, pp. 12-13.

DECLARATION OF JOHN R. WELCH, Ph.D.                13

# John R. Welch, PhD, Registered Professional Archaeologist 10227

Professor & Director of the Professional Master's Program in Heritage Resource Management
Department of Archaeology & School of Resource and Environmental Management
Simon Fraser University    welch@sfu.ca  –  http://www.sfu.ca/rem/people/profiles/welch.html

## EDUCATION

| | | |
|---|---|---|
| 1996 | Ph.D. | Anthropology, University of Arizona, Tucson, U.S. |
| 1985 | M.A. | Anthropology, University of Arizona, Tucson, U.S. |
| 1983 | A.B. | Anthropology (Honors), Spanish, Hamilton College, Clinton, New York, U.S. |

## INTERESTS

*Sovereignty-driven cultural and biophysical heritage stewardship and research*
Keywords: Sovereignty-driven research; Community-based conservation; Customary law and practice; Cultural resources management; Historic preservation; Indigenous archaeology; Activist archaeology; Resistance; American Southwest and British Columbia

*Western Apache archaeology, history, and human ecology in the Arizona uplands*
Keywords: Apache archaeology; Trail archaeology; Sacred sites protection; Land claims; Heritage tourism and culturally appropriate economic development; Indigenous management models

## COURSE PORTFOLIO

| | |
|---|---|
| *Archaeological Resource Management* | *Co-Management with Indigenous Peoples* |
| *Cultural Heritage Crime* | *Heritage Resource Management Law & Policy* |

## EMPLOYMENT

| | |
|---|---|
| April 2005–Current | **Professor & Director of the Professional Graduate Program in Heritage Resource Management**, jointly appointed in the Department of Archaeology and School of Resource and Environmental Management, Simon Fraser University |
| February 2018–Current | **Director, Landscape and Site Preservation Program**, Archaeology Southwest, Tucson. Lead collaborative, preservation-focused, management, advocacy, and tribal and public engagement initiatives. |
| January 2005–Current | **Advisor, Consulting Historian, and Expert Witness**, White Mountain Apache Tribe, Whiteriver, Arizona & San Carlos Apache Tribe, San Carlos, Arizona. Assist in redeveloping the Fort Apache Historic District, reclaiming lands erroneously excluded from the reservation, repatriating cultural items, and protecting sacred sites |
| September 2008–Current | **Associate Faculty**, Archaeology, Arizona State Museum, University of Arizona, Tucson |
| April 2010–July 2013 | **Faculty Mentor**, White Mountain Apache – University of Arizona Western Apache Ethnography and GIS Field School |
| September 1998–June 2005 | **Visiting Scholar**, Department of Anthropology, University of Arizona, Tucson |

*Curriculum Vitae*                                              **John R. Welch, RPA**

| | |
|---|---|
| September 1992–June 2005 | **Archaeologist**, U.S. Bureau of Indian Affairs (BIA), Fort Apache Agency, Whiteriver, Arizona<br>Provided cultural heritage protection, planning, and compliance services for the federal agency administering White Mountain Apache Tribe trust lands |
| November 1996–Jan 2005 | **Tribal Historic Preservation Officer**, White Mountain Apache Tribe, Whiteriver, Arizona<br>Established the Fort Apache Heritage Foundation 501(c)3; Managed research, intergovernmental consultation, environmental protection, and repatriation initiatives in support of White Mountain Apache heritage conservation and economic and community development |
| May 1996–September 2002 | **Archaeologist**, U.S. Dept of Interior, Emergency Rehabilitation Team. Cultural resource lead on interdisciplinary team that created treatment plans for wildfire-impacted federal and Indian lands |
| January 1998–May 2001 | **Associate Faculty** and chair of the Heritage Preservation Curriculum Committee, Northland Pioneer College, Holbrook, Arizona |
| September 1990–May 1991 | **Associate Faculty**, Human Sciences, Pima Comm. College, Tucson |
| August 1990–Dec 1993 | **Assistant Project Director**, Statistical Research Inc, Tucson<br>Directed study of Tonto Basin and Verde River agricultural ecology and ethnohistory under contract to the U.S. Bureau of Reclamation |
| April 1992–October 1992 | **Gila Resource Area Archaeologist**, Safford District, U.S. Bureau of Land Management, Arizona<br>Provided heritage preservation, research, and interpretation services |
| May 1990–August 1990 | **Archaeologist**, International Archaeological Research Institute Inc. Assisted with excavation and survey on island of Moloka'i, Hawaii |
| August 1983–Dec 1989 | **Teaching Assistant** and **Assistant Director**, Archaeological Field School, Anthropology, University of Arizona, Tucson |
| August 1988–June 1989 | **Archaeologist in Residence**, Fenster School, Tucson |

## FUNDING FOR RESEARCH AND RELATED SCHOLARLY PURSUITS

1. **Grant:** Mitacs Accelerate Internship Cluster Grant  **Period:** 2019–2021  **Project Title:** Expanding Cultural Heritage Stewardship Knowledge and Capacity with Nlaka'pamux Nation Tribal Council and Teck Highland Valley Copper Operations  **Funding:** Mitacs  **Total:** $105,000  **Involvement:** Project Director  **Collaboration:** I am recruiting HRM Professional Program students and matcing them with SFU faculty supervisors and one of the seven funded research internships to optimize Nlaka'pamux capacity building and research impacts from the Teck HVC operations.

2. **Grant:** Community Listening Foundations for District-Scale Interpretation of the Fort Apache and Theodore Roosevelt School National Historic Landmark **Period:** 2020–2021  **Funding:** Arizona Humanities Council  **Total:** $10,000  **Involvement:** Project Director  **Collaboration:** I will work with Cline Griggs, fellow Fort Apache Heritage Foundation Board, to plan and facilitate about 20 focus group sessions to learn what Apache community members regard as the desired future for Fort Apache and what stories they want to be told, and how, during the next phase of property interpretation and presentation.

*Curriculum Vitae*                                                    **John R. Welch, RPA**

3. **Grant:** Conservation Assessment Program for Fort Apache and Theodore Roosevelt School National Historic Landmark **Period:** 2019–2020   **Funding:** American Institute for Conservation **Total:** $20,000   **Involvement:** Project Director   **Collaboration:** I planned and facilitated an interdisciplinary review by five established professionals of the 26 historic buildings and associated collections that constitute the Fort Apache Historic Park, resulting in a detailed assessment of conservation issues to serve as the plan for the next phase of property preservation and presentation.

4. **Grant:** Interdisciplinary Workshop Grant **Period:** 2018–2019   **Project Title:** Cultural Heritage Crime and Forensic Sedimentology: Global Theoretical and Local Tactical Responses to Thwart and Prosecute Heritage Destruction and Theft **Funding:** Wenner-Gren Foundation for Anthropological Research **Total:** $20,000   **Involvement:** Project Director   **Collaboration:** I planned and facilitated a workshop at Fort Apache to focus theoretical perspectives and practical tools on the prevention, investigation, and prosecution of heritage Resource Crime.

5. **Grant:** SSHRC Research Connections Grant **Period:** 2018–2020   **Project Title:** A Knowledge Creation Plan for Advancing Stó:lō Collaborative Resource Stewardship and Shared Land-Use Decision-Making in Southwest British Columbia **Total:** $45,676   **Involvement:** Co-Principal Investigator   **Collaboration:** I support David M. Schaepe (Sto:lo Research and Resource Management Centre) and Natasha Lyons (Ursus Consulting & SFU Archaeology) in convening a workshop and preparing a white paper to guide the first-ever Sto:lo Nation research plan.

6. **Contract:** Research and Consulting Contract **Period:** 2018–2022   **Project Title:** Technical Assistance in Heritage Site Restoration and Preservation **Funding:** U.S. Bureau of Indian Affairs **Total:** $875,000   **Involvement:** Principal Investigator   **Collaboration:** I am a principal in Archaeology Southwest's assistance to BIA in preventing and investigating archaeological resource crime, in repairing damages to affected sites, and in creating training and outreach materials.

7. **Grant:** Graduate Research Fellowship Grant **Period:** 2017–2018   **Project Title:** Climate Change Adaptation Planning in Two Indigenous Conservation Organizations. **Funding:** Pacific Institute for Climate Studies **Total:** $5000   **Involvement:** Project Director   **Collaboration:** I direct and support master's research by Vivian Gauer with the Fort Apache Heritage Foundation and the Stolo Research and Resource Management Centre.

8. **Grant:** Open Educational Resource Development Grant (SFU) **Period:** 2016–2017 **Project Title:** OER Assessment and Development for a New Breadth-Humanities Course, Heritage Stewardship in Global Context (ARCH 286) **Funding:** SFU Library OER Fund **Total:** $3000 **Involvement:** Project Director   **Collaboration:** Facilitate collaborations among Erin Hogg, Hope Power, and other SFU colleagues in identifying and refining OERs for ARCH 286.

9. **Grant:** Publication Grant **Awarded:** 2016      **Period:** 2016–2017 **Project Title:** Digital Publication of the SFU Archaeology Press Catalogue **Funding:** SFU Scholarly Digitization Fund **Total:** $4960   **Involvement:** Principal Investigator   **Collaboration:** Facilitate creation of a comprehensive online compendium of the 31 books published by SFU Archaeology Press.

10. **Grant:** Research Grant **Period:** 2016 **Project Title:** 'Ground Truthing' of Ancestral Pueblo Settlement of the Southern and Western Flanks of Arizona's White Mountains, White Mountain Apache Tribe Lands, Arizona. **Funding:** Arizona Archaeological and Historical Society **Total:** $500   **Involvement:** Project Director   **Collaboration:** I led seven colleagues on a mobile symposium to visit and boost documentation for 16 Ancestral Pueblo villages.

*Curriculum Vitae*                                                    **John R. Welch, RPA**

11. **Contract:** Professional Consulting Services      **Period:** 2016
    **Project Title:** San Carlos Apache Strike Team  **Funding:** San Carlos Apache Tribe, Arizona
    **Total:** $19,650   **Involvement:** Cultural heritage consultant   **Collaboration:** I supported the
    Apache Strike Team's opposition to the Proposed Resolution Copper Mine by conducting historical
    research and preparing strategic assessments of documents and plans prepared by the mining
    company, U.S. Forest Service, and their consultants.

12. **Contract/Grant:** Research and Exhibition / Outreach      **Period:** 2015–2016
    **Project Title:** Scowlitz Virtual Museum Companion Project   **Funding:** SFU Community
    Engagement Fund **Total:** $10,000    **Involvement:** Co-Principal Investigator   **Collaboration:** I
    support Kate Hennessey (SFU SIAT) and David Schaepe in developing and installing twin
    exhibits—in the SFU Museum of Archaeology and Ethnology and the Sto:lo Research and
    Resource Management Centre—to expand the reach of the Virtual Museum of Canada website
    dedicated to the Scowlitz ancestral village site.

13. **Contract/Grant:** Professional Consulting Services      **Period:** 2015–2016
    **Project Title:** A Cultural Heritage Program for the San Carlos Apache  **Funding:** Resolution
    Copper Mining Corporation, Arizona  **Total:** $10,578  **Involvement:** Cultural heritage consultant
    **Collaboration:**  I supported Statistical Research Inc. Foundation and Apache colleagues in creating
    a values-based program to protect and perpetuate Apache cultural heritage in the face of changing
    social, economic and biophysical environments.

14. **Grant:** Curriculum Development Research      **Period:** 2015–2016
    **Project Title:** Assessment of a Required Graduate Course, *Social Science of Resource
    Management: Theories of Cooperation* (REM 601) **Funding:** SFU Teaching and Learning Center
    **Total:** $5000   **Involvement:** Project Director   **Collaboration:** I worked with Soudeh Jamshidian
    and other SFU colleagues to survey students and refine REM 601, the social science core course in
    the Master's of Resource Management (MRM) program.

15. **Grant:** Curriculum and Credential Development      **Period:** 2015–2016
    **Project Title:** A Professional Online MA Program in Heritage Resource Management
    (HRM) **Funding:**  SFU Professional Online Scholarship and Training (POST) grant      **Total:**
    $100,000    **Involvement:** Program Director   **Collaboration:**  I facilitate and direct SFU and
    HRM industry colleagues in creating and delivering a new Master's program, starting fall 2016.

16. **Grant:** Research Grant   **Period:** 2014–2017
    **Project Title:** Trails of the Apache   **Funding:** SSHRC Small Institutional  **Total:** $6950
    **Involvement:** Principal Investigator   **Collaboration:** I direct landscape-scale efforts to document
    ancient Apache activity hubs using least-cost path GIS analyses to identify trails and the residential,
    agricultural, and foraging localities they connect.

17. **Grant:** Research and Internet Publication Grant   **Period:** 2013–2015
    **Project Title:** People of the River: Sq'éwwets   **Funding:** Virtual Museums of Canada
    **Total:** $193,000    **Involvement:** Collaborator   **Collaboration:** I support the team led by  David
    Schaepe and  Natasha Lyons in facilitating virtual repatriation to the Scowlitz community of all
    information and other materials relating to their most important ancestral village site.

*Curriculum Vitae*                                                   **John R. Welch, RPA**

18. **Grant:** Publication Grant  **Awarded:** 2013      **Period:** 2013–2014
    **Project Title:** Digital Publication of Documents on the History and Management of White
    Mountain Apache Lands, Arizona  **Funding:** SFU Scholarly Digitization Fund   **Total:** $5000
    **Involvement:** Principal Investigator   **Collaboration:** I helped Ian Song (SFU Library) and
    students develop a text-searchable archive of documents relating to (mis)management of Apache
    lands.

19. **Contract:** Contract  **Awarded:** 2012      **Period:** 2012–2013
    **Project Title:** History of the Northern Boundary Dispute, White Mountain Apache Reservation
    **Funding:** U.S. Bureau of Indian Affairs   **Total:** $17,380      **Involvement:** Principal Investigator
    **Collaboration:** I supported Robert D. Brauchli (White Mountain Apache Legal Department) in
    prosecuting a White Mountain Apache claim to lands erroneously excluded from their reservation.

20. **Grant:** Management grant  **Awarded:** 2012      **Period:** 2012–2013
    **Project Title:** Digitizing FAIRsite, the Fort Apache Indian Reservation heritage site inventory
    **Funding:** The Digital Archaeological Record (tDAR)   **Total:** $2680   **Involvement:** Principal
    Investigator   **Collaboration:** I supported  Frank McManamon (Arizona State U and Digital
    Antiquity),  Matt Peeples (Archaeology Southwest), and Mr. Mark Altaha (White Mountain
    Apache Tribe) in designing and trialing a system to incorporate existing site files into a permanent
    records repository, complete with a digital index to enable heritage site research and conservation.

21. **Grant:** Research Grant   **Awarded:** 2011      **Period:** 2011–2014
    **Project Title:** CNH: Long-term vulnerability and resilience of coupled human-natural ecosystems
    to fire regime and climate changes at an ancient Wildland Urban Interface   **Funding:** National
    Science Foundation Grant 1114898  **Total:** $1,498,027   **Involvement:** Co-Investigator
    **Collaboration:** I supported  Tom Swetnam (U Arizona),  Chris Roos (Southern Methodist U),  T.J.
    Ferguson (U Arizona) in integrating dendrochronology, archaeology, and ethnography in pursuit of
    recommendations for forest, fuels and fire management in the upland Southwest U.S.

22. **Grant:** Research and Curriculum Development Grant   **Awarded:** 2011   **Period:** 2012–2014
    **Project Title:** Tribal Historic Preservation Officer Toolkit: Essential Guide for Tribal Programs
    **Funding:** U.S. National Park Service   **Total:** $39, 634      **Involvement:** Project Consultant
    **Collaboration:** I supported John Brown (Narragansett Tribe), D. Bambi Kraus (National
    Association of Tribal Historic Preservation Officers), and an advisory team by conducting surveys,
    compiling comparable toolkits, and facilitating consultations to build a curriculum to train tribal
    officials in the functions of tribal historic and cultural preservationists.

23. **Grant:** Research Grant   **Awarded:** 2010      **Period:** 2010–2013
    **Project Title:** Western Apache Ethnography and GIS Research Experience for Undergraduates
    **Funding:** National Science Foundation Grant 1004556  **Total:** $254,694   **Involvement:** Joint
    Investigator   **Collaboration:** I supported Karl Hoerig (White Mountain Apache Cultural Center)
    and T.J. Ferguson (U Arizona) in running a community-based field school that maps traditional use
    sites across Western Apache homelands.

24. **Grant:** Internship Grant  **Awarded:** 2010      **Period:** 2011–2013
    **Project Title:** Community land-use planning on First Nations reserves and the influence of land
    tenure: A case study with the Penticton Indian Band      **Funding:** MITACS Accelerate  **Total:**
    $30,000  **Involvement:** Co-Preceptor   **Collaboration:** Murray Rutherford (SFU School of
    Resource and Environmental Management), the Penticton Indian Band Development Corporation,
    and I supervised intern Marena Brinkhurst's study of how different forms of land tenure influence
    the process and results of land use planning on Penticton Indian Band lands.

*Curriculum Vitae*                                          **John R. Welch, RPA**

25. **Contract:** Contract  **Awarded:** 2010     **Period:** 2010–2012
    **Project Title:** History of the Northern Boundary Dispute, White Mountain Apache Reservation
    **Funding:** U.S. Bureau of Indian Affairs   **Total:** $9950          **Involvement:** Principal Investigator
    **Collaboration:** I supported Robert D. Brauchli (White Mountain Apache Legal Department) in prosecuting a White Mountain Apache claim to lands illegally excluded from their reservation.

26. **Grant:** Publication Grant   **Awarded:** 2010     **Period:** 2010–2011
    **Project Title:** Documenting the Management History of White Mountain Apache Tribe Lands, Arizona  **Funding:** SFU Scholarly Digitization Fund  **Total:** $5000   **Involvement:** Principal Investigator   **Collaboration:** Ian Song (SFU Library) and I engaged students to build a digital archive of documents relating to federal (mis)management of White Mountain Apache lands.

27. **Contract:** Contract  **Awarded:** 2010   **Period:** 2010–2011
    **Project Title:** Intergovernmental protocol for Heritage Site Protection, Tla'amin Territory
    **Funding:** City of Powell River  **Total:** $3770           **Involvement:** Principal Investigator
    **Collaboration:** I facilitated efforts by First Nation, City, and Provincial officials to improve consultation and protection for heritage sites threatened by proposed land use changes.

28. **Grant:** Internship Grant   **Awarded:** 2010   **Period:** 2010–2011
    **Project Title:** An Evaluation of Cultural Heritage as a Basis for First Nations Land Use Planning
    **Funding:** MITACS Accelerate  **Total:** $30,000  **Involvement:** Preceptor   **Collaboration:** David Schaepe (Stó:lo Research and Resource Management Centre), Ch-ihl-kway-ukh Forest Limited officials, and I supervised an intern Karen Brady's development of land use planning tools grounded in Stó:lo cultural precepts and site-specific knowledge.

29. **Contract:** Contract  **Awarded:** 2010   **Period:** 2010
    **Project Title:** Archaeological Site Inspection, Savary Island Dock Enhancement, Tla'amin First Nation Territory, British Columbia   **Funding:** Powell River Regional District  **Total:** $6970
    **Involvement:** Principal Investigator **Collaboration:** Megan Caldwell (U Alberta), Chris Springer (SFU) and I conducted pre-project heritage site identification surveys and project monitoring to avoid dock expansion impacts to heritage sites.

30. **Grant:** Management grant   **Awarded:** 2009   **Period:** 2010–2011
    **Project Title:** Pilot Assessment of the Archaeological Sensitivity of the Surface of the Fort Apache and Theodore Roosevelt School Historic District, Arizona
    **Funding:** Fort Apache Heritage Foundation   **Total:** $7100    **Involvement:** Principal Investigator
    **Collaboration:** I guided student crews led by Jenifer Lewis in gathering detailed data to identify significant areas within the 300-acre fort and residential school site.

31. **Grant:** Research Grant   **Awarded:** 2008   **Period:** 2008–2011
    **Project Title:** Community forests as a new model for forest management in British Columbia
    **Funding:** Social Sciences and Humanities Research Council  **Total:** $136,820
    **Involvement:** Joint Investigator   **Collaboration:** I supported Evelyn Pinkerton's (SFU) interdisciplinary assessments of ecological, economic, cultural, and policy issues to promote community forests as alternatives to industrial timber management models.

*Curriculum Vitae*                                                    **John R. Welch, RPA**

32. **Grant:** Major Collaborative Research Initiative   **Awarded:** 2007   **Period:** 2008–2016   **Project Title:** Intellectual Property in Cultural Heritage   **Funding:** Social Sciences and Humanities Research Council   **Annual:** $400,000 **Total:** $2,500,000   **Involvement:** Joint Investigator   **Collaboration:** I support and am a Steering Committee member and working group co-chair for George Nicholas' (SFU) major collaborative research initiative (MCRI) examining relationships among past legacies and contemporary assertions of cultural and intellectual property rights and interests.

33. **Contract:** Consultant contract   **Awarded:** 2008   **Period:** 2008–2009
    **Project Title:** Tribal Engagement in Fort Lowell Master Plan   **Funding:** Pima County and City of Tucson, Arizona   **Total:** $8900   **Involvement:** Principal Investigator   **Collaboration:** I served as tribal liaison in the planning efforts and contributed to draft and final reports.

34. **Grant:** Research Grant   **Awarded:** 2008   **Period:** 2008–2010
    **Project Title:** Ancestral Knowledge, Ethnohistory, and Archaeology of Two Tahltan Village Sites
    **Funding:** Copper Fox Metals, Inc.   **Total:** $15,000   **Involvement:** Principal Investigator
    **Collaboration:** I supported Tahltan community engagement in Vera Asp's Ph.D research.

35. **Grant:** Research Grant   **Awarded:** 2008   **Period:** 2008–2009
    **Project Title:** Tourism Development By and For the White Mountain Apache Tribe
    **Funding:** Coastal Rainforest Alliance and Harvard University Project on American Indian Economic Development   **Total:** $800   **Involvement:** Principal Investigator

36. **Grant:** Strategic Research Grant   **Awarded:** 2007   **Period:** 2008–2011
    **Project Title:** Sovereignty and stewardship: Expanding First Nations conservation and collaborative capacities   **Funding:** Aboriginal Research Program, Social Science and Humanities Research Council   **Total:** $219,000   **Involvement:** Principal Investigator   **Collaboration:** I coordinated participant-driven research with Tla'amin, Tahltan, Scowlitz and Katzie First Nations to create and implement plans to advance stewardship-based sovereignty.

37. **Grant:** Research Grant   **Awarded:** 2007   **Period:** 2007–2008
    **Project Title:** Ancestral knowledge, Ethnohistory, and Archaeology of Two Tahltan Village Sites.
    **Funding:** Fortune Minerals, Inc.   **Total:** $500   **Involvement:** Principal Investigator
    **Collaboration:** I supported Tahltan community engagement in Vera Asp's Ph.D research.

38. **Grant:** Research Grant   **Awarded:** 2007   **Period:** 2007–2008
    **Project Title:** Ancestral knowledge, Ethnohistory, and Archaeology of Two Tahltan Village Sites
    **Funding:** Copper Fox Metals, Inc.   **Total:** $10,000   **Involvement:** Principal Investigator
    **Collaboration:** I supported Tahltan community engagement in Vera Asp's Ph.D research.

39. **Grant:** Research Grant   **Awarded:** 2007   **Period:** 2007–2009
    **Project Title:** Evaluating ecological, economic, and social trade-offs of managing for valued species   **Funding:** BC Forest Science Program   **Total:** $80,000   **Involvement:** Joint Investigator   **Collaboration:** I supported Evelyn Pinkerton's (SFU) interdisciplinary assessment of the value spectra linked to non-timber forest flora. Other team members included K. Lertzman and M. Rutherford (SFU), U Toronto (S. Kant), and Kamloops First Nation (J. McGrath).

*Curriculum Vitae*                                                                                    **John R. Welch, RPA**

40. **Grant:** Research Grant   **Awarded:** 2007   **Period:** 2007–2008
    **Project Title:** Community Resistance as a Window into Customary Conservation Policy and
    Practice   **Funding:** Social Sciences and Humanities Research Council   **Total:** $4950
    **Involvement:** Principal Investigator   **Collaboration:** I compiled oral and documentary histories in
    support of R. Ewing's MA thesis and repatriation studies. Non-SFU partners:  Arizona State
    Museum (U Arizona); Peabody Museum, Harvard; Glenbow Museum, White Mountain Apache
    Tribe, Tohono O'odham Nation, Hopi Tribe.

41. **Grant:** Equipment Grant   **Awarded:** 2004   **Period:** 2005–2008
    **Project Title:** First Nations Cultural and Environmental Resource Management Equipment
    Infrastructural Development    **Funding:** Canada Foundation for Innovation, BC Knowledge Fund,
    SFU Matching Funds    **Total:** $312,000   **Involvement:** Principal Investigator

42. **Grant:** Research Grant   **Awarded:** 2005   **Period:** 2005–2007
    **Project Title:** A Survey of First Nations Heritage Stewardship    **Funding:** SFU President's
    Research Grant   **Total:** $10,000  **Involvement:** Principal Investigator

43. **Grant:** Research Grant   **Awarded:** 2005   **Period:** 2005–2007
    **Project Title:** Seals of Fate    **Funding:** SFU Discovery Parks    **Total:** $5000
    **Involvement:** Principal Investigator

44. **Grant:** Operating Grant   **Awarded:** 2002   **Period:** 2003–2006
    **Project Title:** Preservation Plan Implementation, Kinishba Ruins National Historic Landmark
    **Funding:** Save America's Treasures Program, White House Millennium Council, Washington, DC
    **Total:** $383,000   **Involvement:** Principal Investigator   **Collaboration:** Arizona State grant
    ($100,000) provided matching funds to provide stabilization treatments for the entire site.

45. **Grant:** Research Grant   **Awarded:** 2003   **Period:** 2003–2005
    **Project Title:** Cultural Affiliation Assessment, White Mountain Apache Tribal Lands
    **Funding:** National NAGPRA Office, U.S. National Park Service   **Total:** $75,000
    **Involvement:** Principal Investigator   **Collaboration:** I facilitated intertribal collaboration
    resulting in the repatriation of collections and a guide to the groups affiliated with tribal lands.

46. **Grant:** Research Grant   **Awarded:** 2002   **Period:** 2003–2005
    **Project Title:** The Battle of Cibecue: Investigation and Preservation Planning for the Fight that
    Changed the Apache World   **Funding:** American Battlefield Protection Program, U.S. National
    Park Service   **Total:** $24,000   **Involvement:** Principal Investigator  **Collaboration:** Chip Colwell-
    Chanthaphonh (Center for Desert Archaeology, Tucson) and I developed and published a study.

47. **Grant:** Operating Grant   **Awarded:** 1998   **Period:** 1998–2005
    **Project Title:** White Mountain Apache Tribe Historic Preservation Office
    **Funding:** U.S. National Park Service   **Total:** $480,000  **Involvement:** Principal Investigator

48. **Grant:** Operating and Training Grant   **Awarded:** 2001   **Period:** 2002–2004
    **Project Title:** Undergraduate Research Experience in Native American Archaeology and Heritage
    Preservation: A Cooperative Project of the University of Arizona and the White Mountain Apache
    Tribe (co-PI with Barbara J. Mills)    **Funding:** U.S. National Science Foundation Research
    Experiences for Undergraduates   **Total:** $221,999   **Collaboration:** Mills directed the U Arizona
    field school and research agendas Welch directed the White Mountain Apache stewardship agenda.

ER169

*Curriculum Vitae*                                                                         **John R. Welch, RPA**

49. **Grant:** Strategic Grant   **Awarded:** 2002   **Period:** 2002–2003
    **Project Title:** Organization Development for the Fort Apache Heritage Foundation
    **Funding:** National Trust for Historic Preservation Locals Initiative   **Total:** $2500
    **Involvement:** Principal Investigator

50. **Grant:** Operating Grant   **Awarded:** 2001   **Period:** 2001–2003
    **Project Title:** Exterior Restoration, Fort Apache Officers Quarters no. 205   **Funding:** Heritage
    Fund, Arizona State Parks   **Total:** $91,100       **Involvement:** Principal Investigator

51. **Grant:** Operating Grant   **Awarded:** 2001   **Period:** 2001–2003   **Project Title:** Nohwiki'i
    Nohwanane' (Bringing Home the Ancestors): The Western Apache Repatriation Working Group
    **Funding:** NAGPRA Program, U.S. National Park Service   **Total:** $71,381   **Involvement:**
    Principal Investigator   **Collaboration:** I supported Western Apache Repatriation Working Group
    consultations with and visits to major U.S. museums.

52. **Grant:** Operating Grant   **Awarded:** 1999   **Period:** 1999–2002
    **Project Title:** Preservation Treatments to the Fort Apache Historic District
    **Funding:** Save America's Treasures Program, White House Millennium Council, Washington, DC
    **Total:** $313,000   **Involvement:** Principal Investigator

53. **Grant:** Operating Grant   **Awarded:** 1998   **Period:** 1998–2000
    **Project Title:** Rehabilitation of Fort Apache Officers Quarters no. 203.   **Funding:** Heritage Fund,
    Arizona State Parks   **Total:** $82,572   **Involvement:** Principal Investigator

54. **Grant:** Operating Grant   **Awarded:** 1997   **Period:** 1997–2000
    **Project Title:** Stabilization and Rehabilitation of Grasshopper Ruins   **Funding:** University of
    Arizona Research Fund   **Total:** $33,420   **Involvement:** Principal Investigator

55. **Grant:** Research Grant   **Awarded:** 1997   **Period:** 1997–1999
    **Project Title:** Western Apache Placenames Survey   **Funding:** Historic Preservation Fund Grants to
    Indian Tribes, U.S. National Park Service   **Total:** $49,900   **Involvement:** Principal Investigator
    **Collaboration:** I facilitated participation by representatives from Arizona's five Apache tribes in
    the documentation of toponyms.

56. **Grant:** Operating Grant   **Awarded:** 1997   **Period:** 1997–1999
    **Project Title:** Rehabilitation of Fort Apache Officers Quarters no. 207   **Funding:** Heritage Fund,
    Arizona State Parks   **Total:** $101,190   **Involvement:** Principal Investigator

57. **Grant:** Research Grant   **Awarded:** 1997   **Period:** 1997–1998
    **Project Title:** Fort Apache Rehabilitation Planning   **Funding:** U.S. Department of the Interior
    **Total:** $145,000   **Involvement:** Principal Investigator

58. **Grant:** Operating Grant   **Awarded:** 1997   **Period:** 1997–1998
    **Project Title:** Fort Apache Restoration Cost Assessment   **Funding:** World Monuments
    Fund/American Express Foundation   **Total:** $80,000   **Involvement:** Principal Investigator

59. **Grant:** Operating Grant   **Awarded:** 1996   **Period:** 1996–1998
    **Project Title:** Rehabilitation of Cibecue's Oldest Church   **Funding:** Heritage Fund, Arizona State
    Parks   **Total:** $34,775   **Involvement:** Principal Investigator

60. **Grant:** Operating Grant   **Awarded:** 1994   **Period:** 1994–1998
    **Project Title:** Nohwiki'i Nohwanane': Establishment of the Western Apache Repatriation Working
    Group   **Funding:** NAGPRA Program, U.S. National Park Service   **Total:** $55,000   **Involvement:**
    Principal Investigator

*Curriculum Vitae*                                                                                    **John R. Welch, RPA**

61. **Grant:** Operating Grant   **Awarded:** 1994   **Period:** 1995–1997
    **Project Title:** White Mountain Apache Tribe Museum Director Salary
    **Funding:** AZ Commission on Arts **Total:** $15,000 **Involvement:** Principal Investigator

62. **Grant:** Research Grant   **Awarded:** 1995   **Period:** 1995–1996
    **Project Title:** Needs Assessment for the White Mountain Apache Historic Preservation Office
    **Funding:** Historic Preservation Fund Grants to Indian Tribes, U.S. National Park Service   **Total:** $30,000   **Involvement:** Principal Investigator

63. **Grant:** Research Grant   **Awarded:** 1994   **Period:** 1994–1996
    **Project Title:** Architectural Preservation and Visitor Use Planning for Kinishba Ruins National Historic Landmark   **Funding:** Heritage Fund, Arizona State Parks            **Total:** 22,532
    **Involvement:** Principal Investigator

64. **Grant:** Operating Grant   **Awarded:** 1994   **Period:** 1994–1994
    **Project Title:** Emergency Stabilization, Sole Surviving Cavalry Stables at Fort Apache National Register District   **Funding:** Heritage Fund, Arizona State Historic Preservation Office   **Total:** $5000   **Involvement:** Principal Investigator

65. **Contract:** Contract   **Awarded:** 1991   **Period:** 1991–1992
    **Project Title:** Factors Affecting Agricultural Sustainability in Tadla, Morocco
    **Funding:** U.S. Agency for International Development   **Total:** $16,000
    **Involvement:** Principal Investigator

## FUNDING PROPOSALS UNDER ADJUDICATION

1. **Grant:** Research Grant   **Period:** 2021–2022
   **Project Title:** Intersectional analysis of the experiences of Canadian archaeologists   **Funding:** Social Sciences and Humanities Research Council (Small SSHRC)   **Total:** $7,000   **Involvement:** Principal Investigator, in collaboration with the Canadian Archaeological Association's Working Group on Equity and Diversity

2. **Grant:** Archives Management Grant   **Period:** 2020–2022
   **Project Title:** Inventory, Conservation, and Management Planning for the White Mountain Apache Tribe National Archives   **Funding:** Mellon Foundation   **Total:** $100,000   **Involvement:** Principal Investigator

3. **Grant:** Designer-Led Place-Making   **Period:** 2021–2023
   **Project Title:** Engaging Apache Cultural Preferences and Community Creativity in Site Presentation and Visitor Experience Planning for the Fort Apache and Theodore Roosevelt School National Historic Landmark, Arizona   **Funding:** National Endowment for the Arts   **Total:** $100,000   **Involvement:** Principal Investigator

## CONTRIBUTIONS

## Peer-Reviewed Journal Articles, Books, and Book Chapters

1. Hogg, Erin A., and J.R. Welch (2020) Aboriginal Rights and Title for Archaeologists: A History of Archaeological Evidence in Canadian Litigation. *Journal of Social Archaeology* 20 (1):1-28.

2. Welch, John R. (2020) I ♥ Archaeology. In *Archaeologies of Heart and Emotion*, edited by Kisha Supernant, Jane Eva Baxter, Natasha Lyons, and Sonya Atalay, pp. 23-37. Springer Nature.

*Curriculum Vitae*                                                                         **John R. Welch, RPA**

3.  Welch, John R., Kanthi Jayasundera, Christopher D. Dore, Michael Klassen, David Maxwell, George Nicholas and Joanne Hammond (2020) Where New Meets Old: Online Graduate Training for Professional Archaeologists and Heritage Practitioners. In *6th e-Learning Excellence Awards 2020: An Anthology of Case Studies*, edited by Dan Remenyi, pp. 223-236. Academic Conferences International Limited, Reading, United Kingdom.

4.  Hodgetts, Lisa, Kisha Supernant, Natasha Lyons, John R. Welch (2020) Broadening #MeToo: Tracking Dynamics in Canadian Archaeology through a Survey on Equity and Diversity. *Canadian Journal of Archaeology* 44(1):20-47.

5.  Welch, J.R. and Michael Corbishley (2020) Grand Challenge No. 4: Curriculum Design; Curriculum Matters: Case Studies from Canada and the UK. *Journal of Archaeology and Education* 4 (3/5):1-25.

6.  Welch, John R. (2019) Conserving Contested Ground: Sovereignty-Driven Stewardship by the White Mountain Apache Tribe and the Fort Apache Heritage Foundation. In *Environmentalism on the Ground: Processes and Possibilities of Small Green Organizing*, pp. 73–97, edited by Jonathan Clapperton and Liza Piper. Athabasca University Press.

7.  Welch, John R., Mark Altaha, Garry J. Cantley, William H. Doelle, Sarah A. Herr, Morag M. Kersel, Brandi L. MacDonald, Francis P. McManamon, Barbara Mills, Fred Nials, Mary Ownby, Michael Richards, Ramon Riley, Stacy L. Ryan, Duston Whiting, Donna Yates (2019) Hope in Dirt: Report of the Fort Apache Workshop on Forensic Sedimentology Applications to Cultural Property Crime, 15–19 October 2018. *International Journal of Cultural Property* (2019) 26: 197–210. doi:10.1017/S0940739119000092

8.  Tosa, Paul, Matthew J. Liebmann, T. J. Ferguson, and John R. Welch (2019) Movement Encased in Tradition and Stone: Hemish Migration, Land Use, and Identity. In *The Continuous Path: Pueblo Movement and the Archaeology of Becoming*, edited by Sam Duwe and Robert Preucel, pp. 60-77. Amerind Foundation and University of Arizona Press, Tucson.

9.  Welch, John R.; Burley, David V.; Driver, Jonathan C.; Hogg, Erin A.; Jayasundera, Kanthi; Klassen, Michael; Maxwell, David; Nicholas, George P.; Pivnick, Janet; and Dore, Christopher D. (2018) Digital Bridges Across Disciplinary, Practical and Pedagogical Divides: An Online Professional Master's Program in Heritage Resource Management. *Journal of Archaeology and Education* 2. https://digitalcommons.library.umaine.edu/jae/vol2/iss2/1

10. Welch, John R. (2018) Sovereignty-Driven Research. In *Giving Back: Research and Reciprocity in Indigenous Settings*, pp. 307–329, edited by R. Douglas K. Herman. Oregon State University Press.

11. Ferris, Neal, Aubrey Cannon, and John R. Welch (2018) Objects as Stepping Stones: Sustainable Archaeology. *Canadian Journal of Archaeology* 42(1): 4-12.

12. Schaepe, David, Bill Angelbeck, David Snook, and John R. Welch (2017) Archaeology as Therapy: Connecting Belongings, Knowledge, Time, Place, and Well-Being. *Current Anthropology* 58(4):502-533. doi: 10.1086/692985.

13. Welch, J.R. (2017) Earth, Wind, and Fire: Pinal Apaches, Miners, and Genocide in Central Arizona, 1859-1874. *Sage Open* (October-December):1-19. http://journals.sagepub.com/doi/full/10.1177/2158244017747016

14. Saul L. Hedquist, Alyson M. Thibodeau, John R. Welch, and David J. Killick (2017) Canyon Creek Revisited: New Investigations of a Late Prehispanic Turquoise Mine, Arizona, USA. *Journal of Archaeological Science* 87: 44-58. doi: 10.1016/j.jas.2017.09.0040305-4403.

15. Welch, John R., Sarah A. Herr, and Nicholas C. Laluk (2017) Ndee (Apache) Archaeology. In *Oxford Handbook of Southwest Archaeology*, edited by Barbara J. Mills and Severin Fowles, pp. 495-512. Oxford University Press, New York. DOI: 10.1093/oxfordhb/9780199978427.013.26

16. Hogg, Erin A., Welch, J.R. & Ferris, Neal (2017) Full Spectrum Archaeology. *Archaeologies* 13:1-26.  doi:10.1007/s11759-017-9315-9

17. Welch, John R. and Joseph A. Ezzo (2017) Agricultural Commitment in the Grasshopper Region. In *The Strong Case Approach in Behavioral Archaeology*, pp. 35-50, edited by Michael B. Schiffer, Charles R. Riggs, and J. Jefferson Reid. University of Utah Press, Salt Lake City.

18. Welch, J.R., Editor (2016) *Dispatches from the Fort Apache Scout: White Mountain and Cibecue Apache History Through 1881,* By Lori Davisson, with Edgar Perry and the Original Staff of the White Mountain Apache Cultural Center. University of Arizona Press, Tucson.

19. Natasha Lyons, David M. Schaepe, Kate Hennessy, Michael Blake, Clarence Pennier, Kyle McIntosh, Andy Phillips, J.R. Welch, Betty Charlie, Clifford Hall, Lucille Hall, Alicia Point, Vi Pennier, Reginald Phillips, Johnny Williams Jr., John Williams Sr., Joseph Chapman and Colin Pennier (2016) Sharing Deep History as Digital Knowledge: An Ontology of the Sq'éwlets First Nation Website Project. *Journal of Social Archaeology* 16(3):359–384. DOI:10.1177/1469605316668451.

20. Welch, J.R, and Evelyn Pinkerton (2015) 'Ain't Gonna Study War No More': Teaching and Learning Cooperation in a Graduate Course in Resource and Environmental Management. *Groupwork* 25(2):6-30.

21. Hoerig, Karl A., J.R. Welch, T. J. Ferguson, and Gabriella Soto (2015)  Expanding Toolkits for Heritage Perpetuation: The Western Apache Ethnography and Geographic Information Science Research Experience for Undergraduates. *International Journal of Applied Geospatial Research* 6(1):60-77.

22. Welch, J.R. (2015) The Last Archaeologist to (Almost) Abandon Grasshopper. *Arizona Anthropologist* (Centennial Edition):107-119. https://webcache.googleusercontent.com/search?q=cache:XkNrK4Tk2I0J:https://journals.uair.arizona.edu/index.php/arizanthro/article/download/18856/18499+&cd=1&hl=en&ct=clnk&gl=ca

23. Ferris, Neal, and J.R. Welch (2015) New Worlds: Ethics in Contemporary North American Archaeological Practice, in *Ethics and Archaeological Praxis*, edited by Cristobal Gnecco and Dorothy Lippert, pp. 69–92. Springer, New York.

24. Atalay, Sonya, Lee Rains Clauss, Randall H. McGuire, and John R. Welch, Editors (2014) *Transforming Archaeology: Activist Practices and Prospects*, Left Coast Press, Walnut Creek, Ca.

25. Atalay, Sonya, Lee Rains Clauss, Randall H. McGuire, and John R. Welch (2014) Transforming Archaeology. *In Transforming Archaeology: Activist Practices and Prospects*, edited by Sonya Atalay, Lee Rains Clauss, Randall H. McGuire, and John R. Welch, pp. 7–28. Left Coast Press, Walnut Creek, Ca.

26. Ferris, Neal, and J.R. Welch (2014)   Beyond Archaeological Agendas: In the Service of a Sustainable Archaeology, *Transforming Archaeology: Activist Practices and Prospects*, edited by Sonya Atalay, Lee Rains Clauss, Randall H. McGuire, and John R. Welch, pp. 215–237. Left Coast Press, Walnut Creek, Ca.

27. J.R. Welch and Neal Ferris (2014)  'We have Met the Enemy and It is Us': Improving Archaeology through Application of Sustainable Design Principles. In *Transforming Archaeology: Activist Practices and Prospects*, edited by Sonya Atalay, Lee Rains Clauss, Randall H. McGuire, and John R. Welch pp. 91–113. Left Coast Press, Walnut Creek, Ca.

28. Ferris, Neal, J.R. Welch, and Aubrey Cannon (2013) Towards a Sustainable Archaeology. In *Archaeology and Sustainability*, edited by S. Chiu and C.H. Tsang, pp. 387–410. Center for Archaeological Studies, Research Center of Humanities and Social Science, Taipei, Taiwan.

29. Welch, J.R. and Ian Lilley (editors and authors of introduction with the same title) (2013)  Beyond the Equator (Principles): Community Benefit Sharing in Relation to Major Land Alteration Projects and Associated Intellectual Property Issues in Cultural Heritage. Report on a Forum at the Annual Meeting of the Society for American Archaeology, 5 April 2013, Honolulu, Hawai'i. *International Journal of Cultural Property* 20(4): (entire submission) 467–493; (introduction) 467–469.

30. Welch, J.R. (2013) Globalizing CRM / CHM. In Beyond the Equator (Principles): Community Benefit Sharing in Relation to Major Land Alteration Projects and Associated Intellectual Property Issues in Cultural Heritage. Report on a Forum at the Annual Meeting of the Society for American Archaeology, 5 April 2013, Honolulu, Hawai'i. *International Journal of Cultural Property* 20(4):469–474.

31. Welch, J.R., Editor (2013)  *Kinishba Lost and Found: Mid-Century Excavations and Contemporary Perspectives*. Arizona State Museum Archaeological Series 206, University of Arizona, Tucson.

32. Welch, J.R. (2013)  Un-Silencing Kinishba. In *Kinishba Lost and Found: Mid-Century Excavations and Contemporary Perspectives*, edited by J.R. Welch, pp. 1–11. Arizona State Museum Archaeological Series 206, University of Arizona, Tucson.

33. Welch, J.R. (2013)  Episodes in Kinishba's Cultural and Management Histories. In *Kinishba Lost and Found: Mid-Century Excavations and Contemporary Perspectives*, edited by J.R. Welch, pp. 13–30. Arizona State Museum Archaeological Series 206, University of Arizona, Tucson.

34. Welch, J.R., Mark T. Altaha, and Nicholas C. Laluk (2013)  The Kinishba Boundary Survey. In *Kinishba Lost and Found: Mid-Century Excavations and Contemporary Perspectives*, edited by J.R. Welch, pp. 243–260. Arizona State Museum Archaeological Series 206, University of Arizona, Tucson.

35. Welch, J.R. and T. J. Ferguson (2013)  Apache, Hopi, and Zuni Perspectives on Kinishba History and Stewardship. In *Kinishba Lost and Found: Mid-Century Excavations and Contemporary Perspectives*, edited by J.R. Welch, pp. 261–287. Arizona State Museum Archaeological Series 206, University of Arizona, Tucson.

36. Welch, J.R. (2012)  Effects of Fire on Intangible Cultural Resources: Moving Toward a Landscape Approach. In *Wildland Fire in Ecosystems: Effects of Fire on Cultural Resources and Archaeology*, edited by K.C. Ryan, A.T. Jones, and C.H. Koerner, pp. 157–170. RMRS-GTR-42-vol. 3. Ft. Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

37. Caldwell, Megan E., Dana Lepofsky, Georgia Combes, Michelle Washington, John R. Welch, and John R. Harper (2012)  A Bird's Eye View of Northern Coast Salish Intertidal Resource Management Features, Southern British Columbia, Canada, *Journal of Island and Coastal Archaeology* 7:1–15.

38. Welch, J.R., Dana Lepofsky, Megan Caldwell, Georgia Combes, and Craig Rust (2011)  Treasure Bearers: Personal Foundations For Effective Leadership In Northern Coast Salish Heritage Stewardship, *Heritage and Society* 4(1):83–114.

*Curriculum Vitae*                                          **John R. Welch, RPA**

39. Welch, J.R., Dana Lepofsky, and Michelle Washington (2011)  Assessing Collaboration with the Sliammon First Nation in a Community-Based Heritage Research and Stewardship Program, *Archaeological Review from Cambridge* 26(2):171–190.

40. Welch, J.R. (2011 [2008])  National Historic Landmark Nomination for Fort Apache and Theodore Roosevelt School.  National Park Service, Washington, DC. (book-length, peer- and agency-reviewed significance assessment that was unanimously endorsed by the NHL Committee of the U.S. Park System Advisory Board. http://www.nps.gov/nhl/news/LC/spring2011/FortApache.pdf).

41. Welch, J.R., and Robert C. Brauchli (2010)  "Subject to the Right of the Secretary of the Interior": The White Mountain Apache Reclamation of the Fort Apache and Theodore Roosevelt School Historic District, *Wicazo Sa Review* 25(1):47–73.

42. Nicholas, George, Catherine Bell, Rosemary Coombe, John R. Welch, Brian Noble, Jane Anderson, Kelly Bannister,  and Joe Watkins (2010)  Intellectual Property Issues in Heritage Management, Part 2: Legal Dimensions, Ethical Considerations, and Collaborative Research Practices, *Heritage Management* 3(1):117–147.

43. Welch, J.R., Ramon Riley and Michael V. Nixon (2009)  Discretionary Desecration: American Indian Sacred Sites, Dzil Nchaa Si An (Mount Graham, Arizona), and Federal Agency Decision Making, *American Indian Culture and Research Journal* 33(4):29–68.

44. Welch, J.R., Mark K. Altaha, Karl A. Hoerig and Ramon Riley (2009)  Best Cultural Heritage Stewardship Practices by and for the White Mountain Apache Tribe, *Conservation and Management of Archaeological Sites* 11(2):148–160.

45. Welch, J.R. (2009)  Reconstructing the Ndee Sense of Place. In *The Archaeology of Meaningful Places*, edited by Brenda Bowser and M. Nieves Zedeño, pp. 149–162. University of Utah Press, Salt Lake City.

46. Welch, J.R. (2008)  Places, Displacements, Histories and Memories at a Frontier Icon in Indian Country. In *Monuments, Landscapes, and Cultural Memory*, edited by Patricia E. Rubertone, pp. 101–134.  World Archaeological Congress and Left Coast Press, Walnut Creek, California.

47. Mills, Barbara J., Mark Altaha, J.R. Welch, and T. J. Ferguson (2008)  Field Schools Without Trowels: Teaching Archaeological Ethics and Heritage Preservation in a Collaborative Context. In *Collaborating at the Trowel's Edge:  Teaching and Learning in Indigenous Archaeology*, edited by Stephen W. Silliman, pp. 25–49. University of Arizona Press, Tucson.

48. Nicholas, George P., J.R. Welch, and Eldon C. Yellowhorn (2008)  Collaborative Encounters. In *Archaeological Practice: Engaging Descendant Communities*, edited by Chip Colwell-Chanthaphonh and T. J. Ferguson, pp. 273–298.  AltaMira Press, Walnut Creek, California.

49. Welch, J.R., and T. J. Ferguson (2007)  Putting Patria into Repatriation: Cultural Affiliations of White Mountain Apache Tribe Lands.  *Journal of Social Archaeology* 7:171–198.

50. Welch, J.R. (2007)  'A Monument to Native Civilization': Byron Cummings' Still-Unfolding Vision for Kinishba Ruins. *Journal of the Southwest* 49 (1):1–94.

51. Welch, J.R. (2007)  The White Mountain Apache Photographs of Chuck Abbott and Esther Henderson. *Journal of the Southwest* 49 (1):95–116.

52. Welch, J.R. (2007)  Kinishba Bibliography. *Journal of the Southwest* 49(1):117–127.

53. Welch, J.R., Chip Colwell-Chanthaphonh and Mark Altaha (2005)  Retracing the Battle of Cibecue: Western Apache, Documentary, and Archaeological Interpretations. *Kiva* 71(2):133–163.

*Curriculum Vitae*                                          **John R. Welch, RPA**

54. Welch, J.R., Alex Jay Kimmelman, and Stan Schuman (2002)  National Register Nomination for Lower Cibecue Lutheran Mission, White Mountain Apache Tribe lands.  Keeper of the National Register of Historic Places, National Park Service, Washington, DC.

55. Mahaney, Nancy, and J.R. Welch (2002)  The Legacy of Fort Apache: Interpretive Challenges at a Community Historic Site. *Journal of the Southwest* 44(1):35–47.

56. Welch, J.R., and Ramon Riley (2001)  Reclaiming Land and Spirit in the Western Apache Homeland. *American Indian Quarterly* 25(1):5–12.

57. Welch, J.R., and Todd Bostwick (editors) (2001)  *The Archaeology of Ancient Tactical Sites*. The Arizona Archaeologist No. 32, Arizona Archaeological Society, Phoenix.

58. Welch, J.R. (2001)  Ancient Masonry Fortresses of the Upper Salt River.  In *The Archaeology of Ancient Tactical Sites*, edited by John R. Welch and Todd Bostwick, pp. 77–96. The Arizona Archaeologist No. 32, Arizona Archaeological Society, Phoenix.

59. Welch, J.R. (2000)  The White Mountain Apache Tribe Heritage Program: Origins, Operations, and Challenges.  In *Working Together: Native Americans and Archaeologists*, edited by Kurt E. Dongoske, Mark Aldenderfer, and Karen Doehner, pp. 67–83.  Society for American Archaeology, Washington, DC. http://www.saa.org/Portals/0/SAA/publications/SAAbulletin/16-1/SAA9.html.

60. Anyon, Roger, T.J. Ferguson, and J.R. Welch (2000)  Heritage Management by American Indian Tribes in the Southwestern United States.  In *Cultural Resource Management in Contemporary Society*, edited by Francis P. McManamon and Alf Hutton, pp. 120–141.  Routledge, New York.

61. Van West, Carla, Richard S. Ciolek-Torrello, John R. Welch, Jeffrey H. Altschul, Karen R. Adams, Steven D. Shelley, and Jeffrey A. Homburg (2000)  Subsistence and Environmental Interactions.  In *Salado*, edited by Jeffrey S. Dean, pp. 29–56.  Amerind Foundation, Dragoon, Arizona and University of New Mexico Press, Albuquerque.

62. Whittlesey, Stephanie, Teresita Majewski, John R. Welch, Matthew Bischoff, and Richard S. Ciolek-Torrello (1997)  Euroamerican History, 1540 to the Present.  In *Vanishing River: Landscapes and Lives of the Lower Verde Valley: The Lower Verde Archaeological Project: Overview, Synthesis, and Conclusions*, edited by Stephanie Whittlesey, Richard S. Ciolek-Torrello, and Jeffrey H. Altschul, pp. 281–336.  Statistical Research Inc. Press, Tucson, Arizona.

63. Adams, Karen R., and John R. Welch (1997)  Land form Associations, Seasonal Availability, and Ethnobotany of Plants in the Lower Verde. In *Vanishing River, Landscapes and Lives of the Lower Verde Valley: The Lower Verde Archaeological Project*, Volume 2: Agricultural, Subsistence, and Environmental Studies, edited by Jeffrey A. Homburg and Richard S. Ciolek-Torrello, pp. 33–55. Statistical Research Inc. Press, Tucson, Arizona.

64. Welch, J.R. (1997)  White Eyes' Lies and the Battle for Dzil Nchaa Si An. *American Indian Quarterly* 27(1):75–109.

65. Homburg, Jeffrey A., John R. Welch, Stephanie M. Whittlesey, and Richard S. Ciolek-Torrello (1997)  The Environmental Setting of the Lower Verde Archaeological Project.  In *Vanishing River, Landscapes and Lives of the Lower Verde Valley: The Lower Verde Archaeological Project*, Volume 2: Agricultural, Subsistence, and Environmental Studies, edited by Jeffrey A. Homburg and Richard S. Ciolek-Torrello, pp. 1–15.  Statistical Research Inc. Press, Tucson, Arizona.

66. Welch, J.R. (1996)  The Dry and the Drier: Conflict and Cooperation in Moroccan Irrigation Systems.  In *Canals and Communities: Small-Scale Irrigation Systems*, edited by Jonathan B. Mabry, pp. 69–87.  University of Arizona Press, Tucson.

*Curriculum Vitae*                                      **John R. Welch, RPA**

67. Welch, J.R., Jonathan B. Mabry, and Hsain Ilahiane (1996)  Rapid Rural Appraisal of Arid Land Irrigation.  In *Canals and Communities: Small-Scale Irrigation Systems*, edited by Jonathan B. Mabry, pp. 119–138.  University of Arizona Press, Tucson.

68. Reid, J. Jefferson, J.R. Welch, Barbara K. Montgomery, and Maria Nieves Zedeno (1996)  A Demographic Overview of the Late Pueblo III Period in the Mountains of East-Central Arizona.  In *The Prehistoric Pueblo World, A.D. 1150–1350*, edited By Michael A. Adler, pp. 73–85. University of Arizona Press, Tucson.

69. Welch, J.R. (1995)  Preservation, Research, and Public Interpretation at Pueblo Devol, an Arizona Cliff Dwelling.  *Kiva* 61(2):121–143.

70. Welch, J.R. and Richard S. Ciolek-Torrello (1994)  Nineteenth- and Twentieth-Century Land Use in the Tonto Basin.  In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin, edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 57–78.  Statistical Research Inc., Tucson, Arizona.

71. Ciolek-Torrello, Richard S. and J.R. Welch (editors) (1994)  *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin. Statistical Research Inc., Tucson, Arizona

72. Ciolek-Torrello, Richard S. and John R. Welch (1994)  Introduction. In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin, edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 1–18. Statistical Research Inc., Tucson, Arizona.

73. Welch, J.R., and Richard S. Ciolek-Torrello (1994)  Analytic Approaches to Ancient Agroecology: Goals and Methods of the Agricultural Field Study.  In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin. edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 41–56. Statistical Research Inc., Tucson, Arizona.

74. Welch, J.R. (1994)  Environmental Influences on Tonto Basin Agricultural Productivity and Sustainability.  In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin, edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 19–39.  Statistical Research Inc., Tucson, Arizona.

75. Ciolek-Torrello, Richard S., Stephanie M. Whittlesey, and John R. Welch (1994)  A Synthetic Model of Prehistoric Land Use.  In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin, edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 437–472. Statistical Research Inc., Tucson, Arizona.

76. Welch, J.R. (1994)  Archaeological Studies of Agricultural Contexts.  In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin, edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 223–251.  Statistical Research Inc., Tucson, Arizona.

77. Adams, Karen R., and J.R. Welch (1994)  Tonto Basin Plant Geography and Ecology.  In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin, edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 121–133.  Statistical Research Inc., Tucson, Arizona.

78. Welch, J.R. (1994)  Ethnographic Models for Tonto Basin Land Use.  In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin, edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 79–120.  Statistical Research Inc., Tucson, Arizona.

79. Ciolek-Torrello, Richard S., and J.R. Welch (1993)  Reconstructing Prehistoric Land Use in the Tonto Basin, Arizona.  *Proceedings of the 24th Chacmool Conference*, edited by Ross W. Jamieson, Sylvia Abonyi, and Neil Mirau, pp. 273–282.  The Archaeological Association of the University of Calgary, Alberta.

*Curriculum Vitae*                                                                                    **John R. Welch, RPA**

80. Welch, J.R. (1992)  Irrigation Agriculture in the Tonto Basin.  *Proceedings of the 1992 Salado Conference*, edited by Richard Lange, pp. 93–111.  Arizona Archaeological Society, Tucson.

81. Welch, J.R., and Daniela Triadan (1991)  The Canyon Creek Turquoise Mine, East-Central Arizona. *Kiva* 56(2):145–164.

82. Welch, J.R. (1991)  From Horticulture to Agriculture in the late Prehistory of the Grasshopper Region, Arizona.  In *Mogollon V*, edited by Patrick H. Beckett, pp. 75–92.  COAS, Las Cruces, New Mexico.

83. Donaldson, Bruce R., and J.R. Welch (1991)  Western Apache Dwellings and their Archaeological Correlates.  In *Mogollon V*, edited by Patrick H. Beckett, pp. 93–105.  COAS, Las Cruces, New Mexico.

84. Ciolek-Torrello, Richard S., S. D. Shelley, Jeffrey H. Altschul, and John R. Welch (1990)  *The Roosevelt Rural Sites Study Research Design*.  Technical Series 28 (1).  Statistical Research Inc., Tucson.

## Articles, Reports, Reviews, and Other Works Not Formally Peer-Reviewed

1. Hanacek, Ksenija, and J. R. Welch (2020) Proposed copper mine on land sacred to the indigenous Apache of Arizona, USA. Environmental Justice Atlas. https://ejatlas.org/conflict/a-proposed-copper-mine-on-a-land-that-is-sacred-to-the-apache-indigenous-of-arizona-usa

2. J.R. Welch, compiler and lead author (2020) A Guide to Field Investigation and Documentation of Archaeological Resources Protection Act (ARPA) Violations. Department of Justice Services, U.S. Bureau of Indian Affairs, Albuquerque.

3. J.R. Welch (2019) Congressman O'Halleran Pledges Support for Work to Promote Stewardship and to Prevent Grave Robbing, Looting. *Fort Apache Scout* August 30, 2019.

4. J.R. Welch (2019) "Congressman O'Halleran Supports Site Stewardship and Work to Prevent Grave Robbing, Looting." ACRAsphere, August 22, 2019, https://acra-crm.org/acrasphere/7844079

5. Natasha Lyons, Kisha Supernant, and John R. Welch (2019) What Are the Prospects for an Archaeology of Heart? *SAA Archaeological Record* 19(2):6–9.

6. J.R. Welch (2019) (Yet) Another Southwest: Incipient Preservation Archaeology in Southwest Ethiopia. Preservation Archaeology Blog. Archaeology Southwest https://www.archaeologysouthwest.org/2019/02/14/yet-another-southwest-incipient-preservationarchaeology-in-southwest-ethiopia/

7. J.R. Welch, Mark Altaha, Ramon Riley (2019) THPO, BIA, Fort Apache Heritage Foundation, and Archaeology Southwest Team up to Curb Grave Robbing, Looting. *Fort Apache Scout*, February 15, 2019.

8. J.R. Welch, Mark Altaha, Stacy Ryan, and Garry Cantley (2019) White Mountain Apache THPO, BIA, and Archaeology Southwest Team up to Boost Training to Curb Grave Robbing, Looting, *Site Steward Newsletter*, Arizona State Parks.

9. Helen Erickson, Karl A. Hoerig and John R. Welch (2018) Fort Apache and Theodore Roosevelt School National Historic Landmark [Fort Apache, Arizona], *SAH Archipedia,* eds. Gabrielle Esperdy and Karen Kingsley, Charlottesville: UVaP, 2012—, http://sah-archipedia.org/buildings/AZ-01-017-0034.

*Curriculum Vitae*                                                    **John R. Welch, RPA**

10. Welch, J.R. (2017) Cycles of Resistance, *SAA Archaeological Record* 17(1):17-21. http://onlinedigeditions.com/publication/?i=378203&article_id=2700507&view=articleBrowser&ver=html5#{%22issue_id%22:378203,%22view%22:%22articleBrowser%22,%22article_id%22:%222700507%22}

11. Welch, J.R. (2017) How Can the Cultural / Heritage Management (CRM) Industry Reduce Key Obstacles to Upward Mobility for Junior Staff? Linked In, https://www.linkedin.com/pulse/how-can-cultural-heritage-management-crm-industry-reduce-welch

12. Benrita "Mae" Burnette, Ronnie Cachini, T. J. Ferguson, Sharlot Hart, Stewart B. Koyiyumptewa, Octavius Seowtewa, Paul Tosa, and J.R. Welch (2017) Fire Adds Richness to the Land: Ethnographic Knowledge about Forests and Fire. *Archaeology Southwest* 30(4):5-6.

13. Vigil, Francis, and J.R. Welch (2017) Beyond Community Consent: Toward Sovereignty-Driven Academic Research. *Archaeology Southwest* 30(4):26-27.

14. Welch, J.R., and Erin Hogg (2017) Heritage Resource Management. Open access bibliography containing over 1,000 complete citations to books, articles and other resources. https://www.zotero.org/groups/635575/heritage_resource_management

15. Welch, J.R., Mark Altaha, and the BFRR Collective (2016) 'Ground-Truthing' Ancestral Pueblo Settlement of the Southern and Western Flanks of Arizona's White Mountains, White Mountain Apache Tribe Lands, Arizona. *Glyphs* 67(3):12-15.  http://www.az-arch-and-hist.org/publications/glyphs/

16. The Black Trowel Collective (2016) Foundations of an Anarchist Archaeology: A Community Manifesto. http://savageminds.org/2016/10/31/foundations-of-an-anarchist-archaeology-a-community-manifesto/

17. Ferris, Neal, and J.R. Welch (2016) Notes from the Next Century: Sustainable Archaeology, *Kiva* 82(3):330.

18. Welch, J.R. (2016) Toward Full-Spectrum Cultural Heritage Management (or, My Big, Fat Cultural Future!). *IPinCH Newsletter* 7(Spring 2016):13. http://www.sfu.ca/ipinch/sites/default/files/news/newsletters/ipinch_newsletter_7_final_singles_web.pdf

19. Welch, J.R. (2016) Preservation, Decolonization and Sovereignty Reclamation at the Fort Apache and Theodore Roosevelt National Historic Landmark, Arizona. IHOPE featured case study http://ihopenet.org/preservation-decolonization-and-sovereignty-reclamation-at-the-fort-apache-and-theodore-roosevelt-national-historic-landmark-arizona/

20. Welch, J.R., Editor (2016) *The Site that Nobody Really Knows: Kinishba Reawakened*. *Archaeology Southwest* 30(1): 1-28. https://www.archaeologysouthwest.org/what-we-do/information/asw/asw30-1/

21. Welch, J.R., (2016) The Site that Nobody Really Knows: Kinishba Reawakened. *Archaeology Southwest* 30(1): 3-5.

22. Welch, J.R., (2016) Episodes in Kinishba History. *Archaeology Southwest* 30(1): 6-7.

23. Welch, J.R., (2016) A Dream Deferred: Cummings and the Shaeffers at Kinishba. *Archaeology Southwest* 30(1): 8-10.

24. Welch, J.R., (2016) The Fateful Box: Excavations at Kinishba after 1939. *Archaeology Southwest* 30(1): 11-13.

25. Welch, J.R., Nicholas C. Laluk, and Mark T. Altaha (2016) The Kinishba Boundary Survey. *Archaeology Southwest* 30(1): 23-25.

26. Welch, J.R., and T.J. Ferguson (2016) Preservation Spotlight: Apache, Hopi, and Zuni Perspectives on Kinishba History and Stewardship—This Place is Protected. *Archaeology Southwest* 30(1): 26-27.

27. Hart, Sharlot, T. J. Ferguson, John Welch, and Paul Tosa (2016) Fire Adds Richness to the Land. Pueblo of Jemez *Red Rocks Reporter* (January): 7. http://www.jemezpueblo.org/uploads/FileLinks/46a94f403cfa4d6e9573eeeb89520879/JANUARY_2016_FINAL.pdf

28. Welch, J.R., Karl Hoerig, and Stephen Grede (2016)  *Visitor Guide to Kinishba*.  White Mountain Apache Tribe Heritage Program, Fort Apache, Arizona (revised edition).

29. Welch, J.R. (2015) From the Garbage Czar, with Love (and apologies to the "real" Uncle Willy). *Arizona Anthropologist* (Centennial Edition):120-121.

30. Welch, J.R. (2014) Cultural Heritage: What is it? Why is it important? Fact Sheet Presented by the Intellectual Property Issues in Cultural Heritage Project (IPinCH). http://www.sfu.ca/ipinch/sites/default/files/resources/fact_sheets/ipinch_chfactsheet_final.pdf.

31. Welch, J.R., and the SAA Amity Pueblo Task Force (2014)   The Amity Pueblo Remediation. Analysis presented in the Society for American Archaeology Government Affairs Newsletter, December 2014. http://www.saa.org/AbouttheSociety/GovernmentAffairs/tabid/115/Default.aspx

32. Welch, J.R., editor (2014)   Community-Based Cultural Heritage Research. Wiki for the IPinCH project's Community-Based Cultural Heritage Research (CBCHR) Working Group. https://wiki.sfu.ca/research/ipinch/index.php/Main_Page.

33. Welch, J.R. (2014)   Untitled blog for the Simon Fraser University Indigenous Research Institute. http://www.sfu.ca/olc/blog/indigenous-sfu-community-stories/indigenous-research-institute-sfu-john-r-welch.

34. Welch, J.R. (2014)   White Mountain Apache Collection. Text-searchable compendium of over 500 archival documents relating to the history and resource management of the Fort Apache Indian Reservation, Arizona.  http://content.lib.sfu.ca/cdm/search/collection/faca/page/1.

35. Welch, J.R. (2013)   IPinCH and Golder Associates Host Lively Forum on IP and Benefits-Sharing Issues in International Cultural Resources Management. IPinCH Digest: 2013, Volume 4 (April 2013):1.  http://www.sfu.ca/ipinch/news/ipinch-news/ipinch-and-golder-associates-host-lively-forum-ip-and-benefits-sharing-issues-inter.

36. Welch, J.R., Rudy Ethelbah, and Larry Ethelbah (2013)  Freda Ethelbah: Apache Living Treasure, Mickey Free Granddaughter. *White Mountain Independent*, July 17, 2013. http://www.wmicentral.com/news/latest_news/freda-ethelbah-apache-living-treasure-mickey-free-granddaughter/article_8effce98-ed97-11e2-a8fc-0019bb2963f4.html.

37. Welch, J.R., Rudy Ethelbah, and Larry Ethelbah (2013)  Freda Ethelbah: Apache Living Treasure, Mickey Free Granddaughter. *Fort Apache Scout*, July 12, 2013, pages 1, 3.

38. Welch, J.R. (2012)  Review of *Indigenous Peoples and the Collaborative Stewardship of Nature: Knowledge Binds and Institutional Conflicts***,** by Ross, Anne, Kathleen Pickering Sherman, Jeffrey G. Snodgrass, Henry D. Delcore, and Richard Sherman (Left Coast Press, Walnut Creek, California, 2011), *Journal of Anthropological Research* 68:129–130.

*Curriculum Vitae*                                            **John R. Welch, RPA**

39. Welch, J.R. (2011)  Heritage Site Protection Protocol for Tla'amin Territory, British Columbia. Multi-party Agreement sent to respective councils in November 2011.

40. Welch, J.R., and Lindsay Tripp (2011)  Cooperation in Land and Resource Management – Guide to research materials. http://www.lib.sfu.ca/help/subject-guides/rem/cooperation-in-rem.

41. Welch, J.R., Erica Kowsz, and Lindsay Tripp (2011)  Applied Archaeology and Cultural Resource Management (CRM) – Guide to research materials. http://www.lib.sfu.ca/help/subject-guides/archaeology/applied-archaeology-and-cultural-resource-management.

42. Lyons, Natasha, Andy Philipps, Dave Schaepe, Betty Charlie, Clifford Hall, Kate Hennessey, and John R. Welch (2011)  The Scowlitz Site Online: Launch of the Scowlitz Artifact Assemblage Project *The Midden* 43(2):11–14.

43. Lewis, Jennifer, and J.R. Welch (2011)  Historic Property Identification and Documentation Survey of Portions of the Fort Grant Prison, Arizona. Submitted to Arizona Department of Corrections.

44. Welch, J.R. (2011)  Review of *From Cochise to Geronimo: The Chiricahua Apaches, 1874–1886*, by Sweeney, Edwin R. (University of Oklahoma Press, 2010) *Journal of Arizona History* 52:393–395.

45. Welch, J.R. (2011)  Review of *The Museum of Anthropology at the University of British Columbia*, edited by Carol E. Mayer and Anthony Shelton (Douglas & McIntyre and University of Washington Press, Vancouver and Seattle, 2009), *Museum Anthropology* 34(2):175–176.

46. Welch, J.R., Eric McLay, Michael Klassen, Fred Foster, and Robert Muir (2011)  A Database of Unauthorized Heritage Site Alterations. *The Midden* 43(1):2–3.

47. Caldwell, Megan, Dana Lepofsky, John R. Welch, Chris Springer, and Nyra Chalmer (2011). Tla'amin-SFU Field School in Archaeology & Heritage Stewardship 2010 Field Report and 2011 Prospectus. Submitted to the Sliammon First Nation.

48. Welch, J.R., F. Foster, R. Gillies, M. Klassen, E. McLay, R. Muir (2010)  The Heritage Conservation Act Contravention Data Base. *BC Association of Professional Archaeologists Fall/Winter Bulletin* 2010(2):2–3.

49. Nicholas, George, J.R. Welch, Alan Goodman, and Randall McGuire (2010)  Beyond the Tangible: Repatriation of Cultural Heritage, Bioarchaeological Data, and Intellectual Property. Anthropology News (March):10–11.

50. Welch, J.R. (2010) Review of *Opening Archaeology: Repatriation's Impact on Research and Practice*, edited by Thomas W. Killion (School for Advanced Research Press, 2008) *American Antiquity* 75:201-202.

51. Lewis, Jennifer, and J.R. Welch (2010)  Fort Apache-Theodore Roosevelt School (FA-TRS) Survey 2010, Fort Apache Historic Park, Arizona. Submitted to the Fort Apache Heritage Foundation.

52. Ewing, Robyn, T.J. Ferguson, and J.R. Welch (2009)  Repatriation and Reburial Bibliography, http://tinyurl.com/cput3r, RefShare, Simon Fraser University, Burnaby, BC.

53. Jackley, Julia, Dana Lepofsky, John R. Welch, Megan Caldwell, Chris Springer, Morgan Ritchie, Craig Rust and Michelle Washington (2008)  Tla'amin-SFU Archaeology and Heritage Program 2009. *The Midden* 41(4):5–7.

54. Welch, J.R. (2009)  Review of *Shadows at Dawn: A Borderlands Massacre and the Violence of History,* by Karl Jacoby (The Penguin Press, New York, 2008). *Journal of Arizona History* 50(4):403–404.

55. Lepofsky, Dana, and John R. Welch (2009)  Herring Archaeology in Tla'amin Territory. *Midden* 41(3):3.

56. Tla'amin First Nation – Simon Fraser University Archaeology and Heritage Stewardship Program. Website and electronic documents, http://www.sliammonfirstnation.com/archaeology.

57. Johnson, Sarah, Dana Lepofsky, John R. Welch, Craig Rust and Michelle Washington (2008)  Field School Update: Tla'amin-SFU Field School in Archaeology & Heritage Stewardship, *The Midden* 40(3):8–9.

58. Welch, J.R., Mark Altaha, Doreen Gatewood, Karl Hoerig, and Ramon Riley (2008)  Past is Present: Fort Apache and Theodore Roosevelt School.  In *American Indian Places*, edited by Frances Kennedy, p. 230.  Houghton Mifflin Press, New York.

59. Welch, J.R., Mark Altaha, and Nicholas Laluk (2008)  Decolonizing Kinishba Ruins National Historic Landmark.  In *American Indian Places*, edited by Frances Kennedy, pp. 208–209. Houghton Mifflin Press, New York.

60. Welch, John R., and Karl A. Hoerig (2008)  The White Mountain Apache Tribe. In "Nature-Based Tourism and Tenuring Strategy," prepared by Peter W. Williams, Aaron Heidt, Jen Reilly, and Sydney Johnsen. Coastal First Nations Rainforest Solutions Project.

61. Welch, J.R. (2008)  Review of *Zuni Origins: Toward a New Synthesis of Southwestern Archaeology*, edited by David A. Gregory and David R. Wilcox (University of Arizona Press, 2007) *Canadian Journal of Archaeology* 32:289–292.

62. Welch, J.R. (2008)  Review of *Chiricahua Apache Enduring Power*, by Trudy Griffin-Pierce (University of Alabama Press, 2006) *American Anthropologist* 110(1):108–109.

63. Lepofsky, Dana, John R. Welch, Sarah Johnson, Craig Rust, and Lisa Wilson (with Michelle Washington, Georgia Combes, Hugh Prichard, and the 2008 students) (2008)  Tla'amin-SFU Field School in Archaeology & Heritage Stewardship: 2008 Season Report and 2009 Prospectus. Department of Archaeology, Simon Fraser University.

64. Asp, Vera J., Knut Fladmark, John R. Welch, Robert Muir, and George Kauffman (2007)  Tahltan and Tanzilla Villages. Ancestral Knowledge, Ethnohistory, and Archaeology of Two Tahltan Villages: Report on 2007 Fieldwork. Department of Archaeology, Simon Fraser University.

65. Welch, J.R., David V. Burley, Michael Klassen, and George P. Nicholas (2007)  New Options for a Professional Preparation Curriculum at Simon Fraser University. *The Midden* 39(4):16–19.

66. Welch, J.R. (2007)  Peer Review of Ndee: The Apache Experience, exhibit planning grant submitted by the Heard Museum, Phoenix, Arizona to the National Endowment of the Humanities.

67. Welch, J.R. (2007)  Review of Apache Playing Cards, by Wayland, Virginia, and Alan Ferg (Waveland Press, 2006) *Journal of Arizona History* 49(1):77–79.

68. Welch, J.R. (2007)  Review of *History is in the Land: Multivocal Tribal Traditions in Arizona's San Pedro Valley*, by T.J. Ferguson and Chip Colwell-Chanthaphonh (University of Arizona Press, 2006). *Journal of Arizona History* 48(2):202–204.

69. Welch, J.R., Mark Altaha, Doreen Gatewood, Karl Hoerig, and Ramon Riley (2006)  Archaeology, Stewardship, and Sovereignty.  *The SAA Archaeological Record* 6(4):17–20, 57.

70. Welch, J.R., Karl A. Hoerig, and Raymond Endfield, Jr. (2005)   Enhancing Cultural Heritage Management and Research through Tourism on White Mountain Apache Tribe Trust Lands. *The SAA Archaeological Record* 5(3):15–19.

71. Welch, J.R., Chip Colwell-Chanthaphonh and Mark Altaha (2005)  Triangulating Perspectives on the Battle of Cibecue. *Glyphs* 56(6):7–8.

72. Welch, J.R., and T.J. Ferguson (2005)  Cultural Affiliation Assessment of White Mountain Apache Tribal Lands (Fort Apache Indian Reservation).  Final Report, prepared in fulfillment of a National NAGPRA Documentation and Planning Grant, National Park Service. Historic Preservation Office, White Mountain Apache Tribe, Arizona.

73. Hoerig, Karl A., and J.R. Welch (2005)  *Fort Apache Walking Tour Guide*. White Mountain Apache Tribe Heritage Program, Fort Apache, Arizona.

74. Welch, J.R., Karl Hoerig, and Stephen Grede (2005)  *Visitor Guide to Kinishba Ruins*.  White Mountain Apache Tribe Heritage Program, Fort Apache, Arizona.

75. Welch, J.R. (2004)  Final Report: Kinishba National Historic Landmark Boundary Study.  Report prepared under Contract for the National Park Service, Southwestern Regional Office, Santa Fe.

76. Welch, J.R. (2002)  The Rodeo-Chediski Fire and Cultural Resources.  *Arizona Archaeological Council Newsletter* 26(3):1–3.

77. Welch, J.R. (2001)  The End of Prehistory. *Anthropology News*, May 2001, pp. 9–10.

78. Welch, J.R. (2000)  Old Fort Apache: A Tribe's Struggle to Take the Best Parts of the Past into the Future.  *Heritage Matters*, October 2000, pg. 6.

79. Welch, J.R. (2000)  The New Battle for Old Fort Apache. *White Mountain Magazine* 46:22–23, 116–117 (Summer).

80. Welch, J.R., with George Pinter, Nancy Mahaney, Ngozi Robinson, and Bambi Kraus (2000) *Ndee La'ade: Gathering of the People*.  White Mountain Apache Tribe, Whiteriver, Arizona.

81. Welch, J.R., Nancy Mahaney, and Ramon Riley (2000)  The Reconquest of Fort Apache: The White Mountain Apache Tribe Reclaims its History and Culture. *CRM* 23(9):16–19.

82. Welch, J.R., and Ramon Riley (1998) The Reconquest of Apachería: Apaches Reclaim their History and Culture. *Ciencia Hoi*.

83. Welch, J.R. (1998) White Mountain Apache Heritage Program Operations and Challenges. *Bulletin, Society for American Archaeology* 16(1):8–11.

84. Welch, J.R. (1998)  *Arch-Bark*: Smokescreen or Shortcut? *Glyphs* 49(2):14

85. Welch, J.R. (1997)  Did Archaeoastronomy Begin at the Sabino Canyon Ruin? *Old Pueblo Archaeology* 10:1–5.

86. Welch, J.R. (1997)  Origins of the White Mountain Apache Heritage Program. *Bulletin, Society for American Archaeology* 15(5):26–28.

87. Welch, J.R. (1996)  Archaeological Measures and Social Implications of Agricultural Commitment. Doctoral dissertation, Department of Anthropology, University of Arizona.  University Microforms, Ann Arbor, Michigan.

88. Welch, J.R. (1992)  Book Note: The Fite Ranch Project, by Yvonne R. Oakes, *Kiva* 57(1):281.

89. Welch, J.R. (1989)  Early Investigations at the Sabino Canyon Ruin. Archaeology in Tucson, *Institute for American Research Newsletter*, Summer 1989, pp. 4–6.

90. Welch, J.R. and Aamir Rashid Mufti (1983) Structuralism and Systems of Folk Classification. *Northeastern Anthropological Association Newsletter*, Fall, pp. 1–4.

*Curriculum Vitae*                                                    **John R. Welch, RPA**

## Selected Conference Presentations and Invited Lectures, Colloquia, Seminars

1. Welch, J.R, and the Archaeology Southwest-BIA ARPA Initiative Team (2020) 2020 Perspectives and Tools for Addressing Archaeological Resource Crime in Indian Country: Prevention, Detection, Investigation, Remediation. Webinar invited by the Arizona State Site Stewards, November 12, 2020.

2. Welch, J.R. (2020) A Tale of Two Cities: Casa Malpais, Kinishba, and the Elusive Promise of Archaeological Tourism. Archaeology Southwest Café, May 5, 2020, https://www.archaeologysouthwest.org/event/why-you-should-experience-casa-malpais-and-kinishba/

3. Welch, J.R. (2019) The White Mountain Experiment in Community-Based Site Protection. Archaeology Southwest Tea Series, May 6, 2019, https://www.youtube.com/watch?v=lmTIrcN5PYo

4. Welch, J.R. (2018) Landscapes, Consultations, Archaeologies, and the Promise of Full-Spectrum Heritage Resource Management. Invited keynote. Annual meeting of the Federal Columbia River Power System Cultural Resource Program, Kalispell, Montana, November 8, 2018

5. Welch, J.R. (2018) Fort Apache: Conflict, Conservation, and (Re)Conciliation(?) in Indian Country. Haffenreffer Museum 2018 Shepard Krech III Lecture, Brown University, April 5, 2018. https://www.youtube.com/watch?v=qCj_xKgVUNc&index=1&list=PL031FD246CE1CDC15&t=0s

6. Lyons, Natasha, Lisa Hodgetts, Kisha Supernant, John R. Welch (2018) What Does #MeToo Mean for Archaeology? Paper presented in "Unsettling Archaeology" symposium at the 51st Annual Meeting of the Canadian Archaeological Association, Winnipeg, Manitoba May 3, 2018

7. Welch, J.R., David Burley, Erin Hogg, Kanthi Jayasundera, David Maxwell, George Nicholas, Janet Pivnick, Christopher D. Dore, and Michael Klassen (2017) Digital bridges across disciplinary, practical and pedagogical divides: An Online Professional Master's Program in Heritage Resource Management. Paper presented in "The 'Other Grand Challenge': Archaeological Education & Pedagogy in the Next 50 Years," Chacmool Conference, Calgary, Alberta, November 9, 2017.

8. Welch, J.R. (2017) Fort Apache: Pasts, Presents, Futures. Summer Public Lecture Series, Fort Vancouver, Washington, July 20. http://www.friendsfortvancouver.org/archeology-lecture-series-july-2017/

9. Welch, J.R. (2017) Open Eyes, Open Minds, Open Arms, and Open Hearts Open Archaeology. Paper presented at the Society for American Archaeology Annual Meeting, Vancouver, April 1.

10. Welch, J.R., Francis Vigil, and Rachel A. Loehman (2015) Toward a Sovereignty-Driven Paradigm for Transdisciplinary Research on Social-Ecological Systems. Paper presented at the Society for American Archaeology Annual Meeting, San Francisco, California, April 17.

11. Welch. J.R. (2015) Tribal Historic Preservation Officer Toolkit Training Workshop: Quick Start Guide—Essential Guide for Tribal Programs. Full-day workshop presented to 20 tribal government officials at the National Tribal Preservation Conference, Laguna Pueblo lands near Albuquerque, New Mexico, August 17.

12. Schaepe, David M., Bill Angelbeck, John R. Welch, and David Snook (2015) Archaeology as Therapy: Linking Community Archaeology to Community Health. Paper presented at the meeting of the Society for Applied Anthropology, Pittsburgh, Pennsylvania, March 28.

13. Welch, John R. (presenter and discussant) (2015) Sovereignty-Driven Research Ethics: Beyond Baseline Compliance, Consent and Limitation of Liability. Panel discussion, Indigenous Research Ethics conference, Vancouver, February 19. https://indigenousresearchethics2015.wordpress.com/

14. Welch, J.R. (2015)  Tribal Historic Preservation Officer Toolkit Training Workshop: Essential Guide for Tribal Programs. Full-day workshop presented to 22 tribal government officials at the National Tribal Preservation Conference, Milwaukee, Wisconsin, September 11.

*Curriculum Vitae*                                                                    **John R. Welch, RPA**

15. Welch, John R. (presenter) (2014) Fire and Humans in Resilient Ecosystems. Curriculum development workshop for teachers, Laboratory for Tree-Ring Research and College of Education, University of Arizona, Tucson, June 23.

16. Welch, John R. (organizer and moderator) (2014) CRM-ology: Toward a Research Design for Improving the Dominant Form of Archaeological Practice. Forum, Society for American Archaeology Annual Meeting, Austin, Texas, April 25.

17. Hogg, Erin A., and John R Welch (2014) What does Collaborative Archaeology Mean to You? Community-Engagement in Field Schools, Research Projects, and Consulting. Poster presented at the meeting of the Society for American Archaeology, Austin, Texas, April 25.

18. Ruth Aloua and John R. Welch (2014) Closing the Gap Between Management Practice and Policy at a National Historical Park in Hawai'i. Paper presented in the invited symposium, Society for Applied Anthropology, Albuquerque, New Mexico.

19. Hogg, Erin, and John R. Welch (2013) Do you Collaborate? Community Engagement in Field Schools, Research, and Consulting Projects. Poster presented at the meeting of the Canadian Archaeological Association, Whistler, B.C, May 17, 2013.

20. Welch, John R., and Ian Lilley (organizers and moderators) (2013) Beyond the Equator (Principles): Community Benefit Sharing in Relation to Major Land Alteration Projects and Associated Intellectual Property Issues in Cultural Heritage. Forum, Society for American Archaeology Annual Meeting, Honolulu, Hawaii. April 5.

21. Welch, John R., and Karl A. Hoerig (2013) Fort Apache Heritage Foundation. Presentation in symposium, Bellwhether Nonprofits of the Southwest. Society for American Archaeology Annual Meeting, Honolulu, Hawaii. April 4.

22. Atalay, Sonya, Lee Rains Clauss, Randall H. McGuire, and John R. Welch (organizers) (2013) Archaeology, Relevance, and Activism. Seminar, Amerind Foundation, Arizona. February 27-March 3.

23. Welch, John R. (2013) Placemaking and Displacement at Fort Apache and the Theodore Roosevelt School. Archaeology Café public lecture, sponsored by Archaeology Southwest, available at http://www.archaeologysouthwest.org/event/archaeology-cafe-tucson-placemaking-and-displacement-at-fort-apache-and-theodore-roosevelt-school/.

24. Welch, John R. (2012) Home, Home at the Fort: A Millennium of Place Making and Displacement at Fort Apache and TR School National Historic Landmark, Arizona. Environmental Science Program Seminar, Thompson Rivers University, Kamloops, British Columbia.

25. Welch, John R., and Neal Ferris (2011) Making a Sustainable Archaeology. Society for American Archaeology Annual Meeting, Sacramento, California.

26. Ferris, Neal, John R. Welch, and Aubrey Cannon (2011) Capacities for a Sustainable Archaeology. Sustainable Archaeology Workshop, Taipei, Taiwan.

27. Lepofsky, Dana, John R. Welch, and Michelle Washington (Siemthlut) (2011) The Tla'amin-SFU Field School in Archaeology and Heritage Stewardship. People of the River Conference, May 2011.

28. Welch, J.R., Dana Lepofsky, and Michelle Washington (Siemthlut) (2010) Assessing Collaboration with the Sliammon First Nation in a Community-Based Heritage Research and Stewardship Project, in "Perspectives on the Ethical Engagement of Indigenous Peoples In Archaeological Practice" symposium organized by Kerry Thompson, annual meeting of the Society for American Archaeology, St. Louis, Missouri.

*Curriculum Vitae*                                         **John R. Welch, RPA**

29. Speller, C., D. Lepofsky, A. Benson, M. Washington, M. Caldwell, J.R. Welch, D. Yang. (2010) Reconstructing Past Abundance, Diversity, and Use of Herring in the Pacific Northwest of North America, International Council for Archaeozoology, 11th Annual Conference, Paris, France, August 23–28.

30. Welch, J.R., Siemthlut (Michelle Washington) and Dana Lepofsky (2009) *Getting to 100*: Harmonizing Community, Research, and Societal Interests Through the Tla'amin First Nation-Simon Fraser University Field School in Archaeology and Heritage Stewardship, in "Practicing Public Archaeology: Contemporary Issues of Engagement and Action" symposium organized by Paul Thacker, annual meeting of the Society for Applied Anthropology, Santa Fe, New Mexico.

31. Laluk, Nicholas C. and J.R. Welch (2008) Interpretation and Indigenation of Place: Fort Apache, Arizona, in "Archaeology of the Recent Indigenous Past" symposium organized by Nina Swidler, annual meeting of the Society for Historical Archaeology, Albuquerque, New Mexico.

32. Welch, J.R., Vera J. Asp and George Kaufmann (2008) Linking Documentary and Material Histories Through Community-Based Archaeology in Tahltan Territory, British Columbia, in "Ways of Becoming Athapaskan" symposium organized by H. Kory Cooper, B. Sunday Eiselt, and J.R. Welch, annual meeting of the Society for American Archaeology, Vancouver.

33. Ewing, Robyn and J.R Welch (2008) Seeking Middle Ground: Repatriation's Roles in the Negotiation of New Relationships among Indigenous Communities, Museums and Archaeologists, annual meeting of the Society for American Archaeology, Vancouver.

34. Washington, Michelle, J.R. Welch and Dana Lepofsky (2008) Digging Common Ground: The Tla'amin-Simon Fraser University Field School in Archaeology and Heritage Stewardship, September meeting of the Archaeological Society of British Columbia, Vancouver.

35. Welch, J.R., Dana Lepofsky and Siemthlut (Michelle Washington) (2008) Getting to 100: Harmonizing Community, Research, and Societal Interests through Archaeology and Heritage Stewardship, seminar, Vancouver Island University, Powell River, British Columbia.

36. Asp, Vera J., J.R. Welch and George Kaufmann (2008) A Cultural Landscape Approach to the Integration of Documentary and Material Histories in Tahltan Territory, British Columbia, Northwest Archaeological Conference, Victoria, British Columbia.

37. Welch, J.R. and Karl Hoerig (2007) Archaeology, Ndee Identity, and Tribal Sovereignty, in "Archaeologists as Gatekeepers of American Indian Identity" symposium organized by Sonya Atalay and Randy McGuire, annual meeting of the Society for American Archaeology, Austin, Texas.

38. Welch, J.R. (2006) Of, By, and For the Ndee: Archaeology, Heritage Stewardship, and White Mountain Apache Sovereignty, in "Decolonizing Archaeology" symposium, Chacmool Conference, Calgary, Alberta.

39. Welch, J.R. (2005) Ancient Masonry Fortresses of the Upper Salt River, Arizona, September meeting of the Archaeological Society of British Columbia, Vancouver.

40. Welch, J.R. (2005) Panellist, "Anthropologist as Expert Witness," organized by Sylvia Rodriguez.

41. Welch, J.R., Mark Altaha and Nicholas Laluk (2004) Apache? "The Protohistoric Period in the Southern Southwest" symposium, Arizona Archaeological Council, Tucson.

## Works in Press

1. Roos, Christopher, J.R. Welch (2021) Native American Fire Management at an Ancient Wildland-Urban Interface in the Southwest US. *PNAS* 2020-18733R In press.

*Curriculum Vitae*                                                 **John R. Welch, RPA**

2. Hogg, Erin A., Chelsea H. Meloche, George P. Nicholas, and John R. Welch (2021) Whose Rights? Whose Heritage?: Policy Changes in Canada. In press

3. Welch, J.R., (2020) Archaeology Law and Policy in the United States. In *Open Archaeology: An Introduction to the Field*, edited by Katie Kirakosian (accepted).

4. Hogg, Erin A., and John R. Welch (2020) Archaeological Evidence in the Tsilhqot'in Decision. *Canadian Journal of Archaeology* (in press)


**Works in Preparation and Under Review**

1. Welch, J.R. (2019) 'The only prompt, economical, and humane process': The Pinal Apache Genocide and other Legacies of Industrial Mining in Central Arizona. (in preparation)

2. Hogg, Erin A., and John R. Welch (2020) Expert Witnesses' and Lawyers' Perspectives on the Use of Archaeological Data as Evidence in Aboriginal Rights and Title Litigation. *BC Studies: The British Columbian Quarterly*.

3. Welch, J.R. (2019) *Fort Apache: Places and Displacements at a Frontier Icon in Indian Country*, University of Arizona Press (in preparation, with approved book proposal)


# TRAINING AND SUPERVISION

## Graduate Student Supervision & Completion at SFU

| | Name | Degree | Project / Thesis | Start–Finish |
|---|---|---|---|---|
| 1 | McKillop, Vanessa | M.A. (HRM) | Weji-sqalia'tiek, they 'sprouted up from the earth': Archaeology and Management of Shubenacadie River Valley Paleoshorelines, Nova Scotia | 2017– 2019 |
| 2 | Owens, Camille | M.A. (HRM) | Engaging Public Archaeology Protocols in the Interpretation of Museum Collections | 2017– |
| 3 | Pitul, Michael | M.A. (HRM) | A Policy Framework for Underwater Archaeology in Ontario | 2017– 2019 |
| 4 | Campbell, Michael | M.A. (HRM) | CRM Archaeology and Native Land Claims in British Columbia | 2017– |
| 5 | Johnson, Meaghan | M.A. (HRM) | Building Representation: The Development of Barkerville Historic Town & Park's Chinese Narrative | 2017–2019 |
| 6 | O'Neil, Casey | M.A. (HRM) | Evaluation of Sample Size Protocols for Large Data Recovery Projects | 2016 –2019 |
| 7 | Gauer, Viviane | M.R.M. | Climate Change Adaptation Planning if Two Native-Owned Conservation Organizations | 2016 –2019 |
| 8 | Jaclyn McLeod | M.A. | Building Representation: The Development of Barkerville Historic Town & Park's Chinese Narrative | 2016–2018 |
| 9 | Huck, Michael | M.R.M. | Co-constructing Rural Climate Adaptation: Insights from the State of Climate Adaptation and Resilience in the Basin Pilot Project | 2015–2019 |
| 10 | Hogg, Erin | Ph.D. | Archaeological Data as Evidence in Aboriginal Rights and Title Litigation in Canada | 2014–2019 |

*Curriculum Vitae*                                                          **John R. Welch, RPA**

| | **Name** | **Degree** | **Project / Thesis** | **Start–Finish** |
|---|---|---|---|---|
| [11] | Hogg, Erin | M.A. | Community Engagement in British Columbia Archaeology | 2012–2014 |
| [12] | Aloua, Ruth | M.A. | Closing the Policy-Practice Gap in Heritage Management at Kaloko-Honokohau NHP, Hawaii | 2011–2015 |
| [13] | Nelly Bouevitch | M.R.M. | Co-Management at Gulf Islands National Park | 2011–2016 |
| [14] | Knighton, Mykol | M.R.M. | Cultural Heritage Tourism Planning for the Tla'amin First Nation | 2010–2016 |
| [15] | Lewis, Jennifer | Ph.D. | Revaluing "looted" archaeological materials at Fort Apache and Theodore Roosevelt School National Historic Landmark, Arizona | 2010–2017 |
| [16] | Morrison, Jessica | M.R.M. | Stó:lo Connect: A Case Study in Collaborative First Nation Referral Management | 2010–2013 |
| [17] | Brady, Karen | M.R.M. | Cultural Heritage as Foundation for Regional Planning | 2009–2014 |
| [18] | Hoffmann, Tanja | Ph.D. | An Indigenous Model for Environmental Impact Assessment | 2008–2017 |
| [19] | Jamshidian, Soudeh | Ph.D. | Effects of Top-Down Environmental Management in Post-Conflict Settings | 2007–2020 |
| [20] | Kasstan, Steven | Ph.D. | Caribou is Life:  An Ethnoarchaeology of Ethen-eldèli Denesułiné Respect for Caribou | 2007–2016 |
| [22] | Ewing, Robyn | M.A. | Negotiated Repatriation as Middle Ground | 2006–2010 |

**Graduate Student Committees at SFU**

| **Name** | **Degree** | **Thesis / Project** | **Start–Finish** |
|---|---|---|---|
| Meloche, Chelsey | Ph.D. | TBA | 2015– |
| Stefanyshen, Earl | M.A. (HRM) | Microstratigraphic protocol to assess the impact of wildland fires on subsurface archaeological sites | 2017–2019 |
| Settle, Kathleen | M.A. (HRM) | Vacuum Truck Excavation as a New and Effective Technique in Urban Archaeology | 2016–2019 |
| Brinkhurst, Marena | M.R.M | Community Land Use Planning on First Nations Reserves and the Influence of Land Tenure: A Case Study with the Penticton Indian Band | 2010–2013 |
| Matthews, Beth | M.A. | A Spatial Analysis of Pleistocene-Holocene Transition Sites in the Southern Columbia Plateau and Northern Great Basin of North America | 2008–2016 |
| Duke, Guy | M.A. | Past Irrigation Practices in the Memories of the Indigenous Peoples of Chimborazo, Ecuador | 2008–2010 |
| Johnson, Sarah | M.A. | A Tla'amin Cultural Landscape | 2007–2010 |
| Kaufmann, George | M.A. | Missionary Classrooms in a Northern Indian Agency | 2007–2009 |

*Curriculum Vitae*                                                    **John R. Welch, RPA**

| Name | Degree | Thesis / Project | Start–Finish |
|------|--------|------------------|--------------|
| Peters, Alana | M.A. | Archaeology and Memories of the Casa Grande | 2007–2011 |
| Hammond, Joanne | M.A. | First Nations Heritage Policies as a Window into Community Stewardship | 2006–2009 |
| Klassen, Michael | Ph.D. | Indigenous Heritage Stewardship and the Transformation of Archaeological Practice | 2005–2013 |
| Lennentine, Miku | M.R.M | Brave New World of Community Forestry | 2006–2009 |
| Astofooroff, Nikki | M.R.M. | Achieving Environmental Sustainability in British Columbia Coastal Communities: A Case Study of Haida Gwaii | 2006–2008 |
| Speller, Camilla | Ph.D. | Investigating Turkey Domestication in the Southwest Through Ancient DNA Analysis | 2005–2009 |
| Badenhorst, Shaw | Ph.D. | The Zooarchaeology of Great House Sites in the San Juan Basin of the American Southwest | 2005–2008 |
| Fothergill, Brooklynne | M.A. | Investigations of the Bluff Great House Fauna | 2005–2008 |
| Sanderson, Darlene | Ph.D. | Nipiy Wasekimew / Clear Water: The Meaning of Water, From the Words of the Elders | 2002–2007 |
| Dunn, Catharine | M.R.M | Aboriginal Partnership for Sustainable 2010 Olympic and Paralympic Winter Games | 2004–2007 |
| Woodward, Robyn | Ph.D. | Medieval Legacies: The Industrial Archaeology of an Early Sixteenth Century Sugar Mill at Sevilla La Nueva, Jamaica | 2004–2006 |
| Rawlings, Tiffany | Ph.D. | Faunal Analysis and Meat Procurement: Reconstructing the Sexual Division of Labor at Shields Pueblo, Colorado | 2001–2006 |

**Graduate Student Committee Membership Outside SFU**

| Name | Degree | Institution / Thesis Topic | Start–Fin. |
|------|--------|----------------------------|------------|
| Rich Hutchings | Ph.D. | University of British Columbia / *Rising Affluence, Rising Seas*—Archaeology and Resource Management Responses to The Maritime Heritage Crisis | 2009–2014 |
| Joshua Dent | Ph.D. | University of Western Ontario / Accounts of Engagement: Conditions and Capitals of Indigenous Participation in Canadian Commercial Archaeology | 2010–2016 |
| Aaron Naumann | Ph.D. | University of Washington / Indigenous Archaeology Revisited | 2016– |
| Jonathan Clapperton | Ph.D. | University of Saskatchewan / *Stewards of the Earth?* Aboriginal Peoples, Environmentalists and Historical Representation | 2008–2012 |
| Nicholas Laluk | Ph.D. | University of Arizona / Historical Archaeology at the Chiricahua – Western Apache Interface | 2008–2014 |

*Curriculum Vitae*                                                    **John R. Welch, RPA**

| Name | Degree | Institution / Thesis Topic | Start–Fin. |
|------|--------|----------------------------|------------|
| Mary Ann Wade | Ph.D. | University of Northern Arizona / Theodore Roosevelt School and White Mountain Apache Education | 2007–2010 |
| Karen Capuder | Ph.D. | University of Washington / Skokomish Cultural Landscapes | 2006–2012 |
| Bill Angelbeck | Ph.D. | University of British Columbia / Archaeology of Coast Salish Conflict (External Examiner) | 2004–2009 |
| Nicholas Laluk | M.A. | University of Arizona / Apache Scout Camp Archaeology at Fort Apache | 2003–2006 |
| Lauren Jelinek | M.A. | University of Arizona / Apache Archaeology of the Forestdale Valley | 2003–2005 |

### Supervision of Research Personnel

| | |
|--|--|
| 2011–2012 | Erica Kowsz, A.B., Fulbright Canada Scholar  **Funded by:** Fulbright Program |
| 2009–2011 | Fred Foster, B.S., Research Assistant  **Funded by:** Social Sciences and Humanities Research Council Aboriginal Program Grant |
| 2007–2010 | Natasha Lyons, PhD, Post-Doctoral Fellow  **Funded by:** Social Sciences and Humanities Research Council |
| 2006–2007 | Robyn Ewing, B.A, Research Assistant  **Funded by:** SFU President's Grant |

## SERVICE

### Academic (External)

| | |
|--|--|
| 2020 | External Reviewer for Tenure and Promotion Case: University of British Columbia |
| 2017–2019 | Registrar, Register of Professional Archaeologists |
| 2017 | External Reviewer for Tenure and Promotion Case: Harvard University |
| 2015–2020 | Member, Editorial Board, *Advances in Archaeological Practice* |
| 2014–2020 | Co-Chair, Amity Pueblo Task Force, Society for American Archaeology |
| 2013–2016 | Member, Government Affairs Committee, Society for American Archaeology |
| 2013 | External Reviewer for Tenure and Promotion Cases: Southern Methodist University, Ft. Lewis College |
| 2011–2013 | Chair, Continuing Professional Education Committee, Register of Professional Archaeologists |
| 2003–Life | Trustee, Josephine H. Miles Testamentary Trust, benefiting the Colorado Historical Society and three American Indian schools in Wyoming and Montana |
| 2003–2010 | Member, Government Archaeology Committee, Society for American Archaeology |
| 2006–2009 | Co-Chair, Continuing Professional Education Committee, Register of Professional Archaeologists |

*Curriculum Vitae*                                                        **John R. Welch, RPA**

| | |
|---|---|
| 2003–2007 | Institutional Grant Administrator, *Doo Aniina' Agot'eehi Baa Nohwii Nagoshd'* (I'll Tell You About How it Was): Programming Endowment Challenge Grant, U.S. National Endowment for the Humanities |
| 2003–2006 | Humanities Scholar, The San Pedro Ethnohistory Internet Project, U.S. National Endowment for the Humanities and Southwest Foundation grant to Center for Desert Archaeology, Tucson |
| 2003–2005 | Member, Board of Directors, Ocotillo Literary Endeavors, Tucson |
| 2002–2005 | Project Advisor, Ndee Bike' (Footprints of the Apache) and The Fort Apache Legacy, U.S. National Endowment for the Humanities Interpretation Program Implementation grant to Nohwike' Bagowa White Mountain Apache Tribe Cultural Center and Museum |
| 1998–2005 | Founding Member of Board of Directors, U.S. National Association of Tribal Historic Preservation Officers, Washington, DC |
| 2003–2004 | Project Advisor, Guide to Historic Sites of American Indians and the U.S. Military, U.S. Department of Defense |
| 2002–2004 | Member of Project Review Panel, American Indian Treaty Rights and Historic Preservation, U.S. Department of Defense |
| 2002–2003 | Project Humanities Scholar, Our Apache Books, Arizona Humanities Council |
| 1997–1999 | Member of Board of Directors, Arizona Archaeological Council |

## SFU (Senate, University-Wide, Faculty, and Departmental)

| | |
|---|---|
| 2017–2018 | Member, Tenure & Promotion / School of Resource and Environmental Mgmt. |
| 2015–2019 | Director, Professional Graduate Programs in Heritage Resource Management |
| 2012–2016 | Member, Tenure & Promotion / Department of Archaeology |
| 2015–2017 | Member, Pacific Water Research Center Steering Committee |
| 2013–2014 | Chair, Graduate Studies Com./ School of Resource and Environmental Mgmt. |
| 2013–2014 | Member, Graduate Studies Committee / Department of Archaeology |
| 2013 | Member, Design Committee Environmental Resource Mgmt. Major (BENV) |
| 2012–2013 | Member, Tenure & Promotion / School of Resource and Environmental Mgmt. |
| 2011–2013 | Member, Senate Committee on International Activities |
| 2011–2012 | Chair, Undergraduate Studies Committee/ Department of Archaeology |
| 2011–2014 | Member, two President's Super Colloquia Steering Groups: *Toward a Theory of Global Justice* (Spring 2013) and *Protecting Indigenous Heritage* (Fall 2014) |
| 2011 | Member, Community Teaching Fellows Proposal Adjudication Committee |
| 2010–2011 | Chair, Student Awards / School of Resource and Environmental Management |
| 2007–Current | Member, Museum of Archaeology and Ethnology Collections Committee |
| 2007–2010 | Member, Grad. Studies / School of Resource and Environmental Management |
| 2006–2011 | Member, First Nations Studies Advisory Committee |
| 2005–2007 | Member, First Nations University-Wide Coordinating Committee |
| 2006–2008 | Member, Tenure & Promotion / School of Resource and Environmental Mgmt. |
| 2005–08, 2010–14 | Member, Tenure & Promotion / Department of Archaeology |
| 2005–2006 | Member, Harassment, Equity and Ethics Com. / Resource and Environ. Mgmt. |
| 2005–2006 | Member, Student Awards / Department of Archaeology |

*Curriculum Vitae*                                                                    **John R. Welch, RPA**

## Community

| | |
|---|---|
| 2007–2019 | Member and Board Secretary, Fort Apache Heritage Foundation Board of Directors |
| 2015–2016 | Advisory Committee member, *Tribal Preservation Planning Needs in Case of Emergency*, project developed by the National Association of Tribal Historic Preservation Officers (NATHPO) with support from the U.S. Federal Emergency Management Agency. |
| 2005–2012 | Archaeology Department liaison, SFU United Way Campaign |
| 2005–2011 | Archaeology and REM School liaison, SFU United Way Campaign |
| 2007–2010 | Member, Public Education Committee, Archaeological Society of British Columbia |
| 2007–2009 | Member, Fort Apache Master Plan Revision Team, White Mountain Apache Tribe |
| 1998–2007 | Founding Board Member (ex officio), Secretary, Executive Director (pro tempore), Fort Apache Heritage Foundation, Fort Apache, Arizona |
| 2003–2005 | Member, Board of Directors, Arizona Wilderness Coalition |
| 2002 | Judge, Miss White Mountain Apache Queen Committee, White Mountain Apache Tribe |

## AWARDS AND HONORS

| | |
|---|---|
| 2005–15 | **Title:** Canada Research Chair (Tier 2)  **Type:** Research  **Organization:** Social Sciences and Humanities Research Council    **Details:** Academic appointment to address indigenous heritage stewardship |
| 2007 | **Title:** Fellow    **Type:** Service   **Organization:** Society for Applied Anthropology  **Details:** Endorsement by SfAA Board of the nomination by  Shelby Tisdale |
| 1999 | **Title:** Governors Award   **Type:** Service  **Organization:** State of Arizona  **Details:** For individual achievement in historic preservation |
| 1992 | **Title:** Appreciation Award    **Type:** Service  **Organization:** Arizona Archaeological and Historical Society  **Details:** For contributions to preservation and public education |
| 1991 | **Title:** Comins Fellowship   **Type:** Fellowship  **Organization:** University of Arizona  **Details:** Support for dissertation preparation |
| 1983 | **Title:** Undergraduate Essay Prize   **Type:** Research  **Organization:** Northeastern Anthropological Association  **Details:** Annual prize for the best student essay submittal |
| 1983 | **Title:** Harold C. Bohn Anthropology Prize   **Type:** Scholarship  **Organization:** Hamilton College  **Details:** Award to the best graduate anthropology major |

*Curriculum Vitae*                                                    **John R. Welch, RPA**

## OTHER

### Manuscript and Proposal Refereeing (Last Five Years)

| | |
|---|---|
| *American Antiquity* | *Canadian Journal of Archaeology* |
| *Journal of Social Archaeology* | *Journal of Archaeological Science* |
| Roman & Littlefield | *Environment and History* |
| University of Hawaii Press | University of Arizona Press |
| University of Utah Press | Research Council of Norway |
| *Journal of Environmental Education Research* | Left Coast Press |
| Social Science and Humanities Research Council of Canada | |

### Memberships

| | |
|---|---|
| Az Archaeological and Historical Society (1983–life) | World Archaeological Congress (2006–current) |
| BC Assn Professional Archaeologists (2010–current) | Archaeological Society of BC (2005–current) |
| Society for Applied Anthropology (2003–2013) | Canadian Archaeological Assn (2005–current) |
| Register of Professional Archaeologists (1998–current) | Amer. Anthropological Assn (1986–2016) |
| Society for American Archaeology (1984–current) | |

# Exhibit A

1  PAUL E. SALAMANCA
   Deputy Assistant Attorney General
2  United States Department of Justice
   Environment and Natural Resources Division
3
4  TYLER M. ALEXANDER (CA Bar No. 313188)
   Trial Attorney
5  Natural Resources Section
6  150 M St. NE, Third Floor
   Washington, D.C. 20002
7  (202) 598-3314
8  tyler.alexander@usdoj.gov
9
   *Attorneys for Defendants*
10          THE UNITED STATES DISTRICT COURT
11                 DISTRICT OF ARIZONA
                   PHOENIX DIVISION
12

13
   | Apache Stronghold, | CIVIL NO. 2:21-cv-00050-CDB |
14 |  |  |
15 |        Plaintiff, | **DECLARATION OF** |
   |  | **TRACY PARKER** |
16 | v. |  |
17 | United States of America, *et al.,* |  |
18 |        Defendants. |  |
19
20
21
22
23
24
25
26
27
28

**ER195**

I, Tracy V.L. Parker, state as follows:

1.      I am the Southwest Regional Director for Lands and Minerals for the United States Department of Agriculture, Forest Service ("Forest Service"). I have held this position since 2014. I have 30 years of experience with the Forest Service. I have held positions at all levels of the organization, with increasing levels of responsibility with the Lands and Minerals Program, including working at the National Headquarters in Washington, D.C.

2.      In my role as Regional Lands and Minerals Director, I oversee the delivery of the Forest Service's Southwest Region's Lands program, which includes implementation of the Southeast Arizona Land Exchange and Conservation Act, set forth in Section 3003 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, signed into law on December 19, 2014, as Public Law (P.L.) 113-291; and codified at 16 U.S.C. § 539p ("Act").

3.      I make this declaration based on my personal knowledge, my experience working for the Forest Service, and information made available to me in my official capacity.

4.      I am familiar with the above-captioned lawsuit and the Motion for Temporary Restraining Order and Preliminary Injunction filed by Plaintiff. I am also familiar with the Resolution Copper Project and Land Exchange ("Project"), including the land exchange mandated by Congress pursuant to the Act.

5.      On January 15, 2021, the Forest Service published the Final Environmental Impact Statement ("FEIS") for the Project.

6.      After publication of the FEIS for the Project, the Secretary of Agriculture, acting by and through the Forest Service, is directed by the Act to convey all right, title, and interest of the United States in and to the Federal land, as defined in the Act, to Resolution Copper.

7.      Due to the several steps left to close on the land exchange, including but not limited to, executing a land exchange agreement, receiving the appraisal for the Federal

1

land, reviewing the Federal land appraisal, and drafting detailed escrow instructions, Resolution Copper and the Forest Service will not exchange deeds to the Federal and non-Federal lands, as defined in the Act, any sooner than 55 days after the publication of the FEIS.

8.      Additionally, with respect to subsidence effects to the surface of the exchange parcel caused by underground mining activities, the FEIS at ES-3.2 states that "[t]he subsidence zone at the Oak Flat Federal Parcel would break through the surface at mine year 6…" (*i.e.*, the FEIS effects analysis projects that a surface crater will start to appear six years after active mining commences).

        I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 21st day of January, 2021.

Tracy Parker

**ER197**

# Exhibit B

File copy

*L P*
*Boundaries - Tonto*
*Proc. # 795*

Jan. 13, 1908

Tonto N.F., 2nd Proc.
Proc. #795, 1-13-08

### TONTO NATIONAL FOREST

#### ARIZONA

(SECOND PROCLAMATION)

### By the President of the United States of America

# A Proclamation

· · ·

WHEREAS, it appears that the public good would be promoted by adding to the Tonto National Forest certain lands, within the Territory of Arizona, which are in part covered with timber, and by also including therein the area heretofore reserved and set apart as the Pinal Mountains National Forest;

Now, therefore, I, THEODORE ROOSEVELT, President of the United States of America, by virtue of the power in me vested by the Act of Congress, approved June fourth, eighteen hundred and ninety-seven, entitled, "An Act Making appropriations for sundry civil expenses of the Government for the fiscal year ending June thirtieth, eighteen hundred and ninety-eight, and for other purposes," do proclaim that the Tonto National Forest is hereby enlarged to include the said additional lands, and that the boundaries of the aforesaid National Forest are now as shown on the diagram forming a part hereof;

Excepting from the force and effect of this proclamation all lands which are at this date embraced in any legal entry or covered by any lawful filing or selection duly of record in the proper United States Land Office, or upon which any valid settlement has been made pursuant to law, if the statutory period within which to make entry or filing of record has not expired; and also excepting all lands which at this date are embraced within any withdrawal or reservation for any use or purpose with which this reservation for forest uses is inconsistent: Provided, that these exceptions shall not continue to apply to any particular tract of land unless the entryman, settler, or claimant continues to comply with the law under which the entry, filing, or settlement was made, or unless the reservation or withdrawal with which this reservation is inconsistent continues in force; not excepting from the force and effect of this proclamation, however, any part of the National Forest hereby enlarged which may have been withdrawn to protect the coal therein, but this proclamation does not vacate any such coal land withdrawal; and provided that these exceptions shall not apply to any land embraced in any selection, entry, or filing, which may have been permitted to remain of record subject to the creation of a permanent reservation; and provided also that since the withdrawal made

ER199

by this proclamation and any withdrawal heretofore made for national irrigation works are consistent, both shall be effective upon the land withdrawn, but the withdrawal for national irrigation works shall be the dominant one and may, when necessary, be changed to a withdrawal for irrigation from such works.

Warning is hereby given to all persons not to make settlement upon any of the lands reserved by this proclamation, unless and until they are listed by the Secretary of Agriculture and opened to homestead settlement or entry by the Secretary of the Interior under the Act of Congress, approved June eleventh, nineteen hundred and six, entitled, "An Act To provide for the entry of Agricultural lands within forest reserves:" Provided, that lands heretofore restored to settlement or entry under the provisions of the foregoing act shall be excepted from the force and effect of this proclamation.

**In Witness Whereof,** I have hereunto set my hand and caused the seal of the United States to be affixed.

DONE at the City of Washington this 13th day of January, in the year of our Lord one thousand nine hundred and eight, and of the Independence of the United States the one hundred and thirty-second.

[SEAL.]

**THEODORE ROOSEVELT**

By the President:

ELIHU ROOT
*Secretary of State.*

[No. 795.]

# TONTO NATIONAL FOREST
## ARIZONA
GILA AND SALT RIVER MERIDIAN AND BASE

FOREST SERVICE U.S. DEPT. OF AGRICULTURE
1907

▬▬▬ NATIONAL FOREST BOUNDARY
▓▓▓ ADDITION FROM PUBLIC LANDS
▒▒▒ FORMERLY IN PINAL MOUNTAINS NATIONAL FOREST

[DIAGRAM FORMING A PART OF PROCLAMATION
DATED JANUARY 13, 1908.]

ER201

# Exhibit C

# HEINONLINE



DATE DOWNLOADED: Fri Jan 15 16:11:35 2021
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Treaty with the Apaches, . 10 Stat. 979 (1852).

ALWD 6th ed.
Treaty with the Apaches, . 10 Stat. 979 (1852).

APA 7th ed.
Treaty with the Apaches, 10 Stat. 979 (1852).

Chicago 7th ed.
"Apaches: Treaty with the Apaches," U.S. Statutes at Large 10, no. Main Section
(1852): 979-982

McGill Guide 9th ed.
Treaty with the Apaches, . 10 Stat. 979 (1852).


AGLC 4th ed.
Treaty with the Apaches, . 10 Stat. 979 (1852).

MLA 8th ed.
Treaty with the Apaches, . 10 Stat. 979 (1852). HeinOnline.

OSCOLA 4th ed.
Treaty with the Apaches, . 10 Stat. 979 (1852).

Provided by:
DOJ Libraries

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your license, please use:
   *Copyright Information*

**ER203**

# FRANKLIN PIERCE,

## PRESIDENT OF THE UNITED STATES OF AMERICA:                    July 1, 1852.

#### TO ALL AND SINGULAR TO WHOM THESE PRESENTS SHALL COME, GREETING:

WHEREAS a Treaty was made and concluded at Santa Fé, New Mexico, on the first day of July, in the year of our Lord one thousand eight hundred and fifty-two, by and between Col. E. V. Sumner, U. S. A., commanding the 9th Department, and in charge of the Executive Office of New Mexico, and John Greiner, Indian Agent in and for the Territory of New Mexico, and acting Superintendent of Indian Affairs of said Territory, representing the United States, and Cuentas Azules, Blancito, Negrito, Captain Simon, Captain Vuelta, and Mangus Colorado, chiefs, acting on the part of the Apache nation of Indians, situate and living within the limits of the United States, which treaty is in the words following, to wit:  *Preamble.*

Articles of a Treaty made and entered into at Santa Fé, New Mexico, on the first day of July in the year of our Lord one thousand eight hundred and fifty-two, by and between Col. E. V. Sumner, U. S. A., commanding the 9 Department and in charge of the Executive Office of New Mexico, and John Greiner, Indian Agent in and for the Territory of New Mexico, and acting Superintendent of Indian Affairs of said Territory, representing the United States, and Cuentas, Azules, Blancito, Negrito, Capitan Simon, Capitan Vuelta, and Mangus Colorado, chiefs, acting on the part of the Apache Nation of Indians, situate and living within the limits of the United States.

ARTICLE 1.   Said nation or tribe of Indians through their authorized Chiefs aforesaid do hereby acknowledge and declare that they are lawfully and exclusively under the laws, jurisdiction, and government of the United States of America, and to its power and authority they do hereby submit.  *Authority of United States acknowledged.*

ARTICLE 2.   From and after the signing of this Treaty hostilities between the contracting parties shall forever cease, and perpetual peace and amity shall forever exist between said Indians and the government and people of the United States; the said nation, or tribe of Indians, hereby binding themselves most solemnly never to associate with or give countenance or aid to any tribe or band of Indians, or other persons or powers, who may be at any time at war or enmity with the government or people of said United States.  *Peace to exist.*   *The Apaches not to assist other tribes in hostilities.*

ARTICLE 3.   Said nation, or tribe of Indians, do hereby bind themselves for all future time to treat honestly and humanely all citizens of the United States, with whom they may have intercourse, as well as all persons and powers, at peace with the said United States, who may be lawfully among them, or with whom they may have any lawful intercourse.  *Good treatment of citizens of the United States by nations at peace with them.*

ARTICLE 4.   All said nation, or tribe of Indians, hereby bind themselves to refer all cases of aggression against themselves or their property and territory, to the government of the United States for adjustment, and to conform in all things to the laws, rules, and regulations of said government in regard to the Indian tribes.  *Cases of aggression on them to be referred to government.*   *Laws to be conformed to.*

ARTICLE 5.   Said nation, or tribe of Indians, do hereby bind themselves for all future time to desist and refrain from making any "incursions within the Territory of Mexico" of a hostile or predatory character; and that they will for the future refrain from taking and conveying into  *Provisions against incursions into Mexico.*

980       TREATY WITH THE APACHES. JULY 1, 1852.

captivity any of the people or citizens of Mexico, or the animals or property of the people or government of Mexico; and that they will, as soon as possible after the signing of this treaty, surrender to their agent all captives now in their possession.

**Persons injuring the Apaches to be tried and punished.** ARTICLE 6. Should any citizen of the United States, or other person or persons subject to the laws of the United States, murder, rob, or otherwise maltreat any Apache Indian or Indians, he or they shall be arrested and tried, and upon conviction, shall be subject to all the penalties provided by law for the protection of the persons and property of the people of the said States.

**Free passage over the Apache territory.** ARTICLE 7. The people of the United States of America shall have free and safe passage through the territory of the aforesaid Indians, under such rules and regulations as may be adopted by authority of the said States.

**Military posts, agencies, and trading houses to be established.** ARTICLE 8. In order to preserve tranquillity and to afford protection to all the people and interests of the contracting parties, the government of the United States of America will establish such military posts and agencies, and authorize such trading houses at such times and places as the said government may designate.

**Territorial boundaries to be adjusted.** ARTICLE 9. Relying confidently upon the justice and the liberality of the aforesaid government, and anxious to remove every possible cause that might disturb their peace and quiet, it is agreed by the aforesaid Apache's that the government of the United States shall at its earliest convenience designate, settle, and adjust their territorial boundaries, and pass and execute in their territory such laws as may be deemed conducive to the prosperity and happiness of said Indians.

**Presents to the Apaches.** ARTICLE 10. For and in consideration of the faithful performance of all the stipulations herein contained, by the said Apache's Indians, the government of the United States will grant to said Indians such donations, presents, and implements, and adopt such other liberal and humane measures as said government may deem meet and proper.

**When treaty to be binding.** ARTICLE 11. This Treaty shall be binding upon the contracting parties from and after the signing of the same, subject only to such modifications and amendments as may be adopted by the government of the United States; and, finally, this treaty is to receive a liberal construction, **How construed.** at all times and in all places, to the end that the said Apache Indians shall not be held responsible for the conduct of others, and that the government of the United States shall so legislate and act as to secure the permanent prosperity and happiness of said Indians.

In faith whereof we the undersigned have signed this Treaty, and affixed thereunto our seals, at the City of Santa Fé, this the first day of July in the year of our Lord one thousand eight hundred and fifty-two.

WITNESSES :

| | |
|---|---|
| F. A. CUNNINGHAM,<br>*Paymaster, U. S. A.* | E. V. SUMNER,   [SEAL.]<br>*Bvt. Col. U. S. A. com'g 9th Dept. In charge<br>of Executive Office of New Mexico.* |
| J. C. McFERRAN,<br>*1st Lt. 3d Inf. Act. Ast. Adj. Gen.* | JOHN GREINER,   [SEAL.]<br>*Act. Supt. Indian Affairs, New Mexico.* |
| CALEB SHERMAN. | CAPITAN VUELTA, his x mark [SEAL.] |
| FRED. SAYNTON. | CUENTAS AZULES, his x mark [SEAL.] |
| CHAS. McDOUGALL,<br>*Surgeon, U. S. A.* | BLANCITO ———, his x mark [SEAL.] |
| S. M. BAIRD,<br>*Witness to the signing of Mangus Colorado.* | NEGRITO ———, his x mark [SEAL.] |
| JOHN POPE,<br>*Bvt. Capt. T. E.* | CAPITAN SIMON, his x mark [SEAL.]<br>MANGUS COLORADO, his x mark [SEAL.] |

AND WHEREAS the said Treaty having been submitted to the Senate of the United States, for its constitutional action thereon, the Senate did, on the twenty-third day of March, one thousand eight hundred and fifty-

TREATY WITH THE APACHES.   July 1, 1852.                981

three, advise and consent to the ratification of its articles, by a resolution in the words and figures following, to wit:

In Executive Session, Senate of the United States,
*March 23d, 1853.*

*Resolved,* (two thirds of the Senators present concurring,) That the Senate advise and consent to the ratification of the Articles of a Treaty made and entered into at Santa Fé, New Mexico, on the first day of July, in the year of our Lord, 1852, by and between Colonel E. V. Sumner, United States Army, commanding the 9th Department, and in charge of the Executive Office of New Mexico, and John Greiner, Indian Agent in and for the Territory of New Mexico, and acting Superintendent of Indian Affairs of said Territory, representing the United States, and Cuentas Azules, Blancito, Negrito, Capitan Simon, Capitan Vuelta, and Mangus Colorado, chiefs, acting on the part of the Apache nation of Indians, situate and living within the limits of the United States.

Attest —                    ASBURY DICKINS, *Secretary.*

Now, therefore, be it known, that I, FRANKLIN PIERCE, President of the United States of America, do, in pursuance of the advice and consent of the Senate, as expressed in their resolution of the twenty-third day of March, one thousand eight hundred and fifty-three, accept, ratify, and confirm the said treaty.

In testimony whereof, I have caused the seal of the United States to be herewith affixed, having signed the same with my hand.

Done at the city of Washington, this twenty-fifth day of March, in the year of our Lord one thousand eight hundred and fifty-three, and of the Independence of the United States the seventy-seventh.

[L. s.]

FRANKLIN PIERCE.

By the President:

W. L. MARCY, *Secretary of State.*

ER206

**August 26, 1852.**     BY THE PRESIDENT OF THE UNITED STATES OF AMERICA.

## A PROCLAMATION.

WHEREAS a Supplementary Commercial Convention between the United States of America and His Majesty the King of the Netherlands, was concluded and signed by their Plenipotentiaries, in this city, on the twenty-sixth day of August last, which Supplementary Convention is, word for word, as follows :—

**Preamble.**

**Negotiators.**

**Vol. viii. p. 524.**

The United States of America and His Majesty the King of the Netherlands, being desirous of placing the commerce of the two countries on a footing of greater mutual equality, have appointed as their plenipotentiaries for that purpose: that is to say: the President of the United States of America, Daniel Webster, Secretary of State of the United States, and His Majesty the King of the Netherlands, François Mathieu Wenceslas Baron Testa, Commander of the Royal Grand Ducal Order of the Crown of Oak of Luxembourg, Knight of the Royal Order of the Lion of the Netherlands, and of the Grand Ducal Order of the White Falcon, third class; Counsellor of Legation, and His Majesty's Chargé d'Affaires to the Government of the United States of America; who, after having communicated to each other their respective powers, found in good and due form, have agreed that, for and in lieu of the first and second articles of the treaty of commerce and navigation, signed at Washington on the 19th of January, 1839, between the high contracting parties, the following articles shall be substituted:

De Vereenigde Staten van Amerika en Zÿne Majesteit de Koning der Nederlanden, den handel, tusschen de beide landen wenschende, te brengen op eenen voet van grootere wederkeerige gelykheid, hebben daartoe tot hunne Gevolmagtigden benoemd, te weten: de President der Vereenigde Staten van Amerika, Daniel Webster, Secretaris van Staat der Vereenigde Staten; en Zÿne Majesteit de Koning der Nederlanden, Francois Mathieu Wenceslas Baron Testa, Kommandeur der Orde van de Eikenkroon van Luxemburg, Ridder der Orde van den Nederlandschen Leeuw, Ridder der groot Kertogelÿke Orde van den Witten Valk, 3d klasse, Raad van Legatie en Hoogstdeszelfs Zaakgelastigde bÿ de Regering der Vereenigde Staten van Amerika; dewelke, na elkander hunne in goeden en behoorlÿken vorm bevondene wederzÿdsche volmagten te hebben medegedeeld, zÿn overeengekomen dat, voor en ter vervanging van het eerste en tweede artikel van het handels-en scheepvaartverdrag, den 19 January, 1839, te Washington, tuschen de hooge contracterende partyen geteekend, de volgende artikelen zullen worden in de plaats gesteld:

### ARTICLE I.

**Provisions respecting duties.**

Goods and merchandise, whatever their origin may be, imported into or exported from the ports of the United States, from and to any other country, in vessels of the Netherlands, shall pay no higher or other duties than shall be levied on the

### ARTIKEL I.

Goederen en koopwaren, overschillig welke derzelver herkomst zÿ, met Nederlandsche schepen wordende in of nit gevoerd, in of de havens der Vereenigde Staten, van en naar elk ander land, zullen geene hoogere noch andere regten betalen,

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

<u>**WITNESS LIST**</u>

| ☐ FILED | ☐ LODGED |
| ☐ RECEIVED | ☐ COPY |

X FILED

FEB 0 3 2021

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

Case Number:  2:21-cv-00050          Judge Code:  SPL          Date:  February 3, 2021

Case Name:  Apache Stronghold          vs.  United States, et al.

☐ x Plaintiff / Petitioner    ☐ Defendant / Respondent

☐ Non-Jury Trial    ☐ Jury Trial    ☐ X Other Hearing:  Preliminary Injunction

| Name | Sworn | Appeared |
|------|-------|----------|
| John R. Welch, Ph.D. | 2-3-21 | 2-3-21 |
| Naelyn Pike | 2-3-21 | 2-3-21 |
| Wendsler Nosie, Sr., Ph.D. | 2-3-21 | 2-3-21 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**ER208**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

**EXHIBIT LIST**

Case Number: _2:21-cv-00050_____     Judge Code: _SPL_____     Date: _February 3, 2021_

Case Name: _Apache Stronghold_____ vs. _United States, et al._____

☐ X Plaintiff / Petitioner    ☐ Defendant / Respondent

☐ Non-Jury Trial    ☐ Jury Trial    ☐ X Other Hearing: _Preliminary Injunction_____

| Exhibit No. | Marked For ID | Admitted In Evidence | Description | Stipulated |
|---|---|---|---|---|
| 1 | | 2-3-21 | Map 1 from the Declaration of John R. Welch, Ph.D. | |
| 2 | | 2-3-21 | Map 2 from the Declaration of John R. Welch, Ph.D. | |
| 3 | | 2-3-21 | Detail (enlarged) of Map 2. | |
| 4 | | 2-3-21 | Photographs from the Declaration of Naelyn Pike. | |
| 5 | | 2-3-21 | Photographs from the Declaration of Wendsler Nosie, Sr. Ph.D. | |
| 6 | | 2-3-21 | Images of expected Oak Flat subsidence crater from USFS/Resolution Final EIS Vol. 1. | |
| 6A | | 2-3-21 | Image of the Barrenger Arizona Meteor Crater (for comparative scale reference). | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

ER209

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

**EXHIBIT LIST**

FILED _____ LODGED
_____ RECEIVED _____ COPY

FEB 0 3 2021

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

Case Number: ___2:21-CV-50___     Judge Code: _SPL_    Date: _Feb. 3, 2021_

Case Name: _Apache Stronghold_    vs.  _United States, et al._

☐ Plaintiff / Petitioner    ☒ Defendant / Respondent

☐ Non-Jury Trial    ☐ Jury Trial    ☒ Other Hearing: _Preliminary Injunction_

| Exhibit No. | Marked For ID | Admitted In Evidence | Description | Stipulated |
|---|---|---|---|---|
| 101 | | 2-3-21 | July 1, 1852 Treaty With the Apaches | X |
| 102 | | 2-3-21 | June 27, 1969 Findings of Fact by the ICC | X |
| 103 | | 2-3-21 | September 12, 1972 Findings of Fact by the ICC | X |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**ER210**

# EXHIBIT A

# APACHE STRONGHOLD

## POB 766  SAN CARLOS, AZ 85550

November 13, 2020

John Fowler, Executive Director
The President's Advisory Council on Historic Preservation
401 F Street NW, Suite 308
Washington, DC 20001
via email to jfolwer@achp.gov

RE: Council NHPA §106 Compliance Review Pursuant to 36 C.F.R. §800.9(a) for the Proposed Resolution Copper Mine and Southeast Arizona Land Exchange Undertakings

Dear Executive Director Fowler:

As the co-founder and spokesperson of the Apache Stronghold, and as an enrolled member and former Chairman of the San Carlos Apache Tribe ("Tribe"), I write to request that this letter be given due consideration and be made a part of the administrative record in the National Historic Preservation Act ("NHPA") Section 106 process in the proposed Resolution Copper Mine and Southeast Arizona Land Exchange (the "Undertakings").

We hereby acknowledge and incorporate by reference the words of advice and warning offered to you and other federal and state historic preservation officials and responsible parties by the respected Apache elder, White Mountain Apache Tribe Cultural Resource Director, Ramon Riley, in his November 9, 2020 open letter to U.S. Federal Government Trustees and Tribal Leaders, "Subject: Proposed Resolution Copper Mine and Land Exchange Impacts on First Amendment and Human Rights to Religious Freedom, Exercise and Beliefs." Further, we reference Director Riley's letter of September 11, 2020 and request that Director Riley's letters be made part of the administrative record in the Undertakings' NHPA Section 106 process. Copies of Director Riley's letter are attached.

This correspondence and the Council's ongoing agency compliance review pursuant to 36 C.F.R. § 800.9(a) comes at an ideal time. It is apparent that the U.S. Forest Service ("USFS") seeks to execute a flawed programmatic agreement ("PA")("version 8" of July 27, 2020) to conclude the NHPA Section 106 process for the proposed above-referenced Undertakings.

It is also apparent that USFS does not intend to consult with tribes, the Apache Stronghold, the public, or other consulting parties on any sort of consistent or transparent basis. Indeed, USFS appears unable or unwilling to establish required measures to avoid and minimize adverse effects to historic properties adversely affected by the Undertakings. USFS has thus far dodged its duties and legal obligations to consider our human rights and constitutional rights to the free exercise of our Apache religion and our religious beliefs within our traditional land, especially our *Chi'chil Bildagoteel* ("Oak Flat") religious place and National Register District, all of which is targeted for deliberate and forewarned destruction by the proposed mining.

We also want to be sure that the Council understands that the Tribe's detailed review of that July 27, 2020 "version 8" of the PA, and the Tribe's September 3, 2020 letter by Chairman Terry Rambler to Tonto National Forest Supervisor Neil Bosworth, were both produced under an unnecessary and suddenly short deadline set on us by USFS after eight months of undue and unexplained USFS delays. The Tribe's official review of the PA has made clear to our Tribe's

17,000 members that our USFS federal trustee appears unwilling to properly consult with affected tribes, our organization, other consulting parties, and the public regarding necessary remedial changes to the version 8 draft PA.

We note with appreciation, the Council's perspective regarding the fundamental inadequacies of PA version 8, as expressed in the September 15, 2020 comments on that PA draft, to Supervisor Bosworth. We especially appreciate Dr. McCulloch's reminder to Supervisor Bosworth of the Council's July 23, 2020 Guidance, "Section 106 and Coronavirus Impacts."[1] We strongly support the Council's recommendation in the September 15, 2020 letter concerning the Forest Service's lack of a transparent Section 106 schedule and framework:

> *"…we recommend the TNF now move rapidly to clarify its remaining schedule and framework moving forward to conclude the Section 106 process as it addresses the concerns noted below and the comments provided by other consulting parties. This summation should include milestones for any future consultation meetings and for providing responses to existing comments."*

The USFS' misconduct of the Section 106 process to date spotlights lack of transparency and disregard of core responsibilities under the Section 106 regulations at 36 CFR Part 800. Given our experiences with the USFS–especially mistreatments of our other sacred traditional cultural properties, most particularly Dził Nchaa Si'an ("Big Seated Mountain" aka "Mount Graham") and Dził Cho (San Francisco Peaks)–this systemic misconduct has continued to proceed despite our attempted corrections, for decades.

USFS officials now attempt, once again, to ignore their lawful obligations to consider the integrity, the cultural and religious significance of affected Apache and regionally shared Native American historic and traditional cultural properties. The USFS' failures include dereliction of legal requirements to develop and evaluate feasible alternatives or modifications to the Undertakings–such as alternative methods of mining, earth surface conservation, and disposal of mine wastes–that could avoid, minimize, or mitigate adverse effects to our historic and traditional cultural properties and corresponding effects the Undertakings to our cultures and sacred places.

USFS has most especially failed to meet its obligations to consider the Chi'chil Biłdagoteel National Historic District ("Oak Flat"), the complex of sacred sites targeted by and already suffering adverse effects from, these disrespectful, controversial and harmful Undertakings. Given that the elected method of copper mining enabled by the proposed land exchange would obliterate Chi'chil Biłdagoteel via massive, landscape-scale earth surface subsidence and dewatering, the Council and other signatories stand on the verge of complicity in deception–by USFS the Undertakings' Resolution Copper proponent, the joint venture of Rio Tinto and Broken Hill Properties ("BHP")– to accept the fallacy of "the continued access to Oak Flat" as a "mitigation initiative."

---

[1] One pertinent excerpt from that July 23, 2020 Guidance:

> *Extraordinary circumstances in the current situation warrant case by case adjustments to this process. Specifically, the Section 106 deadlines for the response of State and Tribal Historic Preservation Officers, and Indian tribes and Native Hawaiian organizations (NHOs) that attach religious and cultural significance to historic properties affected by the undertaking, regardless of its location (collectively, states/tribes/NHOs), will be considered paused while, due to the COVID-19 outbreak, an office is closed or work conditions are such that the states/tribes/NHOs are unable to carry out their Section 106 duties or statutory rights to consultation in a timely fashion (e.g., staff unavailability due to health reasons; restricted access to records; state or tribal laws requiring hard copy records; lack of Internet access or telework capabilities). The clock will resume once the conditions are no longer in effect.*

2

**Exb.2**

That temporary offering is both short-lived and cruel because it would give us access to nothing but the reality of aggravated and compounded cumulative transgenerational pain and trauma, eternal reminders of profound disrespect and abuse by our "trustee," to be entombed in a massive and agonizing crater of desecration where Chi'chil Biłdagoteel had existed, since time immemorial as a place of peace.

This is no different than Resolution Copper's co-parent corporation Rio Tinto's deliberate destruction of the Puutu Kunti Kurrama and Pinikura ("PKKP") peoples' sacred place and heritage site, Jukkan, in present-day Western Australia's Pilbara region earlier this year. That human rights abuse and deliberate desecration caused an "investor revolt" within Rio Tinto, forcing the resignation of multiple Rio Tinto executives, including CEO Jean-Sebastien Jacques. In the aftermath, Rio Tinto's Board Chairman, Simon Thompson, declared:

> "What happened at Juukan was wrong. **We are determined to ensure the destruction of a heritage site of such exceptional archaeological and cultural significance never occurs again at a Rio Tinto operation.**" [2]

Jacques' pledge seems to us dubious, at best. Just more empty words from strange people who would do anything to get what they want here. Rio Tinto gives every indication that it will continue, in defiance of its own policies and international law, to deny and stomp on essential human and Indigenous peoples' rights to the land Resolution has targeted.

USFS has avoided compliance with the Section 106 regulations despite multiple requests, including last year's letters to USFS from the Arizona State Historic Preservation Office ("SHPO") and the Council. To assure that the Council and other consulting parties are informed regarding the views of Apache Stronghold, we supplement the San Carlos Tribe's comments on PA version 8 with our review of concerns with the USFS' attempted exercise of the Section 106 process so far.

Our comments on procedural and content deficiencies in the Section 106 process for the Undertakings make clear that USFS has seriously compromised the process. The significance of Chi'chil Biłdagoteel, and Apaches' long-running, highly publicized and internationally-reported defense of our sacred traditional cultural property on our aboriginal land, was well-known to both Rio Tinto and BHP, as well as the USFS, long before they successfully lobbied Senator John McCain, Representative Ann Kirkpatrick, and our other "trustees" to insert an 11th hour rider into the "must pass" Defense appropriations bill on the eve of a looming government shutdown in December 2014.

We urge and advise that the Section 106 process be re-initiated with a transparent and detailed agenda, then conducted in proper conformance with regulations at 36 CFR §800, applicable USFS agreements and policies, and relevant memoranda and guidance documents of the Council and the U.S. Department of the Interior National Park Service.

---

[2] "Rio Tinto CEO, top executives resign amid cave blast crisis," by Nick Toscano and Hamish Hastie, Sydney Morning Herald (September 11, 2020)("Mr. Jacques, Mr. Salisbury and Ms. Niven - whose department oversees community relations - were last month stripped of $7 million of their 2020 bonuses after a board-led review found they had to bear some responsibility."), https://www.smh.com.au/business/companies/rio-tinto-ceo-top-executives-resign-amid-cave-blast-crisis-20200910-p55uf8.html .

And see, *e.g.*, "Grieving after Rio Tinto blast, Aboriginal owners fear Fortescue plans," by Nick Toscano, Sydney Morning Herald (October 12, 2020)  https://www.smh.com.au/business/companies/grieving-after-rio-tinto-blast-aboriginal-owners-fear-fortescue-plans-20201012-p564az.html .

Unless this is done, the Council may find that termination must be considered per 36 CFR §800.7, to preserve semblances of integrity in NHPA administration and oversight, to demonstrate fidelity to Federal Government Indian and public trust responsibilities, and to avoid further prejudices, undue burdens and harms to us, and violations of the legal, constitutional, and human rights of Apache people and other affected Native American tribal members.

## Defects In The Section 106 Process For The Undertakings

The San Carlos Apache Tribe, on behalf of its members such as those of us who have assembled as Apache Stronghold, and most other consulting parties have been dutiful participants in the various Section 106 process attempts for the Undertakings since 2015. Our Tribe has allocated limited staff resources in efforts to protect Chi'chil Biłdagoteel and to assist USFS in meeting its statutory and regulatory obligations without infringing on our legal and human rights.

Our Tribe sent many of our most respected elders to collaborate in the Ethnographic and Ethnohistoric Study of the Superior Area, a study mostly ignored by USFS. We participated in at least fifteen (15) USFS-sponsored meetings regarding the Undertakings. We submitted at least seven (7) substantive sets of comments on prior drafts of the PA and on documents prepared pursuant to the National Environmental Policy Act ("NEPA").

Other tribes, the Arizona SHPO, and the Council have been similarly diligent in assisting USFS in the proper conduct of the Section 106 process. The primary product of collective diligence on the part of the consulting parties, version 8 of the PA, combines failures to meet basic regulatory requirements with unorthodox attempts to use the PA to advance various corporate interests and other purposes not contemplated under the NHPA or its implementing regulations.

The substantial investments by our Tribe and other parties, including the Council, in assuring legitimacy and improving the USFS' faithless performance of its Section 106 duties, have yet to translate into adequate USFS performance. In particular, despite information and advice from consulting parties, USFS has failed to develop and evaluate alternatives or modifications to the Undertakings that could avoid or minimize adverse effects on historic properties. Neither has USFS explained its rationales for ignoring or discarding the information and advice that has been forthcoming from the consulting parties. USFS has yet to simply identify, describe, and evaluate the functions, attributes, and values of our historic properties, especially including Chi'chil Biłdagoteel. USFS has yet to explicitly consider our properties' religious functions, attributes, and values. These steps are prerequisite to USFS completion of mandatory USFS considerations of the adverse effects that the Undertakings will have on these and all other historic properties.

USFS failures to administer the Section 106 process transparently and in accord with the NHPA and the regulations at 36 CFR Part 800 are adding disrespectful insults to the injuries that Apaches and other traditional religious practitioners are experiencing with the industrial damage, alteration, and destruction of Chi'chil Biłdagoteel.

USFS failures fall into four overarching and aggregating categories of defects. Defects One and Two are procedural. Defects Three and Four are substantive, content-specific failures stemming from USFS derelictions in its Indian trust responsibilities, in its government-to-government consultation duties, in its obligations to analyze and disclose adverse effects on historic properties, and in its mandates to seek to avoid, minimize, or mitigate adverse effects.

What follows here below is a review of those four fundamental defects, intended to assist the Council with its compliance review and to guide USFS in the necessary reboot of the Section 106 process. We think that reboot should include an admission of errors in fulfilling of fiduciary

responsibility and should initiate a truthful reconciliation with the Native nations, tribes, and tribal members and citizens and harmed and disrespected by USFS and Rio Tinto-BHP conduct to date.

<u>Defect One</u>: Bifurcation of the 106 Process and Exclusion of Consulting Parties

In a manner inconsistent with both 36 CFR Part 800 and authoritative advice provided by consulting parties, USFS has excluded tribal consulting parties from its communications with government agency consulting parties, and vice versa. The regulations at 36 CFR Part 800 do not allow agencies to make unilateral selections of which consulting parties to communicate with. The regulations do not enable agencies to select which agency determinations to disclose to different subsets of consulting parties, or to presume to speak on behalf of sovereign Indian tribes to others, especially without prior informed written consent and without the presence of the tribes' official representatives. SHPO's September 19, 2019 letter to USFS spotlights that defect: "tribal consultation under Section 106 and the provisions outlined in 36 CFR Part 800 . . . has not proceeded apace of other federal authorities guiding consultation with Native American tribes."

Inconsistent and apparently biased and selective USFS attention to its consultative duties is also seen in USFS failures–despite the Undertakings' complexity, controversial nature, and massive and unmitigated adverse effects on historic properties–to involve the public pursuant to 36 CFR §800.2(d). A conscientious non-governmental organization brought this deficiency to USFS attention a year ago (Arizona Mining Reform Coalition letter to USFS Supervisor Bosworth, November 4, 2019). Despite that appeal, USFS continues to exclude the public from participation in the Section 106 process (other than commentary on the PA), to discount and disregard most values linked to historic properties other than the scientific values associated with National Register Criterion D, and to enable plans for the destruction of hundreds of historic properties despite good options for effect avoidance and minimization. The result of USFS conduct and decision making in the course of this alleged NHPA Section 106 process has been prejudicial and detrimental to the tribal parties' interests, and particularly to our interests and rights to the free exercise of our traditional religion and the protection of our traditional sacred places within and related to the Chi'chil Biłdagoteel sacred property and National Historic District.

<u>Defect Two</u>: Failure to Conduct the Section 106 Consultations Stepwise

The NHPA Section 106 regulations at 36 CFR Part 800 prescribe a protocol for a multi-phased sequence of communications involving disclosures of federal agency plans and proposed determinations intended as a basis for seeking informative comments from consulting parties and the public. While it is understood that the Section 106 regulations are to be flexibly applied, it is not permissible to distort or omit key steps–whether intentionally in bad faith, or negligently as the result of a failure to exercise due care. Earlier phase consultations are, of course, intended to serve as rational bases for procedural and substantive improvements in subsequent phases. Instead of making use of the stepwise method, as prescribed, USFS has ignored NHPA in both letter and spirit by excluding tribal consulting parties from participation in critical steps of the Section 106 process. The San Carlos Apache Tribe's letters of July 10 and September 30, 2019 advised USFS of this chronic defect.

On a parallel track, the SHPO's letter of September 19, 2019 expressed concerns with USFS' management of the process and its substance:

> "This letter is a follow up to and memorialization of the August 29, 2019 meeting between TNF and SHPO staff regarding the Resolution Copper Mine Programmatic Agreement (PA) and ongoing Section 106 Consultation. At our meeting, SHPO reiterated our continuing concerns with the tribal consultation process, which has not been accomplished in concert with the process laid out in 36 CFR Part 800."

5

**Exb.5**

ER216

The Council's October 25, 2019 letter to USFS Supervisor Bosworth likewise expresses concerns with "the lack of clarity on how the TNF has provided tribes with a reasonable opportunity to identify concerns about historic properties; advise on the identification and evaluation of properties of traditional religious and cultural importance to them; articulate their views on the undertaking's effects on such properties; and participate in the resolution of adverse effects." (See at p.1, "Consultation with Indian Tribes"). The reason why it is unclear to the Council, to the SHPO, and to the tribal parties is obvious and has nothing to do with the particular challenges of these Undertakings: the USFS' conduct is unrecognizable when compared with the standard required practices and regulatory requirements.

The USFS December 5, 2019 response to the Tribe feigns innocence and ignorance:

> *"It is not clear form [sic] your letter, which 'specific procedural requirements' you are referring to. The very purpose of the PA is to ensure the Forest is following the legal requirements for section 106."*

As the Council is aware, and as the Tribe and other parties have repeatedly advised USFS, even as consultations are essential foundations for PA preparation, any procedures set forth in an agreement document cannot substitute for specific procedural requirements to consult with the Tribe and other consulting parties regarding proposed methods to be used: to identify historic properties, per 36 CFR §800.4(b); to make evaluations of significance and determinations of eligibility, per §800.4(c); to provide assessments of adverse effect, per §800.5; and, to compose reasonable resolutions of adverse effect, per §800.6.

PA version 8 reveals that USFS has begun taking some of these required steps, but this has not been done in consultation with the tribal consulting parties. The attempt in PA version 8 to exclude tribes from the list of consulting parties is as emblematic of unreliable USFS performance of its duties as it is harmful to the special relationship with tribes that USFS officials are sworn and otherwise legally bound to uphold.

<u>Defect Three</u>: Violations of Government-to-Government Duties and Protocols, and Infringements on Tribal Sovereignties

The Section 106 regulations and other rules that define lawful USFS conduct also prohibit USFS actions that harm or diminish tribal sovereignty. USFS has defied these rules and notifications from our Tribe that we have not been properly consulted about the USFS "Tribal Monitor Program." This "Program" has been co-conceived and fostered by USFS and the Undertakings' proponent and administered by a contractor guided by USFS officials and financially controlled by Rio Tinto-BHP through Resolution Copper.

The "Tribal Monitor Program" must be disclosed and analyzed for what it is: a USFS-sponsored corporate industrial operation to recruit and employ individual tribal member-citizens to provide USFS and Rio Tinto-BHP-Resolution Copper with sensitive cultural information that is privileged and collectively owned by the affected tribes, all in the absence of prior, fully informed, written consent from tribal governing bodies. The San Carlos Apache Tribe's letters of July 10 and September 30, 2019 advised USFS to suspend this "Program" and all other attempts to convert invaluable, tribal cultural, historical, and geographical knowledge into a "currency" for USFS and the Undertakings proponent to "purchase" compliance with NHPA, NEPA, and the Southeast Arizona Land Exchange and Conservation Act.

Instead of initiating non-discretionary, government-to-government consultations regarding the "Tribal Monitor Program," USFS Supervisor Bosworth's December 5, 2019 letter attempted to dodge concerns, claiming that "the Tribal Monitor Program is not part of government-to-

government consultation." USFS continues to champion that operation and to advocate for its commercial collaborators' unauthorized intrusion into the Tribes' sovereign affairs. Despite requests from multiple parties, USFS has failed to clarify, specify, and consult within the Section 106 and NEPA processes about the roles of the "Tribal Monitor Program." Ongoing implementation of that "Program" has corrupted various phases of an already complex and mismanaged Section 106 process, one sorely lacking in demonstrated good faith by USFS.

We once again invoke the Council's trust responsibilities for tribal welfare and assistance in suspending the "Tribal Monitor Program" pending proper completion of the required government-to-government consultations with our Tribe and other affected tribes. In light of USFS resistance to such consultations, Apache Stronghold now must insist on binding and legally enforceable assurances that any and all collectively owned Western Apache traditional knowledge already captured by USFS and the various third-party contractor(s) without proper authorization and prior informed written consent cannot and will not be used for any purpose, including NHPA and NEPA compliances, without the prior informed written consent of the tribal owners.

The Council appears to also be aware that Section IX of PA version 8 includes USFS schemes, only recently announced to tribal officials using means other than government-to-government consultations, regarding "tribal programs" supported by "four financial trusts that would provide 40 years of funding for a variety of programs to meet a number of specific purposes" linked to the mitigation of the Undertakings (USFS Supervisor Bosworth July 24, 2020 letter to San Carlos Apache Tribe Chairman Rambler). This apparent further attempt to co-opt tribal government prerogatives and transfer duties for the avoidance, minimization, and mitigation of adverse effects from the USFS to private third parties, even if permissible, is subject to public disclosures and tribal consultations pursuant to NHPA, NEPA, and other federal laws and rules.

USFS is not meeting these essential fundamental mandates. Instead, USFS is attempting to authorize or legitimize these still-vague schemes through very late insertion in a "final draft" PA, along with the sudden introduction of a new private commercial signatory party and intended PA beneficiary (more about this trickery is presented in Defect Four here below). Those daring and provocative stunts are patently unacceptable in any legitimate Section 106 process, especially because the USFS subsequently informed Apache tribal officials that the USFS is not providing for any tribal consultation about it, only accepting written comments– thereby effectively terminating the Section 106 process on the Undertakings.

We urge the Council to assist USFS in consulting with tribal governments in good faith about the precise roles in the Section 106 process of both its proposed "Tribal Monitor Program" and the proposals outlined in the July 24, 2020 USFS letter and PA Section IX. We Apaches are under no obligation, with or without the overdue government-to-government consultation, to further assist USFS or the proponent of the Undertakings in superficially satisfying their legal obligations or enabling their bad faith and self-serving endeavors to manipulate the Tribe and its members, and the other tribes and their members, with such schemes.

### Defect Four: Inattention to Adverse Effects to Historic Properties and Impediments to Free Exercise of Religion and Undue Burdens on Religious Beliefs

Neither the Section 106 process nor the NEPA process for these Undertakings have contributed materially to any plans other than to do no more than generally and casually note just some of the adverse and cumulative effects of the Undertakings on the *Chi'chil Biłdagoteel* Historic District and multi-tribal sacred place. Hundreds of other historic properties, the vast majority of which were created and are cared for by American Indians, are also being targeted for imminent alteration or complete obliteration. USFS failure to analyze feasible alternate mining methods, or to disclose and consult with the Tribe about the substantive results and treatment

options emerging from those analyses, indicates that the Undertakings will violate and destroy *Chi'chil Biłdagoteel* and the many values and historic properties there and nearby.

Indeed, actions by USFS and Rio Tinto-BHP-Resolution Copper already have been inhibiting and unduly burdening the free exercise and beliefs of members of American Indian religions. They certainly are unjustly encumbering and unduly burdening our religious beliefs and violating our senses of place, vitality, security, identity, health and wellness.

USFS has also failed to analyze and consider the adverse effects of prior undertakings in relation to values other than scientific values or National Register criteria other than Criterion D. These prior and ongoing undertakings include the many drilling sites, road "improvements," and other surface and subsurface alterations, including many actions the Tribe sees as adverse and cumulative effects within and around the boundaries of Chi'chil Biłdagoteel. Neither the individual USFS permits issued with "no adverse effect" determinations for those subsidiary undertakings, nor the proposed land exchange's Draft Environmental Impact Statement ("DEIS"), nor any of the eight (8) draft PAs, account for (much less analyze or resolve) the adverse effects and impacts those actions have had and are continuing to have.

As the Tribe has previously informed USFS, these significant environmental impacts and adverse effects specifically include impacts, effects, and undue impositions on the free exercise and beliefs of Apache religion and on the ability of myself and other Apache people to avail ourselves of the unique, place-based spiritual and emotional benefits of exercising our religious beliefs without the encumbrances of drilling sites, wells, roads, and other industrial intrusions. Neither the draft PA versions 1–8 nor the DEIS contain either general planning approaches or specific protocols for avoiding or reducing adverse effects to historic properties, except through the additional and compounding adverse effects of rote archaeological testing and data recovery.

USFS has also failed to fulfill its binding legal duties to analyze and consider the Undertakings–pursuant to NEPA, NHPA, the First Amendment's Free Exercise Clause, the Religious Freedom Restoration Act ("RFRA"), as amended, and other legal requirements–in terms of cumulative effects. Neither the DEIS nor the Section 106 process has heretofore disclosed, considered, or analyzed quantitative or qualitative dimensions of current, reasonably foreseeable, and cumulative adverse effects to the cultural and religious values and uses directly and indirectly linked to the historic properties on the verge of destruction.

It bears particular mention that the USFS DEIS selected the preferred action alternative for the Undertakings, an option that ensures the greatest number and magnitude of adverse effects to historic properties. In the course of planning and evaluating these Undertakings and other recent undertakings, USFS has overseen and is failing to regulate, avoid, minimize, or mitigate the ongoing and cumulative transformation of our Pinal Mountain Apache cultural landscape into an industrial wasteland. Apache Stronghold asks the Council to assist USFS in providing due consideration, per NEPA, NHPA, 36 CFR § 800.5(a)(1), and our Constitutional and statutory rights, of these and other cumulative effects.

The most recent example of a detail of the compounding defects we review here is the unheralded and late-hour appearance of the Salt River Project ("SRP") as a signatory party in version 8 of the draft PA. SRP has a history of working against tribal rights and interests. The surprise introduction of SRP as a signatory party to the "final draft" PA introduces another realm of adverse effects to our historic properties and sacred places. This abrupt addition also implicates facets of environmental equity and environmental justice. SRP involvements, plans, and attendant issues require bona fide and good faith consultation–which has been, so far, non-existent–in accordance with NHPA Section 106, NEPA, and other applicable laws and executive orders.

For the in-progress Section 106 process, such consultation should be grounded in adequate prior USFS disclosures of SRP involvements in the undertakings and SRP contributions to the resolution of adverse effects. The apparent USFS attempt to add SRP into a final draft PA and to provide coverage for undisclosed and distinct SRP undertakings further violates basic tenets of good faith consultation per NHPA Section 106. We hope the Council will be effective in advising USFS of its duties in leading consultative negotiations. Because this particular Section 106 process involves treaties, tribal sovereignty, religious freedom, basic human rights, and hundreds of Register-eligible historic properties it deserves and requires utmost good faith which has been sorely lacking so far on the part of USFS, SRP, and Rio Tinto-BHP-Resolution Copper.

## Concluding Comments, Recommendations, and Requests

We are grateful in anticipation of the Council's thorough exercise of its federal oversight authority to assist and advise USFS in this matter. We hope to see real progress toward the setting of reasonable and enforceable limits to any further alteration to our ancestral lands, and to our religious and cultural relationships to our imperiled ancestral lands.

We urge the Council's attention to the 2015 "Ethnographic and Ethnohistoric Study of the Superior Area, Arizona," which is part of the administrative records in these NHPA and NEPA processes. That study describes much of the historical depth, cultural breadth, and religious potency of connections among individual historic properties and tribal member-citizens and communities. The ninety-four (94) tribal representatives involved in that Ethnohistoric Study affirmed that the Undertakings would cause direct, indirect, and cumulative adverse effects to historic properties and to the individuals and communities that rely upon these properties for health, vitality, identity, orientation, and other aspects of wellness, peace, and security. Although USFS has recently given nominal attention to that study, it continues to ignore and omit "community health" and "tribal health" place-based relationships in its Section 106 and NEPA plans and analyses for the Undertakings.

Each and all of the four categories of defects discussed above could have been avoided or remedied if USFS had consulted properly and acted accordingly in the attempted Section 106 process. Whatever USFS has and has not done–through negligence, incompetence, or lack of good faith–however great the limitations on USFS discretion and however vigorous and costly its bureaucratic machinations for the Undertakings, the USFS has **not** administered a "process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising" as required by the NHPA and the Council's implementing regulations.

Instead, USFS has chronically disregarded its fiduciary responsibility to federally recognized tribes. USFS has subverted government-to-government protocols, unlawfully distorted the Section 106 process and most harmfully, prioritized special discretionary service to the corporate entity created by two transnational corporations and presented as the proponent of the Undertakings. And now the USFS shamelessly seeks to also provide special rapid NHPA-bypass service to SRP.

USFS failures and miscarriages could and should have been averted or remedied on the basis of either the prior communications from consulting parties, or the lessons USFS should have learned over several decades from similar careless blunders and deliberate insults to tribes and our sacred and holy places–*Dził Nchaa Si'an* (Mount Graham), *Dził Cho* (San Francisco Peaks), *Ba Whyea* (Taos Pueblo's Blue Lake), the Mountain Badger-Two Medicine Traditional Cultural District, etc., etc. Instead, USFS now stubbornly proceeds to fast-track the destruction of *Chi'chil Biłdagoteel* with presumed impunity, posing behind the façade of a defect-ridden pseudo-Section 106 process.

In addition to its great cultural and religious importance to other tribes, *Chi'chil Bildagoteel* is profoundly central to the cultural and religious beliefs and practices of the San Carlos, White Mountain, Cibecue, and Tonto Apaches. The *Chi'chil Bildagoteel* National Register Historic District unmistakably deserves and requires thorough and imminently respectful consideration in terms of its manifold values and the many options available to avoid and reduce adverse effects to those values. The adverse effects and significant impacts from the proposed Undertakings would be a massive undue burden on our Constitutional, religious, and basic human rights. These effects and impacts would all but eliminate our Tribe's ability to practice and transmit to future generations the religious ceremonies, values, beliefs, and practices necessary to sustain our cultural existence.

Apache Stronghold declares that the time has come to expose USFS' attempted unlawful manipulations of the Section 106 process for the Undertakings and to reestablish the legitimacy of these essential proceedings in accordance with the law. We gratefully anticipate Council's thorough review of our concerns and the concerns expressed by our Tribal government officials. We particularly anticipate robust oversight and the responsible Federal Government officials' reassertion of their proper Indian fiduciary duties and re-establishment of lawful, meaningful, and timely government-to-government consultations regarding all matters related to the proposed Undertakings.

In closing, we would like to acknowledge your recently announced and upcoming retirement as the Executive Director and express our appreciation for your accomplishments in the field of historic preservation and cultural heritage protection, particularly your influence and leadership in providing for better understanding and respect for Native American traditional culture and heritage, the preservation of our sacred places, and protection of our religious freedom and human rights.

Sincerely,

Wendsler Nosie, Sr. Ph.D.
APACHE STRONGHOLD
apaches4ss@yahoo.com

Attachments (2) (White Mountain Apache Tribe Cultural Resources Director Ramon Riley's letters of September 11, 2020 and November 9, 2020).

cc (2-page list, as follows):
San Carlos Apache Tribe –
Terry Rambler, Chairman, trambler@scatui.net
Tao Etpison, Vice Chairman, taoz1d10@gmail.com
San Carlos Council Members
THPO, Vernelda Grant, apachevern@yahoo.com
Forest Manager, Dee Randall, DRandall@forestry.scat-nsn.gov
Attorney General, A.B. Ritchie, Alex.Ritchie@scat-nsn.gov
Forester, Seth Pilsk, sethpilsk@gmail.com
Ak-Chin Indian Community Chair, Hon. Robert Miguel, RMiguel@ak-chin.nsn.us
Ak-Chin Indian Community Him Dak Museum Director, Elaine Peters, epeters@ak-chin.nsn.us
Arizona Mining Reform Coalition Director, Roger Featherstone, roger@AZminingreform.org
Arizona State Historic Preservation Officer, Kathryn Leonard, kleonard@azstateparks.gov
Arizona State Lands Department Director, MOHara@azland.gov

Arizona State Museum, Associate Director James Watson, watsonjt@email.arizona.edu
Fort McDowell Yavapai Nation President, Hon. Bernadine Burnett, bburnette@fmyn.org
Fort McDowell Yavapai Nation Museum Director Albert Nelson, anelson@fmyn.org
Fort Sill Apache Tribe Vice Chair, Ho. Lori Ware, lori.g.ware@fortsillapache-nsn.gov
Fort Sill Apache Tribe Historian, L. Michael Darrow, michael.darrow@fortsillapache-nsn.gov
Gila River Indian Community Governor, Hon. Stephen Roe Lewis, P. O. Box 97, Sacaton, AZ 85147
Gila River Indian Community THPO, Barnaby Lewis, Barnaby.Lewis@gric.nsn.us
Hopi Tribe Chairman, Hon. Timothy L. Nuvangyaoma, TNuvangyaoma@hopi.nsn.us
Hopi Tribe Cultural Preservation Office Director, Stewart Koyiyumptewa, SKoyiyumptewa@hopi.nsn.us
Inter Tribal Association of Arizona Executive Director, Maria Dadgar, info@itcaonline.com
Inter Tribal Association of Arizona, Attorney Susan Montgomery, smontgomery@milawaz.com
Mescalero Apache Tribe President, Hon. Gabe Aguilar, gaguilar@mescaleroapachetribe.com
Mescalero Apache Tribe THPO, Holly Houghton, holly@mathpo.org
National Trust for Historic Preservation, Elizabeth S. Merritt, emerritt@savingplaces.org
Pascua Yaqui Tribe Chairman, Hon. Robert Valencia, Robert.Valencia@pascuayaqui-nsn.gov
Pascua Yaqui Tribe THPO, Karl A. Hoerig, karl.hoerig@pascuayaqui-nsn.gov
Pueblo of Zuni Governor, Hon. Val R. Panteah, Sr., val.panteah@ashiwi.org
Pueblo of Zuni THPO, Kurt Dongoske, kdongoske@cableone.net
Pueblo of Zuni ZCRAT, Octavius Seowtewa, oct.seowtewa@gmail.com
Resolution Copper Senior Manager, Vicky Peacey, Victoria.Peacey@riotinto.com
Salt River Pima-Maricopa Indian Community President, Hon. Martin Harvier, 10005 E. Osborn Rd., Scottsdale, AZ 85256
Salt River Pima-Maricopa Indian Community Compliance Supe., Angela Garcia-Lewis, angela.garcia-lewis@srpmic-nsn.gov
Tohono O'odham Nation Chairman, Hon. Ned Norris, Jr., P.O. Box 837, Sells, AZ 85634
Tohono O'odham Nation THPO, Peter Steere, peter.steere@tonation-nsn.gov
Tonto Apache Tribe Chairwoman, Hon. Jeri De Cola, jdecola@tontoapache.org
Tonto Apache Tribe NAGPRA Coordinator, Wally Davis, Jr., wdavis@tontoapache.org
Tonto NF Supervisor, Neil Bosworth, neil.bosworth@usda.gov
US Army Corps of Engineers, Los Angeles District, Michael Langley, michael.w.langley@usace.army.mil
US BLM Arizona State Director, blm_az_asoweb@blm.gov, j06lopez@blm.gov, temmett@blm.gov
White Mountain Apache Tribe Chairwoman, Hon. Gwendena Lee-Gatewood, gwendena@wmat.us
White Mountain Apache Tribe THPO, Mark Altaha, markaltaha@wmat.us
White Mountain Apache Tribe, Cultural Director, Ramon Riley, rileyhali41@gmail.com
Yavapai-Apache Nation Chairman, Hon. Jon Huey, mcassadore@yan-tribe.org
Yavapai-Apache Nation Apache Culture Director, Vincent Randall, vrandall@yan-tribe.org
Yavapai-Apache Nation Archaeologist, Chris Coder, ccoder@yan-tribe.org
Yavapai-Apache Nation Yavapai Culture Director, Gertrude Smith, yavapaiculture@yan-tribe.org
Yavapai-Prescott Indian Tribe Chair, 530 E. Merritt Street, Prescott, AZ 85301, ejones@ypit.com
Yavapai-Prescott Indian Tribe, Culture Research Department Director, Linda Ogo, 530 E. Merritt Street, Prescott, AZ 85301




White Mountain Apache
(520) 338-4625 • Fax (520) 338-1716

Cultural Center
P.O. Box 507 • Fort Apache, AZ 85926

September 11, 2020

To the Arizona Tribal Leaders Affected by the Proposed Resolution Copper Mine:

I am responding due to a letter by Neil Bosworth, Forest Supervisor, Tonto National Forest (dated August 28, 2020, File Code: 1560) to the White Mountain Apache Chairwoman, Gwendena Lee-Gatewood regarding the Southeast Arizona Land Exchange with Oak Flat to Resolution Copper.

First, I represent myself here as an Apache elder. I am almost 80 years old and have spent most of my life and career working to maintain, and pass down to our younger generations, our greatest birthright —our Apache language and cultural knowledge. Second, I am a White Mountain Apache Tribal official. I serve as the Tribe's Cultural Resource Director/NAGPRA Representative, Chair of the Cultural Advisory Board, and on other local Boards.

I am opposed to the proposed Resolution Copper Mine. I think it is time for our Pima, Tohono O'odham, Yavapai, and Apache Nations, our great leaders, and our esteemed cultural representatives to suspend all involvement in making plans for the proposed Resolution Copper Mine that will result in the destruction and desecration of Chich'il Bil Dagot'eel, our holy site.

We have had supposed "consultations" and submitted many statements describing the sacredness and cultural areas and our opposition to the plans by the Resolution Copper Mine corporation. The majority owner is Rio Tinto, the Australian company responsible, just four months ago, for obliterating the sacred Juukan Gorge rock shelters in Western Australia without properly notifying the Aboriginal traditional owners. Rio Tinto is working hard to do the same thing here. Their plan is to damage 35,000 acres (more than 50 square miles) of our beautiful ancestral lands and to make a toxic soup out of billions of gallons of precious clean water. Our homelands will never be the same....

These "consultations" are wrongheaded. In the old days, if somebody killed one of our relatives, if retaliation in-kind was not swift, then they did the next honorable thing: the relatives of the murderer came to the victim's family to provide a just and fair compensation for the loss. They provided the loved one's family with food, horses, and other goods. Amends were made and life went on.

Nobody would ever think about having a discussion with murderers before their foul and evil deed. But I see in that August 28, 2020 letter that Resolution Copper wants to close the deal to get the Tribes to participate in receiving funds for "Tribal Monitors" and "Cultural Programs." This is Resolution Copper's way to try to get tribes' help to legitimize and legalize killing our land and impeding our religious and cultural beliefs and spiritual traditions. Why would we ever agree to this?

Page 1 of 2

**Exb.12**                                                                                   **ER223**

I know we all need funding to support language and culture programs, of course, but let's not take this blood money now. Let's stand together and fight these foreign corporate invaders! Let's support the San Carlos Apache Tribe to stop the Resolution Copper Mine and protect our sacred ancestral land as our ancestors did for centuries.

Tonto National Forest and Resolution Copper officials think they have the laws on their side, but those laws all passed without knowledge, consultation, or support from Native People. AZ congressional members underhandedly submitted the attachment to a bill without our knowledge years ago. The land they want to destroy—the waters they want to poison and dry up, the plants and animals they want to kill, the sacred and holy resting places they want to desecrate—are Indigenous land. It is up to Tribal People to defend and protect it.

It is wrong for our People to be involved in planning to destroy sacred land that made us who we are. I am asking for all Native People to stop working with, and helping Tonto National Forest and Resolution Copper officials get approval for their mine.

Let's resist the divide-and-conquer strategy that made it even possible for this terrible idea for mining one of our most sacred places to have made it this far. Please join me and **just say NO to the proposed Resolution Copper Mine.**

Respectfully,

Ramon Riley, Cultural Resource Director/
NAGPRA Representative
Nohwike' Bagowah Culture Center
White Mountain Apache Tribe

**Page 2 of 2**

**Exb.13**                                                          **ER224**



November 9, 2020

**Subject:** Proposed Resolution Copper Mine and Land Exchange Impacts on First Amendment and Human Rights to Religious Freedom, Exercise and Beliefs

To Our U.S. Federal Government Trustees and Tribal Leaders:

I am an elder and culture bearer for the Apache people and it is my duty to tell the truth and defend our Apache lands, culture, language, and lifeways. I have tried for the last two decades to explain to the Federal Government, to various mining company officials, and to others of the clear duty to protect the Chi'chil Biłdagoteel (Oak Flat). Most have listened, but too few have heard my message and learned, so I am writing it down.

I want to be clear that this is not an issue of "access" and that neither Chi'chil Biłdagoteel, the powers resident there, nor our religious activities that pray to and through these powers can be "relocated." It is painful to experience the continued dismissal by Tonto Forest officials of our rights to exercise our religion at a place uniquely endowed with holiness and medicine. The lands proposed for destruction by the proposed mine cannot be replaced and prompt action is needed to protect Chi'chil Biłdagoteel.

Chi'chil Biłdagoteel, including all 4,309 aces of public lands managed by the Tonto National Forest as the Chi'chil Biłdagoteel National Register Historic District, requires protection for many reasons, especially because it is a place:

- Respected and protected for many centuries for religious use, beliefs, and practice by the ancestors of today's O'odham, Hopi, Zuni, Yavapai, and Apache Tribes, as well as by Spanish, Mexican, and early Anglo residents. All who get to know the Chi'chil Biłdagoteel come to realize, honor, and celebrate its deep and universal sacredness.

- Recognized for the holy beings and powers as inscribed on cliffs and boulders.

- Visited for respectful and sustainable harvest of sacred medicine plants, animals, and minerals essential to our Apache Holy Ground ceremonies and other religious and cultural ceremonies.

- Revered and used for the sacred spring waters that flows from the earth with healing powers not present elsewhere. Chi'chil Biłdagoteel is a place of perpetual prayer and the location for eternal ceremonies that must take place there to benefit from and demonstrate religious obligation, responsibility, and respect for the powers at and of Chi'chil Biłdagoteel.

- Honored for the warriors who sacrificed their lives to protect their lands and families. Apaches and other Native and non-Native peoples recognize battlefields and burial places, much like

Arlington Cemetery, as sacred and protected lands. Why does the Federal Government deny protection for the Apaches who died at and near Chi'chil Biłdagoteel and the Apache Leap?

- Valued as one of the most important sources of our favorite and best acorns, a principal source of Ndee (Western Apache) cultural identity, historical orientation, and good food. We Western Apache are an Acorn Nation. We rely on and nurture oak groves through our ceremonies, prayers, and lifeways. These are our actual Trees of Life.

It is my understanding that the land exchanges authorized in Section 3003 of the FY 2015 National Defense Authorization Act cannot proceed unless and until the Federal Government, the trustee for the welfare of myself, my tribe (White Mountain Apache), the Ndee (Western Apache Nation), and all other federally recognized tribes and their members and citizens does at least four things:

1. Complies with the legal requirements of the National Historic Preservation Act through the execution of a programmatic agreement for the protection of historic properties, including our places of religious and cultural importance, threatened with irreparable damage and destruction by the proposed Resolution Copper Mine.

2. Certifies bona fide appraisals of the lands to be exchanged to enable the proposed Resolution Copper Mine, including the heartless giveaway of the Chi'chil Biłdagoteel, the multi-tribal holy site, sacred place, ceremonial area, and U.S. National Register Historic District previously protected by the Federal Government from mining.

3. Publishes the final environmental impact statement for the proposed Resolution Copper Mine.

4. Defends Federal Government actions and decisions against lawsuits.

The point here is that there is plenty of time for Federal Government officials and the cultural and elected leaders of tribes across Arizona, New Mexico, and beyond, to awaken to moral and legal mandates to protect Chi'chil Biłdagoteel. Let's work together to save this natural and cultural wonderland!

I urge careful attention to the religious and cultural significance of Chi'chil Biłdagoteel in the National Historic Preservation Act Section 106 compliance process underway on the part of the Tonto National Forest. I am asking for our Federal Government Trustee to give focused attention to a key problem with the Tonto Forest Land Exchange and proposed Resolution Copper Mine Project that has been either neglected or deliberately disregarded by our Trustee and other responsible federal and state officials.

The Section 106 process and Programmatic Agreement has given lip service to minimizing and mitigating the adverse effects of the propose mine and land exchange. The key problem is that both Federal and Arizona State government representatives have avoided the mandatory and fundamental step of identifying and evaluating the adverse effects that the proposed mine and land exchange will have on Apache free exercise of our traditional religion and Apache religious beliefs. The Federal Government is pretending to comply with NHPA while avoiding any identification and evaluation of Apaches' deeply rooted First Amendment religious rights to and relationships with Chi'chil Biłdagoteel. This is made clear in the Forest Service's draft NHPA programmatic agreements, and especially in lack of any attempt to avoid impacts to Chi'chil Biłdagoteel and in the sudden appearance of the Salt River Project as a signatory and regulatory beneficiary—much to our detriment.

Tonto Forest representatives have yet to consider and properly document how to avoid, minimize and mitigate the adverse effects on our religious rights of free exercise and beliefs in consultation with us, and with our prior informed written consent. This is, of course, required by the United Nations Declaration of the Rights of Indigenous Peoples and by the Golden Rule of doing to others only what you would have them do to you.

Tonto National Forest and Resolution Copper officials think they have the laws on their side, but none of those are greater than the universal laws of respect for land, life, and religious freedom. Please join me in recognizing that religious and cultural freedom and perpetuation are far more important than money and copper. Please do this, specifically and per my previous letter and request of September 11, 2020, by suspending all planning for mitigation efforts unless and until (1) the options for impact and adverse effect avoidance and reduction have been exhausted and (2) the four Federal Government actions listed above have been completed.

Respectfully,

Ramon Riley, Cultural Resource Director/
NAGPRA Representative
Nohwike' Bagowah Culture Center
White Mountain Apache Tribe

# EXHIBIT B

# INTERNATIONAL COUNCIL OF THIRTEEN INDIGENOUS GRANDMOTHERS

## February 10, 2021

We, The International Council of Thirteen Indigenous Grandmothers, represent a global alliance of prayer, education, and healing for our Mother Earth, all her inhabitants, and the next seven generations to come.  We are deeply concerned about the unprecedented destruction of our Mother Earth and Indigenous ways of life.

All over the world there are human beings who have not separated themselves from the land and from nature. Indigenous cultures have an unbroken chain that extends back to the time when our ancestors first settled the continent. For thousands of years, we lived on this continent and it remained much as it was in the beginning under our care. We have utilized the knowledge passed down from our ancestors about how to live from time immemorial. The San Carlos Apache Stronghold of Oak Flats are among these Indigenous Peoples. We offer this message in support of our relatives who are bringing their concerns before this court.

The cultural survival of the San Carlos Apache is under grave threat from the proposed Resolution Mine. We reaffirm our responsibility to speak for the protection and enhancement of the well-being of Mother Earth, nature, future generations, and all humanity and life. We bring these matters forward as our responsibility.

For the San Carlos Apache, health, law, and the environment are all interconnected. The Oak Flat Stronghold is not just a place, but a home to spiritual powers. There, the sacred springs have healing power, Apache warriors are buried, and the acorns grow from actual trees of life. For centuries, Oak Flat has remained an active place where Indigenous people come to pray, harvest, and gather where holy beings reside and holy springs flow. The San Carlos Apache cannot have this spiritual connection with the land anywhere else on Earth.

Infrastructural incursions from surface and underground mines, dams, roads, ports, and large industrial processing plants contaminate ground and drinking water and threaten the very essence of life on Mother Earth. These actions also degrade an ancient way of thinking, permeating, and influencing the traditional and cultural values, which preserves the wisdom of how to maintain balance of the Mother Earth. If construction on the Resolution Mine were allowed to begin, the San Carlos Apache's sacred connection to the land would be severed and their identity as Apache would be destroyed.

The health and wellbeing of the San Carlos Apache cannot be separated from this land.

Indigenous people are those who are the most far removed from the existing policies and governmental decision-making in regard to access and rights yet are the most impacted. Governments, corporations, and the dominant society do not consider the Indigenous teachings.

We recognize the significance of this convening of a hearing and reaffirm the historic meeting whereby, we issue this statement, in support of the Apache Stronghold Oak Flat's rights regarding the proposed Resolution Mine.

We recommend that there be a review of the existing Environmental Impact Statement and the record of how the industry upholds their existing agreements with other land holders throughout the world before entering into any agreements to their proposals. We feel it is imperative that consideration be given to the points that have been raised regarding the protection, conservation, safety, and access to clean water as a priority in any discussion of the proposal issues. The proposed Resolution Mine poses a grave threat to the cultural survival of the San Carlos Apache and the environment surrounding the mine, as far away as Phoenix. It is imperative that full and effective measures are taken to ensure that these threats are fully and fairly considered when actions and policies with respect to the area are made.

Serious consideration must be given to projects that will irreparably alienate the land and its waters from the San Carlos Apache. The San Carlos Apache must be heard before they are permanently separated from their homes, sacred sites, medicinal gathering areas, and clean water. They must be heard before their way of life and spiritual identity is destroyed forever.

We emphatically ask the governmental institutions, corporations, and all organizations to embrace this sense of commitment to act responsibly to ensure and guarantee generations of our children, grandchildren, great-grandchildren a future landscape full of promise and peace. We are in concert with the need to give voice to the San Carlos Apache perspective of guardianship of all the natural resources including the precious water.

We, the International Council of Thirteen Indigenous Grandmothers believe that it is the obligation of all concerned to ensure that the basic human rights of the San Carlos Apaches to practice their religion are respected, upheld and recognized, now and for the future generations in any determination regarding the Resolution Copper Mine.   These words that we share are our strong statement and we are glad to be heard.

Respectfully submitted:  On February 10, 2021

Author:

Mona Polacca

PO Box 27933

Tucson, AZ 85726

Email:mpolacca@gmail.com

Phone: 602-810-5823

Mona Polacca is the President of the International Council of the Thirteen Indigenous Grandmothers, Co-Secretariat of an Indigenous World Forum on Water and Peace.  She served as the focal point for the Indigenous Peoples program of the  World Water Forum: Citizen's Process 2018 . She works with Indigenous Peoples in addressing access to clean safe drinking water and drafting Water Statements and Water Declarations.