FILED

MAR 5 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| APACHE STRONGHOLD, a 501(c)(3) nonprofit organization,<br><br>Plaintiff-Appellant,<br><br>v.<br><br>UNITED STATES OF AMERICA; et al.,<br><br>Defendants-Appellees. | No. 21-15295<br><br>D.C. No. 2:21-cv-00050-SPL<br>District of Arizona,<br>Phoenix<br><br>ORDER |

Before: M. SMITH, BADE, and BUMATAY, Circuit Judges.

Order by Judges M. SMITH and BADE, Dissent by Judge BUMATAY.

Appellant's emergency motion for an injunction pending appeal (Docket Entry No. 6) is denied without prejudice. *See* 9th Cir. R. 27-3; *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Government has averred that USFS "will not proceed to convey any right, title, and/or interest of the United States in and to the Federal land, as defined in the Act, to Resolution Copper" until after publication of a new FEIS, which will take "months." The Government has also stated, under penalty of perjury, that USFS "will provide 30-days advance notice" to Apache Stronghold prior to the publication of a new FEIS. These representations mean that Apache Stronghold has not shown that it "needs relief within 21 days to avoid irreparable harm" pursuant to its request for an emergency

stay. 9th Cir. R. 27-3. An examination of the merits of Apache Stronghold's request for a preliminary injunction—denied by the district court and currently pending on appeal—is therefore premature. We express no view on the merits.

The previously established briefing schedule remains in effect.

BUMATAY, Circuit Judge, dissenting:

For a great many people, religious and spiritual tradition is among their most precious inheritances. The Western Apaches are no different. For hundreds of years, they have worshipped at a location in Arizona's Tonto National Forest believed to be the most sacred of grounds—Oak Flat. According to their religious tradition, Oak Flat serves as the dwelling place of the Creator's messengers to the earth and generates a direct connection between the Creator's spirit and the Western Apache peoples. Given the deep bond between the Creator and the natural resources of the land, the Western Apaches regard Oak Flat as the holiest land—the perennial home of their sacred religious ceremonies and a historic place of worship. For them, the grounds, plants, and waters of Oak Flat are imbued with unique spiritual significance. It is no overestimation to say that Oak Flat is the spiritual lifeblood of the Western Apache peoples, connecting them to the Creator since before the founding of the Nation.

Despite this sacred history, the Government seeks to convey Oak Flat to a private mining venture—Resolution Copper. By the Government's own assessment, Resolution Copper's plans will destroy Oak Flat—constructing a mine underneath it and literally turning it into a crater. The devastation will be "immediate, permanent, and large in scale." 2 Final Environmental Impact Statement ("FEIS") at 789.[1] And

---

[1] Available at https://www.resolutionmineeis.us/.

it will cause "indescribable hardship" to the Western Apaches. 1 FEIS at ES-29. "Mitigation measures cannot replace or replicate the tribal resources and traditional cultural properties that would be destroyed[.]" 3 FEIS at 856.

Thus, notwithstanding any economic or other benefit that mining would bring to the area, federal law requires the strictest of scrutiny here: under the Religious Freedom Restoration Act ("RFRA"), Congress has commanded in no uncertain terms that the government may not substantially burden religious exercise but for a compelling reason and with the narrowest of means. *See* 42 U.S.C. § 2000bb-1(a).

Apache Stronghold comes to this court seeking a pause on the transfer of Oak Flat to ensure that the Western Apaches' religious liberty is protected. Under RFRA, Apache Stronghold is entitled to that pause. Transferring Oak Flat to a private venture will result in restricted access to the religious site, strip the Western Apaches of certain legal protections, and eventually lead to the complete destruction of the land. This is an obvious substantial burden on their religious exercise, and one that the Government has not attempted to justify. And the Government's eleventh-hour promises of delay and consultation with the Western Apaches are not enough to allay the threat of irreparable harm. The law affords the Western Apaches more than promises.

For these reasons, I respectfully dissent from the denial of injunctive relief pending appeal.

I.

Oak Flat is situated on a 2,422-acre parcel of land in Arizona. Section 3003 of the National Defense Authorization Act of 2015 authorizes the Government to transfer the land to Resolution Copper, a joint venture of two foreign mining companies. P.L. 113-291, 128 Stat. 3292, 3732, § 3003(c) (2014); 16 U.S.C. § 539p (the "Act"). As a prerequisite to conveying the land, the Government is obligated to publish a "single environmental impact statement." 16 U.S.C. § 539p(c)(9)(B). "Not later than 60 days after" the publication of that statement, the Government is legally obligated to convey the land to Resolution Copper. *Id.* § 539p(c)(10).

In December 2020, the Department of Agriculture announced that the FEIS required by the Act would be published in January 2021. The Department subsequently published that FEIS on January 15, 2021. Under the law, this initiates a 60-day period to convey the land to Resolution Copper, which would end on March 16, 2021. *See id.* The Government was poised to effectuate the transfer on March 11, 2021.

Apache Stronghold, a nonprofit organization seeking to prevent the destruction of Apache holy lands, sought an injunction to prevent the land exchange. After the request was denied, Apache Stronghold applied to this court for an emergency injunction pending appeal. Just hours before its opposition was due in this court, the Government directed the Forest Service to rescind the FEIS. Gov't

Opp'n Br. at 1. Now, instead of March 11, 2021, the Government asserts that the date of the pending transfer is unknown. But it assures us that the transfer is "likely" not imminent. *Id.* at 7. A Forest Service employee also commits to providing Apache Stronghold 30 days' advance notice for reinstatement of the FEIS. Gov't 28(j) Ltr. Even if the transfer were imminent, the Government asserts, the Western Apaches would enjoy continued access to Oak Flat *Campground* "to the maximum extent practicable, consistent with health and safety requirements, until such time as the operation of the mine precludes continued public access for safety reasons, as determined by Resolution Copper." 16 U.S.C. § 539p(i)(3). The Oak Flat Campground, not to be confused with Oak Flat, is "approximately 50 acres of land comprising approximately 16 developed campsites." *Id.* § 539p(b)(5).

## II.

A plaintiff seeking a preliminary injunction is ordinarily required to show "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest[.]" *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005) (simplified).

Our circuit applies a sliding scale approach to preliminary injunctions, meaning that "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for*

*the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Likelihood of success on the merits is the most important preliminary injunction factor. *Doe #1 v. Trump*, 984 F.3d 848, 861 (9th Cir. 2020). Where the Government is a party to the case, as here, the third and fourth factors merge. *Id*.

Under these factors, Apache Stronghold is entitled to a preliminary injunction.

**A.**

Apache Stronghold has established a strong likelihood of success on the merits. Congress enacted RFRA "to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). Concerned that "neutral" laws might nonetheless inhibit religious exercise, Congress commanded that the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability[.]" 42 U.S.C. § 2000bb-1(a). The only exception is when the government can demonstrate that the burden "is in furtherance of a compelling governmental interest" and that it has chosen "the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(b)(1)–(2). Thus, when the government substantially burdens the exercise of religion, it may only do so by demonstrating a compelling interest and narrow tailoring. *Id*.

"Religious exercise" as defined in RFRA means "any exercise of religion, whether or not compelled by, or central to, a system of religious belief. *Id*. § 2000cc-

5(7)(A); *see id.* § 2000bb-2(4). And although not statutorily defined, we have held that a burden is substantial when it is "considerable in quantity or significantly great." *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) (simplified). Together, then, the government substantially burdens religious exercise when it places a "significantly great restriction or onus on any exercise of religion, whether or not compelled by, or central to, a system of religious belief of a person." *Id.* at 1035 (simplified). In this way, RFRA "provides a level of protection to religious exercise beyond that which the First Amendment requires." *Guam v. Guerrero*, 290 F.3d 1210, 1218 (9th Cir. 2002); *see also Burwell*, 573 U.S. at 714.

Under RFRA, as then-Judge Gorsuch wrote, a substantial burden exists when the government "prevents the plaintiff from participating in an activity motivated by a sincerely held religious belief." *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014).[2] It also exists when the government "exert[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Guru Nanak Sikh Soc. of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006) (simplified). Further, we have acknowledged that "a place of worship . . . is at the very core of

---

[2] True enough, it was the Religious Land Use and Institutionalized Persons Act ("RLUIPA") at issue in *Yellowbear*. No matter—RLUIPA mirrors RFRA's "substantial burden" language and, thus, uses the "same standard." *Holt v. Hobbs*, 574 U.S. 352, 358 (2015).

the free exercise of religion." *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1069 (9th Cir. 2011) (simplified).

With that in mind, this is not a difficult case. For the Western Apaches, Oak Flat is sacred land—it is a "buffer between heaven and earth" and the dwelling place of the Creator's "messengers." Oak Flat is thus a conduit to the transcendent, and as a result, certain religious ceremonies of the Western Apaches *must* take place there. These practices include the gathering of sacred plants, animals, and minerals for use in ceremony, as well as prayers, songs, and the use of "the sacred spring waters that flow[] from the earth with healing powers not present elsewhere."

Resolution Copper's mining activities won't just temporarily exclude the Western Apaches from Oak Flat, or merely interrupt the worship conducted there. Instead, Resolution Copper will turn Oak Flat into a crater approximately 2 miles across and 1,100 feet deep. 1 FEIS at 10. The Western Apaches' exercise of religion at Oak Flat will not be burdened—it will be obliterated. Simply, the conveyance of the land will render the core religious practices of the Western Apaches' impossible and their primary method of experiencing the divine nonexistent. Everything about Oak Flat will be erased: sacred sites used for various religious ceremonies, trees and plants used in sacred medicine, sacred springs with healing powers, burial grounds, and ancient artifacts.

Worse yet, the Government has not even attempted to justify Oak Flat's annihilation by arguing that it is narrowly tailored to serve a compelling government interest—neither in the district court nor before this court. Amazingly, it instead argues that Resolution Copper's plans will not amount to a substantial burden on the religious exercise of the Western Apaches at all. As just explained, that's wrong.

Our decision in *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008) (en banc), does not require a different result. In that case, the plaintiff Indian Tribes objected under RFRA to the use of recycled wastewater to make artificial snow on "the Snowbowl" in Arizona, a federally owned, public-recreation facility. *Id.* at 1064–65. The Indian Tribes had long used the mountains around the Snowbowl for religious ceremonies. *Id.* at 1064. Thus, they argued that the use of the artificial snow made from recycled wastewater substantially burdened their religious exercise because it "spiritually contaminate[d] the entire mountain and devalue[d]" their religious experience. *Id.* at 1063.

Rejecting the RFRA claim, we emphasized that "the Forest Service ha[d] guaranteed that religious practitioners would still have access to the Snowbowl and the rest of the Peaks for religious purposes." *Id.* at 1070 (simplified). The "only effect" of the use of recycled wastewater was on the Indian Tribes' "subjective,

emotional religious experience." *Id.*³ Indeed, the district court found that "no plants, springs, natural resources, shrines with religious significance, or religious ceremonies . . . would be physically affected" by the artificial snow. It further concluded that the Indian Tribes would "continue to have virtually unlimited access to the mountain, including the ski area, for religious and cultural purposes," including "to pray, conduct their religious ceremonies, and collect plants for religious use." *Id.* at 1063. *Navajo Nation* did not reach the issue here—whether the total devastation of a religious site substantially burdens religious exercise. As the dissent noted, "a court would surely hold that the Forest Service had imposed a 'substantial burden' on the Indians' 'exercise of religion' if it paved over the entirety of [the religious] Peaks." *Id*. at 1090 (Fletcher, J., dissenting).

Our holding in *Navajo Nation* is thus of little help here, where the religious burden in controversy is not mere interference with "subjective" experience, but the undisputed, complete destruction of the entire religious site. By the government's own estimation, this destruction will be permanent and irreversible. 2 FEIS at 789–90. And much before that, the Western Apaches will necessarily be physically excluded from Oak Flat, rendering their core religious practices impossible.

---

³ While I would not characterize religious belief and experience as merely "subjective" and "emotional," *see Navajo Nation*, 535 F.3d at 1096 (Fletcher, J., dissenting) (explaining that "the majority misunderstands the nature of religious belief and practice"), this point is nonetheless important to understand the difference between *Navajo Nation* and the present case.

Consequently, Apache Stronghold has shown a high likelihood of success on the merits: the conveyance of Oak Flat to Resolution Copper will substantially burden the religious exercise of the Western Apaches, with no purported compelling justification.[4]

B.

Apache Stronghold has also shown that the Western Apaches are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. We have held that irreparable harm is "relatively easy to establish" in the context of the First Amendment. *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019). A plaintiff can establish irreparable harm by "demonstrating the existence of a colorable First Amendment claim." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 973 (9th Cir. 2002) (simplified), *abrogated on other grounds by Winter*, 555 U.S. at 22. That is because "[t]he loss of First Amendment

---

[4] In addition to RFRA, I have serious doubts that the Act would pass constitutional muster under our Free Exercise Clause precedent: it is not neutral or generally applicable because it specifically targets the land on which Oak Flat lies. It therefore must satisfy strict scrutiny. *See, e.g.*, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). As just explained, the Government has not done so.

The Free Exercise Clause "defines nothing less than the respective relationships in our constitutional democracy of the individual to government and to God." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 577 (1993) (Souter, J., concurring in part and concurring in the judgment). Accordingly, it is an issue of surpassing importance. But because RFRA alone is sufficient ground to grant relief, I would not reach the Free Exercise claim here.

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

It is clear from the record that, absent an injunction, Apache Stronghold faces a strong likelihood of imminent, irreparable harm. The Government published the FEIS on January 15, 2021. Under the Act, the Government is required to transfer Oak Flat to Resolution Copper "[no] later than 60 days after the date of publication." 16 U.S.C. § 539p(c)(10). That would mean that the Government must transfer to the land by March 16, at the latest.

Once the land is transferred, the Western Apaches will suffer immediate, irreparable harm. First, their First Amendment rights would be burdened by the certain destruction of their religious site. The Government acknowledged that the mining activity planned by Resolution Copper would cause "immediate, permanent, and large . . . scale" destruction of "archeological sites, tribal sites, [and] cultural landscapes." 2 FEIS at 789. And although the Government contends that "any subsidence-causing mining activities are still years in the future," Gov't Opp'n Br. at 8, Resolution Copper will undoubtedly engage in preparatory activities that are likely to degrade the Oak Flat environment. This includes constructing "new shafts," "new roads," a "water treatment plant," an "admin building," and "substations." 1 FEIS 57, Fig. 2.2.2-3. Any of these construction activities may cause irreparable

damage to the Oak Flat, even if the site won't be entirely cratered immediately after conveyance.

Second, the conveyance will result in the Western Apaches being effectively excluded from the Oak Flat site. The Government claims that access to the site will be maintained after the land exchange. Gov't Opp'n Br. at 8. But in a declaration submitted by the Government, Resolution Copper promises only that the venture "will provide access to the surface of the Oak Flat Campground," not Oak Flat in its entirety.[5] The Campground, meanwhile, consists of only "50 acres of land comprising approximately 16 developed campsites." 16 U.S.C. § 539p(b)(5). And even this narrow pledge is accompanied by a wide qualification: Resolution Copper will provide the Western Apaches access only "to the extent practicable and consistent with health and safety requirements." But according to the Act, Resolution Copper "determine[s]" whether access is "practicable" and "consistent with health and safety requirements." *Id.* § 539p(i)(3). The Western Apaches would therefore be dependent on the good grace of a private copper-mining venture for any access to their sacred religious site—that is, until the mining companies eviscerate

---

[5] *See also* 1 FEIS at 314 ("The land exchange would have significant effects on transportation and access. The Oak Flat Federal Parcel would leave Forest Service jurisdiction, and with it public access would be lost to the parcel itself . . . Resolution Copper *may* keep portions of the property open for public access, *as feasible*.") (emphasis added).

the site altogether. On closer scrutiny, this guarantee of access appears to be a hollow promise.

Third, once the land leaves the Government's hands, the Western Apaches likely cannot bring a RFRA or Free Exercise claim against Resolution Copper should the venture burden or extinguish their ability to worship or access Oak Flat. *See Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834 (9th Cir. 1999) ("RFRA does not expressly include private employers within its reach."); *Hall v. Am. Nat'l Red Cross*, 86 F.3d 919, 921 (9th Cir. 1996) ("[P]rivate entities are considered government actors under the First Amendment [only] if they have a sufficient structural or functional nexus to the government.").

The Government absurdly asserts that we needn't worry about any of these concerns because the transfer can be reversed if it turns out that the Western Apaches' free exercise rights are being violated. Gov't Opp'n Br. at 10. Appeals can take months, even years. By then, who knows what will have happened to the land? It may be rendered unfit for religious worship, making reversal of the transfer futile. Moreover, a court considering this remedy will also need to balance Resolution Copper's reliance interests in developing the land. Ultimately, whether to rescind a completed land transfer is a matter of judicial discretion. *See Kettle Range Conservation Grp. v. BLM*, 150 F.3d 1083, 1087 (9th Cir. 1998) (declining to rescind land transfer where the land had already been "denuded" and it would "be

impractical to attempt to unscramble the eggs"). While the law guarantees Apache Stronghold its rights, all the Government can offer is hope.

Furthermore, the Government's decision to rescind the FEIS only hours before its opposition brief was due does not defeat Apache Stronghold's showing of irreparable harm. While the Government previously told the district court that it will convey the land on March 11, 2021, we now have an assurance that it will "likely" not convey the land imminently, Gov't Opp'n Br. at 7, and a promise from a Forest Service employee that the agency will give Apache Stronghold 30 days' notice before republication of the FEIS. Gov't 28(j) Ltr.

I take the Government's word at face-value, but it doesn't guarantee that Oak Flat won't be transferred during this appeal. The Government cannot even guarantee that the conveyance of the land won't occur imminently. At the very least, and most significantly for me, the Government has not identified any *legal impediment* to reinstating the FEIS and conveying the land at any time.[6] At best, the Government

---

[6] To be sure, government regulation requires 30 days' notice before publication of a final environmental impact statement. 40 C.F.R. § 1506.11(b)(2). But the government has already provided that notice. The plain text of the regulation doesn't require a new notice if a final environmental impact statement is published, withdrawn, and then reinstated. Moreover, the regulation also allows for that shortening of the notice period for "compelling reasons." *Id*. § 1506.11(e). Thus, nothing in the words of the regulation bars the Government from reissuing the FEIS at any given time. Most importantly, the Government has never conceded that it is barred from reissuing the FEIS without providing the notice required by § 1506.11(b)(2).

maintains discretion to re-issue the FEIS and immediately thereafter transfer the land to Resolution Copper. And as its eleventh-hour decision to rescind the FEIS amply demonstrates, the Government is nimble enough to adjust their timelines at a moment's notice.

Any uncertainty surrounding the immediacy of the harm was introduced by the Government's last-minute maneuvering. It's noteworthy that the Government made the decision to finalize and issue the FEIS on January 15, opposed Apache Stronghold's motions for injunctive relief for almost two months, opposed an agreement with Apache Stronghold to pause the transfer for 60 days, and then scheduled the land transfer for March 11—only to rescind the FEIS just six hours before its opposition brief was due to this court and then claim that there's no longer threat of irreparable harm. The Supreme Court recently suggested we do not acquiesce to such tactics. *See Cuomo*, 141 S. Ct. at 67 (finding irreparable harm notwithstanding government's assurance that it would not enforce violative restrictions).

---

Further, Apache Stronghold has expressed concern that, because the FEIS has already been published, the 60-day deadline to convey land was triggered and the transfer must occur by March 16, 2021—notwithstanding the last minute recission. Indeed, while the Act does not provide for the withdrawal and reissuance of a FEIS, it makes very clear that the Government "shall convey" Oak Flat within 60 days of the FEIS's "date of publication." *See* 16 U.S.C. § 539p(c)(10). It is unclear what the Government's withdrawal of the FEIS means for this obligation. This uncertainty counsels strongly in favor of staying the matter while these issues are worked out on appeal.

We are asked to trust the Government that, left to its own devices, it will not transfer the land to Resolution Copper in the near future. Faced with such a substantial harm to the Western Apaches' free exercise rights, we should require more than the Government's say-so.

## C.

The balance of the equities and the public interest also "tip[] sharply" in Apache Stronghold's favor. *Cottrell*, 632 F.3d at 1131 (simplified). Not only would the harm to Apache Stronghold be irreparable, imminent, and of constitutional significance in the absence of an injunction, but on this record an injunction would create few costs for the Government. While courts should never take enjoining the Government lightly, the abstract harm of restraining the Government is "not dispositive of the balance of harms analysis." *Latta v. Otter*, 771 F.3d 496, 500 (9th Cir. 2014) (simplified). Indeed, the Government has withdrawn the FEIS and pledged to re-initiate consultation. According to the Government, the transfer is "likely" not imminent. Govt. Opp'n Br. at 7. An injunction during the pendency of this appeal would therefore not disrupt the Government's plans. As Justice Kavanaugh recently noted in the context of government restrictions on places of worship during COVID-19:

> There also is no good reason to delay issuance of the injunctions, as I see it. If no houses of worship end up in [restrictive] zones, then the Court's injunctions today will impose no harm on the State and have no effect on the State's response to COVID–19. And if houses of worship

> end up in [restrictive] zones, as is likely, then today's injunctions will ensure that religious organizations are not subjected to the unconstitutional 10-person and 25-person caps. Moreover, issuing the injunctions now rather than a few days from now not only will ensure that the applicants' constitutional rights are protected, but also will provide some needed clarity for the State and religious organizations.

*Cuomo*, 141 S. Ct. at 74 (Kavanaugh, J., concurring).

Similar concerns counsel in favor of an injunction here. While the Government gives assurances that nothing will "likely" happen soon, the Western Apaches are spared the transfer and eventual destruction of their most sacred site only by the grace of the Government. They are entitled to more clarity. Indeed, "all citizens have a stake in upholding the Constitution." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (simplified). This is particularly so where religious rights are at issue, because "[p]rotecting religious liberty and conscience is obviously in the public interest." *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018). Accordingly, the harm to Apache Stronghold far outweighs any harm to the Government.

### III.

Our Constitution and laws have made the protection of religious liberty fundamental. Apache Stronghold has clearly established that the religious exercise of the Western Apaches will be substantially burdened by the Government's actions here. And the preliminary injunction factors weigh sharply in favor of hitting pause on this case while the parties pursue this appeal. Regrettably, instead of legal

protection and certainty, today's order will provide Apache Stronghold with only ambiguity, while Oak Flat remains at the mercy of the Government.

I respectfully dissent from the denial of injunctive relief.