No. 21-15295

# In the United States Court of Appeals for the Ninth Circuit

APACHE STRONGHOLD,

Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA, ET AL.,

Defendants-Appellees.

Appeal from the United States District Court
for the District of Arizona
Honorable Steven P. Logan
(2:21-cv-00050-PHX-SPL)

## OPENING BRIEF OF PLAINTIFF-APPELLANT
## APACHE STRONGHOLD

MICHAEL V. NIXON
101 SW Madison Street #9325
Portland, OR 97207
(503) 522-4257
michaelvnixon@yahoo.com

CLIFFORD LEVENSON
5119 North 19th Street, Suite K
Phoenix, AZ 85015
(602) 544-1900
cliff449@hotmail.com

LUKE W. GOODRICH
  Counsel of Record
MARK L. RIENZI
DIANA M. VERM
JOSEPH C. DAVIS
CHRISTOPHER PAGLIARELLA
DANIEL D. BENSON
KAYLA A. TONEY
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
lgoodrich@becketlaw.org

Counsel for Plaintiff-Appellant

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 26.1, Apache Stronghold represents that it has no parent entities and issues no stock.

Dated: March 18, 2021

/s/ Luke W. Goodrich
LUKE W. GOODRICH
THE BECKET FUND FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
(202) 955-0095
lgoodrich@becketlaw.org

*Counsel for Plaintiff-Appellant*

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .............................................. i

TABLE OF AUTHORITIES ...................................................................... iv

INTRODUCTION ......................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................. 5

STATEMENT OF ISSUES ........................................................................... 5

STATEMENT OF THE CASE ..................................................................... 6

    A. The Apaches and Oak Flat ............................................................. 6

    B. Mining Interests ............................................................................ 14

    C. The Land Exchange ...................................................................... 16

    D. The Mine ....................................................................................... 19

    E. District Court Proceedings ............................................................ 22

    F. Appellate Proceedings .................................................................. 24

STANDARD OF REVIEW .......................................................................... 27

SUMMARY OF ARGUMENT ................................................................... 27

ARGUMENT ............................................................................................... 30

    I. The Government's actions violate RFRA. ...................................... 30

       A. The transfer and destruction of Oak Flat imposes a
          substantial burden on Plaintiffs' religious exercise. ................ 31

       B. The Government cannot satisfy strict scrutiny ......................... 42

    II. The Government's actions violate the Free Exercise Clause. ....... 44

III. The Government's actions violate its trust
     obligation to the Apaches............................................ 47

     A. The 1852 Treaty created an enforceable trust. ........................ 47

     B. Congress did not abrogate the trust. ........................................ 52

     C. Breaching the trust injures Plaintiffs........................................ 54

     IV. The other injunction factors are met. ................................... 55

CONCLUSION ................................................................ 61

STATEMENT OF RELATED CASES ................................ 62

CERTIFICATE OF COMPLIANCE ........................................ 63

CERTIFICATE OF SERVICE ................................................ 64

ADDENDUM 1 ................................................................ 65

ADDENDUM 2 ................................................................ 83

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A–Z Int'l v. Phillips*,
323 F.3d 1141 (9th Cir. 2003) .............................................................. 31

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ........................................... 30, 45, 52, 55

*Am. Beverage Ass'n v. City & County of San Francisco*,
916 F.3d 749 (9th Cir. 2019) ................................................................ 59

*Bethel World Outreach Ministries v. Montgomery Cnty. Council*,
706 F.3d 548 (4th Cir. 2013) ................................................................ 40

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) .............................................................................. 30

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ............................................................59-60

*Cheema v. Thompson*,
36 F.3d 1102 (9th Cir. 1994) ................................................................ 42

*Choctaw Nation v. Oklahoma*,
397 U.S. 620 (1970) .............................................................................. 49

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) .................................................................... 3, 28, 45

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ........................................................... 33, 41, 43, 44

*Comanche Nation v. United States*,
No.CIV-08-849-D, 2008 WL 4426621
(W.D. Okla. Sept. 23, 2008) ................................................................ 34

*Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*,
218 F. Supp. 2d 1203 (C.D. Cal. 2002) ................................................ 44

*CTIA - The Wireless Ass'n v. City of Berkeley*,
    928 F.3d 832 (9th Cir. 2019) ................................................................ 55

*Cuviello v. City of Vallejo*,
    944 F.3d 816 (9th Cir. 2019) ................................................................ 56

*DeMarco v. Davis*,
    914 F.3d 383 (5th Cir. 2019) ................................................................ 39

*Doe #1 v. Trump*,
    957 F.3d 1050 (9th Cir. 2020) .............................................................. 59

*Doe #1 v. Trump*,
    984 F.3d 848 (9th Cir. 2020) ................................................................ 27

*Emp't Div. v. Smith*,
    494 U.S. 872 (1990) ..................................................................... 28, 44

*Fazaga v. FBI*,
    965 F.3d 1015 (9th Cir. 2020) .............................................................. 46

*Fernandez v. Mukasey*,
    520 F.3d 965 (9th Cir. 2008) ................................................................ 46

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006). ..................................................................... 30, 42

*Greene v. Solano Cnty. Jail*,
    513 F.3d 982 (9th Cir. 2008) ........................................................... 33, 38

*Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*,
    456 F.3d 978 (9th Cir. 2006) ........................................................... 31, 34

*Haight v. Thompson*,
    763 F.3d 554 (6th Cir. 2014) ........................................................... 32, 40

*Herrera v. Wyoming*,
    139 S. Ct. 1686 (2019) ............................................................. 49, 52, 54

*Holt v. Hobbs*,
    574 U.S. 352 (2015) ..................................................................... 32, 35

v

*Int'l Church of Foursquare Gospel v. City of San Leandro*,
  673 F.3d 1059 (9th Cir. 2011)..................................................33, 34, 44

*Jones v. Carter*,
  915 F.3d 1147 (7th Cir. 2019)............................................................. 40

*Kettle Range Conservation Grp. v. BLM*,
  150 F.3d 1083 (9th Cir. 1998)............................................................58

*Little Sisters of the Poor v. Pennsylvania*,
  140 S. Ct. 2367 (2020)........................................................................ 43

*Lyng v. Nw. Indian Cemetery Protective Ass'n.*,
  485 U.S. 439 (1988)...............................................................31, 36, 37

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
  138 S. Ct. 1719 (2018)......................................................................... 46

*McCurry v. Tesch*,
  738 F.2d 271 (8th Cir. 1984)..............................................................39

*McGirt v. Oklahoma*,
  140 S. Ct. 2452 (2020)............................................................... *passim*

*Menominee Tribe of Indians v. United States*,
  391 U.S. 404 (1968)...............................................................49, 50, 53

*Minn. Star & Tribune Co. v. Minn. Comm'r of Revenue*,
  460 U.S. 575 (1983)............................................................................. 44

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172 (1999)............................................................................. 52

*Mockaitis v. Harcleroad*,
  104 F.3d 1522 (9th Cir. 1997)............................................................33

*Nance v. Miser*,
  700 F. App'x 629 (9th Cir. 2017) ...................................................33, 35

*Navajo Nation v. U.S. Forest Serv.*,
  535 F.3d 1058 (9th Cir. 2008)..................................................... *passim*

*Nken v. Holder*,
556 U.S. 418 (2009) .............................................................. 59

*Robinson v. Salazar*,
838 F. Supp. 2d 1006 (E.D. Cal. 2012) ................................ 51

*Roman Catholic Bishop v. City of Springfield*,
724 F.3d 78 (1st Cir. 2013) ................................................. 44

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020) ............................................... 29, 56, 59

*San Jose Christian Coll. v. City of Morgan Hill*,
360 F.3d 1024 (9th Cir. 2004) ............................................. 31

*Seminole Nation v. United States*,
316 U.S. 286 (1942) ............................................................ 48

*Sherbert v. Verner*,
374 U.S. 398 (1963) .................................................. 31, 32, 43

*Shrum v. City of Coweta*,
449 F.3d 1132 (10th Cir. 2006) ...................................... 3, 46

*Snoqualmie Indian Tribe v. FERC*,
545 F.3d 1207 (9th Cir. 2008) ............................................. 37

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
No. 16-1534, 2017 WL 908538 (D.D.C. 2017) .................... 37

*State v. Posenjak*,
111 P.3d 1206 (Wash. App. 2005) ....................................... 55

*Tanzin v. Tanvir*,
141 S. Ct. 486 (2020) .............................................. 32, 41, 56

*Tenafly Eruv Ass'n v. Borough of Tenafly*,
309 F.3d 144 (3d Cir. 2002) ............................................... 45

*Thai Meditation Assoc. of Ala. v. City of Mobile*,
980 F.3d 821 (11th Cir. 2020) ..................................... 31, 40

*Trinity Lutheran Church of Columbia v. Comer*,
137 S. Ct. 2012 (2017) .......................................................... 31

*Uintah Ute Indians of Utah v. United States*,
28 Fed. Cl. 768 (1993) ........................................................ 51

*United States v. Antoine*,
318 F.3d 919 (9th Cir. 2003) ........................................ 32, 44

*United States v. Carlson*,
900 F.2d 1346 (9th Cir. 1990) .......................................... 43

*United States v. Hardman*,
297 F.3d 1116 (10th Cir. 2002) ........................................ 43

*United States v. Mitchell*,
463 U.S. 206 (1983) .................................................... *passim*

*United States v. Navajo Nation*,
537 U.S. 488 (2003) .......................................................... 48

*United States v. Renzi*,
769 F.3d 731 (9th Cir. 2014) ............................................ 17

*United States v. Winans*,
198 U.S. 371 (1905) .......................................................... 54

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) .......................................... 60

*Warsoldier v. Woodford*,
418 F.3d 989 (9th Cir. 2005) ...................................... 33, 56

*Washington State Dep't of Licensing v. Cougar Den, Inc.*,
139 S. Ct. 1000 (2019) ...................................................... 54

*Westchester Day Sch. v. Vill. of Mamaroneck*,
504 F.3d 338 (2d Cir. 2007) ............................................. 40

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ..................................................... 38-39

*Yang v. Sturner*,
   750 F. Supp. 558 (D.R.I. 1990) ............................................. 41

*Yellowbear v. Lampert*,
   741 F.3d 48 (10th Cir. 2014) .................................... 26, 32, 40

**Statutes**

30 U.S.C. § 21 ............................................................... 15

42 U.S.C. § 2000bb-1 ............................................... 30, 42

National Defense Authorization Act,
   P.L. 113-291 (2014) ................................................... *passim*

**Other Authorities**

20 Fed. Reg. 7319 (Oct. 1, 1955) .................................. 16

36 Fed. Reg. 18,997 (Sept. 25, 1971) ........................... 16

9th Cir. R. 27-3 ............................................................ 58

Compl., *Powell v. City of Long Beach*, No. 2:16-cv-2966
   (C.D. Cal. Apr. 29, 2016), ECF 2 ............................. 39

Notice of Settlement, *Powell v. City of Long Beach*,
   No. 2:16-cv-2966 (C.D. Cal. June 28, 2017), ECF 34 .......... 39

FS MB-R3-12-10, Resolution Copper Project and Land
   Exchange Environmental Impact Statement
   (U.S.D.A. 2021) ...................................................... *passim*

H.R. Rep. No. 103-88 (1993) ................................... 40-41

*Resolution Copper: Hearing*,
   112th Cong. (2012) ............................................... 47, 60

USDA Forest Service, *Resolution Copper Project & Land
   Exchange Environmental Impact Statement: Project Update*
   (Mar. 1, 2021) ....................................................... 24

U.S. Geological Survey, Mineral Commodity Summaries,
*Copper* (Jan. 2021) .............................................................................. 45

*1886: Apache armed resistance ends; Geronimo surrenders*,
Native Voices, U.S. National Library of Medicine ............................. 16

David Wallace Adams, *Education for Extinction: American
Indians and the Boarding School Experience*, *1875-1928*
(1995) ...................................................................................................... 15

Stephanie Barclay & Michalyn Steele, *Rethinking
Protections for Indigenous Sacred Sites*,
134 Harv. L. Rev. 1294 (2021) ............................................................. 39

Gilbert King, *Geronimo's Appeal to Theodore Roosevelt*,
Smithsonian Magazine (Nov. 9, 2012) ................................................. 15

Douglas Laycock & Oliver S. Thomas, *Interpreting the
Religious Freedom Restoration Act*,
73 Tex. L. Rev. 209, 229 (1994) ........................................................... 41

Eric Lipton*, In Last Rush, Trump Grants Mining and
Energy Firms Access to Public Lands*, N.Y. Times
(Dec. 19, 2020) ...................................................................................... 18

Katharine E. Lovett, *Not All Land Exchanges are Created
Equal: A Case Study of the Oak Flat Land Exchange*....................... 17

Annette McGivney, *Revealed: Trump officials rush to mine
desert haven native tribes consider holy*, The Guardian
(Nov. 24, 2020) .............................................................................. 16, 18

Lydia Millet, *Selling Off Apache Holy Land*, N.Y. Times
(May 29, 2015).............................................................................. 17, 53

John R. Welch, *Earth, Wind, and Fire: Pinal Apaches,
Miners, and Genocide in Central Arizona, 1859-1874*,
SAGE Open (2017) ....................................................................... 14, 15

John R. Welch, *The United States Treaty with Apaches
(Treaty of Santa Fe), 1852, and Its Relevance to Western
Apache History and Territory* (Dec. 2, 2017) ..................................... 14

Wright & Miller, 11A Fed. Prac. & Proc. Civ. §2948.1 (3d ed.) ............. 59

# INTRODUCTION

Western Apaches have centered their religious practices on Chi'chil Biłdagoteel—"Emory Oak Extends on a Level," or "Oak Flat"—since time immemorial. It is the direct corridor to their Creator and the site of numerous essential religious ceremonies that cannot take place anywhere else. As the district court found, "[t]he spiritual importance of Oak Flat to the Western Apaches cannot be overstated." 1-ER-12.

Yet in a matter of months, the United States plans to transfer control over this sacred site to a mining company for the express purpose of constructing a mine that all parties agree will destroy the site forever—swallowing it in a nearly two-mile wide, 1,100-foot deep crater.

This irreversible destruction of one of the most sacred indigenous sites in the country violates multiple federal laws. It violates the Religious Freedom Restoration Act (RFRA) because it renders core Apache religious ceremonies impossible—thus imposing a "substantial burden" on their religious exercise—and because the Government has not even attempted to satisfy strict scrutiny. It violates the Free Exercise Clause because the statute authorizing the land transfer is not "generally applicable," but instead applies only to Oak Flat and targets only Apache religious practices for extinction. And it violates the Government's trust and fiduciary duties codified in the 1852 Treaty of Santa Fe, in which the United States promised to settle the "territorial boundaries" of the Apaches and pass laws "conducive to the[ir] prosperity and happiness."

1

2-ER-207. Given these serious legal issues, Apache Stronghold has requested a preliminary injunction preventing Oak Flat from being transferred and destroyed before their claims can be adjudicated.

In a typical preliminary-injunction case, a court might wonder whether the threatened harm is imminent or irreparable. Here, however, the Government has already attested to those facts. It concedes that upon transfer, Oak Flat will immediately "become private property and no longer be subject to [laws] or Forest Service management that provides for tribal access," which is a serious "adverse impact on resources significant to the tribes." 3-FEIS-824. And construction of the mine—the avowed and only purpose of the transfer—will result in "immediate," "permanent," and "irreversible" destruction of the site, forever ending religious practices at Oak Flat. 2-FEIS-789–90. The district court expressed no disagreement with any of these imminent and irreparable harms.

Instead, the court denied a preliminary injunction because it said Plaintiffs were unlikely to succeed on the merits of their RFRA, free exercise, and trust claims. But in reaching this conclusion, the district court made several legal errors. First, in rejecting the RFRA claim, the court held that Plaintiffs can show a "substantial burden" on their religious exercise only if they experience one of "two narrow situations": they are deprived of government benefits or subjected to government sanctions. 1-

ER-18. Thus, if the Government merely fenced off Oak Flat and threatened "sanctions" for trespassing, Plaintiffs would face a "substantial burden"; but if the Government destroys the site—rendering Plaintiff's religious exercise forever impossible—they do not. This holding defies both precedent and common sense. As many courts have recognized, if the government imposes a substantial burden by making religious exercise more costly—such as by denying benefits or imposing sanctions—then it *a fortiori* imposes a substantial burden by making religious exercise impossible. As Judge Bumatay said earlier in this appeal: "This is an obvious substantial burden." ECF 26 at 4 (Bumatay, J., dissenting) ("Bumatay Op.").

Second, the district court rejected the free exercise claim on the ground that the land-transfer statute "is facially neutral" and was not motivated by "discriminatory intent." 1-ER-20. But this misstates the law. Under the Free Exercise Clause, the Supreme Court has held that "[f]acial neutrality is not determinative." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). And while "discriminatory motivation may be *sufficient* to prove" a free exercise violation, "the Free Exercise Clause is not confined to actions based on animus." *Shrum v. City of Coweta*, 449 F.3d 1132, 1145 (10th Cir. 2006) (McConnell, J.) (emphasis added). Here, the land-transfer statute is not neutral or generally applicable because it was specifically designed to apply to only one piece of land and has the direct and anticipated effect of decimating Native

3

American religious life while affecting almost no others. As Judge Buma-tay noted, there are "serious doubts" about whether the law can "pass constitutional muster" because "it is not neutral or generally applicable." Bumatay Op. 12 n.4. And, in any event, a sponsor of the law expressed open hostility to the San Carlos Apaches for invoking their religion in opposition to the mine.

Third, the district court rejected Plaintiffs' trust claim on the ground that only a tribal government, not individual members, may assert the tribe's trust interest. But that ruling directly contravenes multiple cases allowing individual tribal members to invoke tribal rights and treaties to protect individual interests. The court also held that the trust was non-existent or abrogated by the land-transfer statute. But that contradicts precedent on how trusts are formed in the Indian-law context, and the rule that a statute abrogating treaty rights must do so expressly—which did not happen here. Thus, the transfer cannot proceed without violating the trust created by the Treaty.

*     *     *

The United States Government has a tragic history of breaking its promises and destroying Apache lives and lands for the sake of mining interests. This time, the Apaches simply ask that their serious legal claims be heard in court before their land is transferred beyond federal control and destroyed forever.

4

## JURISDICTIONAL STATEMENT

The district court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1343, 1361, 2201, and 2202. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because this is an appeal from an interlocutory order denying a preliminary injunction issued on February 12. The notice of appeal was timely filed on February 18 under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF ISSUES

1. Whether the government imposes a "substantial burden" on Native American religious exercise when it authorizes the transfer and destruction of their sacred site, rendering central Native American religious practices forever impossible. 1-ER-12–19.

2. Whether the government is subject to heightened scrutiny under the Free Exercise Clause when it takes targeted action singling out only one piece of land and destroying only Native American religious practices. 1-ER-19–21.

3. Whether the government violates its trust obligation to Native Americans when it promises in a treaty to settle their "territorial boundaries" and pass laws conducive to their "happiness and prosperity," and then takes their sacred religious site by force and transfers it to a mining company for permanent destruction. 1-ER-5–12.

## STATEMENT OF THE CASE

### A. The Apaches and Oak Flat

Since before recorded history, Western Apaches have lived, worshipped on, and cared for Oak Flat and surrounding lands. They believe that Usen, the Creator, gives life to all things. 2-ER-67. Thus, everything has life, including air, water, and Nahagosan—Mother Earth herself. 2-ER-95. The Apaches strive to remain "intertwined with the earth, with the mother" so they can "communicate with what [is] spiritual, from the wind to the trees to the earth to what [is] underneath." 2-ER-84.

Central to this spiritual connection are the Ga'an, who are "guardians" and "messengers" between the Creator and people in the physical world (2-ER-77)—roughly comparable to angels in the Judeo-Christian tradition. Usen created the Ga'an as "the buffer between heaven and earth" and created specific "blessed places" for the Ga'an to dwell. 2-ER-83, 97. The Ga'an are "the very foundation of [Apache] religion."[1] They are "our creators, our saints, our saviors, our holy spirits." 2-ER-77; 3-FEIS-838.

One of the most important of the Ga'an dwelling places is Oak Flat—a 6.7-square-mile traditional cultural property between Apache Leap on

---

[1] USDA, U.S. Forest Service, *Resolution Copper Project and Land Exchange Environmental Impact Statement*, 3-FEIS-838 (Jan. 15, 2021), https://perma.cc/N7MF-6EPL (testimony of Dr. Wendsler Nosie). For the Court's convenience, all pages cited from the Final Environmental Impact Statement ("FEIS") are reproduced in volume 3 of the Excerpts of Record, and a table of relevant quotations from the FEIS is included as Addendum 2 to this Brief.

the west and Ga'an Canyon (called Devil's Canyon by non-Indians) on the east. For Apaches, the Ga'an "live and breathe" in Oak Flat. 3-FEIS-838. The central sacred area of Oak Flat is depicted here:



The terrain of Oak Flat includes jagged cliffs, boulder fields, grassy basins, old-growth Emory oaks, and perennial waters used by songbirds, mountain lions, fox, bear, and deer:



2-ER-251 © *Robert A. Witzeman, Maricopa Audubon Society*



2-ER-251 © *Russ McSpadden, Center for Biological Diversity*

8

Apaches have held Oak Flat sacred since time immemorial. It is "uniquely endowed with holiness and medicine," and neither "the powers resident there, nor [the Apache] religious activities that pray to and through these powers can be 'relocated.'" 2-ER-227. Only there can their "prayers directly go to [the] creator." 2-ER-67.

As the "direct corridor to [their] Apache religion," Oak Flat is the site of religious "ceremonies that must take place there," and cannot take place "anywhere else." 2-ER-67, 227. These include Sunrise Ceremonies, Holy Grounds Ceremonies, sweat lodge ceremonies, the gathering of "sacred medicine plants, animals, and minerals essential to [those] ceremonies," 2-ER-227, specific prayers and songs, and the use of "the sacred spring waters that flows from the earth with healing powers not present elsewhere." *Id.*

The sweat lodge ceremony is for "young boys that are coming into manhood." 2-ER-93. Through this purification ritual, a boy enters the "womb of Mother Earth" and "is taught by his elders" to "understand and know the balance of life" and to "protect Nahagosan," or "Mother Earth." 2-ER-93–95. This ceremony "originated … at Oak Flat," *id.*, and it is important for a boy to "have the opportunity to sweat at Oak Flat for the first time, when he becomes a young man." 3-FEIS-844.

The Apache Holy Grounds Ceremony is "a blessing and a healing ceremony" that a medicine man "conduct[s] for people who are sick, have ailments or seek guidance." 2-ER-124. This ceremony likewise must take

place at Oak Flat because, as Apache medicine man Cranstson Hoffman Jr. testified, it is the "holy place for healing," "for prayer and ceremony," "for peace and personal cleansing," and the ceremony involves medicinal plants available only at Oak Flat. 2-ER-123–24; 3-FEIS-840. "[H]undreds of traditional Apache species of plants, birds, insects" and "the holiest of medicines" are found at Oak Flat, and "[o]nly the species within the Oak Flat area are imbued with the unique power of this area." 3-FEIS-840. Hoffman continues to lead ceremonies in that "holy place" with "stories, songs, and prayers" "passed down for many generations." 2-ER-123–24. The ceremony "supports life, and the emotional, physical and spiritual well-being" of the Apaches. 2-ER-124.

The Sunrise Ceremony takes months of planning and several days to celebrate. 2-ER-70. Often attended by hundreds, the ceremony marks an Apache girl's transition into womanhood. 2-ER-132. To prepare, the girl gathers plants from Oak Flat that contain "the spirit of Chi'chil Biłda-goteel"; plants picked elsewhere cannot be used because they don't "have the spirit that resonates," and "all of the materials from the ceremony" are "from Oak Flat." 2-ER-67–69; 3-FEIS-846. As she gathers, she speaks to the spirit of Oak Flat, thanking it for providing the acorns, yucca, saguaro cactus, cedar, and other plants. 2-ER-67–69. "All the elements of the wind, fire, water, and land go into the Ceremony," especially the dozens of sacred springs at Oak Flat. 3-FEIS-845.

After her godmother dresses her in "the essential tools of … becoming

a woman," tribal members surround her and sing, dance, and pray, explaining how "the spirit that is within her" will bless and "provide for the people." 2-ER-73–74.



*2-ER-133 © Photograph with family permission*

In the night, the Ga'an "come from the mountains" surrounding Oak Flat and enter into Apache men called crown dancers. 2-ER-76. The Ga'an bless the girl, who joins the dance. *Id.*



*2-ER-135 © Photograph with family permission*

On the final day, one of the Ga'an dancers paints the girl with white clay taken from the ground at Oak Flat, "mold[ing] her into the woman she is going to be." 1-ER-75. When her godmother wipes the Oak Flat clay from her eyes, "she's a new woman" forever "imprint[ed]" with the spirit of Oak Flat. 1-ER-75; 1-ER-69.



*2-ER-135 © Photograph with family permission*

**B. Mining Interests**

The Government has a tragic history of destroying Apaches' lives and land for the sake of mining interests. In 1852, in an effort to make peace after a series of violent conflicts on Apache land, Apache Chief Mangas Coloradas signed the Treaty of Santa Fe, in which the U.S. government promised the Apaches it would "designate, settle, and adjust their territorial boundaries" and "pass and execute" laws "conducive to the prosperity and happiness of said Indians."[2] 2-ER-207. Although the formal designation of boundaries never took place, the earliest map prepared by the Smithsonian Institution in 1899 shows Oak Flat as Apache territory, not belonging to the U.S. 2-ER-112–13. Dr. John Welch, an expert in Apache anthropology and archaeology, testified there is "no evidence that the United States compensated the Apache treaty rights holders for Chi'chil Biłdagoteel," and "Oak Flat is Apache land, as it has been for centuries." 2-ER-156.

After the treaty, as settlers and miners entered the area, U.S. soldiers and civilians committed numerous massacres of Apaches, including 35 lethal attacks from 1859-1874.[3] 3-FEIS-827. In 1862, U.S. Army General

---

[2] John R. Welch, *The United States Treaty with Apaches (Treaty of Santa Fe), 1852, and Its Relevance to Western Apache History and Territory* (Dec. 2, 2017).

[3] John R. Welch, *Earth, Wind, and Fire: Pinal Apaches, Miners, and Genocide in Central Arizona, 1859-1874*, SAGE Open (2017) (hereinafter "Welch").

James Carleton "ordered Apache men to be killed wherever found." Welch at 7.

When miners discovered gold and silver nearby, General Carleton ordered "removal to a Reservation or … utter extermination" of the Apaches to make way for the "search of precious metals." *Id.* at 8. The General Mining Act of 1872 authorized mining on "public" land, and by 1874, the U.S. government had forced some 4,000 Apaches onto the San Carlos Reservation, nicknamed "Hell's 40 Acres" because it was a barren wasteland. 3-FEIS-827; 2-ER-130; 30 U.S.C. § 21 *et seq.*

Meanwhile, Apache ancestral lands were decimated "by miners' picks, shovels, drills, and dynamite blasts." Welch at 11. The U.S. government also forcibly removed hundreds of Apache children from their families and sent them to boarding schools aimed at rooting out their "savagism" and coercing them into Christianity.[4] After decades of conflict over their ancestral lands, the Chiricahua Apaches, led by Geronimo, surrendered in 1886 and agreed to be detained for two years in exchange for the return of their land; but this promise, too, was broken.[5] Instead, the U.S. government imprisoned many of them for 23 years and afterward confined

---

[4] David Wallace Adams, *Education for Extinction: American Indians and the Boarding School Experience, 1875-1928*, 6 (1995).

[5] Gilbert King, *Geronimo's Appeal to Theodore Roosevelt*, Smithsonian Magazine (Nov. 9, 2012), https://perma.cc/RRM6-3RBN.

them to the San Carlos Reservation.[6] The FEIS acknowledges that "[a]ll these communities lost large portions of their homelands, including Oak Flat, and today live on lands that do not encompass places sacred to their cultures." 3-FEIS-828.

### C. The Land Exchange

The Government has long recognized the importance of Oak Flat. In 1955, President Eisenhower reserved 760 acres of Oak Flat for "public purposes" to protect it from mining. 20 Fed. Reg. 7319, 7336-37 (Oct. 1, 1955). President Nixon renewed the protection in 1971. 36 Fed. Reg. 18,997, 19,029 (Sept. 25, 1971). The National Park Service placed Oak Flat in the National Register of Historic Places, concluding "that Chi'chil Biłdagoteel is an important feature of the Western Apache landscape as a sacred site, as a source of supernatural power, and as a staple in their traditional lifeway."[7]

But mining companies covet Oak Flat. In 1995, miners discovered a large copper deposit 7,000 feet beneath the sacred ground.[8] From 2005 to 2013, congressional supporters of Resolution Copper, a foreign-owned mining company, introduced thirteen different bills to give Oak Flat to

---

[6] *1886: Apache armed resistance ends; Geronimo surrenders*, Native Voices, U.S. National Library of Medicine, https://perma.cc/UVS6-VYKA.

[7] NRHP Registration Form at 8-9, https://perma.cc/4Y38-XQQE.

[8] Annette McGivney, *Revealed: Trump officials rush to mine desert haven native tribes consider holy*, The Guardian (Nov. 24, 2020), https://perma.cc/LE9H-RAZ6.

Resolution Copper in a land exchange.[9] Each bill failed. One bill sponsor, Representative Rick Renzi, was convicted for soliciting a bribe from Resolution Copper to support the land transfer. *See United States v. Renzi*, 769 F.3d 731, 739-40 (9th Cir. 2014).

In 2013, Resolution Copper published a "General Plan of Operations" for a mine at Oak Flat. 1-FEIS-1. The next year, with a government shutdown looming, and just minutes before a midnight deadline for the must-pass National Defense Authorization Act, Arizona Senators McCain and Flake attached a rider authorizing transfer of a 2,422-acre parcel including Oak Flat to Resolution Copper in exchange for about 5,344 acres scattered elsewhere. P.L.113-291 § 3003(b)(2), (4), (c)(1), (d). Rio Tinto, the majority owner of Resolution Copper, was a regular donor to McCain's campaigns.[10] Flake had worked as a Rio Tinto lobbyist.[11]

The rider's "purpose" was "to authorize, direct, facilitate, and expedite" the conveyance of Oak Flat to "Resolution Copper." P.L. 113-291 § 3003(a). The rider contemplated that Resolution Copper would use the land to carry out the "mine plan of operations" it published in 2013. *Id.* § 3003(c)(9)(B); *see* § 3003(g)(4)(B)(iii); § 3003(b)(11). To that end, the

---

[9] Katharine E. Lovett, *Not All Land Exchanges are Created Equal: A Case Study of the Oak Flat Land Exchange*, 28 Colo. Nat. Res., Energy & Envt'l L. Rev. 353, 366-67 (2017).

[10] Lydia Millet, *Selling Off Apache Holy Land*, N.Y. Times (May 29, 2015), https://perma.cc/VAQ8-SH4W.

[11] *Id.*

rider revoked the presidential orders protecting Oak Flat from mining, *id.* § 3003(i)(1)(A), providing that Oak Flat "shall be available to Resolution Copper for mining and related activities." *Id.* § 3003(c)(8). It directed the Secretary of Agriculture to "prepare a single environmental impact statement" for the "proposed mine" and "the Resolution mine plan of operations." *Id.* § 3003(c)(9)(B). It then required the Secretary to "convey all right, title, and interest of the United States" in Oak Flat to Resolution Copper "[n]ot later than 60 days after the date of publication of the" FEIS. *Id.* § 3003(c)(10).

In August 2019, the Forest Service published a draft environmental impact study and began accepting public comments. The Forest Service estimated that the FEIS would not be ready until summer 2021.[12] But that timeline changed after President Trump lost reelection. In December 2020, the Department of Agriculture announced the FEIS would be published the following month.[13] Officials admitted they pushed up the deadline because of "pressure from the highest level at the Department of Agriculture."[14] The FEIS was published January 15, 2021, triggering a deadline to complete the transfer no later than March 16, 2021.

---

[12] Eric Lipton*, In Last Rush, Trump Grants Mining and Energy Firms Access to Public Lands*, N.Y. Times (Dec. 19, 2020), https://perma.cc/YWX2-D4NS.

[13] *Id.*

[14] McGivney, *supra* n.8.

P.L.113-291 § 3003(c)(10). The Government told the district court that it would transfer the land as early as March 11. 1-ER-4.

On March 1, in response to Apache Stronghold's emergency request for injunction pending appeal (ECF 6-1), the Government announced it was withdrawing the FEIS and temporarily postponing the land transfer. The Government stated that it "cannot give a precise length of time for completing" the new FEIS, but that it could be completed within a matter of "months" (ECF 18-1 "Mot. Opp." at 5)—again triggering the transfer and destruction of Oak Flat. P.L.113-291 § 3003(c)(10).

### D. The Mine

When the land is transferred to Resolution Copper, it will immediately "leave Forest Service jurisdiction." 1-FEIS-185. This "negates the ability of the Tonto National Forest to regulate effects on [geology and mineral] resources from the proposed mine." *Id.*

Because the land will "become private property," it will also "no longer be subject to [laws] or Forest Service management that provides for tribal access." 3-FEIS-824. Thus, the transfer would immediately subject the Plaintiffs to trespassing liability on their sacred, ancestral land—preventing religious ceremonies from taking place, including critical coming-of-age Sunrise Ceremonies that are already planned. 2-ER-124, 132–36. The FEIS deems the transfer to have an immediate "adverse impact on resources significant to the tribes," "regardless of the plans for the land,"

because the transfer places the land beyond the reach of key laws and judicial remedies. 3-FEIS-824.

The FEIS also acknowledges that the mine will cause "immediate, permanent, and large[-]scale" destruction of "archaeological sites, tribal sacred sites, cultural landscapes, and plant and mineral resources." 2-FEIS-789. The loss of Oak Flat will "be an indescribable hardship to [Native] peoples." 1-FEIS-ES-29.

The copper exists between 4,500 and 7,000 feet below the surface. *Id.* at 10. To mine it, Resolution Copper would use a technique called panel caving, which involves digging a network of shafts and tunnels below the ore, fracturing the ore with explosives, and removing the ore from below. *Id.* After the ore is removed, approximately 1.37 billion tons of waste ("tailings") will need to be stored "in perpetuity." *Id.* at 31, 58. The storage of this waste will "permanently bury or otherwise destroy many prehistoric and historic cultural artifacts, potentially including human burials." *Id.* at 40. And the land above the deposit—Oak Flat—will collapse (or "subside") into a massive crater nearly 2 miles across and 1,100 feet deep, destroying Oak Flat forever. *Id.* at 41.

The following map shows the projected subsidence crater in relation to the central sacred area of Oak Flat:



*Cf. id.* at 61.

The FEIS notes that the entire "NRHP-listed Chi'chil Biłdagoteel Historic District [Traditional Cultural Property] would be directly and permanently damaged by the subsidence area at the Oak Flat Federal Parcel." 1-FEIS-ES-28. This includes the permanent, physical destruction of the sacred sites used for Sunrise Ceremonies, Holy Grounds Ceremonies, and sweat lodge ceremonies (2-ER-70, 93, 95, 124, 132); the destruction of old-growth oak groves and sacred medicinal plants essential to core religious practices (1-FEIS-242, 156; 3-FEIS-840); the destruction of at least 20 sacred springs with healing powers present nowhere else (1-FEIS-156; 2-FEIS-790; 2-ER-67, 144, 231); and the destruction of burial grounds and ancient religious and cultural artifacts, including many

fragile petroglyphs (1-FEIS-156; 2-ER-144; 3-FEIS-843, 846). According to the FEIS, "[m]itigation measures cannot replace or replicate the tribal resources and traditional cultural properties that would be destroyed by project construction and operation." 3-FEIS-856. These effects would be "immediate," "large in scale," and "permanent." *Id.* As Apache Stronghold members testified, this would render their core religious exercise impossible. 2-ER-67, 70, 124, 133–34, 147–48.

### E. District Court Proceedings

Plaintiff Apache Stronghold is an Arizona nonprofit founded by Dr. Wendsler Nosie, former Chairman of the San Carlos Apache Tribe and direct descendant of Chiricahua Apache prisoners of war—a group that included Geronimo. Dr. Nosie founded Apache Stronghold to unite Western Apaches with other Native and non-Native allies to preserve indigenous sacred sites, including the land for which his ancestors endured imprisonment. 3-FEIS-841; 2-ER-81, 83.

Apache Stronghold filed this lawsuit on January 12, 2021, seeking to stop the transfer and destruction of Oak Flat. It immediately sought a temporary restraining order and preliminary injunction to stop publication of the FEIS and land transfer. ECF 7. On January 14, the district court denied the TRO without addressing the merits. ECF 13. The court concluded that a TRO was unnecessary because the transfer and mining would not occur until after the FEIS was published, and—given the 60-day statutory deadline for transfer—might not occur until after a TRO

22

would expire. *Id.* at 3-4. The Government published the FEIS the next day (January 15)—starting the statutory clock for the transfer to be completed no later than March 16. 1-ER-3.

On February 3, the district court held a hearing on Plaintiffs' preliminary-injunction motion. ECF 39. At the hearing, the court heard live testimony from multiple witnesses, including Dr. Nosie, his granddaughter Naelyn Pike, and Apache archaeological expert Dr. John Welch.

On February 12, the district court denied a preliminary injunction. The court acknowledged that "[t]he spiritual importance of Oak Flat to the Western Apaches cannot be overstated," and that "the burden imposed by the mining activity in this case is much more substantive and tangible than that imposed in *Navajo Nation*." 1-ER-12, 17 (citing *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1063 (9th Cir. 2008) (en banc)). Even so, the court held that the destruction of their sacred site was not a "substantial burden" under RFRA because "Plaintiff has not been deprived a government benefit, nor has it been coerced into violating their religious beliefs." *Id.* at 17. The district court also held that the land transfer did not violate the Free Exercise Clause because there was "no evidence of any discriminatory intent behind its passage," *id.* at 19, and that Plaintiffs were unlikely to succeed on the merits of their claim that the government violated its obligations under the 1852 Treaty with the Apaches, *id.* at 7-11.

## F. Appellate Proceedings

To stop the imminent land transfer, Apache Stronghold filed an emergency motion for an injunction pending appeal in this Court on February 23. On March 1, six hours before the Government's response to that motion was due, the Department of Agriculture directed the Forest Service to rescind the FEIS because "additional time is necessary to fully understand concerns raised by the Tribes and the public and the project's impacts to these important resources and ensure the agency's compliance with federal law."[15] The Government then argued in this Court that withdrawal of the FEIS meant that the land exchange would be "delayed," and the harm to the Plaintiffs was not "imminent." Mot. Opp. 1.

By a divided vote, the motions panel denied the emergency motion. The majority reasoned that because the Government stated "under penalty of perjury" that it would not transfer Oak Flat until "after publication of a new FEIS, which will take 'months,'" and would provide at least "30-days advance notice" to Apache Stronghold "prior to the publication of a new FEIS," Apache Stronghold "has not shown that it 'needs relief within 21 days to avoid irreparable harm.'" ECF 26 ("Order") at 1-2. However, the panel noted that its denial was "without prejudice." *Id.* It "express[ed] no view on the merits." *Id.* And it said an expedited briefing

---

[15] USDA, Forest Service, *Resolution Copper Project & Land Exchange Environmental Impact Statement: Project Update* (Mar. 1, 2021), https://perma.cc/RD6A-EQZZ

schedule "remains in effect." *Id.* at 2.

Judge Bumatay dissented. He said "[i]t is clear from the record that, absent an injunction, Apache Stronghold faces a strong likelihood of imminent, irreparable harm." Bumatay Op. 13. First, the Plaintiffs will suffer the loss of "First Amendment rights … by the certain destruction of their religious site." *Id.* "Second, the conveyance will result in the Western Apaches being effectively excluded from the Oak Flat site." *Id.* at 14. And third, "once the land leaves the Government's hands, the Western Apaches likely cannot bring a RFRA or Free Exercise claim against Resolution Copper should the venture burden or extinguish their ability to worship or access Oak Flat." *Id.* at 15. Judge Bumatay rejected as "absurd[]" the Government's argument that "the transfer can be reversed if it turns out that the Western Apaches' free exercise rights are being violated"—noting that "whether to rescind a completed land transfer is a matter of judicial discretion," and the land may be "rendered unfit for religious worship [during appeal], making reversal of the transfer futile." *Id.* at 15. Thus, he concluded that the government's "eleventh-hour promises of delay and consultation with the Western Apaches are not enough to allay the threat of irreparable harm." *Id.* at 4.

Judge Bumatay also found that "Apache Stronghold has established a strong likelihood of success on the merits." *Id.* at 7. He noted that under RFRA, "a substantial burden exists when the government 'prevents the plaintiff from participating in an activity motivated by a sincerely held

religious belief.'" *Id.* at 8 (quoting *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014)). Here, the Western Apaches have shown that "certain religious ceremonies … *must* take place" at Oak Flat, and the transfer and destruction of Oak Flat would "render[] their core religious practices impossible"—making this an "obvious substantial burden," and "not a difficult case." *Id.* at 4, 9, 11.

Judge Bumatay further explained that this Court's "decision in *Navajo Nation*"—which upheld the use of treated wastewater to make artificial snow on a sacred mountain—"does not require a different result." *Id.* at 10. There, he explained, "[t]he 'only effect' of" the government's actions "was on the Indian Tribes' 'subjective, emotional religious experience,'" not on the Tribes' ability to "physically" use the sites. *Id.* at 10-11 (quoting *Navajo Nation*, 535 F.3d at 1070). Thus, *Navajo Nation* "is ... of little help here, where the religious burden in controversy is not mere interference with 'subjective' experience, but the undisputed, complete destruction of the entire religious site." *Id.* at 11.

Lastly, Judge Bumatay noted that "the Government has not even attempted to justify Oak Flat's annihilation" by arguing that it satisfies strict scrutiny under RFRA. *Id.* at 10. Accordingly, given that "[t]he balance of the equities and the public interest also 'tip[] sharply' in Apache Stronghold's favor," Plaintiffs should be "spared the transfer and eventual destruction of their most sacred site." *Id.* at 18-19.

## STANDARD OF REVIEW

The district court's denial of a preliminary injunction is reviewed for abuse of discretion. *Doe #1 v. Trump*, 984 F.3d 848, 861 (9th Cir. 2020). "The district court's interpretation of the underlying legal principles, however, is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Id.* (citation omitted).

## SUMMARY OF ARGUMENT

Plaintiffs have shown a likelihood of success on their RFRA, free exercise, and breach-of-trust claims. And the remaining injunction factors strongly favor relief.

**I.** Under RFRA, the federal government may not impose a "substantial burden" on religious exercise unless imposing that burden is the least restrictive means of advancing a compelling governmental interest. Here, the Government has substantially burdened Plaintiffs' religious exercise by authorizing the transfer and destruction of Oak Flat—which will make their core religious practices impossible. It is undisputed that Oak Flat is the center of Plaintiffs' religion, and key religious exercises must be performed there and cannot be performed anywhere else. Yet the Government's actions will render those exercises impossible—both by turning Oak Flat into private property and subjecting Plaintiffs to trespassing liability if they continue to use it, and by "eras[ing]" Oak Flat itself, "turning [it] into" a nearly two-mile-wide, 1,100-foot-deep crater. Bumatay Op. 9.

The Government therefore bears the burden of satisfying strict scrutiny. But it hasn't even tried to do so. The Government made no compelling-interest or least-restrictive-means arguments below, foreclosing it from doing so now. If anything, the Government has a compelling interest in preserving Native American culture and religion—not destroying them.

**II.** Under the Free Exercise Clause, the Government must satisfy strict scrutiny unless the burden on religious exercise is the result of a "valid and neutral law of general applicability." *Emp't Div. v. Smith*, 494 U.S. 872, 879 (1990). The law at issue here is the opposite. Far from being generally applicable, the law applies to only a single piece of land—Oak Flat. And far from being neutral, the "the effect of [the] law in its real operation" is to knowingly destroy a core Native American religious site and only a Native American religious site. *Lukumi*, 508 U.S. at 534, 546. Accordingly, the Government's actions are subject to strict scrutiny, which the Government cannot satisfy.

**III.** Under the 1852 Treaty of Santa Fe, the Government agreed to govern the Apache territory including Oak Flat in a manner "conducive to the prosperity and happiness of" the Apaches. And under settled Indian-law principles, that language created a trust relationship obligating the United States to preserve the Apaches' ability to engage in traditional activities at Oak Flat—including the religious activities at the core of their faith. Contrary to the district court's decision, Section 3003 does not

28

include the clear statement necessary to abrogate such a trust; indeed, Section 3003 doesn't mention the Apaches' treaty rights at all. And the Supreme Court has repeatedly recognized that treaty provisions protecting tribes may be asserted in support of individual interests—like the religious-freedom interests urged by Plaintiffs here.

**IV.** In addition to Plaintiffs' likelihood of success on the merits, the remaining injunction factors all strongly favor relief. Deprivation of religious exercise is itself irreparable harm, and the equities and public interest favor protection of religious liberty. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).

Moreover, the Government itself *agrees* that the effects of the transfer and mining project will be permanent and irreparable. The transfer will immediately subject Plaintiffs to trespassing liability if they continue to use Oak Flat for their religious exercise—stripping them of key legal protections, and greenlighting "preparatory activities that are likely to degrade the Oak Flat environment." Bumatay Op. 13. And the mine itself will cause "immediate," "large[-]scale," "permanent" destruction of Oak Flat—destroying its old-growth trees, eradicating the sacred springs, annihilating the ancient graves, and "literally turning it into a crater." *Id.* at 3. The Court should reverse and remand for entry of a preliminary injunction.

## ARGUMENT

A preliminary injunction is appropriate when the plaintiff shows (1) likelihood of success on the merits, (2) likelihood of irreparable harm absent relief, (3) the equities favor relief, and (4) relief is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011). If "the balance of hardships tips sharply in the plaintiff's favor," the plaintiff need show only "serious questions going to the merits." *Id.* at 1134-35. Here, all four factors favor relief.

## I. The Government's actions violate RFRA.

Congress enacted RFRA "in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). Under RFRA, the federal "Government shall not substantially burden a person's exercise of religion" unless it satisfies strict scrutiny. 42 U.S.C. § 2000bb-1(a)-(b).

RFRA claims thus proceed in two steps. First, the plaintiff must show his "exercise of religion" has been "substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). Second, "the burden is placed squarely on the Government" to prove that substantially burdening the plaintiff is "the least restrictive means" of furthering a "compelling governmental interest." *Id.* at 418, 429. Here, the Government has imposed a substantial burden by authorizing transfer and destruction of Plaintiffs' sacred site. And it has not even tried to

satisfy strict scrutiny. Thus, Plaintiffs are likely to prevail on their RFRA claim.

### A. The transfer and destruction of Oak Flat imposes a substantial burden on Plaintiffs' religious exercise.

Because RFRA, like its sister-statute RLUIPA, does not define the term "'substantial burden,'" courts give the term its "'ordinary, contemporary, common meaning.'" *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) (quoting *A–Z Int'l v. Phillips,* 323 F.3d 1141, 1146 (9th Cir. 2003)). Relying on ordinary meaning, this Court has defined a substantial burden as "a 'significantly great' restriction or onus on 'any exercise of religion.'" *Id.* at 1034-35. It is "more than an inconvenience on religious exercise." *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter,* 456 F.3d 978, 988 (9th Cir. 2006). As this definition suggests, a burden does not have to be "complete, total, or insuperable" to count. *Thai Meditation Assoc. of Ala. v. City of Mobile*, 980 F.3d 821, 830 (11th Cir. 2020). But "government conduct" that *does* "'completely prevent[]'" the plaintiff's religious exercise "clearly satisfies" it. *Id.*

The Supreme Court's cases illustrate that both "'indirect' penalties and "outright prohibitions" can be a substantial burden. *Trinity Lutheran Church of Columbia v. Comer*, 137 S. Ct. 2012, 2022 (2017) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n.*, 485 U.S. 439, 450 (1988)). An example of an "indirect" burden is *Sherbert v. Verner*, 374 U.S. 398

(1963). There, a state denied unemployment compensation to a Seventh-day Adventist who declined to work on her Sabbath. *Id.* at 399-401. This imposed a substantial burden because it forced her "to choose" between either "abandoning one of the precepts of her religion" or else "forfeiting benefits." *Id.* at 403-04. Similarly, in *Holt v. Hobbs*, the Supreme Court held that putting a Muslim prisoner to the "choice" of shaving his beard or facing discipline "easily satisfied" the substantial burden test. 574 U.S. 352, 357, 361 (2015).

But in some cases, the Government is even more coercive. Instead of offering a "choice," it makes the religious exercise impossible. And when the Government "*prevents* the plaintiff from participating in a[] [religious] activity," giving the plaintiff no "degree of choice in the matter," the government action "easily" imposes a substantial burden. *Yellowbear*, 741 F.3d at 55-56 (Gorsuch, J.) (emphasis added). Put differently, "[t]he greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice)." *Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014).

Thus, as the Supreme Court recognized last year, government prevention of religious exercise through physical acts—such as "*destruction of religious property*"—can constitute a "RFRA violation[]." *Tanzin v. Tanvir*, 141 S. Ct. 486, 492 (2020) (emphasis added); *cf. United States v. Antoine*, 318 F.3d 919, 923-24 (9th Cir. 2003) (assuming that "raz[ing]" a "house of worship" to build a freeway would be a substantial burden).

32

Moreover, this Court's precedents have repeatedly acknowledged, on diverse fact patterns, that government action giving the plaintiff no choice in the matter—but instead simply taking action to violate religious beliefs or make religious exercise impossible—constitutes a substantial burden.[16]

That makes this "not a difficult case." Bumatay Op. 9. The Government here has offered Plaintiffs no "choice"—such as allowing them to use the sacred site subject to penalties. Instead, the Government has authorized the physical destruction of the site—meaning Plaintiffs' "exercise of religion at Oak Flat" will not just be "burdened" but "obliterated." *Id.* Thus, this is an *a fortiori* case.

This Court has applied this principle to religious-property cases. In *International Church of Foursquare Gospel v. City of San Leandro*, 673

---

[16] *See, e.g.*:

- *Greene v. Solano Cnty. Jail*, 513 F.3d 982, 988 (9th Cir. 2008) ("little difficulty" finding that prison's "outright" refusal to allow inmate to attend worship services was a "substantial burden");

- *Warsoldier v. Woodford*, 418 F.3d 989, 996 (9th Cir. 2005) (government conceded that "physically forc[ing an inmate] to cut his hair" would constitute a substantial burden);

- *Mockaitis v. Harcleroad*, 104 F.3d 1522, 1525, 1530 (9th Cir. 1997) ("no question" of substantial burden where officials secretly recorded priest giving confession), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997);

- *Nance v. Miser*, 700 F. App'x 629, 631-32 (9th Cir. 2017) (prison's denial of religious oils constituted substantial burden).

F.3d 1059, 1066-70 (9th Cir. 2011), for example, the government refused to let plaintiffs build a church at the only site in the city that would accommodate their religious practices. This Court recognized that the right to "a place of worship … consistent with … theological requirements" is "at the very core of the free exercise of religion." *Id.* (citation omitted). Thus, preventing the plaintiff from building a place of worship could constitute a substantial burden. *Id.* at 1061, 1070; *see also*, *e.g.*, *Guru Nanak*, 456 F.3d at 992 (substantial burden where government's actions "to a significantly great extent lessened the *prospect* of … construct[ing]" a place of worship in the future).

And courts have applied the same principle to use of sacred sites on government-controlled land. In *Comanche Nation v. United States*, the Army planned to build a warehouse on federal land near Medicine Bluffs, a sacred site. No.CIV-08-849-D, 2008 WL 4426621, at *17 (W.D. Okla. Sept. 23, 2008). But the warehouse would have occupied "the precise location" where Native Americans stood for worship near the Bluffs—making their traditional religious practices impossible. *Id.* at *7, *17. The court held that this physical interference with plaintiffs' religious exercise "amply demonstrate[d]" a "substantial burden." *Id.*

Here, the Government admits that the mine will obliterate Oak Flat, leaving a nearly two-mile-wide, 1,100-foot-deep crater in its place—destroying the sacred trees, eradicating the sacred springs, annihilating the ancient graves, and rendering Plaintiffs' religious practices impossible.

As the FEIS admits, this "[p]hysical" destruction of "tribal sacred sites" will be "immediate," "permanent," and "[i]rreversible." 2-FEIS-791–92. Government action like this—which "render[s] [Plaintiffs'] core religious practices impossible"—is "an obvious substantial burden." Bumatay Op. 4, 11.

The district court failed to grapple with this straightforward analysis. Instead, it found no substantial burden based on three arguments, each meritless.

*First*, it tried to distinguish some of Plaintiffs' cases by saying they involved RLUIPA, not RFRA. 1-ER-16 n.8. But that doesn't apply to *Tanzin* or *Comanche Nation*, which are RFRA cases. More importantly, the Supreme Court and this Court have held that RLUIPA and RFRA impose "the same standard," *Holt*, 574 U.S. at 358; *Nance*, 700 F. App'x at 630— which makes sense, given that the operative text is identical. *Accord* Bumatay Op. 8 n.2.

*Second*, the court said that under *Navajo Nation* and *Lyng*, there is no substantial burden "[e]ven where land is physically destroyed." 1-ER-18. But neither *Navajo Nation* nor *Lyng* involved physical destruction of a sacred site; in fact, both cases acknowledged the outcome would have been different otherwise.

In *Navajo Nation*, plaintiffs challenged the use of treated wastewater to make artificial snow for a ski area on a sacred mountain. 535 F.3d at 1062-63. In finding no substantial burden, this Court emphasized that

the snow would have *no physical impact* on the area: "no plants, springs, natural resources, shrines with religious significance, or religious ceremonies … would be physically affected[;] [n]o plants would be destroyed or stunted; no springs polluted; no places of worship made inaccessible, or liturgy modified." 535 F.3d at 1063. The plaintiffs remained free to engage in all of their prior religious practices; "the sole effect of the artificial snow is on the Plaintiffs' *subjective spiritual experience*." *Id.* (emphasis added).

Here, by contrast, "plants *would* be destroyed"; "shrines with religious significance [and] religious ceremonies … *would* be physically affected"; and a place of worship *would* be made not just "inaccessible" but utterly destroyed. The claim isn't just about "subjective spiritual experience"; it's about complete physical destruction that annihilates core Apache religious practices forever. *Navajo Nation* thus "did not reach the issue here." Bumatay Op. 11.

Similarly, in *Lyng*, the Court emphasized that the Government "could [not] have been more solicitous" toward Native American religious practices. 485 U.S. at 454. It chose a route that was "the farthest removed from contemporary spiritual sites," and "provided for one-half mile protective zones around all the religious sites." *Id.* at 454, 443. This ensured that "*[n]o sites where specific rituals take place [would] be disturbed*." *Id.* at 454 (emphasis added).

The district court cited the *Lyng* plaintiffs' claim that the road would "virtually destroy" their "ability to practice their religion." 1-ER-17. But that claim was not based on physical destruction of their sacred site; it was based solely on the effect of the road on their subjective "spiritual development." *Lyng*, 485 U.S. at 451. Accordingly, the Court held that the existence of a substantial burden "cannot depend on measuring the effects of a governmental action on *a religious objector's spiritual development.*" *Id.* (emphasis added). But the Court acknowledged that "prohibiting the Indian [plaintiffs] from *visiting* [their sacred sites] would raise a different set of constitutional questions." *Id.* at 453 (emphasis added).

Here, Plaintiffs' sacred site will not just be "disturbed," *id.* at 454, but destroyed. They will not just be prevented from "visiting" their site, *id.* at 453, it will be gone, forever. And far from being maximally "solicitous" of Plaintiffs' religious practices, *id.* at 454, the Government is being maximally destructive.[17]

---

[17] The same distinction of *Navajo Nation* and *Lyng* applies to the two other cases the district court cited. *See Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1210-11 (9th Cir. 2008) (plaintiffs could still access sacred falls, and relicensing increased water flow); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-1534, 2017 WL 908538, at *9 (D.D.C. 2017) (no claim that Government destroyed a sacred site—only that it rendered lake "'ritually [im]pure'" by allowing pipeline to be built underneath).

*Lastly*, citing *Navajo Nation*, the district court said Plaintiffs can establish a "substantial burden" only if they face one of "two narrow situations": (1) they are "deprived [of] a government benefit" due to their religious practices, or (2) they are "coerced into violating their religious beliefs" by threat of "civil or criminal 'sanction.'" 1-ER-18. In other words, if the Government merely fenced off Oak Flat and threatened "sanctions" for trespassing, Plaintiffs would face a "substantial burden"; but if the Government obliterates Oak Flat forever—rendering Plaintiff's religious practices impossible—they do not.

That is absurd. *Navajo Nation* says that "[a]ny burden imposed on the exercise of religion *short of*" losing a government benefit or suffering a criminal or civil sanction is not a "'substantial burden' within the meaning of RFRA." 535 F.3d at 1069-70 (emphasis added). In other words, loss of benefits or threat of sanctions is the *minimum* government action needed to establish a substantial burden; it is not the *universe* of substantial-burden claims. If government action is *worse*, as it is here, courts have "little difficulty" finding a substantial burden. *Greene*, 513 F.3d at 988.

The district court's contrary reading of *Navajo Nation* produces grotesque results. In *Wisconsin v. Yoder*, for example, the Supreme Court held that imposing a $5 criminal fine on Amish families for violating compulsory schooling laws was a substantial burden. 1-ER-15 (citing 406

38

U.S. 205 (1972)). But under the district court's reasoning, forcibly rounding up Amish children and sending them to a public boarding school—as the Government did to Apache children in the 1800s—would not be. Stephanie Barclay & Michalyn Steele, *Rethinking Protections for Indigenous Sacred Sites*, 134 Harv. L. Rev. 1294, 1332 (2021). Indeed, as long as the Government acted without threatening a penalty or denying benefits, it could impose a variety of extreme and troubling burdens without any consequence under RFRA—such as padlocking the doors of a church to prevent worship,[18] confiscating religious relics,[19] or forcibly removing religious clothing.[20] That is inconsistent with controlling cases and common sense.

Indeed, adopting the district court's stilted reading of *Navajo Nation* would put this Court out of step with every other Circuit to address the issue. No other Circuit has held that *only* government pressure to abandon a religious exercise, and not government action preventing the exercise outright, counts as a substantial burden. And every Circuit to address the question has agreed that *both* varieties of burdens count. *See, e.g.*:

---

[18] *McCurry v. Tesch*, 738 F.2d 271, 276 (8th Cir. 1984) (finding a substantial burden and calling the Government's action "drastic").

[19] *DeMarco v. Davis*, 914 F.3d 383, 390 (5th Cir. 2019).

[20] Compl., *Powell v. City of Long Beach*, No. 2:16-cv-2966 (C.D. Cal. Apr. 29, 2016), ECF 2 (government forcibly removed a woman's hijab); *compare* Notice of Settlement, *Powell* (C.D. Cal. June 28, 2017), ECF 34.

- *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 349 (2d Cir. 2007) (substantial burden not limited to the "dilemma of choosing between religious precepts and government benefits");

- *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 555-56 (4th Cir. 2013) (limiting actionable burdens to government action "pressur[ing] plaintiff] to violate its beliefs would be tantamount to eliminating … substantial burden protection");

- *Haight*, 763 F.3d at 565 (6th Cir. 2014) ("greater restriction … includes the lesser one");

- *Jones v. Carter*, 915 F.3d 1147, 1149 (7th Cir. 2019) (standard is "much easier to satisfy" than government action "rendering the religious exercise 'effectively impracticable'" (cleaned up));

- *Yellowbear*, 741 F.3d at 55-56 (10th Cir. 2014) (outright "prevent[ion]" of religious practice is "easily" a substantial burden);

- *Thai Meditation*, 980 F.3d at 830-31 (11th Cir. 2020) ("complet[e] prevent[ion]" is a "clear[]" case).

As these examples show, the substantial burden inquiry means what it says: if a government action makes religious practice more difficult in a significant way—whether through denial of benefits, imposition of penalties, or complete prevention—the burden is substantial and "federal law requires the strictest of scrutiny." Bumatay Op. 4.

The rigid, two-category reading of *Navajo Nation* is also contrary to RFRA's legislative history. That history expressly rejects the district court's two "narrow situations," 1-ER-18, as the universe of "substantial burden[s]," saying that "in order to violate the statute, government activity *need not* coerce individuals into violating their religious beliefs nor penalize religious activity by denying any person an equal share of the rights, benefits and privileges enjoyed by any citizen." H.R. Rep. No. 103-

88 (1993) (emphasis added). "Rather, the test applies whenever a law or an action taken by the government to implement a law burdens a person's exercise of religion"—a definition meant to be "all inclusive." *Id.*

In fact, examples Congress explicitly contemplated when passing RFRA wouldn't be protected under the district court's understanding of *Navajo Nation*. For example, "[m]uch of the discussion" in Congress "centered upon" a case in which an autopsy was performed on a Hmong man in violation of the family's religious beliefs. *Boerne*, 521 U.S. at 530-31; *see Yang v. Sturner*, 750 F. Supp. 558, 559-60 (D.R.I. 1990). As the Supreme Court has recognized, Congress meant for the plaintiffs in *Yang* to be protected under RFRA. *See Tanzin*, 141 S. Ct. at 492 (citing *Yang* as an example of a "RFRA violation[]"); Douglas Laycock & Oliver S. Thomas, *Interpreting the Religious Freedom Restoration Act*, 73 Tex. L. Rev. 209, 229 (1994) ("[I]t was plain to anyone who attended the hearings in either house that the committee members were moved by these cases and meant to subject them to the Act."). But under the district court's reading of *Navajo Nation*, those plaintiffs would lose even under RFRA, since they weren't put to any choice between their beliefs and incurring a penalty or losing a benefit—the government simply "conducted [the] autopsy" against their beliefs. *Yang*, 750 F. Supp. at 558. Any interpretation of "substantial burden" that allows such a result is contrary to what Congress enacted in RFRA.

Finally, even accepting the lower court's misreading of *Navajo Nation*, the transfer of Oak Flat *does* subject Plaintiffs to penalties: for trespassing on now "private" land. *See* 3-FEIS-824. And it *does* deny them a "governmental benefit": the use and enjoyment of "government" land for religious exercise. Of course, it is "government" land only because it was taken from the Apaches by force. And practicing religion at an ancestral sacred site is a fundamental human right, not a government benefit. But even assuming it is "government" land (which Plaintiffs dispute) and freedom to worship there is merely a "benefit" given by a benevolent government, Plaintiffs have been deprived of it, and therefore substantially burdened.

## B. The Government cannot satisfy strict scrutiny.

Because the Government has imposed a substantial burden on Plaintiffs' religious exercise, it bears the burden of satisfying strict scrutiny. 42 U.S.C. § 2000bb-1(b). But, as Judge Bumatay noted, "the Government has not even attempted to justify Oak Flat's annihilation." Bumatay Op. 10, 12 n.4. And because "the Government bears the burden of proof" on strict scrutiny, its failure to carry that burden below means Plaintiffs— having carried *their* "substantial burden" burden—"must be deemed likely to prevail" for purposes of a preliminary injunction. *O Centro*, 546 U.S. at 426-30; *see also, e.g.*, *Cheema v. Thompson*, 36 F.3d 1102 (9th Cir. 1994) (reversing denial of preliminary injunction under RFRA where

plaintiffs showed a substantial burden and the government "d[id] nothing to compile a factual record in support of its" strict-scrutiny defense); *United States v. Carlson*, 900 F.2d 1346, 1349 (9th Cir. 1990) ("general rule" that this Court does "not consider issues raised for the first time on appeal").

Even if it tried, the Government could not satisfy strict scrutiny. Strict scrutiny under RFRA "is the most demanding test known to constitutional law." *Boerne*, 521 U.S. at 534. "[I]n this highly sensitive … area, only the gravest abuses, endangering paramount interest," allow the government to limit the free exercise of religion. *Sherbert*, 374 U.S. at 406 (cleaned up). "Thus, in order to establish that it has a 'compelling interest'" sufficient to override Plaintiffs' RFRA claim, "the Government would have to show that it would commit one of 'the gravest abuses' of its responsibilities if it did not" authorize the transfer and destruction of Oak Flat. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2392 (2020) (Alito, J., concurring).

To articulate that inquiry is to resolve it. The Government would not commit a grave abuse of its responsibilities by continuing to preserve Oak Flat—as it has for over 65 years, and as Western Apaches have since time immemorial. Rather, the opposite is true. The Government has a "compelling interest" in "preserving Native American culture and religion" and "fulfilling trust obligations to Native Americans." *United States v. Hardman*, 297 F.3d 1116, 1128-29 (10th Cir. 2002) (en banc) (collecting

cases); *Antoine*, 318 F.3d at 922. Meanwhile, this Court has held that the Government's interest in "revenue generation is *not* a compelling state interest sufficient to justify" extinguishing religious land use. *Int'l Foursquare Gospel*, 673 F.3d at 1071 (emphasis added) (citing *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1228 (C.D. Cal. 2002)); *see Cottonwood*, 218 F. Supp 2d at 1214, 1217-18, 1228 (no compelling interest in condemning "blighted" church property and transferring it to Costco for construction of a store).

## II. The Government's actions violate the Free Exercise Clause.

The transfer and destruction of Oak Flat would also violate the Free Exercise Clause. Under *Employment Division v. Smith*, government action burdening religion is protected from strict scrutiny only if it constitutes a "valid and neutral law of general applicability." *Smith*, 494 U.S. at 879. If it doesn't, then the action is subject to strict scrutiny—again, "the most demanding test known to constitutional law," *Boerne*, 521 U.S. at 534.

Here, the Government's actions aren't neutral and generally applicable, for two reasons. First, a law is not "generally applicable" if it designed to apply to only one piece of land. *See, e.g., Roman Catholic Bishop v. City of Springfield*, 724 F.3d 78, 92, 98 (1st Cir. 2013) (Lynch, J.) (law "designed to apply only to the Church" not generally applicable under *Smith* because its "purpose" was to address "particular properties"); *cf. Minn. Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581 (1983)

("special tax that applies only to certain publications" was not "generally applicable"). Here, as Judge Bumatay noted, because the transfer statute "specifically targets the land on which Oak Flat lies," "it is not neutral or generally applicable." Bumatay Op. 12 n.4; *see* P.L. 113-291 § 3003.

*Second*, the law here is not "neutral" because it "targets religious conduct for distinctive treatment." *Lukumi*, 508 U.S. at 534, 546. Targeting is measured by whether "the effect of [the] law in its real operation" accomplishes a "gerrymander." *Id.* at 535. Here, the statute, legislative history, and FEIS all show that the Government knew exactly what it was doing: destroying an Apache religious site forever. *See* P.L. 113-291 § 3003(c); 1-FEIS-40. Under *Lukumi*'s "objective" targeting inquiry, that suffices to require the Government to justify its actions on strict scrutiny, *see* 508 U.S. at 540—or at minimum creates "serious questions going to the merits" that suffice for entry of a preliminary injunction, *Wild Rockies*, 632 F.3d at 1134-35.

The district court resisted this conclusion on two grounds, both incorrect. First, the district court assumed, without citation, that Plaintiffs' "Free Exercise claims," like their RFRA claims, had to fail if there was no "substantial burden" on Plaintiffs' religious exercise. 1-ER-18–19 (emphasis added). But unlike RFRA, "there is no substantial burden requirement" under the Free Exercise Clause. *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002). Instead, when a law is not neu-

tral or generally applicable, the Free Exercise Clause applies "[r]egardless of the magnitude of the burden imposed." *Fazaga v. FBI*, 965 F.3d 1015, 1058 (9th Cir. 2020). So even if the district court's substantial-burden analysis were correct—and it isn't—that still wouldn't shield the Government from having to justify its actions under strict scrutiny.[21]

Second, turning to neutrality and general applicability, the district court held that the Government's actions satisfied that test because Section 3003 was not "passed with the objective to *discriminate against*" the Apaches. 1-ER-21 (emphasis added). But it is immaterial that the Government claims to bear the Apaches no ill will: "Proof of hostility or discriminatory motivation may be sufficient to prove that a challenged governmental action is not neutral, but the Free Exercise Clause is not confined to actions based on animus." *Shrum*, 449 F.3d at 1145 (McConnell, J.) (citation omitted). That the Government may be motivated by greed or indifference rather than animus is cold comfort to the Apaches; their

---

[21] Some of this Court's earlier cases suggested there is a substantial-burden requirement under the Free Exercise Clause. *See, e.g.*, *Fernandez v. Mukasey*, 520 F.3d 965, 966 n.1 (9th Cir. 2008) (per curiam). But those cases predate the Supreme Court's decisions in *Trinity Lutheran* and *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018), which ruled for free-exercise plaintiffs without ever considering whether the government had imposed a substantial burden. Thus, as this Court recognized in *Fazaga*, under current law, the trigger for strict scrutiny under the Free Exercise Clause is lack of neutrality or general applicability, not a substantial burden.

holy place will still be destroyed. In any event, there *is* evidence of hostility. The bill sponsor criticized "the San Carlos Apache" for "car[ing] more about some issues [i.e., religion] than they do about the prospect of employment," and called for "an end to" religious "delays." *Resolution Copper: Hearing*, 112th Cong., 4 (2012).

Because the Government's actions are not neutral and generally applicable, they trigger strict scrutiny. And as explained *supra* Part I.B, the Government has made no effort to satisfy it, nor can it.

## III. The Government's actions violate its trust obligation to the Apaches.

Plaintiffs are also likely to prevail on their treaty claim. The Supreme Court has held that members of a Tribe may assert treaty protections against individual injury. Here, the United States agreed in the 1852 Treaty to pass laws protecting "the prosperity and happiness of [the Apaches]" on their ancestral lands. 2-ER-207. This language gave rise to a trust obligation to protect the traditional uses of ancestral lands—including religious use of Oak Flat. Congress has never abrogated that trust. And turning Oak Flat into a crater breaches this trust by destroying Plaintiffs' ability to practice their faith forever.

## A. The 1852 Treaty created an enforceable trust.

The "general trust relationship between the United States and the Indian people" is "undisputed." *United States v. Mitchell*, 463 U.S. 206, 225

(1983). It arises from a "distinctive obligation" to those the Government has made "dependent and sometimes exploited." *Id.*

This general trust relationship is judicially enforceable when coupled with "a substantive source of law"—like a treaty—"that establishes specific fiduciary or other duties." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003). But even when a treaty says "nothing … expressly" about "a trust or fiduciary connection," the Supreme Court has explained that "where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists." *Mitchell*, 463 U.S. at 225 (cleaned up). That is because "the Government is something more than a mere contracting party" with regard to "treaty obligations with the Indian tribes," but is instead "judged by the most exacting fiduciary standards" in light of the "moral obligations of the highest responsibility and trust" it has assumed. *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942).

Here, no inference from general principles is required. The 1852 Treaty sets forth a trust and specific incident obligations to the Apaches: that "the government of the United States" will "designate, settle, and adjust their territorial boundaries, and pass and execute" laws "conducive to the prosperity and happiness of said Indians." 2-ER-207. This is exactly the sort of beneficiary language long understood to create an enforceable trust in the unique federal-tribal context. *See Mitchell*, 463 U.S.

48

at 224 (requirement to consider "needs and best interests" of Indian beneficiaries in lumber decisions supported trust). And the treaty here goes further in directing a "liberal construction … as to secure the permanent prosperity and happiness" of the Apaches. 2-ER-207.

That language is properly construed to obligate the United States to preserve traditional Apache religious practices on their historic homeland—just as general language in other treaties has been understood to preserve traditional activities like hunting and fishing on historic homelands. For example, in *Menominee Tribe of Indians v. United States*, a treaty gave land to the Menominee "to be held as Indian lands are held." 391 U.S. 404, 406 (1968). The Supreme Court held that this general language included "the right to fish and to hunt" on that land because hunting and fishing are "normal incidents of Indian life" that the tribe "undoubtedly believed … were guaranteed to them." *Id.* at 406 & n.2.

So too would the Apaches have understood that promising their "prosperity and happiness" would mean preserving their ability to continue their normal religious practices on their lands. *See Herrera v. Wyoming*, 139 S. Ct. 1686, 1701 (2019) ("treaty terms [with Indians] are construed as 'they would naturally be understood by the Indians' at the time"). And that's especially so given the settled Indian-law principle that "any doubtful expressions … [are] resolved in the Indians' favor." *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 630-31 (1970) (citing cases). In short, the

1852 Treaty gave rise to a trust obligation to protect the "normal incidents of [Apache] life" on their ancestral lands—including religious use of Oak Flat. *Menominee Tribe*, 391 U.S. at 406 & n.2; *see* 3-FEIS-827–28. And handing Oak Flat over to a mining company for destruction—thus ending all Apache religious use of it—is inconsistent with that obligation.

The district court rejected this trust claim on two grounds, both mistaken. First, it held that there was no trust because "the United States took legal title" from Mexico in 1848 and never "forfeited that title." 1-ER-10. But this misconstrues Plaintiffs' *trust* claim—which asserts a fiduciary duty to protect the "normal incidents of Indian life" on their ancestral land, *Menominee*, 391 U.S. at 406 n.2—as a claim of formal *title*. The issue here isn't whether the Government or the Apaches has formal title to the land; it is whether the Government (formal title-holder or not) would comply with its trust obligations by relegating Oak Flat for destruction—which it wouldn't. *See Mitchell*, 463 U.S. at 224-28 (not title dispute); *Menominee Tribe*, 391 U.S. at 406-07 (same).

Second, the district court rejected the trust claim on the ground that the treaty "merely agreed … at a later date" to "designate territorial boundaries"—an effort that "ultimately failed." 1-ER-10–11. But the district court offered no authority for the notion that the Government's failure to designate boundaries preempted its trust responsibility to serve the Apaches' wellbeing as dependent beneficiaries. And with good reason: such a reading conflicts not only with *Mitchell*, but with the ordinary

"rule that … treaty rights are to be construed in favor [of], not against, tribal rights." *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2470 (2020). Under that rule, it cannot be that one "broke[n] … treaty promise[]" silently renders another promise in the same treaty null. *See id.* at 2480.[22]

The Government's failure to formally draw boundary lines might be an issue if there were any dispute whether Oak Flat falls within the land addressed by the 1852 Treaty in the first place. But there isn't. The earliest map prepared by the Smithsonian Institution in 1899 shows Oak Flat as Apache territory. 2-ER-112–13. And the government's FEIS concedes that the "Oak Flat Federal Parcel" belonged to "the traditional territories of the Western Apache," 3-FEIS-826 (also naming other tribes present), who were "forced onto reservations" but "continued to use the vicinity of the project area into the twentieth century." 2-FEIS-778. So Oak Flat plainly fell within the land within which the United States promised to protect the Apaches' prosperity and happiness. And because

---

[22] The two cases cited by the district court on a failure to draw boundaries are inapposite. *See* 1-ER-11 (citing *Uintah Ute Indians of Utah v. United States*, 28 Fed. Cl. 768 (1993); *Robinson v. Salazar*, 838 F. Supp. 2d 1006 (E.D. Cal. 2012)). Both cases concerned whether a tribe had aboriginal *title* to specific land. *Uintah Ute*, 28 Fed. Cl. at 789; *Robinson*, 838 F. Supp. 2d at 1022-23. What matters here is that the 1852 Treaty created a trust obligation to protect the Apaches' historic *usufruct* rights in Oak Flat regardless of who ultimately holds title.

the transfer and destruction of Oak Flat is inconsistent with that promise, there is at minimum a "serious question[]" whether it violates the law. *Wild Rockies*, 632 F.3d at 1134-35; *see Mitchell*, 463 U.S. at 227-28.

**B. Congress did not abrogate the trust.**

Once a treaty imposes a duty on the United States, only Congress may abrogate the treaty rights, and it "must clearly express its intent to do so." *Herrera*, 139 S. Ct. at 1698; *see also McGirt*, 140 S. Ct. at 2469. No act of Congress does so here; indeed, Section 3003 makes no mention of the Apaches' rights under the 1852 Treaty at all.

The district court held that "Congress made clear its intent to extinguish that trust relationship by passing Section 3003." 1-ER-12. But the bare fact that Congress directed the *transfer* of land in Section 3003 doesn't extinguish the Apaches' treaty rights to *use* that land. Indeed, the Supreme Court has repeatedly rejected claims of abrogation based on language far "clearer" than Section 3003. For example, in *Minnesota v. Mille Lacs Band of Chippewa Indians*, the Court held that the Chippewa retained their treaty rights to hunt, fish, and gather on aboriginal lands despite ratification of a subsequent treaty forcing the Chippewa to cede their off-reservation land and "relinquish … any and all right, title, and interest, of whatsoever nature … to any other lands." 526 U.S. 172, 184 (1999). Their usufructuary rights still survived because the new treaty was "devoid of any language expressly mentioning—much less abrogating—usufructuary rights." *Id.* at 195.

Likewise, in *Menominee*, tribal members retained the treaty right to hunt and fish without state-law restrictions, even though the statute at issue *dissolved* the tribe completely and applied state laws "to the tribe and its members in the same manner as they apply to other citizens or persons." 391 U.S. at 410. And in *McGirt*, the tribal member was still protected by the treaty establishing his tribe's reservation despite later statutes fragmenting the reservation, abolishing tribal courts, and seizing tribal property. *McGirt*, 140 S. Ct. at 2465. Nothing in Section 3003 approaches the clarity of the legislation in *Mille Lacs Band*, *Menominee*, or *McGirt*—which still wasn't clear enough to allow Congress to go back on its word.

And the clear-statement rule is demanding for good reason. The primary check on Congress's ability to revoke a tribe's treaty rights is the "deliberately hard business" of "[m]ustering the broad social consensus required to pass new legislation." *McGirt*, 140 S. Ct. at 2462. Here, however, Section 3003's "land grab was sneakily anti-democratic even by congressional standards."[23] Every stand-alone bill attempting to transfer Oak Flat to Resolution Copper failed. Section 3003 passed only as a midnight rider to a must-pass defense bill. Some legislators may have hoped to "tiptoe to the edge" of abrogating the treaty (if they were even aware

---

[23] Lydia Millet, *Selling Off Apache Holy Land*, N.Y. Times (May 29, 2015), https://perma.cc/VAQ8-SH4W.

of the treaty, which is doubtful), hoping "that judges—facing no possibility of electoral consequences themselves—will deliver the final push." *McGirt*, 140 S. Ct. at 2462. But "saving the political branches the embarrassment" of openly abrogating treaty rights "is not one of [the judiciary's] constitutionally assigned prerogatives." *Id.*

## C. Breaching the trust injures Plaintiffs.

Alternatively, the district court held that Plaintiffs lack standing to assert rights under the 1852 Treaty because they are not "the tribe." 1-ER-7. But this was mistaken. The Supreme Court has repeatedly recognized that treaty provisions protecting tribes may be asserted in support of individual interests. In *Herrera*, for example, a tribal member successfully asserted a right against prosecution based on a treaty that memorialized "*the Tribe's* right to hunt off-reservation." 139 S. Ct. at 1693 (emphasis added). Likewise, in *McGirt*, a tribal member asserted "personal interests" that turned on asserting the tribe's rights: that "the Creek Reservation persists today," and was not disestablished. 140 S. Ct. at 2460-62. And in *Washington State Department of Licensing v. Cougar Den, Inc.*, a tribe member's business successfully invoked a defense to state taxation that a treaty "reserv[ed] to the Yakama Nation." 139 S. Ct. 1000, 1011 (2019) (plurality); *accord id.* at 1016-17 (Gorsuch, J., and Ginsburg, J., concurring). *See also United States v. Winans*, 198 U.S. 371, 378 (1905) (fishing right "secured to said confederated tribes and bands of Indians" protected individuals).

54

The district court tried to distinguish *Herrera* and *McGirt* by saying those cases involved "individualized injury" to "individual treaty rights," because "sovereign nations cannot fish or hunt." 1-ER-6 n.1, 1-ER-7 n.2. But "sovereign nations" cannot enter womanhood in a Sunrise Ceremony either. Plaintiffs here *do* assert an individualized injury: The Government is authorizing the transfer and destruction of their most sacred site, making their individual religious practices forever impossible. Plaintiffs thus have standing to invoke the protections of the 1852 Treaty.[24]

## IV. The other injunction factors are met.

Besides likelihood of success or a serious question on the merits, the Court must also consider the likelihood of irreparable harm absent relief, the balance of equities, and the public interest. *Wild Rockies*, 632 F.3d at 1135. Here, each element strongly favors Apache Stronghold.

***Irreparable harm.*** Irreparable harm is "relatively easy to establish" in the First Amendment context. *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019). This is because "[t]he loss of

---

[24] The district court's primary citation on this point, *State v. Posenjak*, 111 P.3d 1206 (Wash. App. 2005), only confirms that Plaintiffs here have standing. The individual plaintiff in *Posenjak* lacked standing to invoke treaty rights because he wasn't "a *member* of a signatory tribe," not because he was an individual. *Id.* at 1211 (emphasis added). Dr. Nosie and Ms. Pike are enrolled members of the San Carlos Apache Tribe, a successor to the Western Apaches who signed the 1852 Treaty. 2-ER-141 ¶6, 126 ¶1.

First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Diocese of Brooklyn*, 141 S. Ct. at 67. This same principle extends to RFRA claims, because "RFRA secures Congress' view of the right to free exercise under the First Amendment." *Tanzin*, 141 S. Ct. at 489; *Warsoldier*, 418 F.3d at 1001 (applying same irreparable-harm standard under RLUIPA). Thus, to establish "irreparable injury," Plaintiffs need show only "a colorable claim" under RFRA or the First Amendment. *Warsoldier*, 418 F.3d at 1001-02. As explained above, Apache Stronghold has done much more than that: it has shown an "obvious" violation of RFRA. Bumatay Op. 4. That more than suffices to demonstrate irreparable harm. *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019).

That aside, the Government has repeatedly *admitted* that the harm from the transfer and destruction of Oak Flat is irreparable—or, as the FEIS puts it, "permanent," "irreversible" and "irretrievable." 2-FEIS-789–90. The FEIS describes the relevant harm as "irreversible" 66 times, "irretrievable" 54 times, and "permanent" 61 times. It says the destruction caused by the mine will be "immediate, permanent, and large in scale." 2-FEIS-789. It is hard to imagine a clearer admission of irreparable harm.

As Judge Bumatay recognized, the transfer of Oak Flat causes multiple kinds of immediate, irreparable harm. First, the transfer will "strip" Plaintiffs of "legal protections" and "result in the Western Apaches being

56

effectively excluded from the Oak Flat site." Bumatay Op. 4, 14. Without access to the land that they have used for their religious exercise for centuries, Plaintiffs will not be able to carry out important religious ceremonies. 2-ER-70, 97–99, 124. The Government's own FEIS records numerous irreversible impacts of the land transfer, calling it "a substantial threat to the perpetuation of cultural traditions of the Apache" with a "disproportionally adverse effect on Native American communities." 3-FEIS-871.

Although the Government has said Resolution Copper will allow "access to … Oak Flat," ECF 18-2 at 11, 27, this is "a hollow promise," Bumatay Op. 14-15. As Judge Bumatay explained, what is offered is access only to "the Oak Flat *campground*"—a handful of developed campsites and pit toilets comprising only 1% of Oak Flat. *Id.* at 14 (emphasis added); Mot. Opp. 8; 3-FEIS-854 ("only a small portion of Oak Flat" that "would not reduce the impact on tribal cultural heritage"). And even that is offered only temporarily and conditionally—to the extent "practicable," consistent with "safety," "until such time as the operation of the mine precludes continued public access," "as determined by Resolution Copper." P.L.113-291 § 3003(i)(3). Plaintiffs cannot carry out their religious practices while cut off from 99% of Oak Flat and subject to eviction and trespassing liability. 2-ER-70, 97–99, 124; Bumatay Op. 14-15.

Second, transfer allows Resolution Copper to immediately begin "preparatory activities that are likely to degrade the Oak Flat environment"—such as constructing "new shafts," "new roads," a "water treatment plant," an "admin building," and "substations." Bumatay Op. 13-14 (quoting 1-FEIS-57, Fig. 2.2.2-3). "Any of these construction activities may cause irreparable damage" to Oak Flat. *Id.* For this reason, Judge Bumatay rightly rejected as "absurd[]" the Government's argument that a land transfer can simply be rescinded by a court later. *Id.* at 15. Once title transfers, Resolution immediately has authority to "significant[ly] modif[y]" Oak Flat, and without a preliminary injunction, it may be too late to "unscramble the eggs." *Kettle Range Conservation Grp. v. BLM*, 150 F.3d 1083, 1087 (9th Cir. 1998); 1-FEIS-57; Mot. Opp. Ex.4 at 46; Bumatay Op. 13, 15. The transfer would also "negate[] the ability of the Tonto National Forest to regulate effects" on the environmental, cultural, and archaeological resources whose destruction disproportionately affects the Apaches. 2-FEIS-716, 780; 3-FEIS-824.

None of this is affected by the Government's representations that it won't transfer the land until after publication of a new FEIS—which, it says, could be "a matter of months"—and that it will give 30 days' notice before publication. ECF 22. This Court found those representations important at the emergency-motion stage, because (it reasoned) they undermined Plaintiffs' showing that they "need[] relief within 21 days to avoid irreparable harm.'" Order 1-2 (quoting 9th Cir. R. 27-3). But to be entitled

to a preliminary injunction on a *non*-emergency basis—as here—the plaintiff need only show a likelihood of irreparable harm during the pendency of *the litigation*. Wright & Miller, 11A Fed. Prac. & Proc. Civ. §2948.1 (3d ed.); *see Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020) ("The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability *to render a meaningful decision on the merits*." (emphasis added)). And litigating a case to completion can take years.

The law "affords the Western Apaches more than" the Government's "promises." Bumatay Op. 4. Given their strong showing of success on the merits, "[t]here is no justification" for requiring Plaintiffs to "remain under a constant threat that" the land will be transferred before they've had their day in court. *Diocese of Brooklyn*, 141 S. Ct. at 68.

***Balance of equities and public interest.*** The equities and the public interest "merge" when the Government is the defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both factors also "'tip sharply' in Apache Stronghold's favor." Bumatay Op. 18. For one thing, "the fact that Plaintiffs have raised serious" RFRA and "First Amendment questions compels a finding that … the balance of hardships tips sharply in Plaintiffs' favor." *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (cleaned up). And "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (cleaned up); *see also, e.g.*, *California v. Azar*, 911 F.3d 558, 582 (9th Cir.

2018) ("Protecting religious liberty and conscience is obviously in the public interest.").

The Government, for its part, has offered no statement of public interest except that the land transfer was the "judgment of Congress." Mot. Opp. 22. But RFRA was the judgment of Congress, too—not just a midnight rider slipped into a must-pass defense bill, but standalone legislation with overwhelming bipartisan support—and "it is clear that it would not be equitable or in the public's interest" to permit the Government "to violate the requirements of federal law." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (brackets omitted).

Moreover, there is no urgency to this transaction. The land transfer was proposed fifteen years ago and authorized by statute seven years ago. *See Resolution Copper: Hearing,* 112th Cong., 3 (2012). The copper will still be there when this litigation ends. And the Government's unilateral decision to withdraw FEIS and postpone the transfer for "months" (Mot. Opp. 5)—just six hours before its emergency response was due in this Court—only underscores that pausing the transfer causes no harm to the Government and furthers the public interest. *See* Bumatay Op. 18.

By contrast, the harm to Plaintiffs' religious exercise absent injunction is immediate, permanent, and irreversible—"completely devastat[ing] the Western Apaches' spiritual lifeblood." 1-ER-13. A temporary delay protecting the *status quo* would cost the Government nothing; permitting

the government to transfer the land before resolution of this litigation would cost Plaintiffs everything.

## CONCLUSION

The Court should reverse and remand for entry of a preliminary injunction preventing the transfer and destruction of Oak Flat.

Respectfully submitted,

/s/ *Luke W. Goodrich*

MICHAEL V. NIXON
101 SW Madison Street #9325
Portland, OR 97207
(503) 522-4257
*michaelvnixon@yahoo.com*

CLIFFORD LEVENSON
5119 North 19th Street, Suite K
Phoenix, AZ 85015
(602) 544-1900
*cliff449@hotmail.com*

LUKE W. GOODRICH
   *Counsel of Record*
MARK L. RIENZI
DIANA M. VERM
JOSEPH C. DAVIS
CHRISTOPHER PAGLIARELLA
DANIEL D. BENSON
KAYLA A. TONEY
THE BECKET FUND FOR
   RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
   Suite 400
Washington, DC 20006
(202) 955-0095

## STATEMENT OF RELATED CASES

Apache Stronghold is not aware of any related cases pending in this Court, pursuant to Ninth Circuit Rule 28-2.6.

/s/ *Luke W. Goodrich*
Luke W. Goodrich
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## 9TH CIRCUIT RULE 32-1 FOR CASE NUMBER 21-15295

I certify that this brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 13,109 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

/s/ *Luke W. Goodrich*
Luke W. Goodrich
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 18, 2021. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Luke W. Goodrich*
Luke W. Goodrich
*Counsel for Plaintiff-Appellant*

# ADDENDUM 1

Pertinent Constitutional Provisions, Treaties, and Statutes

# Table of Contents

**Page**

First Amendment ........................................................... 66

42 U.S.C. § 2000bb *et seq.* ............................................. 67

P.L.113-291 § 3003 ........................................................ 71

1852 Treaty of Santa Fe ................................................. 82

**First Amendment to the United States Constitution**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.***

**§ 2000bb. Congressional findings and declaration of purposes**

**(a) Findings**

The Congress finds that--

**(1)** the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

**(2)** laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

**(3)** governments should not substantially burden religious exercise without compelling justification;

**(4)** in *Employment Division v. Smith*, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

**(5)** the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

**(b) Purposes**

The purposes of this chapter are--

**(1)** to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205

(1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

**(2)** to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

## § 2000bb-1. Free exercise of religion protected

### (a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

### (b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

**(1)** is in furtherance of a compelling governmental interest; and

**(2)** is the least restrictive means of furthering that compelling governmental interest.

### (c) Judicial relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

## § 2000bb-2. Definitions

As used in this chapter--

68

**(1)** the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;

**(2)** the term "covered entity" means the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States;

**(3)** the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion; and

**(4)** the term "exercise of religion" means religious exercise, as defined in section 2000cc-5 of this title.

## § 2000bb-3. Applicability

### (a) In general

This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.

### (b) Rule of construction

Federal statutory law adopted after November 16, 1993, is subject to this chapter unless such law explicitly excludes such application by reference to this chapter.

### (c) Religious belief unaffected

Nothing in this chapter shall be construed to authorize any government to burden any religious belief.

## § 2000bb-4. Establishment clause unaffected

Nothing in this chapter shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion (referred to in this section as the "Establishment Clause"). Granting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this chapter. As used in this section, the term "granting", used with respect to government funding, benefits, or exemptions, does not include the denial of government funding, benefits, or exemptions.

**P.L.113-291 § 3003.**
## Southeast Arizona Land Exchange and Conservation.

(a) PURPOSE.–The purpose of this section is to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States.

(b) DEFINITIONS.–In this section:

(1) APACHE LEAP.–The term "Apache Leap" means the approximately 807 acres of land depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Apache Leap" and dated March 2011.

(2) FEDERAL LAND.–The term "Federal land" means the approximately 2,422 acres of land located in Pinal County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Federal Parcel-Oak Flat" and dated March 2011.

(3) INDIAN TRIBE.–The term "Indian tribe" has the meaning given the term in section 4 of the Indian Self-Determination and Education Assistance Act(25 U.S.C. 450b).

(4) NON-FEDERAL LAND.–The term "non-Federal land" means the parcels of land owned by Resolution Copper that are described in subsection(d)(1) and, if necessary to equalize the land exchange under subsection(c), subsection(c)(5)(B)(i)(I).

(5) OAK FLAT CAMPGROUND.–The term "Oak Flat Campground" means the approximately 50 acres of land comprising approximately

16 developed campsites depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Oak Flat Campground" and dated March 2011.

(6) OAK FLAT WITHDRAWAL AREA.–The term "Oak Flat Withdrawal Area" means the approximately 760 acres of land depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Oak Flat Withdrawal Area" and dated March 2011.

(7) RESOLUTION COPPER.–The term "Resolution Copper" means Resolution Copper Mining, LLC, a Delaware limited liability company, including any successor, assign, affiliate, member, or joint venturer of Resolution Copper Mining, LLC.

(8) SECRETARY.–The term "Secretary" means the Secretary of Agriculture.

(9) STATE.–The term "State" means the State of Arizona.

(10) TOWN.–The term "Town" means the incorporated town of Superior, Arizona.

(11) RESOLUTION MINE PLAN OF OPERATIONS.–The term "Resolution mine plan of operations" means the mine plan of operations submitted to the Secretary by Resolution Copper in November, 2013, including any amendments or supplements.

(c) LAND EXCHANGE.–

(1) IN GENERAL.–Subject to the provisions of this section, if Resolution Copper offers to convey to the United States all right, title, and

interest of Resolution Copper in and to the non-Federal land, the Secretary is authorized and directed to convey to Resolution Copper, all right, title, and interest of the United States in and to the Federal land.

\* \* \*

(8) USE OF FEDERAL LAND.—The Federal land to be conveyed to Resolution Copper under this section shall be available to Resolution Copper for mining and related activities subject to and in accordance with applicable Federal, State, and local laws pertaining to mining and related activities on land in private ownership.

(9) ENVIRONMENTAL COMPLIANCE.—

(A) IN GENERAL.—Except as otherwise provided in this section, the Secretary shall carry out the land exchange in accordance with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(B) ENVIRONMENTAL ANALYSIS.—Prior to conveying Federal land under this section, the Secretary shall prepare a single environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or

approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities.

(C) IMPACTS ON CULTURAL AND ARCHEOLOGICAL RESOURCES.—The environmental impact statement prepared under subparagraph (B) shall—

(i) assess the effects of the mining and related activities on the Federal land conveyed to Resolution Copper under this section on the cultural and archeological resources that may be located on the Federal land; and

(ii) identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources, if any.

(D) EFFECT.—Nothing in this paragraph precludes the Secretary from using separate environmental review documents prepared in accordance with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) or other applicable laws for exploration or other activities not involving—

(i) the land exchange; or

(ii) the extraction of minerals in commercial quantities by Resolution Copper on or under the Federal land.

(10) TITLE TRANSFER.—Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary shall convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper.

(d) Conveyance and Management of Non-Federal Land.—

(1) CONVEYANCE.—On receipt of title to the Federal land, Resolution Copper shall simultaneously convey–

(A) to the Secretary, all right, title, and interest that the Secretary determines to be acceptable in and to–

(i) the approximately 147 acres of land located in Gila County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-Turkey Creek" and dated March 2011;

(ii) the approximately 148 acres of land located in Yavapai County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel- Tangle Creek" and dated March 2011;

(iii) the approximately 149 acres of land located in Maricopa County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-Cave Creek" and dated March 2011;

(iv) the approximately 640 acres of land located in Coconino County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-East Clear Creek" and dated March 2011; and

(v) the approximately 110 acres of land located in Pinal County, Arizona, depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-Apache Leap South End" and dated March 2011; and

(B) to the Secretary of the Interior, all right, title, and interest that the Secretary of the Interior determines to be acceptable in and to—

(i) the approximately 3,050 acres of land located in Pinal County, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel-Lower San Pedro River" and dated July 6, 2011;

(ii) the approximately 160 acres of land located in Gila and Pinal Counties, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non- Federal Parcel-Dripping Springs" and dated July 6, 2011; and

(iii) the approximately 940 acres of land located in Santa Cruz County, Arizona, identified as "Lands to DOI" as generally depicted on the map entitled "Southeast Arizona Land Exchange and Conservation Act of 2011-Non-Federal Parcel- Appleton Ranch" and dated July 6, 2011.

(2) MANAGEMENT OF ACQUIRED LAND.—

(A) LAND ACQUIRED BY THE SECRETARY.—

(i) IN GENERAL.—Land acquired by the Secretary under this section shall—

(I) become part of the national forest in which the land is located; and

(II) be administered in accordance with the laws applicable to the National Forest System.

(ii) BOUNDARY REVISION.—On the acquisition of land by the Secretary under this section, the boundaries of the national forest shall be modified to reflect the inclusion of the acquired land.

(iii) LAND AND WATER CONSERVATION FUND.—For purposes of section 7 of the Land and Water Conservation Fund Act of 1965 (16 U.S.C. 4601-9), the boundaries of a national forest in which land acquired by the Secretary is located shall be deemed to be the boundaries of that forest as in existence on January 1, 1965.

(B) LAND ACQUIRED BY THE SECRETARY OF THE INTERIOR.—

(i) SAN PEDRO NATIONAL CONSERVATION AREA.—

77

(I) IN GENERAL.—The land acquired by the Secretary of the Interior under paragraph (1)(B)(i) shall be added to, and administered as part of, the San Pedro National Conservation Area in accordance with the laws (including regulations) applicable to the Conservation Area.

(II) MANAGEMENT PLAN.—Not later than 2 years after the date on which the land is acquired, the Secretary of the Interior shall update the management plan for the San Pedro National Conservation Area to reflect the management requirements of the acquired land.

(ii) DRIPPING SPRINGS.—Land acquired by the Secretary of the Interior under paragraph (1)(B)(ii) shall be managed in accordance with the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.) and applicable land use plans.

(iii) LAS CIENEGAS NATIONAL CONSERVATION AREA.—Land acquired by the Secretary of the Interior under paragraph (1)(B)(iii) shall be added to, and administered as part of, the Las Cienegas National Conservation Area in accordance with the laws (including regulations) applicable to the Conservation Area.

\* \* \*

(g) APACHE LEAP SPECIAL MANAGEMENT AREA.—

(1) DESIGNATION.—To further the purpose of this section, the Secretary shall establish a special management area consisting of Apache

Leap, which shall be known as the "Apache Leap Special Management Area" (referred to in this subsection as the "special management area").

(2) PURPOSE.—The purposes of the special management area are—

(A) to preserve the natural character of Apache Leap;

(B) to allow for traditional uses of the area by Native American people; and

(C) to protect and conserve the cultural and archeological resources of the area.

(3) SURRENDER OF MINING AND EXTRACTION RIGHTS.—As a condition of the land exchange under subsection (c), Resolution Copper shall surrender to the United States, without compensation, all rights held under the mining laws and any other law to commercially extract minerals under Apache Leap.

(4) MANAGEMENT.—

(A) IN GENERAL.—The Secretary shall manage the special management area in a manner that furthers the purposes described in paragraph (2).

(B) AUTHORIZED ACTIVITIES.—The activities that are authorized in the special management area are—

(i) installation of seismic monitoring equipment on the surface and subsurface to protect the resources located within the special management area;

(ii) installation of fences, signs, or other measures necessary to protect the health and safety of the public; and

(iii) operation of an underground tunnel and associated workings, as described in the Resolution mine plan of operations, subject to any terms and conditions the Secretary may reasonably require.

(5) PLAN.—

(A) IN GENERAL.—Not later than 3 years after the date of enactment of this Act, the Secretary, in consultation with affected Indian tribes, the Town, Resolution Copper, and other interested members of the public, shall prepare a management plan for the Apache Leap Special Management Area.

(B) CONSIDERATIONS.—In preparing the plan under subparagraph (A), the Secretary shall consider whether additional measures are necessary to—

(i) protect the cultural, archaeological, or historical resources of Apache Leap, including permanent or seasonal closures of all or a portion of Apache Leap; and

(ii) provide access for recreation.

(6) MINING ACTIVITIES.—The provisions of this subsection shall not impose additional restrictions on mining activities carried out by Resolution Copper adjacent to, or outside of, the Apache Leap area beyond

those otherwise applicable to mining activities on privately owned land under Federal, State, and local laws, rules and regulations.

\* \* \*

(i) MISCELLANEOUS PROVISIONS.—

(1) REVOCATION OF ORDERS; WITHDRAWAL.—

(A) REVOCATION OF ORDERS.—Any public land order that withdraws the Federal land from appropriation or disposal under a public land law shall be revoked to the extent necessary to permit disposal of the land.

\* \* \*

(3) PUBLIC ACCESS IN AND AROUND OAK FLAT CAMPGROUND.—As a condition of conveyance of the Federal land, Resolution Copper shall agree to provide access to the surface of the Oak Flat Campground to members of the public, including Indian tribes, to the maximum extent practicable, consistent with health and safety requirements, until such time as the operation of the mine precludes continued public access for safety reasons, as determined by Resolution Copper.

## 1852 Treaty of Santa Fe

\* \* \*

ARTICLE 7. The people of the United States of America shall have free and safe passage through the territory of the aforesaid Indians, under such rules and regulations as may be adopted by authority of the said States.

\* \* \*

ARTICLE 9. Relying confidently upon the justice and the liberality of the aforesaid government, and anxious to remove every possible cause that might disturb their peace and quiet, it is agreed by the aforesaid Apache's [sic] that the government of the United States shall at its earliest convenience designate, settle, and adjust their territorial boundaries, and pass and execute in their territory such laws as may be deemed conducive to the prosperity and happiness of said Indians.

\* \* \*

ARTICLE 11. This Treaty shall be binding upon the contracting parties from and after the signing of the same, subject only to such modifications and amendments as may be adopted by the government of the United States; and, finally, this treaty is to receive a liberal construction, at all times and in all places, to the end that the said Apache Indians shall not be held responsible for the conduct of others, and that the government of the United States shall so legislate and act as to secure the permanent prosperity and happiness of said Indians.

# ADDENDUM 2

Table of Cited Excerpts of the Final Environmental Impact Statement

**Table of Cited Excerpts of the Final Environmental Impact Statement**

| ER Cite | FEIS Cite | Excerpt |
|---|---|---|
| **VOLUME 1** | | |
| 3-ER-270 | 1-FEIS-ES-28 | "The NRHP-listed *Chí'chil Bildagoteel* Historic District TCP would be directly and permanently damaged by the subsidence area at the Oak Flat Federal Parcel." |
| 3-ER-271 | 1-FEIS-ES-29 | "Oak Flat is a sacred place to the Western Apache, Yavapai, O'odham, Hopi, and Zuni. It is a place where rituals are performed, and resources are gathered; its loss would be an indescribable hardship to those peoples…. Development of the Resolution Copper Mine would directly and permanently damage the NRHP-listed *Chí'chil Biłdagoteel* Historic District TCP. One or more Emory oak groves at Oak Flat, used by tribal members for acorn collecting, likely would be lost. Other unspecified mineral or plant collecting locations and culturally important landscapes are also likely to be affected…. Dewatering likely would impact between 18 and 20 GDEs, mostly sacred springs…. Burials are likely to be impacted. The numbers and locations of burials would not be known until such sites are detected as a result of project-related activities." |
| 3-ER-274 | 1-FEIS-9 | "The land surface overlying the copper deposit is located in an area that has a long history of use by Native Americans, including the Apache, O'odham, Puebloan, and Yavapai people…" |
| 3-ER-275 | 1-FEIS-10 | "As the ore moves downward and is removed, the land surface above the ore body also moves downward or 'subsides.' Analysts expect a 'subsidence' zone to develop near the East Plant Site; there is potential for downward movement to a depth between 800 and 1,115 feet. Resolution Copper projects the subsidence area to be up to 1.8 miles wide at the surface." |
| 3-ER-276 | 1-FEIS-31 | "[T]ailings storage facilities are permanent and remain part of the landscape in perpetuity." |
| 3-ER-277–78 | 1-FEIS-39–40 | "Construction and operation of the mine would profoundly and permanently alter the NRHP-listed *Chí'chil Biłdagoteel* … In addition, development of the proposed tailings storage facility at any of the four proposed or alternative locations would permanently bury or otherwise destroy many prehistoric and historic cultural artifacts, potentially including human burials." |

**Table of Cited Excerpts of the Final Environmental Impact Statement**

| 3-ER-280 | 1-FEIS-42 | "Construction and operation of the Resolution Copper Mine would, as a result of anticipated geological subsidence at the East Plant Site, permanently alter the topography and scenic character of the Oak Flat area." |
|---|---|---|
| 3-ER-282 | 1-FEIS-58 | "Approximately 1.37 billion tons of tailings would be created during the mining process and would be permanently stored at the tailings storage facility." |
| 3-ER-287 | 1-FEIS-84 | "Reclamation activities would not occur within the subsidence area. There would be a berm and/or fence constructed around the perimeter of the continuous subsidence area." |
| 3-ER-295 | 1-FEIS-149 | "All public access … would be eliminated on 7,490 acres." |
| 3-ER-296 | 1-FEIS-154 | "The NRHP-listed *Chí'chil Biłdagoteel* Historic District TCP would be directly and permanently damaged." |
| 3-ER-297 | 1-FEIS-156 | "Development of the Resolution Copper Mine would directly and permanently damage the NRHP-listed *Chí'chil Biłdagoteel* Historic District TCP... Dewatering or direct disturbance would impact between 18 and 20 groundwater dependent ecosystems, mostly sacred springs… Burials are likely to be impacted; the numbers and locations of burials would not be known until such sites are detected as a result of mine-related activities. Under this or any action alternative, one or more Emory oak groves at Oak Flat, used by tribal members for acorn collecting, would likely be lost. Other unspecified mineral- and/or plant-collecting locations would also likely be affected; historically, medicinal and other plants are frequently gathered near springs and seeps, so drawdown of water at these locations may also adversely affect plant availability." |
| 3-ER-299–300 | 1-FEIS-185–86 | "The removal of the Oak Flat Federal Parcel from Forest Service jurisdiction negates the ability of the Tonto National Forest to regulate effects on these resources from the proposed mine and block caving. … If the land exchange does not occur, not only would mineral exploration not take place within the 760-acre Oak Flat Withdrawal Area, but subsidence caused by block caving would not be allowed to impact the Withdrawal Area." |

84

**Table of Cited Excerpts of the Final Environmental Impact Statement**

| | | |
|---|---|---|
| 3-ER-302 | 1-FEIS-242 | "The primary impacts on vegetation communities during construction of the action alternatives would be associated with removal and/or crushing of natural, native species; increased potential for noxious and invasive weed establishment and spread; decreased plant productivity from fugitive dust; plant community fragmentation; and changes in plant growth and seasonal phenology from artificial lighting." |
| 3-ER-306, 314 | 1-FEIS-314, 323 | "The land exchange would have significant effects on transportation and access. …[P]ublic access would be lost to the parcel itself, as well as passage through the parcel to other destinations, including Apache Leap and Devil's Canyon." |
| **VOLUME 2** | | |
| 3-ER-314 | 2-FEIS-423 | "Mine dewatering at the East Plant Site under all action alternatives would result in the same irretrievable commitment of 160,000 acre-feet of water from the combined deep groundwater system and Apache Leap Tuff aquifer over the life of the mine. [E]ven if the water sources are replaced, the impact on the sense of nature and place for these natural riparian systems would be irreversible. In addition, the GDEs directly disturbed by the subsidence area or tailings alternatives represent irreversible impacts." |
| 3-ER-316 | 2-FEIS-529 | "Seepage from the tailings storage facilities has several unavoidable adverse effects. In all cases, the tailings seepage adds a pollutant load to the downstream environment… The potential impacts on water quality from tailings seepage would cause an irretrievable commitment of water resources downstream of the tailings storage facility, lasting as long as seepage continued." |
| 3-ER-321 | 2-FEIS-558 | "With respect to surface water flows from the project area, all action alternatives would result in both irreversible and irretrievable commitment of surface water resources." |
| 3-ER-322 | 2-FEIS-575 | "The entire subsidence area would be fenced for public safety…" |
| 3-ER-323 | 2-FEIS-600 | "The direct loss of productivity of thousands of acres of various habitat from the project components would result in both irreversible and irretrievable commitment of the resources… " |

**Table of Cited Excerpts of the Final Environmental Impact Statement**

| 3-ER-325 | 2-FEIS-620 | "The land exchange would have significant effects on recreation. … Additional recreational activities that would be lost include camping at the Oak Flat Campground, picnicking, and nature viewing. The campground currently provides approximately 20 campsites and a large stand of native oak trees." |
|---|---|---|
| 3-ER-328 | 2-FEIS-716 | "[O]nce the land exchange occurs, Resolution Copper could use hazardous materials on this land without approval." |
| 3-ER-329–30 | 2-FEIS-766–67 | "For all action alternatives, there would be an irretrievable loss of scenic quality from increased activity and traffic during the construction and operation phases of the mine... There would be an irretrievable, regional, long-term loss of night-sky viewing during project construction and operations because night-sky brightening, light pollution, and sky glow caused by mine lighting would diminish nighttime viewing conditions in the direction of the mine." |
| 3-ER-332–33 | 2-FEIS-773–74 | "In consultation with SHPO, ACHP, tribes, and other consulting parties, the Forest Service determined that the project will have an adverse effect on historic properties. However, because of the complexity of the project, all of the effects would not be known prior to implementation of the project." |
| 3-ER-334 | 2-FEIS-776 | "The project area is within the traditional territories of the Western Apache, the Yavapai, and the Akimel O'odham or Upper Pima. The histories of the Western Apache—a group that includes ancestors of the White Mountain, San Carlos, Cibecue, and Tonto Apache—tell of migrations into Arizona where they encountered the last inhabitants of villages along the Gila and San Pedro Rivers… In the 1870s, the Apache were forced onto reservations….However, not all Apache stayed on the reservations, and some continued to use the vicinity of the project area into the twentieth century." |
| 3-ER-336 | 2-FEIS-780 | "The removal of the Oak Flat Federal Parcel from Forest Service jurisdiction negates the ability of the Tonto National Forest to regulate effects on these resources. If the land exchange occurs, 31 NRHP-eligible archaeological sites and one TCP within the selected lands would be adversely affected. … [H]istoric properties leaving Federal management is considered an adverse effect, regardless of the plans for the land, meaning |

**Table of Cited Excerpts of the Final Environmental Impact Statement**

| | | |
|---|---|---|
| | | that, under NEPA, the land exchange would have an adverse effect on cultural resources." |
| 3-ER-339 | 2-FEIS-787 | "Even if recorded and documented, loss of these cultural sites contributes to the overall impact to the cultural heritage of the areas. … While the footprint of these projects is used as a proxy for impacts to cultural resources, effects on cultural resources extend beyond destruction by physical disturbance." |
| 3-ER-340–41 | 2-FEIS-789–90 | "Cultural resources and historic properties would be directly and permanently impacted. These impacts cannot be avoided within the areas of surface disturbance, nor can they be fully mitigated. … Physical and visual impacts on archaeological sites, tribal sacred sites, cultural landscapes, and plant and mineral resources caused by construction of the mine would be immediate, permanent, and large in scale. Mitigation measures cannot replace or replicate the historic properties that would be destroyed by project construction. The landscape, which is imbued with specific cultural attributions by each of the consulting tribes, would also be permanently affected…. The direct impacts on cultural resources and historic properties from construction of the mine and associated facilities constitute an irreversible commitment of resources. Archaeological sites cannot be reconstructed once disturbed, nor can they be fully mitigated. Sacred springs would be eradicated by subsidence or tailings storage facility construction and affected by groundwater drawdown. Changes that permanently affect the ability of tribal members to use known TCPs for cultural and religious purposes are also an irreversible commitment of resources." |
| **VOLUME 3** | | |
| 3-ER-344 | 3-FEIS-820 | "No tribe supports the desecration/destruction of ancestral sites. Places where ancestors have lived are considered alive and sacred. It is a tribal cultural imperative that these places should not be disturbed or destroyed for resource extraction or for financial gain. Continued access to the land and all its resources is necessary and should be accommodated for present and future generations. … The Resolution Copper Project and Land Exchange has a very high potential to directly, adversely, and permanently affect numerous cultural artifacts, sacred seeps and springs, traditional ceremonial areas, resource- |

**Table of Cited Excerpts of the Final Environmental Impact Statement**

| | | |
|---|---|---|
| | | gathering localities, burial locations, and other places of spiritual value to tribal members." |
| 3-ER-345 | 3-FEIS-821 | "We received numerous comments from tribal members about the sacredness and importance of Oak Flat to them, their lives, their culture, and their children. Many expressed their sadness and anger that their sacred place would be destroyed and that they would lose access to their oak groves and ceremonial grounds." |
| 3-ER-346 | 3-FEIS-824 | "Direct impacts on resources of traditional cultural significance (archaeological sites; burial locations; spiritual areas, landforms, viewsheds, and named locations in the cultural landscape; water sources; food, materials, mineral, and medicinal plant gathering localities; or other significant traditionally important places) would consist of damage, loss, or disturbance.… [T]he land exchange will have an adverse impact on resources significant to the tribes." |
| 3-ER-348 | 3-FEIS-826 | "In 2015, the Tonto National Forest, in partnership with the San Carlos Apache Tribe, composed a nomination for Oak Flat, the area originally known as *Chí'chil Biłdagoteel*, to be listed in the NRHP as a TCP … Places like springs, ancestral (archaeological) sites, plants, animals, and mineral resource locations are sacred and should not be disturbed or disrupted. The Oak Flat Federal Parcel slated to be transferred to Resolution Copper was once part of the traditional territories of the Western Apache, the Yavapai, the O'odham, and the Puebloan tribes of Hopi and Zuni. They lived on and used the resources of these lands until the lands were taken by force 150 years ago." |
| 3-ER-349–50 | 3-FEIS 827–28 | "After the signing of the Treaty of Guadalupe in 1848…Euro-American settlers began arriving in Western Apache lands in search of mineral wealth and ranching lands. …Several massacres of Apache by soldiers and civilians occurred from the 1850s through the 1870s, including the reported events at Apache Leap. In the 1870s, the Apache were forced off their lands and onto reservations… All these communities lost large portions of their homelands, including Oak Flat, and today live on lands that do not encompass places sacred to their cultures.… Knowing these places is vital to understanding Apache history and, therefore, identity. For the Western Apache, 'the |

**Table of Cited Excerpts of the Final Environmental Impact Statement**

| | | |
|---|---|---|
| | | people's sense of place, their sense of the tribal past, and their vibrant sense of themselves are inseparably intertwined' (Basso 1996:35). The Apache landscape is imbued with diyah, or power. Diyah resides in natural phenomenon like lightning, in things like water or plants, and in places like mountains. Gáán, or holy beings, live in important natural places and protect and guide the Apache people. They come to ceremonies to impart well-being to Apache, to heal, and to help the people stay on the correct path." |
| 3-ER-352 | 3-FEIS-833 | "[T]he tribal monitors recorded 594 special interest areas in the direct analysis area. Of the 594, 523 are described as cultural resources, 66 as natural resources, and 5 as both cultural and natural resources. The cultural resources generally correspond to prehistoric archaeological sites and were categorized by the tribal monitors as cultural areas, settlement areas, resource gathering areas, resource processing areas, agricultural areas, and other." |
| 3-ER-354 | 3-FEIS-837 | "Oak Flat is a sacred place to the Western Apache, Yavapai, O'odham, Hopi, and Zuni. It is a place where rituals are performed, and resources are gathered; its loss would be an indescribable hardship to those peoples. The following is the testimony of tribal members describing the spiritual significance of Oak Flat and what its loss would mean to their culture, especially Apache culture, in their own words." |
| 3-ER-355 | 3-FEIS-838 | "For as long as may be recalled, our People have come together here. We gather the acorns and plants that these lands provide, which we use for ceremonies, medicinal purposes, and for other cultural reasons.… These are holy, sacred, and consecrated lands which remain central to our identity as Apache People." [Congressional testimony of Dr. Wendsler Nosie] |
| 3-ER-356 | 3-FEIS-839 | "*Chí'chil Biłdagoteel* (also known as Oak Flat) is a Holy and Sacred site … where we pray, collect water and medicinal plants for ceremonies, gather acorns and other foods, and honor those that are buried here. … Emory oak groves at Oak Flat used by tribal members for acorn collecting are among the many living resources that will be lost along with more than a dozen other traditional plant medicine and food sources. … The impacts that will occur to Oak Flat will undeniably |

**Table of Cited Excerpts of the Final Environmental Impact Statement**

| | | |
|---|---|---|
| | | prohibit the Apache people from practicing our ceremonies at our Holy site. … Our connections to the Oak Flat area are central to who we are as Apache people. Numerous people speak of buried family members. … The destruction to our lands and our sacred sites has occurred consistently over the past century in direct violation of treaty promises and the trust obligation owed to Indian tribes. … [T]he United States incurred obligations to protect our lands from harm, and to respect our religion and way of life. Despite these obligations, the U.S. Government has consistently failed to uphold these promises or too often fails to act to protect our rights associated with such places like *Chí'chil Biłdagoteel*." [Congressional testimony of Dr. Wendsler Nosie] |
| 3-ER-357 | 3-FEIS-840 | "Throughout our history, Oak Flat continues as a vital part of the Apache religion, traditions, and culture. In Apache, our word for the area of Oak Flat is *Chí'chil Biłdagoteel* (a "Flat with Acorn Trees"). Oak Flat is a holy and sacred site, and a traditional cultural property with deep religious, cultural, archaeological, historical and environmental significance to Apaches, Yavapais, and other tribes. At least eight Apache Clans and two Western Apache Bands have documented history in the area. … A number of Apache religious ceremonies will be held at Oak Flat this Spring, just as similar ceremonies and other religions and traditional practices have been held for a long as long as Apaches can recall. We do so because Oak Flat is a place filled with power, a place Apaches go: for prayer and ceremony, for healing and ceremonial items, or for peace and personal cleansing. …In the Oak Flat area, there are hundreds of traditional Apache species of plants, birds, insects, and many other living things in the Oak Flat area that are crucial to Apache religion and culture. … Only the species within the Oak Flat area are imbued with the unique power of this area." [Congressional testimony of Terry Rambler] |
| 3-ER-358 | 3-FEIS-841 | "In the late 1800s, the U.S. Army forcibly removed Apaches from our lands, including the Oak Flat area, to the San Carlos Apache Reservation. We were made prisoners of war there until the early 1900s. Our people lived, prayed, and died in the Oak Flat area. … Since time immemorial, Apache religious ceremonies and traditional practices have been held at Oak Flat. |

**Table of Cited Excerpts of the Final Environmental Impact Statement**

| | | |
|---|---|---|
| | | Article 11 of the Apache Treaty of 1852, requires the United States to "so legislate and act to secure the permanent prosperity and happiness" of the Apache people. Clearly, H.R. 687 fails to live up to this promise." [Congressional testimony of Terry Rambler] |
| 3-ER-360 | 3-FEIS-843 | "How can we practice our ceremonies at Oak Flat when it is destroyed? How will the future Apache girls and boys know what it is to be Apache, to know our home when it is gone?... *Chí'chil Biłdagoteel* is a place where we pray, collect water and medicinal plants for ceremonies, gather acorns and other foods, and honor those that are buried here. We have never lost our relationship to *Chí'chil Biłdagoteel.*" [Congressional testimony of Naelyn Pike] |
| 3-ER-361 | 3-FEIS-844 | "My nine year old daughter dreams about having her Apache Sunrise dance ceremony at Oak Flat. The Apaches see Oak Flat differently—it is a church, a place for worship and the practice of our traditional religion. It is the center of our most sincerely held, religious beliefs, where diyť (sacred power) can be called upon via prayers. …At least eight Apache clans have direct ties to this location. Tribal members continue to visit Oak Flat for prayer and a wide range of traditional needs and practices. … I pray my son will have the opportunity to sweat at Oak Flat for the first time, when he becomes a young man. We have gone to many Apache spiritual ceremonies (Sunrise dances and Holy ground ceremonies) at Oak Flat." [DEIS comment of Terry Rambler] |
| 3-ER-362 | 3-FEIS-845 | "My family, my ancestors come from Oak Flat. I grew up there, praying, picking the medicine, picking the acorn, going to the springs, gaining the teachings of my role as an Apache woman so I can pass it down to my daughters. … My daughter, Nizhoni, held her Ceremony at Oak Flat in October 2014. … All the elements of the wind, fire, water, and land go into the Ceremony for my daughter. Everything Usen (Creator, God) has created has a significant role in the Ceremony got the 4 days that she prays, dances, connects with all the elements, connected to our ancestors, connected to the Holy Spirit. On the 3rd day of the Ceremony she is painted white with the white clay that is provided from Mother Earth, and that paint |

91

**Table of Cited Excerpts of the Final Environmental Impact Statement**

| | | |
|---|---|---|
| | | blesses all living beings, followed by the next day, the last day of the ceremony, she has to wash the paint off and give it back to the earth. . . . The exact springs she went to wash her paint off is being affected by Resolution Copper Mine already by dewatering the springs. You are already tampering with her life." [DEIS comment of Vanessa Nosie] |
| 3-ER-363 | 3-FEIS-846 | "For at least a half millennium through to the present day, members of our Tribe have utilized the Oak Flat area for traditional religious ceremonies, such as the Sunrise Dance... It is a place where Apache Holy Ground rituals occur, where we commune with and sing to our Creator God, and celebrate our holy spirits, including our mountain spirits, the Ga'an. It is a place filled with rock paintings and petroglyphs, what some may describe as the footprints and the very spirit of our ancestors, hallmarks akin to the art found in gothic cathedrals and temples, like the Western Wall in Jerusalem, St. Peter's Basilica in Vatican City, or Angor Wat in Cambodia. This is why I call Oak Flat the Sistine Chapel of Apache religion." [DEIS comment of Terry Rambler] |
| 3-ER-364 | 3-FEIS-847 | "I just recently had my coming of age ceremony at Oak Flat and being there meant a lot to me to have my ceremony in a place where all my ancestors used to be. If the Resolution Copper mine continues with destroying Oak Flat, then I will never have a sacred place to come back to or to show my kids where our ancestors gathered." [DEIS comment of Gouyen Brown-Lopez]<br><br>"Oak Flat is so important to me because I have a very strong connection with the land. Oak Flat gives me connection with my family and my past ancestors." [DEIS comment of Waya Brown]<br><br>"Oak Flat is also a place where our members still conduct traditional harvesting of plants important to our diet, such as acorns from Emory oaks, and healing plant-based medicines for a wide range of ailments. … The numerous natural elements, that come from these Holy Sites, are used as tools to conduct Religious Ceremonies, spiritual sweats, and Sunrise Ceremonies." [DEIS comment of Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold] |

**Table of Cited Excerpts of the Final Environmental Impact Statement**

| | | |
|---|---|---|
| 3-ER-365 | 3-FEIS-848 | "Distinctive features of the TCP include an Emory oak stand that Apache and Yavapai use to harvest acorn, and a nearby campground, constructed by the Civilian Conservation Corps, that provides a convenient place for family gatherings. All of these resources would be adversely affected by leaving Federal management. In particular, as described above, the loss of the ceremonial area and acorn-collecting area in Oak Flat would be a substantial threat to the perpetuation of cultural traditions of the Apache and Yavapai tribes, because healthy groves are few and access is usually restricted unless the grove is on Federal land." |
| 3-ER-369–70 | 3 FEIS-854–55 | "Maintaining access to Oak Flat Campground … represents only a small portion of Oak Flat, and would not reduce the impact on tribal cultural heritage caused by the destruction of the broader landscape due to the subsidence area. … Significant tribal properties and uses would be directly and permanently impacted. These impacts cannot be avoided within the areas of direct impact, nor can they be fully mitigated." |
| 3-ER-371 | 3-FEIS-856 | "Physical and visual impacts on TCPs, special interest areas, and plant and mineral resources caused by construction of the mine would be immediate, permanent, and large in scale. Mitigation measures cannot replace or replicate the tribal resources and traditional cultural properties that would be destroyed by project construction and operation. … Traditional cultural properties cannot be reconstructed once disturbed, nor can they be fully mitigated. Sacred springs would be eradicated by subsidence or construction of the tailings storage facility, and affected by groundwater drawdown. … For uses such as gathering traditional materials from areas that would be within the subsidence area or the tailings storage facility, the project would constitute an irreversible loss of resources." |
| 3-ER-372 | 3-FEIS-870 | "[T]he U.S. Department of State has acknowledged that internationally as well as domestically there is a link between extractive industries and sex trafficking of exploited women and girls, including Native American women. Within the United States, at least 506 cases have been identified. … Arizona has the third highest number of identified cases." |

**Table of Cited Excerpts of the Final Environmental Impact Statement**

| 3-ER-373 | 3-FEIS-871 | "Native American communities would be disproportionately affected by the land exchange. … Loss of the culturally important area of Oak Flat would be a substantial threat to the perpetuation of cultural traditions of the Apache and Yavapai tribes." |
|---|---|---|
| 3-ER-374 | 3-FEIS-875 | "Representatives of the Yavapai and Apache tribes have identified a number of areas that may be directly or indirectly affected by all alternatives as sacred landscapes and/or TCPs. Additionally, all of the consulting tribes consider all springs and seeps sacred, and all of the tribes strongly object to the development of a mine and placement of tailings in any culturally sensitive area…. [D]isturbance of the sites would result in a disproportionate impact on the tribes, given their historical connection to the land. … Additionally, the potential impacts on archaeological and cultural sites … are directly related to the tribes' concerns and the potential impacts on cultural identity and religious practices. Given the known presence of ancestral villages, human remains, sacred sites, and traditional resource-collecting areas that have the potential to be permanently affected, it is unlikely that compliance and/or mitigation would substantially relieve the disproportionality of the impacts on the consulting tribes." |