No. 21-15295

# In the United States Court of Appeals for The Ninth Circuit

APACHE STRONGHOLD,

Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA, ET AL.,

Defendants-Appellees.

Appeal from the United States District Court
for the District of Arizona
Honorable Steven P. Logan
(2:21-cv-00050-PHX-SPL)

## EXCERPTS OF RECORD VOLUME 3 of 3

MICHAEL V. NIXON
101 SW Madison Street #9325
Portland, OR 97207
(503) 522-4257
*michaelvnixon@yahoo.com*

CLIFFORD LEVENSON
5119 North 19th Street, Suite K
Phoenix, AZ 85015
(602) 544-1900
*cliff449@hotmail.com*

LUKE W. GOODRICH
  *Counsel of Record*
MARK L. RIENZI
DIANA M. VERM
JOSEPH C. DAVIS
CHRISTOPHER PAGLIARELLA
DANIEL D. BENSON
KAYLA A. TONEY
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*lgoodrich@becketlaw.org*

*Counsel for Plaintiff-Appellant*



United States Department of Agriculture

# **FINAL** Environmental Impact Statement
## Resolution Copper Project and Land Exchange





**Volume 1**

Forest Service          Tonto National Forest          MB-R3-12-10          ER266 January 2021

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by:
(1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410;
(2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer and lender.

**Front Cover photo captions**:

*Top*: Map of the Preferred Alternative Project location and the Tonto National Forest
*Bottom Left*: Oak Flat Federal Parcel

# Executive Summary

## ES-1.    Introduction

This executive summary provides an overview of the final environmental impact statement (FEIS) for the proposed Resolution Copper Project and Land Exchange (herein called the project). The FEIS describes the process undertaken by the U.S. Forest Service (Forest Service), a land management agency under the U.S. Department of Agriculture, to evaluate the predicted effects of and issues related to the submittal of a mining General Plan of Operations (GPO) by Resolution Copper Mining, LLC (Resolution Copper), along with a connected, legislatively mandated land exchange of Federal and private parcels in southeastern Arizona (figure ES-1).

This Executive Summary does not provide all details contained in the FEIS. Please refer to the FEIS, its appendices, or referenced reports for more information. The FEIS and supporting documents are available on the project website at https://www.ResolutionMineEIS.us/.

## ES-1.1    Background

Resolution Copper proposes developing an underground copper mine on unpatented mining claims on National Forest System (NFS) land near the town of Superior in Pinal County, Arizona, approximately 60 miles east of Phoenix. Resolution Copper is a limited liability company that is owned by Rio Tinto (55 percent) and BHP Copper, Inc. (45 percent). Rio Tinto is the managing member.

Resolution Copper has ties to the century-old Magma Mine located in Superior, Arizona. The Magma Mine began production in 1910. In addition to constructing substantial surface facilities in Superior, the Magma Mine created approximately 42 miles of underground workings.

In 1995, the Magma Copper Company discovered a copper deposit about 1.2 miles south of the Magma Mine through exploration of those underground workings. The ore deposit lies between 4,500 and 7,000 feet below the surface.

In 1996, BHP Copper, Inc., acquired the Magma Copper Company, along with the Resolution Copper Mine deposit. Later that year, BHP closed operations at the Magma Mine, but exploration of the copper deposit continued.

In 2001, Kennecott Exploration, a subsidiary of Rio Tinto, signed an earn-in agreement with BHP, and initiated a drilling program to further explore the deposit. Based on drilling data, officials believe the Resolution Copper Mine deposit to be one of the largest undeveloped copper deposits in the world, with an estimated copper resource of 1,970 billion metric tonnes at an average grade of 1.54 percent copper.

The portion of the Resolution Copper Mine deposit explored to date is located primarily on the Tonto National Forest and open to mineral entry under the General Mining Law of 1872. The copper deposit likely extends underneath an adjacent 760-acre section of NFS land known as the "Oak Flat Withdrawal Area." The 760-acre Oak Flat Withdrawal Area was withdrawn from mineral entry in 1955 by Public Land Order 1229, which prevented Resolution Copper from conducting mineral exploration or other mining-related activities. Resolution Copper pursued a land exchange for more than 10 years to acquire lands northeast of the copper deposit.

In December 2014, Congress authorized a land exchange pending completion of the environmental impact statement (EIS), as outlined in Section 3003 of the Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for Fiscal Year 2015 (which is referred to as Public Law [PL] 113-291). The exchange parcel to be conveyed to Resolution Copper includes not only the Oak Flat Withdrawal Area but also the NFS lands above the location of the copper deposit. This collective 2,422-acre tract of land is known as the "Oak Flat Federal Parcel."

The draft EIS (DEIS) was published for public review and comment in August 2019. The FEIS contains corrections, modifications, and additional analysis in direct response to public comments submitted on the DEIS. Appendix R of the FEIS contains written responses to all public comments received.

# ES-1.2    Project Overview

Resolution Copper is proposing to develop an underground copper mine at a site in Pinal County, about 60 miles east of Phoenix near Superior, Arizona. Project components include the mine site, associated infrastructure, a transportation corridor, and a tailings storage facility.

The project would progress through three distinct phases: construction (mine years 1 to 9), operations, also referred to as the production phase (mine years 6 to 46), and reclamation (mine years 46 to 51–56). At the end of operations, facilities would be closed and reclaimed in compliance with permit conditions.

Operational projections are removal of 1.4 billion tons of ore and production of 40 billion pounds of copper using a mining technique known as panel caving. Using this process, a network of shafts and tunnels is constructed below the ore body. Access to the infrastructure associated with the panel caving would be from vertical shafts in an area known as the East Plant Site, which would be developed adjacent to the Oak Flat Federal Parcel. This area would include mine shafts and a variety of surface facilities to support mining operations. This area currently contains two operating mine shafts, a mine administration building, and other mining infrastructure. Portions of the East Plant Site would be located on NFS lands and would be subject to Forest Service regulatory jurisdiction. Ore processing would take place at the old Magma Mine site in Superior.

Construction of a tailings storage facility would house the waste material left over after processing. The facility disturbance footprint would occupy from 2,300 to 5,900 acres, depending on the location and embankment design. Pipelines would be constructed to transport the tailings waste from the ore processing facility to the tailings storage facility.

The estimated total quantity of external water needed for the life of the mine (construction through closure and reclamation) is substantial and varies by alternative (180,000 to 590,000 acre-feet). Resolution Copper proposes to use water either directly from the Central Arizona Project (CAP) canal and/or groundwater pumped from the East Salt River valley. Over the past decade, Resolution Copper has obtained banked water credits for recharging aquifers in central Arizona; the groundwater pumped would be recovery of those banked water credits, or groundwater use authorized by the State of Arizona under a mineral extraction withdrawal permit.

While all mining would be conducted underground, removing the ore would cause the ground surface to collapse, creating a subsidence area at the Oak Flat Federal Parcel. The crater would start to appear in year 6 of active mining. The crater ultimately would be between 800 and 1,115 feet deep and roughly 1.8 miles across. The Forest Service assessed alternative mining techniques in an effort to prevent subsidence, but alternative methods were considered unreasonable.

# ES-3.  Summary of Impacts

## ES-3.1  Introduction

Information in chapter 3 of the FEIS describes the natural and human environment that may be affected by the proposed action and its alternatives and discloses the direct, indirect, and cumulative impacts that could occur as a result of implementation of the proposed action or alternatives. The effects of the legislated land exchange are also disclosed in the FEIS. Once the land exchange is completed, Forest Service management regulations would no longer apply on 2,422 acres of the Oak Flat Federal Parcel transferred to Resolution Copper; and 5,460 acres scattered across southeast Arizona would transfer from private ownership into Federal ownership and regulation.

## ES-3.2  Geology, Minerals, and Subsidence

This section describes known geological characteristics at each of the major facilities of the proposed mine—including alternative tailings storage locations—and how the development of the project may impact existing cave and karst features, paleontological resources, area seismicity, and unpatented mining claims. It also outlines subsidence impacts that would result from Resolution Copper's plans to extract the ore from below the deposit using a mining technique known as "block caving" or "panel caving." The analysis concludes the following:

- The subsidence zone at the Oak Flat Federal Parcel would break through to the surface at mine year 6, would be between 800 and 1,115 feet deep, and would be about 1.8 miles in diameter.

- No damage is expected to Apache Leap, Devil's Canyon, or U.S. Route 60 because of the subsidence. The mine is also unlikely to induce seismic activity that would cause damage.

- Some unpatented mining claims not belonging to Resolution Copper are located within the project footprint, and access to these claims may be inhibited.

## ES-3.3  Soils and Vegetation

This section explains how the proposed mine would disturb large areas of ground and potentially destroy native vegetation, including species given special status by the Forest Service, and encourage noxious or invasive weeds. The analysis concludes the following:

- Between 9,900 and 17,000 acres of soil and vegetation would be disturbed by the project.

- Revegetation success in these desert ecosystems is demonstrated. However, impacts to soil health and productivity may last centuries to millennia, and the ecosystem may not meet desired future conditions. The habitat may be suitable for generalist wildlife and plant species, but rare plants and wildlife with specific habitat requirements are unlikely to return.

- Arizona hedgehog cactus (endangered) may be impacted during operations at the East Plant Site, by ground subsidence, and by the pipeline/power line corridor for Alternative 6. The pipeline corridor associated with Alternative 5 would impact critical habitat for acuña cactus (endangered).

- Reclamation of disturbed areas would decrease but not eliminate the likelihood of noxious weeds becoming established or spreading.

# ES-3.7    Water Resources

This section analyzes how the Resolution Copper Project could affect water availability and quality in three key areas: groundwater quantity and groundwater-dependent ecosystems (GDEs); groundwater and surface water quality; and surface water quantity. The analysis concludes the following:

- Impacts to between 18 and 20 GDEs are anticipated. Six of these are springs that are anticipated to be impacted by groundwater drawdown under the no action alternative as a result of ongoing dewatering by Resolution Copper. When block-caving occurs, groundwater impacts expand to overlying aquifers, and two more springs are impacted. Direct disturbance within the project footprint would impact another six to nine springs or ponds. Depending on the alternative, GDEs associated with Queen Creek, Devil's Canyon, and the Gila River would be impacted as a result of reductions in surface runoff. The loss of water would be mitigated for some GDEs, but impacts to the natural setting would remain.

- Groundwater supplies in Superior and Top-of-the-World could be impacted by groundwater drawdown but would be replaced through mitigation.

- Over the mine life, 87,000 acre-feet of water would be pumped from the mine, and between 180,000 and 590,000 acre-feet of makeup water would be pumped from the Desert Wellfield in the East Salt River valley. Alternative 4, which uses filtered (dry-stack) tailings, requires the least amount of makeup water. The wellfield pumping would incrementally contribute to the lowering of groundwater levels and cumulatively reduce overall groundwater availability in the area.

- After closure, the reflooded block-cave zone could have poor water quality. However, a lake in the subsidence zone is not anticipated, and no other exposure pathways exist for this water.

- Stormwater runoff could have poor water quality, but under normal conditions no stormwater contacting tailings or facilities would be released during operations or post-closure until reclamation is successful. For some combination of extreme storms (300-year return period or greater) and operational upset conditions, stormwater could be released over the spillway of the seepage pond.

- All of the tailings facilities would lose seepage with poor water quality to the environment, and all are dependent on a suite of engineered seepage controls to reduce this lost seepage. Modeling indicates that seepage from Alternatives 2 and 4 would result in water quality problems in Queen Creek; Alternative 3 would not, but requires highly efficient seepage control to achieve this (99.5 percent capture). Seepage from Alternatives 5 and 6 does not result in any anticipated water quality problems. These two alternatives also have substantial opportunity for additional seepage controls if needed.

- There would be a reduction in average annual runoff as a result of the capturing of precipitation by the subsidence zone and tailings facilities, varying by alternative: 3.5 percent at the mouth of Devil's Canyon, between 6.5 and 8.9 percent in Queen Creek at Whitlow Ranch Dam, and between 0.2 and 0.5 percent in the Gila River. Alternative 4 also would result in an almost 20 percent loss of flow in Queen Creek at Boyce Thompson Arboretum.

- Under the Clean Water Act, Alternatives 2, 3, and 4 impact zero acres of jurisdictional waters, based on a decision by the USACE that no such waters exist above Whitlow Ranch Dam. Alternative 5 directly impacts about 180 acres, and Alternative 6 directly impacts about 130 acres of potentially jurisdictional waters.

ER271

# ES-3.8  Wildlife and Special Status Wildlife Species

This section describes how impacts to wildlife can occur from habitat loss and fragmentation, as well as from artificial lighting, noise, vibration, traffic, loss of water sources, or changes in air or water quality. The analysis concludes the following:

- Habitat would be impacted in the analysis area for about 50 special status wildlife species. General impacts include a high probability of mortality or injury with vehicles or from grading, increased stress due to noise, vibration, and artificial light, and changes in cover. Changes in behavior include changes in foraging efficiency and success, changes in reproductive success, changes in growth rates of young, changes in predator–prey relationships, increased movement, and increased roadkill.

- There would be loss and fragmentation of movement and dispersal habitats from the subsidence area and tailings storage facility. Ground-clearing and consequent fragmentation of habitat blocks for other mine-related facilities would also inhibit wildlife movement and increase edge effects.

- For Tonto National Forest and BLM sensitive wildlife species, the proposed project may adversely impact individuals but is not likely to result in a loss of viability in the analysis area, nor is it likely to cause a trend toward Federal listing of these species as threatened or endangered.

- The general removal of vegetation, increased activity, and potential changes in streamflow and associated riparian vegetation along Devil's Canyon could impact the yellow-billed cuckoo (threatened); during consultation under Section 7 of the Endangered Species Act, USFWS concurred that the project may affect, but will not likely adversely affect, the yellow-billed cuckoo and proposed critical habitat.

- The pipeline crossings of the Gila River under Alternative 5, including removal of vegetation and increased activity, could impact southwestern willow flycatcher (endangered).

- Critical habitat for Gila chub (endangered) occurs in Mineral Creek above Devil's Canyon. No individuals have been identified here during surveys, and this area is not anticipated to be impacted by groundwater drawdown. During consultation under Section 7 of the Endangered Species Act, USFWS concurred that the project may affect, but will not likely adversely affect, the Gila chub and designated critical habitat.

# ES-3.9  Recreation

This section quantifies, when possible, anticipated changes to some of the area's natural features and recreational opportunities as a result of infrastructure development related to the project. The analysis concludes the following:

- Public access (Tonto National Forest, Arizona State Land Department, and BLM lands) would be eliminated on 7,500 to 14,300 acres. Alternatives 2, 3, and 4 would result in 7,200 to 7,800 acres of access lost on Tonto National Forest land. Alternative 5 would primarily impact access to 2,600 acres of Tonto National Forest Land and 7,000 acres of BLM land, as well as 4,600 acres of Arizona State land, and Alternative 6 would primarily impact access to 10,700 acres, of which 8,200 acres is Arizona State land.

- There would be changes to the recreation opportunity spectrum acres within the Globe Ranger District, ranging from less than 1 percent of semi-primitive non-motorized, up to 3 percent of semi-primitive motorized, and less than 1 percent of roaded natural.

## ES-3.11   Scenic Resources

This section addresses the existing conditions of scenic resources (including dark skies) in the area of the proposed action and alternatives. It also addresses the potential changes to those conditions from construction and operation of the proposed project. The analysis concludes the following:

- All tailings facilities would be visible from long distances, and the change in contrast caused by land disturbance and vegetation removal, dust, and equipment would strongly impact viewers, including recreationists on scenic highways.

- Alternatives 2 and 3 would impact Arizona Trail users and off-highway vehicle users, as would Alternative 4. Alternative 4 would be the tallest facility when viewed (1,000 feet in height). It would dominate the scene and be viewable from sensitive locations (like Picketpost Mountain). Alternative 5 would also be highly visible and would impact Arizona Trail and off-highway vehicle users. Alternative 6 would be visible from within the valley of Dripping Spring Wash but otherwise would not be as visible on the landscape as the other alternatives.

## ES-3.12   Cultural Resources

This section analyzes potential impacts on all known cultural resources within the project area. The analysis concludes the following:

- The NRHP-listed *Chí'chil Bildagoteel* Historic District TCP would be directly and permanently damaged by the subsidence area at the Oak Flat Federal Parcel.

- All alternative areas would have 100 percent pedestrian surveys prior to ground disturbance; the majority of surveys have been completed. Any remaining acreage slated for ground disturbance or land sale would be inventoried per the Programmatic Agreement, and cultural sites identified and addressed in accordance with the Programmatic Agreement. From surveyed areas, the number of NRHP-eligible sites are as follows: Alternatives 2 and 3—120 eligible sites and 18 sites of undetermined eligibility would be directly affected, and 62 sites indirectly affected; Alternative 4—145 NRHP-eligible sites, 2 sites of undetermined eligibility would be directly affected, and 58 sites would be indirectly affected; Alternative 5—154 NRHP-eligible sites, 3 sites of undetermined eligibility would be directly affected, and 77 sites would be indirectly affected; and Alternative 6—377 NRHP-eligible sites, 3 sites of undetermined eligibility would be directly affected, and 58 sites would be indirectly affected.

## ES-3.13   Socioeconomics

This section examines the social and economic impacts on the quality of life for neighboring communities near the proposed mine. The analysis concludes the following:

- On average, the mine is projected to directly employ 1,434 workers, pay about $149 million per year in total employee compensation, and purchase about $490 million per year in goods and services. Including direct and multiplier effects, the proposed mine is projected to increase average annual economic value added in Arizona by about $1.2 billion.

- The proposed mine is projected to generate an average of between $80 and $120 million per year in State and local tax revenues and would also produce substantial revenues for the Federal Government, estimated at more than $200 million per year. There would be a loss of hunting revenue as a result of the tailings storage facilities. The loss would be highest in the Superior area with Alternatives 2, 3, and 4.

- Construction and operations of the proposed mine could affect costs for both the Town of Superior and Pinal County to maintain street and road networks and could strain public services. A number of agreements between Resolution Copper and the Town of Superior would offset impacts to quality of life, education, and emergency services.

- Property values are expected to decline in close proximity to the tailings storage facilities.

## ES-3.14   Tribal Values and Concerns

This section discusses the high potential for the proposed mine to directly, adversely, and permanently affect numerous cultural artifacts, sacred seeps and springs, traditional ceremonial areas, resource gathering localities, burial locations, and other places and experiences of high spiritual and other value to tribal members.

No tribe supports the desecration/destruction of ancestral sites. Places where ancestors have lived are considered alive and sacred. It is a tribal cultural imperative that these places should not be disturbed or destroyed for resource extraction or for financial gain. Continued access to the land and all its resources is necessary and should be accommodated for present and future generations. Participation in the design of this destructive activity has caused considerable emotional stress and brings direct harm to a tribe's traditional way of life; however, it is still deemed necessary to ensure that ancestral homes and ancestors receive the most thoughtful and respectful treatment possible.

- Oak Flat is a sacred place to the Western Apache, Yavapai, O'odham, Hopi, and Zuni. It is a place where rituals are performed, and resources are gathered; its loss would be an indescribable hardship to those peoples.

- Development of the Resolution Copper Mine would directly and permanently damage the NRHP-listed *Chí'chil Biłdagoteel* Historic District TCP. One or more Emory oak groves at Oak Flat, used by tribal members for acorn collecting, likely would be lost. Other unspecified mineral or plant collecting locations and culturally important landscapes are also likely to be affected.

- Dewatering likely would impact between 18 and 20 GDEs, mostly sacred springs. Although mitigation would replace water, impacts to the natural setting of these places would remain.

- Burials are likely to be impacted. The numbers and locations of burials would not be known until such sites are detected as a result of project-related activities.

## ES-3.15   Environmental Justice

This section examines issues in the context of the Resolution Copper Project and Land Exchange that have the potential to harm vulnerable or disadvantaged communities. The analysis concludes the following:

- There are four environmental justice communities in the area, as well as eight Native American communities, that would be impacted by cultural impacts described above. Impacts considered both high and disproportionate on environmental justice communities include impacts to scenic resources and dark skies, impacts to transportation networks, and impacts associated with tribal values and cultural resources. The town of Superior would experience the most direct impacts.

# Chapter 1. Purpose of and Need for Action

## 1.1    Introduction

The U.S. Forest Service (Forest Service) is a land management agency under the U.S. Department of Agriculture. The Forest Service's mission is to sustain the health, diversity, and productivity of the Nation's forests and grasslands to meet the needs of present and future generations.

The Tonto National Forest, a unit of the Forest Service located in south-central Arizona, prepared this environmental impact statement (EIS) to disclose the potential environmental effects of the Resolution Copper Project and Land Exchange (project). The project includes (1) the Southeast Arizona Land Exchange (land exchange), a congressionally mandated exchange of land between Resolution Copper Mining, LLC[1] (Resolution Copper) and the United States; (2) approval of the "General Plan of Operations" (GPO)[2] for any operations on National Forest System (NFS) land associated with a proposed large-scale underground mine (Resolution Copper Project); and (3) amendments to the "Tonto National Forest Land and Resource Management Plan" (forest plan) (1985, as amended).

> ### Overview
>
> On March 18, 2016, the Tonto National Forest issued a Notice of Intent to prepare an environmental impact statement for the Resolution Copper Project and Land Exchange.
>
> Three separate but related components are analyzed in the EIS:
>
> - Approval of a proposed mine plan governing surface disturbance on NFS lands outside of the exchange parcels from mining operations that are reasonably incident to extraction, transportation, and processing of copper and molybdenum that was submitted to the Tonto National Forest in November 2013
>
> - An exchange of the Oak Flat Federal Parcel (2,422 acres of NFS land) for eight parcels located throughout Arizona (5,344* acres of Resolution Copper land)
>
> - Approval of an amendment to the Tonto National Forest Plan, if needed.
>
> \* Resolution Copper increased the offered parcel by an additional 32 acres of privately held land that is adjacent to the 110 acres presented in PL 113-291 as part of the Apache Leap Special Management Area. The additional land was provided to allow for a more contiguous parcel and for ease of surveying.

Resolution Copper is a limited liability company that is owned by Rio Tinto (55 percent) and BHP (45 percent). Rio Tinto is the managing member.

In November 2013, Resolution Copper submitted a proposed GPO to the Forest Service for development and operation of a large-scale mine near Superior, Arizona (figure 1.1-1).[3] The proposed GPO sought authorization for surface disturbance on NFS lands for mining operations and processing of copper and molybdenum. The proposed mine would be located in the Globe and Mesa Ranger Districts. The Forest Service determined the proposed GPO to be complete in December 2014 (U.S. Forest Service 2014c). As proposed in the GPO, the mining portion of the project would occur on a mixture of private, State, and NFS lands.

---

[1] Resolution Copper Mining, LLC, is a U.S. corporation registered in Delaware.

[2] The GPO, as amended, is available online at http://www.resolutionmineeis.us/eis-documents, and at the Tonto National Forest Supervisor's Office, 2324 East McDowell Road, Phoenix, AZ 85006.

[3] The maps contained in this EIS are based on a variety of sources of electronic and geographic data. Every effort has been made to ensure the correctness of these data coverages; however, the U.S. Department of Agriculture Forest Service makes no warranty, expressed or implied, about the accuracy, reliability, completeness, or utility of geospatial data not developed specifically for the Resolution Copper Project and Land Exchange EIS.

ER275

However, in December 2014, Congress passed the Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act (NDAA) for Fiscal Year 2015 (which is referred to as Public Law [PL] 113-291 in this final EIS [FEIS]). Section 3003 of PL 113-291 (appendix A) authorizes and directs the Secretary of Agriculture to administer an exchange of NFS lands, which would convey 2,422 acres of NFS land in the area of the proposed mine to Resolution Copper in exchange for approximately 5,344 acres[4] of private land on eight parcels located elsewhere in eastern Arizona (see section 1.4.2).

The offered private lands would be transferred from Resolution Copper to the United States, to be administered by the Forest Service and the U.S. Department of the Interior Bureau of Land Management (BLM). Upon completion of the land exchange, it is expected that one of the largest copper mines in the United States would be established on the exchange parcel, with an estimated surface disturbance of 6,951 acres[5] (approximately 11 square miles). It would also be one of the deepest mines in the United States, with mine workings extending 7,000 feet beneath the surface.

Section 3003 of PL 113-291 explicitly requires the Secretary of Agriculture to prepare an EIS prior to conveying the Federal land. This EIS shall be used as the basis for all decisions under Federal law related to the proposed mine, the GPO, and any related major Federal actions, including the granting of permits, rights-of-way, or the approvals for construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities.

Section 3003 of PL 113-291 requires this EIS to assess the effects of mining and related activities on such cultural and archaeological resources that may be located on the NFS lands conveyed to Resolution Copper, and identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources, if any. The Secretary of Agriculture is further directed to engage in government-to-government consultation with affected Indian Tribes regarding issues of concern to the affected tribes related to the land exchange and, following such consultation, consult with Resolution Copper and seek to find mutually acceptable measures to address affected tribes' concerns and "minimize the adverse effects on the affected Indian Tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper" (see 16 United States Code [U.S.C.] 539p(c)(3)).

## 1.1.1    Document Structure

The Tonto National Forest prepared this EIS in compliance with the National Environmental Policy Act (NEPA) and other relevant Federal and State laws and regulations. This EIS discloses the direct, indirect, and cumulative environmental impacts that would result from the proposed action and alternatives.

This document has four volumes: volume 1, which contains an executive summary and chapters 1, 2, and the first portion of chapter 3; volume 2, which contains the remainder of chapter 3 and chapters 4–8; and volumes 3 and 4, which contain appendices. The general contents of each volume follow.

---

[4] Resolution Copper increased the offered parcel by an additional 32 acres of privately held land that is adjacent to the 110 acres presented in PL 113-291 as part of the Apache Leap Special Management Area. The additional land was provided to allow for a more contiguous parcel and for ease of surveying.

[5] This acreage includes a number of different facilities. See section 2.2.4 for full details.

The land surface overlying the copper deposit is located in an area that has a long history of use by Native Americans, including the Apache, O'odham, Puebloan, and Yavapai people currently represented by the following federally recognized tribes: Fort McDowell Yavapai Nation, Gila River Indian Community, Hopi Tribe, Mescalero Apache Tribe, Pueblo of Zuni, Salt River Pima-Maricopa Indian Community, San Carlos Apache Tribe, Tonto Apache Tribe, White Mountain Apache Tribe, Yavapai-Apache Nation, and Yavapai-Prescott Indian Tribe. The Forest Service maintains formal and informal consultations with these tribes and other interested and affected parties to better understand the historical, cultural, and religious importance of the area.

## 1.3    Purpose of and Need for Action

The purpose of and need for this project is twofold:

1.  To consider approval of a proposed mine plan governing surface disturbance on NFS lands outside of the exchange parcels from mining operations that are reasonably incident to extraction, transportation, and processing of copper and molybdenum.

2.  To disclose the effects of the exchange of lands between Resolution Copper and the United States as directed by Section 3003 of PL 113-291.

The role of the Forest Service under its primary authorities in the Organic Administration Act, Locatable Minerals Regulations (36 Code of Federal Regulations (CFR) 228 Subpart A), and the Multiple-Use Mining Act is to ensure that mining activities minimize adverse environmental effects on NFS surface resources and comply with all applicable environmental laws. The Forest Service may also impose reasonable conditions to protect surface resources. Through the Mining and Mineral Policy Act, Congress has stated that it is the continuing policy of the Federal Government, in the national interest, to foster and encourage private enterprise in

-   the development of economically sound and stable domestic mining, minerals, and metal and mineral reclamation industries; and

-   the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help ensure satisfaction of industrial, security, and environmental needs.

The Southeast Arizona Land Exchange and Conservation Act was included in a large public lands package containing 68 bills which was amended to the NDAA during the 113th Congress. The NDAA was signed into law by President Obama on December 19, 2014. Under the Southeast Arizona Land Exchange and Conservation Act, Resolution Copper would receive 2,422 acres of Federal land at the site of the future underground copper mine in exchange for 5,376 acres of privately owned conservation and recreation lands throughout Arizona after the completion of a FEIS. While the mine itself would be located on private land after the exchange is completed, ancillary mining operations would need to occur on NFS land, and possibly other Federal and non-Federal land, outside of the exchange parcel.

## 1.4    Proposed Action

The proposed action consists of (1) approval of a mining plan of operations on NFS land associated with a proposed large-scale mine, which would be on private land after the land exchange, (2) the land exchange between Resolution Copper and the United States as directed under PL 113-291, (3) amendment of the forest plan, if needed, and (4) mitigations to offset impacts from the proposed project.

It should be noted that the proposed action is one of several alternatives considered in the EIS. The proposed action should not be confused with the preferred alternative. The preferred alternative is identified in the executive summary and chapter 2 and is the agency's preference for implementation based on the alternatives evaluated and the current analysis.

## 1.4.1    General Plan of Operations

The following is a brief summary of the mining proposal components. A detailed description of the GPO can be found in section 2.2.2.2. The complete GPO is available on the project website, www.ResolutionMineEIS.us.

Resolution Copper proposes to conduct underground mining of a copper-molybdenum deposit located 4,500 to 7,000 feet below the ground surface within the exchange parcel. Resolution Copper estimates that the mine would take approximately 10 years to construct, would have an operational life of approximately 41 years, and would be followed by 5 to 10 years of reclamation activities.

The mining operation would include the following facilities and activities analyzed in the EIS, which would be conducted on a mixture of NFS, private, and State lands:

- The mining itself would take place under the Oak Flat Federal Parcel, which is to be transferred to Resolution Copper pursuant to Section 3003 of PL 113-291. Mining would use an underground mining technique known as panel caving. Resolution Copper would use this process to construct a network of shafts and tunnels below the ore body. They would access the tunnels from vertical shafts in an area known as the East Plant Site. The panel caving technique fractures ore with explosives; gravity moves the ore downward, and then Resolution Copper removes it from below the ore deposit. As the ore moves downward and is removed, the land surface above the ore body also moves downward or "subsides." Analysts expect a "subsidence" zone to develop near the East Plant Site; there is potential for downward movement to a depth between 800 and 1,115 feet. Resolution Copper projects the subsidence area to be up to 1.8 miles wide at the surface.

- An area known as the East Plant Site would be developed adjacent to the Oak Flat Federal Parcel. The East Plant Site is the location of the Magma Mine #9 Shaft and #10 Shaft and associated surface mining support facilities. This area would include mine shafts and a variety of surface facilities to support mining operations. This area currently contains two operating mine shafts, a mine administration building, and other mining infrastructure. Existing roads would provide access to the mine. Magma Mine Road would eventually be relocated as a result of the expected subsidence.[6]

- Resolution Copper would crush the mined ore underground and then transport it underground approximately 2.5 miles west to an area known as the West Plant Site. There, operations would process the ore to produce copper and molybdenum concentrates. The West Plant Site is the location of the old Magma Mine processing and smelter facilities in Superior. Portions of the West Plant Site would be located on NFS lands and would be subject to Forest Service regulatory jurisdiction. A flotation process would process the ore; no heap leach processing is proposed.

- The molybdenum concentrate would then be dried, bagged, and transported to market from the West Plant Site.

---

[6] A full description of subsidence can be found in section 2.2.2.2.

## 1.5.7 Financial Assurance for Closure and Post-closure Activities

### 1.5.7.1 Forest Service

The Forest Service mission of promoting healthy and resilient forests and grasslands is a key component for ensuring that the lands and resources the Forest Service manages are available for future generations. Mineral development on NFS lands is a temporary use of those lands, although some uses like tailings storage facilities are permanent and remain part of the landscape in perpetuity. Reclamation of mining sites is an integral part of all mine plans considered by the Forest Service, as is the requirement that adequate fiscal resources be available to ensure that reclamation can be conducted.

The primary authority for the Forest Service to require financial assurance is contained in the locatable mineral regulations (36 CFR 228 Subpart A). These include the requirement for a plan of operations to include provisions for reclamation: "The plan of operation shall include . . . measures to be taken to meet the requirements for environmental protection. . . ." (36 CFR 228.4). The regulations include specific requirements for financial assurance: "Any operator required to file a plan of operations shall, when required by the authorized officer, furnish a bond conditioned upon compliance with 228.8(g), prior to approval of such plan of operations" (36 CFR 228.13). The amount of financial assurance is also addressed by regulation: "In determining the amount of the bond, consideration would be given to the estimated cost of stabilizing, rehabilitating, and reclaiming the area of operations" (36 CFR 228.13b).

Reclamation and financial assurance requirements are summarized in Forest Service guidance (U.S. Forest Service 2004), which notes that while in the past long-term maintenance, monitoring, and interim management have not been included in bonding or financial assurance estimates, it is now accepted practice to include these items. The Forest Service guidance notes that: "A basic premise of the estimate is that the operator is not available to complete the reclamation and the Forest Service would need to do the reclamation work" (U.S. Forest Service 2004).

However, funding of long-term maintenance and monitoring has always posed a logistical problem, because of the long time frames that would be required. In 2015, the Forest Service issued guidance for establishment of long-term trusts for future large mines, with the intent of eliminating the growing mine-related liabilities on NFS lands (U.S. Forest Service 2015a). The guidance allows the Forest Service to accept trust accounts from operators of large mines by establishing a trust with the Forest Service as a benefactor to address long-term liabilities such as water treatment, dam maintenance, and care and maintenance of infrastructure, which may be required for many years (or centuries) beyond a planned or unplanned mine closure. Use of a long-term trust is one method that will be considered to provide fiscal resources to ensure maintenance and monitoring that extend beyond the closure of the mine.

More detail on financial assurances specific to individual resources can be found in Section 3.3, Soils, Vegetation, and Reclamation; and Section 3.7.2, Groundwater and Surface Water Quality.

The above discussion is specific to the Forest Service mineral regulations (36 CFR 228 Subpart A). If the project pipelines and utilities are instead approved under special use regulations (36 CFR 251), a different regulatory framework would be used for financial assurances. The special use authorization would incorporate terms and conditions (36 CFR 251.56), including minimizing damage to the environment, protecting the public interest, and requiring compliance with water and air quality standards. Pursuant to 36 CFR 252.56(e), the Forest Service may require the holder to furnish a bond or other security to secure all or any of the obligations imposed by the terms of the authorization or by any applicable law, regulation, or order.

other consulting parties. The PA outlines the roles and responsibilities of parties, the procedure for identification and evaluation of historic properties, assessment for effects, and each party's responsibilities for resolving adverse effects from the project. Several versions of the PA were sent out to the consulting parties, including the tribes, for review and comment. Comments were received and incorporated into each new draft of the PA. In addition, the Forest Service held meetings with the tribes to discuss the PA on October 28 and 29, 2019. The final version of the PA circulated for signature is included as appendix O of the FEIS.

The Section 106 process is described in more detail in Section 3.12 Cultural Resources of the FEIS, as well as in Chapter 5 Consulted Parties.

## 1.7    Issues

Issues serve to highlight effects or unintended consequences that may occur from the proposed action and alternatives, giving opportunities during the analysis to reduce adverse effects and compare trade-offs. Issues help set the scope of the actions, alternatives, and effects to consider in our analysis (FSH 1909.15.12.4) (U.S. Forest Service 2012a).

Comments submitted during the scoping period were used to formulate issues concerning the proposed action. Issues are statements of cause and effect, linking environmental effects to actions (FSH 1909.15.12.41) (U.S. Forest Service 2012a). The EIS ID team separated the issues into two groups: significant and non-significant. Significant issues were defined as those directly or indirectly caused by implementing the proposed action. Non-significant issues as identified by CEQ regulations include issues that are outside the scope of the proposed action; already decided by law, regulation, forest plan, or other higher level decision; irrelevant to the decision to be made; or conjectural and not supported by scientific or factual evidence.

The CEQ NEPA regulations state that the EIS should "identify and eliminate from detailed study the issues which are not significant, or which have been covered by prior environmental review (Sec. 1506.3)." A list of non-significant issues and reasons regarding their categorization as non-significant may be found in the project record.[12]

While completing the EIS analysis, some factors and issues formulated during scoping were modified to accurately analyze the resource impacts. Appendix E, Table E-1, Alternatives Impact Summary, documents the issues and issue factors used or modified during the EIS analysis.

The following issue summaries represent brief synopses of the 14 major project issues that were developed from input provided by agencies, tribes, stakeholders, and the public during scoping for this EIS. Many of the identified primary issues were then subdivided into detailed sub-issues in an effort to more fully and accurately capture the concerns expressed. The complete listing of primary issues and sub-issues is included in Appendix E, Table E-1, Alternatives Impact Summary, as well as in the "Resolution Copper Project and Land Exchange Environmental Impact Statement: Final Summary of Issues Identified Through Scoping Process" (Issues Report), available at https://www.resolutionmineeis.us/documents/usfs-tonto-issues-report-201711.

## 1.7.1    Issue 1 – Tribal Values and Concerns

Tribes are concerned about current and future adverse effects on area resources from the Resolution Copper Project, as well as other ongoing mining, transportation, energy transmission, pipeline, and other

---

[12] See "Resolution Copper Project and Land Exchange Environmental Impact Statement FINAL Summary of Issues Identified Through Scoping Process" (U.S. Forest Service 2017i).

**ER280**

developments in and around the Superior region. These affected resources may include physical resources such as access routes, air, groundwater and surface water, plant and animal life, and landscapes, as well as less tangible attributes such as sense of place; sense of historical, spiritual, religious, and tribal identity; opportunities for solitude; and opportunities to continue traditional cultural practices and ceremonies.

## 1.7.2    Issue 2 – Socioeconomics

Construction and operation of the Resolution Copper Project would result in substantial economic and "quality of life" changes—both beneficial and adverse—in the greater Superior area. A large influx of workers to the area would lead to greater demands for housing and capacity pressures on local schools, hospitals, and other medical service providers, as well as on municipal infrastructure such as roads, water and sewer systems, and electrical and communications systems. Conversely, this same influx of workers would contribute to greater retail spending on goods and consumer services in the area and to increased tax revenues to local, county, and state governments. Residential and commercial property values may increase for some but decline for those whose properties are considered negatively affected by proximity to mine facilities (such as the tailings storage area). Some qualities of rural life may be diminished through increased traffic and a possible decrease in local recreational opportunities.

## 1.7.3    Issue 3 – Environmental Justice

Economic benefits may not be experienced by all sectors of society equally; historically, minority and low-income communities (including tribal communities) in a given area tend to accrue less benefit from large-scale land development and mining projects than the population of the area as a whole. In addition, it is possible that minority and low-income communities may be disproportionately affected by adverse environmental effects, potentially including greater risks to human health and safety.

## 1.7.4    Issue 4 – Cultural Resources

Construction and operation of the mine would profoundly and permanently alter the NRHP-listed *Chí'chil Bildagoteel* (Oak Flat) Historic District Traditional Cultural Property (TCP) through anticipated large-scale geological subsidence. Linear facilities, including new pipelines, power lines, and roads, as well as other facilities such as electrical substations, would also be constructed in support of mine operations. In addition, development of the proposed tailings storage facility at any of the four proposed or alternative locations would permanently bury or otherwise destroy many prehistoric and historic cultural artifacts, potentially including human burials. Disturbance of known or unknown cultural resources is an impact that is important to many tribes, regardless of whether data recovery is undertaken. Under the terms of the land exchange, the Oak Flat Federal Parcel would leave Forest Service jurisdiction. Historic properties leaving Federal management is considered an adverse effect.

## 1.7.5    Issue 5 – Public Health and Safety

Construction and ongoing operation of the mine may have a variety of adverse effects on public health and safety. These concerns have focused principally on possible risks of breach or other failure of the tailings facility embankment; emissions and negative effects on air quality; possible seepage from or other contamination related to the tailings facility fouling local groundwater supplies; the potential for hazardous material/chemical spills; conflicts between mine-related haul truck and employee vehicles and residential traffic (including pedestrians); possible safety issues resulting from the anticipated subsidence in the Oak Flat area; and potentially increased risk of wildfire from mine operations.

## 1.7.6    Issue 6 – Water Resources

Potential effects on groundwater and surface water resources from construction, operation, closure, and reclamation of the Resolution Copper Mine is a multi-faceted and complex issue. In many ways, groundwater and surface waters are interconnected, and depletions and geochemical or other alterations of one are likely to affect the other, as well as to affect water-dependent resources such as vegetation and wildlife.

This issue is further complicated by the highly complex geological setting in which the Resolution Copper Mine would be constructed, which would be permanently altered by large-scale ore removal and geological subsidence. The resulting 7,000-foot-deep area of fractured rock and approximately 1.8-mile-wide subsidence area at the surface of Oak Flat, together with ongoing mine dewatering, would be likely over time to result in measurable reductions in flows in Devil's Canyon and Queen Creek and the long-term loss of some seeps and springs in the Superior area.

In addition, a tailings storage facility at either the proposed (Near West) location or at any of the three alternative sites (Silver King, Peg Leg, and Skunk Camp) would, through necessary stormwater management and seepage control practices, reduce the amount of surface water available in that particular watershed. The tailings storage facility also presents risks to the watershed through the potential for contaminants from metals or chemicals in tailings seepage to escape controls and enter groundwater and/or downstream surface waters, thereby potentially threatening riparian areas and other wildlife habitats, human uses, and waters provided to livestock.

## 1.7.7    Issue 7 – Biological Resources

Mine development has the potential to adversely affect local flora and fauna, including through direct injury or mortality; habitat alteration and loss; habitat fragmentation; reduction in water available to the ecosystem; disturbance by vehicular traffic, increased noise, and increased light; potential exposure to toxic chemicals or other hazardous substances; introduction and/or propagation of noxious or invasive plant species; and curtailed reproduction, pollination, seed dispersal, and other biological processes.

## 1.7.8    Issue 8 – Air Quality

Construction, ongoing ore recovery and processing, and other related activities at the mine and along transportation and utility corridors would increase dust, airborne chemicals, and transportation-related (mobile) emissions in the area, which has the potential to result in exceedances of one or more established air quality standards.

## 1.7.9    Issue 9 – Long-term Land Suitability

The mining proposed in the GPO is expected to cause large-scale surface subsidence in the Oak Flat area, eventually resulting in a subsidence area up to 1.8 miles in diameter at the surface and between 800 and 1,115 feet deep. In addition, mine-related ground disturbance from clearing vegetation, grading, and stockpiling soils or equipment or other materials has the potential to compact soils, accelerate erosion, and reduce soil productivity. Damage, disturbance, contamination, or removal of soil may result in a long-term loss of soil productivity, physical structure, and ecological function across the proposed mine site as well as on lands downgradient of mine facilities.

## 1.7.10    Issue 10 – Recreation

Mine development in the Oak Flat area, including within the anticipated subsidence area and, ultimately, at Oak Flat Campground, would eliminate numerous recreational opportunities in this part of the Tonto National Forest. Much of the area would be fenced off and no longer accessible to hikers, rock climbing enthusiasts, cyclists, equestrians, campers, hunters, and other recreational users of these former public lands.

Mine-related linear facilities such as pipelines, power lines, and development within the MARRCO corridor may also sever connectivity of existing roads and trails and further limit recreational access. In addition, construction of a large tailings storage facility and associated pipeline and power line corridors could directly impact the Arizona National Scenic Trail or alter the user experience. Wherever constructed, the area of such a facility would be closed to all recreational uses, resulting in displacement of existing recreation in that area to other locations. Similarly, the exchange of the Oak Flat Federal Parcel would reduce the Federal land base available for recreation and alter recreation access.

## 1.7.11    Issue 11 – Scenic Resources

Construction and operation of the Resolution Copper Mine would, as a result of anticipated geological subsidence at the East Plant Site, permanently alter the topography and scenic character of the Oak Flat area. Development of a proposed tailings storage facility at any of the four alternative locations now being considered would ultimately result in a new and permanent landform approximately 3,200 to 5,800 acres in area (depending on the alternative) and several hundred feet higher than the current landscape, thus forever altering the existing viewsheds. New utility lines and construction of other mine facilities and infrastructure at the West Plant Site, East Plant Site, and filter plant and loadout facility would alter existing viewsheds, although some of these facilities may be removed and the associated areas reclaimed following mine closure. Changes to viewsheds could alter the user experience along scenic highways and the Arizona National Scenic Trail.

## 1.7.12    Issue 12 – Transportation and Access

Transportation of personnel, equipment, supplies, and materials related to mine development, operation, and reclamation would increase traffic in and around the town of Superior. Increased mine-related traffic on local roads and highways has the potential to impact local and regional traffic patterns, levels of service, and planned transportation projects and users of NFS roads. Increased mine-associated rail traffic along the MARRCO corridor also has the potential to impact traffic patterns in the local area.

Mine development is likely to result in permanently altered, added, or decommissioned NFS roads or to temporarily restrict access to NFS roads and lands, which could impact recreational users, visitors, and permittees.

## 1.7.13    Issue 13 – Noise and Vibration

Development, operation, and reclamation of the mine would result in an increase in noise and vibration in the immediate vicinity of mine facilities. Activities that could increase noise and vibration include blasting, underground conveyance of ore, processing operations, operations at the filter plant and loadout facility, and, in the Oak Flat area, episodic land subsidence events. Increases in traffic associated with worker commuting, material delivery, and mine product shipment could also contribute to an overall increase in noise and vibration on area roads and highways.



**Figure 2.2.2-3. Mine phases, time frames, and mine activities by phase**

### Mining Process Overview

The Resolution Copper Mine, including all facilities described in this document, would operate 24 hours per day, 365 days per year. Figure 2.2.2-4 shows an overview of the entire mining process that would occur at full operation.

Mining the copper deposit would occur between approximately 4,500 and 7,000 feet below ground. At full operation, underground mining would produce 132,000 to 165,000 tons of ore per day. Ore would be crushed underground before being transported to two production shafts that would hoist the ore to an offloading station approximately halfway to the surface. From the offloading station, a conveyor system would transport the ore underground to the concentrator complex at the West Plant Site, approximately 2.25 miles west of the East Plant Site.

Resolution Copper Project and Land Exchange



**Figure 2.2.2-4. Overview of the mining process at full operation**

Once arriving at the concentrator complex, the ore would either be processed right away or stockpiled for future processing at a covered stockpile. The ore would then be conveyed into a concentrator building for additional crushing and grinding to a sand-size fraction and then further processed by flotation, whereby copper and molybdenum minerals are separated from non-economic minerals in a water bath with the addition of air and reagents. This process produces two products: molybdenum concentrate and copper concentrate. The molybdenum concentrate would be sent to the molybdenum plant for additional processing, packaging, and delivery to market via truck. Approximately 24,145 tons of molybdenum concentrate would be produced per year and sent to market during the operations phase. The copper concentrate slurry would be partially dewatered and pumped about 21 miles to the filter plant and loadout facility through two 8-inch high-density polyethylene (HDPE)-lined steel pipelines that would be located within the MARRCO corridor.

At the filter plant and loadout facility, copper concentrate would be filtered to remove more water and prepared for transport by railcar to Magma Junction for unloading at the Union Pacific Railroad. During the operations phase, between 6,000 and 7,000 wet tons per day of copper concentrate would be produced and sent out for smelting at an off-site smelter. The final smelter destination is unknown at this time. Water recovered during the filter process would be returned to the process water pond at the West Plant Site through the mine's main water supply pipeline in the MARRCO corridor.

The non-economic sand-like material that remains after the ore has been crushed and the copper and other valuable minerals has been extracted is called tailings. Tailings would be sent to a tailings storage facility approximately 4.7 miles west of the West Plant Site through two pipelines (48-inch pipe for NPAG, 24-inch pipe for PAG; reclaimed water would return to West Plant Site in an 18-inch pipe).

Approximately 1.37 billion tons of tailings would be created during the mining process and would be permanently stored at the tailings storage facility. Tailings leaving the processing plant would be split into two separate streams. About 16 percent of the tailings are classified as potentially acid generating,



**Figure 2.2.2-5. Predicted mining subsidence areas and the East Plant Site area**

ER286

Resolution Copper Project and Land Exchange

### *Operations Processes and Activities*

TRANSPORTATION

Each mine facility would have distinct access routes and traffic volumes during the construction, operations, and reclamation and closure phases. For detailed calculations of predicted traffic volumes that would be generated by the mine, including employee traffic, see the "Transportation and Access" resource section in chapter 3. Table 2.2.2-6 summarizes the access roads that would be used for each of the four main facilities and the materials and equipment deliveries that would occur during the construction and operation phases.

**Table 2.2.2-6. Existing and proposed mine access roads and traffic**

| Facility | Access Routes | Construction Phase Materials and Equipment Traffic | Operation Phase Materials and Equipment Traffic | Closure and Post-closure Materials and Equipment Traffic |
|---|---|---|---|---|
| East Plant Site | Magma Mine Road from U.S. Route 60 (U.S. 60) | Materials deliveries would consist of fuel, underground concrete, underground production consumables, construction steel, other construction materials, and construction concrete. Major process equipment would be delivered over a 4-year period during the construction phase and would consist of crushers, conveyors, rail dump station, locomotives and railcars, ventilation equipment, hoisting equipment, dewatering equipment, and batch plants. | Materials deliveries would consist of fuel, underground concrete, and underground production consumables. | Salvageable equipment, unused chemical reagents, instrumentation, or other salvageable materials would be removed from site. Structures and other facilities would be demolished and/or dismantled and removed from site. Any contamination would be disposed of as appropriate. Replacement of growth media for revegetation would be delivered if not enough found within the footprint or stockpile. |
| West Plant Site | Main entrance: Rerouted Silver King Mine Road (NFS Road 229) from U.S. 60 and Main Street/Lone Tree (Smeltertown) Road | Materials deliveries would consist of concrete, rebar, structural steel, handrails/stairs, prefabricated buildings, chutes/launders, tanks, pipe, electrical equipment, overhead transmission line, semi-autogenous grinding mills, ball mills, and flotation cells. These shipments would occur during a 3-year period within the construction phase. | Materials deliveries would consist of semi-autogenous mill balls, ball mill balls, regrind mill balls, lime, sodium hydrosulfide, and miscellaneous reagents. Molybdenum concentrate shipments would leave the site daily from the concentrator complex. | Same as East Plant Site |
| Tailings storage facility | From U.S. 60 at three locations: service road adjacent to tailings pipeline corridor, Hewitt Canyon Road (NFS Road 357), and NFS Road 8 | Materials and equipment deliveries would consist of pipe, valves, concrete, asphalt, and structural steel. These shipments would occur during a 3-year period within the construction phase. | Material deliveries would primarily consist of equipment and replacement equipment to operate spigots, recycle barges and pumps, and seepage collection systems. | Same as East Plant Site |

| Facility | Access Routes | Construction Phase Materials and Equipment Traffic | Operation Phase Materials and Equipment Traffic | Closure and Post-closure Materials and Equipment Traffic |
|---|---|---|---|---|
| Filter plant and loadout facility | East Skyline Road; rail via MARRCO corridor | Materials and equipment deliveries would consist of pipe, valves, concrete, asphalt, and structural steel. These shipments would occur during a 3-year period within the construction phase. | Filtered copper concentrate would be loaded and shipped 7 miles along the MARRCO corridor by rail car to Magma Junction where the rail line meets the Union Pacific Railroad. Final smelter destination is unknown at this time. | Same as East Plant Site |

ELECTRICITY SUPPLY AND TRANSMISSION LINES

Electricity is currently supplied to the East Plant Site by an existing 115-kilovolt (kV) SRP transmission line and to the West Plant Site by an existing 500-kV SRP transmission line to existing facility substations. Construction and operation of the proposed mine would require electrical transmission lines between these main facilities to accommodate greater power needs, as well as new transmission lines to power the new tailings storage facility, new filter plant, and loadout facility. Substations also would need to be upgraded and/or new 230-kV substations would need to be constructed to accommodate electricity from the upgraded lines and distribute the electricity throughout the site (see East Plant Site, West Plant Site, tailings storage facilities, and filter plant and loadout facilities descriptions earlier in this chapter for upgraded/new substation descriptions).

We estimated power use by the mine in the DEIS (Garrett 2019c). Power use ramps up over time and varies slightly by tailings alternative, but during full operations is estimated to be approximately 250 to 280 megawatts (MW). The primary electricity consumers at the mine site would be as follows:

1. The hoist motors at the East Plant Site that raise the ore out of the mine (roughly 20 to 25 percent of total power use), and underground ore flow (roughly 10 to 15 percent of total power use).

2. The ventilation and cooling systems at the East Plant Site for the underground mine (roughly 10 to 15 percent of total power use).

3. The operation of the grinding and flotation machinery at the concentrator complex at the West Plant Site (roughly 40 to 50 percent of total power use).

4. For Alternatives 5 and 6, pumping of tailings to the tailings storage facility (roughly 5 to 10 percent of total power use). Note that Alternatives 2 and 3 use gravity flow to deliver the tailings to the tailings storage facility, and do not require substantial power for tailings pumping.

5. For Alternative 4, filtering of tailings prior to placement (roughly 5 to 10 percent of total power use).

SRP would provide all electricity used at the mine facilities through the upgraded and new transmission lines. Figure 2.2.2-15 shows the proposed upgraded and new SRP transmission lines that would supply the main facilities with electricity. The Tonto National Forest would use analysis in this EIS to approve any rights-of-way and special use permits needed to construct the upgraded and new power lines.

Public comments received on the DEIS suggested that we underestimated water use for the mine. Based on published water use estimates for other copper mines, commenters suggest that water use for the Resolution Copper project could be as high as 50,000 acre-feet per year, compared to the disclosed values (about 17,000 acre-feet per year). We confirmed that the water use anticipated for Resolution Copper is indeed less than other mines in Arizona; however, commenters failed to account for the differences between these mines (Garrett 2020c). Specifically, the Resolution Copper Project uses thickened tailings ranging from 50 to 65 percent solids, compared to 20 to 50 percent solids in a conventional tailings slurry. The Resolution Copper Project uses less water than other mines since the mine proponent has incorporated enhanced technology (thickening) in order to reduce water use.

Note that in response to public comments on competing water uses, drought, climate change, and potential water scarcity, we included an expansive discussion of these issues as part of the cumulative effects analysis in chapter 4.

SANITARY AND SOLID WASTE MANAGEMENT

New wastewater treatment plants would be constructed at both the East Plant Site and West Plant Site. Effluent from the East Plant Site wastewater treatment plant would be combined with the mine dewatering system, which would be delivered to the concentrator supply water pipeline for use in the concentrator.

Wastewater from the filter plant and loadout facility would be routed to an on-site septic tank and leach field. Septic solids would be removed and disposed of off-site as needed and in accordance with State laws.

Non-hazardous solid waste and special wastes (e.g., petroleum-contaminated soils) generated by any activities at the mine facilities would be disposed of in a manner consistent with applicable local, State, and Federal regulations. Resolution Copper drafted an environmental materials management plan that identifies the disposal method for each anticipated waste (Resolution Copper 2016b). Recycling programs currently used at the East Plant Site and West Plant Site would continue in an effort to reduce waste.

Waste is currently being disposed of and would continue to be disposed of in the following ways:

- Asbestos- and petroleum-contaminated soils waste streams would be managed in accordance with waste-handling protocols and disposed of at an approved waste facility.

- All trash and garbage would be hauled to State-approved landfills. Trash and garbage would be collected on-site in containers before being removed for disposal at permitted landfills. No open burning of garbage and refuse would occur at the project site.

- Wood and inert wastes such as concrete would be buried on-site as part of final closure and reclamation in selected areas in accordance with applicable county, State, and Federal regulations.

- Measures to maintain the general project area in a safe condition in compliance with MSHA safety regulations,

- Measures to manage regulated materials (hazardous materials) in accordance with applicable requirements,

- Measures to maintain access and utilities would continue to function, and

- Plans for managing water systems and maintaining facilities as required by the Stormwater Pollution Prevention Plan (SWPPP), APP, and Arizona Pollutant Discharge Elimination System (AZPDES). Dewatering and treatment of water from the mine infrastructure would continue, and the water would be discharged.

## CONCURRENT RECLAMATION

Reclamation completed during operations is termed concurrent reclamation (or sometimes progressive reclamation). Concurrent reclamation differs from interim reclamation in that this reclamation is designed to provide permanent achievement of reclamation goals and performance standards. Resolution Copper would implement concurrent reclamation of the outer slopes of the tailings storage facility, where practicable, as the operation progresses.

The ability to conduct concurrent reclamation varies by alternative, depending on construction of the tailings storage embankment. These differences among alternatives are explored more in Section 3.3, Soils, Vegetation, and Reclamation.

## FINAL RECLAMATION

Final reclamation efforts would occur for a duration of 5 to 10 years after the operations phase. The general steps to be used in reclaiming disturbed areas at the mine are

- decommissioning facilities,

- removing and/or closing structures and facilities,

- recontouring and regrading,

- replacing growth media (i.e., store and release cover design for tailings), and

- seeding and/or direct seedling plantings where appropriate.

The final reclamation efforts that would occur at each of the main facilities are described in the following text.

## EAST PLANT SITE CLOSURE AND RECLAMATION

Reclamation at the East Plant Site would consist of salvaging and demolishing all buildings, except for the headframes and hoists, which would be used for post-closure groundwater monitoring. All salvageable and non-salvageable materials would be disposed of off-site. All disturbed surfaces except those needed for long-term monitoring, including paved and graveled areas, would be regraded and reseeded with appropriate local seed mixes. Contact water basins would be closed in accordance with APP requirements. Shaft collars and subcollars would be permanently sealed by an engineered seal.

Reclamation activities would not occur within the subsidence area. There would be a berm and/or fence constructed around the perimeter of the continuous subsidence area. To the extent practicable, surface water diversions would be constructed to divert stormwater away from the subsidence area and into natural drainages.

POWER TRANSMISSION FACILITIES CLOSURE AND RECLAMATION

Power transmission facilities, which include electrical substations, transmission lines, and power centers, may be removed as part of the reclamation program, unless a post-mining use is identified. SRP would continue to own the power lines and may have a post-mining use for ongoing power transmission in the area.

RECLAMATION FINANCIAL ASSURANCE

Resolution Copper would be required to establish and maintain sufficient financial assurance in accordance with requirements from the Forest Service, ASLD, BLM, USACE, the APP program, and the Arizona Mined Land Reclamation Act. The purpose of financial assurance is to ensure that responsible agencies would be able to continue any remaining reclamation activities if Resolution Copper becomes unable to meet reclamation and closure and post-closure obligations under the terms and conditions of the applicable permits and approvals. Under the Arizona Mined Land Reclamation Act, the Arizona State Mine Inspector would receive financial assurance for reclamation and closure activities required on private lands, the Forest Service would receive financial assurance for reclamation and closure activities on lands managed by the Forest Service previously described in section 1.5.5, and BLM would receive financial assurance for reclamation and closure activities on BLM-managed lands. USACE would receive financial assurance for compensatory mitigation activities. The APP program would receive financial assurance for reclamation and closure activities for facilities that have the potential to discharge water into the groundwater (tailings storage facility, process ponds, and stormwater ponds), regardless of the facility's location on private or NFS lands.

## 2.2.3    Alternative 1 – No Action Alternative

Under the no action alternative, current management plans would continue to guide management of the project area. The Forest Service would not approve the GPO, none of the activities in the final GPO would be implemented on NFS lands, and the mineral deposit would not be developed. However, note that certain activities are currently taking place on Resolution Copper private property, such as reclamation of the historic Magma Mine; exploration; monitoring of historic mining facilities such as tailings under existing State programs and permits; maintenance of existing shaft infrastructure, including dewatering; and water treatment and piping of treated water along the MARRCO corridor to farmers for beneficial use. These types of activities would be expected to continue, regardless of approval of the GPO. These activities are therefore assumed to occur in the no action alternative (Garrett 2018d). This alternative is required by regulation (40 CFR 1502.14(d)).

The no action alternative includes the following:

- The final GPO would not be approved, thus, none of the activities in the final GPO would be implemented, and the mineral deposit would not be developed;

- The land exchange would not take place;

- Certain ongoing activities on Resolution Copper private land, such as reclamation of the historic Magma Mine, exploration, monitoring of historic mining facilities such as tailings under existing State programs and permits, maintenance of existing shaft infrastructure, including dewatering, and water treatment and piping of treated water along the MARRCO corridor to farmers for beneficial use, would continue regardless of GPO approval;

- Ongoing trends not related to the proposed project would continue, such as population growth, ongoing impacts on air quality from fugitive dust and vehicle emissions, human-caused fires from recreation, ranching, and a corresponding increase in use of public lands; and

**ER291**

- No agency land and resource management plans would be amended for this project.

### 2.2.3.1    Need for Inclusion of Land Exchange in Document

PL 113-291 directs the Forest Service to prepare a single EIS prior to the final execution of the land exchange to serve as the basis for all Federal decisions related to the proposed mine. The proposed action and action alternatives analyzed in detail in chapter 3 therefore assume that the land exchange would occur as directed by Congress; for this reason, it is included as a component common to all action alternatives (see section 2.2.2.1).

However, even though directed by Congress, the land exchange remains a discretionary decision on the part of Resolution Copper, which may or may not choose to undertake the exchange after receipt of the appraised value. It is possible that mining under the proposed action or action alternatives could also take place without the land exchange occurring. The single EIS must therefore allow for a comparison of potential impacts of mining that occurs on land remaining in Federal ownership with potential impacts that would occur following the land exchange. Whether the land exchange occurs or not, the mine would be developed in accordance with the Federal, State, and local laws governing mining operations. However, these laws could differ, depending on whether or not a land exchange occurred.

The no action alternative provides one baseline against which the proposed action and action alternatives may be compared. The no action alternative assumes no land exchange and no Forest Service approval of a GPO. This baseline allows a direct comparison of the effects of most of the mining impacts that would occur from the proposed action and action alternatives. However, the no action alternative is not sufficient to fully analyze the effects of the exchange of the selected lands.

Two other combinations of no action were considered during analysis:

- A fully executed land exchange, but no approval of the GPO; and
- The land exchange would not occur, Oak Flat would stay in Federal management, and the GPO would be approved with the mining taking place on public land.

The first combination was not carried forward as the Forest Service is unable to refuse approval of the GPO within their regulations and guidance. The second combination was considered because the land exchange is a discretionary action on the part of Resolution Copper. Therefore, an analysis was completed that compared the regulatory framework of mining activity on lands remaining in Federal ownership with the regulatory framework on lands being transferred to private ownership (appendix I). This provides the comparison of no land exchange, but approval of the mining plan of operations. See section 2.4 for more details. The effects of the land exchange are also assessed individually in each resource section of chapter 3.

## 2.2.4    Alternative 2 – Near West Proposed Action – Mine Plan Components

Alternative 2 – Near West Proposed Action would include approximately 9,780 acres of disturbance, of which 7,178 acres is NFS land, 312 acres is ASLD managed, and 2,290 acres is private land. Additional project activities would occur on 92 acres for recreational mitigations (see section 2.3.1-3).

Based on comments heard in scoping, in February 2018, Resolution Copper formally notified the Tonto National Forest that the company was revising its proposed action in the May 2016 version of the GPO and replacing the plan for an upstream-type tailings embankment at the GPO location with a modified centerline design, which would provide greater overall stability and a more robust design. This change

# Purpose of this Appendix

As noted in chapter 1, the EIS must consider a situation in which the mine is built but the land exchange is not executed. This situation is a possibility because the land exchange is a discretionary action on the part of Resolution Copper Mining, LLC. Under this scenario, the development of a mine on National Forest System lands would proceed under Title 36 Code of Federal Regulations (CFR) Part 228 surface management regulations (commonly known as Forest Service mining regulations).

The physical impacts to resources from the ore extraction, including subsidence and dewatering, are identical whether the mine is built on private land or public land. These are the impacts considered in chapter 3 of the EIS. With respect to the mine itself, the primary difference made by the land exchange is the regulatory framework under which the mine is regulated. The purpose of this appendix is to compare the regulatory framework applicable to private land (if a land exchange occurs) to the regulatory framework applicable to National Forest System lands (if no land exchange occurs).

# Comparison of 36 CFR 228 Regulations with Other Related State (Arizona) and Federal Environmental Regulations

In virtually all cases, some level of regulatory requirements apply to mining operations, regardless of whether they are taking place on private lands or National Forest System lands (see table I-1). U.S. Department of Agriculture Forest Service (herein called Forest Service) 36 CFR 228 surface management regulations (columns 1 and 2 in the table) apply only to Federal lands administered by the Forest Service. Other applicable laws, regulations, and rules (column 3) apply to both Federal and private lands, except for State mined land reclamation rules, which apply only to private lands.

Unless otherwise indicated in the table, surface resource management regulations are taken from 36 CFR 228. Aquifer Protection Permit (APP) laws and regulations are taken from Arizona Revised Statutes (ARS) 49-241 through 49-252 and Arizona Administrative Code (AAC) R18-9-101 through R18-9-403. Arizona State Mine Inspector laws and regulations are taken from Arizona State reclamation statutes at ARS 27-901, et seq., and rules at R11-2-201, et seq. Other regulations and rules are indicated in table I-1.

See table 1.5.6-1 in chapter 1 of the FEIS for descriptions of the applicable laws, statutes, regulations and rules listed in table I-1. This includes aquifer protection permits administered by the Arizona Department of Environmental Quality, mined land reclamation overseen by the Arizona State Mine Inspector, Clean Water Act permits administered by both the Arizona Department of Environmental Quality and the U.S. Army Corps of Engineers, and Clean Air Act permits administered by both Arizona Department of Environmental Quality and the Pinal County Air Quality Control District,

**Table I-1. Comparison of 36 CFR 228 with Other Applicable Laws, Statutes, Regulations, and Rules**

| Forest Service Regulations 36 CFR 228 Subpart A – Locatable Minerals | Description | Other Applicable Laws, Statutes, Regulations, and Rules that are comparable to 36 CFR 228 Subpart A – Locatable Minerals |
|---|---|---|
| 36 CFR 228.4 | *Description of Operations.* In a notice of intent submitted to the appropriate District Ranger, sufficient description of the proposed area of activity, route(s) of access, equipment, devices, or practices proposed for use during operations, including, where applicable— | None |

Further discussion of financial assurance is included in section 1.5.5, and in certain sections of chapter 3, including section 3.3 (Soils, Vegetation, and Reclamation), 3.7.2 (Groundwater and Surface Water Quality), and 3.10.1 (Tailings and Pipeline Safety).

## 2.4 Effects of the Land Exchange

As described in section 2.2.3.1, a completed land exchange is considered for all resource analyses in chapter 3.

Physically, the panel caving proposed to take place under Oak Flat is independent of the land exchange. The deposit would be mined with fundamentally the same techniques and require fundamentally the same infrastructure, and result in the same surface subsidence, regardless of whether the surface is under Forest Service jurisdiction or is private. The two primary differences are (1) the regulatory framework under which mining would occur "with" or "without" Federal oversight, and (2) without the land exchange, minerals underneath the withdrawal boundary could not be extracted. If a land exchange does not occur, Resolution Copper would mine and reclaim the mined land under Federal, State, and local permits and an approved GPO under 36 CFR 228 Subpart A. If the land exchange does occur and the Oak Flat area becomes private lands, Resolution Copper would be required to conduct its activities in accordance with all applicable Federal, State, and local permits but may not be subject to the requirement of obtaining an approved GPO under 36 CFR 228 Subpart A.

Public comments on the DEIS noted various surface uses of Oak Flat. Foremost among these are uses by tribal members. Other uses include recreation, grazing, and reported use by educational institutions. The land exchange would not necessarily prohibit these uses, but they would take place only with the permission of the private landowner, Resolution Copper. Most of these surface uses would be in conflict with mining operations and likely would cease or be greatly curtailed.

Mine operations are governed by several Federal, State, and local regulatory frameworks. Each of the regulatory frameworks is founded in statute and implemented through regulations and policies of the responsible agency. Agency regulations or rules provide guidance to the agency so it can implement the laws and provide guidance to mine operators so they can follow the laws. Each agency requires certain types of information (filing requirements) before it can process and issue permits under its regulations. Many of the filing requirements for permits from the various agencies are duplicative, even though each agency has its own regulatory authority and responsibilities. Performance standards specify the norm governing how operations would occur and describe the level of compliance expected by the agency.

Performance standards required by the Forest Service for mining on Federal land are contained in 36 CFR 228.8: "All operations shall be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources." These include specific requirements for air quality, water quality, solid waste, scenery values, fishery and wildlife habitat, roads, and reclamation.

State agencies have similar performance standards. For example, the goal of the State's APP program is to ensure no degradation of the state's groundwater. ADEQ ensures this goal by implementing the performance standards outlined by the best available demonstrated control technology (Arizona Department of Environmental Quality 2004). Also, the goal of the state mined land reclamation rules is to ensure safe and environmentally sound reclamation of mined lands. The Office of the Arizona State Mine Inspector ensures this goal by requiring operators to meet operational and post-mine performance standards specified in the regulations at ARS R11-2-601 *et seq*.

## NOISE AND VIBRATION — FEIS SECTION 3.4

| Key factors to analyze the issue of noise and vibration | What are the results of impact analysis for the proposed action (Alternative 2)? | Are the analyzed impacts of these issues substantially different under Alternatives 3, 4, 5, or 6? |
|---|---|---|
| • Assessment of the ability of alternatives to meet rural landscape expectations<br>• Assessment of noise levels (A-weighted decibels [dBA]) and geographic area impacted from mine operations, blasting, and traffic, and qualitative assessment of effects of noise at nearby residences and sensitive receptors<br>• Assessment of effects of vibrations from blasting and mine operations at nearby residences and sensitive receptors | Noise impacts were modeled for 15 sensitive receptors representing residential, recreation, and conservation land uses. Under most conditions, predicted noise and vibrations during construction and operations, for both blasting and non-blasting activities, at sensitive receptors are below thresholds of concern; rural character would not change due to noise (see section 3.4.4.3). | Yes. For Alternatives 3, 4, and 5, noise impacts are the same, with noise and vibration levels at sensitive receptors below thresholds of concern under most conditions.<br><br>For Alternative 6, noise levels along Dripping Springs Road exceed thresholds of concern. However, there would be no residual impacts after mitigation is implemented (i.e., paving the road, imposing 15 miles per hour speed limit, daytime deliveries only), therefore rural character would not be altered due to increased noise. |

## TRANSPORTATION AND ACCESS — FEIS SECTION 3.5

| Key factors to analyze the issue of transportation and access | What are the results of impact analysis for the proposed action (Alternative 2)? | Are the analyzed impacts of these issues substantially different under Alternatives 3, 4, 5, or 6? |
|---|---|---|
| • Assessment of change in type and pattern of traffic by road and vehicle type<br>• Assessment of the change in level of service (LOS) on potential highway routes and local roads<br>• Assessment of roads decommissioned by the mine and roads lost to motorized access | Sixty-four trips expected during the peak hour in peak construction and 46 trips expected during the peak hour during normal operations.<br>Project-related traffic would contribute to decreased LOS at many intersections; unacceptable LOS (E/F) caused by project-related traffic occurs Main Street/U.S. 60 (construction and operations), SR 177/U.S. 60 (construction), and Magma Mine Road/U.S. 60 (operations).<br>Eight miles of NFS roads would be lost due to the West Plant Site, East Plant Site, and filter plant and loadout facility. For the tailings facility, 21.7 miles of NFS roads would be lost and decommissioned. | Yes. Alternatives 3, 5, and 6 would have similar impacts as Alternative 2, but Alternative 4 would increase to 88 trips expected during the peak hour in peak construction and 58 trips expected during the peak hour during normal operations, due to placing the filter plant and loadout facility at the West Plant Site.<br><br>LOS impacts from project-related traffic are similar to Alternative 2 for all other alternatives.<br><br>At Alternative 4, about 18 miles of NFS roads would be lost to the tailings storage facility. Alternative 5 would not have loss of NFS roads but would result in the loss or decommissioning of 29 miles of BLM inventoried routes. Alternative 6 would be located on private lands and impact 5.7 miles of Dripping Springs Road. |

**ER295**

## WATER RESOURCES: GROUNDWATER QUANTITY AND GROUNDWATER-DEPENDENT ECOSYSTEMS (GDEs) — FEIS SECTION 3.7.1

| Key factors to analyze the issue of groundwater quantity and groundwater-dependent ecosystems | What are the results of impact analysis for the proposed action (Alternative 2)? | Are the analyzed impacts of these issues substantially different under Alternatives 3, 4, 5, or 6? |
|---|---|---|
| • Geographic extent in which water resources may be impacted and number of GDEs degraded or lost<br>• Impact on public groundwater supplies<br>• Comparison of mine water needs<br>• Potential for subsidence to occur as a result of groundwater withdrawal | Under no action, six GDEs (all springs) are anticipated to be impacted by groundwater drawdown from ongoing dewatering (see "Alternative 1 – No Action" in section 3.7.1.5).<br><br>When block caving occurs, groundwater impacts expand to overlying aquifers and two more GDEs (springs) are anticipated to be impacted. Alternative 2 also directly disturbs nine GDEs (springs and ponds), and reductions in stormwater runoff impact three more GDEs (Devil's Canyon and two reaches of Queen Creek). There are surface water rights associated with many of these GDEs. A total of 20 GDEs would be impacted by Alternative 2. Loss of water would be mitigated but impacts on natural setting would remain (see Alternative 2, "Groundwater-Dependent Ecosystems Impacted," in section 3.7.1.5).<br><br>Groundwater supplies in Superior and Top-of-the-World could be impacted by groundwater drawdown but would be replaced through mitigation (see "Anticipated Impacts on Water Supply Wells" in section 3.7.1.5).<br><br>Over the mine life, Alternative 2 would dewater about 87,000 acre-feet from the mine and would require about 590,000 acre-feet of makeup water pumped from the Desert Wellfield. The wellfield pumping would incrementally contribute to ground subsidence in the East Salt River valley, and cumulatively reduce overall groundwater availability in the area (see "Changes in Basin Water Balance – Mine Dewatering" and Alternative 2, "Changes in Desert Wellfield Pumping," in section 3.7.1.5). | Yes. There are differences between alternatives in the number of GDEs impacted and the amount of makeup water required.<br><br>Alternative 3 would impact the same GDEs as Alternative 2 but would pump about 490,000 acre-feet from the Desert Wellfield over the mine life (see Alternative 3 in section 3.7.1.5).<br><br>Alternative 4 would impact 18 GDEs (8 springs from groundwater drawdown, 7 springs or ponds from direct disturbance, and 3 stream reaches from reductions in stormwater runoff [Devil's Canyon and 2 areas of Queen Creek]). Alternative 4 uses filtered tailings and would pump about 180,000 acre-feet from the Desert Wellfield over the mine life, much less than the other alternatives (see Alternative 4 in section 3.7.1.5).<br><br>Alternative 5 would impact 18 GDEs (8 springs from groundwater drawdown, 6 springs or ponds from direct disturbance, and 4 stream segments from reductions in stormwater runoff [Devil's Canyon, 2 areas of Queen Creek, and the Gila River]). Alternative 5 would pump about 540,000 acre-feet from the Desert Wellfield over the mine life (see Alternative 5 in section 3.7.1.5).<br><br>Alternative 6 would impact the same GDEs and would pump about the same amount of water as Alternative 5 (see Alternative 6 in section 3.7.1.5). |

ER296

Resolution Copper Project and Land Exchange

## WILDLIFE AND SPECIAL STATUS WILDLIFE SPECIES — FEIS SECTION 3.8

| Key factors to analyze the issue of wildlife | What are the results of impact analysis for the proposed action (Alternative 2)? | Are the analyzed impacts of these issues substantially different under Alternatives 3, 4, 5, or 6? |
|---|---|---|
| <ul><li>Assessment of effects on riparian habitat and species due to changes in flow</li><li>Assessment of acres of suitable habitat disturbed for each special status species and by type of terrestrial and aquatic habitat lost, altered, or indirectly impacted</li><li>Potential of mortality of animal species resulting from the increased volume of traffic related to mine operations</li><li>Effects on wildlife behavior from noise, vibrations, and light</li><li>Change in movement corridors and connectivity between wildlife habitats</li><li>Impacts on aquatic habitats and surface water that support wildlife and plants</li></ul> | Alternative 2 would impact 20 groundwater-dependent ecosystems (GDEs). For the springs or stream segments impacted by groundwater drawdown or surface water flow reductions, mitigation would replace the water source and prevent widespread loss of riparian habitat. The remaining GDEs are lost to surface disturbance and would not be mitigated. Loss of xeroriparian habitat occurs for all alternatives.<br><br>Habitat would be impacted to some extent for about 50 special status wildlife species (see table 3.8.4-2 for details). Specific impacts could occur with western yellow-billed cuckoo (endangered) and southwestern willow flycatcher (endangered) from vegetation removal or project activities. Gila chub (endangered) has critical habitat along Mineral Creek but is not known to be present and habitat in Mineral Creek is not anticipated to be impacted (see "Impacts on Special Status Wildlife Species" in section 3.8.4.2).<br><br>There is a high probability of mortality and/or injury of wildlife individuals from collisions with mine construction and employee vehicles as well as the potential mortality of burrowing animals in areas where grading would occur. Some individuals would be likely to move away from the sources of disturbance to adjacent or nearby habitats. Project-related noise, vibration, and light may also lead to increased stress on individuals and alteration of feeding, breeding, and other behaviors (see "General Construction Impacts" and "General Operations Impacts" in section 3.8.4.2).<br><br>There would be loss and fragmentation of movement and dispersal habitats from the subsidence area and tailings storage facility. Ground-clearing and consequent fragmentation of habitat blocks for other mine-related facilities would also inhibit wildlife movement (see "Wildlife Connectivity" in section 3.8.4.2).<br><br>There are 15 identified wildlife waters within 5 miles of the project footprint. Under Alternative 2, three would be lost beneath the tailings storage facility. | Yes. Alternative 3 is similar to Alternative 2.<br><br>Alternative 4 would have more reduction in surface flow and greater impacts on Queen Creek. Alternatives 5 and 6 would have less impact on Queen Creek due to surface flow reductions. A total of 18 GDEs and 2 wildlife waters would be impacted under Alternatives 4, 5, and 6.<br><br>Specific acres of habitat affected varies between alternatives (see table 3.8.4-2 for details).<br><br>Alternative 6 would impact the greatest amount of acreage for Habitat Block 1 areas. |

**ER297**

# RECREATION — FEIS SECTION 3.9

| Key factors to analyze the issue of recreation | What are the results of impact analysis for the proposed action (Alternative 2)? | Are the analyzed impacts of these issues substantially different under Alternatives 3, 4, 5, or 6? |
|---|---|---|
| <ul><li>Changes in Recreation Opportunity Spectrum designations</li><li>Assessment of acres of the Tonto National Forest that would be unavailable for recreational use, for various phases of mine life and reclamation</li><li>Assessment of potential for noise to reach recreation areas (i.e., audio "footprint")</li><li>Assessment of impacts on solitude in designated wilderness and other backcountry areas</li><li>Assessment of hunter-days lost (quantity based on number of permits available and number of days in season)</li><li>Assessment of miles of Arizona National Scenic Trail, NFS trails, or other known trails requiring relocation, and qualitative assessment of user trail experience</li><li>Assessment of increased pressure on other areas, including roads and trails/trailheads, from displacement and relocation of recreational use as a result of mine facilities</li></ul> | Under Alternative 2, based on the Recreation Opportunity Spectrum (ROS) designation of user experiences, direct removal of 4,407 acres of the semi-primitive motorized setting, and 1,266 acres within the roaded natural setting (see table 3.9.4-1).<br><br>All public access (Tonto National Forest, ASLD, BLM lands) would be eliminated on 7,490 acres. Rock climbing opportunities at Euro Dog Valley, Oak Flat, and other portions of the mine area would be lost under all action alternatives but would be partially mitigated by new climbing area(s) set aside by Resolution Copper (see "Rock Climbing" in section 3.9.4.2).<br><br>Under most conditions, with sensitive receptors representing recreation users, predicted noise during construction and operation are below thresholds of concern (see Alternative 2, "Recreation Opportunity Spectrum," in section 3.9.4.3).<br><br>Visitors to the Superstition Wilderness, Picketpost Mountain, and Apache Leap would have foreground and background views of the tailings facilities from trails and overlooks, and the recreation setting from certain site-specific views could change. Under Alternative 2, 0.07 mile of the tailings pipeline corridor would intersect the Arizona Trail (see Alternative 2, "Recreation Sites," in section 3.9.4.3).<br><br>The number of Arizona hunting permits that are issued in individual Game Management Units would not change as a result of the any of the action alternatives being implemented, though some individual's preferred hunting grounds may be lost (see "Hunting" in section 3.9.4.2).<br><br>Under all action alternatives, it is likely that increased use would occur on other nearby lands that provide similar experiences, depending upon the recreational user type. A minor to moderate increase in user activity would be expected to occur in recreational use areas elsewhere, with uses largely similar to those displaced. | Yes.<br><br>Alternative 3 is identical to Alternative 2.<br><br>Alternative 4 would remove 18 acres of the semi-primitive non-motorized setting, 5,088 acres of the semi-primitive motorized setting, and 608 acres within the roaded natural setting. All public access (Tonto National Forest, ASLD, BLM lands) would be eliminated on 8,094 acres. Alternative 4 would require 3.05 miles of the Arizona Trail to be closed and relocated to an area that would be safe for public use. Under Alternative 4, 26 NFS roads would be impacted for motorized recreation.<br><br>Alternative 5 would remove 95 acres of the semi-primitive motorized setting and 1,044 acres of the roaded natural setting. All public access (Tonto National Forest, ASLD, BLM lands) would be eliminated on 14,307 acres. Under Alternative 5, 23 miles of BLM routes would be impacted for motorized recreation, and additional BLM and NFS roads would be crossed by the pipeline. Alternative 5 would intersect the Passage 16 segment of the Arizona Trail by 0.18 mile of the proposed tailings storage facility pipeline. Visitors to the White Canyon Wilderness would have background views of the Alternative 5 pipeline from some trails and overlooks.<br><br>Alternative 6 would remove 146 acres of the semi-primitive non-motorized setting, 246 acres of the semi-primitive motorized setting, and 253 acres of the roaded natural setting. All public access (Tonto National Forest, ASLD, BLM lands) would be eliminated on 10,685 acres. Under Alternative 6, no BLM or NFS roads are within the footprint, although roads are crossed by the pipeline. The Alternative 6 pipeline would be visible from trails and overlooks in the Superstition Wilderness. |

ER298

Resolution Copper Project and Land Exchange

## CULTURAL RESOURCES — FEIS SECTION 3.12

| Key factors to analyze the issue of cultural resources | What are the results of impact analysis for the proposed action (Alternative 2)? | Are the analyzed impacts of these issues substantially different under Alternatives 3, 4, 5, or 6? |
|---|---|---|
| <ul><li>Assessment of the impacts on places of traditional and cultural significance to Native Americans, including natural resources</li><li>Assessment of number of NRHP-eligible historic properties, sacred sites, and other landscape-scale properties to be buried, destroyed, or damaged</li><li>Assessment of impacts on historic properties, including number of NRHP-eligible historic properties expected to be visually impacted</li></ul> | The NRHP-listed *Chi'chil Biłdagoteel* Historic District TCP would be directly and permanently damaged.<br><br>Under Alternatives 2 and 3, 120 NRHP-eligible sites and 18 sites of undetermined eligibility would be directly affected; another 62 sites would be indirectly affected (see "Direct Impacts" and "Indirect Impacts" in section 3.12.4.3).<br><br>Additional historic properties and archaeological sites are located within 6 miles of the proposed project and could be impacted by their proximity to mining disturbance (see "Atmospheric Impacts" in section 3.12.4.3). | Under any action alternative, impacts of mine development at the associated project facilities would have equivalent adverse effects on cultural resources. Some surveys continue; all alternatives will be 100% pedestrian surveyed.<br><br>For Alternative 4, 145 NRHP-eligible sites and 2 sites of undetermined eligibility would be directly affected; another 58 sites would be indirectly affected (see section 3.12.4.5).<br><br>For Alternative 5, 154 NRHP-eligible sites and 3 sites of undetermined eligibility would be directly affected; another 77 sites would be indirectly affected (see section 3.12.4.6).<br><br>For Alternative 6, 377 NRHP-eligible sites and 3 sites of undetermined eligibility would be directly affected; another 58 additional sites would be indirectly affected (see section 3.12.4.7). |

**ER299**

## TRIBAL VALUES AND CONCERNS — FEIS SECTION 3.14

| Key factors to analyze the issue of tribal values and concerns | What are the results of impact analysis for the proposed action (Alternative 2)? | Are the analyzed impacts of these issues substantially different under Alternatives 3, 4, 5, or 6? |
|---|---|---|
| • Assessment of how cumulative resource disturbance impacts tribal values and spiritual practices<br><br>• Assessment of number of sacred springs or other discrete sacred sites that would be impacted, and potential effects on Native Americans from the desecration of land, springs, burials, and sacred sites<br><br>• Estimated acres of traditional resource collection areas that would be impacted | Development of the Resolution Copper Mine would directly and permanently damage the NRHP-listed *Chi'chil Bildagoteel* Historic District TCP. Other large-scale mine development along with smaller transportation, utility, and private land development projects in the greater Superior region may also affect places and resources of value to Native Americans, including historical and ceremonial sites and culturally valued landforms and features.<br><br>Dewatering or direct disturbance would impact between 18 and 20 groundwater dependent ecosystems, mostly sacred springs. While mitigation would replace water, impacts would remain to the natural setting of these places.<br><br>Burials are likely to be impacted; the numbers and locations of burials would not be known until such sites are detected as a result of mine-related activities.<br><br>Under this or any action alternative, one or more Emory oak groves at Oak Flat, used by tribal members for acorn collecting, would likely be lost. Other unspecified mineral- and/or plant-collecting locations would also likely be affected; historically, medicinal and other plants are frequently gathered near springs and seeps, so drawdown of water at these locations may also adversely affect plant availability. | Under any action alternative, impacts of mine development at the East Plant Site (Oak Flat), West Plant Site, MARRCO corridor, and at other ancillary facilities would have equivalent adverse effects on tribal values and concerns.<br><br>Impacts on tribal values and concerns would be similar in context and intensity under Alternatives 4, 5, and 6; however, because the tailings storage facility under each of these alternatives would be in a different location, the specific impacts on potentially meaningful sites, resources, routes, and viewsheds would vary. See sections 3.11.4 (Scenic Resources), 3.12.4 (Cultural Resources), and 3.14.4 (Tribal Values and Concerns) for detailed impact analyses specific to each alternative. |

**ER300**

to the dewatering that has taken place in the deep groundwater system since 2009 has been limited to the Resolution Graben (see section 3.7.1).

The analysis area has undergone multiple episodes of folding and faulting since the Precambrian. Geological structures, and rotation, thickness, and offset of the geological units in the area (see figure 3.2.3-2) are the result of this series of large-scale structural movements and deformation. The late Cretaceous to early Tertiary Laramide Orogeny caused northeast-trending shortening, which resulted in basement core uplifts and folding along range-front thrust faults across large portions of the western United States (Kloppenburg 2017). Laramide-style compression was followed later in the Tertiary by regional extension, which resulted in fault-block style deformation—which creates the alternating mountain and valley topography that characterizes the region.

### *Mineral Resources*

GENERAL MINERAL OCCURRENCE

Mineral occurrences in the analysis area include a range of metallic, non-metallic, and industrial minerals. There is a more than 100-year history of silver and copper mining near the analysis area, and several operations continue to contribute to the region's economy. In addition to the nearby formerly producing Magma and Silver King mines, over 30 (active or inactive) mines are regionally located near what is known as the "Copper Triangle." These represent a variety of operations but primarily include copper, gypsum, and marble mining. The closest currently active major copper mines are the Ray Mine, approximately 9 miles south of the analysis area, the Pinto Valley Mine, approximately 14 miles northeast of the analysis area, and the Carlota Mine, also northeast of the analysis area. These mines are open-pit operations, but, like the Resolution ore deposit, they are large tonnage, low-grade copper porphyry deposits (Kloppenburg 2017).

RESOLUTION ORE DEPOSIT

The Resolution ore deposit is approximately 64 million years old and is a porphyry copper-molybdenum deposit. It lies approximately 4,500 to 7,000 feet below Oak Flat. As defined by the 1 percent copper shell, the deposit extends over an area of at least 1.2 miles in an east-northeast direction, and 0.9 mile in a north-northwest direction. A detailed description of the deposit and associated mineralization is included in Hehnke et al. (2012).

Rock types with diabase, limestone, and local breccia host and control the strongest copper mineralization. Quartz-rich sedimentary rocks and Cretaceous-Tertiary intrusive rocks demonstrate the strongest molybdenum mineralization. The highest copper grades (greater than 3 percent) are located in the upper central portion of the deposit associated with a large hydrothermal breccia body and hosted primarily in breccia and diabase. The total mineral resource at the Resolution ore deposit is currently estimated (indicated and inferred) to be 1,970 million tons (1,787 million metric tonnes), with an average grade of 1.54 percent copper and 0.035 percent molybdenum (Rio Tinto 2018).

The location and geometry of the mineralization are structurally controlled by several generations of faulting that occurred before, during, and after mineralization. Chalcopyrite is the dominant copper mineral in the deposit, with lesser chalcocite and bornite. Molybdenum occurs primarily as molybdenite. The deposit is associated with hydrothermal alteration and includes a strong pyrite "halo" in the upper areas of the deposit, containing up to 14 percent pyrite. This mineralization has ramifications for water quality, as all of these are sulfide-bearing minerals and have the potential to interact with oxygen and cause water quality problems (acid rock drainage), as discussed in detail in section 3.7.2.

**ER301**

While several karst features have been noted in Queen Creek Canyon upstream of Superior, only one existing cave has been identified in the area: Hawks Claw Cave is located near Alternative 2 tailings storage facility site.

### Unpatented Mining Claims

Numerous unpatented mining claims—both lode and placer—are located within the footprint of the mine components. These are summarized in the GPO in appendix A and figure 3.2-1 (Resolution Copper 2016c) for Alternatives 2 and 3, and have been compiled separately for Alternatives 4, 5, and 6 (Garrett 2019b).

- No unpatented claims unrelated to Resolution Copper are located within the Oak Flat Federal Parcel, or on the East Plant Site.

- The West Plant Site is privately owned. No unpatented claims unrelated to Resolution Copper are located around the periphery of the West Plant Site.

- The MARRCO corridor right-of-way is already existing and in use. No unpatented claims unrelated to Resolution Copper are located within the MARRCO corridor.

- Unpatented claims unrelated to Resolution Copper are located within the various alternatives tailings storage facility footprints and/or the tailings pipeline corridor footprints. In section 3.2.4, impacts on these claims are assessed specific to each alternative.

## 3.2.4    Environmental Consequences of Implementation of the Proposed Mine Plan and Alternatives

### 3.2.4.1    Alternative 1 – No Action Alternative

Under the no action alternative, the mine would not be constructed, block caving would not occur, and there would be no impacts from subsidence, induced seismicity, increased potential for landslides or rockfall, impacts on caves, karst, or paleontological resources, or impacts on mining claims.

### 3.2.4.2    Impacts Common to All Action Alternatives

#### Effects of the Land Exchange

The land exchange would have effects on geology and mineral resources.

The Oak Flat Federal Parcel would leave Forest Service jurisdiction. The role of the Tonto National Forest under its primary authorities in the Organic Administration Act, Locatable Regulations (36 CFR 228 Subpart A), and Multiple-Use Mining Act is to ensure that mining activities minimize adverse environmental effects on NFS surface resources. The removal of the Oak Flat Federal Parcel from Forest Service jurisdiction negates the ability of the Tonto National Forest to regulate effects on these resources from the proposed mine and block caving. With respect to mineral development, no unpatented mining claims other than those associated with Resolution Copper are located on the Oak Flat Federal Parcel (see figure 1.3-2 in the GPO (Resolution Copper 2016c)).

The offered land parcels would enter either Forest Service or BLM jurisdiction. Section 3003 of PL 113-291 specifies that any land acquired by the United States is withdrawn from all forms of entry, appropriation, or disposal under the public land laws, location, entry, and patent under the mining laws, and disposition under the mineral leasing, mineral materials, and geothermal leasing laws.

Specific management of mineral resources on the offered lands would be determined by the agencies, but in general when the offered lands enter Federal jurisdiction, mineral exploration and development would not be allowed. Given these restrictions, no or little mine-related activity would be expected to occur on the offered lands.

The land exchange also effectively ends the mineral withdrawal currently in place for the 760-acre Oak Flat Withdrawal Area. After a land exchange occurs, this area would be privately held and would be open to mineral exploration and mineral development that would not otherwise occur. Because no exploration has taken place within this area, the potential for future mining activities is not known.

If the land exchange does not occur, not only would mineral exploration not take place within the 760-acre Oak Flat Withdrawal Area, but subsidence caused by block caving would not be allowed to impact the Withdrawal Area. This would potentially result in less of the Resolution ore deposit being developed, and the resulting surface disturbance and resource impacts would be less than those disclosed in the EIS.

### Effects of Forest Plan Amendment

The Tonto National Forest Land and Resource Management Plan (1985b) provides guidance for management of lands and activities within the Tonto National Forest. It accomplishes this by establishing a mission, goals, objectives, and standards and guidelines. Missions, goals, and objectives are applicable on a forest-wide basis. Standards and guidelines are either applicable on a forest-wide basis or by specific management area.

A review of all components of the 1985 Forest Plan was conducted to identify the need for amendment due to the effects of the project, including both the land exchange and the proposed mine plan (Shin 2020). A number of standards and guidelines (18) were identified applicable to management of mineral, cave, or paleontological resources. None of these standards and guidelines were found to require amendment to the proposed project, either a forest-wide or management area-specific basis. For additional details on specific rationale, see Shin (2020).

### Effects of Compensatory Mitigation Lands

The compensatory mitigation lands are not anticipated to affect geological resources or subsidence. These lands are protected by conservation easements or similar mechanisms and mining would not occur on these lands.

### Effects of Recreation Mitigation Lands

The recreation mitigation lands are not anticipated to affect geological resources or subsidence. Since these existing roads and trails, as well as new planned routes, are on NFS lands that are open to mineral development, they may now or in the future overlap with unpatented claims. If conflicts arise between surface use for mineral exploration, surface use for the development of mineral resources associated with unpatented claims, and surface use for recreation, the conflicts would be resolved as appropriate under Forest Service mineral regulations.

### Summary of Applicant-Committed Environmental Protection Measures

A number of environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on geology and mineral resources or reduce potential impacts from subsidence and other geological hazards. These are non-discretionary measures, and their effects are accounted for in the analysis of environmental consequences.

### Irreversible and Irretrievable Commitment of Resources

Irreversible commitment of geological and mineral resources would occur with the excavation and relocation of approximately 1.4 billion tons of rock and with the recovery of approximately 40 billion pounds of copper, as well as the burying of any mineral resources below the alternative tailings facilities.

With respect to paleontological and cave/karst resources, a commitment of resources is considered to be irretrievable when project impacts limit the future use or productivity of a nonrenewable resource over a limited amount of time—for example, structures built on top of paleontologically sensitive geological units that might later be removed. A commitment of resources is considered to be irreversible when project impacts cause a nonrenewable resource to be permanently lost—for example, destruction of significant fossils and loss of associated scientific data.

An irreversible commitment of paleontological resources could occur at the Alternative 2 and 3 tailings storage facility location, where potentially fossil-bearing rocks associated with the Martin limestone could be destroyed in site preparation or buried permanently.

ER304

VEGETATION COMMUNITIES, SPECIAL STATUS PLANT SPECIES, NOXIOUS WEEDS

**Construction**

All action alternatives would involve the removal of vegetation during construction activities, resulting in the direct loss of plant communities. Construction of tailings facilities for all alternatives would continue throughout most of mine life as areas would not be disturbed until necessary. The primary impacts on vegetation communities during construction of the action alternatives would be associated with

- removal and/or crushing of natural, native species;
- increased potential for noxious and invasive weed establishment and spread;
- decreased plant productivity from fugitive dust;
- plant community fragmentation; and
- changes in plant growth and seasonal phenology from artificial lighting.

*Vegetation Communities*

Vegetation removal could have a variety of effects on vegetation communities ranging from changes in community structure and composition within the project footprint to alteration of soils. This could result in further loss of soil and vegetation, as well as increased sediment input to water resources. This impact would occur in localized areas of disturbance.

Soil disturbance may lead to the increased potential for the introduction and colonization of disturbed areas by noxious and invasive plant species, which may lead to changes in vegetation communities, including a possible shift over time to more wildfire-adapted vegetation that favors noxious or invasive exotic species over native species. This potential impact would be greatest in vegetation communities that are not adapted to fire, such as Arizona Upland and Lower Colorado River subdivisions of Sonoran Desertscrub. In more fire-adapted communities, such as Interior Chaparral and Semidesert Grasslands, these impacts could still occur, but the intensity of the impacts would decrease as native vegetation in these communities may respond positively to fire.

Fugitive dust from construction activities has the potential to affect photosynthetic rates and decrease plant productivity. Dust can have both physical and chemical impacts (Farmer 1993; Goodquarry 2011; Havaux 1992; Sharifi et al. 1997; Thompson et al. 1984; Walker and Everett 1987). Physical impacts of windborne fugitive dust on plants could include blockage and damage to stomata, shading, and abrasion of leaf surface or cuticle. Dust can increase leaf temperature; inhibit pollen germination; reduce photosynthetic activity, respiration, transpiration, and fruit set; decrease productivity; alter community structure; and contribute to cumulative impacts (e.g., drought stress on already stressed species or allow the penetration of phytotoxic gaseous pollutants, such as sulfur dioxide, nitrogen dioxide, and ozone). Some studies, however, indicate that plant species living in high light conditions are flexible to adapting to lower light conditions (e.g., desert plants) (Alves et al. 2002; Barber and Andersson 1992; Werner et al. 2002) and that some plant species show improved growth with increased dust deposition (i.e., limestone) (Brandt and Rhoades 1972). The overall impact on vegetation from fugitive dust would be localized near sources of dust and would be highest near areas of ground disturbance during construction activities and would decrease with the completion of construction activities.

The construction of project facilities would fragment vegetation communities and create edge areas. Edge areas have different microclimatic conditions and structure and may be characterized by compacted soils and increased runoff that can lead to changes in species composition and vegetation structure.

**Noxious Weeds**

Reclamation of disturbed areas would decrease but not eliminate the likelihood of noxious weeds becoming established or spreading in and adjacent to the project area. In areas where reclamation activities would occur, there would likely be reduced soil stability and an initial increase in the potential for noxious and invasive weed establishment and spread due to ground disturbance and decreased competition for space, light, and water. Efforts to reclaim these areas would lessen the potential for weed establishment and spread in the long term; however, it is anticipated that reclaimed areas would have a higher density of these non-native species than were present before ground-disturbing activities, even at completion of reclamation activities.

### 3.3.4.3     Alternative 2 – Near West Proposed Action

Potential impacts on soils, vegetation communities, and special status plant species, as well as impacts from noxious weeds, would be as described earlier under "Impacts Common to All Action Alternatives" and "Potential to Achieve Desired Future Conditions." Alternative 2 would remove or modify approximately 9,938 acres of vegetation and impact 9,938 total acres of soils (see table 3.3.4-2). This area represents all areas where activities could occur, though some areas are within fence lines and not anticipated to be physically impacted. This area also included mitigation lands, where disturbance would happen but result in an overall improvement in land condition. Of the disturbed area, 3,387 acres would potentially be revegetated and would recover productivity to some extent, as described under "Impacts Common to All Action Alternatives." Other areas—such as the East Plant Site, West Plant Site, and filter plant and loadout facility—could also be revegetated like the tailings storage facility and pipeline, but also may be reclaimed for other uses. The acres of potential impacts on vegetation communities and special status plant species habitat by alternative are given in tables 3.3.4-3 and 3.3.4-4.

***Financial Assurance for Closure and Post-Closure Activities***

Alternative 2 potentially involves long time periods of post-closure maintenance and monitoring related to revegetation and reclamation of the tailings storage facility. This raises the concern for the possibility of Resolution Copper's going bankrupt or otherwise abandoning the property after operations have ceased. If this were to happen, the responsibility for these long-term activities would fall to the Forest Service. The Forest Service would need to have financial assurance in place to ensure adequate funds to undertake these activities for long periods of time—for decades or even longer.

The authority and mechanisms for ensuring long-term funding is discussed in section 1.5.7. The types of activities that would likely need to be funded could include the following:

- Monitoring of the success of revegetation

- Implementing remedial actions if revegetation success criteria are not met

- Monitoring of the post-closure landform for excessive erosion or instability, and performance of any armoring

- Maintenance and monitoring of post-closure stormwater control features

- Monitoring the water quality of stormwater runoff associated with the closure cover, to determine ability to release stormwater back to the downstream watershed

Additional financial assurance requirements for long-term maintenance and monitoring are part of the Arizona APP program and include the following:

The applicant or permittee shall demonstrate financial responsibility to cover the estimated costs to close the facility and, if necessary, to conduct post-closure monitoring and maintenance by providing

ER306

### *Construction and Operations Phase – Non-Blasting Vibration Modeling*

Non-blasting vibration occurs from train movement, construction activities, stationary equipment, and other mobile equipment. Ground-borne vibrations were predicted using the type of equipment generally causing the greatest vibrations (an earthmoving truck), using estimates from the Federal Transit Administration (Quagliata et al. 2018).

## 3.4.3    Affected Environment

### 3.4.3.1    Relevant Laws, Metrics, Regulations, Policies, and Plans

No single regulatory agency or threshold is applicable to non-blasting noise generated by activities at the project sites. A full discussion of noise thresholds of significance appropriate for mining activities can be found elsewhere (Newell 2018d).

---

### Primary Legal Authorities and Technical Guidance Relevant to the Noise and Vibration Effects Analysis

- U.S. Department of Housing and Urban Development standards
- Pinal County Excessive Noise Ordinance
- Federal Highway Administration and Arizona Department of Transportation (ADOT) standards
- Office of Surface Mining Reclamation and Enforcement
- Federal Transit Administration
- Occupational Safety and Health Administration
- Mine Safety and Health Administration

---

### 3.4.3.2    Selected Thresholds

A variety of thresholds are used to put the predicted noise and vibration modeling results in context. These thresholds are being used for the purposes of the NEPA analysis. Note that these thresholds are likely not applicable to the project in a legal or regulatory sense, and in many cases have very specific applications or specific limitations that are not included explicitly in this analysis.

### *Blasting Noise Thresholds (Peak Air Overpressure)*

The selected threshold for airblast level is at or below 120 unweighted decibels (dBL), which is based on results presented in U.S. Bureau of Mines RI 8485 (Siskind et al. 1980) and represents a reasonable maximum threshold to avoid impacts on structures and humans.

### *Non-Blasting Noise Thresholds*

Thresholds of interest for non-blasting noise include the following:

- For the Ldn metric, the selected threshold is 65 A-weighted decibels (dBA). This is based on the U.S. Department of Housing and Urban Development's Acceptability Standards.
- For the Leq(h) metric, the selected threshold is 55 dBA. This is based on the Pinal County Excessive Noise Ordinance for residential areas during nighttime hours.

### Changes in Access

Public access to NFS land and transportation infrastructure would not be impacted under the no action alternative because there would be no new roads, updates to existing roads, or closures of existing roads under this alternative. There would be no direct, indirect, or cumulative effects on changes in access as a result.

### 3.5.4.2    Impacts Common to All Action Alternatives

### Effects of the Land Exchange

The land exchange would have significant effects on transportation and access. The Oak Flat Federal Parcel would leave Forest Service jurisdiction, and with it public access would be lost to the parcel itself, as well as passage through the parcel to other destinations, including Apache Leap and Devil's Canyon. These locations have other means of access, but those routes may not be as direct or convenient. Resolution Copper may keep portions of the property open for public access, as feasible.

The offered land parcels would enter either Forest Service or BLM jurisdiction. The eight parcels would have beneficial effects; they would become accessible by the public and be managed by the Federal Government for multiple uses. Roads and access would be managed in accordance with the appropriate management plans and agency direction.

### Effects of Forest Plan Amendment

The Tonto National Forest Land and Resource Management Plan (1985b) provides guidance for management of lands and activities within the Tonto National Forest. It accomplishes this by establishing a mission, goals, objectives, and standards and guidelines. Missions, goals, and objectives are applicable on a forest-wide basis. Standards and guidelines are either applicable on a forest-wide basis or by specific management area.

A review of all components of the 1985 forest plan was conducted to identify the need for amendment due to the effects of the project, including both the land exchange and the proposed mine plan (Shin 2020). A number of standards and guidelines (12) were identified applicable to management of transportation and access. None of these standards and guidelines were found to require amendment to the proposed project, either on a forest-wide or management area-specific basis. For additional details on specific rationale, see Shin (2020).

### Effects of Compensatory Mitigation Lands

Activities on the compensatory mitigation lands would involve some transportation of equipment to each location, but the traffic volumes would be negligible (a few vehicles) and are short-lived. These parcels are preserved for conservation and would have no long-term effects on traffic patterns or transportation.

### Effects of Recreation Mitigation Lands

The recreation mitigation lands are not anticipated to affect transportation but will improve access to recreation opportunities on NFS lands. Staging areas have been strategically located to be close to recreation areas while being accessible to passenger vehicles, and in close enough proximity to the town of Superior to encourage use. The recreation mitigation lands will facilitate access to recreational opportunities currently unavailable to recreationists in and around Superior as well as those traveling from the Phoenix metropolitan area. Access to the Inconceivables area is provided in the recreation mitigation lands; this area is not readily accessible under current conditions.

### *Transportation Routes and Changes in Access*

Changes in access to the NFS road system as a result of the proposed activities at the East Plant Site, West Plant Site, and filter plant and loadout facility are shown in table 3.5.4-4. Approximately 8.0 miles of NFS roads are expected to be decommissioned or lost.

The primary impacts occur from the subsidence area development and include large portions of NFS Roads 315 and 3153. These roads provide access to areas that include Apache Leap and Devil's Canyon as well as connectivity to other NFS roads. Access would still be available to these areas, but those routes may not be as direct or convenient. Resolution Copper may keep portions of the property open for public access, as feasible, but the roads that pass through the Oak Flat Federal Parcel are not expected to remain open.

All alternatives would involve impacts on Silver King Mine Road and NFS Road 229, which provide through travel to the highlands north of Superior, as well as to private inholdings in the Tonto National Forest. All alternatives would maintain access to these areas; for Alternative 4, access would be administrative due to the presence of the tailings storage facility.

**Table 3.5.4-4. Miles of NFS roads decommissioned and lost for East Plant Site, West Plant Site, and filter plant and loadout facility**

| Facility | Tonto National Forest NFS Roads Decommissioned and Lost (miles)* | Resolution Copper Applicant-Committed Improvements and Maintenance |
|---|---|---|
| West Plant Site: Total Roads | 2.54 | |
|     NFS Road 1010 | 0.37 | Level 1 |
|     NFS Road 229 | 2.17 | Portions reconstructed to level 3 |
| East Plant Site/Subsidence Area: Total Roads | 5.45 | |
|     NFS Road 2432 | 0.78 | None |
|     NFS Road 2433 | 0.23 | None |
|     NFS Road 2434 | 0.29 | None |
|     NFS Road 2435 | 0.28 | None |
|     NFS Road 2438 | 0.32 | None |
|     NFS Road 3153 | 1.19 | None |
|     NFS Road 3791 | 0.1 | None |
|     NFS Road 315 | 2.28 | None |
| San Tan Valley Filter Plant and Loadout Facility: Total Roads | 0.0 | None |

Notes: Roads intersected by pipeline corridors or transmission line corridors are considered to remain open.

Level 1 – Basic custodial care; Level 2 – High-clearance vehicles; Level 3 – Suitable for passenger cars

* Includes West Plant Site, East Plant Site, subsidence area, and maximum impact acreage for Silver King Mine Road alignment. Road segments less than 0.05 mile not shown.

### *Roadway Maintenance*

Transportation of personnel, equipment, supplies, and materials related to mine development, operation, and reclamation could increase roadway maintenance requirements. Increased traffic can contribute to earlier and more extensive deterioration of road surfaces, therefore requiring more frequent and higher levels of maintenance.

This section analyzes impacts on GDEs and local water supplies from dewatering and block caving, the amount of water that would be used by each alternative, the impacts from pumping of the mine water supply from the Desert Wellfield, and the potential for ground subsidence to occur because of groundwater pumping. Some aspects of the analysis are briefly summarized in this section. Additional details not included here are in the project record (Newell and Garrett 2018d).

### Changes from the DEIS

We received a number of technical comments on the groundwater modeling effort used in the DEIS. We assessed these comments with the assistance of the reconvened Water Resources Workgroup. Many of the comments represented alternative modeling choices but not errors in the modeling process (Garrett 2020e). A review of these comments resulted in several clarifications and additions to this section, including details of baseline conditions and model calibration.

This section incorporates updated information with respect to springs and hydrologic conditions at the Skunk Camp location. We added further discussion of the development of the Desert Wellfield model in the East Salt River valley, and a refined analysis of potential subsidence impacts in that area.

The cumulative effects analysis was revised for the FEIS to better quantify impacts. It is described in detail in chapter 4 and summarized in this section. We received numerous comments concerned with water use by the mine and potential water scarcity due to drought, climate change, and competing water uses. The cumulative effects analysis now includes an expanded discussion of these issues. Mitigations developed between the DEIS and FEIS are summarized in appendix J and, if applicable to water quantity, are analyzed for effectiveness in this section.

### 3.7.1.2 Analysis Methodology, Assumptions, and Uncertain and Unknown Information

### Analysis Area

The analysis area for assessing impacts on groundwater quantity and GDEs comprises the groundwater model boundary for the mine site (figure 3.7.1-1) as well as the groundwater model boundary for the East Salt River valley model (figure 3.7.1-2). Models were run up to 1,000 years in the future, but as described below, quantitative results were reasonably applied up to 200 years in the future.

### Modeling Process

In September 2017, the Tonto National Forest convened a multidisciplinary team of professionals, referred to as the Groundwater Modeling Workgroup. The Groundwater Modeling Workgroup included Tonto National Forest and Washington-level Forest Service hydrologists, the groundwater modeling experts on the project NEPA team, representatives from ADWR, AGFD, the EPA, the San Carlos Apache Tribe, and Resolution Copper and its contractors. This group included not only hydrologists working on the groundwater model itself, but also the biologists and hydrologists who have conducted monitoring in the field and are knowledgeable about the springs, streams, and riparian systems in the project vicinity. The Groundwater Modeling Workgroup tackled three major tasks: defining sensitive areas, evaluating the model and assisting the Tonto National Forest in making key decisions on model construction and methodology, and assisting the Tonto National Forest in making key decisions on how to use and present model results.

combined professional judgment, the Groundwater Modeling Workgroup determined that results could be reasonably assessed up to 200 years into the future. All quantitative results disclosed in the EIS are restricted to this time frame.

The Groundwater Modeling Workgroup also recognized that while quantitative predictions over long time frames were not reliable, looking at the general trends of groundwater levels beyond the 200-year time frame still provides valuable context for the analysis. In most cases, the point of maximum groundwater drawdown or impact for any given GDE does not occur at the end of mining. Rather, it takes time for the full impacts to be observed—decades or even centuries. Even if quantitative results are unreliable at long time frames, the general trends in modeled groundwater levels can indicate whether the drawdown or impact reported at 200 years represents a maximum impact, or whether conditions might still worsen at that location. These trends are qualitatively explored, regardless of time frame. Specifically, see the discussions in section 3.7.1.5 titled "Longer Term Modeled Impacts". These qualitative discussions include impacts beyond the 200-year time frame for springs, Devil's Canyon, Queen Creek, Telegraph Canyon, Arnett Creek, and water supplies.

Time frames are only pertinent for transient models. Some public comments suggest that alternative approaches could have been used for the EIS analysis, either using a steady-state model to predict post-mine conditions or simply assuming that post-mine conditions would eventually (many centuries in the future) return to pre-mining conditions. Neither of these approaches is supportable for predicting impacts from the mine.

Steady-state modeling requires aquifer conditions and boundary conditions that are unchanging and in equilibrium. Regarding the mine, the use of block caving will incrementally change the aquifer characteristics over time during operations. Additionally, the amount of pumping is anticipated to change during operations. A transient model that allows for these changes is the only approach that can predict the groundwater levels as conditions change during operations. A steady-state model conceivably could have been used after operations cease to predict post-closure conditions. However, the modeling suggests equilibrium in the aquifer likely will not be achieved for over 1,000 years. Any results from a steady-state model would take place beyond 1,000 years. Thus, we considered such results to be remote and speculative.

Modeling could be avoided entirely if the assumption could be supported that post-mine conditions would eventually return to pre-mining conditions. This will never occur. Block caving is anticipated to fundamentally alter the hydrogeologic framework of the aquifer system, effectively eliminating the Whitetail Conglomerate unit that to date has separated the deep groundwater system from the Apache Leap Tuff aquifer. There is no expectation that the post-mine aquifer system eventually will look the same as it does today. Modeling is the most appropriate tool to predict how an altered aquifer system, fundamentally different from current conditions, would function.

KEY DECISION ON USE OF MODEL RESULTS – LEVEL OF PRECISION

Numerical groundwater models produce highly precise results (i.e., many digits beyond the decimal point). Even in a well-calibrated model, professional hydrologists and modelers recognize that there is a realistic limit to this precision, beyond which results are meaningless. The Groundwater Modeling Workgroup was tasked with determining the appropriate level of precision to use for groundwater modeling results.

Based on combined professional judgment, the Groundwater Modeling Workgroup determined that to properly reflect the level of uncertainty inherent in the modeling effort, results less than 10 feet should not be disclosed or relied upon, as these results are beyond the ability of the model to predict. For values

extend west, below Apache Leap, and into the Superior Basin. Near Superior, water levels associated with these units have declined roughly 20 to 90 feet since 2009 (Montgomery and Associates Inc. and Resolution Copper 2016).

In the Oak Flat area, the Apache Leap Tuff aquifer overlies the deep groundwater system, and the Whitetail Conglomerate unit separates the two groundwater systems. The Whitetail Conglomerate unit acts as an aquitard—limiting the downward flow of groundwater from the Apache Leap Tuff. Groundwater level changes in the Apache Leap Tuff that have been observed have generally been 10 feet or less since 2009.

Groundwater levels in the Apache Leap Tuff are important because they provide water to GDEs, such as the middle and lower reaches of Devil's Canyon (Garrett 2018e). Resolution Copper has extensively monitored Devil's Canyon since as early as 2003. Most hydrologic indicators show no significant change over time in Devil's Canyon (Garrett 2019f). A number of other water sources have been monitored on Oak Flat and show seasonal drying, but these locations have been demonstrated to be disconnected from the Apache Leap Tuff aquifer, relying instead on localized precipitation (Garrett 2018e; Montgomery and Associates Inc. 2017a). Other pumping also occurs within the Superior Basin, but is substantially less than the Resolution Copper dewatering, roughly accounting for less than 10 percent of groundwater pumped within the model area (Montgomery and Associates Inc. 2018).

GROUNDWATER-DEPENDENT ECOSYSTEMS

The Tonto National Forest evaluated 67 different spring or stream locations in the project area as potential GDEs. These include the following:

- **Queen Creek watershed.** Areas evaluated include Queen Creek itself from its headwaters to Whitlow Ranch Dam, four tributaries (Number Nine Wash, Oak Flat Wash, Arnett Creek, and Telegraph Canyon), and 29 spring locations.

- **Devil's Canyon watershed.** Areas evaluated include Devil's Canyon from its headwaters to the confluence with Mineral Creek at the upper end of Big Box Reservoir, three tributaries (Hackberry Canyon, Rancho Rio Canyon, and Iron Canyon), and seven spring locations. Four of these springs are located along the main stem of Devil's Canyon and contribute to the general streamflow.

- **Mineral Creek watershed.** Areas evaluated include Mineral Creek from its headwaters to the confluence with Devil's Canyon at the upper end of Big Box Reservoir, and five spring locations. Three of these springs are located along the main stem of Mineral Creek and contribute to the general streamflow.

After evaluating available lines of evidence for portions of Queen Creek, Devil's Canyon, Mineral Creek, Telegraph Canyon, and Arnett Creek, the Groundwater Modeling Workgroup thought it likely that some stream segments within these watersheds could have at least a partial connection to regional aquifers, and each is described in more detail in the following text of this section. In addition, the Groundwater Modeling Workgroup identified 17 springs that demonstrate at least a partial connection to regional aquifers. The remainder of the potential GDEs were eliminated from analysis for various reasons (Garrett

**Devil's Canyon**

The upper reach of Devil's Canyon (from above the U.S. 60 bridge to approximately km 9.3) includes a reach of perennial flow from approximately DC-11.0 to DC-10.6. The geohydrology suggests that this section of Devil's Canyon lies above the water table in the Apache Leap Tuff aquifer and is most likely supported by snowmelt or precipitation stored in near-surface fractures, and/or floodwaters that have been stored in shallow alluvium along the stream, before slowly draining into the main channel. Further evaluation of hydrochemistry and flow data support this conclusion (Garrett 2018e). Streamflow in Upper Devil's Canyon is not considered to be connected with the regional Apache Leap Tuff aquifer and would not be expected to be impacted by groundwater drawdown caused by the block-cave mining and dewatering. This portion of Devil's Canyon is also upstream of the subsidence area and unlikely to be impacted by changes in surface runoff.

Moving downstream in Devil's Canyon, persistent streamflow arises again about km 9.3. From this point downstream, Devil's Canyon contains stretches of perennial flow, aquatic habitat, and riparian galleries. Flow arises both from discrete springs along the walls of the canyon (four total), as well as groundwater inflow along the channel bottom. These reaches of Devil's Canyon also are supported in part by near-surface storage of seasonal precipitation; however, the available evidence indicates that these waters arise primarily from the regional Apache Leap Tuff aquifer. Streamflow in middle and lower Devil's Canyon is considered to be connected with the regional aquifer, which could potentially be impacted by groundwater drawdown caused by the block-cave mining and dewatering. These reaches of Devil's Canyon also receive runoff from the area where the subsidence area would occur and therefore may also lose flow during runoff events.

**Queen Creek**

The available evidence suggests that Queen Creek from headwaters to Whitlow Ranch Dam is ephemeral in nature, although in some areas above Superior it may be considered intermittent, as winter base flow does occur and likely derives from seasonal storage of water in streambank alluvium, which slowly seeps back in to the main channel (Garrett 2018e). This includes three springs located along the main stem of Queen Creek above Superior.

An exception for Queen Creek is a perennially flowing reach between km 17.39 and 15.55, which is located downstream of Superior and upstream of Boyce Thompson Arboretum. Originally this flowing reach had been discounted because it receives effluent discharge from the Superior Wastewater Treatment Plant. However, discussions within the Groundwater Modeling Workgroup suggested that a component of baseflow supported by regional aquifer discharge may exist in this reach as well. Regardless of whether baseflow directly enters the channel from the regional aquifer, substantial flow in this reach also derives from dewatering discharges from a small open-pit perlite mining operation, where the mine pit presumably intersects the regional aquifer (Garrett 2018e). Therefore, for several reasons, this reach was included as a potential GDE, with the potential to be impacted by regional groundwater drawdown. The AGFD conducted surveys on this reach in 2017 and found that while flow fluctuated throughout the survey reach, aquatic wildlife and numerous other avian and terrestrial species use this habitat, and that aquatic species appeared to be thriving and reproducing (Warnecke et al. 2018).

Queen Creek also has perennial flow that occurs at Whitlow Ranch Dam and supports a 45-acre riparian area (primarily cottonwood, willow, and saltcedar). This location is generally considered to be where most subsurface flow in the alluvium along Queen Creek and other hydrologic units exits the Superior Basin. Queen Creek above and below Superior receives runoff from the area where the subsidence area would occur and therefore may also lose flow during runoff events. About 20 percent of the average

### *Impacts Common to All Action Alternatives*

EFFECTS OF THE LAND EXCHANGE

The land exchange would have effects on groundwater quantity and GDEs.

The Oak Flat Federal Parcel would leave Forest Service jurisdiction. Several GDEs were identified on the Oak Flat Federal Parcel, including Rancho Rio Canyon, Oak Flat Wash, Number 9 Wash, the Grotto (spring), and Rancho Rio spring. The role of the Tonto National Forest under its primary authorities in the Organic Administration Act, Locatable Minerals Regulations (36 CFR 228 Subpart A), and Multiple-Use Mining Act is to ensure that mining activities minimize adverse environmental effects on NFS surface resources; this includes these GDEs. The removal of the Oak Flat Federal Parcel from Forest Service jurisdiction negates the ability of the Tonto National Forest to regulate effects on these resources.

The offered lands parcels would enter either Forest Service or BLM jurisdiction. A number of perennial water features are located on these lands, including the following:

- Tangle Creek. Features of the Tangle Creek Parcel include Tangle Creek and one spring (LX Spring). Tangle Creek is an intermittent or perennial tributary to the Verde River and bisects the parcel. It includes associated riparian habitat with mature hackberry, mesquite, ash, and sycamore trees.

- Turkey Creek. Features of the Turkey Creek Parcel include Turkey Creek, which is an intermittent or perennial tributary to Tonto Creek and eventually to the Salt River at Roosevelt Lake. Riparian vegetation occurs along Turkey Creek with cottonwood, locus, sycamore, and oak trees.

- Cave Creek. Features of the Cave Creek Parcel include Cave Creek, an ephemeral to intermittent tributary to the Agua Fria River, with some perennial reaches in the vicinity of the parcel.

- East Clear Creek. Features of the East Clear Creek Parcel include East Clear Creek, a substantial perennial tributary to the Little Colorado River. Riparian vegetation occurs along East Clear Creek, including boxelder, cottonwood, willow, and alder trees.

- Lower San Pedro River. Features of the Lower San Pedro River Parcel include the San Pedro River and several large, ephemeral tributaries (Cooper, Mammoth, and Turtle Washes). The San Pedro River itself is ephemeral to intermittent along the 10-mile reach that runs through the parcel; some perennial surface water is supported by an uncapped artesian well. The San Pedro is one of the few remaining free-flowing rivers in the Southwest and it is recognized as one of the more important riparian habitats in the Sonoran and Chihuahuan Deserts. The riparian corridor in the parcel includes more than 800 acres of mesquite woodlands that also features a spring-fed wetland.

- Appleton Ranch. The Appleton Ranch Parcels are located along ephemeral tributaries to the Babocomari River (Post, Vaughn, and O'Donnel Canyons). Woody vegetation is present along watercourses as mesquite bosques, with very limited stands of cottonwood and desert willow.

- No specific water sources have been identified on the Apache Leap South Parcel or the Dripping Springs Parcel.

Specific management of water resources on the offered lands would be determined by the agencies, but in general when the offered lands enter Federal jurisdiction, these water sources would be afforded a level of protection they currently do not have under private ownership.

### *Alternative 2 – Near West Proposed Action*

GROUNDWATER-DEPENDENT ECOSYSTEMS IMPACTED

Three GDEs would be directly disturbed by a tailings facility at the Near West site: Bear Tank Canyon Spring, Benson Spring, and Perlite Spring. All three of these GDEs are believed to be disconnected from the regional aquifers, relying on precipitation stored in shallow alluvium or fracture networks. Benson Spring is located near the front of the facility, potentially under the tailings embankment. Bear Tank Canyon Spring is located in the middle of the facility under the NPAG tailings, and Perlite Spring is located at the northern edge of the facility, near the PAG tailings cell.

Alternative 2 likely will impact 20 GDEs (see figure 3.7.1-9):

- Six springs are anticipated to be impacted from continued dewatering under the no action alternative.

- Two additional springs are anticipated to be impacted under the proposed action, because of the block-cave mining.

- Three springs and three ponds are directly disturbed by the subsidence area.

- Three springs are directly disturbed by the Alternative 2 tailings storage facility.

- One perennial stream (Devil's Canyon) is impacted by reduced runoff from the subsidence area.

- Two perennial stream reaches on Queen Creek are impacted by reduced runoff from both the subsidence area and the tailings.

CHANGES IN TAILINGS WATER BALANCE

The substantial differences in water balance between alternatives are directly related to the location and design of the tailings storage facility. There are five major differences, as shown in table 3.7.1-7:

- **Entrainment**. The tailings deposition method affects the amount of water that gets deposited and retained with the tailings. Alternative 2 entrains about the same amount of water as the other slurry tailings alternatives (Alternatives 3, 5, and 6), but substantially more than Alternative 4.

- **Evaporation**. The tailings deposition method also affects the amount of water lost through evaporation, even among slurry tailings. Alternative 2 evaporates a similar amount of water as Alternatives 5 and 6, but substantially more than Alternatives 3 and 4.

- **Watershed losses**. Watershed losses from the capture of precipitation depend primarily on the location of the tailings storage facility and where it sits in the watershed. Surface runoff losses are summarized in table 3.7.1-5, and are analyzed in greater detail in Section 3.7.3, Surface Water Quantity.

- **Seepage.** Differences in seepage losses are substantial between alternatives. Three estimates of seepage are shown in table 3.7.1-7. The amount of seepage based on the initial tailings designs using only the most basic level of seepage controls is shown, and primarily reflects the type of tailings deposition and geology (WestLand Resources Inc. 2018b). After these initial designs, the engineered seepage controls were refined as part of efforts to reduce impacts on water quality from the seepage (Klohn Crippen Berger Ltd. 2019d). The estimated reduced seepage rates with all engineered seepage controls in place, both during operations and post-closure, are also shown in table 3.7.1-7. Alternative 2 loses more seepage than Alternatives 3 and 4, but less seepage than Alternatives 5 and 6. The effects of seepage on groundwater and surface water quality are analyzed in greater detail in Section 3.7.2, Groundwater and Surface Water Quality.

413

While water flow, riparian ecosystems, and associated terrestrial and aquatic habitat would be maintained, there would still likely be a noticeable change in the overall environment that could affect wildlife, or the recreating public. The presence of infrastructure like wells and pipes near some natural areas could change the sense of place and nature experienced in these locations.

IMPACTS FROM MITIGATION ACTIONS

The mitigation actions identified would result in additional ground disturbance, though minimal. Mitigation for any given GDE would likely result in less than 1 acre of impact, assuming a well pad and pipeline installation, or installation of check dams. If all mitigations were installed as indicated in the plan, impacts could total 20 to 30 acres of additional ground disturbance.

MITIGATION EFFECTIVENESS AND IMPACTS OF VOLUNTARY MITIGATION MEASURES APPLICABLE TO GROUNDWATER QUANTITY AND GROUNDWATER-DEPENDENT ECOSYSTEMS

Appendix J contains mitigation and monitoring measures brought forward voluntarily by Resolution Copper and committed to in correspondence with the Forest Service. These measures are assumed to occur but are not guaranteed to occur. Their effectiveness and impacts if they were to occur are disclosed here; however, the unavoidable adverse impacts disclosed below do not take the effectiveness of these mitigations into account. No additional mitigation measures were voluntarily brought forward for groundwater quantity and GDEs.

OTHER POTENTIAL FUTURE MITIGATION MEASURES APPLICABLE TO GROUNDWATER QUANTITY AND GROUNDWATER-DEPENDENT ECOSYSTEMS

Appendix J contains several other potential future mitigation measures that the Forest Service is disclosing as potentially useful in mitigating adverse effects, but for which there is no authority to require. There is no expectation that these measures would occur, and therefore the effectiveness is not considered in the EIS.

**Mitigation of effects of water level declines (PF-WR-03).** The required measure above applied only to GDEs or wells located near the mine site, where dewatering impacts could occur. Similar concerns have been raised regarding drawdown from the Desert Wellfield, in the East Salt River valley. The permitting process for the wellfield will determine whether there are unavoidable impacts that may need mitigation, in which case Resolution Copper has indicated a willingness to consider additional measures.

UNAVOIDABLE ADVERSE IMPACTS

Given the effectiveness of mitigation, there would be no residual impacts on public water supplies near the mine site. All lost water supplies would be replaced.

For GDEs expected to be impacted by groundwater drawdown, the mitigation measures described would result in no net loss of riparian ecosystems or aquatic habitat on the landscape, although the exact nature and type of ecosystems would change to adapt to new water sources. However, impacts on the sense of place and nature experienced at these perennial streams and springs, rare in a desert environment, would not be mitigated by these actions.

The mitigation plan would not mitigate any GDEs lost directly to surface disturbance, depending on the tailings alternative.

Impacts on water supplies in the East Salt River valley in the form of groundwater drawdown and reduction of regional groundwater supply would not be fully mitigated when only required mitigation is considered.

***Other Required Disclosures***

SHORT-TERM USES AND LONG-TERM PRODUCTIVITY

Groundwater pumping would last the duration of the mine life. At the mine itself, groundwater levels would slowly equilibrate over a long period (centuries). Groundwater drawdown from dewatering of the underground mine workings would constitute a permanent reduction in the productivity of groundwater resources within the long time frame expected for equilibrium. Groundwater in the vicinity of the Desert Wellfield would equilibrate more quickly, but there would still be an overall decline in the regional water table due to the Resolution Copper Project and a permanent loss of productivity of groundwater resources in the area.

Seeps and springs could be permanently impacted by drawdown in groundwater levels, as could the riparian areas associated with springs, but these impacts would be mitigated. GDEs or riparian areas directly lost to surface disturbance would be a permanent impact.

IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES

Mine dewatering at the East Plant Site under all action alternatives would result in the same irretrievable commitment of 160,000 acre-feet of water from the combined deep groundwater system and Apache Leap Tuff aquifer over the life of the mine.

Changes in total groundwater commitments at the Desert Wellfield vary by alternative for tailings locations and tailings type. Alternative 4 would require substantially less water overall than the other alternatives (176,000 acre-feet, vs. 586,000 acre-feet for Alternative 2). Loss of this water from the East Salt River valley aquifer is an irretrievable impact; the use of this water would be lost during the life of the mine.

While several GDEs and riparian areas could be impacted by groundwater drawdown, these changes are neither irreversible nor irretrievable, as mitigation would replace water sources as monitoring identifies problems. However, even if the water sources are replaced, the impact on the sense of nature and place for these natural riparian systems would be irreversible. In addition, the GDEs directly disturbed by the subsidence area or tailings alternatives represent irreversible impacts.

## 3.7.2    Groundwater and Surface Water Quality

### 3.7.2.1    Introduction

The proposed mine could potentially impact groundwater and surface water quality in several ways. The exposure of the mined rock to water and oxygen, inside the mine as well as in stockpiles prior to processing, can create depressed pH levels and high concentrations of dissolved metals, sulfate, and dissolved solids. After processing, the tailings would be transported for disposal into the tailings storage facility. Seepage from the tailings has the potential to enter underlying aquifers and impact groundwater quality. In addition, contact of surface runoff with mined ore, tailings, or processing areas has the potential to impact surface water quality.

This section contains analysis of existing groundwater and surface water quality; results of a suite of geochemical tests on mine rock; predicted water quality in the block-cave zone and potential exposure pathways, including the potential for a lake to form in the subsidence area; impacts on groundwater and surface water from tailings seepage; impacts on surface water from runoff exposed to tailings; impacts on assimilative capacity of perennial waters; impacts on impaired waters; whether chemicals added during processing would persist in the tailings storage facility; the potential for asbestiform minerals to be

cells, while the NPAG tailings would be cycloned prior to placement. NPAG cyclone underflow (coarse material) would be used for embankment construction and NPAG cyclone overflow (fine material) would be thickened and placed behind the NPAG embankment. Details of the likely tailings operational sampling were explored by the Water Resources Workgroup (Wickham 2020).

### 3.7.2.4    Environmental Consequences of Implementation of the Proposed Mine Plan and Alternatives

#### No Action Alternative

Under the no action alternative, seepage would not develop from a tailings facility and contribute to chemical loading in downgradient aquifers or surface waters, and stormwater would not potentially contact tailings, ore, or process areas. Water quality in the block-cave zone and surrounding aquifers would continue to match current conditions.

#### Impacts Common to All Action Alternatives

EFFECTS OF THE LAND EXCHANGE

The land exchange would have effects on groundwater and surface water quality.

The Oak Flat Federal Parcel would leave Forest Service jurisdiction. The role of the Tonto National Forest under its primary authorities in the Organic Administration Act, Locatable Regulations (36 CFR 228 Subpart A), and Multiple-Use Mining Act is to ensure that mining activities minimize adverse environmental effects on NFS surface resources; this includes water quality. The removal of the Oak Flat Federal Parcel from Forest Service jurisdiction negates the ability of the Tonto National Forest to regulate effects on these resources.

The offered lands parcels would enter either Forest Service or BLM jurisdiction. A number of perennial water features are located on these lands and entering Federal management would offer additional protection for the water quality of these resources.

EFFECTS OF FOREST PLAN AMENDMENT

The Tonto National Forest Land and Resource Management Plan (1985b) provides guidance for management of lands and activities within the Tonto National Forest. It accomplishes this by establishing a mission, goals, objectives, and standards and guidelines. Missions, goals, and objectives are applicable on a forest-wide basis. Standards and guidelines are either applicable on a forest-wide basis or by specific management area.

A review of all components of the 1985 forest plan was conducted to identify the need for amendment due to the effects of the project, including both the land exchange and the proposed mine plan (Shin 2020). A number of standards and guidelines (16) were identified applicable to management of water resources. None of these standards and guidelines were found to require amendment to the proposed project, either on a forest-wide or management area-specific basis. For additional details on specific rationale, see Shin (2020).

EFFECTS OF COMPENSATORY MITIGATION LANDS

None of the activities proposed on the compensatory mitigation lands would impact groundwater or surface water quality. Ground disturbance could generate small amounts of sediment, but standard stormwater controls and best management practices would be in place to minimize these effects. Overall,

ER318

There is no expectation that these measures would occur, and therefore the effectiveness is not considered in the EIS.

**Create and maintain public information repository (PF-WR-01).** Maintaining a central location for monitoring data would allow the public to have access to reports submitted to regulatory agencies as conditions of permits. This would be beneficial for transparency, but overall would not reduce potential water quality impacts.

UNAVOIDABLE ADVERSE IMPACTS

The applicant-committed environmental protection measures for stormwater control would effectively eliminate any runoff in contact with ore or tailings. There are no anticipated unavoidable adverse effects associated with the quality of stormwater runoff under normal operating conditions, but under certain upset conditions and extreme storm events discharges from the seepage collection pond could occur, resulting in concentrations of contaminants in downstream waters above numeric water quality standards, though only for a certain distance until watershed flows dilute the discharge.

Seepage from the tailings storage facilities has several unavoidable adverse effects. In all cases, the tailings seepage adds a pollutant load to the downstream environment, including downstream aquifers and downstream surface waters where groundwater eventually daylights. The overall impact of this seepage varies by alternative. Alternatives 2, 3, and 4 all have anticipated impacts on water quality or have a high risk to water quality because of the extreme seepage control measures that must be implemented, and the relative inflexibility of adding more measures as needed, given the proximity to Queen Creek.

Alternatives 5 and 6 are located at the head of larger alluvial aquifers with some distance downstream before the first perennial water (the Gila River). Adverse effects are not anticipated from these alternatives. These two locations offer more flexibility for responding to potential problems using additional seepage controls if needed.

For all alternatives, some level of reduction in assimilative capacity of downstream waters (Queen Creek, Gila River) is unavoidable. For Alternatives 2, 3, and 4, discharge of additional contaminant load to designated impaired waters is also unavoidable.

### *Other Required Disclosures*

SHORT-TERM USES AND LONG-TERM PRODUCTIVITY

The use of the alternative sites for tailings storage represents a short-term use, with disposal happening over the operational life of the mine. However, the seepage from the tailings facilities would continue for much longer, with potential management anticipated being required over 100 years in some cases. While seepage persists, the long-term productivity of the downstream aquifers and surface waters could be impaired for some alternatives.

IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES

The potential impacts on water quality from tailings seepage would cause an irretrievable commitment of water resources downstream of the tailings storage facility, lasting as long as seepage continued. Eventually the seepage amount and pollutant load would decline, and water quality conditions would return to a natural state. This may take over 100 years to achieve in some instances.

While long lived, the impacts on water quality would not be irreversible, and would eventually end as the seepage and pollutant load declined.

---

## Primary Legal Authorities and Technical Guidance Relevant to the Surface Water Quantity Analysis

- Clean Water Act (Section 404)

- Executive Order 11988—Occupancy and modification of floodplains; Executive Order 11990—Destruction, loss, or degradation of wetlands

- Pinal County Floodplain Management Ordinance

---

### *Existing Conditions and Ongoing Trends*

REGIONAL HYDROLOGIC SETTING

The analysis area includes the Queen Creek, Devil's Canyon, Dripping Spring Wash, and Donnelly Wash drainages: all of these watercourses are tributaries of the Gila River, as shown in figure 3.7.3-1. Watershed characteristics of these drainages are summarized in table 3.7.3-1.

**Table 3.7.3-1. Watershed characteristics**

| Watershed | Minimum Elevation (feet amsl) | Maximum Elevation (feet amsl) | Mean Elevation (feet amsl) | Average Slope (percent) | Area (square miles) |
|---|---|---|---|---|---|
| Devil's Canyon | 2,240 | 5,610 | 4,240 | 36 | 36 |
| Dripping Spring Wash | 2,025 | 7,645 | 3,670 | 33 | 117 |
| Queen Creek | 2,135 | 5,610 | 3,225 | 31 | 143 |
| Donnelly Wash | 1,615 | 3,900 | 2,900 | 7 | 60 |

Note: Watershed characteristics derived from USGS StreamStats application (U.S. Geological Survey 2018c)

QUEEN CREEK AND DEVIL'S CANYON WATERSHEDS (SUBSIDENCE AREA AND ALTERNATIVES 2, 3, AND 4)

The western part of the analysis area is drained by Queen Creek, which arises in the highlands around the Pinal Mountains and flows past Oak Flat and through the town of Superior. Queen Creek ultimately flows to Whitlow Ranch Dam, about 11 miles west of Superior. The dam is an ungated flood risk–management structure that was constructed in 1960 to reduce the risk of downstream flood damage to farmland and the communities of Chandler, Gilbert, Queen Creek, and Florence Junction. The dam includes a diversion structure to satisfy local water rights.

As discussed in Section 3.7.1, Groundwater Quantity and Groundwater-Dependent Ecosystems, Queen Creek is primarily ephemeral but exhibits perennial flow downstream of the town of Superior wastewater treatment plant, both from effluent and groundwater discharges from a nearby mine pit.

The ore body is located approximately 4,500–7,000 feet beneath Oak Flat in the upper Queen Creek basin. Devil's Canyon is located to the immediate east of Oak Flat with its headwaters located north of U.S. 60. Devil's Canyon cuts through the Apache Leap Tuff, forming a steep-sided canyon that flows in a southerly direction for approximately 9 miles. Devil's Canyon discharges into the reservoir of Big Box Dam. Mineral Creek, to the immediate east of Devil's Canyon, also discharges into the reservoir. Big Box Dam was constructed to divert flows from Devil's Canyon and Mineral Creek around the Ray Mine and into the Gila River. As discussed in section 3.7.1, much of upper Devil's Canyon is ephemeral, where

runoff is driven by rainfall events. However, there are several perennial reaches that are sustained either by shallow, recharged groundwater systems or a regional groundwater system that discharges to the surface via seeps and springs.

The subsidence area would affect portions of the watershed for Queen Creek and Devil's Canyon, and the tailings storage facilities for Alternatives 2, 3, and 4 would affect tributaries to Queen Creek.

GILA RIVER WATERSHED (ALTERNATIVES 5 AND 6)

Alternative 5 – Peg Leg would impact Donnelly Wash, which flows north to join the Gila River downstream of Mineral Creek. Donnelly Wash flows through an alluvial valley and has more gentle slope gradients, compared with the other watersheds. The main stem channel of Donnelly Wash is entirely ephemeral, with no known perennial reaches.

Alternative 6 – Skunk Camp would impact Dripping Spring Wash. Dripping Spring Wash is located in the eastern part of the analysis area. Dripping Spring Wash flows to the southeast for approximately 18 miles before discharging into the Gila River downstream of the Coolidge Dam. The main stem channel of Dripping Spring Wash is entirely ephemeral, with no known perennial reaches.

Both Alternatives 5 and 6 would also affect flow to the Gila River itself, which is perennial between Coolidge Dam and Florence.

CLIMATE CONDITIONS

The climate of the project area is generally arid to semi-arid. Topography influences the spatial distribution of precipitation, being lowest in the valley bottoms (average annual totals of approximately 13 inches in the vicinity of Whitlow Ranch Dam), and greatest in the upper elevations of the Queen Creek watershed (26 inches). There are two separate rainfall seasons. The first occurs during the winter from November through March, when the area is subjected to occasional storms from the Pacific Ocean. The second rainfall period occurs during the July and August "monsoon" period when Arizona is subjected to widespread thunderstorm activity whose moisture supply originates in the Gulf of Mexico and Pacific Ocean.

Precipitation typically occurs as high-intensity, short-duration storms during the summer monsoon, and longer term storms of more moderate intensity that occur during the winter months. Summer storms, coupled with relatively impervious land surfaces, sparse vegetation, and steep topographic gradients, result in rapid increases in streamflow. Winter rains tend to produce runoff events of longer duration and with higher maximum flows than summer rains. This is a result of higher rainfall totals and wetter antecedent moisture conditions that tend to prevail in the winter months due to a significantly lower evapotranspiration demand. These wetter conditions result in less near-surface storage capacity in the winter and a larger proportion of any given rain event runs off rather than infiltrating. Regional gaging stations indicate that a majority of runoff occurs during the winter months (December to March) when evaporation rates are at a minimum.

**ONGOING CLIMATIC TRENDS AFFECTING WATER BALANCE**

Climate trends suggest that runoff could decrease in the future due to increased temperatures and reduced precipitation. Average temperatures in Arizona have increased about 2°F in the last century (U.S. Environmental Protection Agency 2016). In the Lower Colorado River basin, the annual mean and minimum temperature have increased 1.8°F–3.6°F for the time period 1900–2002, and data suggest that spring minimum temperatures for the same time period have increased 3.6°F–7.2°F (Dugan 2018).

Resolution Copper Project and Land Exchange

**Table 3.7.3-2. Watershed locations where changes in streamflow for the project EIS action alternatives were analyzed**

| Location | Drainage Area (square miles) | Action Alternative |
|---|---|---|
| Devil's Canyon – downstream of confluence with Hackberry Canyon, roughly DC-8.1C. | 19.0 | All |
| Devil's Canyon – confluence with Mineral Creek | 35.8 | All |
| Queen Creek – at Magma Avenue Bridge | 10.4 | All |
| Queen Creek – at Boyce Thompson Arboretum | 27.9 | All |
| Queen Creek – Upstream of Whitlow Ranch Dam | 143.0 | All |
| Potts Canyon* – confluence with Queen Creek | 18.1 | Alternative 4 |
| Happy Canyon* – confluence with Queen Creek | 4.2 | |
| Silver King Wash* – confluence with Queen Creek | 6.7 | |
| Roblas Canyon† – confluence with Queen Creek | 10.2 | Alternative 2, Alternative 3 |
| Bear Tank Canyon† – confluence with Queen Creek | 4.9 | |
| Unnamed Wash – confluence with Gila River | 7.1 | Alternative 5 |
| Donnelly Wash – confluence with Gila River | 59.9 | |
| Gila River at Donnelly Wash | 18,011 | Alternative 5 |
| Dripping Spring Wash – confluence with Gila River | 117 | Alternative 6 |
| Gila River at Dripping Spring Wash | 12,866 | Alternative 6 |

Note: See process memorandum for more information on differences between analysis points (Newell and Garrett 2018d).

* Northern tributary impacted by Alternative 4 tailings storage facility.

† Northern tributary impacted by Alternative 2 and Alternative 3 tailings storage facility.

The total area of watershed removed from the system of each of the alternatives is summarized in table 3.7.3-3. These footprints reference the total watershed area where water losses would occur, either due to contact water being collected (tailings storage facilities or West Plant Site) or from the subsidence area.

**Table 3.7.3-3. Watershed area lost for each mine component**

| Mine Component | Area of Watershed Lost (square miles) |
|---|---|
| Subsidence area – Queen Creek | 1.76 |
| Subsidence area – Devil's Canyon | 0.94 |
| West Plant Site | 1.40 |
| Near West tailings storage facility – Alternatives 2 and 3 | 6.90 |
| Silver King tailings storage facility – Alternative 4 | 6.32 |
| Peg Leg tailings storage facility – Alternative 5 | 11.88 |
| Skunk Camp tailings storage facility – Alternative 6 | 12.15 |

*Impacts Common to All Action Alternatives*

EFFECTS OF THE LAND EXCHANGE

The land exchange would have effects on surface water quantity.

The Oak Flat Federal Parcel would leave Forest Service jurisdiction. Several surface waters are located on the Oak Flat Federal Parcel, including Rancho Rio Canyon, Oak Flat Wash, and Number 9 Wash, and the parcel also is a portion of the watershed feeding both Queen Creek and Devil's Canyon. The role of the Tonto National Forest under its primary authorities in the Organic Administration Act, Locatable Regulations (36 CFR 228 Subpart A), and Multiple-Use Mining Act is to ensure that mining activities minimize adverse environmental effects on NFS surface resources; this includes these surface waters. The removal of the Oak Flat Federal Parcel from Forest Service jurisdiction negates the ability of the Tonto National Forest to regulate effects on these resources.

The offered lands parcels would enter either Forest Service or BLM jurisdiction. A number of ephemeral washes and perennial water features are located on these lands:

- Tangle Creek. Tangle Creek is an intermittent or perennial tributary to the Verde River and bisects the parcel. It includes associated riparian habitat with mature hackberry, mesquite, ash, and sycamore trees.

- Turkey Creek. Features of the Turkey Creek Parcel include Turkey Creek, which is an intermittent or perennial tributary to Tonto Creek and eventually to the Salt River at Roosevelt Lake. Riparian vegetation occurs along Turkey Creek with cottonwood, locus, sycamore, and oak trees.

- Cave Creek. Features of the Cave Creek Parcel include Cave Creek, an ephemeral to intermittent tributary to the Agua Fria River, with some perennial reaches in the vicinity of the parcel.

- East Clear Creek. Features of the East Clear Creek Parcel include East Clear Creek, a substantial perennial tributary to the Little Colorado River. Riparian vegetation occurs along East Clear Creek, including boxelder, cottonwood, willow, and alder trees.

- Lower San Pedro River. Features of the Lower San Pedro River Parcel include the San Pedro River and several large ephemeral tributaries (Cooper, Mammoth, and Turtle Washes). The San Pedro River itself is ephemeral to intermittent along the 10-mile reach that runs through the parcel; some perennial surface water is supported by an uncapped artesian well. The San Pedro is one of the few remaining free-flowing rivers in the Southwest and it is recognized as one of the more important riparian habitats in the Sonoran and Chihuahuan Deserts. The riparian corridor in the parcel includes more than 800 acres of mesquite woodlands that also features a spring-fed wetland.

- Appleton Ranch. The Appleton Ranch Parcels are located along ephemeral tributaries to the Babocomari River (Post, Vaughn, and O'Donnell Canyons). Woody vegetation is present along watercourses as mesquite bosques, with very limited stands of cottonwood and desert willow.

- Small ephemeral washes and unnamed drainages are associated with the Apache Leap South Parcel or the Dripping Springs Parcel.

Specific management of surface water resources on the offered lands would be determined by the agencies, but in general when the offered lands enter Federal jurisdiction, these surface waters would be afforded a level of protection they currently do not have under private ownership.

EFFECTS OF FOREST PLAN AMENDMENT

The Tonto National Forest Land and Resource Management Plan (1985b) provides guidance for management of lands and activities within the Tonto National Forest. It accomplishes this by establishing a mission, goals, objectives, and standards and guidelines. Missions, goals, and objectives are applicable

ER323

UNAVOIDABLE ADVERSE IMPACTS

The primary impact described in the analysis (in this section, as well as section 3.7.1) is the loss of surface water flow to riparian areas (including xeroriparian vegetation along ephemeral washes) and loss of surface flow to any GDEs that are associated with these drainages. The conceptual mitigation proposed under the CWA would not be effective at avoiding, minimizing, rectifying, or reducing these impacts. Rather, the proposed conceptual mitigation would be effective at offsetting impacts caused by reduced surface water flows by replacing riparian function far upstream or downstream of project impacts.

As the subsidence area is unavoidable, the loss of runoff to the watershed due to the subsidence area is also unavoidable, as are any effects on GDEs from reduced annual flows. Return of water to Queen Creek would be highly effective at eliminating impacts from this water loss, though this mitigation is voluntary and not guaranteed to occur. The loss of water to the watershed due to the tailings facility (during operations, prior to successful reclamation) is unavoidable as well, due to water management and water quality requirements. Direct impacts on wetlands, stock tanks, and ephemeral drainages from surface disturbance are also unavoidable.

### *Other Required Disclosures*

SHORT-TERM USES AND LONG-TERM PRODUCTIVITY

Desert washes, stock tanks, and wetland areas in the footprint of the subsidence area and tailings storage facility would be permanently impacted. In the short term, over the operational life of the mine, precipitation would be lost to the watershed. In the long term, most precipitation falling at the tailings facility would return to the watershed after closure and successful reclamation. There would be a permanent reduction in the quantity of surface water entering drainages as a result of capture of runoff by the subsidence area.

IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES

With respect to surface water flows from the project area, all action alternatives would result in both irreversible and irretrievable commitment of surface water resources. Irreversible commitment of surface water flows would result from the permanent reduction in stormwater flows into downstream drainages from the subsidence area. Changes to wetlands, stock tanks, and ephemeral drainages caused by surface disturbance would also be irreversible. Irretrievable commitment of surface water resources would be associated with additional temporary diversion, storage, and use of stormwater during active mining, but would be restored to the watershed after closure and reclamation.

Artificial lighting associated with the construction phase of the proposed project is less defined but is assumed to be less intense that associated with the operations phase, and to vary in location and intensity through the 1- to 9-year time period. Specific impacts would be similar to those described in the "General Operations Impacts" section; impacts on species groups are discussed in subsequent sections.

For species that utilize olfactory inputs to trigger part of their life cycle or habitat use, potential impacts from smells associated with construction activities could occur under all action alternatives. These potential impacts would be greatest for species that rely heavily on olfactory communication or cues.

### General Operations Impacts

Potential impacts on wildlife and special status wildlife species during the operations phase of all action alternatives would be associated with subsidence; potential reduction in surface water flows and groundwater availability to support riparian habitats; habitat changes from ongoing noxious and invasive weed establishment and spread; and the ongoing presence of workers and equipment.

During the operations phase of the proposed mine, there would be impacts on wildlife and special status wildlife species from subsidence. Subsidence of the ground surface is anticipated to occur at approximately 6 years after initiation of mining activities and is anticipated to continue until 41 years after initiation of mining activities (see Section 3.2, Geology, Minerals, and Subsidence).

Within the cave limit, the development of a subsidence area would change the slope, aspect, surface water flow direction and rate; surface elevation; and would impact habitat on approximately 1,342 acres. This could lead to mortality of wildlife species individuals within the subsidence area during caving/fracture events. Within the fracture limit (1,598 acres) the potential impacts would be similar to the cave limit; however, the intensity would be decreased as this area would have reduced surface impacts. The continuous subsidence limit (1,757 acres) would have limited potential for localized impacts on vegetation communities as it would have minimal surface impacts. The entire subsidence area would be fenced for public safety and would remove the subsidence area as habitat for some wildlife and special status wildlife species. Smaller species and avian species would be able to use the subsidence area as habitat.

Potential water usage associated with operation of all action alternatives would reduce water in the regional aquifer and may reduce surface water and groundwater levels downstream of the mine in Devil's Canyon and Queen Creek. Surface water amounts would be reduced, and timing/persistence of surface water would decrease. These potential decreases in groundwater and surface water would occur over a long period of time but could cause changes in riparian vegetation extent or health, and the potential reduction in streamflow could impact species that use these riparian areas during portions of their life cycle. Potential impacts may reduce or remove available habitat for wildlife and special status wildlife species and impact individuals in localized areas along Devil's Canyon and Queen Creek, or around springs. A reduction in spring and riparian habitats may require species in the area to travel farther to find water, thus impacting their overall fitness due to increased metabolic expenditures. Section 3.7.3.4 addresses potential changes to water availability.

The proposed water usage associated with the project is not anticipated to affect flow regimes or riparian habitat along the Gila River (see section 3.7.1 for a more detailed discussion of impacts on GDEs and riparian areas).

We do not anticipate any impacts on wildlife or special status wildlife species from water quality impacts at any of the tailings locations during operations, as any stormwater that comes in contact with the tailings piles would be contained in the tailings facilities or in seepage ponds downstream. Water quality modeling for the proposed project indicates that water quality at the tailings pile area would not exceed

### 3.8.4.5 Other Required Disclosures

***Short-Term Uses and Long-Term Productivity***

Impacts on wildlife and wildlife habitat would primarily be short term and would include destruction of habitat for mine construction, disturbance from mining and associated activities, and direct mortality from increased mine-related vehicle traffic. Disturbance and direct mortality would cease at mine closure, and reclamation would eventually allow wildlife habitat to reestablish itself. However, this could take many decades or longer. Portions of the tailings storage facility landform may never return to pre-mining conditions, and the effects of reduced quality of habitat would be long term or permanent. Impacts on wildlife and aquatic habitat due to drawdown that affects streams and springs would represent a permanent loss in productivity.

***Irreversible and Irretrievable Commitment of Resources***

The direct loss of productivity of thousands of acres of various habitat from the project components would result in both irreversible and irretrievable commitment of the resources that these areas provide for wildlife (i.e., breeding, foraging, wintering, and roosting habitat; animal movement corridors, etc.). Some habitat could reestablish after closure, which would represent an irretrievable commitment of resources, but portions of the tailings storage facility landform may never return to pre-mining conditions, and the effects of reduced quality of habitat would likely be irreversible.

treasures of Arizona and our nation. The Arizona Trail experience provides opportunities for quality recreation, self-reliance, and discovery within a corridor of open space defined by the spectacular natural landscapes of the state (U.S. Forest Service 2018c).

The Arizona Trail is administered by the Forest Service in cooperation with other Federal agencies. The Forest Service is developing a comprehensive management plan for the Arizona Trail that establishes a 0.5-mile trail management corridor extending from the trail centerline (total 1-mile-wide corridor) for the entire length of the trail. The management corridor is critical to the nature and purpose of the trail, and management plans for lands within the trail corridor will be developed or updated by the respective agencies after the Forest Service completes its comprehensive management plan.

Four trail "passages" are located within the analysis area, stretching from the Tortilla Mountains in the south to the Superstition Mountains in the north (see figure 3.9.3-1). The four passages of the Arizona Trail total approximately 84 miles of trail through the analysis area. These are Passage 15 – Tortilla Mountains; Passage 16 – Gila River Canyons; Passage 17 – Alamo Canyon; and Passage 18 – Reavis Canyon.

APACHE LEAP SPECIAL MANAGEMENT AREA

The Apache Leap SMA was established in 2017 (U.S. Forest Service 2017c) and straddles the Apache Leap escarpment, covering 839 acres (figure 3.9.3-5). This escarpment of cliffs and hoodoos visually dominates the eastern skyline from the basin below creating a scenic backdrop for the town of Superior and adjacent highways. The escarpment's eastern slopes include numerous drainages and canyons that lead to the Oak Flat area, located approximately 2 air miles away. The area offers dispersed recreation opportunities that emphasize nonmotorized and nature-based activities in a predominantly undeveloped setting.

The area was set aside in recognition of its unique natural and scenic character; for its bounty of life-sustaining natural resources, which include acorns, medicinal and other edible plants, wild game, and water; and as a place of religious and cultural importance to the Apache people.

No mining activities are proposed within the SMA. However, authorized activities under PL 113-291 include installing seismic monitoring equipment, as well as signage and other public safety notices, and operating an underground tunnel and associated workings between the East Plant Site and West Plant Site, which would extend beneath the Apache Leap escarpment.

OAK FLAT CAMPGROUND

The Tonto National Forest manages the Oak Flat Campground, which provides approximately 20 campsites (available first come, first served) and two vault toilets (U.S. Forest Service 2018d). The campground is situated along the Gila-Pinal Scenic Road in the rolling hills near Devil's Canyon (figure 3.9.3-6) and hosts a large stand of mature oak trees that provide natural shade. The surrounding area is known for its numerous recreational bouldering opportunities. Families and individuals like to come to this site for its natural desert beauty and rock climbing. Oak Flat Campground is also an important birding destination and considered an eBird "hotspot," with approximately 183 different species reported by birders to eBird (Arizona Game and Fish Department 2018e). Oak Flat is a unique recreation setting for not only Tonto National Forest but the entire state of Arizona. Multi-year camera studies conducted from 2011 to 2019 indicated over 5,000 observances of users in various areas of Oak Flat (Featherstone and Alexander 2019; Featherstone et al. 2012).

### 3.9.4.2 Impacts Common to All Action Alternatives

Impacts that would occur under each of the action alternatives are presented in this section. Regardless of action alternative, the principal adverse impact on recreational users of public lands as a result of the proposed action or alternatives would be through closure of lands to public access, meaning both direct loss of recreational use of the lands themselves and potential loss of access to adjacent lands because movement across these areas would become prohibited (see "Loss of Federal Land Base" below). Other impacts on recreational users may occur through increased traffic, increased noise, changes to the scenery or visual qualities of certain areas, and other mine-induced effects. Such effects are noted in the following text and addressed in greater detail in the portions of chapter 3 relevant to each of those resources.

A number of existing Resolution Copper–owned properties in the recreation analysis area are, by and large, already closed to public access: these include the privately held portions of the East Plant Site, the West Plant Site, and the filter plant and loadout facility. Thus, in the impact analyses presented in the sections that follow, loss of access to or across these private lands is not considered as a change from current, existing conditions. However, potential expansion of any of these facilities onto Tonto National Forest or other public lands as a result of project approval is considered a change from current conditions and thus an impact. So, too, is potential development of new facilities or physical alteration of lands that would result in closure of lands to recreational use or through-access, such as construction at any of the tailings storage facility locations or development of the anticipated subsidence area at Oak Flat.

The following project components that are common to all action alternatives are considered in the impact analyses: tailings storage facility including fence line boundary; subsidence area; East Plant Site expansion onto Tonto National Forest lands; MARRCO corridor; and conveyance of the Oak Flat Federal Parcel to Resolution Copper through the PL 113-291–mandated land exchange. It should be noted that tailings pipeline corridors and power transmission line corridors, though part of mine facilities under any alternative, may represent a change to recreation settings but are not considered in this analysis as precluding public crossing or other access.

Components or differing configurations of components that are unique to one or more alternatives are described and addressed in the portions of the analysis specific to each alternative.

#### *Effects of the Land Exchange*

The land exchange would have significant effects on recreation. The Oak Flat Federal Parcel would leave Forest Service jurisdiction, and with its myriad recreational opportunities currently available and used by the public. The Oak Flat bouldering area offers freestanding bounders and small cliff-lined canyons with over 1,000 documented boulder routes and problems. The area has held various bouldering and climbing competitions as recently as 2016 and the Phoenix Bouldering Contests and Phoenix Boulder Blasts through 2004; all climbing and bouldering areas would be lost when the Oak Flat Federal Parcel transfers out of Federal ownership. Additional recreational activities that would be lost include camping at the Oak Flat Campground, picnicking, and nature viewing. The campground currently provides approximately 20 campsites and a large stand of native oak trees. It also is boasted as an important birding destination with approximately 183 different species reported by birders.

The offered lands parcels would enter either Forest Service or BLM jurisdiction. The eight parcels would have beneficial effects; they would become accessible by the public and would be managed by the Federal Government for multiple uses, which could include recreational activities. Some parcels, specifically Cave Creek, Tangle Creek, and Turkey Creek, all have trails leading directly into them. Under Federal management, these parcels could provide an extension of current recreational activities in those areas. Specific uses would be identified by the respective agency upon conduction of the land

**ER328**

Community. Recreational use of Queen Creek is highly likely, given the proximity to trail systems and the new Castleberry Campground.

### Effects of Recreation Mitigation Lands

The recreation mitigation lands are anticipated to affect recreation through the development of a planned recreation trail system on NFS lands. The existing roads and trails, as well as new planned routes, will provide opportunities for hikers, equestrians, mountain bicyclists, rock climbers, and OHV users. The planned trail system will better employ the currently underdeveloped recreation opportunities of NFS lands located in close proximity to Superior and the Phoenix metropolitan area.

The recreation mitigation lands also are anticipated to reduce conflicts between recreational use and other uses of the Tonto National Forest or nearby private property. Trails were designed to reduce user motorized and nonmotorized group conflicts, to avoid trails near illegal and unauthorized shooting areas, and to eliminate private land crossing, including access to an existing mine operation not associated with the Resolution Copper Project.

### Summary of Applicant-Committed Environmental Protection Measures

A number of environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on recreation. These are non-discretionary measures, and their effects are accounted for in the analysis of environmental consequences.

Applicant-committed environmental protection measures by Resolution Copper include the following:

- Developing traditional and sport climbing open to the public on Resolution Copper property outside of the mining footprint through agreement with Queen Creek Coalition. Further detail can be found on the Queen Creek Coalition website and the agreement with REI.

- Developing a concentrate pipeline corridor management plan to reestablish crossing on the Arizona Trail after construction. Further detail can be found in the Concentrate Pipeline Corridor Management Plan (M3 Engineering and Technology Corporation 2019).

To prevent exposure of the public to geological hazards, Resolution Copper would use fencing, berms, locking gates, signage, natural barriers/steep terrain (25 to 30 percent or greater), and site security measures to limit access roads and other locations near areas of heavy recreational use.

### General Setting

It is possible that users could be displaced or opportunities for public recreation activities could be diminished in portions of the action alternatives area where public access is restricted. The subsidence area (approximately 1,672 acres of NFS lands, prior to the land exchange) would be lost for public access in perpetuity. Based on current knowledge, the steep and unstable slopes of the subsidence area are projected to be unsafe for future public access. Adjacent and surrounding areas likely would experience increased recreational use displaced when Oak Flat becomes unavailable. This pressure could lead to overcrowding and overuse commensurate with future increases in recreation visitation.

The removal of covering vegetation during pre-mining and mining operations would have an indirect impact on adjacent recreational users in the analysis area from diminishing the quality of the recreational setting. The recreation setting would be changed as a result of the visual contrast these activities introduce to the existing landscape. Although the sight of mining activities may not affect some recreational users (e.g., hunting or OHV driving), those seeking the features of a natural setting may see the change to the

There is no expectation that these measures would occur, and therefore the effectiveness is not considered in the EIS.

**Voluntary achievement of "no net loss" of habitat (PF-WI-01).** The acquisition of additional open space within the region would offer direct benefits to habitat, wildlife, and recreation.

**Purchase lands in the "Preserve" (PF-RC-01).** The acquisition of additional open space within the region would offer direct benefits to habitat, wildlife, and recreation.

**Develop MARRCO corridor for tourism and reactivate rail (PF-RC-02).** This mitigation would only be undertaken after study and resolution of potential safety and operational conflicts. If feasible, it would provide a new recreation opportunity in the town of Superior, which would be beneficial for socioeconomic development and tourism.

**Fund extension of the LOST Queen Creek segment (PF-RC-03).** This mitigation would add to recreational trail opportunities in the vicinity of the town of Superior, building on the suite of mitigation measures already being required (FS-RC-03). However, this use may not be compatible with the management of the Apache Leap SMA.

### *Unavoidable Adverse Impacts*

Recreational use of the area would be permanently adversely impacted. Unavoidable adverse impacts on recreation include long-term displacement from the project area and the loss of public access roads throughout the project area. These impacts cannot be avoided or fully mitigated.

## 3.9.4.10    Other Required Disclosures

### *Short-Term Uses and Long-Term Productivity*

Recreation would be impacted in both the short and long term. Public access would be restricted within the perimeter fence until mine closure, which is considered to be a short-term impact. However, most of the tailings and subsidence area would not be available for uses such as OHV or other recreational use in the future, depending on the final stability and revegetation of these areas.

### *Irreversible and Irretrievable Commitment of Resources*

In general, there would be irretrievable and irreversible impacts as a result of displaced recreational users and adverse effects on recreation experiences and activities as reported above under "Loss of Federal Land Base." There would be irretrievable impacts on recreation with all action alternatives. Alternatives 2, 3, and 5 would cross the Arizona Trail. Alternative 4 would require rerouting of the trail.

Each action alternative would result in the permanent removal of off-highway routes, resulting in a permanent loss of recreation opportunities and activities. Public access would only be permitted outside the mine perimeter fence. Although routes through the project area might be reestablished after closure of the East Plant Site, West Plant Site, filter plant and loadout facility, and the MARRCO corridor, routes through the subsidence area and tailings storage facility would not be reestablished. Therefore, impacts on OHV routes are considered irretrievable for those that would be reestablished following mine closure, and irreversible for those that would be permanently affected.

Even after full reclamation is complete, the post-mine topography of the project area may limit the recreation value and potential for future recreation opportunities.

ER330

### Impacts Common to All Action Alternatives

Based on the preliminary GPO, potentially hazardous materials, including petroleum products, processing fluids, and reagents and explosives, would be transported to and stored within the boundaries of the mine in large quantities for use in various operational components of the mine (Resolution Copper 2016c). Hazardous and non-hazardous materials and supplies are included in section 3.9 of the GPO, "Materials, Supplies and Equipment." Transportation of hazardous materials as well as proposed mining activities have the potential to release these materials into the environment and affect the natural condition of soils, vegetation, wildlife, surface water and groundwater resources, and air quality within the analysis area. The issues considered in this section are (1) the use, storage, and disposal of hazardous materials within the project area; (2) the transportation of hazardous materials to the project area; and (3) the potential for those materials to enter the environment in an uncontrolled manner, such as by accidental spill.

An accidental release or significant threat of a release of hazardous chemicals into the environment could result in direct and indirect harmful effects on or threat to public health and welfare or the environment. The environmental effects of a hazardous chemical release would depend on the substance, quantity, timing, and location of the release. A release event could range from a minor diesel fuel spill within the boundaries of the mine, where cleanup would be readily available, to a major or catastrophic spill of contaminants into a stream or populated area during transportation. Some hazardous chemicals could have immediate destructive effects on soils and vegetation, and there also could be immediate degradation of aquatic resources and water quality if spills were to enter surface water. Spills of hazardous materials could potentially seep into the ground and contaminate the groundwater system over the long term.

EFFECTS OF THE LAND EXCHANGE

The land exchange would have an effect on the potential presence and use of hazardous materials on these lands.

The Oak Flat Federal Parcel would leave Forest Service jurisdiction. The role of the Tonto National Forest under its primary authorities in the Organic Administration Act, Locatable Regulations (36 CFR 228 Subpart A), and Multiple-Use Mining Act is to ensure that mining activities minimize adverse environmental effects on NFS surface resources; this includes use of hazardous materials. The removal of the Oak Flat Federal Parcel from Forest Service jurisdiction negates the ability of the Tonto National Forest to regulate effects on these resources. No hazardous materials are presently being used at the Oak Flat Federal Parcel; once the land exchange occurs, Resolution Copper could use hazardous materials on this land without approval. However, all other environmental laws regarding the use, storage, transport, and disposal of hazardous materials would still apply and need to be followed.

The offered land parcels would enter either Forest Service or BLM jurisdiction. This would provide a new level of control over the use of hazardous materials on these properties.

EFFECTS OF FOREST PLAN AMENDMENT

The Tonto National Forest Land and Resource Management Plan (1985b) provides guidance for management of lands and activities within the Tonto National Forest. It accomplishes this by establishing a mission, goals, objectives, and standards and guidelines. Missions, goals, and objectives are applicable on a forest-wide basis. Standards and guidelines are either applicable on a forest-wide basis or by specific management area.

towers; avoiding use of monopole transmission structures; avoiding "skylining" of transmission and communication towers and other structures (i.e., considering topography when siting transmission structures to avoid "skylining" of structures on high ridges in the landscape); and using air transport capability to mobilize equipment and materials for clearing, grading, and erecting transmission towers in areas of the highest visual sensitivity with difficult access. These measures would be effective at reducing and minimize the scenery impacts and project contrast of mining operations in the surrounding landscape and impacts upon sensitive viewers. The power line corridors occur mainly on NFS lands, and the mitigation measures can be required within those areas, regardless of alternative.

### Mitigation Effectiveness and Impacts of Voluntary Mitigation Measures Applicable to Scenic Resources

Appendix J contains mitigation and monitoring measures brought forward voluntarily by Resolution Copper and committed to in correspondence with the Forest Service. These measures are assumed to occur but are not guaranteed to occur. Their effectiveness and impacts if they were to occur are disclosed here; however, the unavoidable adverse impacts disclosed below do not take the effectiveness of these mitigations into account. No additional mitigation measures were voluntarily brought forward for scenic resources.

### Other Potential Future Mitigation Measures Applicable to Scenic Resources

Appendix J contains several other potential future mitigation measures that the Forest Service is disclosing as potentially useful in mitigating adverse effects, but for which there is no authority to require. There is no expectation that these measures would occur, and therefore the effectiveness is not considered in the EIS. No potential future mitigation measures were identified applicable to scenic resources.

### Unavoidable Adverse Impacts

The subsidence area and residual tailings storage facility would constitute a permanent adverse impact that cannot be avoided or completely mitigated. While night brightness from mine facility lighting would be mitigated to a large degree, residual impacts would remain that are not avoidable and cannot be completely mitigated.

## 3.11.4.10   Other Required Disclosures

### Short-Term Uses and Long-Term Productivity

Impacts on visual resources would be both short and long term. While impacts associated with processing plant buildings and structures such as utility lines and fences would cease when they are removed at closure, the subsidence area and tailings storage facility would permanently alter the scenic landscape and affect the scenic quality of the area in perpetuity. Impacts on dark skies from night lighting would cease after mine closure and reclamation.

### Irreversible and Irretrievable Commitment of Resources

For all action alternatives, there would be an irretrievable loss of scenic quality from increased activity and traffic during the construction and operation phases of the mine. The size and extent of the tailings facilities would create losses of scenic quality until rock weathering and slope revegetation have reduced color, form, line, and texture contrasts to a degree that they blend in with the surrounding landscape; revegetation would occur relatively soon after closure, but weathering would take such a long time scale as to be considered permanent. Due to the geological time frame necessary for these processes to occur, the loss of scenic quality associated with the tailings facilities would effectively be irreversible.

For each action alternative, the visual contrasts that would result from the introduction of facilities associated with the project would be an irretrievable loss of the undeveloped, semi-primitive setting until the project is closed and full reclamation is complete. Under all of the action alternatives, existing views would be irreversibly lost behind the tailings storage facility because of the height and extent of the piles.

There would be an irretrievable, regional, long-term loss of night-sky viewing during project construction and operations because night-sky brightening, light pollution, and sky glow caused by mine lighting would diminish nighttime viewing conditions in the direction of the mine. Impacts on dark skies due to night lighting would cease after mine closure and reclamation. Regional dark skies would continue to brighten due to other development factors in the region throughout the mine life. Therefore, it is unlikely that a return to current dark sky conditions would occur after mine closure.

**ER333**

Resolution Copper Project and Land Exchange

# 3.12 Cultural Resources

## 3.12.1 Introduction

Cultural resources consist of the physical aspects of the activities of past or present cultures, including archaeological sites, historic buildings and structures, trails, roads, infrastructure, traditional cultural properties, and other places of traditional, cultural, or religious importance. Cultural resources can be human-made or natural features and are, for the most part, unique, finite, and nonrenewable. Cultural resources are often discussed in terms of historic properties under the National Historic Preservation Act (NHPA); however, the term "historic properties" has a very specific definition that may omit other resources that are critical to NEPA analysis but do not qualify as historic properties. This analysis is designed to capture potential impacts on cultural resources within the project area; however, it focuses on the potential impacts on historic properties (i.e., cultural resources that are listed in or have been determined eligible for listing in the National Register of Historic Places (NRHP)) and

| Overview |
| --- |
| Applicable laws that oversee cultural resources management in the United States include the National Historic Preservation Act, Archaeological Resources Protection Act, and numerous other laws and regulations at various levels of government. Despite the host of laws in place to mandate and oversee the detailed cultural resources surveys undertaken on behalf of Resolution Copper, it is likely that some portion of currently buried or otherwise undetected prehistoric (Native American only) and historic (Native American and Euro-American) artifacts and resources could be lost to mine-related construction and operation. This is especially true in areas such as Oak Flat, the Queen Creek watershed, and the Superior area, which have long histories of human habitation. Even those sites and artifacts that researchers have recorded and archived would be irrevocably altered. |

cultural resources that have not been evaluated for their NRHP status. The numbers and types of historic properties and those resources that may be historic properties represent the best possible information about cultural resources that can be verified and quantified.

### 3.12.1.1 Changes from the DEIS

Since the publication of the DEIS, surveys for cultural resources have been completed and reported on for the majority of the project area and alternatives; these data were compiled and used in the FEIS analysis. Design elements for project components, including alternatives, have been refined and are reflected in the analysis. Alternatives 5 and 6 now have only a single pipeline route to reach the tailings storage facility, as described in chapter 2. Additionally, we revised the Alternative 6 pipeline route, primarily to address potential impacts to habitat and resources along Mineral Creek. These changes are reflected in this section.

In response to comments on the DEIS, information and analysis on indirect or atmospheric impacts to the built environment of Superior, Globe, and Miami was added, as well as a discussion of the Section 106 area of potential effects (APE) and its relationship to the analysis area. Methods for the visual analysis have been brought more in line with those used in Section 3.11, Scenic Resources. Expanded background information on the Historic Euro-American period has been added. Mitigation discussions have been updated to reflect measures that were developed for the Section 106 PA in consultation with the tribes, local communities, the public, and cooperating agencies to resolve adverse effects; these measures are summarized in appendix J.

The cumulative effects analysis was revised for the FEIS to better quantify impacts. It is described in detail in chapter 4 and summarized in this section.

A complete listing and brief description of the legal authorities and agency guidance used in this cultural resources impacts analysis may be reviewed in Newell (2018a).

### Compliance with Section 106 of the NHPA

The most pertinent law or regulation for the proposed project is Section 106 of the NHPA and its implementing regulations found at 36 CFR 800. Section 106 requires federal agencies to consider the effects of an undertaking on historic properties which are defined by 36 CFR 800.16(l)(1) as any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the NRHP. An undertaking is a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license, or approval (36 CFR 800.16(y)).

36 CFR 800 sets forth the procedures to be followed during the Section 106 process: initiation of the Section 106 process, identification of historic properties, assessment of adverse effects, and resolution of adverse effects. The following summarizes each step in the process and how the Forest Service has fulfilled its responsibilities as lead Federal agency for the undertaking.

During the initiation of the Section 106 process (36 CFR 800.3), the Federal agency establishes that there is an undertaking and determines that it has the potential to affect historic properties. The agency then ascertains whether other State or Federal agencies are involved, identifies the appropriate SHPO and/or Tribal Historic Preservation Officers (THPOs), identifies appropriate tribes and others consulting parties, and makes a plan for involving the public in the process. The Forest Service initiated consultation with the SHPO on March 31, 2017; with ACHP on December 7, 2017; and with 11 tribes on the prefeasibility exploration plan for the Resolution Copper Project via a letter dated June 6, 2008, for the land exchange via a letter dated August 4, 2015, and with four additional tribes on December 3, 2018.

The Forest Service determined that due to the complexity of the project, a PA would be needed to modify the Section 106 processing moving forward. The Forest Service has developed a PA in consultation with SHPO, ACHP, tribes, and other consulting parties; the final version of the PA circulated for signature can be found in appendix O. The PA outlines the roles and responsibilities of parties, the procedure for identification and evaluation of historic properties, assessment for effects, and each party's responsibilities under the Section 106 process. Several versions of the PA were sent out for review and comment to the consulting parties including the tribes. Comments were received and incorporated into each new draft of the PA. In addition, the Forest Service held meetings with the tribes to discuss the PA on October 28 and 29, 2019. The following processes described below are in accordance with those described in the PA.

During the identification of historic properties (36 CFR 800.4), the Federal agency determines the APE in consultation with the SHPO/THPO, tribes, and other consulting parties, identifies resources that may be historic properties within the APE to the appropriate level of effort in consultation with the SHPO/THPO, tribes, and other consulting parties, and evaluates the historic significance of each resource through application of the NRHP criteria and determining whether a resource is eligible for the NRHP in consultation with the SHPO/THPO, tribes, and other consulting parties.

The Forest Service continuously consulted with the SHPO, tribes, and consulting parties regarding the APE. The APE has changed and been shaped by the input of these parties over time. We assert that this APE is expansive enough to account for direct, indirect, and cumulative effects of the project (see section 3.12.2.1 above for discussion of APE development).

For the APE for physical effects, the Forest Service directed the completion of pedestrian surveys across the majority of the physical APE where project-related ground-disturbing activities might occur (see below for an expanded discussion of these survey and their results). Areas surveyed include the Oak Flat Federal Parcel, GPO project components (East Plant Site, West Plant Site, MARRCO corridor, and filter plant and loadout facility), and the proposed tailings locations for Alternatives 2, 3, 4, 5, and 6. Results from these cultural resource inventories have been compiled into three reports and shared with the SHPO, relevant land-managing agencies, and consulting tribes.

For the APE for auditory effects and the APE for visual effects, a Class I records search for archaeological sites and built environment resources was conducted of the entire APE (see below). The Forest Service also sought information on places of traditional and cultural importance to tribes through three measures: tribal consultations, compilation of an ethnographic and ethnohistoric report, and pedestrian surveys by tribal monitors of the APE for physical effects. Along with agency determinations on eligibility, survey results have been or will be shared with SHPO, land-managing agencies, and consulting tribes. Please note that some reports contain sensitive information provided by the tribes and therefore this information is shared in a summarized form as part of consultation.

During the assessment of adverse effects (36 CFR 800.5), the Federal agency, in consultation with the SHPO/THPO, tribes, and other consulting parties, applies the criteria of adverse effects on the historic properties in the APE and determines if the undertaking will result in an adverse effect on historic properties. If no adverse effects are found, then the undertaking may be implemented and the agency's Section 106 responsibilities have been fulfilled. If adverse effects on historic properties are found, the agency must consult with SHPO, tribes, and other consulting parties to resolve the adverse effects.

In consultation with SHPO, ACHP, tribes, and other consulting parties, the Forest Service determined that the project will have an adverse effect on historic properties. However, because of the complexity of the project, all of the effects would not be known prior to implementation of the project. The processes for addressing these effects is outlined in the PA (see appendix O).

Resolution of adverse effects (36 CFR 800.6) involves the agency consulting with SHPO, tribes, and other consulting parties to develop strategies to avoid, minimize, or mitigate adverse effects on historic properties. This is done through the development and implementation of an agreement between the Federal agency, the ACHP, the SHPO, and tribes and other consulting parties. The development shall also include the public.

In accordance with 36 CFR 800.2(d)(3), the Forest Service intentionally relied on a NEPA public participation strategy to assist the Federal agencies in satisfying the public involvement requirements under Section 106. This strategy included involving interested parties in the NEPA process, providing project information to the public, giving them opportunities to comment on the project including Section 106 issues through five public scoping meetings held on April 4, 5, 6, March 31, and June 9, 2016; two alternatives workshops held on March 21 and 22, 2017; and DEIS public meetings on September 10, 12, 17, 19, and October 8 and 10, 2019. Specific workshops to hear public comments and concerns about Section 106 compliance and the PA were held on June 13, 14, and 15, 2018. A workshop for consulting parties to discuss the PA was held on December 11, 2019. Additionally, the Forest Service received public comments through the NEPA process on the PA as presented in the DEIS.

## 3.12.3.2    Existing Conditions and Ongoing Trends

Human occupation of east-central Arizona spans from the Paleoindian period to today, with the primary occupation in the project area vicinity from the Formative era to the Late Historic period. The following section is a brief overview to provide context for discussing potential impacts from the proposed project.

spread of polychrome pottery in southern Arizona. At the end of the Formative, a reorganization of Salado sites can be seen, with many villages abandoned in favor of a smaller number of larger settlements, possibly due to conflicts. The Salado went into decline likely due to environmental factors and population pressure, and by the end of the Formative period most Salado sites were abandoned.

## PROTOHISTORIC AND HISTORIC NATIVE AMERICAN

The project area is within the traditional territories of the Western Apache, the Yavapai, and the Akimel O'odham or Upper Pima. The histories of the Western Apache—a group that includes ancestors of the White Mountain, San Carlos, Cibecue, and Tonto Apache—tell of migrations into Arizona where they encountered the last inhabitants of villages along the Gila and San Pedro Rivers. The Western Apache practiced a mixed subsistence strategy of farming in the summer in the north, and hunting and gathering in the winter in the south. In the 1870s, the Apache were forced onto reservations, which curtailed much of their seasonal round. However, not all Apache stayed on the reservations, and some continued to use the vicinity of the project area into the twentieth century. Like the Western Apache, the Yavapai practiced a mixed subsistence strategy with an emphasis on hunting and gathering. Yavapais had little contact with Euro-Americans until the 1860s, and also like the Apache, after silver was discovered in Arizona, they were forced onto reservations in the 1870s. The Akimel O'odham were primarily farmers who also practiced hunting and gathering of wild resources. They and other O'odham groups are the likely descendants of the Hohokam, and like the Hohokam, lived along the Gila River to the west of the project area. The year-round source of water allowed them to settle large villages and cultivate more crops with irrigation agriculture than some of the other O'odham groups in harsher areas of the desert while still gathering resources from the surrounding areas.

## HISTORIC EURO-AMERICAN

Spanish, Mexican, and Euro-American settlers began to arrive in appreciable numbers in the eighteenth century. The ensuing period of historical exploitation was marked by mining, ranching, and homesteading interests. After the end of the Mexican–American War and the signing of the Treaty of Guadalupe in 1848, the United States acquired what was to become Arizona from Mexico.

The discovery of gold in California, the 1862 Homestead Act, and development of gold and silver mines in western and central Arizona heralded the arrival of a large number of Euro-American settlers. However, in the vicinity of the project area, the Apache presence prevented much settling of the area until they were forcibly removed by the U.S. Army and several forts were established in the area. Mining became a significant industry by the late 1800s, with mines in Globe, Miami, Ray, and Superior. Some of these mines were exhausted quickly; others, like the Ray Mine, are still in operation today. Mining brought all sorts of people to the area looking for work, including Mexican Americans and Native Americans as well as Anglo miners and settlers. Ranchers also came to the area in the late 1800s, and several small ranches were established. These ranches remained small operations but often supplied food to local miners; ranchers also worked for the mines to supplement their income.

Concerns over environmental degradation in the area due to overgrazing and drought led to the establishment of the Tonto National Forest (then the Tonto National Reserve) in 1905 to protect the Salt River Watershed. Some of the Tonto National Forest was transferred to the Crook National Forest in 1908, but was eventually returned. During the Works Progress Administration era, a large erosion control project was conducted in the project area, as well as establishing the Oak Flat Campground. Nature-based tourism and recreation continues to play an important role in the area, enhancing the quality of life and economy of local communities.

ER337

### Inventory of the Indirect Impacts Analysis Area

For the indirect impacts analysis area, SWCA Environmental Consultants (SWCA) conducted a Class I records search of the area. The cultural resources team searched AZSITE—the online cultural resources database that contains records from the SHPO, BLM, and the ASLD—as well as records housed at the Tonto National Forest Phoenix Office, the BLM Tucson and Lower Sonoran Field Offices, and the Arizona State Museum, for all recorded archaeological sites within 2 miles of the direct analysis area. The NRHP database was also searched for historic properties listed within 2 miles of the direct analysis area.

### Inventory of the Atmospheric Impacts Analysis Area

For the atmospheric impacts analysis area, SWCA conducted a Class I records search of the area. The cultural resources team searched AZSITE, the Tonto National Forest Phoenix Office records, Arizona State Museum, and the BLM Tucson and Lower Sonoran Field Offices records for resources (historic properties) eligible for the NRHP under Criteria A, B, and/or C. Previous built environment surveys for Superior, Globe, and Miami were consulted for properties eligible under Criteria A, B, and/or C. Personnel also searched the NRHP for resources listed under Criteria A, B, and/or C. Historic properties eligible for the NRHP under Criteria A, B, and/or C are more likely to be sensitive to impacts on setting than properties determined to be eligible under Criterion D.

### Direct Analysis Area

ARCHAEOLOGICAL SITES

Within the direct impacts analysis area, 644 archaeological sites have been recorded. Of the 645 sites, 506 are recommended or determined eligible for the NRHP, 116 are recommended or determined not eligible for the NRHP, 21 are undetermined, and one is exempt from Section 106 compliance.

The archaeological sites range in age from the Archaic to Historic periods and several sites have two or more temporal components. Cultural site components are attributed to Archaic peoples (12), Hohokam (64), Hohokam-Salado (48), Salado (311), Apache-Yavapai (18), Native American (91), Euro-American (151), and unknown (3). Archaeological sites found in the analysis area represent short- and long-term habitations, agricultural sites, resource procurement and processing sites, campsites, a historic-age campground, communication sites, ranching sites, mining sites, soil conservation, utilities, transportation (roads and trails), recreation activities, water management, and waste management.

TRADITIONAL CULTURAL PROPERTY

One NRHP-listed TCP is located within the direct analysis area: the *Chí'chil Biłdagoteel* Historic District. The *Chí'chil Biłdagoteel* Historic District was listed on the NRHP in 2016 as an Apache TCP and its boundaries contain 38 archaeological sites that contribute to the overall eligibility of the district, in addition to sacred places, springs, and other significant locations. See Section 3.14, Tribal Values and Concerns, for a more detailed discussion of the resource. Of the 38 archaeological sites within the TCP, six are found within the direct impacts analysis area.

HISTORIC BUILDINGS AND STRUCTURES

Twenty-eight historic buildings or structures have been recorded within the direct analysis area. Seventeen of the historic buildings or structures are associated with the Magma Mine; however, all but three have been demolished as part of a reclamation plan. No formal recommendation or determination of eligibility has been made for the Magma Mine resources. The remaining eight resources are in-use

ER338

### Atmospheric Impacts

If the GPO is not approved, then none of the proposed mining facilities would be constructed, so no adverse indirect impacts on cultural resources would be anticipated from mining facilities. If the land exchange does not occur, no adverse indirect impacts on cultural resources would be anticipated.

## 3.12.4.2    Impacts Common to All Action Alternatives

### Effects of the Land Exchange

The land exchange would have effects on cultural resources.

The Oak Flat Federal Parcel would leave Forest Service jurisdiction. The role of the Tonto National Forest under its primary authorities in the Organic Administration Act, Locatable Regulations (36 CFR 228 Subpart A), and Multiple-Use Mining Act is to ensure that mining activities minimize adverse environmental effects on NFS surface resources; this includes cultural resources. The removal of the Oak Flat Federal Parcel from Forest Service jurisdiction negates the ability of the Tonto National Forest to regulate effects on these resources. If the land exchange occurs, 31 NRHP-eligible archaeological sites and one TCP within the selected lands would be adversely affected. Under Section 106 of the NHPA and its implementing regulations (38 CFR 800(a)(2)(vii)), historic properties leaving Federal management is considered an adverse effect, regardless of the plans for the land, meaning that, under NEPA, the land exchange would have an adverse effect on cultural resources.

The offered lands parcels would enter either Forest Service or BLM jurisdiction. Entering Federal management would offer additional protection for any cultural resources on these lands. Cultural resources surveys of the offered lands have identified 93 archaeological sites: 65 eligible and 28 not eligible. Of the 65 eligible sites, three have an Archaic component, 12 have a Hohokam component, 24 have a Hohokam/Salado or Hohokam/Pueblo component, seven have a Southern Sinagua component, four have a Salado component, two have a Sobaipuri or Sobaipuri/Apache component, four have a Native American not further specified component, 10 have a Euro-American component, and two components are Unknown. Native American sites consist of habitations, including hamlets, villages, pueblos, compounds, and a rockshelter; agricultural sites, including terraces, gridded fields, rock piles, and field houses; resource procurement and processing sites; and rock art. Euro-American sites consist of roads, homesteads and ranches, and mining sites.

### Effects of Forest Plan Amendment

The Tonto National Forest Land and Resource Management Plan (1985b) provides guidance for management of lands and activities within the Tonto National Forest. It accomplishes this by establishing a mission, goals, objectives, and standards and guidelines. Missions, goals, and objectives are applicable on a forest-wide basis. Standards and guidelines are either applicable on a forest-wide basis or by specific management area.

A review of all components of the 1985 forest plan was conducted to identify the need for amendment due to the effects of the project, including both the land exchange and the proposed mine plan (Shin 2020). A number of standards and guidelines (10) were identified as applicable to management of cultural resources. None of these standards and guidelines were found to require amendment to the proposed project, either on a forest-wide or management area-specific basis. For additional details on specific rationale, see Shin (2020).

### Effects of Compensatory Mitigation Lands

Cultural resources surveys identified five archaeological sites on the compensatory mitigation lands: three eligible and two not eligible for the NRHP. The three eligible sites are a highway, a transmission line, and a resource processing and procurement site. The planned activities on the compensatory mitigation lands are focused on restoring riparian systems and, if sites are avoided during the restoration, would not have an effect on cultural resources.

Within the parcels slated for recreation mitigation, 14 NRHP-eligible or undetermined archaeological sites have been recorded. Three sites have a Hohokam component, one has a Salado component, five have Native American components, and six have Euro-American components. Prehistoric sites include habitation, field house, campsites, resource procurement and processing sites, and a rockshelter. Historic sites include roads or trails, transmission lines, a townsite, and waste piles.

### Effects of Recreation Mitigation Lands

The recreation mitigation lands are anticipated to have an adverse effect on cultural resources. While preliminary trail alignments and trailhead areas were surveyed for cultural resources that are eligible for the NRHP and trail designs were refined to reduce conflict with cultural resources, any ground disturbance is deemed to be an adverse effect on cultural and tribal resources.

### Summary of Applicant-Committed Environmental Protection Measures

A number of environmental protection measures are incorporated into the design of the project (the GPO, not the land exchange) that would act to reduce potential impacts on cultural resources. These are non-discretionary measures, and their effects are accounted for in the analysis of environmental consequences.

Applicant-committed environmental protection measures to reduce impacts on cultural resources are covered in the GPO. Specifically, Resolution Copper has committed to following the Section 106 process for the resolution of adverse effects on historic properties, including the development of a PA (see appendix O) and will design the footprint of the project to avoid resources to the maximum extent possible. Aspects of the PA are discussed in the "Mitigation Effectiveness" section below.

## 3.12.4.3    Alternative 2 – Near West Proposed Action

### Direct Impacts

Under Alternative 2, 138 cultural resources would be impacted: 120 NRHP-eligible and 18 undetermined archaeological sites. Ninety-five percent (9,288 acres) of the total alternative has been surveyed at the time of this review. Table 3.12.4-1 presents the number of cultural resources that are listed in or eligible for the NRHP or that are of undetermined NRHP status within each project element. Some sites would be impacted by more than one project element; hence, the total numbers in the following tables are different from the total number of sites overall.

Of the site components present in Alternative 2, six can be attributed to the Archaic, 17 to the Hohokam, 21 to Hohokam-Salado, 49 to the Salado, 13 to the Apache-Yavapai, 12 to Native American, 13 to Euro-American, and one unknown. The Archaic components are represented by campsites. Formative period sites attributed to the Hohokam, Hohokam-Salado, or Salado are large and small habitation sites including one Hohokam village, campsites and resource processing sites, a Salado hilltop retreat, agricultural sites, and a lithic quarry. The Protohistoric-Historic Apache-Yavapai sites are campsites and one rockshelter. The Historic Euro-American sites consist of roads, trails, railroads and facilities, mineral exploration and exploitation, homesites, ranching sites, utility lines, and waste piles.

ER340

In addition, Alternative 2 would adversely impact one NRHP-listed TCP in the East Plant Site and undetermined historic buildings in the West Plant Site; this is true for Alternatives 2 through 6.

**Table 3.12.4-1. Cultural resources directly impacted by Alternative 2**

| GPO Component | Number of NRHP-Listed or Eligible Sites | Number of NRHP-Undetermined Sites | Total |
|---|---|---|---|
| Oak Flat Federal Parcel | 43 | 0 | **43** |
| East Plant Site and subsidence area | 24 | 0 | **24** |
| West Plant Site | 9 | 0 | **9** |
| Tailings facility and corridor | 20 | 16 | **36** |
| Silver King Mine Road realignment | 6 | 0 | **6** |
| MARRCO corridor | 38 | 2 | **40** |
| Transmission line | 15 | 0 | **15** |

Note: Some sites would be impacted by more than one project element; hence, total numbers in this table are different from the total number of sites overall.

### Indirect Impacts

Within the indirect impact analysis area for Alternative 2, 62 cultural resources may be impacted: two listed, 41 eligible, and 19 unevaluated. Nine of those resources are within 2 miles of the tailings facility, one is within 2 miles of the East Plant Site and subsidence area (the *Chí'chil Biłdagoteel* Historic District), 38 are within 2 miles of the West Plant Site, one is within 2 miles of Silver King Mine Road, 12 are within 2 miles of the MARRCO corridor (including the Boyce Thompson Arboretum), and three are within 2 miles of the transmission line corridor. Of the 37 resources within 2 miles of the West Plant Site, 33 are buildings in Superior.

Indirect impacts to historic buildings in Superior, including those in the two potential historic districts, may occur from noise and vibration generated by increased traffic.

### Atmospheric Impacts

Outside of the proposed project footprint for Alternative 2, there are 53 historic properties listed on or eligible for listing on the NRHP under Criterion A, B, or C within 2 miles of the East Plant Site, the West Plant Site, the subsidence area, and the transmission line. Four resources are listed on the NRHP: *Chí'chil Biłdagoteel* Historic District, the Boyce Thompson Arboretum, the Devil's Canyon Bridge, and the Hotel Magma. The *Chí'chil Biłdagoteel* Historic District is less than 1 mile from the East Plant Site/subsidence area, the West Plant Site, and the Silver King to Oak Flat transmission line corridor. Other historic properties within 2 miles of the East Plant Site, the West Plant Site, the subsidence area, and the transmission line include 14 archaeological sites, two proposed historic districts in Superior, and 33 historic buildings. Many of the historic buildings are within the two proposed historic districts. If project components are visible from these properties, adverse visual impacts may occur.

For the Alternative 2 tailings, 54 historic properties listed on or eligible for the NRHP under Criteria A, B, and/or C are within 6 miles of the Alternative 2 tailings facility and within the scenic resources viewshed analysis area (see section 3.11). When plotted against the viewshed analysis for the tailings piles, the tailings pile would not be visible to three historic resources and not very visible to an additional 40, including the majority of buildings in Superior. The Superior Commercial District, as a whole, would have slightly better visibility, along with two archaeological sites. The tailings pile would be very visible from eight resources, including the TCP and the Boyce Thompson Arboretum.

The following actions were determined through the cumulative effects analysis process to be reasonably foreseeable, and have impacts that likely overlap in space and time with impacts from the Resolution Copper Project:

- LEN Range Improvements
- Pinto Valley Mine Expansion
- Ray Land Exchange and Proposed Plan Amendment
- Ripsey Wash Tailings Project
- Silver Bar Mining Regional Landfill and Cottonwood Canyon Road
- Superior to Silver King 115-kV Relocation Project

The cumulative effects analysis area for cultural resources is the APE, which has been determined through Section 106 consultation. The metric used to quantify cumulative impacts to cultural resources is the physical footprint of the RFFAs. Almost all projects result in disturbance of cultural sites, in many cases only after data recovery and mitigation activities. However, even if recorded and documented, loss of these cultural sites contributes to the overall impact to the cultural heritage of the areas. Often cultural sites are only known to be impacted if surveys have been conducted, which is not necessarily required on private land; physical footprint can serve as a proxy for the overall disturbance to cultural sites where no site-specific data exist.

The six reasonably foreseeable future actions above, combined with the Resolution Copper Project, represent about 28,500 acres of the 730,000-acre cumulative effects analysis area, or about 3.9 percent. This represents the potential area in which cultural resources could be lost, which contributes to an overall loss of cultural heritage within the area. While the footprint of these projects is used as a proxy for impacts to cultural resources, effects on cultural resources extend beyond destruction by physical disturbance. The presence of activities nearby also can change the character of prehistoric and historic cultural sites.

## 3.12.4.9    Mitigation Effectiveness

| Mitigation Identifier and Title | Authority to Require |
|---|---|
| FS-RC-04: Establish an alternative campground site (Castleberry) to mitigate the loss of Oak Flat Campground | Required – Forest Service and Programmatic Agreement |
| FS-CR-01: Implementation of Oak Flat HPTP | Required – Forest Service and Programmatic Agreement |
| FS-CR-02: GPO Research Design | Required – Forest Service and Programmatic Agreement |
| FS-CR-03: Visual, Atmospheric, Auditory, Socioeconomic, and Cumulative Effects Mitigation Plan | Required – Forest Service and Programmatic Agreement |
| FS-CR-07: Archaeological Database Funds | Required – Forest Service and Programmatic Agreement |
| FS-SO-01: Community Development Fund | Required – Forest Service and Programmatic Agreement |

We developed a robust monitoring and mitigation strategy to avoid, minimize, rectify, reduce, or compensate for resource impacts that have been identified during the process of preparing this EIS. Appendix J contains descriptions of mitigation measures that are being required by the Forest Service and mitigation measures voluntarily brought forward and committed to by Resolution Copper. Appendix J also contains descriptions of monitoring that would be needed to identify potential impacts and mitigation effectiveness.

PA. Tribal monitors may participate in mitigation of adverse effects. The effectiveness of these future plans to reduce effects on historic property are assumed, but cannot be defined at this time.

**Archaeological Database Funds (FS-CR-07).** Resolution Copper will provide funding to the State of Arizona to assist in the development of a new database or upgrading the existing database of archaeological resources in Arizona. The database is intended to allow the State of Arizona to better manage archaeological resources on State lands. These funds would not prevent impacts to historic properties, but would assist in the ensuring the effectiveness of the treatment activities described under measures FS-CR-01 and FS-CR-02.

**Community Development Fund (FS-SO-01).** Resolution Copper will establish a foundation for the communities of Superior, Miami, Globe, Kearny, Hayden, and Winkelman for the rehabilitation of historic buildings. This measure would be effective at helping prevent the loss of historic properties within the Copper Triangle, preserving them for future generations, and preserving the historic mining heritage of these towns.

### Mitigation Effectiveness and Impacts of Voluntary Mitigation Measures Applicable to Cultural Resources

Appendix J contains mitigation and monitoring measures brought forward voluntarily by Resolution Copper and committed to in correspondence with the Forest Service. These measures are assumed to occur but are not guaranteed to occur. Their effectiveness and impacts if they were to occur are disclosed here; however, the unavoidable adverse impacts disclosed below do not take the effectiveness of these mitigations into account. No additional mitigation measures were voluntarily brought forward for cultural resources.

### Other Potential Future Mitigation Measures Applicable to Cultural Resources

Appendix J contains several other potential future mitigation measures that the Forest Service is disclosing as potentially useful in mitigating adverse effects, but for which there is no authority to require. There is no expectation that these measures would occur, and therefore the effectiveness is not considered in the EIS. No potential future mitigation measures were identified applicable to cultural resources.

### Unavoidable Adverse Impacts

Cultural resources and historic properties would be directly and permanently impacted. These impacts cannot be avoided within the areas of surface disturbance, nor can they be fully mitigated. The land exchange is also considered an unavoidable adverse effect on cultural resources.

## 3.12.4.10   Other Required Disclosures

### Short-Term Uses and Long-Term Productivity

Physical and visual impacts on archaeological sites, tribal sacred sites, cultural landscapes, and plant and mineral resources caused by construction of the mine would be immediate, permanent, and large in scale. Mitigation measures cannot replace or replicate the historic properties that would be destroyed by project construction. The landscape, which is imbued with specific cultural attributions by each of the consulting tribes, would also be permanently affected.

### *Irreversible and Irretrievable Commitment of Resources*

The direct impacts on cultural resources and historic properties from construction of the mine and associated facilities constitute an irreversible commitment of resources. Archaeological sites cannot be reconstructed once disturbed, nor can they be fully mitigated. Sacred springs would be eradicated by subsidence or tailings storage facility construction and affected by groundwater drawdown. Changes that permanently affect the ability of tribal members to use known TCPs for cultural and religious purposes are also an irreversible commitment of resources.

disclosed here. The unavoidable adverse impacts disclosed below take the effectiveness of these mitigations into account.

**GDE and water well mitigation (FS-WR-01).** This measure would replace water sources for any riparian areas associated with springs or perennial streams (groundwater-dependent ecosystems) impacted by drawdown from the mine dewatering and block caving. Though this measure could change the overall natural character of riparian areas, it would be effective at preserving riparian vegetation and aquatic habitats, which are of importance to recreational users of the Tonto National Forest. Preserving recreational opportunities is beneficial to the long-term socioeconomic stability of the Superior area.

**Clean Water Act Section 404 Compensatory Mitigation Plan (FS-WR-02).** The compensatory mitigation parcels would offer conservation of riparian habitat, as well as overall improvement in the health and stability of riparian habitats, by minimizing invasive non-native species and returning conditions to a more natural state. This measure would be effective at replacing xeroriparian habitat lost within the project footprint. Whether recreation would be specifically allowed on these lands would be determined later, if compatible with conservation easements put in place to protect waters and habitat. The Queen Creek parcel would likely be effective at improving recreational opportunities in the immediate vicinity of Superior, when considered in combination with the Castleberry campground (FS-RC-04), implementing the Tonto National Forest multi-use trail plan (FS-RC-03), and replacement of water in Queen Creek (FS-WR-04). Preserving and enhancing recreational opportunities is beneficial to the long-term socioeconomic stability of the Superior area.

**Replacement of water in Queen Creek (FS-WR-04).** This measure would replace the storm runoff in Queen Creek that otherwise would be lost to the subsidence area. It would be highly effective at minimizing the effects felt in Queen Creek caused by reduction in the watershed area, specifically impacts to surface water quantity and riparian habitat, which would prevent impacts to wildlife using this habitat. This would be effective at minimizing impacts to recreational users and birdwatchers drawn to riparian habitat in this area. Note that other stormwater losses would still occur under Alternatives 2, 3, and 4. Preserving and enhancing recreational opportunities is beneficial to the long-term socioeconomic stability of the Superior area.

**Access to Oak Flat Campground (FS-RC-02).** Maintaining access to Oak Flat Campground, to the extent practicable with respect to safety, would be effective at reducing impacts caused by the loss of the Oak Flat area to subsidence. However, the user experience at the campground likely would not be the same, given the open space, trails, roads, and climbing opportunities that would no longer abut the campground. Preserving recreational opportunities is beneficial to the long-term socioeconomic stability of the Superior area.

**Mitigation for adverse impacts to recreational trails (Tonto National Forest multi-use trail plan) (FS-RC-03).** Implementation of this plan would replace over 20 miles of motorized and non-motorized trail on Tonto National Forest around Superior. The Oak Flat area is heavily used for recreation, and the loss of Federal land base due to the land exchange (and the tailings storage facilities for some alternatives) would put pressure on remaining recreation areas. This plan would be effective at expanding the motorized and non-motorized travel routes and recreational opportunities in a sustainable manner consistent with Tonto National Forest management direction. Replacing and enhancing recreational opportunities is beneficial to the long-term socioeconomic stability of the Superior area.

**Establish an alternative campground site (Castleberry) to mitigate the loss of Oak Flat Campground (FS-RC-04).** Establishing the replacement campground would be effective at offsetting impacts caused by loss of dispersed camping opportunities on the Tonto National Forest, and the changes

the Superior area. However, this use may not be compatible with the management of the Apache Leap Special Management Area.

**Mitigation for reduction in property values (PF-SO-01).** This mitigation measure could include the continued purchase of properties in the vicinity of the tailings storage facility that would be impacted by the vicinity, water quality, water supply, noise, or air quality.

**Commitment to continue and possibly expand existing apprenticeship program (PF-SO-02).** Resolution Copper has committed on a corporate level to local hiring and use of local services; however, this is dependent on an appropriate labor pool. This program would potentially create training pipeline that would enhance the labor pool and allow more local hiring.

### Unavoidable Adverse Impacts

Loss of jobs in the local tourism and outdoor recreation industries cannot be avoided or fully mitigated. Likewise, loss in property values for property close to the mine would constitute an impact that cannot be avoided or fully mitigated. The applicant-committed measures would be effective at expanding the economic base of the community and improving resident quality of life, and could partially offset the expected impacts, although many of the current agreements would expire prior to full construction of the mine. Many of the mitigation measures that would contribute to the recreational economy of the Superior area are required and these impacts would be offset, and recreational opportunities may even be enhanced. Many of the mitigation measures that would directly offset socioeconomic effects in the area are voluntary only. These mitigation measures would effectively offset impacts, but cannot be guaranteed to take place.

## 3.13.4.5    Other Required Disclosures

### Short-Term Uses and Long-Term Productivity

Socioeconomic impacts are both positive and negative and are primarily short term. The project would provide increased jobs and tax revenue from construction through final reclamation and closure. However, this would be offset by potential impacts on local tourism and outdoor recreation economies, and a decrease in nearby property values. As these effects are largely the result of the tailings storage facility, which is a permanent addition to the landscape, they could persist over the long term.

The long-term continued population and economic growth in areas of the Copper Triangle with existing copper mines indicates that these impacts are in the magnitude of being decades long and would not be permanent.

### Irreversible and Irretrievable Commitment of Resources

Some changes in the nature of the surrounding natural setting and landscape would be permanent, including the tailings storage facility and the subsidence area. The action alternatives would therefore potentially cause irreversible impacts on the affected area regarding changes in the local landscape, community values, and quality of life.

## 3.14  Tribal Values and Concerns

### 3.14.1  Introduction

This project would occur across a landscape that is important to many tribes, has been for many generations, and continues to be used for cultural and spiritual purposes. Tonto National Forest has consulted regularly with 11 federally recognized tribes that are culturally affiliated with the lands that would be affected and have had the opportunity to be active in the consultation, review, and comment processes of the project. No tribe supports the desecration/destruction of ancestral sites. Places where ancestors have lived are considered alive and sacred. It is a tribal cultural imperative that these places should not be disturbed or destroyed for resource extraction or for financial gain. Continued access to the land and all its resources is necessary and should be accommodated for present and future generations. Participation in the design of this destructive activity has caused considerable emotional stress and brings direct harm to a tribe's traditional way of life; however, it is still deemed necessary to ensure that ancestral homes and ancestors receive the most thoughtful and respectful treatment possible.

> **Overview**
>
> In accordance with long-established agency practice and the requirements of the NHPA, the Tonto National Forest regularly conducts government-to-government consultation with tribes in Arizona and elsewhere in the Southwest that may be affected by Federal decision-making. The Resolution Copper Project and Land Exchange has a very high potential to directly, adversely, and permanently affect numerous cultural artifacts, sacred seeps and springs, traditional ceremonial areas, resource-gathering localities, burial locations, and other places of spiritual value to tribal members. This section describes the interactions to date between the Tonto National Forest and the 11 Indian Tribes actively participating in consultation related to the project.

By law, Federal agencies must consult with Indian Tribes about proposed actions that may affect lands and resources important to them, in order to comply with the NHPA for NRHP-listed historic properties (see Section 3.14.3, Affected Environment, for the list of laws and regulations). Section 3003 of PL 113-291 also requires that the Secretary of Agriculture engage in government-to-government consultation with affected tribes concerning issues related to the land exchange. The Secretary of Agriculture authorized the Forest Supervisor, Tonto National Forest, to consult with Resolution Copper to seek mutually acceptable measures to address the concerns of the affected tribes and minimize the adverse effects from mining and related activities on the conveyed lands.

Beginning in 2015, the Tonto National Forest began consultation with 11 tribes regarding the proposed mine, the land exchange, and the development of alternate tailings locations. Tonto National Forest also consulted the tribes regarding the management of the Apache Leap SMA, as directed by Section 3003 of PL 113-291.

Government-to-government consultations are ongoing between Tonto National Forest and the Fort McDowell Yavapai Nation, Gila River Indian Community, Hopi Tribe, Mescalero Apache Tribe, Pueblo of Zuni, Salt River Pima-Maricopa Indian Community, San Carlos Apache Tribe, Tonto Apache Tribe, White Mountain Apache Tribe, Yavapai-Apache Nation, and Yavapai-Prescott Indian Tribe. The four O'odham tribes (the Four Southern Tribes Cultural Committee) are represented by the Salt River Pima-Maricopa Indian Community and the Gila River Indian Community. The BLM identified four tribes that may be affected if the alternative on BLM land is selected: the Ak-Chin Indian Community, Fort Sill Apache Tribe, Pascua Yaqui Tribe, and Tohono O'odham Nation. See Chapter 5, Consulted Parties, for a full account of consultation to date.

Tribal values and concerns regarding the land exchange and the proposed GPO include resources with traditional or cultural significance, some of which are also described in Section 3.12, Cultural Resources. Resources of traditional or cultural significance can be traditional cultural properties (TCPs) as defined by National Register Bulletin 38, "Guidelines for Documenting and Evaluating Traditional Cultural Properties" (Parker and King 1998); sacred places; and traditional knowledge places (TKPs)—including burial locations, landforms, viewsheds, and named locations in the cultural landscape; water sources; and traditional resource-gathering locations for food, materials, minerals, and medicinals.

### 3.14.1.1    Changes from the DEIS

Several changes were made to the "Tribal Values" section from the DEIS. We received numerous comments from tribal members about the sacredness and importance of Oak Flat to them, their lives, their culture, and their children. Many expressed their sadness and anger that their sacred place would be destroyed and that they would lose access to their oak groves and ceremonial grounds. In response, we added information on the history of Oak Flat and its significance to the tribes; expanded the plant resources list with information gathered by the tribal monitors; included tribal monitor survey results conducted since the DEIS for special interest areas; and disclosed information from the ethnographic report while respecting the sensitive nature of that data. To demonstrate in their own words the heartbreak and pain caused by this project to tribal members, we also included excerpts from Congressional testimony of Wendsler Nosie Sr., Chairman Terry Rambler, and Naelyn Pike, as well as personal perspectives and comments from tribal members collected during the DEIS comment period.

## 3.14.2    Analysis Methodology, Assumptions, and Uncertain and Unknown Information

### 3.14.2.1    Analysis Area

The direct, indirect, and atmospheric analysis areas for tribal values and concerns are the same as for cultural resources, found in section 3.12.2. The direct analysis area for the proposed project is defined by several factors: the acreage of ground disturbance expected for each mine component described in the GPO and the acreage of land leaving Federal stewardship as a result of the land exchange. The direct analysis area for the proposed action (GPO and land exchange) is approximately 39,272 acres and consists of the following, which includes access roads and other linear infrastructure:

- 1,861-acre East Plant Site and subsidence area, including the reroute of Magma Mine Road;
- 2,422-acre Oak Flat Federal Parcel, which is NFS land to be exchanged with Resolution Copper;
- 953-acre West Plant Site and Silver King Road realignment;
- 6.96-mile Silver King to Oak Flat transmission line;
- 685-acre MARRCO railroad corridor and adjacent project components;
- 553-acre filter plant and loadout facility;
- Alternatives 2–6 tailings storage facilities and tailings corridors; and
- Mitigations to reduce recreational impacts and compensatory mitigation associated with a 404 permit.

The indirect analysis area consists of a 2-mile buffer around all project and alternative components and is designed to account for impacts on resources not directly tied to ground disturbance and outside the direct analysis area.

### 3.14.2.2    Analysis Approach

The Forest Service worked collaboratively with the tribes to gather information on tribal values and resources via an ethnographic study (Hopkins et al. 2015) and through ongoing consultation. Resolution Copper funded the collection of cultural resources information important to tribal members through Class I records searches and Class III pedestrian surveys. During consultation, several tribes requested the inclusion of tribal monitors in the archaeological survey to record areas of special interest. To honor that request, the Forest Service arranged for the archaeological contractors to employ tribal monitors.

#### *Impact Indicators*

***Direct impacts*** on resources of traditional cultural significance (archaeological sites; burial locations; spiritual areas, landforms, viewsheds, and named locations in the cultural landscape; water sources; food, materials, mineral, and medicinal plant gathering localities; or other significant traditionally important places) would consist of damage, loss, or disturbance that would alter the characteristic(s) that make the resource eligible for listing in the NRHP or sacred to the respective cultural group(s). The loss might be caused by ground disturbance, loss of groundwater or surface water, or by the erection of facilities that alter the viewshed. Indirect impacts would consist primarily of visual impacts from alterations to setting and feeling, auditory impacts, or inadvertent disturbance.

Impact indicators for this analysis include the following:

- Loss, damage, or disturbance to historic properties, including TCPs listed in or eligible for listing in State or Federal registers, that are significant to Native American tribes.

- Loss, damage, or disturbance to burial sites; spiritual areas and viewsheds; cultural landscapes; sacred places; springs and other water resources; food and medicinal plants; minerals; and hunting, fishing, and gathering areas.

- Loss of access to burial sites; spiritual areas and viewsheds; cultural landscapes; sacred places; springs and other water resources; food and medicinal plants; minerals; and hunting, fishing, and gathering areas.

- Alterations to setting, feeling, or association of historic properties significant to Native American tribes, including TCPs where those characteristics are important to their State or Federal register eligibility.

Assuming the land exchange occurs, as mandated by Congress in Section 3003 of PL 113-291, the selected lands would be conveyed to Resolution Copper no later than 60 days after the publication of the FEIS, and the Oak Flat Federal Parcel would become private property and no longer be subject to the NHPA or Forest Service management that provides for tribal access. Under Section 106 of the NHPA and its implementing regulations (38 CFR 800), historic properties leaving Federal management is considered an adverse effect regardless of the plans for the land, meaning that as analyzed under NEPA, the land exchange will have an adverse impact on resources significant to the tribes.

Adverse impacts on historic properties would be avoided, minimized, or mitigated through the Section 106 process of the NHPA and through Tonto National Forest's consultations with Resolution Copper in accordance with Section 3003 of PL 113-291. Adverse impacts on resources that may not be historic properties under Section 106 would be avoided, minimized, or mitigated through steps outlined in the FEIS and ROD.

## 3.14.3    Affected Environment

The primary legal authorities and agency guidance relevant to this analysis of anticipated project-related impacts on tribal resources are shown in the accompanying text box.

---

### Primary Legal Authorities and Technical Guidance Related to the Effects Analysis for Tribal Values and Concerns

- National Historic Preservation Act of 1966 (54 U.S.C. 300101 et seq.)

- Archaeological Resources Protection Act (16 U.S.C. 470aa–470mm)

- American Indian Religious Freedom Act (AIRFA) of 1978 (42 U.S.C. 1996)

- Religious Freedom Restoration Act (42 U.S.C. 2000bb et seq.)

- Native American Graves Protection and Repatriation Act (NAGPRA) of 1990 (25 U.S.C. 3001–3013)

- U.S. Forest Service Region 3 First Amended Programmatic Agreement Regarding Historic Property Protection and Responsibilities (executed December 24, 2003)

- Executive Order 12898 (February 16, 1994), "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations"

- Executive Order 13007 (May 24, 1996), "Indian Sacred Sites"

- Executive Order 13175 (November 6, 2000), "Consultation and Coordination with Indian Tribal Governments"

- Bald and Golden Eagle Protection Act of 1940 (16 U.S.C. 688–688d)

- Endangered Species Act (16 U.S.C. 1531–1543)

- Migratory Bird Treaty Act (16 U.S.C. 703–711)

- National Environmental Policy Act (42 U.S.C. 4321 et seq.)

- Programmatic Agreement among the USDA Forest Service Tonto National Forest, Arizona State Historic Preservation Officer, The Advisory Council on Historic Preservation, Regarding Compliance with the National Historic Preservation Act on the Resolution Copper Project and Southeast Arizona Land Exchange Near Superior, Arizona

---

A complete listing and brief description of the regulations, reference documents, and agency guidance used in this effects analysis may be reviewed in Newell (2018i).

### 3.14.3.1    Existing Conditions and Ongoing Trends

Resolution Copper funded cultural resources surveys of the proposed project area and tailings alternatives, as outlined in section 3.12. Tribal monitors resurveyed or accompanied archaeological survey crews in those areas to identify areas of tribal interest to four cultural groups with ties to the area (Puebloan, O'odham, Apache, and Yavapai), to include springs and seeps, plant, animal, and mineral resource collecting areas, landscapes, and landmarks. All springs and seeps are considered sacred by all the consulting tribes.

Tonto National Forest conducted tribal monitor resource identification survey training sessions in January 2018, October 2018, and September 2019, as described in Section 5.7.1, Tribal Monitor Program. The method for identifying places of importance consisted of four steps (King and Shingoitewa 2020). First, tribal monitors walked the survey areas looking for areas of interest which were defined as Special Interest areas. The special interest areas were loosely grouped into categories: Settlement Areas, Resource-gathering Areas, Agricultural Areas, and Natural Resources Areas. Second, if a special interest area was deemed to be particularly important, it was further recorded as a TKP. Then, the Tonto National Forest staff would present the TKP to the THPO or the designated tribal representative as a potential TCP. Finally, the TKP would be evaluated by tribal elders, THPOs, and/or other designated tribal representative through field visits. Resulting TCP requests from the tribes would then be shared with Tonto National Forest staff for evaluation under the NHPA.

As a result of completing the tribal monitoring program resource identification surveys, more reports have been made available for consideration in the FEIS analysis. These reports include: the final Tribal Monitor report for Alternative 5 – Peg Leg; and the draft Tribal Monitor reports for the Oak Flat Federal Parcel, Near West (Alternatives 2 and 3), and Silver King (Alternative 4). For the Skunk Camp (Alternative 6), and the Peg Leg pipeline and power line corridor surveys, all fieldwork is complete and the data collected are presented and analyzed in this document.

In 2015, the Tonto National Forest, in partnership with the San Carlos Apache Tribe, composed a nomination for Oak Flat, the area originally known as *Chí'chil Biłdagoteel*, to be listed in the NRHP as a TCP (Nez 2016). This effort consisted of extensive literature research and interviews with tribal members.

In addition, an ethnographic study was completed titled "Ethnographic and Ethnohistoric Study of the Superior Area, Arizona" (Hopkins et al. 2015). The study consisted of archival and existing literature review and compilation, as well as oral interviews and field visits with tribal members to collect oral history and knowledge. Tribal members accompanied research staff to important places throughout the study area and shared information about those places. Members of the San Carlos Apache Tribe, Tonto Apache Tribe, White Mountain Apache Tribe, Yavapai-Apache Nation, Fort McDowell Yavapai Nation, Yavapai-Prescott Indian Tribe, Gila River Indian Community, Salt River Pima-Maricopa Indian Community, Hopi Tribe, and Pueblo of Zuni contributed to the study. This study was used in the FEIS analysis.

### History of Oak Flat

The concept of a cultural landscape must drive how we analyze the impacts of the proposed project (King 2003; National Park Service 2020; U.S. Forest Service 2015b). According to the National Park Service, a cultural landscape is "a geographic area, including both cultural and natural resources and the wildlife or domestic animals therein, associated with a historic event, activity, or person, or exhibiting other cultural or aesthetic values" (National Park Service 2020). For tribes, a cultural landscape encompasses all of the places, resources, features, archaeological sites, springs, etc., that are associated with their history and way of life. Each of the tribes associated with the project area has their own way of defining and understanding their cultural landscape which are described briefly below; however all the tribes share some places or resources that they feel are vital and sacred parts of their landscapes. Places like springs, ancestral (archaeological) sites, plants, animals, and mineral resource locations are sacred and should not be disturbed or disrupted.

The Oak Flat Federal Parcel slated to be transferred to Resolution Copper was once part of the traditional territories of the Western Apache, the Yavapai, the O'odham, and the Puebloan tribes of Hopi and Zuni. They lived on and used the resources of these lands until the lands were taken by force 150 years ago.

The following briefly describes their historic connection to the land and how they were removed from it and confined by the U.S. government.

WESTERN APACHE

Apache oral tradition recounts that the first Western Apache clans emerged from the First World into what is now the Southwest (Goodwin 1994). The world was defined by the four cardinal directions and their associated mountains and winds (Goodwin 1994). The Apache call themselves Nde or "the People." The term "Western Apache" is used to refer to Apache groups that historically have lived in Arizona (Goodwin 1935), composed of the San Carlos Apache, the White Mountain Apache, the Cibecue Apache, and the Tonto Apache, according to Basso (1983). The San Carlos Apache ranged through the Pinal, Apache, Mescal, and Catalina Mountains and along the San Pedro River (Basso 1983; Hilpert 1996). The White Mountain Apache ranged from the White Mountains to the Pinaleño Mountains. The Cibecue Apache ranged from the Salt River north to the Flagstaff area; the Tonto Apache lived from around the Verde River north to the San Francisco Mountains (Basso 1983).

Each Western Apache group ranged across their territory gathering seasonal resources and moving camp as resources became available (Basso 1970; Buskirk 1949; Hilpert 1996). Mescal was gathered in the spring and summer and roasted in large pits (Basso 1983; Hilpert 1996; Watt 2004). Later in the spring, they would plant corn in canyons returning periodically to check on the corn and water it (Basso 1971; Hilpert 1996). In the late summer and fall, the Apache gathered acorns and harvested the corn (Basso 1971).

When foods were scarcer from December to March, the Apache would focus on raiding for supplies and livestock (Basso 1983, 1971).To the Apache, raiding was different from warfare: raiding was an economic activity designed to obtain goods, while warfare was to kill enemies (Basso 1971). The Apache often raided the O'odham, as well as Mexican ranchers (Brooks 2016). They occasionally raided Yavapai groups but more often would ally with them against the O'odham. The O'odham raided the Apache and Yavapai in retaliation. The area around Superior-Globe was a meeting place for Apache and Yavapai who were headed south to raid the O'odham (Basso 1971).

The Spanish were the first Anglo people to encounter the Apache; however, the Spanish did not have much influence north of the Gila River (Sheridan 1995). After the signing of the Treaty of Guadalupe in 1848—which ended the Mexican–American War and ceded the Southwest to the United States—Euro-American settlers began arriving in Western Apache lands in search of mineral wealth and ranching lands. Repeated conflicts between settlers and Apache prompted the U.S. government to build forts on Apache lands (Basso 1983, 1971; Hilpert 1996; Thrapp 1967). The presence of these forts and their troops had a devastating effect on the Apache, as soldiers killed Apache they saw as a threat and the Apache retaliated (Basso 1971). Several massacres of Apache by soldiers and civilians occurred from the 1850s through the 1870s, including the reported events at Apache Leap. In the 1870s, the Apache were forced off their lands and onto reservations: Fort Apache, Camp Verde, Camp Grant (and later San Carlos), and Ojo Caliente (Basso 1983, 1971). This effort was led by General George Cook, who assumed command of the army in Arizona in 1871. In 1874, the U.S. government further embarked on a program to move the Western Apache, Chiricahua Apache, and Yavapai onto San Carlos with the idea that this would make them easier to control and would facilitate their transition to farming and ranching (Basso 1971). However, the different groups did not know one another, which led to friction, the settled agricultural life was the opposite of their lifeway, and they were not provided with adequate resources. Conflicts between the U.S. Army and Apache who escaped the reservations or had refused to go continued until 1890.

ER352

A reservation was eventually established in the lands of the Cibecue and White Mountain Apache in 1897. Apache and Yavapai who left San Carlos to return to the Verde Valley or the Payson area found they did not have land there as promised. A reservation at Camp Verde for Apache and Yavapai was established in 1937, which later became the Yavapai-Apache Nation in 1992. A small reservation was established in 1972 for the Tonto Apache in Payson. All these communities lost large portions of their homelands, including Oak Flat, and today live on lands that do not encompass places sacred to their cultures.

For the Western Apache, history and place-naming are an integral part of the cultural landscape (Basso 1996). Place names were originally spoken by the ancestors and invoke past events that occurred at that location (Basso 1996). History for the Apache is "written" across the landscape through place names; names can evoke those events so that they are also, in a sense, happening when they are being spoken of. Knowing these places is vital to understanding Apache history and, therefore, identity. For the Western Apache, "the people's sense of place, their sense of the tribal past, and their vibrant sense of themselves are inseparably intertwined" (Basso 1996:35).

The Apache landscape is imbued with diyah, or power (Basso 1996). Diyah resides in natural phenomenon like lightning, in things like water or plants, and in places like mountains. Gáán, or holy beings, live in important natural places and protect and guide the Apache people (Hilpert 1996). They come to ceremonies to impart well-being to Apache, to heal, and to help the people stay on the correct path.

YAVAPAI

The Yavapai once ranged a huge area from Flagstaff in the north, to the Colorado River to the west, to the Salt and Gila Rivers to the south, and the Tonto Basin to the east (Khera and Mariella 1983). Yavapai people belong to one of four groups, each with its own lands: the Tolkepaya (Western People), Kwevkepaya (Southeastern People), Wipukepa (Northeastern People), and Yavapé (Northwestern People) (Braatz 2007; Khera and Mariella 1983).The Kwevkepaya lived in and around the analysis area (Gifford 1932). The Yavapai have occupied these lands from the beginning. According to their oral history, the Yavapai emerged from the underworld into the current world on the first maize plant from Montezuma's Well (Khera and Mariella 1983).

Like the Apache, the Yavapai traveled across the landscape to take advantage of seasonally available resources, as well as some farming (Braatz 2007; Gifford 1932). Among the many plant resources that the Yavapai sought were acorns (Khera and Mariella 1983). Also like the Apache, the Yavapai would raid their neighbors for supplies and they sometimes joined with the Apache to raid the O'odham (Basso 1971; Braatz 2007).

After the signing of the Treaty of Guadalupe, the influx of Euro-American settlers began to impact the Yavapai way of life as they were forced off their lands. The Yavapai generally avoided conflicts with the newcomers; however, by the 1860s, they began to have conflicts as more settlers invaded their lands (Khera and Mariella 1983). In 1865, a group of Yavapai were settled on a reservation near the Colorado River but did not have enough resources to survive. Other attempts to settle Yavapai on reservations were also unsuccessful until the early 1870s when General Crook ordered that they be moved to the newly established Rio Verde Reservation (Khera and Mariella 1983); however, this policy led to a horrible massacre. In December of 1872, the U.S. Army, which had been tasked with rounding up the Yavapai, killed a group of Kewevkapaya in the Salt River Canyon (Thrapp 1967). The Yavapai were moved onto the Rio Verde Reservation by 1873; however, just 2 years later in the winter of 1875 they were moved again to the San Carlos Reservation along with the Apache. Conditions along the 180-mile route to San Carlos were very harsh and over 100 Yavapai died during the march (Khera and Mariella 1983).

The Western Apache territory stretches from the San Francisco Peaks just north of Flagstaff south to the Rincon Mountains southeast of Tucson. The western border of the Western Apache area is just east of the Verde River along the Mazatzal Mountains down to the Gila River at Winkelman and south to the Rincon Mountains. To the east, the border runs from the San Francisco Peaks southeast across the Colorado Plateau along the Little Colorado River to the San Francisco Mountains and the New Mexico border and then roughly southwest to the Rincon Mountains.

The Pima-Maricopa territory (Akimel O'odham) consists of all of the Phoenix Valley (Gila and Salt River basins) and extending to the east to the Pinal Highlands, south to Avra Valley, west to the Gila Bend Mountains, and north to Lake Pleasant.

The Yavapai territory stretches from just south of the San Francisco Peaks at the north to just east of the Colorado River at the west, then east along the border of the Pima-Maricopa territory to north of Phoenix. It then extends southeast between the Pima-Maricopa and the Western Apache almost to the Gila River.

### 3.14.3.3 Direct Analysis Area

**Archaeological Sites**

In section 3.12, we discuss the 645 archaeological sites recorded to date in the direct analysis area. Eighteen of those sites have components attributed to Apache/Yavapai peoples; 423 are attributed to Hohokam, Hohokam/Salado, or Salado. The remaining sites or components are attributed to Archaic, Native American, or Euro-American peoples.

**Traditional Cultural Properties and Cultural Landscapes**

A portion of the direct analysis area is within the *Chí'chil Bildagoteel* Historic District, which is listed in the NRHP as an Apache TCP. Apache Leap, Oak Flat, and 38 archaeological sites that contribute to the eligibility of the district are within the *Chí'chil Bildagoteel* Historic District. Apache Leap is within the indirect analysis area, but access to the Protohistoric/Historic Apache village at its summit is through the direct analysis area.

Consistent with the direction in the land exchange legislation, the Tonto National Forest set aside Apache Leap, a sacred landscape for the Apache and Yavapai and other tribes, as a special management area totaling 839 acres (Apache Leap SMA). The Tonto National Forest was also directed in PL 113-291 Section 3003 to develop a management plan in consultation with the tribes. Meetings were held individually with tribes, with cultural groups, and an all-tribes meeting to discuss the management options for this sacred landscape. Tribes made the following requests regarding the Apache Leap SMA:

1. Leave it in its natural state;

2. Guarantee access, including possibly developing a new road, so that tribal members can reach the top to perform ceremonies once the current access route is closed due to subsidence;

3. Do not renew or reissue the extant grazing permits; and

4. Allow day-use only (no overnight camping), and do not permit any rock-climbing.

These requests were integrated into the management plan as part of the environmental assessment of the SMA. A final decision notice, special area management plan, and corresponding forest plan amendment were issued December 26, 2017. When a new access route is designed, it will require an environmental review to determine whether the route poses any adverse effects on cultural and/or tribal resources.

### *Places of Traditional and Cultural Importance*

Additional resources (special interest areas or resources) were recorded during the ethnographic study within the analysis areas (Hopkins et al. 2015) and by the tribal monitor surveys.

During their surveys, the tribal monitors recorded 594 special interest areas in the direct analysis area. Of the 594, 523 are described as cultural resources, 66 as natural resources, and 5 as both cultural and natural resources. The cultural resources generally correspond to prehistoric archaeological sites and were categorized by the tribal monitors as cultural areas, settlement areas, resource gathering areas, resource processing areas, agricultural areas, and other. The natural resources areas are landforms, rockshelters, springs, water sources, vantage points, plant resources areas, and mineral resources areas. Special interest areas that are categorized as both cultural and natural resources include rockshelter, plant resources and processing areas, a tinaja with plant processing areas, and a quarry. Please note that information regarding special interest areas is sensitive data and will only be discussed in general terms.

Research conducted for the ethnographic study identified seven places of traditional and cultural importance within the direct analysis area (Hopkins et al. 2015). The places include springs, canyons, an archaeological site, a rock art site, and Oak Flat.

### *Springs*

Up to 15 springs or seeps (Bitter, Bored, Hidden, McGinnel Mine, McGinnel, Walker, Grotto, Rancho Rio, KP Reservoir, Benson, Bear Canyon, Perlite, Iberri, DC-6.6W, and Kane) and three ponds (Above Grotto, SS-1, and Anxiety Fault Pond) are located within the direct analysis area that could be directly disturbed or impacted by dewatering (see section 3.7.1). Springs are sacred to all the consulting tribes. These are springs with known persistence that have been monitored in the field and either would be directly disturbed or potentially dewatered by drawdown in the regional aquifer. Other springs and seeps have been mapped in the area from a variety of sources; many of these are likely to be seasonal and not associated with regional groundwater.

### *Plant and Mineral Resources*

One hundred fifteen plant species of special interest have been identified to date within the direct impacts analysis area (table 3.14.1). Several of these plants have been identified as a component of natural resources special interest areas.

**Table 3.14.1. Plants within the Analysis Area**

| Common Name | Scientific Name | In a Special Interest Area (Y/N) |
|---|---|---|
| Agave | *Agave* sp. | N |
| Aloe vera | *Aloe vera* | N |
| Arizona juniper | *Juniperus arizonica* | Y |
| Arizona lupine | *Lupinus arizonicus* | N |
| Arizona thistle | *Cirsium arizonicum* | Y |
| Banana yucca | *Yucca baccata* | Y |
| Barberry | *Mahonia fremontii* | N |
| Barrel cactus | *Ferocactus acanthodes* | N |
| Beargrass | *Nolina microcarpa* | Y |
| Blue bonnet | *Lupinus texensis* | N |
| Blue palo verde | *Parkinsonia florida* | N |

Resolution Copper Project and Land Exchange

| Common Name | Scientific Name | In a Special Interest Area (Y/N) |
|---|---|---|
| Soaptree yucca | *Yucca elata* | N |
| Sotol | *Dasylirion wheeleri* | Y |
| Staghorn cholla | *Cylindropuntia versicolor* | Y |
| Sunflower | *Helianthus* sp. | Y |
| Sweetbush | *Bebbia juncea* | N |
| Tansy mustard | *Descurainia pinnata* | N |
| Teddybear cholla | *Cylindropuntia bigelovii* | Y |
| Thorn-apple | *Datura* sp. | N |
| Three awn grass | *Aristida purpurea* | N |
| Timber oak | *Quercus* sp. | N |
| Triangle bur ragweed | *Ambrosia deltoidea* | N |
| Turpentine bush | *Ericameria* sp. | N |
| Velvet mesquite | *Prosopis velutina* | N |
| White tackstem | *Calycoseris wrightii* | N |
| Whitethorn acacia | *Vachellia constricta* | Y |
| Wild spinach | *Chenopodium* sp. | Y |
| Wild onion | *Allium maropetalum* | N |
| Willow | *Chilopsis linearis* | Y |
| Wire lettuce | *Stephanomeria pauciflora* | N |
| Wolfberry | *Lycium berlandieri* | Y |
| Woodsorrel | *Oxalis* sp. | N |
| Yellow palo verde | *Parkinsonia microphylla* | Y |
| Yucca | *Yucca* spp. | Y |

Eight minerals or types of minerals important to tribal groups were identified in the direct impacts analysis area: Apache tear obsidian, caliche, mica, red ore, polishing stones, quartz crystals, iron sand deposits, and schists.

### 3.14.3.4    Indirect Analysis Area

A portion of the *Chí'chil Bildagoteel* Historic District TCP is within the indirect analysis area outside of the direct analysis area. Specifically, Apache Leap to the west of Oak Flat is adjacent to the direct analysis area. Ten places of traditional and cultural importance have been identified in the ethnographic report within the indirect analysis area.

One hundred forty-seven springs or surface water sources are found in the indirect analysis area. These springs and water sources are within the Queen Creek watershed, Devil's Canyon watershed, and the Gila River watershed.

ER356

### 3.14.3.5    Atmospheric Analysis Area

Tonto National Forest's consultations and ethnohistoric study of the general area around Oak Flat have identified many named Western Apache locations and special interest areas, as well as Yavapai band traditional territories. This applies particularly to the areas within the U.S. 60 corridor—for example, the Superstition Mountains, Picketpost Mountain, Apache Leap, and Devil's Canyon are all named sacred locations. A portion of the *Chí'chil Bildagoteel* Historic District is within the atmospheric analysis area. The ethnographic report identified 13 places of traditional and cultural importance to tribes within the atmospheric analysis area. These places include springs, ridges, mountains and mountain ranges, resource collection sites, and archaeological sites.

The atmospheric analysis area also contains prehistoric sites and resources of interest to the tribes that are related to the prehistoric occupation of the area— descendant communities comprise the Gila River Indian Community, the Hopi Tribe, the Salt River Pima-Maricopa Indian Community, and the Pueblo of Zuni.

## 3.14.4    Environmental Consequences of Implementation of the Proposed Mine Plan and Alternatives

### 3.14.4.1    Alternative 1 – No Action

#### Direct Impacts

Under the no action alternative, the Forest Service would not approve the GPO, current management plans would remain except for the development of a new forest plan, and Resolution Copper would continue current activities on private property and previously permitted activities on the Tonto National Forest. As described in section 2.2.3, the no action alternative analysis analyzed the impacts of (1) the Forest Service's not approving the GPO, and (2) the land exchange's not occurring.

If the Forest Service does not approve the GPO, the mining operation as defined in the GPO would not occur; if the land exchange does not occur, the selected lands would remain under Forest Service management. Under either scenario, no direct impacts are anticipated to archaeological sites, TCPs, springs, or other resources significant to the tribes, including loss of access to resources.

#### Indirect and Atmospheric Impacts

If either the land exchange does not occur or the GPO is not approved, no adverse indirect or atmospheric impacts are anticipated to resources other than to some springs. With or without the land exchange, the continued dewatering of mine shafts on private land would occur, lowering the water table in the area, which may have adverse indirect impacts on six springs. See section 3.7.1 for more information on dewatering and its potential effects on area resources.

### 3.14.4.2    Impacts Common to All Action Alternatives

Under all action alternatives, the Oak Flat parcel will be adversely impacted by the proposed mining operation. Extraction of the ore via block caving will eventually lead to the subsidence of the parcel; access to Oak Flat and the subsidence zone will be curtailed once it is no longer safe for visitors. Oak Flat is a sacred place to the Western Apache, Yavapai, O'odham, Hopi, and Zuni. It is a place where rituals are performed, and resources are gathered; its loss would be an indescribable hardship to those peoples. The following is the testimony of tribal members describing the spiritual significance of Oak Flat and what its loss would mean to their culture, especially Apache culture, in their own words. The first section contains portions of the congressional testimony by members of the San Carlos Apache Tribe; the second

section is a selection of representative comments on the DEIS, which emphasize the cultural importance of Oak Flat to Native peoples.

### *Congressional Testimony*

WENDSLER NOSIE SR. CONGRESSIONAL TESTIMONY

Wendsler Nosie Sr., Chairman of the San Carlos Apache Tribe from 2006 to 2010, gave testimony before Congress several times beginning in 2007. Mr. Nosie testified to the importance of Oak Flat and Apache Leap to the Apache peoples, stating, "These lands are holy and sacred places." He reiterated the sacredness of these places each time he testified to Congress. The following excerpts are illustrative of the statements made during these hearings.

November 1, 2007, U.S. House Natural Resources Committee, National Parks, Forests, and Public Lands Subcommittee:

> Well before Oak Flat, Apache Leap, and Devil's Canyon were appreciated for their unique habitat and features by hikers, bird watchers, off-road enthusiasts, and rock climbers, these Lands were home to the Apache People. In our native language Oak Flat is called *Chí'chil Biłdagoteel*, and it lies in the heart of T'is Tseban country. The Oak Flat area is bounded in the east by Gan Bikoh or Crown Dancers Canyon, and in the north by Gan Diszin or Crowndancer Standing. These canyons are called "Devil's Canyon" and "Queen Creek Canyon" by non-Indians.

> For as long as may be recalled, our People have come together here. We gather the acorns and plants that these lands provide, which we use for ceremonies, medicinal purposes, and for other cultural reasons. We have lived throughout these lands, and the Apache People still come together at Oak Flats and Apache Leap to conduct religious ceremonies and to pray or take rest under the shade of the ancient oak trees that grow in the area. The importance of these lands has not changed. These are holy, sacred, and consecrated lands which remain central to our identity as Apache People.

> In the nearby area called Devil's Canyon, we have placed marks, which are symbols of life on Earth, on the steep ledges and canyon walls that rise high above the stream that has carved deep into the Canyon, and we buried our ancestors in the Canyon's heart. The escarpment of Apache Leap, which towers above nearby Superior, is also sacred and consecrated ground for our People for a number of reasons, many of which are not appropriate to discuss here. You should know, however, that at least seventy-five of our People sacrificed their lives at Apache Leap during the winter of 1870 to protect their land, their principles, and their freedom when faced with overwhelming military force from the U.S. Calvary which would have required them to surrender as prisoners of war. (Nosie Sr. 2007)

June 17, 2009, U.S. Senate Energy and Natural Resource Committee, Public Lands and Forests Subcommittee:

> Apache spiritual beings, our Gaan, exist within the three sacred sites of Oak Flat, Gaan Canyon and Apache Leap affected by S. 409. These sites become RCM property and subject to its proposed mine. Yet, to Apache, the Gaan live and breathe in those sites. The Gaan are the very foundation of our religion; they are our creators, our saints, our saviors, our holy spirits. Imagine if this same type of mine as proposed by RCM lay 7,000 feet beneath the National Cathedral here in Washington, D.C. Imagine further that the mine was affected by a major subsidence, one that shook and swallowed the National Cathedral. Everyone would be outraged. Every person of every faith would fight to their last breath to prevent that mine from happening. Every American understands that the desecration of any

one religion affects all religions, and that such an act even threatens the free exercise protections afforded under the First Amendment of the Constitution. (Nosie Sr. 2009)

March 12, 2020, House Committee on Natural Resources, Indigenous Peoples of the United States Subcommittee (regarding the DEIS):

The analysis of the Tribal Values and Concerns focuses the impacts of the proposed Land Exchange and Resolution Copper Mine on the past without recognizing the current presence of religious and cultural practices that have endured at Oak Flat for centuries. This erasure of Native Americans in contemporary terms perpetuates the genocidal history of America. What was once gunpowder and disease is now replaced with bureaucratic negligence and a mythologized past that treats we Native people as something invisible or gone. We are not.

We are still a vibrant and vital part of our Nation's fabric despite repeated attempts to relegate our cultures as artifacts in museums or blubs in history books. However, the permanent damage that will be caused by the Resolution Copper Mine is something that will contribute to this genocidal narrative continuing now and well into the future. It is disappointing that the cumulative effects analyzed in the Oak Flat DEIS do not look at the present or future of impacted Native peoples.

*Chí'chil Biłdagoteel* (also known as Oak Flat) is a Holy and Sacred site for our Apache people and many other Native Americans. It is a place where we pray, collect water and medicinal plants for ceremonies, gather acorns and other foods, and honor those that are buried here. It is important to understand that we have never lost our relationship to *Chí'chil Biłdagoteel*. Despite the violent history of the U.S. Government's exile, forced march and imprisonment of Native people on reservations, and the efforts by the U.S. Government to discourage, impede, or fully disallow us from coming to this holy area, we have our own legacy of persistence and never letting go of this place. *Chí'chil Biłdagoteel*'s religious value to our prayers, our ceremonies, and in our family histories cannot be overstated. Native religion was the first religion practiced in this area. And for over five years now, we have established an encampment to protect the Holy Ground at *Chí'chil Biłdagoteel* with its four crosses, which represent the entire surrounding Holy and Sacred area, including its water, animals, oak trees, and other plants central to our tribal identity. It is important to note that *Chí'chil Biłdagoteel* is listed on the National Park Service's National Register of Historical Places ("NRHP") as a Historic District and Traditional Cultural Property ("TCP"). Emory oak groves at Oak Flat used by tribal members for acorn collecting are among the many living resources that will be lost along with more than a dozen other traditional plant medicine and food sources. Other unspecified mineral and plant collecting locations and culturally important landscapes will also be affected. Development of the Resolution Copper Mine would directly and permanently damage *Chí'chil Biłdagoteel*, the designated TCP that is vital to us, which is why we strongly oppose this operation.

The impacts that will occur to Oak Flat will undeniably prohibit the Apache people from practicing our ceremonies at our Holy site. Construction of the mine would temporarily cut off access and once the mine has been completed, the ongoing safety concerns of subsidence will create a permanent barrier preventing Apache ceremonies from taking place. Our connections to the Oak Flat area are central to who we are as Apache people. Numerous people speak of buried family members. Most of them include childhood memories. Everyone speaks to the deep spiritual and religious connection that Apaches have to the land, water, plants and animals that would be permanently destroyed by this proposed action. The destruction to our lands and our sacred sites has occurred consistently over the past century in direct violation of treaty promises and the trust obligation owed to Indian tribes. Tribes ceded or had taken hundreds of millions of acres of our homelands to help build this Nation. In return, the United States incurred obligations to protect our lands from harm, and to respect our

**ER359**

religion and way of life. Despite these obligations, the U.S. Government has consistently failed to uphold these promises or too often fails to act to protect our rights associated with such places like *Chí'chil Biłdagoteel.* (Nosie Sr. 2020)

TERRY RAMBLER CONGRESSIONAL TESTIMONY

Terry Rambler, Chairman of the San Carlos Apache Tribe from 2010 to the present, also gave testimony before Congress about the impacts on Apache culture and spirituality by the proposed project.

February 9, 2012, U.S. Senate Committee on Energy and Natural Resources, prepared statement excerpt:

> Throughout our history, Oak Flat continues as a vital part of the Apache religion, traditions, and culture. In Apache, our word for the area of Oak Flat is *Chí'chil Biłdagoteel* (a "Flat with Acorn Trees"). Oak Flat is a holy and sacred site, and a traditional cultural property with deep religious, cultural, archaeological, historical and environmental significance to Apaches, Yavapais, and other tribes. At least eight Apache Clans and two Western Apache Bands have documented history in the area. Apache clans originated from this area and Apaches on the Reservation have ancestors who came from the Oak Flat area before they were forced to Old San Carlos. Tribal members' ancestors passed their knowledge about Oak Flat to their descendants who are alive today.

> A number of Apache religious ceremonies will be held at Oak Flat this Spring, just as similar ceremonies and other religions and traditional practices have been held for a long as long as Apaches can recall. We do so because Oak Flat is a place filled with power, a place Apaches go: for prayer and ceremony, for healing and ceremonial items, or for peace and personal cleansing. The Oak Flat area and everything in it belongs to powerful Diyin (Medicine Men) who we respect, and the home of a particular kind of Gaan—powerful Mountain Spirits and Holy Beings on whom Apaches depend for our well-being.

> The Oak Flat area is bounded on the west by portions of the large escarpment known as Dibecho Nadil (Apache Leap), to the east by Gaan Bikoh (Crown Dancer's, Mountain Spirit's, or Gaan Canyon, and known as Devil's Canyon), and is intersected to the north by Gaan Daszin (Crown Dancer's or Mountain Spirits Standing, and known as Queen Creek Canyon).

> In the Oak Flat area, there are hundreds of traditional Apache species of plants, birds, insects, and many other living things in the Oak Flat area that are crucial to Apache religion and culture. Some of these species are among the holiest of medicines—medicines that are only known and harvested by gifted Apache spiritual or healing practitioners. Only the species within the Oak Flat area are imbued with the unique power of this area. The ancient oak groves provide an abundant source of acorns that for many centuries and today serve as an important traditional food source for the Apache people.

> Any mining on Oak Flat will adversely impact the integrity of the area as a whole—both as a holy and religious place and as a place of continues traditional and cultural importance to Apaches and other tribal people. There are no human actions or steps that can ever make this place whole again or restore to the Apache what will be lost. Mining on Oak Flat will desecrate our Gaan's home and could greatly diminish the power of this place, as well as our ability to most effectively conduct our ceremonies. The destruction of Oak Flat will add to the many problems and sufferings that our community already faces. We will become vulnerable to a wide variety of illness, and our Apache spiritual existence will be threatened. (Rambler 2012)

March 21, 2013, U.S. House Committee on Natural Resources, Energy and Mineral Resources Subcommittee:

The San Carlos Apache Reservation is bordered on the west by the Tonto National Forest. The Oak Flat area is 15 miles from our Reservation. The Forest and the Oak Flat area are part of our and other Western Apaches' aboriginal lands and it has always played an essential role in the Apache religion, traditions, and culture. In the late 1800s, the U.S. Army forcibly removed Apaches from our lands, including the Oak Flat area, to the San Carlos Apache Reservation. We were made prisoners of war there until the early 1900s. Our people lived, prayed, and died in the Oak Flat area. At least eight Apache Clans and two Western Apache Bands document their history in the area. Since time immemorial, Apache religious ceremonies and traditional practices have been held at Oak Flat. Article 11 of the Apache Treaty of 1852, requires the United States to "so legislate and act to secure the permanent prosperity and happiness" of the Apache people. Clearly, H.R. 687 fails to live up to this promise. The Oak Flat area, as well as other nearby locations, are eligible for inclusion in, and protection under, the National Historic Preservation Act of 1966, as well as many other laws, executive orders and policies.

Today, the Oak Flat area continues to play a vital role in Apache ceremonies, religion, tradition, and culture. In Apache, the Oak Flat area is *Chí'chil Bildagoteel* (a "Flat with Acorn Trees"). The Oak Flat area is a place filled with power—a place where Apaches today go for prayer, to conduct ceremonial dances such as the sunrise dance that celebrates a young woman's coming of age, to gather medicines and ceremonial items, and to seek and obtain peace and personal cleansing. The Oak Flat area and everything in it belongs to powerful Diyin, or Medicine Men, and is the home of a particular kind of Gaan, which are mighty Mountain Spirits and Holy Beings on whom we Apaches depend for our well-being.

Apache Elders tell us that mining on the Oak Flat area will adversely impact the integrity of the area as a holy and religious place. Mining the Oak Flat area will desecrate the Gaan's home and would diminish the power of the Gaan. Without the power of Gaan, the Apache people cannot conduct our ceremonies. We become vulnerable to a variety of illnesses and our spiritual existence is threatened. There are no human actions or steps that could make this place whole again or restore it once lost. (Rambler 2013a)

November 20, 2013, U.S. Senate Committee on Energy and Natural Resources, Public Lands, Forests, and Mining Subcommittee:

At least eight Apache Clans and two Western Apache Bands have documented history in the area. Apache clans originated from this area and Apaches on the Reservation who came from the Oak Flat area before being forced to Old San Carlos. Tribal members' ancestors passed their knowledge to their descendants who are alive today. Our people lived, prayed, and died in the Oak Flat area for decades and centuries before this mining project was conceived.

For centuries, Apache religious ceremonies and traditional practices have been held at Oak Flat. Article 11 of the Apache Treaty of 1852 requires the United States to "so legislate and act to secure the permanent prosperity and happiness" of the Apache people. S. 339 would directly abrogate this promise. The Oak Flat area, as well as other nearby locations, is eligible for inclusion in and protection under the National Historic Preservation Act of 1966 and under other laws, executive orders and policies.

Today, the Oak Flat area continues to play a vital role in Apache religion, tradition, and culture. The ceremonies conducted at Oak Flat are part of a centuries-old continuum of ceremony and

everyday life. The Oak Flat area is a place filled with power—a place where Apaches today go for prayer, to conduct ceremonies such as Holy Ground and the Sunrise Dance that celebrates a young woman's coming of age, to gather medicines and ceremonial items, and to seek and obtain peace and personal cleansing. The Oak Flat area and everything in it belongs to powerful Diyin, or Holy Beings, and is the home of a particular kind of Gaan, which are mighty Mountain Spirits and Holy Beings on whom we Apaches depend for our well-being.

Apache traditions and practices mean that we are responsible to respect and to take care of our relatives, which in our culture includes all living things. On my mother's side, I am Túgain, (Whitewater Clan). I am related to the eagles and hawks, yellow corn, and a plant called iya'aiyé (wild tarragon). On my father's side, I am Nadots'osn (Slender Peak Clan) and related to the roadrunner, side-oats grama grass, and black corn. These animals and plants thrive at Oak flat and elsewhere. Our lives are closely intertwined with these living things as the power of the Holy Beings provide the plants, corn and animals to sustain life and for use in our ceremonies and prayers. The Apache way of life is to take care of these relatives and their habitats. The Tonto National Forest's own website states that it works closely with tribes in the area to ensure that we can continue to practice our religious and traditional activities there and to protect tribal archeological, historical, and cultural areas. (Rambler 2013b)

NAELYN PIKE CONGRESSIONAL TESTIMONY

Naelyn Pike, a member of the San Carlos Apache Tribe, testified before the U.S. House Natural Resources Committee Indigenous Peoples of the United States Subcommittee, on March 12, 2020, about her experiences at Oak Flat during her Sunrise Dance:

Oak Flat is one of the sacred areas where Apaches hold the coming of age Sunrise Ceremony for girls to mark their entrance into womanhood. The ceremony begins when a girl goes to the sacred land and builds a wikkiup, which becomes their new home for the journey ahead.

On the first day of my ceremony, I made the four Apache breads for the medicine man and my godparents. My godmother helped me dress in my traditional clothing and stayed with me throughout the ceremony. On the second day of the ceremony, I woke up when the sun started to rise. I danced and prayed with my godmother, godfather, and my partner by my side. I danced to the sun, the Creator. I hit the ground hard with my cane in time with the drumbeat to wake up the sacred mountain, the spirits, and the Gaans, also known as Angels, bringing them back to life.

Without the power of the Gaans, the Apache people cannot conduct our ceremonies. I awoke the Gaans and danced beside them, tears streaming down my face. On the third day, my partner and I danced underneath the four sacred poles. This day is when I became the white-painted woman. My godfather and the Gaans painted me with the Glesh. In our creation story, the white-painted woman came out of the earth, covered with white ash from the earth's surface. Being painted with the Glesh represents the white-painted woman and her entrance into a new life. The paint molds and glues the prayers and blessings from the ceremony onto me. With my face completely covered, my godmother wiped my eyes with a handkerchief. Once my eyes opened, I looked upon the world not as a little girl, but as a changed woman. At the end of my dance, my family and friends congratulated me. We all cried because I was no longer a girl; I was now a woman. On the last day of my ceremony, my grandmother undressed me and took me to the stream so I could bathe. While she washed my hair, a small green hummingbird flew right in front of us and hovered about before it flew toward the sky. I knew this was a great blessing. I dressed in my everyday clothes, and we went back to the camp.

I had become a woman and followed in the footsteps of Apache girls that have come before me. My ceremony is just one part of an Apache way of life. It is our religious right to be able to practice these ceremonies in these sacred places. How can we practice our ceremonies at Oak Flat when it is destroyed? How will the future Apache girls and boys know what it is to be Apache, to know our home when it is gone? (Pike 2020)

Ms. Pike also described her family's visits to Oak Flat to gather acorns and other plants:

Through my entire existence, I was consistently brought back to Oak Flat. My family would come together for prayer and ceremony. When the red berries and the acorn were in season, I was taken to Oak Flat to gather our traditional foods. With the food we collected, we were able to feed our families. Through this practice, I was able to learn my role as an Apache girl and to live our culture. The acorn, berries, and medicinal plants can never be replaced. Nor can they ever be relocated to a different area. Usen has planted these plants and herbs there for a reason. To me, Oak Flat is home, and it will always be home. (Pike 2020)

### *Personal Statements from DEIS comments*

Many Apache people provided personal statements about the importance of Oak Flat to their culture and religion. The following statements attest to the role Oak Flat has in Apache religious belief, ceremonial practice, and resource gathering:

*Chí'chil Biłdagoteel* (also known as Oak Flat) is a Holy and Sacred site for our Apache people and many other Native Americans. It is a place where we pray, collect water and medicinal plants for ceremonies, gather acorns and other foods, and honor those that are buried here. We have never lost our relationship to *Chí'chil Biłdagoteel*. Despite the violent history of the U.S. Government's exile, forced march and imprisonment of Native people on our reservations and the efforts by the U.S. Government to discourage, impede, or fully disallow us from coming to this holy area, we have our own legacy of persistence and never letting go of its religious value in our prayers, in our ceremonies, and in our family memories. – Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

The Gaan people (Crown Dancers) are angels, Apache spiritual beings. Our Gaan exist within the three sacred sites of *Chí'chil Biłdagoteel* (Oak Flat), Gaan Canyon and Apache Leap. The Gaan live and breathe in these sites. The Gaan are the very foundation of our religion. They are our Creator, our Saints, our Saviors, and our Holy Spirits. This mine endangers our Holy Spirits and this was not considered in the impacts. – Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

We have lived throughout these lands since time immemorial. For as long as may be recalled, our people have come together here. The Apache People continue to come together at Oak Flats and Apache Leap to conduct religious ceremonies and to pray or take rest under the shade of the ancient oak trees that grow in the area. These are holy, sacred, and consecrated lands which remain central to our identity as Apache People. Cultural significance is displayed largely in the historic social practices of a group. The Religious value of a current ongoing connection to the area is not addressed. – Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

In the nearby area called Devil's Canyon, the marks (petroglyphs) that exist are symbols of life on earth. They exist on the steep ledge and canyon walls that rise high above the stream that has carved deep into the Canyon. This loss of our written history is not considered in the impacts. . . . We buried our ancestors in the Canyon's heart. The loss of our Sacred Burial Ground is mentioned in passing. – Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

The escarpment of Apache Leap, which towers above nearby Superior, is also sacred and consecrated ground for our People for a number of reasons, many of which are not appropriate to discuss here. As you know, however, that at least seventy-five of our People sacrificed their lives at Apache Leap during the winter of 1870 to protect their land, their principles, and their freedom when faced with overwhelming military force from the U.S. Calvary which would have required them to surrender as prisoners of war. The escarpment of Apache Leap, which towers above nearby Superior, is also Sacred and consecrated ground for our People.
– Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

Although the DEIS has set aside Apache Leap as a Special Management Area, it does not discuss the spiritual and religious connection the desecration of *Chí'chil Biłdagoteel* will have on Apache Leap. They are of the same body and connected in every way. Creating the Apache Leap Special Management Area does not protect the Holy, Sacred, spiritual and religious nature of this consecrated ground. The protection of Apache Leap from subsidence is not conclusive. The impacts of the loss of this land form to Apache people has not been addressed.
– Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

My children have been going to Oak Flat since they were born. I have three children and they are all directly connected to the land and the environment. My nine year old daughter dreams about having her Apache Sunrise dance ceremony at Oak Flat. The Apaches see Oak Flat differently—it is a church, a place for worship and the practice of our traditional religion. It is the center of our most sincerely held, religious beliefs, where diyf'(sacred power) can be called upon via prayers. Oak Flat is the goiff'(home) of our diyi'n, visited by our ga 'an (spiritual beings) who provide us with healing and spiritual services. It is also a place that speaks to the very essence of tribal culture. Covering 4,309 acres, Oak Flat lies within the traditional territory of the T'iis Tseban (the "cottonwood trees gray among rocks people"), also known as the "Pinal Band" of Apaches, and is closely associated with the related Tse Binesti 'e (the "surrounded by rocks people"), also known as the Aravaipa Band. At least eight Apache clans have direct ties to this location. Tribal members continue to visit Oak Flat for prayer and a wide range of traditional needs and practices. – Terry Rambler

Apache Sunrise dance is a womanhood ceremony for a young girl and we hope she will have the opportunity to choose to have her ceremony there on our traditional homelands. My seven year old son has five different forts at Oak Flat and every time we go to Oak Flat he runs to check on all his forts. He says I have to make sure they have not destroyed my forts yet. This is a disheartening statement for a mother to hear, because my son knows Resolution Cooper is trying to destroy our holy place. I pray my son will have the opportunity to sweat at Oak Flat for the first time, when he becomes a young man. We have gone to many Apache spiritual ceremonies (Sunrise dances and Holy ground ceremonies) at Oak Flat and we know the land personally. – Lian Bighorse

The memories I have there when visiting there is praying, picking acorn, visiting the spring, going hiking, playing tag, participating with my cousin sunrise dance ceremony, having my massage ceremony at Oak Flat. Oak Flat means so much because of the memories but also because it where my ancestor use to live and rom free. It's where our sacred Red Guan came from another holy place to go to Oak Flat. I believe Oak Flat is sacred. I believe it because when you are there you can feel it, it's in the wind, the rocks, the dirt, the spring, it's just all around you. – Baase Pike

I've been to the holy grounds and puberty ceremonies at Oak Flat. I do healing ceremonies for people who are needing prayer there. . . . When I was younger, we would go through Oak Flat on the way to Casa Grande. It was part of different tribes competing. At the time, those rocks caught my eye. It brings be [sic] back to my ancestors who walked the canyon. You can hear their prayers and songs.

As a kid, I remember the stories. You can feel it, something special about that place. . . . You can still see the human figures. Before the turn off to the campground there is a shape of a skill like a Gaan dancer. You can still see that. – Jerry Thomas

Even to my people (Un'k Akimel O'odham) Oak Flat is a sacred holy place. It is mentioned in our traditional songs that my ancestors would meet and pray there because of the direct connection to the holy spirit Juhwertamahkai (earth doctor). – Esteban Lopez

I went to Oak Flats when I was a kid with my parents. We used to always go out there to pick acorn, herbs, spices. And just to get away from home at a place where we could go to picnics. Learning my history about Oak Flats, I have family that is buried there. So it became a memorial place where me and my family can go pay our respects to the people who have died there. I have family that are buried there. It's been basically a big part of my life growing up. Introducing my kids the place and to the environment, I did what my parents did for me. Take them out there and enjoy what I enjoyed as a kid. To teach them at a young age, learning how to gather and hunt was a big issue when I was growing up to teach the younger generation, which I tend to do all the time. I got involved in running. It's been a journey, going every year. I'm trying to show my siblings, my sons and daughters, how important it is to me why I go up there. It's important to me to get them involved, knowing that it's a place where we go to gather acorns. It's also a place for me to teach them about our bloodlines and where they're buried there. – Andrew Victor Tarango

Comments regarding the Sunrise Dance:

My family, my ancestors come from Oak Flat. I grew up there, praying, picking the medicine, picking the acorn, going to the springs, gaining the teachings of my role as an Apache woman so I can pass it down to my daughters. Those teachings through the songs and prayers still exist, and I and many others have passed it on to our children. I have 3 daughters which my two younger daughters had their coming of age Ceremony for our girls who become women there at Oak Flat. My daughter, Nizhoni, held her Ceremony at Oak Flat in October 2014. As a Mother and as a family, we prepare our daughters from the day they take their first breath onto this world until the day their ceremony starts. All the elements of the wind, fire, water, and land go into the Ceremony for my daughter. Everything Usen (Creator, God) has created has a significant role in the Ceremony got the 4 days that she prays, dances, connects with all the elements, connected to our ancestors, connected to the Holy Spirit. On the 3rd day of the Ceremony she is painted white with the white clay that is provided from Mother Earth, and that paint blesses all living beings, followed by the next day, the last day of the ceremony, she has to wash the paint off and give it back to the earth. . . . The exact springs she went to wash her paint off is being affected by Resolution Copper Mine already by dewatering the springs. You are already tampering with her life. My daughter, Nizhoni was reborn from a young girl into a beautiful strong Apache woman at Oak Flat. Her feet touched the ground as the beat of the drum is the heart beat of Mother Earth. Her tears hit the ground having Mother Earth feel her love for the land, the water, and all creations. She prayed to our Holy people and entered the spirit world to pray for all people in this world and all that is created for she/we believe that everything is alive. – Vanessa Nosie

Our granddaughter, Nizhoni had her sunrise dance there at Oak Flat. . . . When someone has there dance, they have to be ready. They have to know as they're growing up the different things they need to know as a women. She would have to pick what she wanted to be on her buckskin, what would be her representation. And those things that she loves about Oak Flat were the butterflies and the hummingbird and so in her emblems on her buckskin, those were where those representations of nature were on her own dress. After her dance was over, she would have to be washed of all the

Resolution Copper Project and Land Exchange

ashes. So, we took her to the spring there and as we took her to the spring, all the butterflies came to meet her. We were going up toward the spring and there were groups of butterflies, black monarchs and yellow ones. The followed us all the way there. It was very special. And during her dance, there were times when hummingbirds actually came to the ceremony to where she was. Those things are very important to her and to me as a grandmother. Coming of age there is always going to hold reverence in her life and her kid's lives and her grandchildren's lives, the same it does with me. There are is connected to her and is connected to me through life, through practices, through ceremony, through prayers. – Theresa Nosie

The Sunrise ceremony places Apache women's bodies into the ground where the ceremony exists. They build their homes, physically and spiritually, where they are called to have their ceremony. As several people who gave testimonial, the location of a Sunrise ceremony is one that each girl must arrive to herself and in their own understanding of a spiritual connection.
– Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

This is about our Apache way of life and concern for Oak Flat, which is a holy place for me. I witness ceremonies like Sunrise Dances, and a Holy Ground Song, I hear, Chanting Songs, and bells from Ga'an in dances, such as bull-roaring. So it means a lot to any Apache who stops there hears things and feelings. – Linda Thomas

For at least a half millennium through to the present day, members of our Tribe have utilized the Oak Flat area for traditional religious ceremonies, such as the Sunrise Dance, where we celebrate the event of a girl's maturation from puberty over four days, through dance, drumming, song and prayer, and the visitation of Crown Dancers. It is a place where Apache Holy Ground rituals occur, where we commune with and sing to our Creator God, and celebrate our holy spirits, including our mountain spirits, the Ga'an. It is a place filled with rock paintings and petroglyphs, what some may describe as the footprints and the very spirit of our ancestors, hallmarks akin to the art found in gothic cathedrals and temples, like the Western Wall in Jerusalem, St. Peter's Basilica in Vatican City, or Angor Wat in Cambodia. This is why I call Oak Flat the Sistine Chapel of Apache religion. – Terry Rambler

I have a cousin who had her coming of age ceremony at Oak Flat. It was a time where she became a woman. The amazing thing about the ceremony is that it brought together family and we did what we do as Apache people. At this time I was a young girl. We came together and I wanted to someday have my ceremony just like her. To think that a mine would come and destroy the area of where my cousin had her ceremony breaks my heart. – Kellieann Goseyun

My daughter runs to Oak Flat. She wanted to have her Sunrise Ceremony at Oak Flat. We got all of the materials for the ceremony from Oak Flat, the plants the yucca sticks, and branches for the Ga'an Dancers. A week before the dance it snowed. When I went to check the dance grounds, everything was covered in snow. It worried me, but kept on doing what we were doing to prepare for the dance. When we got there the dance grounds were clear of snow and dry. Everything was ready for the ceremony. That was very spiritual to us that the grounds were ready. To me Oak Flat is very spiritual. Her house is still up at Oak Flat. That was in March, and it is still up today, She goes and checks on it every chance she gets. – Matonth Brown

Oak Flat is a special place to my family and the Apache people. Our ancestors prayed and dance there. Our medicine, water and food comes from there. When you are in the presents of Oak Flat you can feel the strength, struggle and resistance of our ancestors. This is where my daughter and nieces made their journey to womanhood through the coming of age ceremony. The houses they built with

their own two hands still stands strong in Oak Flat a place they call home where they can revisit and still feel the power of the songs and prayers. – Sinetta Lopez

I just recently had my coming of age ceremony at Oak Flat and being there meant a lot to me to have my ceremony in a place where all my ancestors used to be. If the Resolution Copper mine continues with destroying Oak Flat, then I will never have a sacred place to come back to or to show my kids where our ancestors gathered. I have many memories of Oak Flat of our family when we would sing our traditional songs. Our elders would tell us the history of Oak Flat. – Gouyen Brown-Lopez

The reason why Oak Flat is so important to me is because I have a very strong connection with the land. Oak Flat gives me connection with my family and my past ancestors. A place for me to dance with people that I love including my closest cousin and my sister who had their Sunrise Dances there which I was able to be a big part of. Because of all the dances I have done there it became my home. Whenever I am there the nature around me makes me feel free and I am able to rethink past mistakes and also the land makes me think of the future and how I can make my life better. With all the dances I was able to learn more about my culture and things I am supposed to do as a person and when I get older I know what I can pass on to the next generation. – Waya Brown

Comments about acorn and resource gathering at Oak Flat:

Oak Flat is also a place where our members still conduct traditional harvesting of plants important to our diet, such as acorns from Emory oaks, and healing plant-based medicines for a wide range of ailments. – Terry Rambler

We gather the acorns and plants that these lands provide for ceremonial and medicinal purposes and for other cultural reasons. The numerous natural elements, that come from these Holy Sites, are used as tools to conduct Religious Ceremonies, spiritual sweats, and Sunrise Ceremonies. The loss of these natural elements, fundamental to our religion, was not considered in the impacts.
– Terry Rambler and Wendsler Nosie on behalf of Apache Stronghold

We pick acorn. I forgot what that plant medicine is called, My families pick the plant medicine to heal themselves, like wild tea. It is a sacred and spiritual place for me and my family the ones that are traditional and they don't want anything to be built there. We would like to keep it to be sacred.
– Melissa Irving

We pick them up in acorn, and then we grind it, and we put it into a soup. We make dumpling, squash, corn, mixed together, and then we just— we do a lot of things with it. We eat, mostly— the elderlies love to pick acorn, and I am the one that love to pick acorn. And I have spent four days doing this, and it takes a lot of hard work, but if it's—if you guys do something about it and destroy it, there will be nothing. There will be nothing. So I just want you to know that it's very, very important. – Geraldine Kitcheyan

We have concerns about Oak Flat. There shouldn't be a mine there, because it's our acorns, squaw berries and we use squaw berries stem to make burden basket and it is our Apache Kool-Aid. Acorn we have been picking for our food and the acorn is Apache food when Geronimo was here in San Carlos that is his favorite food. And there's 3 ways of acorn soup that we do. I'm 67 years old and that's where I find my acorn and squash berries. Our families (Victor) have been picking acorn there and for us to have lunch there too. – Leopha Victor Chatlin

He used to go up over the mountain with my mom and she would collect acorn. And we were always stopping by over there [Oak Flat]. There are so many acorn trees. My Aunt Marie, she would go there and pick acorns. Out there she would smash hem on the rocks and put them in a blanket. She'd shake

it and then blow the hard ones away. She would grind it on a wheel and then we'd take it home and make acorn soup. My mom used to pick the berries—in Indian it's called, everyone called it Kool Aid. At that time everybody talked Apache. So that's what I know to call those berries. She would make that for us at home. I don't see people make that as much anymore. But Oak Flat is where she used to get it. – Imogene Brown

My great grandmother Dott Crockett, born in 1882 and passed away in 1981 at the age of 99 years old. . . . She told me stories of camping at the Oak Flats and praying while there, how they collected medicinal plants, also acorn which was the staple back then. She talked about the Red Berries they would pick and use as Koolaid to drink, she also talked about 'noos.' I never found its original name. – Brenda Schildt

### *Effects of the Land Exchange*

Assuming that the land exchange occurs, as mandated by Congress in the Southeast Arizona Land Exchange Act, the selected lands would be conveyed to Resolution Copper no later than 60 days after the publication of the FEIS, and the Oak Flat Federal Parcel would become private property and no longer be subject to the NHPA. Under Section 106 of the NHPA and its implementing regulations (38 CFR 800), historic properties leaving Federal management is considered an adverse effect regardless of the plans for the land, meaning that as analyzed under NEPA, the land exchange would have an adverse effect on resources significant to the tribes.

The Oak Flat Federal Parcel contains 31 NRHP-eligible historic properties, and one NRHP-listed TCP. Distinctive features of the TCP include an Emory oak stand that Apache and Yavapai use to harvest acorn, and a nearby campground, constructed by the Civilian Conservation Corps, that provides a convenient place for family gatherings. All of these resources would be adversely affected by leaving Federal management. In particular, as described above, the loss of the ceremonial area and acorn-collecting area in Oak Flat would be a substantial threat to the perpetuation of cultural traditions of the Apache and Yavapai tribes, because healthy groves are few and access is usually restricted unless the grove is on Federal land. Four of the places of traditional and cultural importance identified in the ethnographic report are found within the Oak Flat Federal Parcel; they are all part of the TCP. Two additional places of traditional and cultural importance are found within the East Plant Site of the GPO.

### *Effects of Forest Plan Amendment*

The Tonto National Forest Land and Resource Management Plan (1985b) provides guidance for management of lands and activities within the Tonto National Forest. It accomplishes this by establishing a mission, goals, objectives, and standards and guidelines. Missions, goals, and objectives are applicable on a forest-wide basis. Standards and guidelines are either applicable on a forest-wide basis or by specific management area.

A review of all components of the 1985 forest plan was conducted to identify the need for amendment due to the effects of the project, including both the land exchange and the proposed mine plan (Shin 2020). A number of standards and guidelines (10) were identified applicable to management of tribal resources. None of these standards and guidelines were found to require amendment to the proposed project, on either a forest-wide or management area-specific basis. For additional details on specific rationale, see Shin (2020). No standards and guidelines were identified that are strictly applicable to tribal resources; however, a great number of standards and guidelines are related to resources considered important or sacred by tribes, including wildlife, water resources, and scenic resources. The need for a forest plan amendment for these resources is discussed in the appropriate section.

### Effects of Compensatory Mitigation Lands

The compensatory mitigation lands are intended for conservation and overall improvement of riparian areas and are not anticipated to have any impact on tribal values or concerns. One compensatory mitigation land is located on tribal lands and is being undertaken in cooperation with the Gila River Indian Community.

### Effects of Recreation Mitigation Lands

The recreation mitigation lands are anticipated to have an adverse effect on tribal values. Although preliminary trail alignments and trailhead areas were surveyed for impacts to cultural resources that are eligible for the NRHP and trail designs were refined to reduce conflict with cultural resources, the trails would be visible from known TCPs, and any ground disturbance is deemed to be an adverse effect on cultural and tribal resources.

### Summary of Applicant-Committed Environmental Protection Measures

A number of environmental protection measures are incorporated into the design of the project that would address the loss of resources of tribal value and concern. These are non-discretionary measures, and their effects are accounted for in the analysis of environmental consequences. Many of these are related to other resources, such as minimizing ground disturbance or loss of habitat, and are not reiterated here.

Measures to reduce impacts on tribal resources that are covered in detail in the PA (see appendix O) are described in the "Mitigation Effectiveness" section.

### 3.14.4.3    Alternatives 2 and 3 – Near West

### Direct Impacts

Under Alternatives 2 and 3, the land exchange would occur and the Forest Service would approve the GPO. For both alternatives, there are variations of the footprint and the type of storage facility proposed in the modified GPO location; however, the direct effects would be the same for both. Section 3.12.4.2 contains a description of the location of the 138 prehistoric and historic archaeological sites (18 of which have eligibility yet to be determined) that would be impacted by these alternatives and their associated mine operation areas (East Plant Site, subsidence area, West Plant Site, tailings facility and corridor, Silver King Mine Road, MARRCO corridor, and roads) (see table 3.12.4-1).

Twenty-three special interest areas were recorded in the tailings facility and corridor proposed for Alternatives 2 and 3; all of the special interest areas are cultural and are categorized as settlement or cultural areas. Several special interest areas are deemed to be related and are grouped together into three larger areas of importance. Each of these incorporates an active spring and archaeological sites. The area also contains many plants and minerals of use to tribes. Specifically, 67 plant species are found within the tailings facility; 17 of those are found in special interest areas. All alluvial deposits would be removed to expose bedrock for the tailings storage facility, so all of these soil and vegetation resources would be destroyed by construction and use of the facility. Resources in the direct analysis area may be lost completely because of ground disturbance, or tribes may lose access to those resource once they are part of the mine.

Eight persistent springs are anticipated to be dewatered by mine drawdown. In addition, three springs and three ponds within the subsidence area and three springs in the Alternative 2 and 3 tailings facility footprint will be directly disturbed.

### Indirect Impacts

For both alternatives, a portion of the *Chí'chil Biłdagoteel* Historic District TCP found outside the project area may be indirectly impacted from inadvertent damage from construction activities in the area. In addition, 10 places of traditional and cultural importance identified in the ethnographic report are within the indirect impacts analysis area. Fifty springs or other water sources are within the indirect analysis area. Either tailings storage facility configuration would adversely reduce and affect the flow of water into Queen Creek; the long-term effects on groundwater quality due to tailings seepage are discussed in section 3.7.2.

### Atmospheric Impacts

The tailings location for Alternatives 2 and 3 is located directly opposite Picketpost Mountain, a mountain sacred to Western Apache bands, and the presence of the nearly 500-foot-high tailings would constitute an adverse visual effect on the landscape.

Plotting the visual effects buffers against the results of the ethnographic study, two identified places of traditional and cultural importance are within 1 mile of the MARRCO corridor, eight are within 2 miles of the GPO mine facilities (i.e., East Plant Site, West Plant Site, etc.), and five are within 6 miles of the tailings facility. Adverse visual effects are expected for these places.

## 3.14.4.4    Alternative 4 – Silver King

### Direct Impacts

This alternative contains a total of 147 prehistoric and historic archaeological sites that would be adversely impacted by the combined areas of the mine; two of these archaeological sites have eligibility yet to be determined (see table 3.12.4-2). As noted earlier in this section, impacts on resources on Oak Flat would be the same for Alternative 4 and Alternatives 2 and 3. Resources in the direct analysis area may be lost completely because of ground disturbance, or tribes may lose access to those resources once they are part of the mine.

Thirty-three special interest areas were recorded in the Silver King tailings facility and corridor: 28 are cultural resources areas and five are natural resources areas. The cultural resource areas consist of settlement areas, resource processing areas, cultural areas, and agricultural areas. One of the natural resource areas was a mineral source; there is no information available on the other four. Several of the cultural areas are grouped into two larger areas of interest; an additional area consisting of a spring, riparian area, and grinding features was also defined. In addition, 70 plant species are found within the Silver King tailings alternative; 16 of these species are found within special interest areas. Eight persistent springs are anticipated to be dewatered by mine drawdown. In addition, three springs and three ponds within the subsidence area and one spring in the Alternative 4 tailings facility footprint will be directly disturbed.

### Indirect Impacts

Like Alternatives 2 and 3, a portion of the *Chí'chil Biłdagoteel* Historic District TCP outside the project area may be indirectly impacted from inadvertent damage from construction activities. In addition, the same 10 places of traditional and cultural importance are located in the indirect impacts analysis area. Sixty springs, seeps, or other water sources are within the indirect impacts analysis area. A tailings storage facility at the Alternative 4 location would reduce the surface area of the local watershed and have long-term effects on local groundwater quality within the Queen Creek watershed due to tailings seepage (see sections 3.7.2 and 3.7.3).

ER370

areas include springs and other water sources, plant resource areas, and a rockshelter. Two special interest areas are classified as both cultural and natural resource areas; they are both plant processing locations.

In addition, 62 plant species are found in the Alternative 6 tailings facility and pipeline; four of these species can be found in special interest areas. These resources may be lost completely because of ground disturbance, or tribes may lose access to these resources once they are part of the mine facility.

Direct impacts to water sources in the subsidence crater are the same as Alternatives 2–5. The surface area of the watershed would be reduced due to the permanent tailings storage facility (see section 3.7).

### Indirect Impacts

Indirect impacts to the TCP are the same as for Alternatives 2–5. Indirect impacts to places of traditional and cultural importance are the same as Alternatives 2–5. One-hundred six springs or other water sources are within the indirect impacts analysis area for Alternative 6. The Alternative 6 tailings facility is within the Dripping Springs watershed, which would reduce the surface area of the local watershed and may also have long-term effects on local groundwater quality within the Dripping Springs watershed due to tailings seepage (see sections 3.7.2 and 3.73).

### Atmospheric Impacts

Plotting the visual effects buffers against the results of the ethnographic study, two identified places of traditional and cultural importance are within 1 mile of the MARRCO corridor, and eight are within 2 miles of the GPO mine facilities. Adverse visual effects are expected for these places.

## 3.14.4.7    Cumulative Effects

Full details of the cumulative effects analysis can be found in chapter 4. The following represents a summary of the cumulative impacts resulting from the project-related impacts described in Section 3.14.4, Environmental Consequences, that are associated with tribal values and concerns, when combined with other reasonably foreseeable future actions.

The following actions were determined through the cumulative effects analysis process to be reasonably foreseeable, and have impacts that likely overlap in space and time with impacts from the Resolution Copper Project:

- Pinto Valley Mine Expansion
- Ray Land Exchange and Proposed Plan Amendment
- Ripsey Wash Tailings Project
- Silver Bar Mining Regional Landfill and Cottonwood Canyon Road

The cumulative effects analysis area for tribal concerns and values is considered to be the ancestral homelands of the affected tribes, which is assumed to be the southwestern United States. The metric used to quantify cumulative impacts to tribal values and concerns is the physical footprint of the projects. Given the long time period in which tribal members have occupied these lands, and their religious and community connections to the landscape, there are many areas on the natural landscape that represent sacred sites for tribal members, or for which general disturbance of the natural landscape represents an impact to their tribal values. These types of impacts are difficult to quantify. Physical footprint is used as a proxy for the level of disturbance occurring to the natural landscape, assuming that effects on tribal values would stem from these disturbances.

### Mitigation Effectiveness and Impacts of Required Mitigation Measures Applicable to Tribal Values and Concerns

Appendix J contains mitigation and monitoring measures being required by the Forest Service under its regulatory authority or because these measures are required by other regulatory processes (such as the PA or Biological Opinion). These measures are assumed to occur, and their effectiveness and impacts are disclosed here. The unavoidable adverse impacts disclosed below take the effectiveness of these mitigations into account.

Measures FS-RC-04 (Castleberry campground), FS-CR-01 (Oak Flat HPTP), FS-CR-02 (GPO Research Design), FS-CR-03 (Visual, Atmospheric, Auditory, Socioeconomic, and Cumulative Effects Mitigation Plan), FS-CR-07 (Archaeological Database Funds), and FS-SO-01 (Community Development Fund) were all described in Section 3.12, Cultural Resources. These measures have in common that they are primarily aimed at mitigating historic properties. While these measures are effective at reducing, but not preventing, impacts associated with destruction of historic properties, it is important to note that historic properties are not synonymous with tribal values and concerns.

According to the tribes consulted, adverse impacts on TCPs, special interest areas, and other places or resources of significant interest to tribes cannot be mitigated; therefore, mitigation strategies for tribal resources are designed to provide benefits to affected tribes. The mitigation strategies will have, and are having, positive impact on tribal communities such as providing jobs, funding tribal visits for evaluation of special interest areas, and increasing access to Emory oak resources. Specific mitigations include the following.

**Resource salvage (FS-SV-01).** This measure allows for tribal access for salvage of culturally-important resources within the mine footprint prior to disturbance. This measure would not replace those areas lost to cultural resource collection in perpetuity, but would be effective at preventing loss of all of these resources.

**GDE and water well mitigation (FS-WR-01).** This measure would replace water sources for any riparian areas associated with springs or perennial streams (groundwater-dependent ecosystems) impacted by drawdown from the mine dewatering and block caving. Springs are considered sacred to many tribes. Though this measure would replace water, it may not replace the significance of the springs in the overall cultural landscape.

**Access to Oak Flat Campground (FS-RC-02).** Maintaining access to Oak Flat Campground, to the extent practicable with respect to safety, would be effective at reducing impacts caused by the loss of the Oak Flat area to subsidence. However, this represents only a small portion of Oak Flat, and would not reduce the impact on tribal cultural heritage caused by the destruction of the broader landscape due to the subsidence area.

**Increase size of Apache Leap Special Management Area (FS-CR-04).** The addition of acreage to the Apache Leap SMA would help expand this protected area and reduce management conflicts. This would not reduce the impact on tribal cultural heritage caused by the destruction of the broader landscape of Oak Flat due to the subsidence area.

**Emory Oak Collaborative Tribal Restoration Initiative (FS-CR-05).** In partnership with the Tonto National Forest, Resolution Copper will fund the Emory Oak Collaborative Tribal Restoration Initiative, a multi-year restorative fieldwork program for Emory oak groves located in the Tonto National Forest and the Coconino National Forest. The program is designed to restore and protect Emory oak groves that are accessed by Apache communities for traditional subsistence gathering and ensure their sustainability for future generations. This would replace one culturally important resource, but would not reduce the impact

on tribal cultural heritage caused by the destruction of the broader landscape of Oak Flat due to the subsidence area.

**Tribal Cultural Heritage Fund (FS-CR-06).** Resolution Copper will establish a cultural heritage foundation for consulting Native American Tribes for long-term funding of cultural heritage projects. While not preventing the impacts to cultural heritage caused by the mine, these projects could be effective at preventing impacts from other projects, or preserving aspects of tribal cultural heritage that otherwise would be jeopardized.

**Tribal Education Fund (FS-CR-08).** Resolution Copper will establish a fund dedicated to funding scholarships for tribal members pursuing post-high school education, at a college, university, vocational school, or accredited 2-year program. Scholarships will be awarded based upon a committee's review of applicants. These scholarships would be effective at reducing economic impact to tribal members, but would not directly offset any of the impacts to tribal values disclosed.

**Establish foundations for long-term funding, including the Tribal Monitor Program (FS-SO-02).** Resolution Copper will establish a foundation or foundations for funding the continuation of the Tribal Monitor Program, long-term maintenance and monitoring of the Emory Oak Collaborative Tribal Restoration Initiative, and development of a Tribal Youth Program in partnership with the Forest Service and consulting tribes. This measure would be effective at enhancing these other measures, as it would ensure that these programs have a long-term base of financial support, rather than short-term funding that would be eventually exhausted.

### Mitigation Effectiveness and Impacts of Voluntary Mitigation Measures Applicable to Tribal Values and Concerns

Appendix J contains mitigation and monitoring measures brought forward voluntarily by Resolution Copper and committed to in correspondence with the Forest Service. These measures are assumed to occur but are not guaranteed to occur. Their effectiveness and impacts if they were to occur are disclosed here; however, the unavoidable adverse impacts disclosed below do not take the effectiveness of these mitigations into account.

**Increase size of Apache Leap Special Management Area (RC-CR-04).** The addition of acreage to the Apache Leap SMA would help expand this protected area and reduce management conflicts. This would not reduce the impact on tribal cultural heritage caused by the destruction of the broader landscape of Oak Flat due to the subsidence area.

### Other Potential Future Mitigation Measures Applicable to Tribal Values and Concerns

Appendix J contains several other potential future mitigation measures that the Forest Service is disclosing as potentially useful in mitigating adverse effects, but for which there is no authority to require. There is no expectation that these measures would occur, and therefore the effectiveness is not considered in the EIS. No potential future mitigation measures were identified applicable to tribal values and concerns.

### Unavoidable Adverse Impacts

Significant tribal properties and uses would be directly and permanently impacted. These impacts cannot be avoided within the areas of direct impact, nor can they be fully mitigated.

## 3.14.4.9    Other Required Disclosures

### *Short-Term Uses and Long-Term Productivity*

Physical and visual impacts on TCPs, special interest areas, and plant and mineral resources caused by construction of the mine would be immediate, permanent, and large in scale. Mitigation measures cannot replace or replicate the tribal resources and traditional cultural properties that would be destroyed by project construction and operation. The landscape, which is imbued with specific cultural attributions by each of the consulting tribes, would also be permanently affected.

### *Irreversible and Irretrievable Commitment of Resources*

The direct impacts on TCPs and special interest areas from construction of the mine and associated facilities constitute an irreversible commitment of resources. Traditional cultural properties cannot be reconstructed once disturbed, nor can they be fully mitigated. Sacred springs would be eradicated by subsidence or construction of the tailings storage facility, and affected by groundwater drawdown. Changes that permanently affect the ability of tribal members to access TCPs and special interest areas for cultural and religious purposes also consist of an irreversible loss of resources. For uses such as gathering traditional materials from areas that would be within the subsidence area or the tailings storage facility, the project would constitute an irreversible loss of resources.

All communities experienced an increase in their unemployment rate between 2010 and 2018. San Tan Valley CDP experienced the smallest change in unemployment rate, with an increase of 0.2%, while Queen Valley CDP had the largest change, with an increase of 10.6% between 2010 and 2018.

### Other Environmental Justice Considerations

Recently, local governments, State governments, and the Federal government have attempted to bring attention to under-reported and unreported violent crimes perpetrated on indigenous women (Arizona House Bill 2570; EO 13898). These violent crimes come in various forms of which the most egregious have become collectively referred to as Missing and Murdered Indigenous Women and Girls (MMIWG). The general dearth of information and reporting of these crimes results in a lack of awareness regarding MMIWG. Recent studies have attempted to understand the scope of the issues, but still lack accurate estimates to the extent of the crisis (Lucchesi and Echo-Hawk 2018). Additionally and potentially exacerbating the problem of MMIWG, the U.S. Department of State has acknowledged that internationally as well as domestically there is a link between extractive industries and sex trafficking of exploited women and girls, including Native American women (U.S. Department of State 2017). Within the United States, at least 506 cases have been identified. The Southwest has the highest number of regionally identified cases, at 157 (Lucchesi and Echo-Hawk 2018). Arizona has the third highest number of identified cases of MMIWG (54).

Quality of life is another impact partially captured in the analysis of environmental justice. Quality of life of residents within and near communities that could potentially be affected by the construction and operation of the proposed mine facilities is a combination of multiple resource impacts. This includes resource impacts that, by themselves, do not rise to a level of concern. Some aspects, such as impacts on property values, local services, tourism, noise levels, and traffic, are analyzed quantitatively in respective sections of chapter 3. Other aspects, such as impacts to scenic quality or dark skies, recreation access, or rural character are qualitatively analyzed. Analysis in this section reflects only high and adverse impacts to environmental justice communities, in compliance with available guidance. We recognize that changes in quality of life may also result from lesser but combined impacts. This is particularly true within the town of Superior. Because of the physical proximity to the East Plant Site and West Plant Site, many resource impacts occur within the town of Superior, even if not rising to levels of concern on an individual basis.

## 3.15.4 Environmental Consequences of Implementation of the Proposed Mine Plan and Alternatives

### 3.15.4.1 Alternative 1 – No Action Alternative

Under the no action alternative, adverse impacts on environmental justice populations would not occur, as the current land use would remain unchanged and opportunities for disproportionate adverse impacts would not exist.

### 3.15.4.2 Impacts Common to all Action Alternatives

Under all action alternatives, potential impacts on environmental justice populations resulting from the proposed mine facilities including the East Plant Site and West Plant Site, subsidence area, and from auxiliary facilities for the East Plant Site and West Plant Site (such as transmission lines, pipelines, and roads) would be similar.

For detailed differences between alternatives by resource, see the respective resource analyses in the "Environmental Consequences" parts of each resource section, or the summary in appendix I. For many resources (e.g., geology, wildlife, and soils and vegetation), potential adverse impacts resulting from the action alternatives would be generally limited to the immediate project footprint. The analysis also investigated potential indirect impacts, such as impacts to scenic resources, GDEs and groundwater quantity, transportation resources, noise impacts, and socioeconomic impacts that may disproportionately affect the environmental justice populations within the town of Superior.

### Effects of the Land Exchange

The land exchange would have effects on some environmental justice communities.

The Oak Flat Federal Parcel would leave Forest Service jurisdiction and no longer be open to public use to those communities in the vicinity. The offered lands that would enter either Forest Service or BLM jurisdiction would be beneficial to nearby communities of each parcel.

Native American communities would be disproportionately affected by the land exchange because Oak Flat would be conveyed to private property and would no longer be subject to the NHPA (see sections 3.12 and 3.14). Loss of the culturally important area of Oak Flat would be a substantial threat to the perpetuation of cultural traditions of the Apache and Yavapai tribes. The land exchange would have a disproportionally adverse effect on Native American communities as a result of the effects on tribal values and concerns and cultural resources.

### Effects of the Forest Plan Amendment

The Tonto National Forest Land and Resource Management Plan (1985b) provides guidance for management of lands and activities within the Tonto National Forest. It accomplishes this by establishing a mission, goals, objectives, and standards and guidelines. Missions, goals, and objectives are applicable on a forest-wide basis. Standards and guidelines are either applicable on a forest-wide basis or by specific management area.

A review of all components of the 1985 forest plan was conducted to identify the need for amendment due to the effects of the project, including both the land exchange and the proposed mine plan (Shin 2020). No standards and guidelines were identified as applicable to environmental justice. For additional details on specific rationale, see Shin (2020).

### Effects of Recreation Mitigation Lands

The recreation mitigation lands are anticipated to affect environmental justice communities. The town of Superior has been identified as an environmental justice community and would be positively impacted by the proposed trail system via the economic benefits from long-term sustainable recreation and ecotourism.

### Summary of Applicant-Committed Environmental Protection Measures

A number of environmental protection measures are incorporated into the design of the project that would act to reduce potential impacts on environmental justice communities. These are non-discretionary measures, and their effects are accounted for in the analysis of environmental consequences. Because they cover a variety of resources (see table 3.15.4-1), these measures are not repeated here.

change in landscape form, line, color, and texture and the dominance of new landscape features in the view. In addition, the magnitude of the increase in sky brightness that would occur as a result of the West Plant Site and auxiliary facilities would be disproportionally experienced by adjacent residences. Given the proximity of residences to the West Plant Site, it is unlikely that compliance and/or mitigation would substantially relieve the disproportionality of the impacts on affected community members.

Impacts on cultural resources and tribal concerns and values would have a disproportionally adverse impact on Native American communities. Other environmental justice communities (with the exception of Native American communities) would not experience adverse impacts as a result of the proposed project because they would be located outside the geographic area of influence for most resources. The town of Superior would experience disproportionately high and adverse impacts under all alternatives primarily because the West Plant Site and associated facilities would be located directly north of and adjacent to the town.

The tribal values and concerns resource section (see section 3.14) indicates that during consultation with Native American tribes, the tribes requested that tribal monitors resurvey a number of geographic areas to identify traditional cultural properties of importance to the four cultural groups with ties to the region (Puebloan, O'odham, Apache, and Yavapai). Traditional cultural properties can include springs and seeps, plant and mineral resource collecting areas, landscapes and landmarks, caches of regalia and human remains, and sites that may not have been recognized by non-Native archaeologists. Representatives of the Yavapai and Apache tribes have identified a number of areas that may be directly or indirectly affected by all alternatives as sacred landscapes and/or TCPs. Additionally, all of the consulting tribes consider all springs and seeps sacred, and all of the tribes strongly object to the development of a mine and placement of tailings in any culturally sensitive area. Although the physical boundaries of the reservations of the consulting tribes are not within the project area boundaries, disturbance of the sites would result in a disproportionate impact on the tribes, given their historical connection to the land. Additionally, the potential impacts on archaeological and cultural sites (see section 3.12) are directly related to the tribes' concerns and the potential impacts on cultural identity and religious practices. Given the known presence of ancestral villages, human remains, sacred sites, and traditional resource-collecting areas that have the potential to be permanently affected, it is unlikely that compliance and/or mitigation would substantially relieve the disproportionality of the impacts on the consulting tribes.

Impacts on potential environmental justice populations that could result from the proposed tailings storage facilities are discussed by alternative in the following text. Impacts on resources that would not be disproportionately high and adverse are not discussed.

### 3.15.4.3    Alternatives 2 and 3 – Near West

Effects from the tailings storage facility and auxiliary facilities under Alternatives 2 and 3 that are anticipated to have disproportionately high and adverse impacts on environmental justice communities include cultural resources and tribal values and concerns. For these resources, impacts would be similar to those described in Section 3.15.4.2, Impacts Common to All Action Alternatives.

The proposed location of the Alternatives 2 and 3 tailings storage facilities contains culturally important areas (see section 3.14), as well as a number of archaeological sites that would be adversely impacted by either alternative (see section 3.12). In addition, these alternatives are located in proximity to an identified sacred site, and the presence of the tailings storage facility would constitute an adverse visual effect on the landscape (see sections 3.11 and 3.14). This alternative would result in disproportionately high and adverse impacts on cultural resources and tribal values and concerns.

ER377

**Resolution Copper social investment program (RC-SO-04).** This program is designed to help create a diverse local business community and focuses on projects that help build a healthier and safer community, including parks/pool facilities and schools. These projects would be effective at developing projects that would offset potential socioeconomics impacts associated with the mine that are not yet identified, including education and quality of life. This would be effective at reducing the potential for disproportionate effects on environmental justice communities.

**Continue funding Community Working Group (RC-SO-05).** Continued funding of the Community Working Group ensures that a diverse set of viewpoints from the local community are engaged in issues related to the mine, which would be effective at identifying potential adverse impacts and potential remedies. This would be effective at reducing the potential for disproportionate effects on environmental justice communities.

**Agreement with Town of Superior to cover direct costs (RC-SO-06).** Increased tax revenue is projected as a result of Resolution Copper's business impacts on the Town of Superior, driven mainly through increased sales taxes from Resolution Copper employees and contractors, and to a lesser extent property and sales tax increases benefiting the Town through Pinal County and State apportionments. Resolution Copper has historically paid the Town for more public safety coverage than a standard level of service requires at a mine site. Resolution Copper is committed to public safety and will continue to work with the Town to agree annually on projected net direct costs that will be Resolution Copper's responsibility. This measure would be effective at offsetting some of the economic costs borne by the Town due to the presence of the mine, but the amount may not cover all costs, as it would depend on future negotiations and agreements.

### *Other Potential Future Mitigation Measures Applicable to Environmental Justice*

Appendix J contains several other potential future mitigation measures that the Forest Service is disclosing as potentially useful in mitigating adverse effects, but for which there is no authority to require. There is no expectation that these measures would occur, and therefore the effectiveness is not considered in the EIS.

**Commitment to continue and possibly expand existing apprenticeship program (PF-SO-02).** Resolution Copper has committed on a corporate level to local hiring and use of local services; however, this is dependent on an appropriate labor pool. This program would potentially create a training pipeline that would enhance the labor pool and allow more local hiring. This could be effective at reducing the potential for disproportionate effects on environmental justice communities.

### *Unavoidable Adverse Impacts*

The change in scenery and dark skies for the town of Superior cannot be avoided or fully mitigated. Similarly, the disproportionately high and adverse impacts on cultural resources and tribal values and concerns cannot be avoided or fully mitigated. Many of the mitigation measures that would directly offset socioeconomic effects in the area are voluntary only; these mitigation measures would effectively offset impacts, but cannot be guaranteed to take place.

## 3.15.4.9    Other Required Disclosures

### *Short-Term Uses and Long-Term Productivity*

Environmental justice impacts are expected only for the town of Superior, and tribes with cultural, social, or religious ties to the project area would be affected permanently from direct, permanent impacts on these sites and values. The loss of these values would be long term.

Resolution Copper Project and Land Exchange

| Resource | Spatial Analysis Area for Cumulative Effects Analysis | Impact Metrics and Rationale |
|---|---|---|
| Cultural Resources | The direct and indirect analysis areas for cultural resources is identical to the area of potential effects (APE) which has been determined through Section 106 consultation. The cumulative effects analysis area for cultural resources is identical, as it would be these same areas in which cultural resources would be present that could be affected by other projects. | **Metric:** Historic properties impacts [number]; in lieu of this, physical footprint can be used as a proxy for disturbance of sites [acres]<br><br>**Rationale:** Smaller projects, like exploration projects, generally can identify and avoid cultural sites. Projects covering a large area generally result in disturbance of cultural sites, in many cases only after data recovery and mitigation activities. However, even if recorded and documented, loss of these cultural sites contributes to the overall impact to the cultural heritage of the areas. Impacts to cultural sites are known if surveys were conducted, which is not necessarily required on private land. Physical footprint can serve as a proxy for the overall disturbance to cultural sites where no site-specific data exist. |
| Socioeconomics | The direct and indirect analysis area for socioeconomic effects is the area encompassing Maricopa, Pinal, Gila, and Pima Counties. The cumulative effects analysis area for socioeconomic effects is identical, as the economic changes caused by other projects would affect these same towns, economies, and public services. | **Metric:** Overall change in labor workforce from baseline levels [percent]; overall effect on local housing and local community services, including emergency services. Where these metrics do not exist, a qualitative discussion of the cumulative impacts would be used.<br><br>**Rationale:** Industrial, commercial, and residential development has positive and negative impacts. These become cumulative mostly where residents see impacts from multiple projects on their communities, such as housing stock, housing prices, or services such as schools, ambulance, fire department, or police services. |
| Tribal Values and Concerns | The direct and indirect analysis area for tribal values and concerns is identical to the cultural resource analysis area. However, the effects on tribes can extend over much larger areas, and projects can impact tribal values independent of proximity. The cumulative effects analysis area for tribal concerns and values is considered to be the ancestral homelands of the affected tribes, which is assumed to be the southwestern United States. | **Metric:** Physical footprint of RFFAs [acres]<br><br>**Rationale:** Given the long time period in which tribal members have occupied these lands, and their religious and community connections to the landscape, there are many areas on the natural landscape that represent sacred sites for tribal members, or for which general disturbance of the natural landscape represents an impact to their tribal values. These types of impacts are difficult to quantify. Physical footprint is used as a proxy for the level of disturbance occurring to the natural landscape, assuming that effects on tribal values would stem from these disturbances. |
| Environmental Justice | Due to the project's large scale, the direct and indirect analysis area for environmental justice is the state of Arizona. However, the analysis ultimately focuses only on those communities found to have adverse, high, and disproportionate impacts. The cumulative effects analysis area for environmental justice is an area that encompasses both the project facilities and these communities. | **Metric:** Communities defined as environmental justice communities and experiencing disproportionately high and adverse impacts from the project, also being impacted by RFFAs [number]<br><br>**Rationale:** A number of environmental justice communities were identified in the project area, and some of these communities experience disproportionately high and adverse impacts associated with the project. Cumulative effects would occur if these same communities experienced similar impacts from other RFFAs, even if by themselves those impacts were not considered disproportionately high or adverse. |

## 4.3.3.17    Tribal Values and Concerns

The following actions were determined through the cumulative effects analysis process to be reasonably foreseeable, and overlap in space and time with project impacts to tribal values and concerns (figure 4.3.3-17):

- Pinto Valley Mine Expansion
- Ray Land Exchange and Proposed Plan Amendment
- Ripsey Wash Tailings Project
- Silver Bar Mining Regional Landfill and Cottonwood Canyon Road

Three others RFFAs identified in the screening as pertinent to tribal values and concerns fell outside the cumulative effects analysis area: Southline Transmission Project, SunZia Southwest Transmission Project, and Verde Connect project.

The metric used to quantify cumulative impacts to tribal values and concerns is the physical footprint of the RFFAs. Given the long time period in which tribal members have occupied these lands, and their religious and community connections to the landscape, there are many areas on the natural landscape that represent sacred sites for tribal members, or for which general disturbance of the natural landscape represents an impact to their tribal values. These types of impacts are difficult to quantify. Physical footprint is used as a proxy for the level of disturbance occurring to the natural landscape, assuming that effects on tribal values would stem from these disturbances.

The cumulative effects analysis area for tribal values and concerns is approximately 729,680 acres, the Resolution Copper Project preferred alternative footprint within the cumulative effects analysis area is approximately 15,117 acres, and the combined physical disturbance area of the four RFFAs within the cumulative effects analysis area is approximately 13,371 acres. The cumulative effect of the Resolution Copper Project and the RFFAs listed above would result in approximately 28,488 acres of physical disturbance within the cumulative effects analysis area, or 3.9 percent of the total area.

As described in section 3.14 in chapter 3, impacts to tribal values and concerns are inadequately expressed through percentages and numbers. As disclosed in that section, the impacts of the Resolution Copper Project alone are substantial and irreversible due to the changes that would occur at Oak Flat. The other projects listed have not been identified as exhibiting the same level of tribal concern; however, the combined disturbance across a wide region contributes to an overall disruption of the landscape and erosion of traditional places important to tribes.

government relationship between the United States and Indian Tribes. In addition, PL 113-291 requires consultation with affected Indian Tribes concerning issues of concern related to the land exchange.

The Tonto National Forest has been conducting tribal consultation related to various Resolution Copper projects, the land exchange, and the Apache Leap SMA environmental assessment. This consultation has included formal and informal meetings, correspondence, sharing information, site visits, and documentation of tribal comments and concerns by the Forest Service. Consultations are ongoing and will continue through the end of the project. The following tribes are involved in the consultation process:

- Fort McDowell Yavapai Nation
- Gila River Indian Community
- Hopi Tribe
- Mescalero Apache Tribe
- Pueblo of Zuni
- Salt River Pima-Maricopa Indian Community
- San Carlos Apache Tribe
- Tonto Apache Tribe
- White Mountain Apache Tribe
- Yavapai-Apache Nation
- Yavapai-Prescott Indian Tribe

Additional tribes were included in consultation with the introduction of the Peg Leg alternative location. These tribes, included at the BLM's request, are as follows:

- Ak-Chin Indian Community
- Fort Sill Apache Tribe
- Pascua Yaqui Tribe
- Tohono O'odham Nation

Consultation records include formal and informal communications between the Tonto National Forest and the tribes. A listing of communications occurring from the project initiation through FEIS publication is documented in appendix S.

## 5.6   Section 106 Consultation

Section 106 consultation was initiated by the Tonto National Forest and the SHPO on March 31, 2017, and the ACHP on December 7, 2017. A Programmatic Agreement (PA) was drafted and revised based on interested stakeholder comments, including the Tonto National Forest, Arizona SHPO, ACHP, Resolution Copper, ASLD, BLM, USACE, and tribes. The final version of the PA circulated for signature is included in appendix O. This document is a legally binding agreement that describes the process to ensure cultural and historical resources are identified, protected, and managed in a predetermined manner with those involved.

Michael V. Nixon, pro hac vice
(OR Bar #893240)
101 SW Madison Street #9325
Portland, OR 97207
Telephone: 503.522.4257
Email: michaelvnixon@yahoo.com

Clifford Levenson (AZ Bar #358287)
5119 North 19th Avenue
Suite K
Phoenix, AZ 85015
Telephone: 602.258.8989
Fax: 602.544.1900
Email: cliff449@hotmail.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
### Phoenix Division

| | |
|---|---|
| Apache Stronghold,<br>    a 501(c)(3) nonprofit organization,<br><br>            Plaintiff,<br><br>    v.<br><br>United States of America,<br><br>Sonny Perdue, Secretary, U.S. Department of<br>    Agriculture (USDA),<br><br>Vicki Christensen, Chief, USDA Forest<br>    Service,<br><br>Neil Bosworth, Supervisor, USDA Tonto Na-<br>    tional Forest,<br><br>and<br><br>Tom Torres, Acting Supervisor, USDA<br>    Tonto National Forest,<br><br>            Defendants. | No. 2:21-cv-00050-PHX-SPL<br><br>**NOTICE OF APPEAL**<br><br>**PRELIMINARY INJUNCTION<br>APPEAL** |

Plaintiff Apache Stronghold appeals to the United States Court of Appeals for the Ninth Circuit from the February 12, 2021, Order of the United States District Court for the District of Arizona denying the Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction (ECF 57). A representation statement is attached.

Dated: February 18, 2021          Respectfully submitted,


/s/ Michael V. Nixon
Michael V. Nixon, *pro hac vice*
(OR Bar #893240)
101 SW Madison Street #9325
Portland, OR 97207
Telephone: 503.522.4257
Email: michaelvnixon@yahoo.com

Clifford Levenson (AZ Bar #014523)
5119 North 19th Avenue, Suite K
Phoenix, AZ 85015
Telephone: 602.258.8989
Fax: 602.544.1900
Email: cliff449@hotmail.com

1

2  Michael V. Nixon, pro hac vice
   (OR Bar #893240)
3  101 SW Madison Street #9325
   Portland, OR 97207
4  Telephone: 503.522.4257
   Email: michaelvnixon@yahoo.com
5
   Clifford Levenson (AZ Bar #358287)
6  5119 North 19th Avenue
   Suite K
7  Phoenix, AZ 85015
   Telephone: 602.258.8989
8  Fax: 602.544.1900
   Email: cliff449@hotmail.com
9
10 Attorneys for Plaintiff
11
                **IN THE UNITED STATES DISTRICT COURT**
12               **FOR THE DISTRICT OF ARIZONA**
                         **Phoenix Division**
13

14 _____

15 Apache Stronghold,                        No. 2:21-cv-00050-PHX-SPL
16      a 501(c)(3) nonprofit organization,
                                             **PLAINTIFF'S**
17                        Plaintiff,          **REPRESENTATION**
        v.                                   **STATEMENT**
18
   United States of America,
19
   Sonny Perdue, Secretary, U.S. Department
20      of Agriculture (USDA),

21 Vicki Christensen, Chief, USDA Forest
        Service,
22
   Neil Bosworth, Supervisor, USDA Tonto
23      National Forest,

24 and

25 Tom Torres, Acting Supervisor, USDA
        Tonto National Forest,
26
                        Defendants.
27 _____

        PLAINTIFF'S REPRESENTATION STATEMENT                    1
                                                            **ER384**

Plaintiff Apache Stronghold files this Representation Statement under Federal Rule of Appellate Procedure 12(b) and Circuit Rules 3-2(b) and 12-2.

**Plaintiff:**

Apache Stronghold, a 501(c)(3) nonprofit organization

**Counsel for Plaintiff:**

Michael V. Nixon, *pro hac vice*
(OR Bar #893240)
101 SW Madison Street #9325
Portland, OR 97207
Telephone: 503.522.4257
Email: michaelvnixon@yahoo.com

Clifford Levenson (AZ Bar #014523)
5119 North 19th Avenue, Suite K
Phoenix, AZ 85015
Telephone: 602.258.8989
Fax: 602.544.1900
Email: cliff449@hotmail.com

*Additional appellate counsel not appearing in the District of Arizona:*

Luke W. Goodrich
Mark L. Rienzi
Diana M. Verm
Joseph C. Davis
Christopher C. Pagliarella
Daniel D. Benson
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW
Suite 400
Washington, DC 20006
Telephone: 202.349.7209
Fax: 202.955-0095
lgoodrich@becketlaw.org
mrienzi@becketlaw.org
dverm@becketlaw.org
jdavis@becketlaw.org
cpagliarella@becketlaw.org
dbenson@becketlaw.org

**Defendants:**

United States of America

Sonny Perdue, Secretary, U.S. Department of Agriculture (USDA)
Vicki Christensen, Chief, USDA Forest Service
Neil Bosworth, Supervisor, USDA Tonto National Forest
Tom Torres, Acting Supervisor, USDA Tonto National Forest

**Counsel for Defendants:**

Jean E. Williams
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

Trial Counsel:
Tyler M. Alexander
150 M St. NE, Third Floor
Washington, D.C. 20002
(202)305-4224
tyler.alexander@usdoj.gov

Reuben S. Schifman
150 M St. NE, Third Floor
Washington, D.C. 20002
(202)305-4224
reuben.schifman@usdoj.gov

Dated: February 18, 2021          Respectfully submitted,

/s/ Michael V. Nixon
Michael V. Nixon, *pro hac vice*
(OR Bar #893240)
101 SW Madison Street #9325
Portland, OR 97207
Telephone: 503.522.4257
Email: michaelvnixon@yahoo.com

Clifford Levenson (AZ Bar #014523)
5119 North 19th Avenue, Suite K
Phoenix, AZ 85015
Telephone: 602.258.8989
Fax: 602.544.1900
Email: cliff449@hotmail.com

*Attorneys for Plaintiff*

# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CIVIL DOCKET FOR CASE #: 2:21-cv-00050-SPL

Apache Stronghold v. United States of America et al
Assigned to: Judge Steven P Logan
Interim Related Cases: 2:21-cv-00068-DWL
                       2:21-cv-00122-DLR
Case in other court: Ninth Circuit, 21-15295
Cause: 28:1343 Violation of Civil Rights

Date Filed: 01/12/2021
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Apache Stronghold**
*a 501(c)(3) nonprofit organization*

represented by **Clifford Irwin Levenson**
Clifford Levenson Attorney at Law
5119 N 19th Ave., Ste. K
Phoenix, AZ 85015
602-258-8989
Fax: 602-544-1900
Email: cliff449@hotmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael V Nixon**
Michael V Nixon JD
101 SW Madison St., Ste. 9325
Portland, OR 97207
503-522-4257
Email: michaelvnixon@yahoo.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United States of America**

represented by **Reuben S Schifman**
US Dept of Justice
601 D St. NW
Washington, DC 20004
202-305-4224
Fax: 202-3050506
Email: reuben.schifman@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tyler McVeigh Alexander**
US Dept of Justice
4 Constitution Sq,
150 M St. NE

**ER387**

Washington, DC 20002
202-305-0238
Fax: 202-305-0506
Email: tyler.alexander@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erika Danielle Norman**
US Dept of Justice - ENRD
4 Constitution Sq.
Washington, DC 20002
202-305-0475
Email: erika.norman@usdoj.gov
*ATTORNEY TO BE NOTICED*

| | | |
|---|---|---|
| <u>**Defendant**</u> | | |
| **Sonny Perdue**<br>*Secretary, U.S. Department of Agriculture*<br>*(USDA)* | represented by | **Reuben S Schifman**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Tyler McVeigh Alexander**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Erika Danielle Norman**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| <u>**Defendant**</u> | | |
| **Vicki Christensen**<br>*Chief, USDA Forest Service* | represented by | **Reuben S Schifman**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Tyler McVeigh Alexander**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Erika Danielle Norman**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| <u>**Defendant**</u> | | |
| **Neil Bosworth**<br>*Supervisor, USDA Forest Service, Tonto*<br>*National Forest* | represented by | **Reuben S Schifman**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Tyler McVeigh Alexander**<br>(See above for address) |

**ER388**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erika Danielle Norman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tom Torres**                              represented by **Reuben S Schifman**
*Acting Supervisor, USDA Forest Service,*                  (See above for address)
*Tonto National Forest*                                    *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                            **Tyler McVeigh Alexander**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **Erika Danielle Norman**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**Resolution Copper Mining LLC**            represented by **Jennifer A MacLean**
                                            Perkins Coie LLP - Washington, DC
                                            700 13th St. NW, Ste. 600
                                            Washington, DC 20005-3960
                                            202-434-1648
                                            Fax: 202-654-6211
                                            Email: JMaclean@perkinscoie.com
                                            *LEAD ATTORNEY*
                                            *PRO HAC VICE*
                                            *ATTORNEY TO BE NOTICED*

**Amicus**

**Ramon Riley**                             represented by **Michalyn Steele**
                                            Brigham Young University Professor of
                                            Law
                                            J Reuben Clark Bldg.
                                            Provo, UT 84602
                                            801-376-7825
                                            Email: steelem@law.byu.edu
                                            *LEAD ATTORNEY*
                                            *PRO HAC VICE*
                                            *ATTORNEY TO BE NOTICED*

                                            **Stephanie Hall Barclay**
                                            Religious Liberty Initiative at Notre Dame
                                            Law School
                                            3120 Eck Hall of Law
                                            Notre Dame, IN 46556

**ER389**

801-361-0401
Email: stephanie.barclay@nd.edu
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Morningstar Institute**                represented by  **Michalyn Steele**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie Hall Barclay**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**MICA Group**                           represented by  **Michalyn Steele**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie Hall Barclay**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2021 | 1 | COMPLAINT. Filing fee received: $ 402.00, receipt number 0970-19052643 filed by Apache Stronghold. (Levenson, Clifford) (Attachments: # 1 Civil Cover Sheet)(MCO) (Entered: 01/12/2021) |
| 01/12/2021 | 2 | SUMMONS Submitted by Apache Stronghold. (Levenson, Clifford) (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(MCO) (Entered: 01/12/2021) |
| 01/12/2021 | 3 | Filing fee paid, receipt number 0970-19052643. This case has been assigned to the Honorable Camille D Bibles. All future pleadings or documents should bear the correct case number: CV-21-50-PHX-CDB. Magistrate Election form attached. (MCO) (Entered: 01/12/2021) |
| 01/12/2021 | 4 | NOTICE TO FILER OF DEFICIENCY re: 1 Complaint filed by Apache Stronghold. Pursuant to the Electronic Case Filing Administrative Policies and Procedures Manual Section II(B), attorneys are required to submit the automated Civil Cover Sheet when filing a new case. ***FOLLOW-UP ACTION REQUIRED:*** Please refile corrected document. Deficiency must be corrected within one business day of this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MCO) (Entered: 01/12/2021) |

| 01/12/2021 | 5 | Summons Issued as to Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(MCO). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 01/12/2021) |
| 01/13/2021 | 6 | *AMENDED DOCUMENT re: 1 Complaint by Apache Stronghold *Civil Cover Sheet*. (Levenson, Clifford) *Modified to add document link on 1/14/2021 (REK). (Entered: 01/13/2021) |
| 01/14/2021 | 7 | *First MOTION for Temporary Restraining Order by Apache Stronghold. (Attachments: # 1 Affidavit Declaration of Cranston Hoffman, # 2 Affidavit Declaration of Clifford Levenson, # 3 Affidavit Declaration of Naelyn Pike, # 4 Affidavit Declaration of Wendsler Nosie, # 5 Affidavit Declaration of John R. Welch, # 6 Text of Proposed Order Proposed Order)(Levenson, Clifford). *Added MOTION for Preliminary Injunction on 1/14/2021. (LFIG) *Modified to remove incorrect "Ex Parte" Designation on 1/15/2021 (REK). (Entered: 01/14/2021) |
| 01/14/2021 | 8 | NOTICE of Appearance by Tyler McVeigh Alexander on behalf of Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America. (Alexander, Tyler) (Entered: 01/14/2021) |
| 01/14/2021 | 10 | Party Elects Assignment of Case to District Judge Jurisdiction. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAP) (Entered: 01/14/2021) |
| 01/14/2021 | 11 | MINUTE ORDER: Pursuant to Local Rule 3.7(b), a request has been received for a random reassignment of this case to a District Judge. FURTHER ORDERED Case reassigned by random draw to Judge Steven P Logan. All further pleadings/papers should now list the following COMPLETE case number: CV-21-0050-PHX-SPL. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MAP) (Entered: 01/14/2021) |
| 01/14/2021 | 12 | PRELIMINARY ORDER that a motion pursuant to Fed. R. Civ. P. 12(b) is discouraged if the defect can be cured by filing an amended pleading. The parties must meet and confer prior to the filing of such motion to determine whether it can be avoided. FURTHER ORDERED that Plaintiff(s) serve a copy of this Order upon Defendant(s) and file a notice of service. Unless the Court orders otherwise, on April 12, 2021, the Clerk of Court shall terminate without further notice any Defendant in this action that has not been served pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. See attached Order for complete details. Signed by Judge Steven P. Logan on 1/14/2021. (LMR) (Entered: 01/14/2021) |
| 01/14/2021 | 13 | ORDER: Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction 7 is denied in part to the extent that it requests issuance of a Temporary Restraining Order. No later than January 15, 2021, Plaintiff must provide Defendants with a copy of the following: (1) the Complaint; (2) the Motion for Preliminary Injunction; and (3) this Order. Plaintiff shall further file with the Court a notice indicating when and how notice was provided. Defendants have until January 21, 2021 to respond to the Motion for Preliminary Injunction 7 . Plaintiff shall have until January 25, 2021 to file a reply in support of its Motion for Preliminary Injunction 7 .The Court will hold a hearing on the Motion for Preliminary Injunction 7 on January 27, 2021 at 9:00 a.m. The hearing shall be held telephonically, and the parties shall jointly email Judge Logan's chambers by January 25, 2020 to obtain the call-in information. The parties shall file a Joint Notice by January 20, 2021, indicating whether the motion may be decided on the briefing and argument of counsel alone. See order for additional details. Signed by Judge Steven P. Logan on 1/14/2021. (LMR) (Entered: 01/14/2021) |

| 01/17/2021 | 14 | SERVICE EXECUTED filed by Apache Stronghold: Affidavit of Service re: Summons, Complaint, Motion upon US Attorney's Office on 01/14/2021. (Levenson, Clifford) (Entered: 01/17/2021) |
|---|---|---|
| 01/20/2021 | 15 | *NOTICE of Errata re: 7 MOTION for Preliminary Injunction by Plaintiff Apache Stronghold. (Attachments: # 1 Affidavit Declaration of John Welch)(Levenson, Clifford) *Modified to add document link on 1/21/2021 (REK). (Entered: 01/20/2021) |
| 01/20/2021 | | Remark: Pro hac vice motion(s) granted for Michael V Nixon on behalf of Plaintiff Apache Stronghold. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 01/20/2021) |
| 01/20/2021 | 16 | NOTICE re: Joint Notice re: Jan. 27 Hearing by Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America re: 13 Order on Motion for TRO . (Alexander, Tyler) (Entered: 01/20/2021) |
| 01/21/2021 | 17 | ORDER: A preliminary injunction hearing is currently scheduled for January 27, 2021 at 9:00 a.m. See order for deadlines and details. Signed by Judge Steven P. Logan on 1/21/2021. (Attachments: # 1 Attachments)(LMR) (Entered: 01/21/2021) |
| 01/21/2021 | 18 | RESPONSE in Opposition re: 7 First MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America. (Attachments: # 1 Affidavit of Tracy Parker, # 2 Exhibit Second Proclamation of the Tonto National Forest, # 3 Exhibit July 1, 1852 Treaty with the Apaches)(Alexander, Tyler) (Entered: 01/21/2021) |
| 01/22/2021 | 19 | Consent MOTION for Leave to File Excess Pages *Nunc Pro Tunc* by Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America. (Attachments: # 1 Text of Proposed Order, # 2 Proposed Overlength Brief)(Alexander, Tyler) (Entered: 01/22/2021) |
| 01/22/2021 | 20 | *(*REQUEST CANCELLED; HEARING CONT'D TO 3FEB2021 PER DOC. 25* ) - TRANSCRIPT REQUEST (3rd Party/Media) by Debra Krol of the Arizona Republic for proceedings held on 01/27/2021, Judge Steven P Logan hearing judge(s). (RAP) *Modified to reference cancellation because hearing cont'd on 1/26/2021 (RAP). (Entered: 01/22/2021) |
| 01/22/2021 | 21 | ORDER: The Motion to Exceed 19 is granted. Defendants' Response in Opposition to the Motion for Preliminary Injunction shall be deemed filed at Doc. 18. Signed by Judge Steven P. Logan on 1/22/2021. (LMR) (Entered: 01/22/2021) |
| 01/22/2021 | 22 | Joint MOTION to Amend/Correct 17 Order by Apache Stronghold. (Attachments: # 1 Text of Proposed Order)(Nixon, Michael) (Entered: 01/22/2021) |
| 01/24/2021 | 23 | REPLY to Response to Motion re: 7 First MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *Reply Memoandum* filed by Apache Stronghold. (Nixon, Michael) (Entered: 01/24/2021) |
| 01/25/2021 | 24 | STATEMENT of Joint Pre-Hearing Statement re: 17 Order by Defendants Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America. (Alexander, Tyler) (Entered: 01/25/2021) |
| 01/25/2021 | 25 | ORDER: The parties' Joint Motion for Virtual Hearing & Amendment of Order of January 21, 2021 22 is granted. Plaintiff shall have until January 29, 2021 to file an Amended Reply, which shall not exceed twenty-four pages in length. Preliminary Injunction hearing set for January 27, 2021 is vacated and reset for February 3, 2021 at 9:00 a.m. The hearing shall be held in person in the Sandra Day OConnor United States Courthouse, located at 401 West Washington Street, Phoenix, Arizona 85003, 5th Floor, Courtroom 505. In- |

| | | |
|---|---|---|
| | | person access shall remain restricted to those participating in the hearing. Defendants shall be permitted to appear telephonically. Defendants shall email Judge Logan's chambers by February 1, 2021 to obtain the call-in information. The joint pre-hearing statement, proposed findings of fact and conclusions of law, proposed form of preliminary injunction, and joint notice to court reporter shall be due by January 29, 2021 at 12:00 p.m. The parties shall further coordinate the delivery of exhibits in the manner prescribed in Attachment A to the Court's January 21, 2021 Order (Doc. 17 ) no later than January 29, 2021. See order for additional details. Signed by Judge Steven P. Logan on 1/25/2021. (LMR) (Entered: 01/25/2021) |
| 01/26/2021 | 26 | TRANSCRIPT REQUEST (3rd PARTY) by Christopher D. Thomas of Perkins Coie LLP for proceedings held on 02/03/2021, Judge Steven P Logan hearing judge(s). (RAP) (Entered: 01/26/2021) |
| 01/26/2021 | 27 | TRANSCRIPT REQUEST (3rd PARTY/MEDIA) by Debra Krol of the Arizona Republic for proceedings held on 02/03/2021, Judge Steven P Logan hearing judge(s). (RAP) (Entered: 01/26/2021) |
| 01/27/2021 | | Remark: Pro hac vice motion(s) granted for Jennifer A MacLean on behalf of Intervenor Defendant Resolution Copper Mining LLC. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 01/27/2021) |
| 01/29/2021 | 28 | NOTICE re: of Filing of Defendants' Proposed Findings of Fact and Conclusions of Law by Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America re: 25 Order, Set/Reset Motion and R&R Deadlines/Hearings . (Attachments: # 1 Proposed Findings of Fact and Conclusions of Law)(Alexander, Tyler) (Entered: 01/29/2021) |
| 01/29/2021 | 29 | STATEMENT of Joint Pre-Hearing Statement re: 25 Order, Set/Reset Motion and R&R Deadlines/Hearings by Defendants Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America. (Alexander, Tyler) (Entered: 01/29/2021) |
| 01/29/2021 | 30 | *Amended REPLY to Response to Motion re: 7 First MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by Apache Stronghold. (Nixon, Michael) *Modified to reflect "amended" on 2/1/2021 (REK). (Entered: 01/29/2021) |
| 02/01/2021 | 31 | NOTICE re: Joint Notice to Court Reporter by Apache Stronghold re: 25 Order, Set/Reset Motion and R&R Deadlines/Hearings . (Nixon, Michael) (Entered: 02/01/2021) |
| 02/01/2021 | 32 | MOTION for Leave to File Corrected Amended Reply Memorandum by Apache Stronghold. (Attachments: # 1 Text of Proposed Order)(Nixon, Michael) (Entered: 02/01/2021) |
| 02/01/2021 | 33 | *Request denied as moot per 35 Order*LODGED Proposed Corrected Amended Reply Memorandum re: 32 MOTION for Leave to File Corrected Amended Reply Memorandum . Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by Apache Stronghold. (Nixon, Michael) Modified on 2/2/2021 (REK). (Entered: 02/01/2021) |
| 02/02/2021 | 34 | *Filed at 36 *LODGED Proposed Corrected Amended Reply Memorandum (THE correct one) re: 32 MOTION for Leave to File Corrected Amended Reply Memorandum . Document to be filed by Clerk if Motion or Stipulation for Leave to File or Amend is granted. Filed by Apache Stronghold. (Nixon, Michael) Modified on 2/2/2021 (REK). (Entered: 02/02/2021) |
| 02/02/2021 | 35 | ORDER: Plaintiff's Motion for Leave 32 is granted. The Clerk of Court shall file the lodged Proposed Corrected Amended Reply Memorandum (lodged at Doc. 34 ). IT IS FURTHER ORDERED that a request to file the initial Corrected Amended Reply (lodged |

| | | |
|---|---|---|
| | | at Doc. 33 ) is denied as moot. Signed by Judge Steven P Logan on 2/02/2021. (REK) (Entered: 02/02/2021) |
| 02/02/2021 | 36 | Amended REPLY to Response to Motion re: 7 First MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by Apache Stronghold. (REK) (Entered: 02/02/2021) |
| 02/03/2021 | 37 | REQUEST re: Request for Daily Transcript of the February 3, 2021 Preliminary Injunction Hearing by Plaintiff Apache Stronghold. (Nixon, Michael) (Entered: 02/03/2021) |
| 02/03/2021 | 38 | NOTICE TO FILER OF DEFICIENCY re: 37 Request filed by Apache Stronghold. Incorrect event (Request) used and the attached form in blank. ***FOLLOW-UP ACTION REQUIRED:*** Please refile using the correct event (Transcript Request) and with a completed form. Deficiency must be corrected within one business day of this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (RAP) (Entered: 02/03/2021) |
| 02/03/2021 | 39 | *AMENDED BY DOC. 46 * MINUTE ENTRY for proceedings held before Judge Steven P Logan: Hearing is held on Plaintiff's Motion for Preliminary Injunction 7 . Plaintiff's Motion for Preliminary Injunction 7 will be taken under advisement upon submission of closing arguments. (Court Reporter Elva Cruz-Lauer.) Hearing held 9:08 AM to 12:03 PM. (LMR) Modified on 2/4/2021 (LMR). (Entered: 02/03/2021) |
| 02/03/2021 | 40 | AMENDED TRANSCRIPT REQUEST pursuant to 38 Notice of Deficiency by Apache Stronghold for proceedings held on February 3, 2021, Judge Steven P Logan hearing judge(s). (Nixon, Michael) (Entered: 02/03/2021) |
| 02/03/2021 | 41 | Witness List by Plaintiff Apache Stronghold. (LMR) (Entered: 02/03/2021) |
| 02/03/2021 | 42 | Exhibit List by Plaintiff Apache Stronghold. (LMR) (Entered: 02/03/2021) |
| 02/03/2021 | 43 | Exhibit List by Defendants Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America. (LMR) (Entered: 02/03/2021) |
| 02/03/2021 | 44 | NOTICE TO FILER OF DEFICIENCY re: AO435 40 Transcript Request filed by Apache Stronghold. Item(s) were not completed (left blank): 1-20: Entire form is blank.. ***FOLLOW-UP ACTION REQUIRED:*** Please refile the transcript request on form AO435 with Items 1-20 completed. Deficiency must be corrected within one business day of this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (RAP) (Entered: 02/03/2021) |
| 02/03/2021 | 45 | *NOTICE re: Plaintiff's *Proposed Findings of Fact and Conclusions of Law and Order*. (Attachments: # 1 Text of Proposed Order)(Nixon, Michael) *Modified to correct event and text on 2/4/2021 (REK). (Entered: 02/03/2021) |
| 02/03/2021 | 46 | AMENDED MINUTE ENTRY - Amending Doc. 39 - for proceedings held before Judge Steven P Logan: Hearing is held on Plaintiff's Motion for Preliminary Injunction 7 . Plaintiff's Motion for Preliminary Injunction 7 will be taken under advisement upon submission of closing arguments. (Court Reporter Elva Cruz-Lauer.) Hearing held 9:08 AM to 12:03 PM. <br><br> Reason for Amendment: to correct date closing arguments are due. (LMR) (Entered: 02/04/2021) |
| 02/04/2021 | 47 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of *HEARING ON MOTION FOR PRELIMINARY INJUNCTION* proceedings held on 02/03/2021, before Judge STEVEN P. LOGAN. [Court Reporter: Elva Cruz-Lauer, RMR, CRR, Telephone number (602) 322-7261]. The ordering party will have electronic access to the transcript immediately. All others may view the transcript at the court public terminal or it may be purchased through |

| | | |
|---|---|---|
| | | the Court Reporter/Transcriber by filing a Transcript Order Form on the docket before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/25/2021. Redacted Transcript Deadline set for 3/8/2021. Release of Transcript Restriction set for 5/5/2021. (RAP) (Entered: 02/04/2021) |
| 02/04/2021 | 48 | AMENDED TRANSCRIPT REQUEST pursuant to 38 , 44 Notice of Deficiency by Apache Stronghold for proceedings held on February 3, 2021, Judge Steven P Logan hearing judge(s). (Nixon, Michael) (Entered: 02/04/2021) |
| 02/05/2021 | 49 | NOTICE of Appearance by Reuben S Schifman on behalf of United States of America. (Schifman, Reuben) (Entered: 02/05/2021) |
| 02/05/2021 | 50 | BRIEF by Defendant United States of America. (Schifman, Reuben) (Entered: 02/05/2021) |
| 02/05/2021 | 51 | REPLY to Response to Motion re: 7 First MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *Closing Argument Brief* filed by Apache Stronghold. (Nixon, Michael) (Entered: 02/05/2021) |
| 02/08/2021 | 52 | MINUTE ORDER re Exhibits: The exhibits marked are returned to respective counsel. (LMR) (Entered: 02/08/2021) |
| 02/09/2021 | 53 | *(**CANCELLED BY REQUESTOR**) - TRANSCRIPT REQUEST (3rd PARTY) by Jennifer Clifton of ASU Center for the Study of Religion and Conflict for proceedings held on 02/03/2021, 02/10/2021, & 02/12/2021, Judge Steven P Logan hearing judge(s). (RAP) *Modified to cancel out request on 2/11/2021 (RAP). (Entered: 02/09/2021) |
| 02/10/2021 | | Remark: Pro hac vice motion(s) granted for Stephanie Hall Barclay on behalf of Amicus Parties MICA Group, Morningstar Institute, Ramon Riley. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 02/10/2021) |
| 02/10/2021 | 54 | MOTION to File Amicus Curiae by MICA Group, Morningstar Institute, Ramon Riley. (Attachments: # 1 Proposed Amicus Brief, # 2 Exhibit A, # 3 Exhibit B)(Barclay, Stephanie) (Entered: 02/10/2021) |
| 02/11/2021 | 55 | ORDER granting Motion for Leave to File Amicus Brief 54 : Ramon Riley, The Morningstar Institute, and the MICA Group shall file their proposed Amicus Brief separately on the record no later than 5:00 p.m. today, February 11, 2021. Signed by Judge Steven P. Logan on 2/11/2021. (LMR) (Entered: 02/11/2021) |
| 02/11/2021 | 56 | BRIEF *Amicus Brief* by Amicus Parties MICA Group, Morningstar Institute, Ramon Riley. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Barclay, Stephanie) (Entered: 02/11/2021) |
| 02/12/2021 | 57 | ORDER: Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction 7 is denied. See order for details. Signed by Judge Steven P. Logan on 2/12/2021. (LMR) (Entered: 02/12/2021) |
| 02/16/2021 | 58 | NOTICE of Lis Pendens by Apache Stronghold. (Nixon, Michael) (Entered: 02/16/2021) |
| 02/18/2021 | 59 | *NOTICE OF INTERLOCUTORRY APPEAL to 9th Circuit Court of Appeals re: 57 Order by Apache Stronghold. Filing fee received: $ 505.00, receipt number 0970-19175390. (Attachments: # 1 Appeal Information)(Nixon, Michael) *Modified to correct event on 2/19/2021 (DXD). (Entered: 02/18/2021) |
| 02/18/2021 | 60 | MOTION to Consolidate Cases by Neil Bosworth, Tom Torres, United States Forest Service, Neil Bosworth, Tom Torres, Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America. (Associated Cases: CV-21-00050-PHX-SPL, CV-21-00068-PHX-DWL, CV-00122-PHX-DLR) (Alexander, Tyler) (Entered: 02/18/2021) |
| 02/19/2021 | 61 | Emergency MOTION to Stay re: 57 Order on Motion for Preliminary Injunction |

**ER395**

| | | Emergency MOTION for Preliminary Injunction *Pending Appeal* by Apache Stronghold. (Attachments: # 1 Text of Proposed Order)(Nixon, Michael) (Entered: 02/19/2021) |
|---|---|---|
| 02/19/2021 | 62 | NOTICE re: Expedited Consideration by Apache Stronghold re: 61 Emergency MOTION to Stay re: 57 Order on Motion for Preliminary Injunction Emergency MOTION for Preliminary Injunction *Pending Appeal* . (Nixon, Michael) (Entered: 02/19/2021) |
| 02/22/2021 | 63 | USCA Case Number re: 59 Notice of Appeal. Case number 21-15295, Ninth Circuit. (LAD) (Entered: 02/22/2021) |
| 02/22/2021 | 64 | ORDER denying 61 Plaintiff's Emergency Motion to Stay. See order for details. Signed by Judge Steven P. Logan on 2/22/2021. (LMR) (Entered: 02/22/2021) |
| 02/22/2021 | 65 | Joinder re: (60 in 2:21-cv-00050-SPL) MOTION to Consolidate Cases . filed by Resolution Copper Mining LLC. (Associated Cases: 2:21-cv-00068-DWL, 2:21-cv-00050-SPL, 2:21-cv-00122-DLR) (Thomas, Christopher) (Entered: 02/22/2021) |
| 02/26/2021 | | Remark: Pro hac vice motion(s) granted for Michalyn Steele on behalf of Amicus Parties MICA Group, Ramon Riley. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (BAS) (Entered: 02/26/2021) |
| 03/04/2021 | 66 | RESPONSE to Motion re: (60 in 2:21-cv-00050-SPL) MOTION to Consolidate Cases *in Opposition* filed by Arizona Mining Reform Coalition, Center for Biological Diversity, Earthworks, Grand Canyon Chapter of the Sierra Club, Inter Tribal Association of Arizona Incorporated. (Associated Cases: 2:21-cv-00050-SPL, 2:21-cv-00068-DWL, 2:21-cv-00122-DLR) (DXD) (Entered: 03/05/2021) |
| 03/09/2021 | 67 | Consent MOTION for Extension of Time to File Answer re: 1 Complaint by Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America. (Attachments: # 1 Text of Proposed Order)(Alexander, Tyler) (Entered: 03/09/2021) |
| 03/11/2021 | 68 | NOTICE OF ATTORNEY APPEARANCE: Erika Norman appearing for Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America. *(additional counsel of record)*. (Norman, Erika) (Entered: 03/11/2021) |
| 03/11/2021 | 69 | *Filed at 70 with correct event*REPLY to Response to Motion re: 60 MOTION to Consolidate Cases filed by Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America. (Norman, Erika) Modified on 3/12/2021 (REK). (Entered: 03/11/2021) |
| 03/11/2021 | 70 | REPLY to Response to Motion re: (60 in 2:21-cv-00050-SPL) MOTION to Consolidate Cases filed by Neil Bosworth, Tom Torres, United States Forest Service, Neil Bosworth, Vicki Christensen, Sonny Perdue, Tom Torres, United States of America, Neil Bosworth, Tom Torres. (Associated Cases: 2:21-cv-00122-DLR, 2:21-cv-00050-SPL, 2:21-cv-00068-DWL) (Norman, Erika) (Entered: 03/11/2021) |
| 03/11/2021 | 71 | ORDER: Defendants' Unopposed Motion for Extension of Time 67 is granted. Defendants shall have until April 14, 2021 to file a response to Apache Stronghold's Complaint 1 . Signed by Judge Steven P. Logan on 3/11/2021. (LMR) (Entered: 03/11/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/18/2021 21:18:04 | | |
| PACER Login: | lwgoodrich:4452020:5252802 | Client Code: |

| **Description:** | Docket Report | **Search Criteria:** | 2:21-cv-00050-SPL |
|---|---|---|---|
| **Billable Pages:** | 9 | **Cost:** | 0.90 |