No. 21-15295

―――――――――――――――――

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

―――――――――――――――――

APACHE STRONGHOLD,
*Plaintiff/Appellant*,

v.

UNITED STATES OF AMERICA, et al.,
*Defendants/Appellees*.

―――――――――――――――――

Appeal from the United States District Court for the District of Arizona
No. CV-21-00050-PHX-SPL (Hon. Steven P. Logan)

―――――――――――――――――

**APPELLEES' ANSWERING BRIEF**

―――――――――――――――――

JEAN E. WILLIAMS
*Acting Assistant Attorney General*
ANDREW C. MERGEN
JOAN M. PEPIN
TYLER M. ALEXANDER
KATELIN SHUGART-SCHMIDT
*Attorneys*
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 353-1834
katelin.shugart-schmidt@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................... iv

GLOSSARY ........................................................................ xi

INTRODUCTION ................................................................... 1

STATEMENT OF JURISDICTION................................................ 2

STATEMENT OF THE ISSUES ................................................... 2

STATEMENT OF THE CASE ..................................................... 3

    A.    Legal background. .................................................... 3

        1.    Relevant treaties. ............................................ 3

        2.    The Southeast Arizona Land Exchange and
                 Conservation Act................................................. 4

        3.    The Free Exercise Clause and RFRA. ................. 5

    B.    Factual background. .................................................. 5

    C.    Procedural background. ............................................. 8

SUMMARY OF ARGUMENT ................................................... 12

STANDARD OF REVIEW ....................................................... 14

ARGUMENT....................................................................... 14

I.    Plaintiffs are unlikely to succeed on the merits. ................... 15

    A.    Plaintiffs' RFRA claims are foreclosed by Supreme
        Court and en banc Circuit precedent. ......................... 15

        1.    The Act does not impose a "substantial burden"
                 on Plaintiffs within the meaning of RFRA. ...................... 15

2. *Lyng* and *Navajo Nation* are controlling and not distinguishable.................................................. 27

3. The cases on which Plaintiffs rely are distinguishable.................................................. 32

4. Plaintiffs' extreme hypotheticals do not follow from *Navajo Nation*'s correct definition of "substantial burden." ........................................ 38

5. RFRA's legislative history supports *Navajo Nation*'s definition of 'substantial burden'. ....................... 39

6. Plaintiffs' expansive reading of "substantial burden" cannot be restricted to the "narrow" result they claim to seek.................................. 41

7. Legislation, not RFRA, is the only remedy for the problems Plaintiffs and Amici raise. .......................... 46

B. Plaintiffs are unlikely to succeed on their Free Exercise claim. ......................................................... 48

C. Plaintiffs lack standing to bring a breach-of-trust claim and cannot show an existing trust obligation. ............................ 51

II. Plaintiffs have not established that they will suffer irreparable harm absent preliminary relief........................................... 56

A. Plaintiffs will continue to have access to the land after the land transfer, and no subsidence-causing mining activities will occur for at least two years. .................................. 57

B. Federal land exchanges can be reversed..................................... 59

III. The other *Winter* factors favor denial of injunctive relief...................... 61

CONCLUSION.................................................................................. 62

STATEMENT OF RELATED CASES ......................................................... 63

CERTIFICATE OF COMPLIANCE

SUPPLEMENTAL ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*American Motorcyclist Association v. Watt*,
    714 F.2d 962 (9th Cir. 1983) ............................................................. 61

*Bowen v. Roy*,
    476 U.S. 693 (1986) ............................................................... 1, 21, 22

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) ....................................................................... 18

*California Parents v. Torlakson*,
    973 F.3d 1010 (9th Cir. 2020) ........................................................ 48

*Church of the Lukumi Babalu Aye v. City of Hialeah*,
    508 U.S. 520 (1993) .................................................................. 48, 50

*City of Boerne v. Flores*,
    521 U.S. 519 (1997) ....................................................................... 16

*Comanche Nation v. United States*,
    2008 WL 4426621 (W.D. Okla. Sept. 23, 2008) ................................. 33

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005) ....................................................................... 34

*DeMarco v. Davis*,
    914 F.3d 383 (5th Cir. 2019) .......................................................... 25

*Desert Citizens Against Pollution v. Bisson*,
    231 F.3d 1172 (9th Cir. 2000) ..................................................... 59, 60

*Dorsey v. United States*,
    567 U.S. 260 (2012) .................................................................. 16, 17

*Edge v. City of Everett*,
    929 F.3d 657 (9th Cir. 2019) .......................................................... 14

*Employment Division v. Smith*,
    494 U.S. 872 (1990) ............................................................. 15

*Environmental Protection Information Center v. Carlson*,
    968 F.3d 985 (9th Cir. 2020) ............................................... 14

*Fleischfresser v School District 200*,
    15 F.3d 680 (7th Cir. 1994) ................................................. 44

*Greene v. Solano County Jail*,
    513 F.3d 982 (9th Cir. 2008) ............................................... 34

*Gros Ventre Tribe v. United States*,
    469 F.3d 802 (9th Cir. 2006) ............................................... 54

*Hackford v. Babbitt*,
    14 F.3d 1457 (10th Cir. 1994) ............................................. 52

*Haight v. Thompson*,
    763 F.3d 554 (6th Cir. 2014) ............................................... 34

*Herrera v. Wyoming*,
    139 S. Ct. 1686 (2019) ........................................................ 52

*Holt v. Hobbs*,
    574 U.S. 352 (2015) ...................................................... 19, 43

*Inter Tribal Council of Arizona, Inc. v. Babbitt*,
    51 F.3d 199 (9th Cir. 1995) ................................................. 54

*James v. Watt*,
    716 F.2d 71 (1st Cir. 1983) ................................................. 52

*Jones v. Carter*,
    915 F.3d 1147 (7th Cir. 2019) ............................................. 34

*Jones v. Meehan*,
    175 U.S. 1 (1899) ............................................................... 60

*Kettle Range Conservation Group v. Bureau of Land Management*,
  150 F.3d 1083 (9th Cir. 1998) ............................................................. 60

*La Cuna de Aztlan Sacred Sites Protection Circle v. U.S. Department of
  the Interior*, No. 13-56799 (9th Cir.) .................................................. 42

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
  140 S. Ct. 2367 (2020) ...............................................................18, 44

*Lockhart v. Kenops*,
  927 F.2d 1028 (8th Cir. 1991) ............................................................ 37

*Lone Wolf v. Hitchcock*,
  187 U.S. 553 (1903)........................................................................... 55

*Lyng v. Northwest Indian Cemetery Protective Association*,
  485 U.S. 439 (1988)......................................................................passim

*McGirt v. Oklahoma*,
  140 S. Ct. 2452 (2020) ...................................................................... 52

*Mockaitis v. Harcleroad*,
  104 F.3d 1522 (9th Cir. 1997) ............................................................ 35

*Mora v. New York*,
  524 F.3d 183 (2d Cir. 2008) ............................................................... 53

*Morton v. Mancari*,
  417 U.S. 535 (1974)........................................................................... 17

*Mozert v. Hawkins County Board of Education*,
  827 F.2d 1058 (6th Cir. 1987) ............................................................ 44

*Nance v. Miser*,
  700 F. App'x. 629 (9th Cir. 2017) ...................................................... 34

*National Forest Preservation Group v. Butz*,
  485 F.2d 408 (9th Cir. 1973)............................................................... 60

*National Parks & Conservation Association v. Bureau of Land Management*,
606 F.3d 1058 (9th Cir. 2010) .............................................. 59

*National Wildlife Federation v. Espy*,
45 F.3d 1337 (9th Cir. 1995) ............................................... 60

*National Wildlife Federation v. National Marine Fisheries Service*,
886 F.3d 803 (9th Cir. 2018) ...........................................56, 58

*Navajo Nation v. U.S. Forest Service*,
No. 06-15371 (9th Cir.) ...................................................... 30

*Navajo Nation v. U.S. Forest Service*,
535 F.3d 1058 (9th Cir. 2008) .......................................passim

*Nken v. Holder*,
556 U.S. 418 (2009) .......................................................... 61

*Omnipoint Communications, Inc. v. City of White Plains*,
202 F.R.D. 402 (S.D.N.Y. 2001) ......................................... 35

*Parents for Privacy v. Barr*,
949 F.3d 1210 (9th Cir. 2020) ............................................ 49

*Parker v. Hurley*,
514 F.3d 87 (1st Cir. 2008) ................................................ 44

*Prater v. City of Burnside, Kentucky*,
289 F.3d 417 (6th Cir. 2002) ..........................................37, 38

*Robinson v. Salazar*,
838 F. Supp. 2d 1006 (E.D. Cal. 2012) ............................... 53

*Salazar v. Buono*,
559 U.S. 700 (2010) ......................................................48, 61

*Sherbert v. Verner*,
374 U.S. 398 (1963) .......................................................... 15

*Skokomish Indian Tribe v. United States*,
    410 F.3d 506 (9th Cir. 2005) ............................................................ 52

*Snoqualmie Tribe v. FERC*,
    545 F.3d 1207 (9th Cir. 2008) .......................................................... 28

*Sovereign Inupiat for a Living Arctic v. Bureau of Land Management*,
    No. 3:20-cv-00290, 2021 WL 454280
    (D. Alaska Feb. 6, 2021)................................................................... 60

*Tanzin v. Tanvir*,
    141 S. Ct. 486 (2020) ................................................................25, 26

*Trinity Lutheran Church v. Comer*,
    137 S. Ct. 2012 (2017) ...............................................................27, 49

*Uintah Ute Indians v. United States*,
    28 Fed. Cl. 768 (1993) ..................................................................... 53

*United States v. California*,
    436 U.S. 32 (1978) .....................................................................3, 4, 6

*United States v. Hoffman*,
    436 F. Supp. 3d 1272 (D. Ariz. 2020) ............................................. 26

*United States v. Jicarilla Apache Nation*,
    564 U.S. 162 (2011)....................................................................54, 55

*United States v. Lara*,
    541 U.S. 193 (2004).......................................................................... 55

*United States v. Means*,
    858 F.2d 404 (8th Cir. 1988) ........................................................... 37

*United States v. Navajo Nation*,
    537 U.S. 488 (2003)......................................................................... 54

*United States v. Oakland Cannabis Buyers' Co-op.*,
    532 U.S. 483 (2001)......................................................................... 61

*Valley Forge Christian College v. Americans United for Separation of Church and State*,
454 U.S. 464 (1982)............................................................ 22

*Western Land Exchange Project v. Dombeck*,
47 F. Supp. 2d 1216 (D. Or. 1999) ..................................... 61

*Warsoldier v. Woodford*,
418 F.3d 989 (9th Cir. 2005) ............................................... 35

*Wilson v. Block*,
708 F.2d 735 (D.C. Cir. 1983) ............................................ 37

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ........................................ 14, 27, 30, 40, 58

*Wisconsin v. Yoder*,
406 U.S. 205 (1972)........................................... 15, 16, 39, 40

*Yang v. Sturner*,
728 F. Supp. 845 (D.R.I. 1990) .......................................... 41

*Yellowbear v. Lampert*,
741 F.3d 48 (10th Cir. 2014).................................... 19, 32, 34

*Youpee v. Babbit*,
519 U.S. 234 (1997)............................................................ 60

## Statutes

16 U.S.C. § 539p ...............................................................4, 8, 57

42 U.S.C. § 2000 ........................................... 5, 15, 16, 35, 43, 46

Treaty of Guadalupe Hidalgo,
9 Stat. 922 (1848) ................................................................. 3

Ariz. Rev. Stat. § 41-1493.01 ........................................... 27

## Other Authorities

*Hearing on H.R. 1063 et al. before the H. Subcommittee on Energy and Mineral Resources, H. Comm. On Natural Resources*,
113th Congress 93, 101 (2013) .............................................................. 7

*Hearing on H.R. 3301, H. Comm. on Natural Resources, Subcommittee on National Parks, Forest and Public Lands*,
110th Cong. 18 (2007) .......................................................................... 6

*House Committee Report*,
139 Cong. Rec. 27,239-41 (1993) ........................................................ 39

*Legislative Hearing on 112 H.R. 1904 et al., H. Comm. on Natural Resources, Subcommittee on National Parks, Forests and Public Lands*,
112th Congress 68 (2011) ...................................................................... 7

*Reservation of Lands Pursuant to Executive Order No. 10355*,
20 Fed. Reg. 7337 (Oct. 1, 1955) ......................................................... 6

*Rethinking Protections for Indigenous Sacred Sites*,
134 Harv. L. Rev. 1294 (2021) ....................................................... 33, 47

*Save Oak Flat Act*,
H.R. 1884, 117th Cong. (2021) .......................................................... 48

*Save Oak Flat Act*,
S. 915, 117th Cong. (2021) ................................................................. 48

# GLOSSARY

| | |
|---|---|
| EIS | Environmental Impact Statement |
| RFRA | Religious Freedom Restoration Act of 1993 |
| ROD | Record of Decision |

## INTRODUCTION

The district court correctly denied preliminary injunctive relief because binding Supreme Court and en banc Circuit precedent foreclose Plaintiffs' claims on the merits. The Religious Freedom Restoration Act (RFRA) and the Free Exercise Clause are "written in terms of what the government cannot do to the individual, not in terms of what the individual" can require of the government. *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1073 (9th Cir. 2008) (en banc), quoting *Bowen v. Roy*, 476 U.S. 693, 700 (1986). They prohibit government from using the power of the state to coerce individuals to comply with laws that infringe on an individual's exercise of religion—or to punish noncompliance with such laws—unless the government satisfies strict scrutiny.

But as this Court and the Supreme Court have long held, neither RFRA nor the Free Exercise Clause require the government to conduct its own internal affairs, including the management of its own property, in conformity with the religious beliefs or practices of its citizens. Indeed, "no government— let alone a government that presides over a nation with as many religions as the United States of America—could function were it required to do so." *Navajo Nation*, 535 F.3d at 1064. Plaintiffs seek to change that longstanding rule, but their arguments are foreclosed by binding precedent. Only Congress can provide the relief Plaintiffs seek.

## STATEMENT OF JURISDICTION

The United States concurs in Plaintiffs' statement of jurisdiction.

## STATEMENT OF THE ISSUES

1. RFRA applies strict scrutiny to laws that impose a "substantial burden"—defined by this Court as *punishment* or *denial of an otherwise-available benefit*—on a person's religious exercise. Under binding precedent, federal land-management actions do not impose a substantial burden on individuals, even when the incidental impact on their religious practices is severe.

Did the district court correctly hold that Plaintiffs are unlikely to succeed on the merits of their RFRA claim?

2. The Free Exercise Clause applies strict scrutiny to laws that substantially burden the exercise of religion if they lack neutrality and general applicability—that is, if they single out the religious for disfavored treatment. The challenged statute does not target religious exercise, and it applies equally to all users of the exchanged federal property.

Did the district court correctly hold that Plaintiffs are unlikely to succeed on the merits of their Free Exercise Claim?

3. Trust relationships exist only when affirmatively identified by Congress through the enactment of public law. Congress has not given content

or force to any trust relationship enforceable by Apache Stronghold, which is not a Tribe.

Did the district court correctly hold that Plaintiffs are unlikely to succeed on the merits of their tribal trust claim?

4. No irreversible harm will occur at Oak Flat for at least two years, and Congress has found that the land exchange serves the public interest.

Have Plaintiffs established that the public interest and equities weigh in their favor?

## STATEMENT OF THE CASE

### A. Legal background.

#### 1. Relevant treaties.

In the Treaty of Guadalupe Hidalgo, signed on February 2, 1848, Mexico ceded land in the present-day state of Arizona, including Oak Flat, to the United States. 9 Stat. 922 (1848); *United States v. California*, 436 U.S. 32, 34 n. 3 (1978). In 1852, the United States signed a treaty with a representative of Apaches west of the Rio Grande. Treaty with the Apache, July 1, 1852, 10 Stat. 979. The treaty stated that unspecified territorial boundaries would be designated at a later date. *Id.* The United States has never alienated title to the lands at issue in this suit.

### 2. The Southeast Arizona Land Exchange and Conservation Act.

The Southeast Arizona Land Exchange and Conservation Act (Act) directs the U.S. Forest Service to convey title to 2,422 acres of the Tonto National Forest, including Oak Flat, to Resolution Copper in exchange for 5,459 acres of conservation lands to be added to the National Forest System. 16 U.S.C. § 539p(b)(2), (d)(1). The Act directs the Forest Service to engage in consultation with affected Indian Tribes and to prepare an environmental impact statement (EIS) to inform future agency decision making associated with the exchange. *id.* § 539p(c)(3),(9). The Forest Service "shall" convey title to the parcel "[n]ot later than 60 days after the date of publication of the final [EIS]." *Id.* § 539p(c)(10).

The Act also directs the Forest Service to establish a special management area to protect Apache Leap, an area identified during hearings as culturally and religiously significant to members of the San Carlos Apache Tribe. *Id.* § 539p(g). The Act requires Resolution Copper to surrender "all rights held under the mining laws and any other law to commercially extract minerals under Apache Leap," and directs the Forest Service to preserve the natural character of Apache Leap and to "allow for traditional uses of the area by Native American people." *Id.*

### 3. The Free Exercise Clause and RFRA.

The First Amendment of the U.S. Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The Free Exercise Clause prohibits government from imposing a substantial burden on a person's religious exercise unless the burden results from a valid and neutral law of general applicability.

To legislatively expand the protection of religious exercise, Congress enacted RFRA. RFRA states that the federal government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government demonstrates that the "application of the burden to the person" is in furtherance of a "compelling governmental interest" and is the "least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.

### B. Factual background.

In 1995, the third-largest copper orebody in the world was discovered 7,000 feet below lands in the Tonto National Forest, near the town of Superior, Arizona. 3-ER-268. Resolution Copper, a mining company, holds unpatented mining claims on much of the deposit, but part of the deposit extends beneath the "Oak Flat Picnic and Camp Ground," a 760-acre parcel that was

withdrawn from mineral entry by executive order in 1955. *Id.*; 20 Fed. Reg. 7337.

Believing that the mine would bring jobs and economic development to an economically-depressed part of the state, members of Arizona's Congressional delegation introduced bills over successive Congresses to convey Oak Flat to Resolution Copper in exchange for conservation lands of equal value.

At a 2007 hearing on one such bill, Wendsler Nosie, then-Chairman of the San Carlos Apache Tribe, testified in opposition to the bill. He explained that the "lands to be acquired and mined . . . are referred to by non-Indians as Oak Flat and Apache Leap. These lands are sacred and holy places." *Hearing on H.R. 3301, H. Comm. on Natural Resources, Subcommittee on National Parks, Forest and Public Lands*, 110th Cong. 18 (2007). He explained that Apache Leap is "sacred and consecrated ground for our People," in part because "seventy-five of our People sacrificed their lives at Apache Leap during the winter of 1870 to protect their land, their principles, and their freedom." *Id.* at 19. But the "holy and consecrated nature of these places are not embodied solely in the physical feature known as Apache Leap. Oak Flat and nearby Devil's Canyon are also holy, sacred, and consecrated grounds." *Id.* at 21-22.

San Carlos Apache Tribal Chairman Terry Rambler also testified against the bill, explaining that "Apache spiritual beings, *Ga'an*, live and exist within the sacred sites of Oak Flat, *Ga'an* Canyon (Devil's Canyon), and Apache Leap," and that mining would "desecrate the *Ga'an*'s home." *Hearing on H.R. 1063 et al. before the H. Subcommittee on Energy and Mineral Resources, H. Comm. On Natural Resources*, 113th Congress 93, 101 (2013).

Former San Carlos Apache Tribal Chairman Harrison Talgo disagreed, testifying that "we are in such desperate need of jobs and industry. We are one of the poorest Indian tribes in the Nation. Seven of ten eligible workers in the tribe are unemployed. . . . Without jobs our children are forced to move to neighboring communities, or into cities to find work. Not many of them return, and with each passing generation a piece of Apache identity and culture is lost." *Legislative Hearing on 112 H.R. 1904 et al., H. Comm. on Natural Resources, Subcommittee on National Parks, Forests and Public Lands*, 112th Congress 68 (2011). Former Chairman Talgo stated that he respects the "desire to protect sites that have cultural and historical significance. But Oak Flat is a long way from us, and I believe strongly that it is possible for our traditional values to co-exist with economic progress. In fact, I don't believe one can survive without the other." *Id.*

Ultimately, Congress concluded that the public interest favored allowing the mine to go forward by directing the transfer of Oak Flat to Resolution Copper, while also protecting Apache Leap. As a condition of the exchange, Resolution Copper was required to surrender all rights it held to mine under Apache Leap, and the Forest Service was directed to preserve it to "allow for traditional uses of the area by Native American people." 16 U.S.C. § 539p(g); *see* p. 4, *supra.*

While the bills were pending in Congress, Oak Flat was experiencing a revival in traditional ceremonial use. A 2014 article in the Apache Messenger newspaper reported that a Sunrise Ceremony was held at Oak Flat for "the second [time] in more than a hundred years." https://perma.cc/UAH6-PQ62. Lamenting that "limiting religious ceremonies to places within the reservation ha[s] become a norm for Apache people today," the article celebrated "the return [to Oak Flat] of the Sunrise Dance two years ago." *Id.* The article noted that the "Sunrise Dance comes at a time when a bill still sits in the U.S. Congress" to transfer Oak Flat. *Id.*

## C.    Procedural background.

Apache Stronghold, an advocacy organization dedicated to protecting Oak Flat, sued on January 12, 2021, to enjoin the land transfer. 2-ER-262–63; https://perma.cc/NB88-PRZJ. The San Carlos Apache Tribe has filed a

separate challenge to the exchange, but no Tribe has joined in *this* action, nor has any Tribe asserted religious-exercise claims in a separate suit. *See San Carlos Apache Tribe v. U.S. Forest Service*, No. 2:21-cv-68-DWL (D. Ariz. filed Jan. 14, 2021).

Plaintiffs moved for a temporary restraining order (TRO) and preliminary injunction blocking issuance of the EIS, which was set for publication the next day. The district court denied the TRO because Plaintiffs could not show immediate and irreparable injury. The EIS was published on January 15.

The district court held a hearing on the preliminary injunction, at which Apache Stronghold co-founder Wendsler Nosie and his granddaughter Naelyn Pike testified about the importance of Oak Flat to their religious and cultural practices. The district court, while acknowledging the depth of their connection to Oak Flat, held that preliminary injunctive relief must be denied because Plaintiffs were unlikely to succeed on the merits. The court first found that neither Apache Stronghold nor its individual members had standing to assert treaty rights, which can be enforced only by sovereign Tribes. 1-ER-5–8. But even if Plaintiffs did have standing, the court held, they identified no trust duty that the government has breached. 1-ER-8–12.

Turning to Plaintiffs' RFRA claim, the court held that Plaintiffs' claims were foreclosed by *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988) and *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008) (en banc), discussed *infra* at pp. 20-23. Those cases, the court explained, held that government land-use actions that severely impacted the religious practices of Native plaintiffs did not impose a substantial burden "[b]ecause the plaintiffs were not 'coerced by the Government's action into violating their religious beliefs' nor did the 'governmental action penalize religious activity by denying [the plaintiffs] an equal share of the rights, benefits, and privileges enjoyed by other citizens.'" 1-ER-18, quoting *Lyng*, 485 U.S. at 449.

Turning to Plaintiffs' Free Exercise Clause claim, the court rejected Plaintiffs' claim that Congress passed the Act "in order to suppress the religious exercise of Plaintiff Apache Stronghold and its Western Apache members." 1-ER-19, quoting Complaint ¶ 85, 2-ER-260. Noting that Plaintiffs "provided no evidence of any discriminatory intent behind its passage" and when asked "could not directly answer the question," 1-ER-20, the district court rejected Plaintiffs' claim that the Act is not neutral, and held that they were unlikely to succeed on their Free Exercise claim.

After rejecting two other claims that Plaintiffs do not raise on appeal, the district court held that because Plaintiffs failed to establish a likelihood of

success on the merits, there was no need to address the other *Winter* factors. *See* p. 14, infra. The court accordingly denied preliminary injunctive relief. Plaintiffs promptly appealed and moved for an injunction pending appeal, which the district court denied.

Plaintiffs then moved this Court for an emergency injunction pending appeal. While that motion was pending, the Forest Service rescinded the EIS in compliance with a directive from the Department of Agriculture which stated that "additional time is necessary to fully understand concerns raised by Tribes and the public and the project's impacts to these important resources and ensure the agency's compliance with federal law." Resolution EIS Project Update, https://perma.cc/W348-XUKH (March 1, 2021). The government committed to give 60-days' notice before publishing a final EIS. *San Carlos Apache Tribe*, No. 2:21-cv-68-DWL, ECF No. 46 at 2.

A divided motions panel denied the emergency motion without prejudice to renewal. The majority (M. Smith and Bade, JJ) held that withdrawal of the EIS, coupled with the government's commitment under penalty of perjury to provide advance notice of publication of a new EIS, eliminated the risk of imminent irreparable harm and any need for an emergency stay. The majority accordingly held that an "examination of the merits of Apache Stronghold's request for a preliminary injunction—denied by

the district court and currently pending on appeal—is therefore premature. We express no view on the merits." ECF 26 at 2. Judge Bumatay dissented and wrote an opinion espousing Plaintiffs' position on every merits issue and every *Winter* factor.[1]

## SUMMARY OF ARGUMENT

The district court correctly denied preliminary injunctive relief because Plaintiffs' merits arguments are foreclosed by binding Supreme Court and Circuit precedent. On their RFRA claim, Plaintiffs have established the first element of a *prima facie* case by showing that their religious exercise will be adversely affected by the government action, but they cannot establish the second element of showing that the government has applied a "substantial burden" to them. The Supreme Court and this Court have both held that government management of federal land does not impose a substantial burden on anyone, even if it severely impacts their religious exercise. Contrary to Plaintiffs' arguments, those cases are not distinguishable; in fact, the Supreme Court expressly rejected Plaintiffs' proffered distinction between physical and

---

[1] Plaintiffs' brief relies extensively on Judge Bumatay's dissent, citing it more than twice as many times as this Court's directly controlling en banc decision in *Navajo Nation*. Because the dissent is not precedential and contains no arguments not raised in Plaintiffs' brief, the government confines its responses to the brief.

spiritual or "subjective" impacts because it would impermissibly require the Court to evaluate the truth of religious beliefs.

Plaintiffs are unlikely to succeed on their Free Exercise Clause claims because the Act is neutral and generally applicable—which means that its object was not the suppression of religious exercise, and it applies equally to religiously-motivated and non-religiously-motivated conduct. Plaintiffs attempt to redefine the terms "neutral" and "generally applicable," but their arguments are irreconcilable with binding precedents.

Further, Plaintiffs are unlikely to succeed on their tribal trust claims. As a nonprofit organization—not a federally-recognized Indian Tribe—Plaintiffs lack standing to bring a breach-of-trust claim. They also identify no discrete, enforceable trust duty the government has violated. And even if a trust obligation had existed, Congress extinguished it when it passed the Act and directed that the land at issue be transferred to a private company.

Because Plaintiffs are unlikely to succeed on the merits, this Court need not reach the other *Winter* factors, but they also weigh against preliminary relief. No irreparable harm will occur before this case can be decided. No timeline for the exchange currently exists, and there will be ample advance notice before it can occur. If it does occur, religious and recreational access will continue, and no activities that could later cause subsidence will occur, for at

least two years. And if Plaintiffs were ultimately to prevail, this Court has the power to unwind the exchange. Finally, Congress has determined that this exchange is in the public interest, and its balancing of competing interests is entitled to deference.

## STANDARD OF REVIEW

This Court reviews for an abuse of discretion the district court's decision to deny a preliminary injunction, and reviews de novo any questions of law underlying that decision. *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020).

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. "Likelihood of success on the merits is the most important factor; if a movant fails to meet this threshold inquiry, [the Court] need not consider the other factors." *Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019).

# I.   Plaintiffs are unlikely to succeed on the merits.

## A.   Plaintiffs' RFRA claims are foreclosed by Supreme Court and en banc Circuit precedent.

### 1.   The Act does not impose a "substantial burden" on Plaintiffs within the meaning of RFRA.

Congress enacted RFRA in response to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), which held that the Free Exercise Clause does not require religious exemptions from a "valid and neutral law of general applicability." Unless "prohibiting the exercise of religion" is "the object of" the law, the Court held, "the First Amendment has not been offended." *Id.* at 878-79.

RFRA restored, as a matter of federal statutory right, the broader protection of religious exercise exemplified in the Supreme Court's earlier decisions in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). 42 U.S.C. § 2000bb(b)(1). In *Sherbert*, the Court held that South Carolina's denial of unemployment benefits to a Seventh-Day Adventist fired for refusing to work on Saturdays placed "the same kind of burden upon the free exercise of religion as would a fine imposed against [her] for her Saturday worship," 374 U.S. at 404, and that no compelling governmental interest justified imposing that burden. *Id.* at 406-07. And in *Yoder*, the Court held that no sufficient State interest justified Wisconsin's compulsory

schooling law, which "unduly burden[ed]" the religious exercise of Amish parents and children by "compel[ling] them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Yoder*, 406 U.S. at 218, 220.

RFRA reinstates the *Sherbert/Yoder* test legislatively. It provides that the federal government[2] "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government demonstrates that "application of the burden to the person" furthers a "compelling governmental interest" and is the "least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. It applies to "all Federal law, and the implementation of that law, whether statutory or otherwise." *Id.* § 2000bb-3(a).[3] As in *Navajo Nation*, 535

---

[2] As originally enacted, RFRA applied to the States as well, but was held unconstitutional as applied to the States. *City of Boerne v. Flores*, 521 U.S. 519, 532-36 (1997). Congress then enacted the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, which requires States and local governments to satisfy strict scrutiny for laws imposing substantial burdens on religious exercise with respect to zoning, *id.* § 2000cc, and institutionalized persons, *id.* § 2000cc-1.

[3] RFRA also provides that later-enacted federal statutes are subject to RFRA "unless such law explicitly excludes such application by reference to this chapter." 42 U.S.C. § 2000bb-3(b). Even when an earlier statute states that later exceptions must be explicit, however, "statutes enacted by one Congress cannot bind a later Congress, which remains free . . . to exempt the current statute from the earlier statute" and to "express any such intention either expressly or by implication as it chooses." *Dorsey v. United States*, 567 U.S. 260,

F.3d at 1067 n.9, it is undisputed that RFRA applies to federal land-management statutes and their implementation; the disputed question is whether such actions impose a substantial burden.

To establish a *prima facie* RFRA case, a plaintiff must establish two elements. "First, the activities the plaintiff claim are burdened by the government action must be an 'exercise of religion.' Second, the government action must 'substantially burden' the plaintiff's exercise of religion." *Navajo Nation*, 535 F.3d at 1068 (citation omitted). The elements are "distinct," and the "first question, that the Plaintiffs' activities are an 'exercise of religion,' . . . has no bearing on the second, 'substantial burden,' question." *Id.* at 1076-77. If the plaintiff makes those two distinct showings, the burden shifts to the government to show that it has acted in the least restrictive means to further a compelling interest. *Id.* at 1068.

On the first prong, plaintiffs enjoy broad deference in determining whether a law conflicts with their religious exercise. Defendants, and courts,

---

273-74 (2012). If, as Plaintiffs contend, the Act imposes a substantial burden on their religious exercise without a narrowly-tailored compelling justification, then RFRA and the Act would be irreconcilable, giving rise to a necessary implication that Congress has exempted the Act from RFRA. *Morton v. Mancari*, 417 U.S. 535, 550 (1974); *Dorsey*, 567 U.S. at 274-75. But this Court need not reach that question, because binding precedent compels the conclusion that the Act does not impose a substantial burden on Plaintiffs' religious exercise.

"must accept the sincerely held . . . objections of religious" claimants. *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020). Apache Stronghold has carried its first-prong burden of showing that the Act would impact its members' religious exercise.

The second prong examines whether the government exercises the coercive power of the state against the plaintiff to deter or punish the conduct constituting their religious exercise; it does not, as Plaintiffs suggest, inquire how seriously the government's action offends or conflicts with the plaintiffs' religious exercise. Thus, in *Burwell v. Hobby Lobby Stores, Inc.*, the Supreme Court held that the Affordable Care Act's contraceptive-coverage requirement substantially burdened the plaintiffs' religious beliefs, not because the *conflict* was severe, but because the *consequences* were: "Because the contraceptive mandate forces them to pay an enormous sum of money . . . if they insist on providing insurance coverage in accordance with their religious beliefs, the mandate clearly imposes a substantial burden on those beliefs." 573 U.S. 682, 726 (2014); *see also id.* at 691 ("If these *consequences* do not amount to a substantial burden, it is hard to see what would.") (emphasis added). Similarly, in *Holt v. Hobbs*, the Supreme Court held that the prison's grooming policy imposed a substantial burden on the Muslim prisoner because "[i]f petitioner contravenes that policy and grows his beard, he will face serious disciplinary

action." 574 U.S. 352, 361 (2015). And "in *Yoder*, it was not the effect of the high school's secular education on the children's subjective religious sensibilities that constituted the undue burden on the free exercise of religion. Rather, the undue burden was the penalty of criminal sanctions on the parents for refusing to enroll their children in such school." *Navajo Nation*, 535 F.3d at 1070 n.12. The substantial-burden inquiry "isn't into the merit of the plaintiff's religious beliefs or the relative importance of the religious exercise: we can't interpret his religion for him. Instead, the inquiry focuses only on the coercive impact of the government's actions." *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014) (Gorsuch, J.).

Plaintiffs argue that, because Congress did not define "substantial burden" in RFRA, this Court should construe the term according to its "ordinary meaning" rather than by reference to pre-*Smith* case law. Brief at 31. But this Court rejected that invitation in *Navajo Nation:* "Congress expressly referred to and restored a body of Supreme Court case law that defines what constitutes a substantial burden on the exercise of religion (i.e. *Sherbert*, *Yoder*, and other pre-*Smith* cases). Thus, we must look to those cases in interpreting the meaning of 'substantial burden.'" 535 F.3d at 1074 (citation omitted).[4]

---

[4] The legislative history supports that holding. The principal Senate sponsors of both RFRA and RLUIPA stated that the "Act does not include a definition of the term 'substantial burden' because it is not the intent of this Act to create a

Guided by "the express language of RFRA and decades of Supreme Court precedent," *Navajo Nation* held that "a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*). Any burden imposed on the exercise of religion short of that described by *Sherbert* and *Yoder* is not a 'substantial burden' within the meaning of RFRA, and does not require the application of the compelling interest test set forth in those two cases." *Id.* at 1068, 1069-70.

This Court then applied that definition to a fact pattern strikingly similar to the one presented here. *Navajo Nation* was a challenge to a Forest Service decision to allow the operator of a ski resort to make snow using recycled wastewater. The plaintiffs, including the White Mountain Apache Nation, Yavapai-Apache Nation, Navajo Nation, and Havasupai Tribe, claimed that the use of treated wastewater would desecrate "the most sacred mountain of southwestern Indian tribes," contaminate soil, plants, and animals essential to

---

new standard for the definition of 'substantial burden' on religious exercise. Instead, that term as used in the Act should be interpreted by reference to Supreme Court jurisprudence." 146 Cong. Rec. 16645 (2000) (Statement of Sens. Hatch and Kennedy).

their religious exercise, and prevent them from performing religious ceremonies. *Id.* at 1080, 1098-1106 (Fletcher, J., dissenting).

This Court concluded that the decision did not impose a "substantial burden" on the plaintiffs because it "does not force the Plaintiffs to choose between following the tenets of their religion and receiving a governmental benefit, as in *Sherbert*." It "also does not coerce the Plaintiffs to act contrary to their religion under the threat of civil or criminal sanctions, as in *Yoder*." *Id.* at 1070. Because the plaintiffs were "not fined or penalized in any way" by the government's approval of a third party's request to use recycled water for snowmaking, the incidental impact of that decision on the plaintiffs' religious beliefs and practices, "serious though it may be—is not a 'substantial burden' on the free exercise of religion." *Id.*

In so holding, this Court was guided by two other pre-*Smith* Supreme Court Free Exercise decisions: *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), and *Bowen v. Roy*, 476 U.S. 693 (1986). In *Bowen*, the plaintiff objected to the government's use of a Social Security number for his daughter, believing that it would rob her of spiritual power. 476 U.S. at 697. The Supreme Court held that the government's use of a Social Security number to identify the daughter did not impose a cognizable burden: it required nothing of the plaintiff or his child, nor did it impose any penalty on

them. "The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens," the Court explained. "The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Id.* at 699-700.

The Supreme Court applied that principle in *Lyng*, which—like *Navajo Nation*—was a challenge to a use of federal land with "devastating effects on traditional Indian religious practices." 485 U.S. at 451. The Supreme Court held that the government's use of "publicly owned land cannot meaningfully be distinguished from the use of a Social Security number in *Roy*. In both cases, the challenged Government action would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs. In neither case, however, would the affected individuals be coerced by the Government's action into violating their religious beliefs; nor would either governmental action penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Lyng*, 485 U.S. at 449. *Cf. Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 485 (1982) (rejecting Establishment Clause challenge to land transfer because plaintiffs "fail to

identify any personal injury suffered by them *as a consequence* of the alleged

constitutional error, other than the psychological consequence presumably

produced by observation of conduct with which one disagrees.") (emphasis in

original). "However much we might wish that it were otherwise," the *Lyng*

Court explained, "government simply could not operate if it were required to

satisfy every citizen's religious needs and desires." *Id.* at 452.

*Lyng* and *Navajo Nation* compel the conclusion that the Act does not

impose a substantial burden on Plaintiffs. As the district court explained,

"Apache Stronghold runs into the same problem as plaintiffs in both *Navajo*

*Nation* and *Lyng*, each of which is still good law and binding upon this Court:

Plaintiff has not been deprived a government benefit, nor has it been coerced

into violating their religious beliefs." 1-ER-18.

Plaintiffs argue that it was "absurd" for the district court to conclude that

a substantial burden exists only when a plaintiff has been deprived of a benefit

or coerced to violate their beliefs. Brief at 38. They cannot deny that *Navajo*

*Nation* held that "Under RFRA, a 'substantial burden' is imposed only when

individuals are forced to choose between following the tenets of their religion

and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to

their religious beliefs by the threat of civil or criminal sanctions (*Yoder*)." 535

F.3d at 1069-70. But they claim that the next sentence, which states that "[a]ny

burden imposed on the exercise of religion short of that described by *Sherbert* and *Yoder* is not a 'substantial burden' within the meaning of RFRA," *id.* at 1070, converts the previous sentence's holding into a mere illustrative list. They contend that the Congressionally-mandated land exchange here is *worse* than, not "short of," coercion or punishment, and thus falls within *Navajo Nation*'s definition of "substantial burden." Brief at 32, 38.

That argument is irreconcilable with *Navajo Nation*'s reasoning and result. *Navajo Nation* involved a government land-use decision that, according to the sincere religious beliefs of the plaintiffs, rendered "the most sacred mountain of southwestern Indian tribes" unfit for their religious exercise. *Navajo Nation*, 535 F.3d at 1080 (Fletcher, J., dissenting). But this Court held that "even were we to assume, as did the Supreme Court in *Lyng*, that the government action in this case will 'virtually destroy the Indians' ability to practice their religion,' " there would still be no substantial burden because the government was not punishing or coercing the Plaintiffs. *Id.* at 1072 (majority). There is no meaningful distinction between actions that "destroy the Indians' ability to practice their religion," *id.*, and actions that "make religious exercise impossible," Brief at 33, so Plaintiffs' attempt to reconcile their position with *Navajo Nation* fails.

Moreover, if, as Plaintiffs contend, such actions impose a substantial burden because they are worse than, rather than short of, punishment or coercion, then this Court would have found a substantial burden in *Navajo Nation*. The same is true of *Lyng*. 485 U.S. at 451 (holding no substantial burden despite plaintiffs' belief that project would "render any meaningful continuation of traditional practices impossible"). That those Courts did not find a substantial burden precludes this Court from finding one here.

Plaintiffs imply that *Lyng* and *Navajo Nation* have been undermined by subsequent case law, stating that the Supreme Court "recognized last year [that] government prevention of religious exercise through physical acts—such as '*destruction of religious property*'—can constitute a 'RFRA violation.'" Brief at 32, quoting *Tanzin v. Tanvir*, 141 S. Ct. 486, 492 (2020) (emphasis supplied by Plaintiffs); *see also* Brief at 35. But the Supreme Court did nothing of the sort; *Tanzin* held that RFRA plaintiffs could seek money damages against FBI agents who placed them on the No Fly List in retaliation for their refusal to act as informants against their religious communities. 141 S. Ct. at 489. Noting that damages is "the *only* form of relief that can remedy some RFRA violations," the Court cited *DeMarco v. Davis*, 914 F.3d 383, 390 (5th Cir. 2019), a § 1983 suit against a prison guard who confiscated and destroyed the prisoner's Bible, parenthetically describing it as involving "destruction of

religious property." *Tanzin*, 141 S. Ct. at 492. Thus, *Tanzin*'s lone reference to "destruction of religious property" refers to personal property *owned by the plaintiff*, and in no way undermines *Lyng* or *Navajo Nation*.

Plaintiffs also classify as "absurd" the notion that no substantial burden exists here because they have not been punished or denied a benefit, yet "if the Government merely fenced off Oak Flat and threatened 'sanctions' for trespassing, Plaintiffs would face a 'substantial burden." Brief at 38. But, as shown above, the substantial-burden inquiry examines what the government is doing *to the plaintiff*, not to public property. If the government threatens or imposes punishment on an individual for their religious use of federal land, that punishment can be a substantial burden. *See United States v. Hoffman*, 436 F. Supp. 3d 1272, 1286 (D. Ariz. 2020) (holding RFRA required vacatur of criminal convictions of religiously-motivated individuals for leaving supplies for migrants in federal wilderness area; distinguishing *Navajo Nation* because "[h]ere, in contrast, Defendants face criminal sanctions for exercising their religious beliefs.") But where, as here, the government imposes neither punishment nor denial of an otherwise-available benefit on the Plaintiffs, it has not imposed a substantial burden on them.

Finally, Plaintiffs argue that they *have* been deprived of a benefit—the use of Oak Flat—and *are* subject to penalties—for trespassing. But RFRA does

not require government to provide religious claimants with "benefits" not available to anyone else; it prohibits the government from *conditioning* an "otherwise available benefit" on the claimant's religious status or conduct. *Trinity Lutheran Church v. Comer*, 137 S. Ct. 2012, 2021-22 (2017); *accord Lyng*, 485 U.S. at 449 (government may not "penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens."). As for penalties, the United States has never threatened Plaintiffs with penalties for visiting Oak Flat, and they do not allege otherwise. If they ever do face trespassing charges, they may assert a defense under RFRA or Arizona's virtually identical statute, Ariz. Rev. Stat. § 41-1493.01, at that time.

### 2. *Lyng* and *Navajo Nation* are controlling and not distinguishable.

Plaintiffs strive to distinguish *Lyng* and *Navajo Nation*, arguing that the government actions in those cases "would have no physical impact" on the sacred sites, whereas this case "isn't just about 'subjective spiritual experience,' it's about complete physical destruction that annihilates core Apache religious practices forever." Brief at 36. They allege that both this Court and the Supreme Court "acknowledged the outcome would have been different" if they had "involved physical destruction of a sacred site." *Id.* at 35.

Plaintiffs are wrong on all counts. Both this Court and the Supreme Court acknowledged that the result would have been the *same* regardless of the severity of the impact on the plaintiffs' religious exercise. In *Lyng*, the Court quoted a study concluding that the challenged road "would cause serious and irreparable damage to the sacred areas which are an integral and necessary part" of the plaintiffs' religious exercise. 485 U.S. at 442. It acknowledged the plaintiffs' religious belief that their "rituals would not be efficacious if conducted at other sites" and that the project would make their traditional religious practices "impossible." *Id.* at 451. But even if the project would "virtually destroy the Indians' ability to practice their religion," the Court held, "the Constitution simply does not provide a principle that could justify upholding [their] legal claims." *Id.* at 451-52 (cleaned up). As noted above, p. 24, this Court made the same holding in *Navajo Nation*. 535 F.3d at 1072. And in *Snoqualmie Tribe v. FERC*, this Court found no substantial burden in a case where the licensed hydroelectric facility had a profound physical impact on the waterfall held sacred by the plaintiffs. 545 F.3d 1207, 1213-14 (9th Cir. 2008).

The Supreme Court in *Lyng* also rejected the proffered distinction between "subjective" and "physical" impacts because it would require courts to assess not just the sincerity but the *truth* of a claimant's religious beliefs. The

*Lyng* plaintiffs argued that *Roy* was distinguishable because "the Social Security number in *Roy* could be characterized as interfering with Roy's religious tenets from a subjective point of view, where the government's conduct of its own internal affairs was known to him only secondhand and did not interfere with his ability to practice his religion," but "in this case, . . . the proposed road will physically destroy the environmental conditions and the privacy without which the religious practices cannot be conducted." 485 U.S. at 449 (cleaned up).

"These efforts to distinguish *Roy* are unavailing," the Supreme Court held, because "this Court cannot determine the truth of the underlying beliefs that led to the religious objections here or in *Roy*, and accordingly cannot weigh the adverse effects on the appellees in *Roy* and compare them with the adverse effects" on the *Lyng* plaintiffs. *Id.* at 449-50 (cleaned up). "Without the ability to make such comparisons, we cannot say that the one form of incidental interference with an individual's spiritual activities should be subjected to a different constitutional analysis than the other." *Id.* at 450.

The Supreme Court's rejection of the supposed distinction between physical and spiritual or "subjective" harm explains why *Navajo Nation* is not distinguishable either. The *Navajo Nation* plaintiffs' claims of harm to their religious exercise are strikingly similar to the claims of Plaintiffs here. The

Hopi Tribe explained that the San Francisco Peaks are "the home of the Katsina," spiritual beings that are "the guardians of the Hopi people." *Navajo Nation v. U.S. Forest Service*, 9th Cir. 06-15371, ECF 23 at 37, 39. The Hopi visit the Peaks to "make prayer offerings and to gather plants and other materials," and they believed that the use of recycled wastewater would "render impure the plants gathered there" and "irreparably weaken and possibly destroy the link between the Katsina . . . and the Hopi people." *Id.* at 37-38. Vincent Randall, a Yavapai-Apache legislator, averred that the San Francisco Peaks are "one of the primary homes for the GAAN," and that the snowmaking "will interfere with the ability of the GAAN to guide us in our lives." *Navajo Nation*, 9th Cir. 06-15371, ECF 22-1 at 1-ER-151-52. Ramon Riley, a White Mountain Apache (and amicus here, ECF 37), "testified that the project will have a significant impact on the ability of the Apache people to perform the Sunrise Ceremony, allowing a young lady to pass into womanhood, and the Crown Dancer ceremonies." *Navajo Nation*, 9th Cir. 06-15371, ECF 22 at 36.

In arguing that *Navajo Nation* is distinguishable, Plaintiffs are asking this Court to hold that their claims are credible because Oak Flat will be physically damaged, while the *Navajo Nation* plaintiffs' claims are less weighty because they are "subjective" and "spiritual." The law does not allow such a distinction, nor do the facts. It is untenable to suggest that the Hopi's belief

that recycled wastewater would contaminate plants gathered on the Peaks is "subjective," whereas Naelyn Pike's testimony that only acorns gathered at Oak Flat "have the spirit that resonates" is objective. Brief at 10. This Court cannot conclude that Ramon Riley's testimony in *Navajo Nation* about Sunrise Ceremonies and Crown Dancers merely addressed his "subjective spiritual experience," but that his statements that those same ceremonies "must take place" at Oak Flat because it is "uniquely endowed with holiness and medicine" describe objective physical realities. 2-ER-227; *see also* Brief at 9 (quoting Mr. Riley three times). Because this Court "cannot determine the truth of the underlying beliefs that led to the religious objections here or in" *Navajo Nation*, it "accordingly cannot weigh the adverse effects on" the *Navajo Nation* plaintiffs and judge them less weighty than the adverse effects here. *Lyng*, 485 U.S. at 449.

Plaintiffs' argument also fails because it rests on the false premise that a "substantial burden" exists whenever a government action interferes with a plaintiff's religious exercise. As shown above, pp. 18-19, such interference establishes only the first prong, not the second. "Once again, the inquiry here isn't into the merit of the plaintiff's religious beliefs or the relative importance of the religious exercise: we can't interpret his religion for him. Instead, the inquiry focuses *only* on the coercive impact of the government's actions."

*Yellowbear*, 741 F.3d at 55 (emphasis added). Thus, although the physical impact of the exchange will be greater than the physical impacts of the snowmaking in *Navajo Nation*, that factual distinction is irrelevant to the substantial-burden inquiry, which examines what the government is doing *to the plaintiff*, not to federal land.

Amici Prof. Alvaré et al. attempt a different distinction, arguing that *Lyng* held that "a different set of constitutional questions" would arise if worshippers were prohibited from visiting a sacred site. ECF 36 at 13-14. But context makes clear that *Lyng* was talking about *discriminatory* denial of access: "The Constitution does not permit government to discriminate against religions that treat particular physical sites as sacred, and a law prohibiting the Indian respondents from visiting the Chimney Rock area would raise a different set of constitutional questions." *Lyng*, 485 U.S. at 453. But here, as in *Lyng*, there is no discrimination. Because the Act treats all users of Oak Flat equally, the questions here are the same as in *Lyng* and *Navajo Nation*—and so are the answers.

### 3. The cases on which Plaintiffs rely are distinguishable.

Plaintiffs cite a long list of cases that purportedly conflict with *Navajo Nation* and the decision below, but only one—an unpublished district court case from another Circuit—is actually in conflict. In *Comanche Nation v. United*

*States*, a court preliminarily enjoined construction of a building at Ft. Sill, Oklahoma, because it would interfere with the "viewscape" of Medicine Bluffs, an "unobstructed view" of which "is central to the spiritual experience of the Comanche people." 2008 WL 4426621 (W.D. Okla. Sept. 23, 2008) at *17. In an opinion that never mentions *Lyng* and expressly declines to follow *Navajo Nation*, *id.* at *3 n.5, the Oklahoma district court held that construction of the building on federal property would impose a substantial burden on the plaintiffs by impacting their religious practices. But that is wrong; such an impact establishes only the first prong of a *prima facie* RFRA case.

As the authors of the amicus brief for Mr. Riley et al. acknowledge elsewhere, *Comanche Nation* is irreconcilable with *Lyng, Navajo Nation*, and every other case to address the issue. In their view, *Comanche Nation* "is the exception that demonstrates that the approach followed by virtually every other court is flawed."[5] It is certainly the exception, and while they are entitled to their opinion that the Supreme Court and this Court got it wrong, *Lyng* and *Navajo Nation* control here.

Plaintiffs cite several prisoner cases that, they claim, show that any government action that "prevents" the plaintiff from participating in a religious

---

[5] Stephanie Hall Barclay and Michalyn Steele, *Rethinking Protections for Indigenous Sacred Sites*, 134 Harv. L. Rev. 1294, 1341 (2021).

exercise imposes a substantial burden. *See* Brief at 32, 33 n.16. But each case

involves actual coercion or punishment, and is thus consistent with *Navajo*

*Nation* and the decision below. In *Yellowbear, Greene v. Solano County Jail,* and

*Haight v. Thompson*, prison officials prohibited the incarcerated plaintiffs from

participating in group religious ceremonies.[6] In *Nance v. Miser*, prison officials

prohibited the incarcerated plaintiff from growing a beard or using scented oils

in his religious exercises.[7] In *Jones v. Carter*, prison officials refused to provide

meals complying with the incarcerated plaintiff's religious dietary

requirements.[8] In each case, the "prevention" of religious exercise resulted

from the state exercising coercive control over the plaintiff to an extent

"unparalleled in civilian society." *Cutter v. Wilkinson*, 544 U.S. 709, 720-21

(2005). Such coercion easily establishes a substantial burden under *Navajo*

*Nation*. And in *Warsoldier v. Woodford*, the incarcerated plaintiff was punished

for refusing to cut his hair in violation of his religious beliefs—another exercise

---

[6] *See Yellowbear*, 741 F.3d at 55-56; *Greene v. Solano County Jail*, 513 F.3d 982, 988 (9th Cir. 2008); *Haight v. Thompson*, 763 F.3d 554 (6th Cir. 2014).

[7] *Nance v. Miser*, 700 F. App'x. 629 (9th Cir. 2017).

[8] *Jones v. Carter*, 915 F.3d 1147 (7th Cir. 2019).

of coercion, as *Navajo Nation* acknowledged.[9] *Navajo Nation*, 535 F.3d at 1077. Neither form of coercion is present here.[10]

Plaintiffs and amici also cite many RLUIPA land-use cases, Brief at 33-34, 40, but RLUIPA's land-use provision, 42 U.S.C. § 2000cc, governs what restrictions government may place on land owned by religious assemblies, not what restrictions religious worshippers may place on land owned by the government. *Navajo Nation*, 535 F.3d at 1077 & n.22. It is expressly limited to land in which "the claimant has an ownership, leasehold, easement, servitude, or other property interest" or a "contract or option to acquire such an interest." 42 U.S.C. § 2000cc-5(5). Thus, RLUIPA cases recognizing a plaintiff's right to use its *own* property as a place of worship do not imply an analogous right to the use of public property or other property the plaintiff does not own. *See Omnipoint Commc'ns, Inc. v. City of White Plains*, 202 F.R.D. 402, 403 (S.D.N.Y.

---

[9] *Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005).

[10] Plaintiffs also cite *Mockaitis v. Harcleroad*, a pre-*Boerne* RFRA case, in which this Court held, without explanation, that the surreptitious taping of a prisoner's confession substantially burdened the priest's religious exercise, but that retention of the tape over the priest's objection did not. 104 F.3d 1522, 1530-31 (9th Cir. 1997). But *Navajo Nation* stated that "*Mockaitis* cannot serve as precedent here" because of its subsequent overruling and because "*Mockaitis* did not define substantial burden, let alone analyze the substantial burden standard under the *Sherbert / Yoder* framework restored in RFRA." 535 F.3d at 1074 n.15.

2001) (RLUIPA does not provide grounds for synagogue to challenge construction of utility tower on neighboring property).

Plaintiffs fault the district court for distinguishing the RLUIPA land-use cases, arguing that "the Supreme Court and this Court have held that RLUIPA and RFRA impose 'the same standard.'" Brief at 35. That both statutes apply the *Sherbert/Yoder* standard to government actions that "substantially burden" religiously-motivated conduct is undisputed, but as the district court correctly recognized, "[w]hat constitutes a 'substantial burden' . . . has evolved differently under each statute." 1-ER-16 n.8. *Navajo Nation* "express[ed] no opinion as to the standards to be applied in RLUIPA actions," 535 F.3d at 1077 n.23, and so some of this Court's RLUIPA land-use cases have continued to apply the dictionary-derived "significantly great" definition of substantial burden that this Court rejected for RFRA purposes. As in *Navajo Nation*, "RLUIPA is inapplicable to this case," because it does not apply "to the government's management of its own land," and because RLUIPA land-use cases are distinguishable. *Id.* at 1077-78.

Citing those inapposite RLUIPA cases, Plaintiffs argue that adhering to this Court's en banc precedent in *Navajo Nation* "would put this Court out of step with every other Circuit to address the issue." Brief at 39. But in fact, all other Circuits that have addressed the issue have found that government use of

public property that conflicts with individuals' religious use does not impose a substantial burden. In a case strikingly similar to this one, the Eighth Circuit declined to enjoin a land exchange, despite the plaintiff's claim that it "would interfere with Indian religious ceremonies," because the "first amendment does not require the government to conduct its own affairs to comport with the religious beliefs of its citizens." *Lockhart v. Kenops*, 927 F.2d 1028, 1031, 1036 (8th Cir. 1991); *see also United States v. Means*, 858 F.2d 404, 407 (8th Cir. 1988) (collecting cases). The D.C. Circuit rejected the Hopi Tribe's challenge to a permit for expansion of the same ski resort at issue in *Navajo Nation*, holding that "unless such actions penalize faith, they do not burden religion." *Wilson v. Block*, 708 F.2d 735, 741 (D.C. Cir. 1983). And the Sixth Circuit rejected a claim by a church asserting a religious calling to expand their facilities onto an undeveloped roadway. While accepting the church's claim that the City's refusal to abandon the roadway impacted their religious exercise, the Sixth Circuit held that the City's refusal "did not . . . burden the Church's rights under the Free Exercise Clause." *Prater v. City of Burnside, Ky.*, 289 F.3d 417, 427-28 (6th Cir. 2002). It is Plaintiffs' position, not this Court's holding in *Navajo Nation*, that would place this Court in conflict with its sister Circuits.

### 4. Plaintiffs' extreme hypotheticals do not follow from *Navajo Nation*'s correct definition of "substantial burden."

Plaintiffs argue that, under *Navajo Nation*'s definition of "substantial burden," government could forcibly round up Amish children and send them to a public boarding school, padlock the doors of a church to prevent worship, confiscate religious personal property, or forcibly remove religious clothing, all without imposing a substantial burden. Brief at 39. Not so. People generally have legally-protected rights to the custody of their own children, the possession of their own personal and real property, and the physical integrity of their own body, and government may not deprive them of those rights without due process of law. Such deprivations, if legal, would involve the application of a civil or criminal sanction to the person, which can present a substantial burden under RFRA. Plaintiffs identify no case, and we are aware of none, in which *Navajo Nation*'s definition of "substantial burden" led to such absurd results.

To the extent Plaintiffs suggest that *Navajo Nation* recognizes only the unrealized threat, but not the actual imposition, of civil or criminal sanctions as a substantial burden, it is they who are engaging in a "stilted reading of *Navajo Nation*." *Id. Navajo Nation* cited *Yoder* as the basis for its holding that a substantial burden exists when a person is "coerced to act contrary to their

religious beliefs by the threat of civil or criminal sanctions (*Yoder*)." 535 F.3d at 1070.  In *Yoder*, the "respondents were charged, tried, and convicted" and fined. *Yoder*, 406 U.S. at 208. The exercise of the coercive power of the state against a person, as well as the threat of such exercise, is encompassed within *Navajo Nation*'s definition of substantial burden.

### 5.  RFRA's legislative history supports *Navajo Nation*'s definition of 'substantial burden'.

Citing the House Committee Report on the bill that became RFRA, Plaintiffs argue that RFRA's legislative history contradicts *Navajo Nation*'s holding that only coercive government action directed at the plaintiff constitutes a substantial burden. Brief at 40-41. But the House bill lacked the requirement that government action "substantially burden" religious exercise before strict scrutiny would be triggered, and is therefore a weak guide to the meaning of that term. The word "substantially" was later added by the Senate and concurred in by the House. 139 Cong. Rec. 27,239-41 (1993).

The Senate Committee Report supports this Court's interpretation. Although the Senate bill was identical to the House bill at the time, the Senate report uses the terms "substantial burden" and "substantially burden" extensively. S. Rep. 103-111 (1993). After stating that courts should "look to free exercise cases decided prior to *Smith* for guidance in determining whether

the exercise of religion has been substantially burdened," *id.* at 8, the Senate report explains that "pre-*Smith* case law makes it clear that strict scrutiny does not apply to government actions involving only management of internal Government affairs or the use of the Government's own property or resources." *Id.* at 9, citing *Lyng* and *Bowen*.

After the bill had been amended to add the "substantial burden" requirement, Senator Hatch, one of the two principal co-sponsors of RFRA in the Senate, explained that "RFRA does not affect *Lyng* . . . , a case concerning the use and management of Government resources, because the incidental impact on a religious practice does not constitute a cognizable burden on anyone's free exercise of religion." 139 Cong. Rec. 26,193 (1993). For the same reason, Senator Hatch also explained that "RFRA would have no effect on cases like *Bowen v. Roy*." *Id.*

Plaintiffs argue that unless the meaning of "substantial burden" is expanded to include internal, non-coercive government actions like those in *Bowen*, *Lyng, Navajo Nation,* and here, then Congress's evident concern with cases like *Yang v. Sturner*—in which an autopsy was performed on a Hmong man in violation of his family's religious beliefs—would be untouched by RFRA. But the court's initial decision favorable to the Yang family, withdrawn after *Smith*, rested on the fact that next-of-kin "possess a 'quasi-

property' right in the body of the deceased" that is "interfere[d] with . . . by mutilating or operating on the body." 728 F. Supp. 845, 851 (D.R.I. 1990). By performing the autopsy without the family's consent, the medical examiner used the coercive power of the state to take that right from the Yang family. Without that right, however, the family would have had no claim; an autopsy performed on a stranger, no matter how offensive to their beliefs, would not have imposed a substantial burden on them.

### 6. Plaintiffs' expansive reading of "substantial burden" cannot be restricted to the "narrow" result they claim to seek.

The Supreme Court explained that if individuals could subject to strict scrutiny any government action that conflicted with their religious beliefs— whether or not the government was coercing them or depriving them of a benefit—then "government simply could not operate." *Lyng*, 485 U.S. at 452. Although the *Lyng* plaintiffs "stress[ed] the limits of the religious servitude that they are now seeking to impose" on federal land, the Court explained that "nothing in the principle for which they contend" is so limited. *Id.* (cleaned up). Noting the plaintiffs' religious need for privacy and undisturbed naturalness, the Court explained that "such beliefs could easily require *de facto* beneficial ownership of some rather spacious tracts of public property." *Id.* at 453.

This Court echoed those concerns in *Navajo Nation*, 535 F.3d at 1066 n.7, and claims asserted in other cases confirm the sweeping consequences that would follow from Plaintiffs' theory. Wilbur Slockish, the plaintiff in another pending RFRA challenge to government use of public land, testified that the "entire state of Washington and Oregon" is "very sacred" to him. *Slockish v. Federal Highway Admin.*, 21-35220, ECF 18-5 at 4-ER-716. La Cuna de Aztlan Sacred Sites Protection Circle, which challenged multiple solar projects on federal land, opposed development within an area "extending 100 miles to the east and 100 miles to the west of the Colorado River from Spirit Mountain [in Nevada] . . . to the Gulf of California"— some 40,000 square miles. *La Cuna de Aztlan Sacred Sites Prot. Circle v. U.S. Dep't of the Interior*, 9th Cir. 13-56799, ECF 12-3 at 1-ER-27.

If such claimants need not show that the government is applying coercion *to them* by punishing them or depriving them of a right or benefit, then "any action the federal government were to take, including action on its own land, would be subject to the personalized oversight of millions of citizens. Each citizen would hold an individual veto to prohibit the government action solely because it offends his religious beliefs." *Navajo Nation*, 535 F.3d at 1063.

Plaintiffs dismiss that problem as a "strawman," falsely characterizing it as a mere argument of counsel rather than an en banc holding of this Court.

ECF 24 at 7. They contend that their "position is narrow: complete physical destruction of a sacred site, rendering core religious practices impossible, is a substantial burden." *Id.* But Plaintiffs' "attempt to stress the limits of the religious servitude that they are now seeking to impose" must be rejected for the same reason a parallel attempt was rejected in *Lyng*: "Nothing in the principle for which they contend . . . would distinguish this case from another lawsuit" where none of those adjectives apply. *Lyng*, 485 U.S. at 452.

RFRA's broad definition of religious exercise "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7). Courts cannot distinguish between "core" religious practices and those that are optional, peripheral, or occasional. Nor, as Plaintiffs acknowledge, is RFRA limited to government actions that make certain religious practices "impossible." Brief at 31. And, as shown above, pp. 28-29, courts may not distinguish between physical and "subjective" or "spiritual" impacts.

It also matters not whether other forms of religious exercise remain unimpaired, or whether the claimant's religious exercise is not widely shared. *Holt*, 574 U.S. at 361-62. And RFRA of course does not permit courts to treat claimants differently based on their religion, race, or ethnicity. The principle for which Plaintiffs contend therefore cannot be limited to Indian Tribes—

none of which have joined this suit—or to Native American religious practitioners.

Plaintiffs' proposed rewriting of the substantial-burden requirement cannot even be limited to the context of federal land use. Courts deciding religious challenges to a wide variety of government actions depend on the principle that a substantial burden is not imposed unless the government is actually *applying a burden to the plaintiff* rather than merely conducting its own affairs. Thus, in *Little Sisters of the Poor*, Justice Alito's concurrence (joined by Justice Gorsuch) explained that the contraceptive mandate imposed a substantial burden because violations were punishable by fines, whereas "in *Bowen*, the objecting individuals were not faced with penalties or 'coerced by the Government into violating their religious beliefs.'" 140 S. Ct. at 2390 & n.5 (Alito, J., concurring), quoting *Lyng*, 485 U.S. at 449.

The First, Sixth, and Seventh Circuits have rejected claims from parents challenging schools' use of books incompatible with the parents' religious beliefs, finding no substantial burden because "no coercion exists." *Fleischfresser v Sch. Dist. 200*, 15 F.3d 680, 690 (7th Cir. 1994); *accord Parker v. Hurley*, 514 F.3d 87, 103-05 (1st Cir. 2008) (citing *Bowen* and *Lyng*); *Mozert v. Hawkins County Board of Ed.*, 827 F.2d 1058, 1065 (6th Cir. 1987). But under Plaintiffs' theory, any claimant who sincerely believes their religious exercise is infringed

by the existence of such schoolbooks, or the Pledge of Allegiance, or the motto on U.S. coinage—all real cases—could require the government to justify those internal actions under strict scrutiny, even if nothing was being required of the claimant.

Plaintiffs' brief conveys the impression that their religious exercises can be held *only* on Oak Flat, and that if Oak Flat is destroyed, their ability to practice their religion will be destroyed as well. Brief at 9-13. That impression is not entirely consistent with the record. Naelyn Pike, for example, testified that her Sunrise Ceremony was held at Mt. Graham, 2-ER-132, which suggests that Plaintiffs' brief is incorrect in stating that such ceremonies "must take place" at Oak Flat and "cannot take place anywhere else." Brief at 9. But even if Plaintiffs could perform all of their religious exercises elsewhere, that would not deprive them of a claim concerning Oak Flat because a religious exercise need not be "compelled" to be protected under RFRA. As long as Plaintiffs can sincerely claim that the Act will interfere with their religious use of Oak Flat—and that is undisputed—then they can satisfy the permissive first prong of the RFRA *prima facie* case.

It is precisely *because* RFRA's definition of religious exercise is so expansive, and the first prong so easily satisfied, that the second prong cannot be rewritten as Plaintiffs urge. If every individual were to have the right to

subject any law or government action that conflicts with their religious beliefs to strict scrutiny, *regardless of whether the government was imposing any coercion on the individual*, then "no government—let alone a government that presides over a nation with as many religions as the United States of America—could function." *Navajo Nation*, 535 F.3d at 1064. The Supreme Court has rejected any such expansive interpretation of substantial burden, and so has this Court sitting en banc. Those decisions are controlling here.

### 7. Legislation, not RFRA, is the only remedy for the problems Plaintiffs and Amici raise.

Plaintiffs and amici note that existing laws have often left Native Americans without the means to prevent incompatible uses of sites that are important to their cultural and religious practices. Amici Mr. Riley, et al., argue that because many Native American sacred sites are in federal ownership, a "baseline of government coercion" exists similar to that commonly found in prisoner cases. ECF 37 at 20. They propose that, for RFRA cases brought by Indians, government ownership of the *land* should be sufficient to establish coercion, just as government custody of the *person* commonly establishes coercion in prisoner cases. But RFRA applies strict scrutiny only to the "application of the burden *to the person,*" 42 U.S.C. § 2000bb-1 (emphasis added). Amici admit that their position

contradicts *Navajo Nation*, ECF 37 at 20, and the brief's authors admit that it contradicts *Lyng*, which they fault for "treat[ing] tribal members as though they are no different than other non-Indigenous individuals." Barclay & Steele, *supra*, at 1325.

Nothing in RFRA authorizes disparate treatment of claimants based on their particular religious, racial, or ethnic background, nor based on their historical grievances, however valid they may be. Unless Plaintiffs can show that the government is applying a substantial burden to them—that is, imposing a punishment or denying a right or benefit to which they are otherwise entitled—then RFRA does not require the government to satisfy strict scrutiny. That is the law for everyone, and only Congress has the power to change it.

Such distinctions, if they are to be made, would require legislation. Professor Alex Tallchief Skibine proposes one such legislative solution that addresses some problems identified in *Lyng* and *Navajo Nation. Towards a Balanced Approach for the Protection of Native American Sacred Sites*, 17 Mich. J. of Race and Law 269 (2012). And Professors Barclay and Steele note that after *Lyng*, the "record proved persuasive in motivating the political branches to act to protect the site where the Court would not." Barclay & Steele, *supra*, at 1319.

That option remains available here as well; bills to repeal the Act have

been introduced in both houses of Congress. H.R. 1884, 117th Cong. (2021);

S. 915, 117th Cong. (2021). Congress, with its power to make and change laws

and its "prerogative to balance opposing interests and its institutional

competence to do so," has the power to solve the problems Plaintiffs present.

*Salazar v. Buono*, 559 U.S. 700, 717 (2010). This Court, however, does not.

### B.  Plaintiffs are unlikely to succeed on their Free Exercise claim.

Laws that substantially burden the exercise of religion are subject to

strict scrutiny under the Free Exercise Clause if they lack neutrality or general

applicability. A law is not *neutral* "if the object of a law is to infringe upon or

restrict practices because of their religious motivation." *Church of the Lukumi*

*Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993). A law is not *generally*

*applicable* if it "in a selective manner impose[s] burdens only on conduct

motivated by religious belief." *Id.* at 543.

Plaintiffs deny that the Act is generally applicable because it applies to

"only one piece of land." Brief at 44. By that logic, taken together with

Plaintiffs' erroneous assertion that there is no substantial-burden requirement

under the Free Exercise Clause,[11] *all* government land-use decisions would be

---

[11] This Court recently rejected the argument that the Supreme Court has
eliminated the substantial-burden requirement in Free Exercise cases. *California*

subject to strict scrutiny. Plaintiffs' theory is irreconcilable with *Trinity Lutheran*, in which the Supreme Court distinguished laws that are "neutral and generally applicable without regard to religion . . .from those that single out the religious for disfavored treatment," and discussed *Lyng*—which involved one piece of land—as an "example" of the former. 137 S. Ct. at 2020.

This Court rejected an analogous argument in *Parents for Privacy v. Barr*, 949 F.3d 1210, 1235 (9th Cir. 2020). In that case, the plaintiffs brought a Free Exercise challenge to the school's Student Safety Plan for a transgender boy, arguing that "a policy implemented for a single student is not generally applicable." *Id.* at 1234. This Court rejected that claim, explaining that "the question of general applicability addresses whether a law treats religious observers unequally," not whether the subject matter of the law is all-encompassing. *Id.* at 1235. Because the safety plan "affects all students and staff—it does not place demands on exclusively religious persons or conduct," it "qualifies as neutral and generally applicable." *Id.* at 1236.

---

*Parents v. Torlakson*, 973 F.3d 1010, 1019-20 (9th Cir. 2020). *Accord Trinity Lutheran*, 137 S. Ct. at 2021-22 (holding that state policy violates the Free Exercise Clause by excluding religious organizations "from the benefits of a public program for which [they are] otherwise fully qualified"—a paradigm substantial burden.) At any rate, this Court need not reach that Constitutional question here because the Act is neutral and generally applicable.

Plaintiffs also allege that the Act specifically targeted their religious conduct, but they have "provided no evidence of any discriminatory intent behind its passage," and when asked to do so, "Plaintiff's counsel could not directly answer the question." 1-ER-20. Plaintiffs attempt to remedy that deficiency with an edited statement from the late Sen. John McCain, Brief at 47, original at Supplemental Add. 3a-6a, but that statement falls far short of showing that preventing Plaintiffs' religious exercise was the *object* of the legislation. To the contrary, Sen. McCain's comments make clear that the object was to "employ 3,700 Americans," "produce 25 percent of the United States copper supply," "generate[] $61 billion in economic growth, [and] provide $20 billion in Federal, State, and local tax revenue." Add. 4a.

Unable to show a discriminatory purpose, Plaintiffs resort to arguing that the Act's object is "immaterial." That is not the law. To show that a law is not neutral, a plaintiff must prove that the law was enacted "because of, not merely in spite of," its adverse effects on their religious practice. *Lukumi*, 508 U.S. at 540. Plaintiffs cannot meet that standard; indeed, they admit that Congress may have been motivated by economic factors and "indifference rather than animus." Brief at 46. But as the district court held, insufficient solicitude for Plaintiffs' cultural and religious use of the land, "as disappointing

and inappropriate as it may be, in no way shows that the law was passed with the objective to discriminate against them." 1-ER-21.

### C. Plaintiffs lack standing to bring a breach-of-trust claim and cannot show an existing trust obligation.

Plaintiffs also fail to show a likelihood of success on their breach of trust claim, for three independent reasons.

*First*, even if Plaintiffs had identified a specific substantive source of trust obligations or property that was subject to those obligations (which, as discussed below, it has not), Plaintiffs lack standing to bring such a breach-of-trust claim. Apache Stronghold is a nonprofit organization that includes some Apache tribal members; it is not a Tribe, nor could it be the beneficiary of any trust created by the 1852 Treaty. Brief at 47. To the extent that the Treaty created any duties that could support the type of breach of trust claim asserted here (and it could not), such a claim must be brought by a federally-recognized Indian Tribe or Tribes. It is not enough that individual members of Apache Stronghold are members of such a Tribe. The injuries they allege—however individually experienced—are collective. To the extent there were any trust duties owed for the Oak Flat area, those duties would have been to the Tribe or Tribes as a whole, not to individuals.[12] Thus, any claim for *breach* of such a

---

[12] Again, the San Carlos Apache Tribe is pursuing relief against the land exchange but has not brought a breach of trust claim against the United States.

duty would be properly brought by the Tribe as the beneficiary of the trust relationship.

*Herrera v. Wyoming*, 139 S. Ct. 1686 (2019), and *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), are not to the contrary. Neither case was, at heart, about an individual asserting an alleged trust duty owed to a Tribe. Both involved individuals arguing that they were not subject to prosecution—in *Herrera*, for exercising a Treaty-protected hunting right, in *McGirt*, for state court charges stemming from activity in "Indian country." Both cases involved resolution of the scope of tribal rights, but neither case addressed a circumstance at all like here, in which a non-Tribe sought to assert the purported rights of an absent Tribe.

Courts have routinely held that individual tribal members may not sue to enforce right or duties held by or owed to the Tribe as a whole. *See, e.g.*, *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 515 (9th Cir. 2005) (individual members could not seek to vindicate communal rights); *Hackford v. Babbitt*, 14 F.3d 1457, 1466 (10th Cir. 1994) (member lacks standing to sue as to tribal asset); *James v. Watt*, 716 F.2d 71, 72 (1st Cir. 1983) (individual Indians lacked standing to assert tribal rights to land). This limitation follows

---

*See San Carlos Apache Tribe v. U.S. Forest Service*, No. 2:21-cv-68-DWL (filed Jan. 14, 2021).

naturally from the rule that, absent specific provisions providing for individual rights, treaties between sovereigns "do not create privately enforceable rights." *Mora v. New York*, 524 F.3d 183, 201 & n.25 (2d Cir. 2008) (collecting cases).

**Second**, Plaintiffs do not identify a discrete, enforceable trust duty that the government has violated. The only Treaty provision Plaintiffs specifically identify states that "the government of the United States" will "designate, settle, and adjust their territorial boundaries, and pass and execute" laws governing that territory "conducive to the prosperity and happiness of said Indians." Brief at 48. But they fail to show a specific duty this imposed on the United States for Oak Flat. While Plaintiffs refer to a "trust" or "trust interest," the land is not, in fact, held in trust for the Apache. The cited treaty language at most indicated a future plan to adjust boundaries or establish trust lands, *see Robinson v. Salazar*, 838 F. Supp. 2d 1006, 1022 (E.D. Cal. 2012); *Uintah Ute Indians v. United States*, 28 Fed. Cl. 768, 789 (1993) (parsing identical language in other treaties), but no such designation occurred to include Oak Flat. Plaintiffs do not argue that this language specifically required the United States to hold the land in trust for the Western Apache people, nor do they otherwise specify what, exactly, is the duty that the United States violated. And Plaintiffs do not claim title to the Oak Flat area. Brief at 50.

The amorphous references to a "trust" and "trust responsibilities" are insufficient to establish that the United States has breached trust duties to any Tribe in the manner asserted by Plaintiffs. The United States' duties as trustee are "defined and governed by statutes" creating and prescribing the limits of trust relationships; accordingly, the "Government assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 174, 177 (2011).

To succeed on such a claim, then, a Tribe must "identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003). The analysis of the government's alleged failure to meet its duties as a trustee "must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Id.* There may be a specific rights-creating trust duty when identifiable tribal assets are formally held in trust by the government, but this Court has held—consistent with Supreme Court precedent—that the obligations to manage tribal assets held in trust does not extend to a more generalized duty to "regulate third-party use of non-Indian resources for the benefit of" Tribes. *Gros Ventre Tribe v. United States*, 469 F.3d 802, 812-13 (9th Cir. 2006); *see also Inter Tribal Council of Arizona, Inc. v. Babbitt*, 51 F.3d 199, 203 (9th Cir. 1995) (denying breach of trust

claim where property at issue "is not properly the subject of a trust corpus. The off-reservation school was not part of Indian lands . . . .Tribes have no interest in the School Property, which was owned and controlled by the United States government.").

Plaintiffs have identified no such specific trust duties established by specific rights-creating or duty-imposing statutory or regulatory prescriptions, and the absence of any allegedly mismanaged tribal asset that is held in trust. Their breach of trust claim cannot succeed.

**Third**, even if Congress had created a distinct trust obligation with respect to Oak Flat in the Treaty, Congress extinguished that obligation when it passed the Act. Congress's power to legislate in the realm of Indian affairs is "plenary and exclusive," *United States v. Lara*, 541 U.S. 193, 200 (2004); *Jicarilla Apache*, 564 U.S. at 175, and "not subject to be controlled by the judicial department of the government," *Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903). While the United States cannot terminate a treaty right by implication, the express purpose of the Act was to transfer Oak Flat to a private company. That express purpose directly and obviously conflicts with Plaintiffs' theory that the land is subject to any trust responsibility (although, as explained above, Plaintiffs have not made clear what that trust duty is). This is not, as in *Herrera* and the precedent on which it relies, a later act of Congress

that arguably might implicitly subvert some interest held by a Tribe; it is an express abrogation of any trust duties related to Oak Flat. Such abrogation is ultimately a political act, within Congress's authority, and not the proper subject of a breach of trust claim.

## II. Plaintiffs have not established that they will suffer irreparable harm absent preliminary relief.

Plaintiffs cannot establish that they will suffer irreparable harm absent preliminary relief. "There must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined" to justify injunctive relief. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018).

The Forest Service's withdrawal of the EIS means that there is no date by which the exchange must occur; the Act's 60-day deadline will not start running until the EIS is released. And even if the exchange occurs, it would not cause immediate irreparable harm. The harm that Plaintiffs claim is an inability to access Oak Flat for religious purposes. But public access to the land will continue; no subsidence-causing activities will occur for at least two years after transfer; and if the Act is ultimately held to violate either the Constitution or RFRA, the transfer can be reversed by this Court.

**A. Plaintiffs will continue to have access to the land after the land transfer, and no subsidence-causing mining activities will occur for at least two years.**

Plaintiffs wrongly assert that the transfer will lead to "immediate," "permanent" harm, and their brief misstates the facts. Brief at 57. Even setting aside that the transfer may not occur for some time, once it does occur public access to Oak Flat *will continue*. Neither issuance of the EIS nor the transfer imminently prevents Plaintiffs' use of Oak Flat. No irreparable harm justifies preliminary injunctive relief.

*First*, contrary to Plaintiffs' assertions, the "immediate" impact of the exchange would *not* be loss of access to Oak Flat.[13] Brief at 2. Although the exchange would cause an "immediate" change of applicable law—expected with any transfer of government land to private ownership—Plaintiffs, along with the public, will continue to have broad access after the exchange, including for cultural and religious practice. The Act expressly mandates such, 16 U.S.C. § 539p, and Resolution has detailed these commitments within the EIS, ROD, site management plan, and its own declarations. ECF 18 at 25-28;

_____

[13] Plaintiffs repeatedly quote the EIS for the terms "immediate," "permanent," and "irreversible." But these terms are used in the context of the eventual construction of the mine or when discussing the finality of the commitment of resources. 2-ER-789–90. As used in the EIS, they do not refer to loss of access to Oak Flat for cultural purposes on the day of the exchange.

EIS Vol. 4 p. J-27, available at

https://www.resolutionmineeis.us/documents/final-eis.

Access to Oak Flat at large will continue to the maximum extent practicable until the operation of the mine precludes public access for safety reasons, which is, at a minimum, *years* away. ECF 18 at 27; ROD p. 31, available at https://www.resolutionmineeis.us/documents/draft-rod. Resolution "will ensure ongoing public access," not just "to the Oak Flat Campground" but also to Oak Flat area "recreational trails and climbing." ECF 18 at 25.

For the Oak Flat campground, access is expected to continue "at least for the next few decades." *Id.* at 28. Resolution would mirror and match current Forest Service management. It would also accommodate requests to periodically close the campground to the public for use for traditional and ceremonial purposes. ECF 18 at 25-27, 57; EIS Vol. 4 p. J-27; ROD p. 31.

Beyond the campground, "[w]ith respect to the Western Apaches annual fall harvesting of Emory oak acorns," Resolution "will continue to permit harvesting of the Emory oak groves by individuals, or commercially." ECF 18 at 25-26. Off-highway vehicle use and travel through the property to reach hunting areas will also remain available to the public. *Id.* at 25-27. And "climbing and bouldering" will continue "on the Oak Flat Parcel." *Id.*

**Second**, any action that would irrevocably alter the character of the land is not weeks or months but *years* in the future, leaving ample time for this Court's review on the merits. Active mining will not occur at the site for several years at the earliest. ECF 18 at 28, 46-47; 3-ER-269; ROD p. 2. Before that mining can occur, Resolution must conduct additional feasibility study work and detailed study of the geologic characteristics and mineralization of the orebody, as well as environmental studies. ECF 18 at 46; 3-ER-269. That information is necessary before much of the required underground infrastructure can be developed, and such development is "several years away, perhaps longer." ECF 18 at 8. Additional regulatory hurdles also exist; for example, Resolution must secure special use permits for roads through other federal lands to conduct its operations. ECF 18 at 25; EIS Vol. 1 p. 27-30. Any actions that could lead to subsidence are years away, and no irreparable harm to the land will occur absent injunctive relief.

## B. Federal land exchanges can be reversed.

If this Court determines that the exchange violates the Constitution or RFRA, it can be reversed.

This Court can reverse federal land exchanges after they have occurred, and has previously exercised that power. *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1187 (9th Cir. 2000) (voiding a land exchange); *see Nat'l*

*Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1063-64 (9th Cir. 2010) (explaining the district court's decision to set aside an already-effected land exchange); *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1342-43 (9th Cir. 1995); *Nat'l Forest Pres. Grp. v. Butz*, 485 F.2d 408, 411 (9th Cir. 1973).

And, in *Youpee v. Babbit*, 519 U.S. 234 (1997), the Supreme Court held that the Indian Land Consolidation Act's escheat provision was an unconstitutional taking, even after partial distribution of property had been validated and decreed. The Supreme Court has applied a similar principle when a congressionally authorized land transfer conflicted with a treaty of the United States. *Jones v. Meehan*, 175 U.S. 1 (1899).

Here, as in *Desert Citizens Against Pollution v. Bisson*, this is not a case in which an exchange has been "completed substantially prior to the initial challenge before the district court," or where a reversal of the exchange would "return federal lands which have been irrevocably changed by private actions." 231 F.3d at 1187; *see, e.g.*, *Kettle Range Conservation Grp. v. Bureau of Land Mgmt.*, 150 F.3d 1083, 1085 (9th Cir. 1998) (denying injunctive relief where plaintiffs had made no effort to join private entities who had obtained title to the lands and begun ground-disturbing activities). No irreversible impacts like clear-cutting or blasting would occur immediately after transfer. *See, e.g.*, *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 2021 WL 454280,

at *4 (D. Alaska 2021); *W. Land Exch. Project v. Dombeck*, 47 F. Supp. 2d 1216, 1218 (D. Or. 1999).

An injunction is unnecessary because the exchange would be reversible if Plaintiffs were to ultimately prevail.

## III.     The other *Winter* factors favor denial of injunctive relief.

This Court need not go further to consider the balance of equities and public interest, since Plaintiffs' showing of entitlement to preliminary injunctive relief has already failed. *See Nken v. Holder*, 556 U.S. 418, 435-36 (2009). But should the Court proceed to those factors, they favor denying injunctive relief.

A "court sitting in equity cannot ignore the judgment of Congress." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) (cleaned up). When Congress has affirmatively spoken on a matter—here, the public benefits of the exchange—it is in accord with the public interest to not frustrate Congress's intent. *Id.* (citations omitted). "Congress's prerogative to balance opposing interests and its institutional competence to do so provide one of the principal reasons for deference to its policy determinations." *Salazar v. Buono*, 559 U.S. at 717 (reversing injunction against land-transfer statute); *see also Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 967 (9th Cir. 1983).

In passing the Act, Congress determined that expanding Tonto National Forest—a Forest which serves multiple public purposes including recreation opportunities and habitat conservation—as well as facilitating copper mining in Arizona, employing more than 3,000 people, and providing billions in tax revenue and economic growth, is in the public interest. It did so after seeking out multiple rounds of testimony from all affected parties, considering the exchange in many iterations over many years, and ultimately determining that this exchange should go forward.

The equities weigh against granting relief.

## CONCLUSION

The district court's order denying preliminary injunctive relief should be affirmed.

<div style="margin-left: 40%;">

Respectfully submitted,

s/ Katelin Shugart-Schmidt
JEAN E. WILLIAMS
*Acting Assistant Attorney General*
ANDREW C. MERGEN
JOAN M. PEPIN
TYLER M. ALEXANDER
KATELIN SHUGART-SCHMIDT
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice

</div>

May 17, 2021
90-1-0-16230

## STATEMENT OF RELATED CASES

*Slockish v. U.S. Federal Highway Administration*, 9th Cir. No. 21-35220, is related within the meaning of Circuit Rule 28-2.6 because it has an issue in common with this case, specifically, whether a federal land-use decision imposed a substantial burden on religious practitioners in violation of RFRA and the Free Exercise Clause.

**Form 8.  Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**        21-15295

I am the attorney or self-represented party.

**This brief contains 13,916 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties;
   [ ] a party or parties are filing a single brief in response to multiple briefs; or
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**    s/ Katelin Shugart-Schmidt

**Date**        May 17, 2021

## SUPPLEMENTAL ADDENDUM

Statement of Hon. John McCain ................................................................ 1a



S. Hrg. 112–486

# RESOLUTION COPPER

# HEARING

BEFORE THE

## COMMITTEE ON
## ENERGY AND NATURAL RESOURCES
## UNITED STATES SENATE

ONE HUNDRED TWELFTH CONGRESS

SECOND SESSION

TO

CONSIDER H.R. 1904, THE SOUTHEAST ARIZONA LAND EXCHANGE AND CONSERVATION ACT OF 2011; AND S. 409, THE SOUTHEAST ARIZONA LAND EXCHANGE AND CONSERVATION ACT OF 2009, AS REPORTED BY THE COMMITTEE DURING THE 111TH CONGRESS

FEBRUARY 9, 2012



Printed for the use of the
Committee on Energy and Natural Resources

U.S. GOVERNMENT PRINTING OFFICE

75–271 PDF                    WASHINGTON : 2012

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

## COMMITTEE ON ENERGY AND NATURAL RESOURCES

JEFF BINGAMAN, New Mexico, *Chairman*

RON WYDEN, Oregon
TIM JOHNSON, South Dakota
MARY L. LANDRIEU, Louisiana
MARIA CANTWELL, Washington
BERNARD SANDERS, Vermont
DEBBIE STABENOW, Michigan
MARK UDALL, Colorado
JEANNE SHAHEEN, New Hampshire
AL FRANKEN, Minnesota
JOE MANCHIN, III, West Virginia
CHRISTOPHER A. COONS, Delaware

LISA MURKOWSKI, Alaska
JOHN BARRASSO, Wyoming
JAMES E. RISCH, Idaho
MIKE LEE, Utah
RAND PAUL, Kentucky
DANIEL COATS, Indiana
ROB PORTMAN, Ohio
JOHN HOEVEN, North Dakota
DEAN HELLER, Nevada
BOB CORKER, Tennessee

ROBERT M. SIMON, *Staff Director*
SAM E. FOWLER, *Chief Counsel*
McKIE CAMPBELL, *Republican Staff Director*
KAREN K. BILLUPS, *Republican Chief Counsel*

(II)

2a

# CONTENTS

---

## STATEMENTS

Page

Bingaman, Hon. Jeff, U.S. Senator From New Mexico ..................................... 1
Cherry, Jon, Vice President, Resolution Copper Company ................................. 25
Farquhar, Ned, Deputy Assistant Secretary, Land and Minerals Management, Department of the Interior ................................................................ 17
Kyl, Hon. Jon, U.S. Senator From Arizona ............................................. 5
Lewis, Shan, President, Inter Tribal Council of Arizona, Vice Chairman, Fort Mojave Tribe ......................................................................... 30
McCain, Hon. John, U.S. Senator From Arizona ....................................... 3
Wagner, Mary, Associate Cheif, Forest Service, Department of Agriculture ..... 13

## APPENDIXES

### APPENDIX I

Responses to additional questions ........................................................ 49

### APPENDIX II

Additional material submitted for the record ......................................... 65

(III)

3a

ter than the rest of us in the U.S. Senate and we should give deference to their views.

## STATEMENT OF HON. JOHN MCCAIN, U.S. SENATOR FROM ARIZONA

Senator MCCAIN. Thank you, Mr. Chairman. First of all, I would like to thank you for all the efforts you have made on behalf of trying to see this very important issue come to fruition. I want to thank you and your staff for the efforts that we have made. If in my statement and Senator Kyl's statement, I am sure if we show a little frustration, I think maybe it would be understandable because we have been at this issue for a long time.

As you know, the bill would facilitate a complex land exchange, as you said, that will ultimately protect 5,000 acres of environmentally sensitive lands throughout Arizona, while allowing for the Resolution Copper project to develop the third largest copper ore body in the world—the third largest in the world.

It would employ 3,700 Americans. It would produce 25 percent of the United States copper supply. It generates $61 billion in economic growth, provide $20 billion in Federal, State, and local tax revenue.

We can get copper from this mine, Mr. Chairman, or we can import it from someplace overseas. There will be a continued demand for copper in our economy.

My colleague, Senator Kyl, and I first introduced the bill in 2005, 7 years ago. Today marks the bill's sixth hearing before our congressional committee. At every hearing the project's tremendous economic and environmental values are reaffirmed, and yet at each hearing we see the same agitators trot it out to play the tired role of the industry obstructionist.

This vocal minority is so philosophically opposed to any mining in Arizona, they are willing to throw away the future of young families along with the best hope for long-term prosperity in the town of Superior, Arizona and the San Carlos Apache Indian reservations, where, Mr. Chairman, unemployment hovers around 50 percent.

Unfortunately, today's testimony by the Administration includes no meaningful recognition of the mine's national importance aside from passively mentioning "potential economic and employment benefits." Shame on the Administration for that kind of a statement when we have unemployment ripe throughout my State, and people are hurting, and homes are under water. The only mention in their long statement will be "potential economic and employment benefits." The disconnect between Washington Democrats and facts on the ground could never be more apparent than in the Administration's statement today.

Instead the Administration's testimony feeds unsubstantiated claims that the mine imminently threatens the area's environmental quality and cultural resources. This committee spent years analyzing, discussing, and evaluating this land exchange. We have had representatives of the Administration, including Interior Secretary Ken Salazar, visit the proposed mine site. The Forest Service began conducting preliminary evaluation of the mine area as far back as 2004.

The Resolution Copper Company has invested $750 million to collect engineering data to develop its mine plan of operation, which is now nearly complete. Yet no "compromise" is acceptable to the opponents who continue to demand more tribal consultation and more environmental study.

Let me say a word about tribal consultation. You are going to have a witness here from the Indian—Inter Tribal Council of Arizona. He will not mention that despite Senator Kyl and I constant urging that the San Carlos Apache tribe just sit down, just listen to the Resolution Copper. They refuse to do it. They refuse to sit down and at least listen and let the copper company make a presentation. Yet they will urge tribal consultation, tribal consultation.

It is not fair. It is not right to the poorest part of my home State of Arizona that we cannot move forward with what would not only help that part of our State, but also the United States of America.

So, I want to point out again the San Carlos Apache tribe have never met with Resolution Copper to learn about the project or discuss their cultural concerns. That is not what America is supposed to be all about. I respect tribal sovereignty. I do not respect people who refuse to sit down and at least listen to something that could help the tribe itself enormously, economically.

So, the tribal leaders—the San Carlos Apache obviously care more about some issues than they do about the prospect of employment for their tribal members, which, as I mentioned, is incredibly high, not to mention the problems of drug abuse, alcohol, and all the other things that plague their reservation because of their failure to have any kind of viable economy.

On multiple occasions, I have asked the chairman of the tribe to be briefed on the project and engage in constructive dialog, and each time my request and Senator Kyl's request has been declined.

So, are we to believe that the mining opponents genuinely want tribal consultation? Are we to assume that in light of the Keystone Pipeline issue this Administration will not delay or ultimately reject the project in the name of more study and more tribal input? The Administration's apathetic view of the mine is disgraceful and frustrating, and should trouble every member of this body who has land exchange legislation pending before this committee.

Mr. Chairman, it is time for Congress to put an end to these delays. The people in my State are hurting, and this mine is an economic opportunity that should not be squandered.

Mr. Chairman, I have numerous letters from elected officials from the Governor of the State of Arizona to the mayor of Superior, Arizona, and other towns in the area. I would ask that they be accepted in the record at this time.

Again, I apologize, Mr. Chairman, for any emotion that I have displayed in this, but I would ask the chairman to go to Superior, Arizona where half the homes are shut down, where the businesses are not functioning, where unemployment is close to 50 percent. All these people want is a chance to work and an opportunity to have a better life.

This bureaucracy that you will hear from and this Indian tribe is preventing them from having that opportunity. I am not asking them to agree; I am just asking them to sit down and listen to what we and the Resolution Copper Company have to say.

I thank you, Mr. Chairman.

The CHAIRMAN. Thank you very much. We will certainly include all the letters that you referred to in the record.

Senator Kyl.

## STATEMENT OF HON. JON KYL, U.S. SENATOR FROM ARIZONA

Senator KYL. Thank you, Mr. Chairman, and a formal statement of both Senator McCain and I as well.

The CHAIRMAN. We are glad to include those statements in the record.

Senator KYL. Thank you. One of the reasons why this land exchange is necessary is there is something called the copper triangle. It involves cities in Arizona called Globe, Miami, and Superior, and then Winkelman and Hayden. Within that area there is an enormous amount of copper, a lot of it which has been mined. But now this is, as Senator McCain said, the richest ore body—third richest in the world, and it would provide 25 percent of our copper.

The problem here is that—and the copper company has all of the land around the area under which they would be mining. By the way, the mine would be about 7,000 feet underground. This is not surface mining; this is underground mining. But because of the danger of operations, the potential for some possible subsidants, and the safety issues, as I said, it is important for them to also have the little bit of area that would be exchanged here. I think it is about 5,000 acres that would be—excuse me, about 2,000 acres. Excuse me, I will get the exact amount here—2,466 acres, which is kind of right in the middle of it.

The problem here is that the government withdrew a bunch of that land many years ago for a campground, and all it is is just an undeveloped campground for the Forest Service. That would be what would be available for the mining activity.

In exchange for that, over 5,000 acres of incredibly strong environmental land would be transferred to the Federal Government. All of the environmental groups, even though they may not support the exchange, are very strongly in support of the Federal Government acquiring this Riparian area along the San Pedro River. There is an area at the Los Cienegas National Conservation area. There is an area near East Clear Creek, which has been featured in Arizona Highways magazine, and we got the approval to pull this out of the magazine. I am going to pass this up to you. Just take a look at it. This is the kind of land the Federal Government will get in exchange for the land that would go to the development of the mine.

Let me address directly the other items that have been raised in objection. Senator McCain talked about the consultation. Now, we would like for the tribe to be able to sit down and express directly to the folks who would develop the mine why they do not want the employment, why they have a problem with this after all the other protections that have been granted.

The big area in Arizona that is near here that everybody wants to make sure is protected is called Apache Leap. That is a big escarpment, very important in Native American culture and the history of Arizona. Actually this land exchange adds 110 acres of pri-