**No. 21-15295**

_____

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

APACHE STRONGHOLD, a 501(c)(3) nonprofit organization
*Plaintiff-Appellant*,

v.

UNITED STATES OF AMERICA,
*Defendant-Appellee.*

_____

On Appeal from the United States District Court for the District of Arizona
Civ. No. 2:21-cv-00050-PHX-SPL, The Honorable Steven P. Logan

_____

*AMICUS CURIAE* **BRIEF FILED BY
THE TOWNS OF SUPERIOR AND HAYDEN, ARIZONA, AND JAMIE
RAMSEY, THE MAYOR OF KEARNY, ARIZONA
IN SUPPORT OF DEFENDANT-APPELLEE**

_____

William E. Trachman
MOUNTAIN STATES
LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
wtrachman@mslegal.org
(303) 292-2021

Timothy Sandefur
GOLDWATER INSTITUTE
500 E Coronado Rd
Phoenix, AZ 85004
litigation@goldwaterinstitute.org
(602) 462-5000

*Attorneys for Amici Curiae
Towns of Superior and Hayden, Arizona, and Kearny, Arizona Mayor Jamie
Ramsey*

## CORPORATE DISCLOSURE STATEMENT[1]

The undersigned attorneys certify that *amici curiae* Town of Superior (Superior) and the Town of Hayden (Hayden), Arizona, are municipalities organized under the laws of the State of Arizona. Hayden and Superior are government entities, and not publicly traded, and have no parent corporation. They have no stock, and therefore no publicly held corporation owns ten percent or more of their stock. Mayor Jamie Ramsey is individual filing in her personal capacity.

---

[1] Pursuant to Fed. R. App. P. 29, both parties have consented to the filing of this *amicus curiae* brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), the undersigned affirms that no counsel for a party authored this brief in whole or in part, and no person or entity other than Superior, or its counsel, made a monetary contribution specifically for the preparation or submission of this brief.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF AUTHORITIES .................................................. iv

IDENTITY AND INTEREST OF *AMICUS CURIAE* ........................... 1

INTRODUCTION ........................................................... 3

STATEMENT OF THE CASE ................................................. 9

SUMMARY OF THE ARGUMENT ...................................... 10

ARGUMENT .............................................................. 13

    I.    Plaintiff-Appellant's alleged injury will not
rise to the level of the legal definition of
"substantial burden." ........................................... 13

    II.   The Land Transfer at Issue in this Matter is
a Facially Neutral Policy, and not Subject to
Heightened Scrutiny Under the Free Exercise
Clause. .................................................... 23

    III.  A Preliminary Injunction Is Not in the
Public Interest. ............................................... 28

CONCLUSION ........................................................... 30

CERTIFICATE OF SERVICE .............................................. 32

CERTIFICATE OF COMPLIANCE ....................................... 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1000 Friends of Oregon v. U.S. Forest Service*,
   1992 WL 151538 (D. Ore., June 18, 1992) ....................................... 29

*American Hotel and Lodging Association v. City of Los Angeles*,
   834 F.3d 958 (9th Cir. 2016)................................................... 30

*Attakai v. U.S.*,
   746 F. Supp. 1395 (D. Ariz. 1990)........................................... 16

*Barker v. Conroy*,
   921 F.3d 1118 (D.C. Cir. 2019) .............................................. 22

*Boumediene v. Bush*,
   553 U.S. 723 (2008) ........................................................ 23

*Bowen v. Roy*,
   476 U.S. 693 (1986) ........................................................ 12

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) .................................................... 23, 24

*Curtis v. School Committee of Falmouth*,
   420 Mass. 749, 652 N.E.2d 580 (Mass. 1995)................................... 14

*El-Shifa Pharmaceutical Industries Co. v. U.S.*,
   607 F.3d 836 (D.C. Cir. 2010) .............................................. 21

*Employment Div., Dept. of Human Resources of Oregon v. Smith*,
   494 U.S. 872 (1990) ......................................................... 9

*Enquist v. Oregon Dept. of Agric.*,
   553 U.S. 591 (2008) ........................................................ 17

*Espinoza v. Montana Department of Revenue Supreme Court
   of the United States*,
   140 S. Ct. 2246 (2020) ..................................................... 23

iv

*File v. Kastner*,
    469 F. Supp. 3d 883 (E.D. Wisc. 2020) ................................................. 19

*La Cuna De Aztlan Sacred Sites Protection Circle Advisory Comm. v.*
    *United States Department of Interior*,
    2014 WL 12597035 (C.D. Cal., June 20, 2014) ................................... 17

*Listecki v. Official Committee of Unsecured Creditors*,
    780 F.3d 731 (7th Cir. 2015) ................................................................. 21

*Lyng v. Northwest Indian Cemetery Protective Ass'n*,
    485 U.S. 439 (1988) .............................................................. *passim*

*Manzanita Band of Kumeyaay Nation v. Wolf*,
    496 F. Supp. 3d 257 (D.D.C. 2020) ...................................................... 16

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
    138 S. Ct. 1719 (2018) ......................................................... 25, 26, 27

*Merrick v. Farmers Ins. Group*,
    892 F.2d 1434 (9th Cir. 1990) .............................................................. 28

*Navajo Nation v. U.S. Forest Service*,
    535 F.3d 1058 (9th Cir. 2008) ......................................... 7, 8, 13, 18, 19

*Olson v. Paine, Webber, Jackson & Curtis, Inc.*,
    806 F.2d 731 (7th Cir. 1986) ................................................................. 19

*Parents for Privacy v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) ........................................................ 24, 25

*Rasul v. Myers*,
    512 F.3d 644 (D.C. Dir. 2008) .............................................................. 23

*San Jose Christian College v. City of Morgan Hill*,
    360 F.3d 1024 (9th Cir. 2004) .............................................................. 25

*Slockish v. United States Federal Highway Administration*,
    2018 WL 4523135 (D. Ore., Mar. 2, 2018) ......................................... 16

*Snoqualmie Indian Tribe v. F.E.R.C.*,
    545 F.3d 1207 (9th Cir. 2008) ........................................................ 14, 18

*South Fork Band v. U.S Dept. of Interior*,
   643 F. Supp. 2d 1192 (D. Nev. 2009) .................................................. 13

*Stagg v. Department of State*,
   673 Fed. Appx. 93 (2d Cir. 2016)........................................................ 29

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
   239 F. Supp. 3d 77 (D.D.C. 2017) .................................................... 13, 14, 15, 16

*Stormans, Inc. v. Wiesman*,
   794 F.3d 1064 (9th Cir. 2015)............................................................. 24, 28

*Sutton v. Providence St. Joseph Medical Center*,
   192 F.3d 826 (9th Cir. 1999)............................................................... 20

*Thiry v. Carlson*,
   887 F. Supp 1407 (D. Kan. 1995)........................................................ 14

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
   137 S. Ct. 2012 (2017) ........................................................................ 18

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ........................................................................ 22

*United States v. Hardman*,
   297 F.3d 1116 (10th Cir. 2002)........................................................... 13, 15

*Van Stry v. McCrea*,
   2020 WL 1812586 (E.D. Tex., Apr. 9, 2020)...................................... 20

*Village of Bensenville v. Federal Aviation Admin*,
   457 F.3d 52 (D.C. Cir. 2006) .............................................................. 21

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008) ................................................................................ 10, 29

**Statutes**

16 U.S.C. § 539p...................................................................................... 4

42 U.S.C. § 2000bb.................................................................................. *passim*

**Rules**

Fed. R. App. P. 29 ................................................................. 5

Fed. R. App. P. 29(a)(4)(E) .................................................. 5

**Other Authorities**

*Amicus Brief of the Jewish Coalition for Religious Liberty, et. al*,
    No. 21-15295, (Mar. 25, 2021) ............................................ 7

Ernest Scheyder, *Arizona mining fight pits economy, EVs against
    conservation, culture*, YAHOO FINANCE (April 19, 2021) ................... 6

Ernest Scheyder, *Explainer-What's next for Rio Tinto's Arizona copper
    project after U.S. land swap*, Reuters (Jan. 5, 2021) .......................... 20

Felica Fonseca, *Mayor: Superior can't reach full potential without mine*,
    THE WASH. TIMES (April 13, 2021) .................................................. 1, 3, 5

*Genesis* 4:9 ............................................................................. 23

Ira C. Lupu & Robert W. Tuttle, *The Forms and Limits of Religious
    Accommodation: The Case of RLUIPA*,
    32 Cardozo L. Rev. 1907 (2010) ......................................................... 22

*Leviticus* 19:16 ....................................................................... 23

Mark Cowling, *Pinal board writing to Biden in support of Resolution
    Copper*, FLORENCE REMINDER & BLADE-TRIBUNE (March 24, 2021) ...... 6

Mayor Ramsey, Mila Besich of Superior, and Mayor Dean Hetrick
    of Hayden, *Mayors' Ltr. To President Biden*,
    FACEBOOK (Mar. 17, 2021) .................................................. 3, 4, 10

*Resolution of The Mayor and Town Council of the Town of Kearny*,
    Resolution No. 13-697 (Mar. 18, 2013)................................................. 2

Ryan Randazzo, *McCain was crucial backer of Superior copper
    mine for jobs and national security*, THE REPUBLIC, (Aug. 31, 2018) ....... 5

*U.S. Senate Committee on Energy and Natural Resources*,
    112 Cong. 486 (2012) (statement of Senator Jon Kyl) ...................... 1

Victoria Harker, *Delay of mine in "Copper Corridor" could have "devastating" effects on economy in region*,
  CHAMBER BUSINESS NEWS (Mar. 15, 2021)......................................... 3

## IDENTITY AND INTEREST OF *AMICI CURIAE*

Superior, Kearny, and Hayden are critical parts of Arizona's Copper Corridor. They share a storied legacy as an important center for the mining industry. The copper ore deposit in Superior, for instance, is estimated to be the largest in North America, adding substantially to Superior's and the State of Arizona's position as a national producer and exporter of Copper in the United States.

These towns are more than just copper, however. They are preferred destinations for hikers, mountaineers, bikers, and nature enthusiasts from across the world who want to experience some of the most majestic beauty in the American West. *See, e.g.*, Felica Fonseca, *Mayor: Superior can't reach full potential without mine*, THE WASH. TIMES (April 13, 2021), https://www.washingtontimes.com/news/2021/apr/13/mayor-superior-cant-reach-full-potential-without-m/ ("The mayor of a small community in Arizona's copper corridor likes to think of Superior as a town with a mine, not a mining town.").

Hayden, for its part, was identified as far back as 2012 by former Arizona Senator Jon Kyl as part of the "Copper Triangle," which would benefit from the land transfer. *See U.S. Senate Committee on Energy and Natural Resources*, 112 Cong. 486 (2012) (statement of Senator Jon Kyl), https://www.govinfo.gov/content/pkg/CHRG-112shrg75271/html/CHRG-112shrg75271.htm ("One of the reasons why this land exchange is necessary is there

is something called the copper triangle. It involves cities in Arizona called Globe, Miami, and Superior, and then Winkelman and Hayden. … [A]s Senator McCain said, the richest ore body—third richest in the world, and it would provide 25 percent of our copper."), Kearny, similarly, has embraced the transfer as part of its commitment to economic diversity of the local economy. *See Resolution of The Mayor and Town Council of the Town of Kearny*, Resolution No. 13-697 (Mar. 18, 2013),

https://gosar.house.gov/sites/gosar.house.gov/files/kearny%20resolution%20of%20support.pdf.

But Plaintiff-Appellant's suit, including its appeal to enjoin the land transfer at issue, threatens Superior's, Hayden's, and Kearny's economies and its futures more broadly. For these reasons, Superior, Hayden, and Mayor Ramsey file this *Amicus Curiae* brief.

**INTRODUCTION**

As the Defendant-Appellee noted in oral argument before the District Court, the land exchange at issue "was approved by Congress in 2014 and was found to be in the public interest, placing thousands of acres of land into conservation and federal stewardship, but also generating valuable minerals jobs and economic development in Arizona." ER041; *see also* Fonseca, *Mayor*, April 13, 2021 ("[Superior Mayor] Besich said she can't refute what tribes hold sacred, just as tribes can't speak for Superior. She and several other mayors and elected officials wrote to President Joe Biden last month, saying they're 'gravely concerned' that delaying the copper mine will cause irreparable harm to the region and their way of life."); Victoria Harker*, Delay of mine in "Copper Corridor" could have "devastating" effects on economy in region*, CHAMBER BUSINESS NEWS (Mar. 15, 2021), https://chamberbusinessnews.com/2021/03/15/resolutioncopper/ ("Having a steady home-grown copper supply will be a competitive advantage for U.S. manufacturing companies, said business and economic development groups who have worked through the process. Arizona stands to benefit tremendously.").

The March 17, 2021 letter, sent by Mayor Ramsey, Mayor Besich of Superior, and Mayor Dean Hetrick of Hayden, addressed the context of the potential cancellation of the land exchange, and noted:

> Let us be clear: we love and honor our Native American brethren
> and sisters. Their voices must be heard and respected. They deserve

3

a seat at the table. Ten tribes participated in this process and their voices need to heard and respected too. And, so do the voices of small communities and stakeholders such as ours who see this new mine as an economic lifeline to our economically challenged communities.

Mayor, Mila Besich, *Mayors' Ltr. To President Biden*, FACEBOOK, (Mar. 17, 2021),

https://www.facebook.com/MayorMilaBesich/photos/pcb.2956321347981433/2956321307981437.[2]

The truth is that Congress carefully weighed and considered the issues attendant to the land transfer at issue under 16 U.S.C. § 539p. It had the opportunity to hear testimony on the questions surrounding religious practice, and nevertheless made the judgment to engage in the land transfer at issue in this case. The late Arizona Senator John McCain made the project part of his legacy, convincing

---

[2] Note that each page of this letter posted on Facebook has a different Universal Resource Locator, or URL:
Page 1:
https://www.facebook.com/MayorMilaBesich/photos/pcb.2956321347981433/2956321297981438
Page 2:
https://www.facebook.com/MayorMilaBesich/photos/pcb.2956321347981433/2956321307981437
Page 3:
https://www.facebook.com/MayorMilaBesich/photos/pcb.2956321347981433/2956321291314772

Democrats and Republicans to support it in the interests of national security, at a

time when not many things in Washington, D.C. could achieve bipartisan consensus:

> McCain said the nearly decade-long effort to move the land swap through Congress was one of the three or four most difficult challenges he faced in Washington.

> Two months after his visit, McCain got the land swap added to a must-pass Defense Department spending bill, and the Senate passed the measure 89-11 before the Christmas recess.

> President Barack Obama later signed the bill into law.

> McCain took credit for putting the mine on the defense bill.

> "I think it has a lot to do with national security," McCain said at the time. "This mine, when it's fully operational, will supply 25 percent of America's copper supply, and that is a national security issue."

Ryan Randazzo, *McCain was crucial backer of Superior copper mine for jobs and national security*, THE REPUBLIC, (Aug. 31, 2018), https://www.azcentral.com/story/news/politics/arizona/2018/08/31/sen-john-mccain-legacy-resolution-copper-project-near-superior-arizona/1110685002/.

Congress concluded, correctly, that the land exchange was beneficial public policy, and good for the United States. *See id.* ("Before they can dig for copper, Resolution needs a federal land swap, trading 2,400 acres of federal land *for 5,300 acres of environmentally sensitive land around the state that Resolution acquired to make the deal*.") (emphasis added); *see also*, Fonseca, *Mayor* ("So far, Resolution Copper has invested in the town's school, a community and business center, and advertising, [Superior Mayor] Besich said. . . . 'This would really set us back

probably two decades at this point if we had to start all over again,' Besich said."); *see also* Mark Cowling, *Pinal board writing to Biden in support of Resolution Copper*, FLORENCE REMINDER & BLADE-TRIBUNE (March 24, 2021), https://www.pinalcentral.com/florence_reminder_blade_tribune/news/pinal-board-writing-to-biden-in-support-of-resolution-copper/article_e36ea00e-867d-56c8-9069-20bf79f4fc88.html ("Local communities, Native American Tribes and other stakeholders actively participated with local, federal and state cooperating agencies to provide meaningful input throughout the process.").

Of course, *amici* do not dispute that Plaintiff-Appellant had a right to engage in concerted lobbying efforts to prevent the land transfer from being enshrined into federal legislation, just as it has the right to engage in similar policy efforts, however ill-advised, to try to cancel the land transfer today. *See* Ernest Scheyder, *Arizona mining fight pits economy, EVs against conservation, culture*, YAHOO FINANCE, (April 19, 2021), https://finance.yahoo.com/news/arizona-mining-fight-pits-economy-100816886.html ("The ongoing fight pits conservationists and Native Americans against local officials and residents who support its economic benefits. . . . The Resolution mine could fill about 25% of the demand for U.S. cooper," a key component of electric vehicles).

But even as Plaintiff-Appellant continues its policy efforts to undo the land exchange, it presently seeks to challenge, as a legal matter, the validity of a land

transfer over land which it does not own, and has no possessory interest in, because, after the government has transferred the land to a private party, that party will allegedly impair Plaintiff-Appellant's religious practices. The scope of this argument, if adopted, cannot be understated. Every time a private party would interact with the federal government—whether over a contract, a lease, a purchase, or a sale—a religious objector may assert that RFRA prevents the federal government from doing so, or at least subjects the pending interaction to strict scrutiny. *See, e.g.*, ER 042 (oral argument before the district court) ("Every action the government took with its own property, so that could be … doing a land exchange, as is the case here, or it could be a timber sale, or it could be anything with even a government federal building, anything could subject to suit by unlimited parade of religious objectors."). Even foreign policy could be vulnerable to RFRA challenges, to the extent that it impaired access or the existence of a holy religious site. *See, e.g.*, *Amicus Brief of the Jewish Coalition for Religious Liberty, et. al*, No. 21-15295, (Mar. 25, 2021), at 17 ("It follows that a destroyed Oak Flat would arguably be even more devastating to the Western Apaches than an obliterated Vatican for Catholics, or a demolished Kaaba (in Mecca) for Muslims.").

Both the Ninth Circuit and the U.S. Supreme Court have held that the type of burden articulated by Plaintiff-Appellant is not, as a legal matter, "substantial." In *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1070–71 (9th Cir. 2008) (en

7

banc), this Court held "[u]nder RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*)." Thus, "[a]ny burden imposed on the exercise of religion short of that described by *Sherbert* and *Yoder* is *not a 'substantial burden' within the meaning of RFRA*, and does not require the application of the compelling interest test set forth in those two cases." *Id.* at 1070 (emphasis added).

This Court should not attempt to revisit this test, which is settled and which appears in numerous cases. Indeed, it was the Plaintiff-Appellant's approach that was embraced by the dissenters in *Navajo Nation*, who failed to carry the day. *Id.* at 1081 (Fletcher, J., dissenting) ("The majority holds that spraying 1.5 million gallons per day of treated sewage effluent on the most sacred mountain of southwestern Indian tribes does not 'substantially burden' their 'exercise of religion' in violation of RFRA."). Moreover, "[p]recisely because we are a cosmopolitan nation made up of people of almost every conceivable religious preference, and precisely because we value and protect that religious divergence, we cannot afford the luxury of deeming *presumptively invalid*, as applied to the religious objector, every regulation of conduct that does not protect an interest of the highest order."

*Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 888 (1990) (internal quotation marks and citations omitted) (original emphasis).

The Court should also forcefully reject Plaintiff-Appellant's argument that the land transfer is somehow not a neutral, generally applicable policy. If the Court indulged such an argument in this case, there is likely no end to the sorts of policies that could be implicated. And to the extent that Plaintiff-Appellant's argument regarding the Free Exercise Clause is adopted, numerous state and local laws will also be subject to the same religious objections, and to strict scrutiny.

## STATEMENT OF THE CASE

Amici has long been counting on the land transfer at issue to occur. Indeed, the towns at issue have themselves interacted with tribal representatives during the process. As the local mayors noted in the March 17, 2021 letter described above:

> We have actively participated in the process from the moment legislation was signed into law in 2014 as did every community and stakeholder in the region.

> Ten of the 11 tribes in the region actively participated in the process as well. One tribe chose not to participate in the process and most likely has no intention of doing so. But, because they have objected vociferously and garnered sympathy from many individuals and the media in the U.S. and around the world who have never been to our region, this process has been halted. This is patently unfair to those communities, tribes and stakeholders that worked tirelessly to forge an agreement with the mine to mitigate many of the impacts from this activity.

Mayor, Mila Besich, *Mayors' Ltr. To President Biden*, FACEBOOK, (Mar. 17, 2021),

https://www.facebook.com/MayorMilaBesich/photos/pcb.2956321347981433/295

6321307981437.   The letter went on to highlight how the land exchange was

beneficial to the communities at issue, and how it would have positive effects on the

region.

> As leaders in Arizona's Copper Corridor, we are keenly aware of the
> role this industry serves in developing clean energy and continued
> technological advancement.  We also have first-hand experience in
> navigating through the boom-and-bust cycles of the mining industry.
> We all have worked hard to create more resilient and economically
> diverse communities, and to become less dependent on extraction
> industry.  The mining industry is important to our region and state,
> not only through the private capital investment and jobs that it
> generates, but also the other direct and indirect benefits that accrue
> to communities where it is based.

*Id.*,

https://www.facebook.com/MayorMilaBesich/photos/pcb.2956321347981433/295

6321297981438.   Nevertheless, Plaintiff-Appellant now lodges a challenge to a

process that began in 2014, relying on a dubious theory regarding the Religious

Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb.  The Court should swiftly

reject the effort to recast RFRA and Free Exercise caselaw as supportive of this

challenge.

## SUMMARY OF THE ARGUMENT

A preliminary injunction is an extraordinary remedy that may only be awarded

upon a clear showing that the plaintiff is entitled to such relief.  *See Winter v. Natural*

*Res. Def. Council*, 555 U.S. 7, 22 (2008). To succeed, a plaintiff seeking a preliminary injunction must establish the following: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury to the plaintiff if injunctive relief is not granted; (3) a balance of hardships favoring the plaintiff; and (4) advancement of the public interest. Plaintiff-Appellant cannot establish a likelihood of success on the merits, nor would a preliminary injunction be in the public interest. *Id.* at 20. In any event, Plaintiff-Appellant cannot establish that it was an abuse of discretion for the district court to deny a preliminary injunction in this case.

Indeed, a decision holding that a private party may challenge a land exchange between the government and another entity under RFRA courts serious danger to our constitutional order. With respect to America's storied history of religious freedom, it simply cannot be the case that any religious practice can be used to stop the federal government from engaging in an interaction with a third party.

Indeed, for this reason, even where it was the government impairing a religious right—and not even a private party completely unbound by RFRA—Plaintiff-Appellant's argument has been explicitly rejected by the U.S. Supreme Court. *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 453 (1988) ("Whatever rights the Indians may have to the use of the area, however, those rights do not divest the Government of its right to use what is, after all, *its* land.") (original emphasis); *see id.* at 450–51 ("This does not and cannot imply that

incidental effects of government programs, which may make it more difficult to practice certain religions but which have *no tendency to coerce individuals into acting contrary to their religious beliefs*, require government to bring forward a compelling justification for its otherwise lawful actions.") (emphasis added); *see also Bowen v. Roy*, 476 U.S. 693, 699 (1986) ("Never to our knowledge has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family.") (original emphasis).

Indeed, Plaintiff-Appellant embraces precisely the argument rejected in *Lyng,* which was advanced by the dissenters:

> [The Court's] astonishing conclusions follow naturally from the Court's determination that *federal land-use decisions that render the practice of a given religion impossible do not burden that religion in a manner cognizable under the Free Exercise Clause, because such decisions neither coerce conduct inconsistent with religious belief nor penalize religious activity*. … Because the Court today refuses even to acknowledge the constitutional injury respondents will suffer, and because this refusal *essentially leaves Native Americans with absolutely no constitutional protection against perhaps the gravest threat to their religious practices*, I dissent.

*Lyng*, 485 U.S. at 458–59 (Brennan, J., dissenting) (emphasis added).

Moreover, consistent with Ninth Circuit precedent, the land transfer at issue in this case must be construed as a neutral policy. Indeed, this is especially important, since the Free Exercise Clause binds not only the federal government, as

RFRA does, but all states and localities as well. If the instant land transfer is subject to strict scrutiny, so will be a host of local, state, and other federal actions.

Amici take no position on the argument advanced by Plaintiff-Appellant that the land transfer constitutes a breach of the federal government's trust duty, save for the fact that the requested injunction does not benefit the public interest.

## ARGUMENT

### I.  Plaintiff-Appellant's alleged injury will not rise to the level of the legal definition of "substantial burden."

Because *Lyng* remains good law with respect to whether the practice of religion is substantially burdened, this Court may not choose to sidestep the majority in *Lyng* and adopt the logic of the dissenters in that case.  *See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 239 F. Supp. 3d 77, 93 (D.D.C. 2017) ("When drafting and debating RFRA, Congress expressly noted that RFRA did not undermine *Lyng*."); *United States v. Hardman*, 297 F.3d 1116, 1143 (10th Cir. 2002) (Hartz, J., concurring) ("Although *Lyng* has been criticized, RFRA does not purport to affect the law set forth in that opinion."); *South Fork Band v. U.S Dept. of Interior*, 643 F. Supp. 2d 1192, 1207 n.8 (D. Nev. 2009) (overturned on other grounds) ("Although *Lyng* predates the enactment of RFRA, in *Navajo Nation* the Ninth Circuit made clear that the Court's reasoning in *Lyng* applies equally to RFRA cases.").

An entire body of caselaw has developed rejecting the idea that a transaction between the government and a third-party entity might nevertheless substantially burden the religion of another individual. *See Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207, 1214 (9th Cir. 2008) ("[T]he Tribe's arguments that the dam interferes with the ability of tribal members to practice religion are irrelevant to whether the hydroelectric project either forces them to choose between practicing their religion and receiving a government benefit or coerces them into a Catch–22 situation."); *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 239 F. Supp. 3d 77, 91 (D.D.C. 2017) ("The government action here—i.e., granting the easement to Dakota Access and thereby enabling the flow of oil beneath Lake Oahe—does not impose a sanction on the Tribe's members for exercising their religious beliefs, nor does it pressure them to choose between religious exercise and the receipt of government benefits."); *Thiry v. Carlson*, 887 F. Supp 1407, 1413 (D. Kan. 1995) (rejecting RFRA claim even where "[t]he gravesite and the area immediately surrounding it is a place which holds special meaning for the Thirys. They practice their religious beliefs by visiting the area to be near the spirit of their deceased child and to worship and pray."); *Curtis v. School Committee of Falmouth*, 420 Mass. 749, 652 N.E.2d 580 (Mass. 1995) (rejecting Free Exercise challenge evaluated under pre-*Smith* caselaw to condom-availability plan in public high school, where plaintiffs argued that the school's endorsement of the plan conflicted

with the parents' religion); *cf. Hardman*, 297 F.3d at 1143 (Hartz, J., concurring) (opining that the government's use and maintenance of the National Eagle Repository does not violate RFRA, based on *Lyng*).

Plaintiff-Appellant cannot properly distinguish these cases on the basis that the damage that may be done to Oak Flat is worse than the damage contemplated in other cases. Plaintiff-Appellant's Opening Brief, at 35. That argument simply attempts to squeeze distinctions out of minor differences in fact patterns that have no impact on the attendant legal conclusions. *See, e.g.*, *Standing Rock Sioux Tribe*, 239 F. Supp. 3d at 92 ("Cheyenne River's religious-exercise claim is much like the one at issue in *Lyng*. It involves a government action—granting an easement to Dakota Access to build and operate a pipeline—regarding the use of federal land— the land under Lake Oahe, as discussed infra—that has an incidental, *if serious*, *impact on a tribe's ability to practice its religion because of spiritual desecration of a sacred site*. Just as the government's tree cutting and road building in *Lyng* did not give rise to an actionable Free Exercise claim, neither does its easement granting here likely violate RFRA."); *see id.* at 92 ("As should be evident from the language it used to discuss the impact on the tribe's religious exercise—e.g., 'devastating' and 'extremely grave,'—the Supreme Court [in *Lyng*] was not unsympathetic to the plight of the affected individuals.") (internal citations omitted).

Nor, even if it were true as a matter of fact that the damage done to Oak Flat is worse than in other cases rejecting Plaintiff-Appellant's theory, would it be material to this case. *See Attakai v. U.S.*, 746 F. Supp. 1395, 1403 (D. Ariz. 1990) ("The fact that a person's ability to practice their religion will be *virtually destroyed* by a governmental program does not allow them to impose a religious servitude on the property of the government, much less property which the government holds in trust for another sovereign Indian tribe.") (emphasis added); *see also Standing Rock Sioux Tribe*, 239 F. Supp. 3d at 92, 97–98 ("[T]he Supreme Court would have reached the same result in *Lyng*—no substantial burden—had the construction of the road *totally destroyed* the affected tribe's ability to practice its religion.") (emphasis added); *Slockish v. United States Federal Highway Administration*, Case No. 3:08-cv-01169-YY, 2018 WL 4523135, *5 (D. Ore., Mar. 2, 2018) ("There [in *Lyng*] the Supreme Court held that even assuming that the government's actions would 'virtually destroy' the Native Americans' ability to practice their religion the Constitution simply does not provide a principle that could justify upholding their legal claims.") (internal ellipses and brackets omitted); *Manzanita Band of Kumeyaay Nation v. Wolf*, 496 F. Supp. 3d 257, 267 (D.D.C. 2020) ("Through the lens of *Lyng* then, damage to the surrounding areas—*even those integral to the Kumeyaay religion and culture*—that is incidental to the Government's use of its

16

own land fails to meet the heightened standard for irreparable harm.") (emphasis added).

Plaintiff-Appellant responds that it is problematic, as a matter of plain English, to argue that the complete destruction of a religious site is not a "substantial burden." Plaintiff-Appellant's Opening Brief, at 31. But the truth is that this case demands a legal outcome, not a linguistic one. *Cf. Enquist v. Oregon Dept. of Ag.*, 553 U.S. 591, 603–04 (2008) (offering hypothetical of rejecting an Equal Protection Clause challenge by a ticketed driver who claimed that everyone on the road was speeding, even though it "may be good English to say that the officer has created a class of people that did not get speeding tickets, and a 'class of one' that did."). Courts have consistently rejected legal challenges involving burdens falling exclusively on third parties. *E.g.*, *Lyng*, 485 U.S. at 451–52 ("Even if we assume that we should accept the Ninth Circuit's prediction, according to which the G–O road will 'virtually destroy the ... Indians' ability to practice their religion,' the Constitution simply does not provide a principle that could justify upholding respondents' legal claims. However much we might wish that it were otherwise, government simply could not operate if it were required to satisfy every citizen's religious needs and desires."); *La Cuna De Aztlan Sacred Sites Protection Circle Advisory Comm. v. United States Department of Interior*, EDCV 11-1478-GW(SSx), 2014 WL 12597035, *7 (C.D. Cal., June 20, 2014) ("Central to all of these cases,

17

and to Free Exercise cases generally, are notions of *coercion* or *compulsion* to act against religious precepts. Without it, there can be no Free Exercise clause violation—or, in the words of RFRA, no 'substantial burden'—even if the governmental conduct has a significant incidental impact on a person's religious exercise.") (original emphasis); *id.* at *7 ("Unlike in *Sherbert*, but like in *Lyng*, *Navajo Nation*, and *Snoqualmie*, the undisputed evidence shows that Federal Defendants' approval of the Project did not put Plaintiffs to a choice between obtaining a government benefit—Project site access—and abandoning their religious precepts. Indeed, Plaintiffs never even claim (nor could they given the undisputed facts) that Federal Defendants conditioned their access to the Project site on forgoing religious exercise. As a result, *Plaintiffs cannot show a Sherbert-type 'substantial burden' under RFRA*.") (emphasis added).

To the extent that the Plaintiff-Appellant contends that the law must change to account for the usage of individual words in RFRA, it must acknowledge the extensive history in this area, and cannot piece together a jurisprudential counternarrative from stray statements in inapposite cases. Indeed, the Supreme Court has indicated the vitality of *Lyng* in its very recent caselaw. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017) (describing *Lyng*) ("Accepting that the building of a road or the harvesting of timber would interfere significantly with private persons' ability to pursue spiritual fulfillment according to

18

their own religious beliefs, we nonetheless found no free exercise violation, because the affected individuals were not being coerced by the Government's action into violating their religious beliefs."). In short, Plaintiff-Appellant's arguments are significantly constrained by the caselaw on this point. *See also Navajo Nation,* 535 F.3d 1058, 1081 (citing dictionary definitions in dissent for the definition of "substantial burden").

Similarly, it is improper to suggest that the Supreme Court has impliedly modified *Lyng* or its applicability to modern RFRA cases by way of recent caselaw involving direct burdens between the government and an individual. *See, e.g.*, *Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806 F.2d 731, 734 (7th Cir. 1986) ("We must consider therefore whether this is one of those rare cases where circumstances have created a near certainty that only the occasion is needed for the pronouncement by the Supreme Court of the doom of an obsolete doctrine.") (internal brackets and quotation marks omitted); *File v. Kastner*, 469 F. Supp. 3d 883, 890 (E.D. Wisc. 2020) ("[B]efore a lower court may conclude that the Supreme Court has implicitly overruled one of its precedents, the lower court must be certain or almost certain that the decision or doctrine would be rejected by the higher court if a case presenting the issue came before it. This is a high standard and will rarely be met.") (internal quotation marks and citations omitted). Neither Plaintiff-Appellant nor *amici* on their behalf can make any such showing.

19

Indeed, it is even an open question whether RFRA applies to government conduct where a private party is the would-be entity triggering a substantial burden, as opposed to the government, since RFRA does not apply to private parties. *See Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 834 (9th Cir. 1999) (emphasizing that RFRA applies only to government conduct or conduct of a person acting under color of law); *Van Stry v. McCrea*, Case No. 2:19-CV-00104-WCB, 2020 WL 1812586, *7 (E.D. Tex., Apr. 9, 2020) (RFRA cannot be asserted as a defense to a private action for copyright infringement). The fact that a private party may substantially burden religious practices at some indefinite point in the future is hardly the usual fact pattern for RFRA cases. *See* Ernest Scheyder, *Explainer-What's next for Rio Tinto's Arizona copper project after U.S. land swap*, Reuters (Jan. 5, 2021), https://www.reuters.com/article/us-usa-mining-resolution-land-explainer-idUSKBN29A2GC ("After obtaining permits, Rio would need to make a final investment decision. The company said tribal members will be able to continue to access the land for the next few decades."). In short, the harm that Plaintiff-Appellant alleges is not harm that the federal government is itself undertaking. *Accord Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 840 (9th Cir. 1999) (allowing a constitutional claim against a private actor to go forward only because it was "jointly pursuing an unconstitutional end" with a state actor).

Even where the government plays a role in a transaction that directly burdens an individual's religious practice, RFRA does not apply. *Listecki v. Official Committee of Unsecured Creditors*, 780 F.3d 731, 738 (7th Cir. 2015) ("[A] creditor's committee is a combination of private decisions, Trustee appointment, and court supervision, with the private actions providing the qualifying criteria for appointment. This is not action that can be fairly treated as that of the State itself."); *Village of Bensenville v. Federal Aviation Admin*, 457 F.3d 52, 66 (D.C. Cir. 2006) ("Where the FAA cannot be said to in any way foster or encourage the burden on religious exercise, the simple device of characterizing the FAA's inaction as 'authorization' or 'encouragement,' is insufficient to justify imposition of RFRA's compelling interest test.") (internal citations, brackets, and quotation marks omitted).

Imagine the breadth of the scope of Plaintiff-Appellant's argument: pacifists might sue over government-contracted weapons development; religions holding that a particular animal is sacred might sue to stop government-backed loans related to cattle ranching. Even foreign policy questions, normally restrained from the judiciary's purview, would become justiciable. *See El-Shifa Pharmaceutical Industries Co. v. U.S.*, 607 F.3d 836, 841 (D.C. Cir. 2010) ("Disputes involving foreign relations, such as the one before us, are quintessential sources of political questions.") (internal quotation marks omitted). This is because such questions have

21

been committed, as an initial matter, to other branches of government. *Barker v. Conroy*, 921 F.3d 1118, 1136 (D.C. Cir. 2019) ("A claim raises such a question if it involves a textually demonstrable constitutional commitment of the issue to a coordinate political department.") (internal quotation marks omitted). But did Congress hand those "political questions" *back* to the courts under RFRA?[3] *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2407 (2018) (proceeding with review of statutory Immigration and Nationality Act claim after assuming reviewability, and noting that the Court had previously reviewed similar claims); *see id.* at 2407 ("[B]ecause exclusion of aliens is a fundamental act of sovereignty by the political branches, review of an exclusion decision is not within the province of any court, *unless expressly authorized by law*.") (emphasis added). If transferring land to a private party in Arizona is subject to the religious objections of a third party, why not tactical military operations in the Middle East? Certainly, the same types of religious objections would be made to operations affecting holy sites on the other side of the

_____

[3] Some commentators have even suggested that RFRA itself overcame the Court's instinct in *Smith* that the practice of scrutinizing the measure of a religious burden was outside the expertise of the judiciary. Ira C. Lupu & Robert W. Tuttle, *The Forms and Limits of Religious Accommodation: The Case of RLUIPA*, 32 CARDOZO L. REV. 1907, 1917–18 (2010) (quoting *Smith's* statement that: "Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim."); *see id.* at n. 53 ("This concept [announced in *Smith*] is analogous to the doctrine of political questions, which precludes decision of certain constitutional issues because of a lack of judicially discoverable and manageable standards for resolving them.") (internal quotation marks omitted).

world.  In short, there is no end to the logic that any individual can lodge a religious objection to conduct undertaken by the government with respect to a third party.[4]

## II. The Land Transfer at Issue in this Matter is a Facially Neutral Policy, and not Subject to Heightened Scrutiny Under the Free Exercise Clause.

"The Free Exercise Clause … protects religious observers against unequal treatment and against laws that impose special disabilities on the basis of religious status." *Espinoza v. Montana Department of Revenue Supreme Court of the United States*, 140 S. Ct. 2246, 2255 (2020) (internal quotation marks omitted).  The instant land transfer implicates neither of these concerns.

As much as any federal policy that affects a single item or issue, the land transfer is a generally applicable law that does not target religion.  It is neither overinclusive nor underinclusive.  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 545 (1993) (evaluating underinclusivity of a law with respect

---

[4] Consider, also, cases where RFRA objections have previously failed, such as in the case of Guantanamo Bay detainees.  *See Rasul v. Myers*, 512 F.3d 644, 671 (D.C. Dir. 2008) (vacated on other grounds by *Boumediene v. Bush*, 553 U.S. 723 (2008)) ("We believe that RFRA's use of 'person' should be interpreted consistently with the Supreme Court's interpretation of 'person' in the Fifth Amendment and 'people' in the Fourth Amendment to exclude non-resident aliens.").  These sorts of claims would suddenly come back to life, if only the plaintiff were a co-religionist asserting that an injustice done to his brother was an injustice done to himself.  *See, e.g.*, *Genesis* 4:9 ("Afterward the Lord asked Cain, 'Where is your brother? Where is Abel?' 'I don't know,' Cain responded. 'Am I my brother's guardian?'"); *Leviticus* 19:16, ("Do not stand idly by when your neighbor's life is threatened.  I am the Lord.").

to its stated goals). Its terms burden no person more, or less, based on their religion. *Parents for Privacy v. Barr*, 949 F.3d 1210, 1236 (9th Cir. 2020) ("[T]he Student Safety Plan affects all students and staff—it does not place demands on exclusively religious persons or conduct."). Individuals may have objections to copper mining either of a religious or non-religious nature. *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1077 (9th Cir. 2015) ("The possibility that pharmacies whose owners object to the distribution of emergency contraception for religious reasons may be burdened disproportionately does not undermine the rules' neutrality. The Free Exercise Clause is not violated even if a particular group, motivated by religion, may be more likely to engage in the proscribed conduct."). In short, the land transfer is not the type of transaction that smacks of targeting or non-neutrality.

When reviewing the government's actions under the Free Exercise Clause, courts determine whether laws treat religious and non-religious persons equally, or whether such laws are motivated by anti-religious animus. *See Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 542–43 ("All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice. The Free Exercise Clause protects religious observers against unequal treatment, and inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation.") (internal citation and

quotation omitted). The Free Exercise Clause does not implicate laws that are generally applicable, even in those cases where a law *does* pertain to specific individuals or groups. *Parents for Privacy v. Barr*, 949 F.3d 1210, 1234 (9th Cir. 2020) ("[N]eutrality and general applicability are considered with respect to religion rather than with respect to the person or groups to which the law most directly pertains."); *see id.* at 1235 ("Plaintiffs' complaint contains no allegation suggesting that the Student Safety Plan was adopted with the object of suppressing the exercise of religion.").

Here, a land transfer is just a land transfer. The law itself is generally applicable, to the extent any law about specific pieces of land can be. *See San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004) ("If the zoning law is of general application and is not targeted at religion, it is subject only to rational basis scrutiny, even though it may have an incidental effect of burdening religion."). The terms of transfer achieve the aims of the parties involved in the transaction, and any disparate impact on the Plaintiff-Appellant's religious practices is incidental thereto.

With respect to the alleged statements by legislator cited by Plaintiff-Appellant, it is true that every citizen has a right to be free of government action that targets for disadvantage the individual on account of religious practice. *See Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719,

25

1732 (2018) ("Phillips was entitled to a neutral decisionmaker who would give full and fair consideration to his religious objection as he sought to assert it in all of the circumstances in which this case was presented, considered, and decided.").

In *Masterpiece Cakeshop*, of course, the very adjudicatory body deciding the Petitioner's case had engaged in vile efforts to insult the Petitioner and his religious beliefs. The U.S. Supreme Court described the proceedings at length, noting that the Colorado Civil Rights Commission had broadly engaged in discriminatory rhetoric regarding religion:

> At several points during its meeting, commissioners endorsed the view that religious beliefs cannot legitimately be carried into the public sphere or commercial domain, implying that religious beliefs and persons are less than fully welcome in Colorado's business community. One commissioner suggested that Phillips can believe "what he wants to believe," but cannot act on his religious beliefs "if he decides to do business in the state." A few moments later, the commissioner restated the same position: "[I]f a businessman wants to do business in the state and he's got an issue with the—the law's impacting his personal belief system, he needs to look at being able to compromise.
>
> …
>
> On July 25, 2014, the Commission met again. This meeting, too, was conducted in public and on the record. On this occasion another commissioner made specific reference to the previous meeting's discussion but said far more to disparage Phillips' beliefs. The commissioner stated:
>
> "I would also like to reiterate what we said in the hearing or the last meeting. Freedom of religion and religion has been used to justify all kinds of discrimination throughout history, whether it be slavery,

> whether it be the holocaust, whether it be—I mean, we—we can list hundreds of situations where freedom of religion has been used to justify discrimination. And to me it is one of the most despicable pieces of rhetoric that people can use to—to use their religion to hurt others."

*Id.* at 1729. The Court had little trouble finding that "to describe a man's faith as 'one of the most despicable pieces of rhetoric that people can use' is to disparage his religion in at least two distinct ways: by describing it as despicable, and also by characterizing it as merely rhetorical—something insubstantial and even insincere." *Id.* at 1729.

Separately, in *Masterpiece Cakeshop*, the Court relied on the decision of the Colorado Civil Rights Commission in another matter, in which a baker had asserted a right of conscience against making a cake due to the religious messages on the cake that the baker considered offensive. *See id.* at 1730 ("Another indication of hostility is the difference in treatment between Phillips' case and the cases of other bakers who objected to a requested cake on the basis of conscience and prevailed before the Commission."). That the Colorado Civil Rights Commission had engaged in such obvious discrimination on the basis of religion was key to the Court's decision. *See id.* at 1732–33 (Kagan, J., concurring) ("The Court partly relies on the 'disparate consideration of Phillips' case compared to the cases of three other bakers' who 'objected to a requested cake on the basis of conscience.' … The Court finds that the legal reasoning of the state agencies differed in significant ways as between

27

the Jack cases and the Phillips case. … As the Court states, a 'principled rationale for the difference in treatment' cannot be 'based on the government's own assessment of offensiveness.'") (internal citations omitted).

There is no such record of repeated, insulting comments to religion in this case. Nor is there any similarly situated land transfer in the record that was not pursued due to a non-religious group's objection. The Court should thus reject the argument that Plaintiff-Appellant suffered any targeting or unequal treatment under the Free Exercise Clause. *Cf. Stormans, Inc.*, 794 F.3d at 1078 ("Whether a court may examine legislative history in this context remains an open question. Even if we should analyze that history, it does not reveal improper intent. As we explained in *Stormans I*, the administrative history hardly reveals a single design to burden religious practice; rather, it is a patchwork quilt of concerns, ideas, and motivations."); *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir. 1990) ("[S]tray remarks are insufficient to establish discrimination.") (internal quotation marks omitted).

### III.   A Preliminary Injunction Is Not in the Public Interest

Even if Plaintiff-Appellant were likely to prevail on the merits of its RFRA or Free Exercise claims, the Court should deny a request for preliminary injunction. As the media reports noted above make clear, Congress has already decided that the project is one that affects the environment, the community of Superior, Hayden, and

Kearny, and even national security. Worse, if the project is enjoined, even temporarily, it may be halted altogether. Surely these impacts cannot be described as being in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 26 (2008) ("The public interest in conducting training exercises with active sonar under realistic conditions plainly outweighs the interests advanced by the plaintiffs."); *Stagg v. Department of State*, 673 Fed. Appx. 93, 96 (2d Cir. 2016) (unpublished) ("Having carefully scrutinized the specific national security interests presented by the government, we conclude that its stated interests outweigh Stagg's claimed harm.").

Even minor public benefits—which this project far exceeds—have been deemed to outweigh environmental interests in some cases. *See 1000 Friends of Oregon v. U.S. Forest Service*, Civ. No. 92–690–FR, 1992 WL 151538, *4 (D. Ore., June 18, 1992) (denying a preliminary injunction in case where defendant argued, among other things, that the environmental damage at issue was outweighed "by interests of thousands of members of the skiing public in using public land for purposes for which it is designated").

Here the Court must weigh the substantial costs of stopping the land transfer against a set of claims that stretch beyond the limits of RFRA. As discussed above, the Plaintiff-Appellant cannot show how a regular, well-considered land transfer is a substantial burden under RFRA. On the other side of the ledger sits national

security, economic, and other benefits to the localities, state, and nation.  The public is therefore best served by affirming the denial the preliminary injunction.  At the very least, it cannot be said that denial of the preliminary injunction was an abuse of discretion.  *See American Hotel and Lodging Association v. City of Los Angeles*, 834 F.3d 958, 962 (9th Cir. 2016) ("Denial of a preliminary injunction is reviewed for abuse of discretion.").

## CONCLUSION

> A broad range of government activities—from social welfare programs to foreign aid to conservation projects—will always be considered essential to the spiritual well-being of some citizens, often on the basis of sincerely held religious beliefs.  Others will find the very same activities deeply offensive, and perhaps incompatible with their own search for spiritual fulfillment and with the tenets of their religion.  The First Amendment must apply to all citizens alike, and it can give to none of them a veto over public programs that do not prohibit the free exercise of religion.  The Constitution does not, and courts cannot, offer to reconcile the various competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours.  That task, to the extent that it is feasible, is for the legislatures and other institutions. *Cf.* The Federalist No. 10 (suggesting that the effects of religious factionalism are best restrained through competition among a multiplicity of religious sects).

*Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. at 452.

The land transfer at issue, long-debated and considered by Congress, does not implicate either RFRA or the Free Exercise Clause of the First Amendment.  Nor is it in the public interest to grant an injunction pending appeal.  This court should decline to do so.

DATED this the 24th day of May 2021.

Respectfully submitted,

/s/ William E. Trachman
William E. Trachman
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
(303) 292-2021
wtrachman@mslegal.org

Timothy Sandefur
GOLDWATER INSTITUTE
500 E Coronado Rd
Phoenix, AZ 85004
litigation@goldwaterinstitute.org
(602) 462-5000

*Attorneys for Amici Curiae Towns of
Superior and Hayden, Arizona, and Kearny
Mayor Jamie Ramsey*

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2021, I electronically filed the foregoing *Amicus Curiae Mountain States Legal Foundation's Brief in Support of Defendant-Appellee* with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit via the appellate CM/ECF system, which will serve all registered CM/ECF users.

*/s/ William E. Trachman*
William E. Trachman
MOUNTAIN STATES LEGAL FOUNDATION

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 21-15295 _____.

I am the attorney or self-represented party.

**This brief contains 6,941 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ William E. Trachman* _____ **Date** May 24, 2021 _____.
*(use "s/[typed name]" to sign electronically-filed documents)*

33