**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| APACHE STRONGHOLD, a 501(c)(3) nonprofit organization,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>UNITED STATES OF AMERICA; THOMAS J. VILSACK, Secretary, U.S. Department of Agriculture (USDA); RANDY MOORE, Chief, USDA Forest Service; NEIL BOSWORTH, Supervisor, USDA Forest Service, Tonto National Forest; TOM TORRES, Acting Supervisor, USDA Forest Service, Tonto National Forest,<br>*Defendants-Appellees*. | No. 21-15295<br><br>D.C. No. 2:21-cv-00050-SPL<br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
Steven Paul Logan, District Judge, Presiding

Argued and Submitted October 22, 2021
San Francisco, California

Filed June 24, 2022

Before:  Mary H. Murguia, Chief Judge, and Marsha S. Berzon and Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea;
Dissent by Judge Berzon

## SUMMARY[*]

### Religious Freedom Restoration Act / Free Exercise Clause

The panel affirmed the district court's denial of Apache Stronghold's motion for a preliminary injunction seeking to stop a land exchange and prevent any copper mining on Oak Flat, a plot of land in Arizona.

A 2014 act of Congress requires the U.S. Secretary of Agriculture to convey Oak Flat to Resolution Copper, a mining company.  In exchange, Resolution Copper will convey to the United States a series of nearby plots of land (the "Land Exchange").  To the Apache American Indians, Oak Flat, known to the Apache as Chi'chil Bildagoteel, is sacred ground.  Apache Stronghold, a nonprofit organization, sued the government, alleging that the Land Exchange violated the Religious Freedom Restoration Act ("RFRA"), the Free Exercise Clause of the Constitution's First Amendment, and a trust obligation imposed on the United States by the 1852 Treaty of Santa Fe between the Apache and the United States.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Concerning Apache Stronghold's RFRA claim, the panel began by addressing what constituted a "substantial burden" under RFRA.  First, RFRA by its text restored *Sherbert v. Verner*, 374 U.S. 398 (1963), *Wisconsin v. Yoder*, 406 U.S. 205 (1972), their "compelling interest" test, and their "substantial burden" inquiry, and defined a "substantial burden" under RFRA as either of the burdens present in those two cases.  Second, the Supreme Court has used the phrase "substantial burden" as a Free Exercise Clause term of art that meant only the two burdens within the *Sherbert/Yoder* framework, and a "substantial burden" under RFRA must hold that same settled meaning.  Third, *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988), and *Bowen v. Roy*, 476 U.S. 693 (1986), the cases most factually and legally analogous to *Navajo Nation v. United States Forest Service*, 535 F.3d 1058 (9th Cir. 2008) (en banc), and this case, confirmed that even burdensome government action did not constitute a "substantial burden" (and did not trigger the "compelling interest" test) if that action fell outside the *Sherbert/Yoder* framework.

The panel next turned to Apache Stronghold's main argument that the Land Exchange would hand Oak Flat over to Resolution Copper for its mining plan, thus incidentally making it impossible for Apache Stronghold's members to worship on Oak Flat and thereby substantially burdening them.  The panel held that this argument could not succeed in light of *Navajo Nation*.  The Land Exchange's effect on Apache Stronghold's members fell outside of the *Sherbert/Yoder* framework, and thus outside of RFRA's definition of a substantial burden.  No government benefits will be lost (as in *Sherbert*) nor will governmental penalties be imposed (as in *Yoder*).  The Department of Agriculture will simply transfer ownership of a plot of government land

4 APACHE STRONGHOLD V. UNITED STATES

to Resolution Copper, and the Land Exchange does not coerce the Apache to abandon their religion by threatening them with a negative outcome. Because Apache Stronghold's members have not established that they would suffer a substantial burden under RFRA, Apache Stronghold is not likely to succeed on its RFRA claim. The panel rejected Apache Stronghold's and the dissent's contentions to the contrary.

Next, the panel addressed Apache Stronghold's secondary argument that the Land Exchange did in fact deprive its members of a benefit and subjected its members to a penalty. Namely, the Land Exchange allegedly deprived Apache Stronghold members of the "use and enjoyment of 'government' land for religious exercise" and subjected them to penalties for "trespassing on now 'private' land." The panel disagreed. The government does not substantially burden religion every time it ends a governmental benefit that at one time went to religious beneficiaries: there must be an element of coercion. The Land Exchange does not "condition" any government benefits on the Apache violating their religious beliefs. The panel also rejected Apache Stronghold's argument that the Land Exchange subjected its members to penalties: liability for trespassing on land that will be private after the Exchange. Apache Stronghold has not shown a sufficiently realistic fear of future criminal trespass liability. Also, Apache Stronghold seeks relief that RFRA cannot provide: RFRA does not authorize Apache Stronghold to enjoin the entire Land Exchange. Similarly, it is not clear that the Apache will be subject to civil trespass liability. But even if Apache Stronghold's members were subject to the threat of imminent civil trespass suits, the panel could not enjoin the entire Land Exchange as Apache Stronghold requested.

The panel rejected Apache Stronghold's claim that the Land Exchange would violate the Constitution's Free Exercise Clause. Apache Stronghold argued that the Land Exchange Provision was neither neutral nor generally applicable and thus was subject to strict scrutiny. The panel held that the Land Exchange was neutral in that its object was not to infringe upon the Apache's religious practices. All the evidence suggests that the Land Exchange was meant to facilitate mineral exploration activities – nothing more and nothing less. The panel concluded that the district court properly found that Apache was not likely to succeed on its Free Exercise claim.

Last, the panel considered Apache Stronghold's trust claim under the Treaty of Santa Fe. Namely, that the Treaty created an enforceable trust obligation on the U.S. government, and the Land Exchange was inconsistent with the U.S.'s obligation to pass laws conducive to the prosperity and happiness of the Apache. The panel agreed with the government that on this record, Apache Stronghold has not established that the Treaty of Santa Fe imposes on the United States an enforceable trust obligation. The panel concluded that Apache Stronghold's trust claim was unlikely to succeed.

The panel recognized the deep ties the Apache have to Oak Flat, and acknowledged that the Land Exchange may impact the Apache's plans to worship at Oak Flat. But RFRA, the Free Exercise Clause, and the 1852 Treaty of Santa Fe do not afford Apache Stronghold the relief that it seeks.

Dissenting, Judge Berzon wrote that the majority applied an overly restrictive test for identifying a "substantial burden" on religious exercise under RFRA. The majority's

flawed test leads to an absurd result: blocking Apaches' access to and eventually destroying a sacred site where they have performed religious ceremonies for centuries did not substantially burden their religious exercise. There was no doctrinal basis for limiting the definition of "substantial burden" to the types of burdens imposed in *Sherbert* and *Yoder*. The majority's proffered practical basis for its constricted definition of "substantial burden" is also flawed. Applying the correct definition of "substantial burden," Judge Berzon would hold that Apache Stronghold has shown that it is likely to succeed on the merits of its RFRA claim. She would remand for the district court to address the remaining elements of the preliminary injunction test.

## COUNSEL

Luke W. Goodrich (argued), Mark L. Rienzi, Diana M. Verm, Joseph C. Davis, Christopher Pagliarella, Daniel D. Benson, And Kayla A. Toney, The Becket Fund for Religious Liberty, Washington, D.C.; Michael V. Nixon, Portland, Oregon; Clifford Levenson, Phoenix, Arizona; for Plaintiff-Appellant.

Joan M. Pepin (argued), Andrew C. Mergen, Tyler M. Alexander, and Katelin Shugart-Schmidt, Attorneys; Jean E. Williams, Acting Assistant Attorney General; Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C.; for Defendants-Appellees.

Gene C. Schaerr and Joshua J. Prince, Schaerr | Jaffe LP, Washington, D.C.; James C. Phillips, Chapman University, Dale E. Fowler School of Law, Orange, California; for Amici Curiae Jewish Coalition for Religious Liberty, The

International Society for Krishna Consciousness, The Sikh Coalition, and Protect The 1st.

Miles E. Coleman, Greenville, South Carolina; Thomas Hydrick and Hunter Windham, Columbia, South Carolina; for Amici Curiae Religious Liberty Law Scholars.

Stephanie Hall Barclay, Associate Professor of Law, Director, Religious Liberty Initiative, Notre Dame Law School, Notre Dame, Indiana; Michalyn Steele, Professor of Law, BYU Law School, Provo, Utah; for Amici Curiae National Congress of American Indians, A Tribal Elder, and Other Federal Indian Law Scholars and Organizations.

William E. Trachman, Mountain States Legal Foundation, Lakewood, Colorado; Timothy Sandefur, Goldwater Institute, Phoenix, Arizona; for Amici Curiae the Towns of Superior, and Hayden, Arizona, and Jamie Ramsey, the Mayor of Kearny, Arizona.

David Debold, Thomas G. Hungar, and Matthew S. Rozen, Gibson, Dunn & Crutcher, LLP, Washington, D.C.; for Amici Curiae American Exploration & Mining Association, Women's Mining Coalition, and Arizona Rock Products Association.

8        APACHE STRONGHOLD V. UNITED STATES

## OPINION

BEA, Circuit Judge:

A 2014 act of Congress requires the U.S. Secretary of Agriculture to convey Oak Flat, a plot of federal land in Arizona, to a mining company named Resolution Copper. In exchange, Resolution Copper will convey to the United States a series of other nearby plots of land (the "Land Exchange"). Resolution Copper is considering constructing a copper mine under Oak Flat to access one of the world's largest undeveloped copper deposits. But to the Apache American Indians, Oak Flat—or as the Apache call it, Chi'chil Biłdagoteel—is sacred ground. So Apache Stronghold, a non-profit organization formed to preserve and protect American Indian sacred sites, sued the government on the grounds that the Land Exchange violates each of: 1) the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq*; 2) the Free Exercise Clause of the Constitution's First Amendment; and 3) a trust obligation that Apache Stronghold claims was imposed on the United States by the 1852 Treaty of Santa Fe between the Apache the United States. In the district court below, Apache Stronghold moved for a preliminary injunction, seeking to stop the Land Exchange and prevent any copper mining. The district court reviewed Apache Stronghold's evidence and arguments and ruled that the non-profit was unlikely to succeed on any of its claims. The district court thus denied Apache Stronghold's motion. We affirm.

## I. Background

### A. The At-Issue Land

The Tonto National Forest stretches across nearly 3 million acres (or about 4,500 square miles) across Arizona.

*See Tonto National Forest*, U.S. Dep't of Agriculture, https://www.fs.usda.gov/detail/tonto/home/?cid=fsbdev3_0 18924 (last visited June 15, 2022).  Most of the forest is owned by the United States and is managed by the United States Forest Service, a division of the United States Department of Agriculture.  *See id.*  Within the Tonto Forest is Oak Flat, a 6.7-square-mile plot of plains, oak groves, and rocky cliffs that sits about 4,000 feet above sea level. Beneath Tonto Forest and extending under part of Oak Flat lies "one of the largest undeveloped copper deposits in the world," containing an estimated 1,970 billion tons of copper.

Also within the Tonto National Forest are several areas sacred to the Apache American Indians.  Oak Flat is one of these areas, as are Devil's Canyon (called Ga'an Bikoh by the Apache), a depression just east of Oak Flat, and Apache Leap (called Dibecho Nadil by the Apache), a steep slope just to Oak Flat's west.  These three adjacent areas are places where the Apache's Ga'an—beings that the Apache describe as their "creators, [their] saints, [their] saviors, [their] holy spirits"—live and where the Apache can communicate with them.  Currently, the federal government owns Oak Flat.[1] Devil's Canyon is owned partially by Arizona state government trusts[2] and partially by the federal government. And Apache Leap is owned partially by Resolution Copper

---

[1] Apache Stronghold may dispute the United States' ownership of part of Tonto National Forest later in this litigation but does not do so in this appeal.

[2] Arizona holds some land in trust on behalf of a group of public entities, including state universities and state K-12 schools.  *See State Trust Land Beneficiaries*, Ariz. State Land Dep't, https://land.az.gov/our-agency-mission/beneficiaries (last visited June 15, 2022).

10     APACHE STRONGHOLD V. UNITED STATES

and partially by the federal government. *See* 16 U.S.C. § 539p(d)(1)(A)(v).

In recent years, Oak Flat has been used for a variety of purposes, both religious and secular. After decades of holding religious rituals on their reservations, the Apache have recently returned to worship in Tonto Forest. In 2014, the Apache held a "Sunrise Dance" on Oak Flat for just the second time in "more than a hundred years." That 2014 ceremony closely followed another Sunrise Dance held the previous year at Mt. Graham, another sacred site elsewhere in Arizona. Separately, recreational users often camp, hike, or rock-climb throughout Tonto National Forest, including on Oak Flat.

**B. The Land Exchange Provision**

After nearly a decade of debate, Congress included in the 2014 National Defense Authorization Act a provision (the "Land Exchange Provision") that requires the Secretary of Agriculture to complete a land swap arrangement with Resolution Copper. *See* National Defense Authorization Act for Fiscal Year 2015, Pub. L. No. 113-291, § 3003, 128 Stat. 3732–41 (2014) (codified at 16 U.S.C. § 539p). Under the Provision's terms, the Department of Agriculture must convey 2,422 acres of federal land, including Oak Flat, to Resolution Copper in exchange for 5,344 acres of Arizona land currently owned by Resolution Copper (again, the "Land Exchange"). *See* 16 U.S.C. § 539p(b), (c).[3]

_____

[3] The Land Exchange is also subject to several conditions not at issue here. *See, e.g.*, 16 U.S.C. § 539p(c)(2)(A), (B) (requiring that the parcels of land conveyed by Resolution Copper to the United States be "acceptable to the Secretary [of Agriculture or the Secretary of the Interior, depending on the parcel,]" and "conform[] to the title approval

APACHE STRONGHOLD V. UNITED STATES        11

Once the Forest Service and Resolution Copper exchange the land specified in the Land Exchange Provision, Resolution Copper expects to take "several years" to conduct a "detailed feasibility study" regarding whether to proceed with a mine on the land it receives. Under Resolution Copper's current proposal, it would use a mining technique called "panel caving"; while Resolution Copper would not need to dig a mine on the surface, the land over the mine would eventually subside, "profoundly and permanently alter[ing]" the landscape.

The Land Exchange Provision also requires a series of consultation and mitigation measures. The Secretary of Agriculture must conduct "government-to-government consultation" with all "affected Indian tribes," 16 U.S.C. § 539p(c)(3)(A), and must also agree with Resolution Copper on "mutually acceptable measures" to "address the concerns of the affected Indian tribes" and "minimize the adverse effects on the affected Indian tribes resulting from mining and related activities," *id.* § 539p(c)(3)(B), (B)(i), (B)(ii).

The Secretary of Agriculture must also prepare an environmental impact statement under the National Environmental Policy Act of 1969. *See id.* § 539p(c)(9)(B). This impact statement will guide any further federal government decisions on permitting and other approvals necessary for any development of the transferred land. *See id.* To that end, the impact statement must "assess the effects of the mining and related activities on the Federal land conveyed to Resolution Copper under [the Land Exchange Provision] on the cultural and archeological resources that

standards of the Attorney General of the United States applicable to land acquisitions by the Federal Government").

may be located on [that] land" and "identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources." *Id.* § 539p(c)(9)(C)(i), (ii).

Last, after the Department of Agriculture and Resolution Copper complete the Land Exchange, the Land Exchange Provision prohibits Resolution Copper from mining on Apache Leap and obligates Resolution Copper to surrender all rights to mine on or extract minerals from that land. *See id.* § 539p(g)(3). Apache Leap will be designated the "Apache Leap Special Management Area" with the goal of preserving the area's "natural character" and "cultural and archeological resources" and protecting the "traditional uses of the area by Native American people." *Id.* § 539p(g)(1), (2).

## C. Administrative and Procedural History

In the years since Congress passed the Land Exchange Provision, the Forest Service has engaged in a consultation process with the public and with American Indian tribes. The Forest Service held eleven public meetings and accepted public comments for 120 days. Over that period, the Forest Service received nearly 30,000 comments. Government officials also met with American Indian tribes on dozens of occasions between 2003 and 2020.

Separately, Resolution Copper has also collaborated with Apache tribe members to conduct a series of surveys that identified 6,906 "salvage locations" in Oak Flat, including 6,871 plant salvage locations, 9 animal salvage locations, and 26 mineral salvage locations. Resolution Copper has committed to removing and relocating the relevant articles from the salvage locations and preserving them at another location. Still, these consultation processes

and mitigation measures were not enough to reach a solution that satisfied all parties.  This lawsuit stands as evidence of this lack of success.

After these consultations, the Forest Service was scheduled to publish its final environmental impact statement on January 15, 2021.  But several days before that scheduled publication date, Apache Stronghold filed this lawsuit, alleging that the Land Exchange violates RFRA, the Free Exercise Clause, and certain trust duties that Apache Stronghold argues were created by the 1852 Treaty of Santa Fe between the U.S. government and the Apache.[4]  Two days after that, Apache Stronghold filed a motion for a temporary restraining order and for a preliminary injunction to prevent the Land Exchange.  The district court denied the temporary restraining order, reasoning that Apache Stronghold "could not show immediate and irreparable injury," and ordered Apache Stronghold's motion for a preliminary injunction to be fully briefed.  *Apache Stronghold*, 519 F. Supp. 3d at 597.

After a full round of briefing on Apache Stronghold's motion for a preliminary injunction, the district court held a three-hour hearing, accepted documentary evidence, and heard testimony from witnesses on Apache Stronghold's behalf.  After considering the evidence and the parties' arguments, the district court denied Apache Stronghold's motion.  *See id.* at 611.  As relevant here, the district court found that Apache Stronghold was unlikely to succeed on its claims under RFRA, the Free Exercise Clause, or the 1852

---

[4] Apache Stronghold also brought claims under the Fifth Amendment's Due Process Clause and the First Amendment's Petition Clause.  Those claims were rejected by the district court and Apache Stronghold does not appeal those rulings.  *See Apache Stronghold v. United States*, 519 F. Supp. 3d 591, 609–11 (2021).

Treaty of Santa Fe. *See id.* at 598–609. Apache Stronghold appealed, and also moved for an injunction pending appeal.

Separate from this litigation, the Forest Service had issued its environmental impact statement on-time in January 2021. But in March 2021, soon after Apache Stronghold filed its motion for an injunction pending appeal, the Department of Agriculture ordered the Forest Service to rescind the environmental impact statement. The Department of Agriculture explained that the government needed "additional time" to "understand concerns raised by Tribes and the public" and to "ensure the agency's compliance with federal law." The Forest Service "cannot give a precise length of time for completing the reinitiation of consultation" but estimates that the process will take "several months."

Returning to this litigation, a Ninth Circuit motions panel heard another full round of briefing, including additional documentary evidence, as to Apache Stronghold's motion for an injunction pending appeal. The motions panel eventually denied that motion, concluding that Apache Stronghold had again failed to show that it needed immediate relief to "avoid irreparable harm," in large part because the Forest Service expected to take "months" to complete its revised environmental review. In dissent, Judge Bumatay disagreed and would have granted Apache Stronghold an injunction pending our resolution of this appeal. Apache Stronghold's appeal then reached this panel for a decision on the appeal's merits.

Besides this case, there are two other pending cases brought by other plaintiffs who hope to prevent the Land Exchange. Both of these cases were stayed by agreement of the parties after the Forest Service withdrew its original environmental impact statement. *See Ariz. Mining Reform*

*Coal. v. U.S. Forest Serv.*, No. 21-00122 (D. Ariz. Mar. 15, 2021) (order granting, in light of the parties' joint status report, a stay "pending the Forest Service's publication of a future Final Environmental Impact Statement . . . for the Resolution Copper Project and Land Exchange); *San Carlos Apache Tribe v. U.S. Forest Serv.*, No. 21-00068 (D. Ariz. Mar. 15, 2021) (order granting the parties' "Joint Motion to Stay Proceedings").

## II. Standard of Review

We review for an abuse of discretion a district court's decision to deny a preliminary injunction but review de novo any questions of law underlying that decision.  *See Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020).

## III. Discussion

A party seeking a preliminary injunction must show that: 1) it is "likely to succeed on the merits"; 2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; 3) "the balance of equities tips in [its] favor"; and 4) "an injunction is in the public interest."[5] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

In the district court, Apache Stronghold sought a preliminary injunction on the grounds that the Land Exchange violates RFRA, the Free Exercise Clause, and the trust obligations that Apache Stronghold claims were created by the Treaty of Santa Fe.  The district court denied Apache Stronghold's motion, finding that it was unlikely to succeed on the merits of any of those three claims.  *See Apache*

---

[5] Here, where "the government opposes a preliminary injunction," the third and fourth factors "merge into one inquiry."  *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021).

16          APACHE STRONGHOLD V. UNITED STATES

*Stronghold*, 519 F. Supp. 3d at 598–609.  The district court did not analyze the other *Winter* factors.  *See id.* at 611.  On appeal, Apache Stronghold argues both that it is likely to succeed on the merits of its claims and that the other *Winter* factors favor it.  Apache Stronghold requests that the Court reverse and remand for entry of a preliminary injunction. We have jurisdiction under 28 U.S.C. § 1292, and we affirm the district court's decision to deny Apache Stronghold's motion for a preliminary injunction upon the grounds given by the district court.

**A.  Apache Stronghold's RFRA Claim**

We first address Apache Stronghold's claim under the Religious Freedom Restoration Act (again, "RFRA"). Under RFRA, the federal government may not "substantially burden" a person's sincere exercise of religion unless that burden is both "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that . . . interest."  42 U.S.C. § 2000bb-1(a), (b).  Congress passed RFRA in response to the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), a case holding that the Constitution's Free Exercise Clause "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability.'"  *Id.* at 879 (quoting *United States v. Lee*, 455 U.S. 252, 263 n. 3 (1982) (Stevens, J., concurring in judgment)).

Apache Stronghold primarily argues that the Land Exchange—by enabling Resolution Copper to mine on Oak Flat if the company so decides—will render Apache religious exercise on Oak Flat "impossible" and thus substantially burden the religious exercise of Apache

Stronghold's Apache members.[6]  Though that argument is where Apache Stronghold focuses its efforts, Apache Stronghold also contends that the Land Exchange substantially burdens its members in another way: by depriving its members of the "government benefit" of their present right to access the government-owned land of Oak Flat and by subjecting its members to the potential penalty of a trespass lawsuit for entering Oak Flat once it becomes the private property of Resolution Copper.

The government, for its part, concedes that Apache Stronghold's members seek to exercise sincere religious beliefs by holding ceremonies on Oak Flat, *see Apache Stronghold*, 519 F. Supp. 3d at 604, and wisely so.  The government's only response to Apache Stronghold's RFRA claim, at least at this stage of the litigation, is to argue the Land Exchange would not "substantially burden" Apache Stronghold under RFRA.  42 U.S.C. § 2000bb-1(b).

We proceed as follows.  First, we summarize the binding Ninth Circuit case law that defines the term "substantially burden" as used in RFRA.  Second, we apply that settled understanding of the term to the facts of the Land Exchange and determine whether the Exchange will substantially burden Apache Stronghold under Apache Stronghold's primary RFRA argument.  And third, we discuss Apache Stronghold's secondary RFRA argument that the Land Exchange deprives its members of the benefit of access to

---

[6] Apache Stronghold further argues that the Land Exchange violates RFRA because the "substantial burden" that the Exchange imposes is unsupported by a compelling governmental interest.  The district court did not address this issue, *see Apache Stronghold*, 519 F. Supp. 3d at 603–08, and we have no need to do so here.

18      APACHE STRONGHOLD V. UNITED STATES

government land and subjects them to the potential penalty of trespass lawsuits.

### 1.  The Definition of a "Substantial Burden"

The parties contest what constitutes a substantial burden under RFRA but fortunately, we do not write on a clean slate.  This Court previously addressed this same question in *Navajo Nation v. United States Forest Service*, 535 F.3d 1058 (9th Cir. 2008) (en banc).  In *Navajo Nation*, our en banc court faced facts that mirror those here.  Plaintiffs in *Navajo Nation*, several American Indian tribes and individuals, sued the U.S. Forest Service to enjoin the Service from allowing a ski resort operating on government land to use recycled wastewater to make artificial snow for skiing.  *See id.* at 1063.  Like Oak Flat, the site of the ski resort (a mountain named Humphrey's Peak) was "sacred in [the American Indians'] religion" and was a site for religious ceremonies.  *Id.*  Like the Land Exchange, the Forest Service's plan in *Navajo Nation* to permit the ski resort to use recycled wastewater on Humphrey's Peak would indisputably "spiritually contaminate" a sacred area and inhibit religious ceremonies.  *Id.*  And like Apache Stronghold, the *Navajo Nation* plaintiffs claimed that the challenged government action would violate RFRA.  *See id.*

Just as the facts in *Navajo Nation* parallel the facts here, so do the legal issues.  On appeal in *Navajo Nation* was whether Forest Service's proposed plan would create a "substantial burden" under RFRA.  *Id.* at 1067.

To determine the definition of a "substantial burden" under RFRA, *Navajo Nation* turned to RFRA's text.  RFRA's stated statutory purpose is to "restore the compelling interest test as set forth in [two landmark Free Exercise Clause cases,] *Sherbert v. Verner*, 374 U.S. 398

(1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee [that test's] application in all cases where free exercise of religion is substantially burdened."  42 U.S.C. § 2000bb(b)(1).  (This "compelling interest test" is what we typically call strict scrutiny, and it requires that any substantial burden on religion both be "in furtherance of a compelling governmental interest" and be "the least restrictive means of furthering that . . . interest."  *Id.* § 2000bb-1(a), (b).)

But *Sherbert* and *Yoder* did not only "set forth the compelling interest test."  *Navajo Nation*, 535 F.3d at 1069.  These two cases also "define[d] what kind or level of burden on the exercise of religion is sufficient to invoke" that test— in other words, what burden counts as a "substantial burden."  *Id.*  So, because RFRA expressly "restore[d]" *Sherbert* and *Yoder*'s compelling interest test, 42 U.S.C. § 2000bb(b)(1), we concluded that *Sherbert* and *Yoder* must "also control [RFRA's] 'substantial burden' inquiry," the step that determines whether the compelling interest test applies to government action in the first place, *Navajo Nation*, 535 F.3d at 1069.

Accordingly, to define a "substantial burden" under RFRA, *Navajo Nation* looked to the type of burden on religion that was imposed in *Sherbert* and in *Yoder*.  In *Sherbert*, the Supreme Court held that denying government benefits on account of religion imposes a substantial burden on religion.  *See* 374 U.S. at 410.  South Carolina thus violated the Free Exercise Clause by withholding unemployment benefits from a worker who was fired because she refused to work on her faith's day of rest.  *See id.*  In *Yoder*, the Supreme Court held that imposing a government penalty on account of religion also imposes a substantial burden.  *See* 406 U.S. at 213, 234.  Wisconsin

20      APACHE STRONGHOLD V. UNITED STATES

thus violated the Free Exercise Clause by fining Amish parents for violating a state truancy law that required children to attend school until age sixteen, even though sending children to high school was "contrary to the Amish religion." *Id.* at 208. So under RFRA, the government imposes a substantial burden on religion only when the government action fits within the framework established by *Sherbert* and *Yoder*: "when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit," as in *Sherbert*, or when individuals are "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions," as in *Yoder*. *Navajo Nation*, 535 F.3d at 1070.

A second textual clue also supports our holding in *Navajo Nation*. RFRA explicitly defined numerous terms but not the phrase "substantial burden." *See* 40 U.S.C. § 2000bb-2. This omission has a simple explanation: "substantial burden" already had a well-established definition in the religious liberty context. The phrase "substantial burden" is "a term of art . . . previously used in numerous Supreme Court cases in applying the Free Exercise Clause." *Navajo Nation*, 535 F.3d at 1074–75; *see also Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) ("The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." (citing *Yoder*, 406 U.S. at 220–21)); *Smith*, 494 U.S. at 883 ("Under the *Sherbert* test, governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest.").

How did the Supreme Court define this "substantial burden" term of art? By reference to the *Sherbert*/*Yoder*

framework. In *Jimmy Swaggart Ministries v. Bd. of Equalization of California*, for instance, the Supreme Court held that a generally applicable tax "impose[d] no constitutionally significant burden on [the] appellant's religious practices or beliefs" because "in no sense has the State 'conditioned receipt of an important benefit upon conduct proscribed by a religious faith, or . . . denied such a benefit because of conduct mandated by religious belief.'" 493 U.S. 378, 391–92 (1990) (quoting *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 141 (1987))). Other Free Exercise cases echoed this understanding of when the Free Exercise Clause applies—in other words, this understanding of when the government has created a substantial burden.[7] *See, e.g.*, *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 717–18 (1981) ("Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief . . . a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial."). With this background in mind, *Navajo Nation*'s conclusion about the meaning of "substantial burden" is even stronger. Where, as here, a statute does not expressly define a term of settled meaning, courts "must infer . . . that Congress means to incorporate the established meaning of that term." *NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 94 (1995) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992)). Guided by this mandate, *Navajo Nation* recognized that the Supreme Court's settled definition of a "substantial

---

[7] While some of these cases refer to "conditioning receipt" of a benefit and "den[ying]" a benefit, *e.g. Thomas*, 450 U.S. at 717, rather than conditioning the receipt of a benefit or imposing a penalty, *see Navajo Nation*, 535 F.3d at 1070, denying a benefit and imposing a penalty are two sides of the same coin.

22    APACHE STRONGHOLD V. UNITED STATES

burden" in the Free Exercise context—a burden within the *Sherbert*/*Yoder* framework—governs that same phrase's meaning under RFRA.

*Navajo Nation* drew further support from *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988) and *Bowen v. Roy*, 476 U.S. 693 (1986), two Free Exercise Clause cases that asked and answered essentially the same question that we ask here: what constitutes a "substantial burden" on religion?  In *Lyng*, a group of American Indians challenged a federal plan to build a road over, and permit logging on, land those American Indians held sacred.  *See* 485 U.S. at 441–42.  The challengers claimed that the planned construction would "physically destroy the environmental conditions and the privacy without which the [American Indian] religious practices [could not] be conducted."  *Id.* at 449.  In *Bowen*, the petitioners challenged a federal statute that required state agencies to use social security numbers to identify welfare benefit recipients; according to the challengers' American Indian religion, assigning a numerical identifier to their daughter would rob her of "spiritual power."  *See* 476 U.S. at 695–96.  But the petitioners in neither *Lyng* nor *Bowen* had stated a valid Free Exercise claim because in "neither case . . . would the affected individuals be coerced by the Government's action into violating their religious beliefs; nor would either governmental action penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens."  *Lyng*, 485 U.S. at 449; *see Bowen*, 476 U.S. at 700.  This was true, the Supreme Court held, even if the government's action in *Lyng* would "virtually destroy the . . . Indians' ability to practice their religion."  485 U.S. at 451.  *Lyng* and *Bowen* thus confirmed that a "substantial burden" in the Free Exercise context consists *only* of those government actions

APACHE STRONGHOLD V. UNITED STATES     23

that fall within the *Sherbert*/*Yoder* framework—actions that impose a penalty or deny a benefit—no matter how otherwise burdensome the government might be.[8] The same must be true for substantial burdens under RFRA, given that "*Sherbert*, *Yoder*, and federal court rulings prior to *Smith*"— that is, rulings like *Lyng* and *Bowen*—"control [RFRA's] 'substantial burden' inquiry." *Navajo Nation*, 535 F.3d at 1069.

To summarize, *Navajo Nation* held that a "substantial burden" under RFRA consists only of burdens within the *Sherbert*/*Yoder* framework for three reasons. First, RFRA by its text "restored" *Sherbert*, *Yoder*, their "compelling interest" test, and their "substantial burden" inquiry, thus defining a "substantial burden" under RFRA as either of the burdens present in those two cases. Second, the Supreme Court has long used the phrase "substantial burden" as a Free Exercise Clause term of art that meant only the two burdens within the *Sherbert*/*Yoder* framework, and a "substantial burden" under RFRA must hold that same, settled meaning. And third, *Lyng* and *Bowen*, the cases most factually and legally analogous to *Navajo Nation* (and for that matter, to this case) confirmed that even burdensome government action does not constitute a "substantial burden" (and thus does not trigger the "compelling interest" test) if that action falls outside the *Sherbert*/*Yoder* framework.

---

[8] Admittedly, *Lyng*'s terminology was imprecise. It did not use the phrase "substantial burden" but instead used different words for the same idea: the proposed road through the American Indian sacred site did not impose a "burden on [the American Indians'] religious practices [] heavy enough to violate the Free Exercise Clause," or even heavy enough to "require [the] government to bring forward a compelling justification" for its plan. 485 U.S. at 447, 450.

24      APACHE STRONGHOLD V. UNITED STATES

Applying *Navajo Nation*'s "substantial burden" standard to that case's facts, we held that under RFRA the Navajo suffered no "substantial burden" on their religion and thus had no RFRA claim against the Forest Service. *See id.* at 1070. To the Navajo, the Forest Service's decision to permit wastewater on Humphrey's Peak would "spiritually desecrate a sacred mountain." *Id.* But that government decision lay outside the *Sherbert/Yoder* framework to which RFRA applies. The Forest Service did not "coerce the [Navajo] to act contrary to their religion" by imposing a penalty or denying a governmentally granted benefit when it authorized the ski resort to use wastewater on the peaks. *Id.* The Service thus imposed no substantial burden under RFRA. *See id.* This was so, we held, "[e]ven were we to assume . . . that the government action in this case will 'virtually destroy the . . . [Navajo's] ability to practice their religion.'" *Id.* at 1072 (quoting *Lyng*, 485 U.S. at 451). Where there is no substantial burden, there is no ground to apply the "compelling interest" test, and thus no RFRA violation—no matter how dire the practical consequences of a government policy or decision. Any other result would be inconsistent with RFRA's text and with the Supreme Court's understanding of what constitutes a substantial burden on religious exercise.

While *Navajo Nation*'s "substantial burden" holding has firm doctrinal roots, we noted further that our holding there also has a strong practical basis. Were the scope of a substantial burden under RFRA broader than the *Sherbert/Yoder* framework, "any action the federal government were to take, including action on its own land, would be subject to the personalized oversight of millions of citizens." *Id.* at 1063. And in the specific factual context of *Navajo Nation*—federal land use decisions—"giving one religious sect a veto over the use of public park land would

deprive others of the right to use what is, by definition, land that belongs to everyone." *Id.* at 1063–64.

### 2. Apache Stronghold's Primary RFRA Argument

With this background in mind, we turn to Apache Stronghold's arguments. Apache Stronghold's main argument is that the Land Exchange would hand Oak Flat over to Resolution Copper for the latter's mining plan, thus incidentally making it "impossible" for Apache Stronghold's members to worship on Oak Flat and thereby substantially burdening them. Even assuming that the Land Exchange would in fact make Apache Stronghold's members worship "impossible," this argument cannot succeed in light of *Navajo Nation*.

The Land Exchange's effect on Apache Stronghold's members falls outside of the *Sherbert*/*Yoder* framework and thus outside of RFRA's definition of a substantial burden. Under RFRA, the government imposes a substantial burden on religion in two—and only two—circumstances: when the government "force[s individuals] to choose between following the tenets of their religion and receiving a governmental benefit" and when the government "coerce[s individuals] to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Id.* at 1070. Here, the government will do neither by transferring Oak Flat to Resolution Copper. No government benefits will be lost (as in *Sherbert*) nor will governmental penalties be imposed (as in *Yoder*). The Department of Agriculture will simply transfer ownership of a plot of government land to Resolution Copper. The Land Exchange's "incidental effects" on the religious exercise of Apache Stronghold's members, as significant as they may be to the Apache, "may make it more difficult [for them] to practice [their religion] but [will] have no tendency to coerce [the Apache] into

acting contrary to their religious beliefs." *Lyng*, 485 U.S. at 450–51.  Hence, under RFRA the Land Exchange imposes no substantial burden and RFRA thus does not limit the government's ability to complete the Land Exchange.

This is true even if the Land Exchange makes worship on Oak Flat "impossible."  The government makes exercises of religion more difficult all the time.  Doing so is not inherently coercive.  As one example, the United States has a special visa program for "[m]inisters of [r]religion." *See Visas for Immigrant Religious Workers*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/us-visas/immigrate/visa-religious-workers.html (last visited June 15, 2022). When the government denies one of these visas, the government no doubt makes it more difficult for that minister's following to exercise their faith.  But the visa denial does not coerce those followers by threatening them with a negative outcome (*i.e.*, a penalty or the denial of a governmental benefit) if they continue to worship despite that hardship.  So too here: the Land Exchange does not coerce the Apache to abandon their religion by threatening them with a negative outcome.  Accordingly, Apache Stronghold's members have not established that they would suffer a substantial burden under RFRA.  Apache Stronghold is not likely to succeed on its RFRA claim.

Between them, Apache Stronghold and the dissent offer three arguments in response.  First, the dissent argues that *Navajo Nation* misread RFRA and should have held that the definition of a "substantial burden" under RFRA extends beyond the *Sherbert*/*Yoder* framework.  Second, both the dissent and Apache Stronghold contend that *Navajo Nation* contains exceptions that permit the panel to find a substantial burden here.  And third, the dissent would hold that intervening Supreme Court precedent since *Navajo Nation*

APACHE STRONGHOLD V. UNITED STATES        27

is "clearly irreconcilable" with *Navajo Nation*, permitting the panel to disregard *Navajo Nation* in its entirety. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). None of these responses persuades us.

The dissent first argues that *Navajo Nation* misread RFRA in concluding that RFRA defines a "substantial burden" as those burdens falling within the *Sherbert*/*Yoder* framework. As an initial matter, our en banc decision in *Navajo Nation* binds this panel—we cannot overrule *Navajo Nation* even if we do not agree with it. *See Robbins v. Carey*, 481 F.3d 1143, 1149 n.3 (9th Cir. 2007). But even considering the points that the dissent raises as grounds for overruling *Navajo Nation*, we find them unconvincing.

At the outset, the dissent contends that RFRA was not "concern[ed]" with defining a "substantial burden" but instead with "ensuring that the compelling interest standard would be applied once a substantial burden had been demonstrated." Dissent at 61. In support, the dissent notes that RFRA "offers no definition" of a "substantial burden." *Id.*

We do not agree. The two cases that RFRA explicitly cited and "restored"—*Sherbert* and *Yoder*—both defined the "compelling interest" test *and* set out the two burdens that satisfy the predicate "substantial burden" inquiry: a penalty imposed and a governmental benefit denied. *Navajo Nation*, 535 F.3d at 1069. Moreover, the phrase "substantial burden" was not defined in RFRA's text but *was* a term of art in Free Exercise Clause doctrine that referred to those same two burdens set out in *Sherbert* and *Yoder*. *See id.* at 1074. With this background in mind, the best reading of RFRA's text is that RFRA "restore[d]" both *Sherbert* and *Yoder*'s "compelling interest" test and their "substantial burden" inquiry. 42 U.S.C. § 2000bb(b)(1). RFRA both explicitly

adopted *Sherbert* and *Yoder*'s "compelling interest" test *and*, in the same sentence, used the term of art "substantial burden," a related concept also based on those two cases. *Id.* It would make no sense for RFRA to do all of this, only to silently reject the definition that those same two cases gave that same term of art. We thus have no need to concoct our own definition of a "substantial burden," distinct from the one that Congress chose.

The dissent also argues that *Navajo Nation*'s "substantial burden" definition "lacks a basis in pre-*Smith* precedent." Dissent at 64. Not so. The dissent has identified some cases where courts may have suggested that Free Exercise Clause violations could fall outside of the *Sherbert*/*Yoder* "substantial burden" framework. But the two cases that RFRA specifically "restore[d]" and cited in its very text were indeed *Sherbert* and *Yoder*. 42 U.S.C. § 2000bb(b)(1). Relying on that statutory text, *Navajo Nation* rightly focused on the burdens on religion imposed in those two cases. Moreover, the cases that the dissent cites all predate *Lyng*, which confirmed that under Free Exercise doctrine, the *Sherbert*/*Yoder* framework defines the scope of a "substantial burden." *See Lyng*, 485 U.S. at 449 (noting that the government imposes no substantial burden unless "affected individuals [are] coerced by the Government's action into violating their religious beliefs" or "governmental action penalize[s] religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens"). Before *Lyng* made this clear, it is perhaps not surprising that Free Exercise cases occasionally diverged from that framework.

Further, and as noted above, the Supreme Court's post-*Lyng* but pre-*Smith* Free Exercise doctrine reinforces *Navajo Nation*'s understanding of the scope of a "substantial

APACHE STRONGHOLD V. UNITED STATES        29

burden." Pre-*Smith*, the Free Exercise Clause applied only when the government "placed a substantial burden" on religious exercise. *Hernandez*, 490 U.S. at 699. And a "substantial burden" referred only to burdens within the *Sherbert/Yoder* framework. *See Lyng*, 485 U.S. at 449; *Jimmy Swaggart Ministries*, 493 U.S. at 391–92.

With the above in mind, we also reject the dissent's suggestion that *Navajo Nation* "constricted" the definition of a "substantial burden" relative to pre-*Smith* Free Exercise Clause doctrine. Dissent at 67. As just shown, and setting aside the potential outliers that the dissent identified, pre-*Smith* Free Exercise Clause doctrine already defined a "substantial burden" as only those burdens that fall within the *Sherbert/Yoder* framework: coercion caused by the government either imposing a penalty or denying a benefit. *See Lyng*, 485 U.S. at 449; *Jimmy Swaggart Ministries*, 493 U.S. at 391–92. So, when *Navajo Nation* recognized that this same framework also defines the scope of a "substantial burden" under RFRA, *Navajo Nation* did not narrow or constrict the definition of a "substantial burden." Rather, *Navajo Nation* stayed faithful to a substantial burden's already settled scope.

The dissent also points to the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*, as evidence that "the definition of 'substantial burden' [under RFRA] includes the denial of access to religious locations and resources." Dissent at 69. RLUIPA imposes RFRA's "compelling interest" test on substantial burdens on religion in two specific contexts: prison and local land use regulation. *See* 42 U.S.C. §§ 2000cc, 2000cc-1.

Yet we disagree with the dissent here too: RLUIPA's definition of a "substantial burden" casts no doubt on how

*Navajo Nation* defined that term as to RFRA. We have previously interpreted a "substantial burden" under RLUIPA to be defined not by the *Sherbert*/*Yoder* framework but by the "plain meaning" of the phrase "substantial burden." *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004). But unlike RFRA, RLUIPA's text does not even mention, much less cite, either *Sherbert* or *Yoder*. *Compare* 42 U.S.C. §§ 2000cc, 2000cc-1, *with id.* § 2000bb. So *Navajo Nation*'s key inference—that a "substantial burden" under RFRA is defined by the burdens in *Sherbert* and *Yoder*—does not carry over to RLUIPA. While a "substantial burden" under RLUIPA is defined by the "plain meaning" of the phrase "substantial burden," *San Jose Christian Coll*, 360 F.3d at 1034, *Navajo Nation* correctly held otherwise as to RFRA.

The dissent also equates the two contexts covered by RLUIPA—prisons and local land regulation—to situations involving "Native American sacred sites located on government land." Dissent at 62. In all three contexts, the dissent contends, the government substantially burdens religion by "denying access" to "religious locations and resources." *Id.* at 63. But while RLUIPA covers the first two contexts (again, prisons and local land regulation), the third context—the context actually at issue here—falls to RFRA. *Compare* 42 U.S.C. §§ 2000cc, 2000cc-1, *with id.* § 2000bb-1. RFRA's definition of a "substantial burden" thus governs here, regardless what the dissent's RLUIPA cases say, because the Land Exchange involves neither prisons nor local land regulation. *See also Navajo Nation*, 535 F.3d at 1077 ("RLUIPA is inapplicable to this case . . . . RLUIPA applies only to government land-use regulations of private land—such as zoning laws—not to the government's management of its own land."). For all these reasons, we

reject the dissent's argument that *Navajo Nation* misread the scope of a "substantial burden" under RFRA.

Second, Apache Stronghold and the dissent both argue that even under *Navajo Nation*, the Land Exchange may substantially burden religious exercise. Both reach this conclusion two ways. Neither approach persuades us.

They first seize onto a statement from *Navajo Nation* that any "burden imposed on the exercise of religion *short of* that described by *Sherbert* and *Yoder* is not a 'substantial burden' within the meaning of RFRA," 535 F.3d at 1070 (emphasis added), and argue that the Land Exchange constitutes a substantial burden because it imposes a "greater burden on religious exercise" than that imposed in *Yoder* or *Sherbert*. Dissent at 71. Shorn of context, the "short of" phrase to which the dissent and Apache Stronghold point might conceivably support their interpretation. But considered with the rest of the opinion, that phrase does not.

Properly understood, *Navajo Nation* did not set out a quantitative floor for a "substantial burden" such that all "greater" burdens qualify. Rather, *Navajo Nation* singled out two specific qualitative burdens—denying a benefit or imposing a penalty—that together form the complete universe of "substantial burdens" under RFRA. For evidence, look no farther than the sentence immediately before the "short of" phrase, which reads: "Under RFRA, a 'substantial burden' is imposed *only when* individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*)." *Navajo Nation*, 535 F.3d at 1069–70 (emphasis added). Further proving this point, immediately after the "short of" phrase *Navajo Nation* applies the test that it announced in the preceding sentences:

32        APACHE STRONGHOLD V. UNITED STATES

"[T]here is no 'substantial burden' on the Plaintiffs' exercise of religion in this case. The [challenged government action] does not force the Plaintiffs to choose between following the tenets of their religion and receiving a governmental benefit, as in *Sherbert*. The [challenged action] also does not coerce the Plaintiffs to act contrary to their religion under the threat of civil or criminal sanctions, as in *Yoder*." *Id.* at 1070. *Navajo Nation* did not further ask if the Forest Service had imposed a burden *greater* than that imposed in *Sherbert* or *Yoder*, reinforcing that such a step is not necessary. Other passages in *Navajo Nation* similarly belie the dissent and Apache Stronghold's reading of the case.**9** Accurately read, *Navajo Nation* recognized that the government imposes a substantial burden under RFRA only when the government denies the delivery of a benefit (as in *Sherbert*) or imposes a penalty (as in *Yoder*). The "short of" language did not change the character or type of government action that is required to constitute a "substantial burden" under RFRA.

Apache Stronghold and the dissent contend also that both *Navajo Nation* and *Lyng* are limited to cases where the government action would interfere with "subjective spiritual experience," not cases where the government "objectively and severely interfere[s] with a plaintiff's access to religious locations or resources." Dissent at 72 (quoting *Navajo Nation*, 535 F.3d at 1063). (Apache Stronghold's

---

**9** *See, e.g.*, *Navajo Nation*, 535 F.3d. at 1075 ("In the pre-*Smith* cases adopted in RFRA, the Supreme Court has found a substantial burden on the exercise of religion *only* when the burden fell within the *Sherbert/Yoder* framework.") (emphasis added); *id.* at 1067 ("The presence of recycled wastewater on the Peaks does not coerce the Plaintiffs to act contrary to their religious beliefs under the threat of sanctions, nor does it condition a governmental benefit upon conduct that would violate their religious beliefs, *as required to establish a 'substantial burden' on religious exercise under RFRA*." (emphasis added)).

formulation of the same idea is that *Navajo Nation* and *Lyng* do not apply to cases involving a "physical impact" on land.) Because Resolution Copper's mining plan would have such an "objective" or "physical" impact here, they argue that *Navajo Nation* and *Lyng* do not control.  True enough, in dicta, *Navajo Nation* pointed out that the challenged government action would not make any "places of worship . . . inaccessible" or physically affect any "religious ceremonies."  535 F.3d at 1063.  Similarly, dicta in *Lyng* states that "[n]o sites where specific rituals take place were to be disturbed."  485 U.S. at 454.  But neither case is as narrow as the dissent and Apache Stronghold suggest.

Neither *Navajo Nation* nor *Lyng* turned on whether the challenged government action "objectively" interfered with religious exercise or "physically" affected sacred land.  The rule that *Navajo Nation* drew from RFRA's text and from "*Sherbert*, *Yoder*, and federal court rulings prior to *Smith*" was clear: "Under RFRA, a 'substantial burden' is imposed *only when* individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*)."  *Id.* at 1069–70 (emphasis added).  This rule contains no exception for when the government neither imposes a penalty nor denies a benefit but "objectively" or "physically" interferes with religious exercise.

A close examination of the claimed burden on religion in *Lyng* further refutes the dissent and Apache Stronghold's argument.  It was true that "[n]o sites where specific rituals take place were to be disturbed." *Lyng*, 485 U.S. at 454.  But those opposed to the government action argued that "the proposed road w[ould] 'physically destroy the environmental conditions and the privacy without which the

[American Indian] religious practices [could not] be conducted.'" *Id.* at 449. And even so—despite this "objective," "physical" impact that could "virtually destroy" the American Indians' "ability to practice their religion," the Supreme Court found no substantial burden there.[10] *See id.* In sum, we cannot differentiate between physical and intangible damage to religious sites as Apache Stronghold asks because the *Sherbert/Yoder* framework turns on the nature of government action, not on the severity of the government's encroachment on a religious site. *See Lyng*, 485 U.S. at 451 (noting that the substantial burden inquiry "cannot depend on measuring the effects of a governmental action" on religious exercise"); *Navajo Nation*, 535 F.3d at 1070 n.12 ("[I]n *Yoder*, it was not the effect . . . on the children's subjective religious sensibilities that constituted the undue burden on the free exercise of religion. Rather, the undue burden was the penalty of criminal sanctions on the parents."); *accord Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 723–24 (2014) (noting that courts have "have no business addressing" whether the RFRA substantial burden analysis changes if a religious adherent would only be forced

---

[10] Apache Stronghold also notes that in *Lyng*, the Supreme Court remarked that "a law prohibiting the Indian [plaintiffs] from visiting the Chimney Rock area would raise a different set of constitutional questions." 485 U.S. at 453. But the full sentence reads: "The Constitution does not permit government to discriminate against religions that treat particular physical sites as sacred, and a law prohibiting the Indian respondents from visiting the [sacred] area would raise a different set of constitutional questions." *Id.* Context thus makes clear that the Court was referring to *discriminatory* prohibitions on access. And even if Apache Stronghold were right that a non-discriminatory access prohibition raises a "different set" of legal questions than those covered in *Lyng*, *Navajo Nation* answers those questions. Again, unless the government imposes a penalty or denies a benefit, the government imposes no substantial burden under RFRA. *See Navajo Nation*, 535 F.3d at 1069–70.

to participate in a religiously prohibited act in an "attenuated" way).

If any doubts about *Navajo Nation*'s meaning survive the arguments above, the many Ninth Circuit cases that have applied *Navajo Nation* put those doubts to rest. These cases—including one written by the author of the dissent—betray no confusion about *Navajo Nation*'s "substantial burden" holding: "Under RFRA, a 'substantial burden' is imposed *only when* individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit . . . or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Fazaga v. Fed. Bureau of Investigation*, 965 F.3d 1015, 1061 (9th Cir. 2020) (Berzon, J.) (emphasis added) (quoting *Navajo Nation*, 535 F.3d at 1069–70), *rev'd on other grounds by* 142 S. Ct. 1051 (2022).[11]

---

[11] *See also Does v. Wasden*, 982 F.3d 784, 794 n.3 (9th Cir. 2020) ("Under RFRA, by contrast, 'a "substantial burden" is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit . . . or are coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions.'" (quoting *Navajo Nation*, 535 F.3d at 1069–70)); *Oklevueha Native Am. Church of Hawaii, Inc. v. Lynch*, 828 F.3d 1012, 1016 (9th Cir. 2016) ("[W]e have held that a substantial burden under RFRA exists in a context such as this one 'only when individuals are . . . coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions . . . .'" (quoting *Navajo Nation*, 535 F.3d at 1070)); *Ruiz-Diaz v. United States*, 703 F.3d 483, 486 (9th Cir. 2012) ("We have held that the government imposes a substantial burden 'only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions.'" (quoting *Navajo Nation*, 535 F.3d at 1070)); *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1214–15 (9th Cir. 2008) ("[W]e have not found any evidence demonstrating that Snoqualmie Tribe members will lose a

As the dissent notes, none of these post-*Navajo Nation* cases addressed the precise facts at issue here. Dissent at 72 n.4. None need have. RFRA defined a "substantial burden" according to the *Sherbert*/*Yoder* framework. *See Navajo Nation*, 535 F.3d at 1069–70. This is an across-the-board definition that applies in all cases under the statute, not a "restricted railroad ticket, good for th[at] day and train only." *Smith v. Allwright*, 321 U.S. 649, 669 (Roberts, J., dissenting) (1944). And dispositive here, this definition contains no exceptions for burdens on religion thought to be quantitatively "greater" than the burdens in *Sherbert* and *Yoder* or for burdens that neither impose a penalty nor deny a benefit but "objectively" or "physically" interfere with religious exercise in an incidental way.

Apache Stronghold (but not the dissent) also points to a scattered set of cases that apply a definition of "substantial burden" in a manner broader than the *Sherbert*/*Yoder* framework.[12] But for a variety of reasons, these cases do not

government benefit or face criminal or civil sanctions for practicing their religion. We therefore hold that . . . FERC's decision relicensing the project . . . does not impose a substantial burden under RFRA on the tribal members' ability to exercise their religion, as we have defined substantial burden in *Navajo Nation*.").

[12] Apache Stronghold also argues briefly that RFRA's legislative history supports its reading of the statute. Regardless whether legislative history is a valid tool of statutory interpretation, neither House reports nor "discussion in Congress" can overcome RFRA's clear text and explicit statutory purpose, as applied in *Navajo Nation*. *See* 42 U.S.C. § 2000bb(b); *Navajo Nation*, 535 F.3d at 1069–70 ("Under RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*)."). And in any event, other legislative history, were we to consider it,

affect our interpretation of *Navajo Nation*. As an initial matter, even were courts from other circuits to take approaches different than ours in *Navajo Nation*, *Navajo Nation* binds this panel and this Circuit.[13] But turning to the substance of the in-circuit cases that Apache Stronghold cites, they either interpret RFRA but predate *Navajo Nation*[14] or interpret not RFRA but RLUIPA instead.[15] To the extent our pre-*Navajo Nation* RFRA cases defined a "substantial burden" differently than did *Navajo Nation*, our later en banc decision in *Navajo Nation* controls. *See Robbins*, 481 F.3d at 1149 n.3. And the RLUIPA cases are similarly unpersuasive. As we have explained, we have interpreted RFRA and RLUIPA to apply different substantial burden standards. *Compare Navajo Nation*, 535 F.3d at 1069–70 ("Under RFRA, a 'substantial burden' is

---

supports the government's position instead. *See* S. Rep. No. 103-111, at 9 (1993) ("[P]re-*Smith* case law makes it clear that strict scrutiny does not apply to government actions involving only management of internal Government affairs or *the use of the Government's own property* or resources." (emphasis added)).

[13] As a three-judge panel, we are bound by circuit precedent like *Navajo Nation*. *See Robbins*, 481 F.3d at 1149 n.3. We thus cannot rely on conflicting out-of-circuit cases like *Comanche Nation v. United States*, No. 08-00849, 2008 WL 4426621 (W.D. Okla. Sept. 23, 2008), and *Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014).

[14] *See, e.g.*, *United States v. Antoine*, 318 F.3d 919 (9th Cir. 2003); *Mockaitis v. Harcleroad*, 104 F.3d 1522 (9th Cir. 1997).

[15] *See, e.g.*, *Johnson v. Baker*, 23 F.4th 1209 (9th Cir. 2022); *Jones v. Slade*, 23 F.4th 1124 (9th Cir. 2022); *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059 (9th Cir. 2011); *Greene v. Solano Cnty. Jail*, 513 F.3d 982 (9th Cir. 2008); *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978 (9th Cir. 2006); *Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005); *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024 (9th Cir. 2004).

imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*).”), *with San Jose Christian Coll.*, 360 F.3d at 1035 (holding that under RLUIPA, the government imposes a “substantial burden” on religion when it “imposes a ‘significantly great’ restriction or onus” on religious exercise). Apache Stronghold’s RLUIPA cases thus give us no guidance for how to interpret the phrase “substantial burden” under RFRA.[16]

Last, the dissent argues that *Navajo Nation* is “clearly irreconcilable” with recent Supreme Court precedent, allowing the panel to ignore *Navajo Nation* entirely. Dissent at 74 (quoting *Miller*, 335 F.3d at 900). *Miller* does permit Ninth Circuit panels to treat as “effectively overruled” any Ninth Circuit cases that are “clearly irreconcilable” with “intervening Supreme Court authority.” 335 F.3d at 900. But the “‘clearly irreconcilable’ requirement ‘is a high standard.’” *Fed. Trade Comm’n v. Consumer Def., LLC*, 926 F.3d 1208, 1213 (9th Cir. 2019) (quoting *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013)). If, as a panel, “we can apply our precedent consistently with that of the higher authority, we must do so.” *Consumer Def.*, 926 F.3d at 1213.

In our view, *Navajo Nation* is fully reconcilable with the Supreme Court’s recent cases. The dissent highlights

---

[16] Apache Stronghold responds to this point by claiming that RFRA and RLUIPA impose the “same standard.” *Holt v. Hobbs*, 574 U.S. 352, 358 (2015) (quoting *Gonzales v. O Centro Espírita Beneficente Uniõ do Vegetal*, 546 U.S. 418, 436 (2006)). We address this point below. *See* post at 39–40.

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), *Holt v. Hobbs*, 574 U.S. 352 (2015), and *Ramirez v. Collier*, 142 S. Ct. 1264 (2022). To this list we add *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020), a case that Apache Stronghold cites, and *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017). When we compare these cases to *Navajo Nation*, we do not see any clear irreconcilability.

Turning first to *Hobby Lobby*, that case does not contradict *Navajo Nation*'s "substantial burden" holding. *Hobby Lobby* held that closely held corporations can maintain a RFRA claim but it provided no comprehensive definition of "substantial burden." *See* 573 U.S. at 719. In fact, *Hobby Lobby* framed a substantial burden in precisely the way *Navajo Nation* did: Hobby Lobby suffered a substantial burden because it would have had to "pay an enormous sum of money" to the government—a government penalty—"if [it] insist[ed] on providing insurance coverage in accordance with their religious beliefs." *Id.* at 726.

As the dissent rightly notes, *Hobby Lobby* made clear that RFRA claims need not perfectly track pre-*Smith* Free Exercise doctrine in every single way. RFRA plaintiffs are not limited to those who "fell within a category of plaintiffs [who] had brought a free-exercise claim that [the Supreme] Court entertained in the years before *Smith*" because RFRA did not "merely restore[ the Supreme] Court's pre-*Smith* decisions in ossified form." *Id.* at 715–16.

But *Navajo Nation* did not assume otherwise. Rather, *Navajo Nation* observed that RFRA, by its own terms, "restore[d]" pre-*Smith* Free Exercise doctrine in a single, limited way: it incorporated *Sherbert* and *Yoder*'s "compelling interest test" and predicate "substantial burden" inquiry. 42 U.S.C. § 2000bb(b)(1); *Navajo Nation*, 535 F.3d at 1068. So, because "we can apply [*Navajo Nation*]

40      APACHE STRONGHOLD V. UNITED STATES

consistently with [*Hobby Lobby*]," "we must do so." *Consumer Def.*, 926 F.3d at 1213.

Next is *Holt*. There, the Supreme Court stated that RLUIPA "allows prisoners 'to seek religious accommodations pursuant to the same standard as set forth in RFRA.'" 574 U.S. at 358 (quoting *Gonzales v. O Centro Espírita Beneficente Uniõ do Vegetal*, 546 U.S. 418, 436 (2006)). From this connection, the dissent argues that RFRA, like RLUIPA, recognizes a "substantial burden" "when the government denies access to religious locations or resources." Dissent at 64. But we do not read *Holt*'s dicta to support the dissent's position. This quotation from *Holt* is best read as applying to the "compelling interest" test— that is, the stage of the RFRA (and RLUIPA) analysis at which individuals "seek religious accommodations" and have those accommodations assessed against the government's justification—not as applying to the predicate "substantial burden" stage. The dissent seems to recognize this nuance as well, observing that "RLUIPA sets forth the 'same standard' for evaluating governmental justifications for imposing substantial burdens on religion as RFRA— strict scrutiny." Dissent at 68–69.

Further, the actual "substantial burden" standard that *Holt* applied matches the *Sherbert/Yoder* framework almost perfectly. Holt challenged a prison grooming policy that required him to "shave his beard and thus to 'engage in conduct that seriously violates his religious beliefs.'" *Holt*, 574 U.S. at 361 (quoting *Hobby Lobby*, 573 U.S. at 720). If Holt violated that policy, he would "face serious disciplinary action" and the Supreme Court reasoned that "[b]ecause the grooming policy puts [Holt] to this choice, it substantially burdens his religious exercise." *Id.* The *Sherbert/Yoder* "substantial burden" framework includes situations when

individuals are "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation*, 535 F.3d at 1070. The government action in *Holt*— requiring a prisoner to violate his religious beliefs or "face serious disciplinary action," 574 U.S. at 361—falls squarely within that framework. So here, too, "we can apply our precedent consistently with that of the higher authority." *Consumer Def.*, 926 F.3d at 1213.

For similar reasons, we dismiss the dissent's appeal to *Ramirez*. First, *Ramirez* was a RLUIPA case, not a RFRA case. And more pointedly, the scope of a "substantial burden" under either statute was explicitly not at issue. The government "d[id] not dispute that any burden [its] policy impose[d] on Ramirez's religious exercise [wa]s substantial," and *Ramirez* accordingly provided no analysis whatsoever concerning the scope of a substantial burden.[17] 142 S. Ct. at 1278. Instead, the Court simply cited *Holt*, which (as noted above) framed a "substantial burden" consistent with those discussed in *Navajo Nation*. *See id.*; ante at 40–41; *Holt*, 574 U.S. at 361.

Finally, Apache Stronghold points to *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020), in which the Supreme Court held that RFRA "permits litigants . . . to obtain money damages against federal officials in their individual capacities." *Id.* at

---

[17] The dissent suggests that both *Ramirez*'s "locution" and ultimate outcome in Ramirez's favor indicate that the Supreme Court agreed with the government's waiver on the "substantial burden" issue. Dissent at 70 n.3. The outcome sheds no light here: Ramirez would have also prevailed had the Court merely accepted the government's concession. And as for the Supreme Court's locution, we take the Court at its word: the scope of a "substantial burden" on religion was "not [in] dispute" in *Ramirez*, 142 S.Ct. at 1278, so *Ramirez* neither created nor implied a "substantial burden" rule that can be compared with *Navajo Nation*'s.

42      APACHE STRONGHOLD V. UNITED STATES

493.  If such a citation sounds irrelevant, that's because it is. The district court below dismissed the plaintiffs' RFRA claims on the sole basis that "RFRA does not permit monetary relief," *id.* at 489; the Supreme Court rejected that argument without discussing what constitutes a "substantial burden" under RFRA.  True, *Tanzin* explained that a "damages remedy . . . is also the only form of relief that can remedy some RFRA violations" and noted that "[f]or certain injuries . . . effective relief consists of damages, not an injunction."  *Id.* at 492.  But that is as far as the case went. *Tanzin* did not hold that a "substantial burden" extends beyond the *Sherbert/Yoder* framework or even say as much in dicta.

We also reject the idea that *Tanzin* implied any substantial burden holding through its choice of lower-court cases to cite.  *Tanzin* included a "*See, e.g.*," citation to *DeMarco v. Davis*, 914 F.3d 383 (5th Cir. 2019), a Free Exercise Clause case involving a prison officials' destruction of a prisoner's personal property—his legal and religious books.[18]  *See id.* at 389–90.  From that citation, Apache Stronghold divines the principle that the government can violate RFRA through the "destruction of religious property," purportedly including government-owned real property (*i.e.*, land).  But the *DeMarco* citation supported the unremarkable proposition that "[f]or certain injuries . . . effective relief consists of damages, not an injunction."  *Id.* at 492.  This proposition has nothing to do with what qualifies as a substantial burden under RFRA.  And in any

---

[18] That "*See, e.g.*," citation also included *Yang v. Sturner*, 728 F. Supp. 845 (D.R.I.), *withdrawn* 750 F. Supp. 558 (D.R.I. 1990), a Free Exercise Clause case involving an autopsy of a man whose parents' religion holds that autopsies "are a mutilation of the body."  750 F. Supp. at 558.

event, we are skeptical that the Supreme Court would revolutionize the scope of a "substantial burden" on religion—as plainly set out in cases like *Lyng*—through its choice of cases in a string citation. If we expect Congress not to "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), we should hold the Supreme Court to the same standard.

We also add an overarching consideration that further supports our conclusion that *Navajo Nation* and the Supreme Court's decisions cited by the dissent can be reconciled. We must read *Hobby Lobby*, *Holt*, *Ramirez*, and *Tanzin* in conjunction with the Supreme Court's other precedents. And the Supreme Court reaffirmed as recently as 2017 that a "substantial burden" on religion is still defined by the *Sherbert/Yoder* framework recognized in *Navajo Nation*. In *Trinity Lutheran Church of Columbia, Inc. v. Comer*, the Supreme Court quoted *Lyng*'s "substantial burden" rule: even actions that "would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs" pose "no free exercise violation . . . [if] the affected individuals were not being 'coerced by the Government's action into violating their religious beliefs.'" 137 S. Ct. 2012, 2020 (2017) (quoting *Lyng*, 485 U.S. at 449). That reasoning matches ours here perfectly. So when the dissent's cases and *Trinity Lutheran* are taken together, as they must be, they cast no doubt on the scope of the *Sherbert/Yoder* framework or on *Navajo Nation*'s "substantial burden" holding.[19]   Given that we

---

[19] In the dissent's view, *Trinity Lutheran* "does not imply the Court would reach the same result [as it did in *Lyng*] in a case in which the government controlled access to religious resources and entirely denied a plaintiff access to those resources." Dissent at 73. To the contrary: *Trinity Lutheran* must imply that result. *Trinity Lutheran* quotes *Lyng*'s

44      APACHE STRONGHOLD V. UNITED STATES

decline to apply our past precedents only when more recent Supreme Court decisions are "clearly irreconcilable" with those precedents, *Miller*, 335 F.3d at 893, we must apply *Navajo Nation* here and we do so without hesitation.

We thus conclude that under *Navajo Nation*, the Land Exchange does not substantially burden Apache Stronghold within the meaning of RFRA, even if the Land Exchange does make it "impossible" for Apache Stronghold's members to worship on Oak Flat. Apache Stronghold is unlikely to succeed on its RFRA claim and the district court was right to so find. We acknowledge that this is a harsh result for Apache Stronghold's members. But it is the result that RFRA commands. And for multiple reasons, this result is necessary.

As we observed in *Navajo Nation*, were the definition of "substantial burden" under RFRA any broader than the *Sherbert/Yoder* framework, "any action the federal government were to take, including action on its own land, would be subject to the personalized oversight of millions of citizens." *Navajo Nation*, 535 F.3d at 1063. Limiting RFRA violations to government action that makes an exercise of religion "impossible" or "deny access" to a religious site

unequivocal "substantial burden" rule: There is "no free exercise violation . . . [if] the affected individuals were not being 'coerced by the Government's action into violating their religious beliefs.'" *Trinity Lutheran*, 137 S. Ct. at 2020 (quoting *Lyng*, 485 U.S. at 449). And as discussed above, the Land Exchange may incidentally prevent religious exercise on Oak Flat but involves no coercion. *See ante* at 25–26; *see also Lyng*, 485 U.S. at 450–51 (rejecting the view that the "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions").

does little to reduce that risk. We recognize that currently, Apache Stronghold objects only to the Land Exchange, and not also to the presence on Oak Flat of hikers, climbers, and other recreational users who now use the land. But other religions have stricter requirements, and a wide array of government or government-authorized actions could, in some worshippers' views, render "impossible" exercises of religion or otherwise obstruct the land on which those exercises would take place. In *Lyng*, in fact, the government project took care not to disturb any "sites where specific rituals [took] place," but to the worshippers, the planned paved road would still "physically destroy the environmental conditions and the privacy without which the[ir] religious practices [could not] be conducted." *Lyng*, 485 U.S. at 449. "[S]uch beliefs could easily require de facto beneficial ownership of some rather spacious tracts of public property." *Id*. at 453. And again, when it comes to the federal government's use of its own land, "giving one religious sect a veto over the use of public park land would deprive others of the right to use what is, by definition, land that belongs to everyone." *Navajo Nation*, 585 F.3d at 1063–64.

The dissent is surely right that some government action swept into RFRA by a more expansive "substantial burden" definition would survive strict scrutiny. *See* Dissent at 77–77. But even so, RFRA cannot require the government to satisfy strict scrutiny every time that the government, through the management of its own land, interferes with religion or denies "access to religious resources." Every new hiking path, ranger station, or "Keep Off the Grass" sign in every National Park could deny access to land or "physically destroy the environmental conditions and the privacy" necessary to some religious practices. *Lyng*, 485 U.S. at 449. The government need not satisfy strict scrutiny to manage federal lands in these ways.

Apache Stronghold's broader definition of "substantial burden" would also create another, deeper problem: It would force judges to make decisions for which we are fundamentally unsuited. The dissenters in *Navajo Nation* were correct on one important point: "[R]eligious exercise invariably, and centrally, involves a 'subjective spiritual experience.'" 535 F.3d at 1096 (Fletcher, J., dissenting); *see also id.* at 1070 n.12 (majority opinion) (agreeing with the dissent on this point). Who are we to say whether government action has an "objective" impact on religious observance or merely "diminishes [a worshipper's] subjective spiritual fulfillment"? *Id.* Questions like this raise issues on which judges must not pass. As we are often reminded, it is outside the "judicial ken to question the centrality of particular beliefs or practices to a faith." *Hernandez*, 490 U.S. at 699. The straightforward *Sherbert*/*Yoder* framework avoids these problems.

Of course, the U.S. government may propose future projects that, like the Land Exchange here, would impose no substantial burden but still have an incidental impact on religious observance or fulfillment. And someone must decide whether the government should ultimately pursue each such project. But RFRA's text trusts that unenviable task to the hands of those both more accustomed to these tradeoffs and more accountable to the people: our elected representatives in Congress.

### 3. Apache Stronghold's Secondary RFRA Argument

Apache Stronghold's secondary argument is that the Land Exchange does in fact deprive its members of a benefit and subject its members to a penalty. Apache Stronghold contends that the Exchange deprives its members of "the use and enjoyment of 'government' land for religious exercise"

and subjects them to penalties for "trespassing on now 'private' land." We disagree.

Turning first to Apache Stronghold's argument that the Land Exchange denies its members a benefit, that argument has a problem. The government does not substantially burden religion every time it ends a "governmental benefit" that at one time went to religious beneficiaries. There must be an element of coercion: the government must "condition" the benefit upon conduct that would violate sincerely held religious beliefs. *Navajo Nation*, 535 F.3d at 1067. Consider this example. Suppose that for many years, the Forest Service has paid Apache Stronghold's members to host educational sessions to teach local children about the Apache's history and culture, including the Apache's religious traditions. But this year, the Forest Service says to Apache Stronghold: "our budget's been cut—we can't renew your contract for more sessions next year." Apache Stronghold's members have just been deprived of a benefit—payment for the educational sessions that they previously held—but they have not been coerced to abandon their religious beliefs. We need not apply strict scrutiny to every contract cancellation or revision.

Under this rubric, the Land Exchange thus presents no "substantial burden." The Exchange does not "condition" any government benefits on the Apache violating their religious beliefs. Like the cancelled educational sessions in the hypothetical above, the Land Exchange does not force Apache Stronghold's members to choose between following their religion and losing a benefit (the "use and enjoyment" of Oak Flat). The Land Exchange just incidentally keeps everybody—Apache Stronghold's members included—from using Oak Flat: No conditioning of a benefit; no coercion. Were the rule otherwise, the federal government

would substantially burden religion any time it cancels a contract with a religious entity or repeals a program that subsidized both parochial and secular private schools.

Next is Apache Stronghold's argument that the Land Exchange subjects its members to penalties: liability for trespassing on land that will be private after the Exchange. We also reject this argument.

Turning first to criminal trespass liability, when a religious plaintiff has a "sufficiently realistic fear" that the government will punish him for exercising his religious beliefs, he can sue the government under RFRA to forestall any such prosecution. *United States v. Christie*, 825 F.3d 1048, 1055 (9th Cir. 2016); *see also O Centro*, 546 U.S. at 425 (affirming "declaratory and injunctive relief" after a religious sect that used a prohibited hallucinogen in its ceremonies had been "threatened . . . with prosecution" under the Controlled Substances Act). If the government's intended prosecution cannot satisfy strict scrutiny, RFRA "immuniz[es]" a religious adherent's conduct "from official sanction—even though such conduct violated a law that is otherwise valid." *Christie*, 825 F.3d at 1055.

But Apache Stronghold's argument faces two problems. For one, Apache Stronghold has not shown a "sufficiently realistic fear" of future criminal liability. *Christie*, 825 F.3d at 1055. Unlike in *O Centro*, there has been no threat of prosecution here. The record shows no imminent plans by Arizona state law enforcement (who are not defendants here and thus could not be subject to the requested preliminary injunction) or by the federal government to prosecute Apache Stronghold's members for any trespasses that may or may not occur in the future.

APACHE STRONGHOLD V. UNITED STATES          49

And even had Apache Stronghold shown a "sufficiently realistic fear" of criminal prosecution, it seeks relief that RFRA cannot provide. Injunctive relief "must be tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). Here, that means that RFRA could give Apache Stronghold's members "immun[ity]" from any criminal trespass charges brought against them for entering Oak Flat after the land passed into private hands unless the government can prove a compelling and narrowly tailored government interest. *Christie*, 825 F.3d at 1055. But Apache Stronghold does not ask for immunity. It asks instead that we enjoin a complex, multi-step land exchange that does much more than (potentially) subject Apache Stronghold's members to criminal liability. RFRA does not authorize Apache Stronghold to enjoin the entire Land Exchange any more than RFRA authorized the *O Centro* plaintiffs to strike down the entire Controlled Substances Act.

Next, when we consider potential civil trespass suits brought by Resolution Copper, we again see two problems with Apache Stronghold's argument.[20] The first problem is factual. At this early stage in the litigation, it is not clear whether the Apache will in fact be subject to civil trespass liability. Even after the Land Exchange, Resolution Copper "will ensure ongoing public access to the Oak Flat Campground, recreational trails and climbing," and will "accommodate requests to periodically close the campground to the public for traditional and ceremonial purposes." Resolution Copper also committed to "permit

---

[20] RFRA is not a defense in private litigation. *See Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834 (9th Cir. 1999). RFRA thus would not prevent Resolution Copper from pursuing private trespass actions against any would-be worshipers.

harvesting of the Emory oak groves by individuals, or commercially through an authorization." And the Apache need not rely on Resolution Copper's goodwill alone. The Land Exchange Provision itself obligates Resolution Copper to "provide access to the surface of the Oak Flat Campground to members of the public, including Indian tribes." 16 U.S.C. § 539p(i)(3). True, Resolution Copper may restrict access once "the operation of the mine precludes continued public access for safety reasons." *Id.* But Resolution Copper is still "several years" and a "detailed feasibility study" away from any final decision as to whether to proceed with the mine at all. So the mine may never come to be, and Resolution Copper may never restrict access at all. At this preliminary injunction stage, these factual uncertainties prevent Apache Stronghold from showing a "likelihood" that Resolution Copper will subject Apache Stronghold's members to trespass liability for using Oak Flat.[21]

The second problem is legal. As with the (potential) criminal charges, even were the Land Exchange to subject Apache Stronghold's members to the threat of civil trespass lawsuits, the substantial burden would be the lawsuits themselves, not Resolution Copper's mining activities. Again, injunctive relief "must be tailored to remedy the

---

[21] We also acknowledge the novelty of Apache Stronghold's fallback argument. RFRA applies only to "[g]overnment" action that substantially burden religious exercise, 42 U.S.C.A. § 2000bb-1, and it is far from clear that it constitutes "government" action for the Forest Service to transfer government land to a private entity which might (or might not) sue other private parties for trespassing on that land. *Cf. Vill. of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 66 (D.C. Cir. 2006). But the parties sparsely briefed Apache Stronghold's secondary argument and the government did not argue that there is no "government" action here, so we leave this issue for another day.

specific harm alleged." *Lamb-Weston, Inc.*, 941 F.2d at 974. Even assuming Apache Stronghold's members were subject to imminent civil trespass suits, we could at most require the government to negotiate with Resolution Copper an easement or a license giving Apache Stronghold's members some access to Oak Flat even after the Land Exchange. We could not enjoin the entire Land Exchange as Apache Stronghold asks us to do.

**B.  Apache Stronghold's Free Exercise Clause Claim**

We next address Apache Stronghold's claim that the Land Exchange would violate the Constitution's Free Exercise Clause. *See* U.S. Const. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."). Under *Employment Division v. Smith*, a "valid and neutral law of general applicability" does not violate the Free Exercise Clause, even if that law burdens religion. 494 U.S. at 879 (quoting *Lee*, 455 U.S. at 263 n.3 (Stevens, J., concurring in judgment)). But laws that are not neutral or are not generally applicable are subject to strict scrutiny. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). A law is not neutral if the law's "object . . . is to infringe upon or restrict practices because of their religious motivation"; a law is not "generally applicable" if the law "impose[s] burdens only on conduct motivated by religious belief" in a "selective manner." *Id*. at 533, 543. Apache Stronghold argues that the Land Exchange Provision is neither neutral nor generally applicable and is thus subject to strict scrutiny. We are not persuaded.

First, the Land Exchange is "neutral" in that its "object" is not to infringe upon the Apache's religious practices. *Id*. at 533. The Land Exchange Provision never mentions religion, and when it comes closest to doing so, the Provision

shows solicitude towards religion, not intent to infringe.  *See* 16 U.S.C. § 539p(g) (designating a "special management area" "to allow for traditional uses of the area by Native American people").  And even though "[f]acial neutrality is not determinative," Apache Stronghold has identified no "subtle departures from neutrality" here.  *Lukumi*, 508 U.S. at 534 (quoting *Gillette v. United States*, 401 U.S. 437, 452 (1971)).  All the evidence suggests that the Land Exchange is meant to facilitate "mineral exploration activities." 16 U.S.C. § 539p(c)(6)(A)(i).  Nothing more and nothing less.

Apache Stronghold disagrees, arguing that the Land Exchange "targets religious conduct for distinctive treatment."  As evidence, it posits that Congress must have known the adverse impact that the Land Exchange would have on the Apache.  But even assuming that 535 distinct Congresspersons could have a single collective "knowledge" or "purpose," Congress's knowledge is not enough to prove its purpose.[22]  It is one thing to pass a statute

---

[22] Apache Stronghold cites, as "evidence of hostility" toward religion, a snippet from the Congressional record where a "bill sponsor criticized 'the San Carlos Apache' for 'car[ing] more about some issues [*i.e.*, religion] than they do about the prospect of employment,' and called for 'an end to' religious 'delays.'"  (All alterations here are Apache Stronghold's.)  This argument has two problems.  First, once Senator McCain's remarks are shorn of all misleading editing, they show no hostility toward religion.  *See Resolution Copper: Hearing on H.R. 1904 and S. 409 Before the S. Comm. on Energy and Nat. Res.*, 112th Cong. 4 (2012) (statement of Sen. John McCain) ("So, the tribal leaders . . . obviously care more about some issues than they do about the prospect of employment for their tribal members . . . .");  *id.* at 4 ("Mr. Chairman, it is time for Congress to put an end to these delays.").  And second, Senator McCain's remarks shed no light on how Congress as a whole perceived the Land Exchange's purpose.  They show only a single Senator's frustration with impediments to the Exchange achieving

with the knowledge that it could burden the Apache's religious exercise.  It is another entirely to pass a statute with the purpose or goal of creating that burden.  *Cf., e.g.*, Model Penal Code § 2.02 (distinguishing between actions made "knowingly" and actions made "purposely").

The Land Exchange is also generally applicable: it does not selectively "impose burdens only on conduct motivated by religious belief."  *Lukumi*, 508 U.S. at 543.  Rather, the Land Exchange will also burden all manner of secular activities on the areas to be transferred to Resolution Copper.  After the Land Exchange, parts of the Tonto National Forest will "no longer [be] accessible to hikers, rock climbing enthusiasts, cyclists, equestrians, campers, hunters, and other recreational users."

Apache Stronghold responds that the Land Exchange is not generally applicable because it is "designed to apply to only one piece of land," but this argument misconstrues the legal standard.  We do not ask if the law was "designed to apply to only one piece of land."  Indeed, the statute challenged in *Smith*—and upheld there as neutral and generally applicable—was designed to apply to only one type of conduct: the "knowing or intentional possession of a 'controlled substance.'"  494 U.S. at 874 (quoting Ore. Rev. Stat § 475.992(4) (1987)).  The question under *Smith* is whether a government action "burdens only . . . conduct motivated by religious belief."  *Lukumi*, 508 U.S. at 543; *see also Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1079 (9th Cir. 2015) ("A law is not generally applicable if it, 'in a selective manner, imposes burdens only on conduct motivated by religious belief.'" (quoting *Lukumi*, 508 U.S.

---

the purpose that particular Senator had in mind: increased gainful employment.

at 543)).  And again, the Land Exchange does not impose such a selective burden.  The Exchange affects not just the Apache but all "hikers, rock climbing enthusiasts, cyclists, equestrians, campers, hunters, and other recreational users" who wish to enjoy the areas to be conveyed to Resolution Copper.  We thus hold that the Land Exchange Provision is a neutral and generally applicable law and passes muster under *Smith*.  The district court properly found that Apache Stronghold is not likely to succeed on its Free Exercise claim.

## C.  Apache Stronghold's Trust Claim

We last consider Apache Stronghold's trust claim.  As relevant background, the Apache and the U.S. government signed the Treaty of Santa Fe in 1852.  In that treaty, the U.S. promised to "designate, settle, and adjust [the Apache's] territorial boundaries, and pass and execute in their territory such laws as may be deemed conducive to the prosperity and happiness of [the Apache]."  Importantly, however, Apache Stronghold has not adduced any evidence that the U.S. ever formally designated any such boundaries.  Apache Stronghold nevertheless argues that this language created an enforceable trust obligation on the U.S. government's part, and that the Land Exchange is "inconsistent" with the U.S.'s obligation to pass laws "conducive to the prosperity and happiness" of the Apache.

The government responds that this trust claim fails for three reasons: 1) Apache Stronghold cannot bring a trust claim under the Treaty of Santa Fe because it is a non-profit group, not the Apache tribe that signed the treaty; 2) the Treaty of Santa Fe does not create an "enforceable trust duty"; and 3) the Land Exchange Provision abrogated the

Treaty of Santa Fe by statute. We need address only the second reason, as it is dispositive here.[23]

We agree with the government that on this record, Apache Stronghold has not established that the Treaty of Santa Fe imposes on the United States an enforceable trust obligation. As a general matter, the U.S. government shoulders a trust obligation with respect to an American Indian tribe when the U.S. government "takes on or has control or supervision over tribal monies or properties." *United States v. Mitchell*, 463 U.S. 206, 225 (1983) (quoting *Navajo Tribe of Indians v. United States*, 224 Ct. Cl. 171, 183 (Ct. Cl. 1980)). But here, the government does not control or supervise tribal properties at Oak Flat. Oak Flat belongs to the government, a fact that Apache Stronghold does not presently contest. Apache Stronghold argues that title over Oak Flat is irrelevant, as it seeks not title but

---

[23] The government phrases its first argument—that a non-profit like Apache Stronghold cannot bring claims under the Treaty of Santa Fe— in terms of "standing." But the government does not assert that Apache Stronghold lacks Article III standing to bring this claim. Rather, the government argues that treaties between the U.S. and American Indian Tribes, like other "treaties between sovereigns," "do not create privately enforceable rights." The government thus claims that the Treaty of Santa Fe gives only the American Indian tribe that signed the treaty—and not individual members of that tribe—a cause of action upon which a court can grant relief. But this is a question of substantive law, not of Article III, and thus "is not a jurisdictional question." *Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1156 (9th Cir. 2015). We thus need not address the government's first argument before considering its second argument: that the Treaty of Santa Fe creates no enforceable trust duty. And because we agree with that second argument, we need not address the government's first argument at all. "[I]f it is not necessary to decide more, it is necessary not to decide more." *N. Cnty. Commc'ns Corp. of Ariz. v. Qwest Corp.*, 824 F.3d 830, 838 n.2. (9th Cir. 2016) (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1030 (9th Cir. 2013) (Bea, J., concurring in part and dissenting in part)).

"usufructuary rights to use land for traditional purposes." But the Treaty's language explicitly tied any obligations that it created to the Apache's title to land. The government promised to "designate, settle, and adjust [the Apache's] territorial boundaries, and pass and execute *in their territory* such laws," "their" referring to the Apache treaty signatories. Even assuming that Oak Flat was once Apache land according to historical maps, Apache Stronghold has not pointed to any evidence indicating that the government designated any boundaries of the Apache's territory after the 1852 Treaty, let alone boundaries that encompass Oak Flat. Because Apache Stronghold points to no evidence establishing that the U.S. government "designate[d] . . . territory" on which the government has any obligation to "pass and execute" laws, it is not likely to prove that the government has assumed any Treaty-based trust obligations with respect to Oak Flat.

This conclusion accords with how both we and other courts have interpreted identical treaty language in other cases. The Treaty with the Utah, just like the Treaty of Santa Fe, required the United States to "designate, settle, and adjust [the American Indians'] territorial boundaries, and pass and execute such laws, in their territory, as the [United States] may deem conducive to the happiness and prosperity of said [American] Indians." Treaty with the Utah, Dec. 30, 1849, art. VII, 9 Stat. 984. But that language only "reserves for a future date the final delineation of boundaries." *Uintah Ute Indians of Utah v. United States*, 28 Fed. Cl. 768, 788, 789 (Fed. Cl. 1993). The Treaty with the Utah "contains no obligations with respect to property" and created neither "a trust relationship [n]or trust protection," at least not until "the Government established boundaries" that delineated American Indian land upon which the United States could have some obligations. *Id.* We agreed in *Robinson v. Jewell*

when we held that the Treaty with the Utah did not "create[] any enforceable property rights."  790 F.3d 910, 916 (9th Cir. 2015); *see also id.* at 917.

So too here.  Apache Stronghold has not adduced evidence which establishes that the U.S. government implemented the Treaty of Santa Fe by designating any land or recognizing any title vested in the Apache.  And without title vested in the Apache, there can be no trust relationship arising from the Treaty of Santa Fe and no trust obligations relating to "usufructuary rights."  Apache Stronghold's trust claim is thus unlikely to succeed.

**\* \* \***

We are a "cosmopolitan nation made up of people of almost every conceivable religious preference." *Braunfeld v. Brown*, 366 U.S. 599, 606 (1961).  This pluralism is a source of strength, but it places demands on us all.  In some cases, the many must accommodate the needs of the few—we accept that the government must sometimes "expend additional funds to accommodate citizens' religious beliefs." *Hobby Lobby*, 573 U.S. at 730.  But in other cases, our need to "maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to the common good."  *Lee*, 455 U.S. at 259.  This give-and-take suits perfectly neither the religious nor the secular.  The "diversity of beliefs in our pluralistic society" demands as much.  *Bowen*, 476 U.S. at 712 (plurality opinion).  Here, for the reasons given above, this case is the second of those two types.

As we reach this conclusion, we do not rejoice.  Rather, we recognize the deep ties that the Apache have to Oak Flat and to the nearby Apache Leap and Devil's Canyon.  And we acknowledge that the Land Exchange may impact the

Apache's plans to worship on Oak Flat. But RFRA, the Free Exercise Clause, and the 1852 Treaty of Santa Fe do not afford Apache Stronghold the relief that it seeks. This dispute must be resolved as are most others in our pluralistic nation: through the political process. In fact, legislation seeking to repeal the Land Exchange Provision is already before Congress. *See* Save Oak Flat Act, H.R. 1884, 117th Cong. (2021).

The district court's denial of Apache Stronghold's motion for a preliminary injunction is **AFFIRMED**.

---

BERZON, Circuit Judge, dissenting:

The majority applies an overly restrictive test for identifying a "substantial burden" on religious exercise under the Religious Freedom Restoration Act of 1993 ("RFRA"), 107 Stat. 1488, 42 U.S.C. § 2000bb to § 2000bb–4. The majority's flawed test leads to an absurd result: blocking Apaches' access to and eventually destroying a sacred site where they have performed religious ceremonies for centuries does not substantially burden their religious exercise. The majority offers both a doctrinal and a practical basis for its unduly narrow definition of "substantial burden." Both are incorrect.

First, the doctrinal argument rests on the notion that RFRA limited the concept of "substantial burden" to the types of burdens the Supreme Court found in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), two cases that preceded *Employment Division v. Smith*, 494 U.S. 872 (1990), the case that precipitated RFRA. But RFRA did no such thing. Instead, RFRA codified only the "compelling interest test" from *Sherbert* and *Yoder*—the level of justification the

APACHE STRONGHOLD V. UNITED STATES          59

government must provide *after* a substantial burden on religion has been found. The statute does not define "substantial burden," and there is no doctrinal basis for narrowing that term to the types of burdens described in *Sherbert* and *Yoder*.

The majority ignores the reality that pre-*Smith* federal cases applied a broader definition of "substantial burden," particularly in the prisoner context. Those cases recognized that when a plaintiff depends on the government for access to religious resources, the government's withholding of those resources can constitute a substantial burden on religious exercise. By making religious practice impossible, instead of merely discouraging or penalizing it, such a burden can be *greater* than those imposed in *Sherbert* and *Yoder*.

The majority derives its definition of "substantial burden" from *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008) (en banc). Because that case held that RFRA did not remedy burdens "short of" those described in *Sherbert* and *Yoder*, *id.* at 1070, I would read *Navajo Nation* as leaving room for recognizing a greater burden as actionable under RFRA. Alternatively, if *Navajo Nation* does not bear that reading, it is irreconcilable with Supreme Court precedent recognizing such burdens in the prisoner context, *see Ramirez v. Collier*, 142 S. Ct. 1264, 1277–78 (2022), and so is no longer binding precedent, *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

Second, the "practical basis" for the majority's definition stems from the concern that "giving one religious sect a veto over the use of public park land would deprive others of the right to use what is, by definition, land that belongs to everyone." Majority Op. 24–25 (quoting *Navajo Nation*, 535 F.3d at 1063–64). But redefining "substantial burden" to

60          APACHE STRONGHOLD V. UNITED STATES

exclude great burdens on religious exercise because accommodating a religious practice could interfere with other uses of federal land is a disingenuous means of reconciling those competing claims. Instead of denying the burden exists, the appropriate way to address the conflicting interests is at the justification stage. If accommodating the religious practice would cause other societal harms, then the government may well be able to show that applying the burden is the "least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb–1(b). Here, the government has not attempted to make that showing.

Applying the correct definition of "substantial burden," I would hold that Apache Stronghold has shown it "is likely to succeed on the merits" of its RFRA claim. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). I would therefore remand for the district court to address the remaining elements of the preliminary injunction test.[1]

## I.

I begin with the majority's principal doctrinal argument—that RFRA limited the definition of "substantial burden" to the types of burdens described in *Sherbert* and *Yoder*. RFRA certainly did not do so expressly. Instead, Congress found that "governments should not substantially burden religious exercise without compelling justification"; that "in *Employment Division v. Smith*, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise

---

[1] Because I would hold that Apache Stronghold is likely to succeed on its RFRA claim, I would not reach its claims under the Free Exercise Clause of the First Amendment or the 1852 Treaty of Santa Fe.

APACHE STRONGHOLD V. UNITED STATES          61

imposed by laws neutral toward religion"; and that "the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests." 42 U.S.C. § 2000bb(a)(3)–(5). The purpose of RFRA was therefore "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." *Id.* § 2000bb(b)(1). This recitation makes evident that Congress's concern was not with defining "substantial burden"—for which RFRA offers no definition—but with ensuring that the compelling interest standard would be applied once a substantial burden had been demonstrated.

The majority relies on *Navajo Nation* for the conclusion that "*Sherbert* and *Yoder* must 'also control [RFRA's] "substantial burden" inquiry.'" Majority Op. 19 (alteration in original) (quoting *Navajo Nation*, 535 F.3d at 1069). As explained in more detail below, I do not read *Navajo Nation* as so instructing. And the idea that RFRA—a statute intended to *restore* religious freedom—silently limited the concept of "substantial burden" to the two types of burdens found in *Sherbert* and *Yoder* requires an inferential leap justified neither by logic nor by the pre-*Smith* federal case law.

*Sherbert* and *Yoder* both addressed situations occurring in private life—that is, life outside an institutional setting such as a prison. In private life, "government inhibitions on voluntary religious practice are the exception rather than the norm." Stephanie Hall Barclay & Michalyn Steele, *Rethinking Protections for Indigenous Sacred Sites*, 134 Harv. L. Rev. 1294, 1301 (2021). Two common tools the

government uses to influence behavior "in contexts in which voluntary choice is the baseline" are so-called "carrots and sticks." *Id.* at 1326. The government offers carrots, or government benefits, to induce desired behavior, and uses sticks, or penalties, to deter undesired behavior. As *Sherbert* and *Yoder* recognized, the government substantially burdens religious exercise when it denies carrots, or threatens sticks, based on a person's religious activity. Or, as the majority puts it: "the government imposes a substantial burden on religion . . . 'when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit,' as in *Sherbert*, or when individuals are 'coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions,' as in *Yoder*." Majority Op. 20 (quoting *Navajo Nation*, 535 F.3d at 1070).

But some Americans seek to practice their religion in contexts in which voluntary choice is *not* the baseline. In these contexts, the government controls access to religious locations and resources. *See Barclay & Steele*, *supra*, at 1301. Three main examples of these contexts are prisons, Native American sacred sites located on government land, and zoning.

Prisoners "are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 720–21 (2005). Prisons may allow or prevent access to resources such as prison chapels or religious texts. Many traditional Native American religious sites are located on federal land. The government controls access to and other aspects of these sites, leaving Native Americans "at the mercy of government permission to access sacred sites." Barclay & Steele, *supra*, at 1301. And through zoning decisions, local governments

can limit religious groups' ability to "build, buy, or rent" "a place of worship . . . adequate to their needs and consistent with their theological requirements," which is "at the very core of the free exercise of religion." *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1069 (9th Cir. 2011) (quoting *Vietnamese Buddhism Study Temple in Am. v. City of Garden Grove*, 460 F. Supp. 2d 1165, 1171 (C.D. Cal. 2006)). In these three contexts, the government may exercise its sovereign power more directly than by using carrots and sticks. By simply preventing access to religious locations and resources, the government may directly prevent religious exercise.

It would be an exceedingly odd statute that recognized and provided remedies for government-created substantial burdens on religious exercise only when the government uses carrots and sticks to influence people's behavior indirectly but not when it directly prevents access to religious resources. Yet the majority reaches just that illogical interpretation of RFRA in this case, without acknowledging its incoherence.

Of course, Congress can enact illogical laws if it chooses. But there is no basis for concluding that RFRA is such a statute, and several reasons for concluding it is not.

First, as discussed, the majority relies primarily on RFRA's invocation of *Sherbert* and *Yoder* in reinstating the compelling interest test. RFRA also refers generally to "Federal court rulings" "prior" to *Smith*. 42 U.S.C. § 2000bb(a)(5). But the majority overlooks the many pre-*Smith* federal cases that recognized, in the prison context, that the government may substantially burden religion simply by controlling access to religious resources.

Second, the Supreme Court has held repeatedly that courts should apply the "same standard" in deciding cases under RFRA and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000cc–5. *Holt v. Hobbs*, 574 U.S. 352, 358 (2015) (quoting *Gonzales v. O Centro Espírita Beneficente Uniõ do Vegetal*, 546 U.S. 418, 436 (2006)). RLUIPA prevents governments from substantially burdening religious exercise in prisons or through zoning decisions unless the compelling interest standard is met. 42 U.S.C. §§ 2000cc, 2000cc–1. The Supreme Court, our court, and other courts of appeals have recognized a substantial burden under RLUIPA in prisoner and zoning cases when the government denies access to religious locations or resources.

Third, recent Supreme Court case law makes evident that pre-*Smith* cases should not be read to cabin RFRA's reach. As the Supreme Court has explained, there is "no reason to believe" that RFRA "was meant to be limited to situations that fall squarely within the holdings of pre-*Smith* cases." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 n.18 (2014). If this court held otherwise in *Navajo Nation*, 535 F.3d 1058—which I do not believe it did—then *Navajo Nation* is in irreconcilable conflict with subsequent Supreme Court case law and is no longer binding. *See Miller*, 335 F.3d at 900.

## A.

A review of the pre-*Smith* Free Exercise cases ignored by the majority demonstrates that the majority's constrained definition of "substantial burden" lacks a basis in pre-*Smith* precedent. In *Cruz v. Beto*, 405 U.S. 319 (1972) (per curiam), for example, a Buddhist prisoner in Texas alleged that the prison denied him access to the prison chapel and prohibited him from corresponding with his religious adviser. The

Supreme Court reversed the dismissal of the complaint, noting that if the allegations were "assumed to be true," "Texas has violated [the Free Exercise Clause of] the First and Fourteenth Amendments." *Id.* at 322. Later, in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), Muslim prisoners assigned to an outside work detail were prevented from attending "Jumu'ah, a weekly Muslim congregational service." *Id.* at 345. The Supreme Court held that the policy requiring the prisoners to remain outside did not violate the Free Exercise Clause, but not because there was no burden on the prisoners' religious exercise. Assuming a burden, the Court went on to evaluate the question whether the burden was justified by "legitimate penological objectives" and found that it was. *Id.* at 352–53. In both these cases, the claim was not that the plaintiffs were "forced to choose between following the tenets of their religion and receiving a governmental benefit" or "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions," Majority Op. 20 (internal quotation marks omitted), but that they were directly denied access to religious resources.

Similarly, in *McElyea v. Babbitt*, 833 F.2d 196 (9th Cir. 1987), we reversed a grant of summary judgment in favor of an Arizona prison because the plaintiff had raised triable issues of fact regarding his claims that "(1) there were no weekly Jewish services conducted at the prison; (2) he was unreasonably denied permission to attend a special service on the High Holy Days; (3) he was unable to obtain a kosher diet; and (4) there were no Jewish religious writings available at the prison." *Id.* at 197. Our reversal for further factual development recognized that, if true, the allegations not only raised equal protection concerns but also showed a burden on religious exercise that the government must justify. *Id.* at 199. We explained, for example, that "the defendants cannot erect a barrier to an inmate's access to

66    APACHE STRONGHOLD V. UNITED STATES

religious reading material absent a security or penological interest." *Id.*[2]

Other federal courts of appeals decided similar cases before *Smith*. For example, in *Williams v. Lane*, 851 F.2d 867 (7th Cir. 1988), the Seventh Circuit upheld a district court ruling that a prison "violated plaintiffs' right to the free exercise of their religion by not allowing communal religious services, by not permitting prisoners participation in rituals of their faith, and by depriving the inmates of religious counseling and instruction." *Id.* at 877–78. In *Kennedy v. Meacham*, 540 F.2d 1057 (10th Cir. 1976), the Tenth Circuit reversed the dismissal of a complaint alleging that a prison violated the plaintiffs' right to practice "the Satanic religion" when, among other things, it "denied them the right to possess necessary ritual items in their cell." *Id.* at 1059. The Court held that further factual development was needed, as the prison's "asserted justification of such restrictions on religious practices based on the State's interest in maintaining order and discipline must be shown to outweigh the inmates' First Amendment rights." *Id.* at 1061; *see also LaReau v. MacDougall*, 473 F.2d 974, 979–80 & n.9 (2d Cir. 1972) (requiring case-by-case evaluations of governmental justifications for banning prisoners in segregation from attending chapel).

In short, federal cases prior to *Smith* accepted that governments substantially burden religious exercise—and

---

[2] In *Allen v. Toombs*, 827 F.2d 563 (9th Cir. 1987), we held that a prison did not violate plaintiffs' Free Exercise rights by denying them access to a sweat lodge ceremony. But as in *O'Lone*, the reason was not that plaintiffs' religious exercise was not burdened, but because we accepted the prison's determination that allowing high-risk prisoners to participate in the ceremony would present unacceptable security risks. *Id.* at 567.

so must justify their actions—when they control access to religious resources and deny plaintiffs access to those resources. The notion that pre-*Smith* cases recognized a substantial burden *only* when the government denied a benefit or threatened a penalty is revisionist history not supported by the case law.

**B.**

Nor is there any reason to believe that Congress, in enacting RFRA, *narrowed* the definition of "substantial burden" from what it had been in the pre-*Smith* Free Exercise cases. Congress enacted RFRA as a reaction to *Smith*, "which held that neutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause of the First Amendment." *Holt*, 574 U.S. at 356–57. "Following . . . *Smith*, Congress enacted RFRA in order to provide *greater* protection for religious exercise than is available under the First Amendment." *Id.* at 357 (emphasis added). The majority's implicit suggestion that in so doing, Congress silently *constricted* the definition of "substantial burden" is exceedingly difficult to credit in light of the overall thrust of RFRA.

If there were any question whether Congress intended for RFRA's definition of "substantial burden" to be broad enough to encompass governmental denial of access to religious resources, it is laid to rest by Congress's passage of RLUIPA seven years later. By then, *City of Boerne v. Flores*, 521 U.S. 507 (1997), had "invalidated RFRA as applied to States and their subdivisions, holding that the Act exceeded Congress' remedial powers under the Fourteenth Amendment." *Cutter*, 544 U.S. at 715. "Congress responded to *City of Boerne* by enacting RLUIPA, which applies to the States and their subdivisions and invokes congressional

authority under the Spending and Commerce Clauses." *Holt*, 574 U.S. at 357.

Section 2 of RLUIPA governs land-use regulation such as zoning. It provides that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden . . . (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1).

Section 3 of RLUIPA governs religious exercise by institutionalized persons, such as prisoners. "Section 3 mirrors RFRA and provides that '[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Holt*, 574 U.S. at 357–58 (alterations in original) (quoting 42 U.S.C. § 2000cc–1(a)). As the Supreme Court has repeatedly recognized, "RLUIPA thus allows prisoners 'to seek religious accommodations pursuant to the same standard as set forth in RFRA.'" *Id.* at 358 (quoting *Gonzales*, 546 U.S. at 436).

Given that Congress enacted RLUIPA to restore part of RFRA's original reach, that RLUIPA uses the same "substantial burden" language as RFRA, and that RLUIPA sets forth the "same standard" for evaluating governmental justifications for imposing substantial burdens on religion as

RFRA—strict scrutiny—there is no reason to believe that "substantial burden" means something different under RFRA and RLUIPA. Cases decided under RLUIPA, in both the prison and zoning contexts, confirm that the definition of "substantial burden" includes the denial of access to religious locations and resources.

For example, in *Greene v. Solano County Jail*, 513 F.3d 982 (9th Cir. 2008), a county jail denied the plaintiff, a maximum-security prisoner, the opportunity to attend group worship services. We had "little difficulty in concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise." *Id.* at 988. Similarly, in *Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014) (Gorsuch, J.), the Tenth Circuit held that it did not "take much work to see that" a prison substantially burdened the plaintiff's religious exercise by "flatly prohibiting" him from using the prison's sweat lodge. *Id.* at 56. And in *Haight v. Thompson*, 763 F.3d 554 (6th Cir. 2014), the Sixth Circuit held that prison officials substantially burdened plaintiffs' religious exercise by denying them permission to buy ceremonial foods for an annual event. *Id.* at 565.

Most recently, the Supreme Court stayed the execution of a prisoner who requested that "his long-time pastor be allowed to pray with him and lay hands on him while he is being executed." *Ramirez*, 142 S. Ct. at 1272. The Court held that Ramirez was entitled to a preliminary injunction because, among other things, he was "likely to succeed in showing that Texas's" refusal to permit audible prayer or

70      APACHE STRONGHOLD V. UNITED STATES

religious touch "substantially burdens his exercise of religion." *Id.* at 1278.**[3]**

In the zoning context, we have held that a county "imposed a substantial burden" on a Sikh organization's "religious exercise under RLUIPA" by denying applications from the group, Guru Nanak, for a conditional use permit to build a temple. *Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 981–82 (9th Cir. 2006). The denials "to a significantly great extent lessened the prospect of Guru Nanak being able to construct a temple in the future" and so "imposed a substantial burden on Guru Nanak's religious exercise." *Id.* at 992. Likewise, in *International Church of the Foursquare Gospel*, which concerned a city's denial of a conditional use permit to build a church, we reversed the district court's grant of summary judgment to the city. 673 F.3d at 1061. The church "presented significant evidence that no other suitable properties existed," raising a "triable

---

**[3]** The majority dismisses *Ramirez* as irrelevant because the government officials in that case did "not dispute that any burden their policy imposes on Ramirez's religious exercise is substantial," 142 S. Ct. at 1278, and "the scope of a 'substantial burden' under either statute was [therefore] explicitly not at issue," Majority Op. 41. But the Court's "do not dispute" language was followed by the statement that "Ramirez is likely to succeed in showing that Texas's policy substantially burdens his exercise of religion." 142 S. Ct. at 1278. That statement, along with the "do not dispute" locution, indicates agreement with the proposition not disputed rather than a waiver determination, which is what the majority suggests. Further, if the burden alleged by Ramirez were simply not cognizable under RLUIPA no matter the actual impact on his exercise of religion, as the majority's ruling here would indicate, surely the Supreme Court would not have taken the extraordinary measures of staying his execution, requiring Texas to "prove that [its] refusal to accommodate" his religious exercise furthered a compelling interest by the least restrictive means, and—after finding Texas had not carried its burden—ordering preliminary relief. *Id.* at 1278, 1284.

issue of material fact regarding whether the City imposed a substantial burden on the Church's religious exercise under RLUIPA." *Id.* at 1061, 1068.

As demonstrated by this case law in the prison and zoning contexts, when the government controls access to religious locations and resources, it substantially burdens religious exercise by directly—rather than indirectly through the use of carrots and sticks—denying access to those locations or resources, objectively interfering with the plaintiff's religious practice.

## C.

*Navajo Nation* is not to the contrary. There, we held that "[a]ny burden imposed on the exercise of religion *short of* that described by *Sherbert* and *Yoder* is not a 'substantial burden' within the meaning of RFRA." 535 F.3d at 1070 (emphasis added). By excluding burdens "short of" those described in *Sherbert* and *Yoder*, we left room for a more severe burden to qualify as substantial.

As discussed, the government's denial of access to religious resources may result in a *greater* burden on religious exercise—potentially preventing religious practice altogether—than when it influences religious exercise indirectly by withholding benefits or threatening penalties. *See Cutter*, 544 U.S. at 720–21 (explaining that the "degree of control" the government exercises in institutional contexts is "severely disabling to private religious exercise"); *Yellowbear*, 741 F.3d at 56 (holding that when a "prison refuses *any* access" to a sweat lodge, the restriction does not present "a situation where the claimant is left with some degree of choice in the matter and we have to inquire into the degree of the government's coercive influence on that choice," but instead "easily" qualifies as a substantial

burden); *Haight*, 763 F.3d at 565 ("The greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice).").

*Navajo Nation*'s failure to recognize a substantial burden under the facts of that case supports rather than undermines my reading of the opinion. In *Navajo Nation*, the plaintiffs objected to the government's planned "use of artificial snow," made from recycled wastewater, "for skiing on a portion of a public mountain sacred in their religion." 535 F.3d at 1062. "[N]o plants, springs, natural resources, shrines with religious significance, or religious ceremonies . . . would be physically affected by the use of such artificial snow," "no places of worship [would be] made inaccessible," and the plaintiffs would "continue to have virtually unlimited access to the mountain, including the ski area, for religious and cultural purposes." *Id.* at 1063. Additionally, the plaintiffs were unable to identify an objective impact on their religious practice. We concluded that "the sole effect of the artificial snow [would be] on the Plaintiffs' subjective spiritual experience." *Id.* at 1063.

In short, in *Navajo Nation*, the government did not deny access to or destroy a religious site, as the en banc court emphasized. So the case did not involve a situation in which the government objectively and severely interfered with a plaintiff's access to religious locations or resources.[4]

---

[4] The majority cites several cases in which it says we applied the constrained definition of "substantial burden" the majority derives from *Navajo Nation*. Majority Op. 37–38 & n.11. But none of those cases addressed a situation in which the government entirely denied access to or destroyed a religious site or resource. *See, e.g.*, *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1215 (9th Cir. 2008) ("The issuance of a new license [to operate for another forty years the Snoqualmie Falls

APACHE STRONGHOLD V. UNITED STATES        73

Nor does *Bowen v. Roy*, 476 U.S. 693 (1986), *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988), or *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), support the majority's constricted understanding of the term "substantial burden" in RFRA. In *Bowen*, the plaintiff objected to the government's use of a Social Security number in conducting its "internal affairs." 476 U.S. at 699. *Bowen* thus did not address a context in which the government controlled the plaintiff's access to religious resources. In *Lyng*, as in *Navajo Nation*, the government did control access to several religious sites, but the government action at issue—a proposed road in a national forest—did not deny access to or directly damage the sites. "No sites where specific rituals take place were to be disturbed" by the road, and the government sited the road so as to minimize "audible intrusions" and "visual impact" on the religious sites. 485 U.S. at 454. Last, *Trinity Lutheran*, in discussing the Court's Free Exercise Clause jurisprudence, simply noted that the Court had not found government coercion in *Lyng*. 137 S. Ct. at 2020. That summation is accurate and does not imply the Court would reach the same result in a case in which the government controlled access to religious resources and entirely denied a plaintiff access to those resources.

In sum, there is no doctrinal basis for limiting the definition of "substantial burden" to the types of burdens imposed in *Sherbert* and *Yoder*. To the contrary, the case law supports defining "substantial burden" to include, at a minimum, situations in which the government controls

---

Hydroelectric Project] . . . does [not] prohibit or prevent the Snoqualmies' access to Snoqualmie Falls, their possession and use of religious objects, or the performance of religious ceremonies.").

access to religious resources and entirely denies access to or destroys those resources, objectively interfering with the plaintiff's religious practice.

Finally, and alternatively, if—contrary to my view—*Navajo Nation*'s discussion of the meaning of "substantial burden" does not leave room to recognize greater burdens than those described in *Sherbert* and *Yoder*, as the majority insists it does not, Majority Op. 31–32, then I would hold that the Supreme Court since *Navajo Nation* was decided has "undercut the theory or reasoning underlying [*Navajo Nation*] in such a way that the cases are clearly irreconcilable." *Miller*, 335 F.3d at 900.

As discussed, the Supreme Court has repeatedly instructed courts to apply the "same standard" in cases under RFRA and RLUIPA. *Holt*, 574 U.S. at 358 (quoting *Gonzales*, 546 U.S. at 436). Recent Supreme Court cases under RLUIPA and RFRA are irreconcilable with *Navajo Nation* if that case is read, as the majority reads it, to limit "substantial burden" to denied benefits and threatened penalties. In *Ramirez*, a case under RLUIPA, the Court's holding rested on an understanding of "substantial burden" that includes the denial of access to religious resources where the government controls access to those resources. 142 S. Ct. at 1278. And *Hobby Lobby* emphasized that Congress enacted RFRA "to provide very broad protection for religious liberty" that goes "far beyond what [the Supreme] Court has held is constitutionally required." 573 U.S. at 693, 706. The Court rejected as "absurd" the notion that "RFRA merely restored [the Supreme] Court's pre-*Smith* decisions in ossified form." *Id.* at 715. If *Navajo Nation* held that RFRA's definition of "substantial burden" is limited to the types of burdens described in *Sherbert* and *Yoder*, that holding cannot be squared with *Holt*, *Ramirez*,

and *Hobby Lobby*, read together. *See Miller*, 335 F.3d at 900.[5]

**II.**

The majority's proffered "practical basis" for its constricted definition of "substantial burden" fares no better than its faulty doctrinal analysis. Majority Op. 24–25. Practicality, the majority maintains, requires limiting the concept of "substantial burden" to exclude burdens arising from the government's control over access to Native American sacred sites on federal land because "giving one religious sect a veto over the use of public park land would deprive others of the right to use what is, by definition, land that belongs to everyone." *Id.* (quoting *Navajo Nation*, 535 F.3d at 1063–64).

True, recognizing Native Americans' right of access to traditional religious sites on federal land may sometimes constrain competing uses of the land. But this "practical basis" for the majority's definition of "substantial burden" is flawed in two ways. First, there is no justification for resolving competing claims on the uses of federal land by refusing to recognize the Native American claim at the "substantial burden" stage of the analysis. Second, recognizing a substantial burden on religious exercise does

---

[5] If I am incorrect that *Navajo Nation*, if understood as the majority posits, does not survive *Holt*, *Ramirez*, and *Hobby Lobby*, then our court should reconsider en banc the majority's holding here that "under RFRA, the government imposes a substantial burden on religion only when the government action fits within the framework established by *Sherbert* and *Yoder*." Majority Op. 20. That reading of RFRA is wrong for all the reasons explained in this dissent.

not result in an automatic "veto" over other uses of the land. I address these errors in turn.

First, burdens on Native Americans who practice land-based religions and who depend on the federal government for access to federal land are not excluded from RFRA's coverage. RFRA "applies to all Federal law, and the implementation of that law, whether statutory or otherwise." 42 U.S.C. § 2000bb–3(a). There is no exception for federal laws relating to federal land or access to sacred sites.

Moreover, it is disingenuous to resolve the concern about competing claims on federal land by slipping it into the substantial burden analysis. The majority's concern, revealed by its discussion of the "practical basis" for its holding, has nothing to do with whether the Apaches' religious exercise is substantially burdened and everything to do with how we address competing demands for resources—in this case, federal land that hosts both a traditional sacred site and a copper deposit. By pretending that the question is whether there is a "substantial burden" on the Apaches' religious exercise, and not whether the government has shown a compelling interest in putting the site to a different use, we avoid a transparent inquiry into the considerations that should determine the allocation of resources for which there are competing demands, one of which is religion-based.

That brings me to the majority's second error, its assertion that acknowledging a substantial burden when Native Americans are denied access to sacred sites would give Native Americans an automatic "veto" over competing uses of federal land. Majority Op. 24–25. It would not. Instead, it would lead us to the second step of the analysis, the compelling interest test.

Unlike the substantial burden inquiry, the compelling interest test provides a transparent tool for airing and resolving conflicts between the interests of religious adherents and those of others in society. It gives the government an opportunity to provide a rationale for its action and demonstrate the lack of viable alternatives. It allows the court to engage in an open discussion about balancing competing interests. And it does not result in an automatic loss for the government. "Strict scrutiny is not 'strict in theory, but fatal in fact.'" *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 237 (1995)). According to one empirical analysis, federal courts applying strict scrutiny in religious liberty cases between 1990 and 2003 upheld the challenged laws nearly 60 percent of the time. Adam Winkler, *Fatal in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts*, 59 Vand. L. Rev. 793, 796–97 (2006).

The majority has demonstrated neither a doctrinal nor a practical basis for its narrow definition of "substantial burden" under RFRA. The case law and history of RFRA instead support recognizing a substantial burden when the government controls access to religious resources and completely denies access to or destroy those resources, objectively interfering with the plaintiff's religious exercise. After finding a substantial burden, courts still must apply RFRA's compelling interest standard, which permits a transparent inquiry into the strength of the government's proffered justification for its action.

**III.**

Applying the proper definition of the term, there is no doubt that the complete destruction of Oak Flat would be a "substantial burden" on the Apaches' religious exercise. As

78        APACHE STRONGHOLD V. UNITED STATES

the district court found, the "evidence . . . shows that the Apache peoples have been using Oak Flat as a sacred religious ceremonial ground for centuries." *Apache Stronghold v. United States*, 519 F. Supp. 3d 591, 603 (D. Ariz. 2021). And the Oak Flat location is not fungible with other locations for purposes of the Apaches' religious activities. The Apaches perform ceremonies at Oak Flat because they believe the site to be "a 'direct corridor' to the Creator's spirit." *Id.* at 604. "Many of the young Apache women have a coming of age ceremony, known as a 'Sunrise Ceremony,' in which each young woman will 'connect her soul and her spirit to the mountain, to Oak Flat.' . . . Apache individuals pray at the land and speak to their Creator through their prayers." *Id.* "The spiritual importance of Oak Flat to the Western Apaches cannot be overstated." *Id.* at 603.

The purpose of the Land Transfer Act, and Resolution Copper's planned use of the land, is to extract copper ore from below Oak Flat, using a technique called "block caving" or "panel caving." Once the ore is removed, the land above the deposit will collapse, creating a "subsidence zone" about 1.8 miles in diameter and about 1,000 feet deep, destroying Oak Flat. According to the government's environmental impact statement, "the impacts on archaeological sites, tribal sacred sites, cultural landscapes, and plant and mineral resources caused by construction of the mine would be immediate, permanent, and large in scale." As the district court found, "the land . . . will be all but destroyed to install a large underground mine, and Oak Flat will no longer be accessible as a place of worship." *Apache Stronghold*, 519 F. Supp. 3d at 606. By preventing the Apache people from using Oak Flat as a site for religious ceremonies as they have for centuries, the Land Transfer Act will "have a devastating effect on the Apache people's

religious practices." *Id.* at 607. "The Western Apaches' exercise of religion at Oak Flat will not be burdened—it will be obliterated." Order Denying Emergency Mot. for Injunction Pending Appeal at 9, *Apache Stronghold v. United States*, No. 21-15295 (9th Cir. Mar. 5, 2021) (Bumatay, J., dissenting), ECF No. 26.

As the government controls access to Oak Flat and the result of the Land Transfer Act will be to make the site inaccessible and eventually destroy it, objectively preventing Apaches from holding religious ceremonies there, I would hold Apache Stronghold is likely to succeed in showing a substantial burden on its members' religious exercise.[6]

Once a court finds a substantial burden, "the burden of persuasion shifts to the government to prove that the challenged government action is in furtherance of a 'compelling governmental interest' and is implemented by 'the least restrictive means.'" *Navajo Nation*, 535 F.3d at 1068. The government has not attempted to satisfy the compelling interest test here or in the district court, instead limiting its arguments to the substantial burden issue.

---

[6] Alternatively, I would hold that even under the majority's unduly narrow definition of "substantial burden," Apache Stronghold has demonstrated that the Land Transfer Act will coerce its members "to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation*, 535 F.3d at 1069–70. After Resolution Copper closes Oak Flat, but before it is totally destroyed, Apache Stronghold members will face penalties for trespassing if they attempt to hold religious ceremonies there.

I do not stand principally on this point, however. I am reluctant to lend credence to the notion that a trespass conviction is a substantial burden on religion but complete destruction of an irreplaceable religious location is not.

Because the government bears the burden of persuasion on the compelling interest test and has not carried it, Apache Stronghold is likely to succeed on the merits of its RFRA claim. *See Gonzales*, 546 U.S. at 429 (confirming the government bears the burden of satisfying RFRA's compelling interest test at the preliminary injunction stage). As the district court did not address the other elements of the preliminary injunction test, I would remand for the district court to do so in the first instance.

I therefore respectfully dissent.