CASE NO. 21-15295

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Apache Stronghold,

*Plaintiff and Appellant*,

vs.

United States of America, et al.,

*Defendants and Appellees*.

Appeal From the United States District Court
for the District of Arizona,
Hon. Steven P. Logan
Case No. 2:21-cv-00050-PHX-SPL,

**BRIEF OF TRIBAL NATIONS AND
TRIBAL ORGANIZATIONS AS *AMICI CURIAE*
SUPPORTING PLAINTIFF-APPELLANT**

Jason Searle
Beth Wright
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302
Telephone: (303) 447-8760
Facsimile: (303) 443-7776
Searle@narf.org
Wright@narf.org

April Youpee-Roll
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
April.Youpee-Roll@mto.com

Counsel for *Amici*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1, Amici the Association on American Indian Affairs and the National Association of Tribal Historic Preservation Officers state that they do not have parent corporations, nor are they are publicly traded. Amici Tohono O'odham Nation, Tonto Apache Tribe and San Juan Southern Paiute are governmental entities for which no corporate disclosure is required.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTEREST OF AMICI CURIAE ............................................................1

INTRODUCTION .................................................................................3

ARGUMENT ........................................................................................4

I.    **It is Critical That This Court Clarify RFRA's Applicability on Federal Land** ................................................................................4

    A.    **The Ninth Circuit is Home to More Tribal Nations and More Traditional Tribal Territory Than Any Other Circuit** ........4

    B.    **Sacred Places Remain Vitally Important to the Continued Existence of Tribal Nations** .............................................6

    C.    **The Proposed Land Exchange Would Lead to Irreparable Damage of Oak Flat and Exacerbate Existing and Historic Suppression of Tribal Cultures and Religions** ...............10

II.    **The Rule Applied by the District Court Deprives Tribal Nations and Tribal Citizens of RFRA's Protections** .................................13

    A.    **The *Navajo Nation* Rule Should be Abandoned as Inconsistent with RFRA's Text and Foreclosed by Subsequent Caselaw** ...............................................14

        1.    The Benefit/Sanctions Framework is Inconsistent with the Text of RFRA ................................................15

        2.    The Supreme Court Has Foreclosed Adherence to the Benefit/Sanctions Framework ..................................16

    B.    **The Plain Meaning of "Substantial Burden" Encompasses the Destruction of the Ability to Practice at Oak Flat** .................18

    C.    **Continued Application of the Benefit/Sanctions Framework Will Lead to Unjust Results** ............................................23

CONCLUSION ...................................................................................25

CERTIFICATE OF COMPLIANCE ....................................................27

CERTIFICATE OF SERVICE .............................................................28

i

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Burwell v. Hobby Lobby*,
573 U.S. 682 (2014)............................................................................ 16, passim

*City of Boerne v. Flores*,
521 U.S. 507 (1997).................................................................................17, 20

*Cruz v. Beto*,
405 U.S. 319 (1972)........................................................................................21

*Emp't Div., Dep't of Human Res. of Or. v. Smith*,
494 U.S. 872 (1990).......................................................................................20

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006)) .................................................................................22, 24

*Hobby Lobby Stores, Inc. v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) ...........................................................20, 23, 24

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988).......................................................................................19

*McElyea v. Babbitt*,
833 F.2d 196 (9th Cir. 1987) ..........................................................................20

*Mockaitis v. Harcleroad*,
104 F.3d 1522 (9th Cir. 1997) ........................................................................20

*Navajo Nation v. United States Forest Service*,
535 F.3d 1058 (9th Cir. 2008) .................................................................. 3, passim

*San Jose Christian Coll. v. City of Morgan Hill*,
360 F.3d 1024 (9th Cir. 2004) ........................................................................18

*Shakur v. Schriro*,
514 F.3d 878 (9th Cir. 2008) ..........................................................................20

*Stormans, Inc. v. Wiesman*,
794 F.3d 1064 (9th Cir. 2015) ........................................................................13

*Yellowbear v. Lampert*,
  741 F.3d 48 (10th Cir. 2014) ..................................................................11, 24

**FEDERAL STATUTES**

42 U.S.C. § 2000bb(a) ................................................................................20, 21

42 U.S.C. § 2000bb(b) ................................................................................13, 15

42 U.S.C. § 2000cc–3(g)........................................................................16, 23, 24

42 U.S.C. §§ 2000cc to 2000cc-5 ..................................................................17

**OTHER AUTHORITIES**

*10 Public Lands with Powerful Native American Connections*,
  U.S. Dep't of Interior, https://www.doi.gov/blog/10-public-lands-
  powerful-native-american-connections (Oct. 30, 2020)......................................6

*Announcement of U.S. Support for the United Nations Declaration
  on the Rights of Indigenous Peoples*, U.S. Dept. of State
  (Jan. 12, 2011)...........................................................................................2

Bureau of Indian Affairs Office of Trust Servs., *Indian Lands of
  Federally Recognized Tribes of the United States*,
  U.S. Dep't of Interior, https://www.bia.gov/sites/default/files/dup/
  assets/bia/ots/webteam/pdf/idc1-028635.pdf (June 2016) ..................................5

Claudia (We-La-La) Long et al., *Assessing Cultural Life Skills of
  American Indian Youth*,
  35 Child Youth Care Forum 289(2006).................................................................9

G.A. Res. 61/295, United Nations Declaration on the Rights of
  Indigenous Peoples (Oct. 2, 2007)..................................................................2, 9

Hillary Hoffman & Monte Mills, *A Third Way: Decolonizing the
  Laws of Indigenous Cultural Protection* (2020)............................................6, 20

*Indian Entities Recognized by and Eligible To Receive Services From
  the United States Bureau of Indian Affairs*,
  87 Fed. Reg. 4636 (Jan. 28, 2022) ..................................................................5

iii

Eric Hemenway, *Native Nations Face the Loss of Land and Traditions*, Nat'l Park Serv., https://www.nps.gov/articles/ negotiating-identity.htm (Sept. 13, 2022) ..........................................22

Exec. Order No. 13175, 65 Fed. Reg. 67249 (Nov. 6, 2000) ...................................2

Exec. Order No. 13336, 69 Fed. Reg. 25295 (April 30, 2004) .................................2

Jeanette Wolfley, *Reclaiming A Presence in Ancestral Lands: The Return of Native Peoples to the National Parks*, 56 Nat. Res. J. 55 (2016) ................................................................. 7-8

Jessica M. Wiles, *Have American Indians Been Written Out of the Religious Freedom Restoration Act?*, 71 Mont. L. Rev. 471 (2010) ...........................................................23

Kristen A. Carpenter, *A Property Rights Approach to Sacred Sites Cases: Asserting a Place for Indians as Nonowners*, 52 UCLA L. Rev. 1061 (2005) ..........................................................8

Kristen A. Carpenter et al., *In Defense of Property*, 118 Yale L. J. 1022 (2009).........................................................................10

Kristen A. Carpenter, *Living the Sacred: Indigenous Peoples and Religious Freedom*, 134 Harv. L. Rev. 2103 (2021) .......................................6, 7

Kristen A. Carpenter, *Old Ground and New Directions at Sacred Sites on the Western Landscape*, 83 Denv. U. L. Rev. 981 (2006).............................7

Lauren Redniss, *Oak Flat: A Fight for Sacred Land in the American West* (2020) .........................................................................12

*Memorandum of Understanding Regarding Interagency Coordination and Collaboration for the Protection of Indigenous Sacred Sites*, U.S. Depts. of Interior, Agric., Transp., and Energy, U.S. EPA, White House Council on Env't Quality, Advisory Council on Hist. Pres., and Tenn. Valley Auth. (Nov. 9, 2021) .......................................2

Nat'l Park Serv., *Keepers of the Treasures: Protecting Historic Properties and Cultural Traditions on Indian Lands* (1992) ..............................8

Presidential Memorandum on Tribal Consultation, The White House (Nov. 5, 2009)..........................................................2

R.C. Gordon-McCutchan, *The Battle for Blue Lake: A Struggle for Indian Religious Rights*, 33 J. Church & St. 785 (1991) ................................................................. 9

Richard Guest, *Tribal Supreme Court Project: Ten Year Report*, 1 Am. Ind. L. J. 28 (2017) ....................................................................... 4

Robert Charles Ward, *The Spirits Will Leave: Preventing the Desecration and Destruction of Native American Sacred Sites on Federal Land*, 19 Ecology L. Q. 795 (1992) ........................................... 6

*Search Federally Recognized Tribes*, U.S. Dep't of Interior, https://www.bia.gov/service/tribal-leaders-directory/federally-recognized-tribes ...................................................................... 5

*Tribal Connections*, U.S. Forest Serv., https://usfs.maps.arcgis.com/apps/webappviewer/index.html?id=fe 311f69cb1d43558227d73bc34f3a32 (Jan. 2018) .................................. 6

William C. Sturtevant, *Early Indian Tribes, Culture Areas, and Linguistic Stocks*, U.S. Geological Survey (1991) .............................. 5

## INTEREST OF AMICI CURIAE[1]

Amici Tohono O'odham Nation, Tonto Apache Tribe, and San Juan Southern Paiute are federally recognized Tribal Nations whose traditional territories and reservation lands are located within the Ninth Circuit. Amici the Association on American Indian Affairs and the National Association of Tribal Historic Preservation Officers are national organizations dedicated to the rights of Tribal Nations and Tribal citizens, and to the preservation of Tribal cultures and traditions.

Amici and their members possess a vital interest in the protection of American Indian religious freedoms, the continuation of American Indian religious practices, the protection of sacred places and resources, and access thereto. As recognized in the withdrawn Final Environmental Impact Statement (FEIS) for the Resolution Copper Project and Land Exchange, "[n]o tribe supports the desecration/destruction of ancestral sites" and "[i]t is a tribal cultural imperative that these places should not be disturbed or destroyed for resource extraction or for financial gain." (3-FEIS-820.) "Desecration of sacred places" has and continues to cause "enduring negative impacts" to the "social, cultural, spiritual, mental, and

---

[1] Counsel for all parties have consented to the filing of this brief. Amici affirm that no counsel to a party authored this brief in whole or in part; no party or counsel to a party contributed money intended to fund preparing or submitting this brief; and no person other than Amici and their counsel contributed money intended to fund preparing or submitting this brief.

physical wellbeing" of Amici and their members. *Memorandum of Understanding Regarding Interagency Coordination and Collaboration for the Protection of Indigenous Sacred Sites*, U.S. Depts. of Interior, Agric., Transp., and Energy, U.S. EPA, White House Council on Env't Quality, Advisory Council on Hist. Pres., and Tenn. Valley Auth. (Nov. 9, 2021). Indigenous peoples possess recognized rights "to maintain and strengthen their distinctive spiritual relationship with their traditionally owned or otherwise occupied and used lands, territories, waters and coastal seas and other resources and to uphold their responsibilities to future generations in this regard." See G.A. Res. 61/295, United Nations Declaration on the Rights of Indigenous Peoples, art. 25 (Oct. 2, 2007); *see also Announcement of U.S. Support for the United Nations Declaration on the Rights of Indigenous Peoples*, U.S. Dept. of State (Jan. 12, 2011). The interest of the Tribal Nation Amici further stems from their "unique legal and political relationship" with the United States, which has been recognized by the Executive Branch in establishing and reaffirming policies of consultation and coordination between various federal agencies and tribal governments. *See* Presidential Memorandum on Tribal Consultation, The White House (Nov. 5, 2009); *see also* Exec. Order No. 13336, 69 Fed. Reg. 25295 (April 30, 2004); Exec. Order No. 13175, 65 Fed. Reg. 67249 (Nov. 6, 2000).

**INTRODUCTION**

The proposed land transfer and the Resolution Copper Mine threaten "indescribable hardship" to the Tribal Nations and individuals who conduct religious ceremonies at *Chí'chil Biłdagoteel* (Oak Flat). (*See* 1-FEIS-29, 3-FEIS-820; 1-ER-12–14.) The land transfer itself would instantly preclude tribal access (3-FEIS-824), while the proposed mine will "directly and permanently damage" (1-FEIS-29) a "religious ceremonial ground" held sacred "for centuries." (1-ER-12; *see generally* OB at 6.)

Nevertheless, the District Court held that the obvious and undisputed burden on religious practices stemming from the loss of access to and the ultimate destruction of Oak Flat and its resources is insufficient to invoke the protections of the Religious Freedom Restoration Act (RFRA) under the rule announced by this Court in *Navajo Nation v. United States Forest Service*, 535 F.3d 1058 (9th Cir. 2008) (en banc). (1-ER-17–18.) *See also Navajo Nation*, 535 F.3d at 1070 ("Any burden imposed on the exercise of religion short of that described by *Sherbert* and *Yoder* is not a 'substantial burden' within the meaning of RFRA, and does not require the application of the compelling interest test set forth in those two cases."); *id*. at 1072 (no cognizable substantial burden even assuming virtual destruction of ability to practice). The rule applied by the District Court deprives Tribal Nations and Tribal citizens of RFRA's intended protections by excluding

place-based religious practices from the statute's reach. This error is of unique importance given the Ninth Circuit's location and size. Amici ask this Court to reconsider, or at least clarify, the scope and continued viability of the *Navajo Nation* rule.

## **ARGUMENT**

## I.      **It is Critical That This Court Clarify RFRA's Applicability on Federal Land**

### A.      **The Ninth Circuit is Home to More Tribal Nations and More Traditional Tribal Territory Than Any Other Circuit**

By virtue of its size and location, the Ninth Circuit adjudicates more disputes concerning Tribal Nations and Tribal citizens than any of the other federal courts of appeals. Experts have noted that "the Ninth and Tenth Circuits are located within the heart of Indian country and hear substantially more Indian law cases involving a wider range of issues than the other courts." Richard Guest, *Tribal Supreme Court Project: Ten Year Report*, 1 Am. Ind. L. J. 28, 59 (2017); *see also id*. at 58-59 (28% of the 259 petitions for writ of certiorari filed in Indian law cases between 2000 and 2010 came from the Ninth Circuit and 14% from the Tenth Circuit).

The Ninth Circuit's Indian law docket reflects the sheer number of Tribal Nations who live, govern, and maintain their cultures and traditions within its jurisdiction. Approximately 427—nearly 75%—of the 574 federally recognized Tribal Nations are located within the federal judicial districts that comprise the

4

Ninth Circuit.[2] Because of the high concentration of Tribal Nations within this Circuit, this Court's decisions have an outsized impact on Tribal Nations and Tribal citizens.

As to claims related specifically to Indian lands, the Circuit's geographical boundaries and footprint further magnify the significance of its decisions. The Circuit encompasses more traditional tribal territory and Indian reservations than any of its sister circuits.[3] The traditional territory of the Indigenous Peoples of the United States spans the entire country, *see, e.g.*, William C. Sturtevant, *Early Indian Tribes, Culture Areas, and Linguistic Stocks*, U.S. Geological Survey (1991) (map depicting locations of tribes and cultural areas prior to the formation of the United States), and the Ninth Circuit spans more of the United States than any other circuit. Although much of this land is now under federal ownership or

---

[2] *See Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs*, 87 Fed. Reg. 4636 (Jan. 28, 2022) (identifying "347 federally recognized Indian Tribes within the contiguous 48 states and 227 federally recognized Tribal entities within the state of Alaska"); *see also* U.S. Department of the Interior, *Search Federally Recognized Tribes*, https://www.bia.gov/service/tribal-leaders-directory/federally-recognized-tribes (directory of federally recognized Tribal Nations by state); *What is the Ninth Circuit?*, Ninth Circuit Court of Appeals, https://www.ca9.uscourts.gov/judicial-council/what-is-the-ninth-circuit/ (identifying the judicial districts comprising the Ninth Circuit).

[3] *See* Bureau of Indian Affairs Office of Trust Servs., *Indian Lands of Federally Recognized Tribes of the United States*, U.S. Dep't of Interior, https://www.bia.gov/sites/default/files/dup/assets/bia/ots/webteam/pdf/idc1-028635.pdf (June 2016).

5

control, the United States recognizes that tribal "cultural landscape[s] . . .

encompass[] all of the places, resources, features, archaeological sites, springs,

etc., that are associated with their history and way of life" (3-FEIS-826), regardless

of current ownership or control.[4]

## B. Sacred Places Remain Vitally Important to the Continued Existence of Tribal Nations

The "survival" of Tribal Nations depends on their "ability to practice certain

religious traditions and ways of life." Kristen A. Carpenter, *Living the Sacred:*

*Indigenous Peoples and Religious Freedom*, 134 Harv. L. Rev. 2103, 2114 (2021)

("*Living the Sacred*"). For many, the practice of their religious traditions and ways

of life is inseparable from the "specific geographic locations" at which they are

practiced. Robert Charles Ward, *The Spirits Will Leave: Preventing the*

*Desecration and Destruction of Native American Sacred Sites on Federal Land*, 19

Ecology L. Q. 795, 798 (1992). This is because "[m]any indigenous religions are

place based, centering on a principle of stewardship toward a specific place."

Hillary Hoffman & Monte Mills, *A Third Way: Decolonizing the Laws of*

---

[4] *See also 10 Public Lands with Powerful Native American Connections*, U.S. Dep't of Interior, https://www.doi.gov/blog/10-public-lands-powerful-native-american-connections (Oct. 30, 2020) ("All public land was once tribal land."); *Tribal Connections*, U.S. Forest Serv., https://usfs.maps.arcgis.com/apps/webappviewer/index.html?id=fe311f69cb1d435 58227d73bc34f3a32 (Jan. 2018) (interactive map "designed to illustrate the relationship between lands administered by the Forest Service, Indian lands, and lands ceded to the United States").

*Indigenous Cultural Protection* 41 (2020); *see also id.* (noting that "[m]any indigenous nations, tribes, bands and communities have unique religions, and although it is difficult to generalize . . . there are certain themes that are useful for the purposes of understanding legal claims involving indigenous religions," including that many Indigenous religions observe place-based practices). In sum, there exists an "inextricable connection among place, belief, and practice that characterize[s] many Indigenous People's religions." Carpenter, *Living the Sacred*, *supra*, at 2113.

That many sacred places are now under federal ownership or control does not diminish their significance. The United States government took Indian land "through generations of federal polices such as removal, allotment, . . . termination . . . and outright physical conquest." Kristen A. Carpenter, *Old Ground and New Directions at Sacred Sites on the Western Landscape*, 83 Denv. U. L. Rev. 981, 983 (2006). Although Tribal Nations "tried to protect their sacred sites through treaty negotiations . . . just as often the federal government broke these treaties." Carpenter, *Living the Sacred*, *supra*, at 2116. As a result, "sacred sites ended up under the ownership and jurisdiction of the federal government." *Id*. Much of what was once Indian land is now managed by the federal government "as 'public lands,' including National Parks and Forests." *Id*.; *see also* Jeanette Wolfley, *Reclaiming A Presence in Ancestral Lands: The Return of Native Peoples to the*

7

*National Parks*, 56 Nat. Res. J. 55, 59 (2016) (explaining that "the federal policy of reducing the landholding of Indian tribes in the West coincides with the federal movement to preserve large areas of land" as public lands).

Despite the loss of control of much of their traditional territories, Tribal Nations and Tribal citizens maintain deep connections and responsibilities to care for and protect their sacred places. *See* Nat'l Park Serv., *Keepers of the Treasures: Protecting Historic Properties and Cultural Traditions on Indian Lands* 67 (1992) (Tribal Nations remain "concerned about preserving ancestral sites and traditional use areas on lands that they no longer control, whether these lands are under Federal, State, or local control or in private ownership"). Many Tribal Nations have enacted laws that "pertain specifically to the protection of sacred" places, whether located on federal or tribal land. Kristen A. Carpenter, *A Property Rights Approach to Sacred Sites Cases: Asserting a Place for Indians as Nonowners*, 52 UCLA L. Rev. 1061, 1115 (2005).

Tribal Nations have also worked for decades to protect their sacred places now under federal control. *See generally*, *id.* For example, when "the sacred Zuni Salt Lake was threatened by the federal government's approval of a . . . mine ten miles from the lake," Zuni's Governor testified before Congress that, although "[g]overnment intervention and the inequities of history have prevented this great salt shrine from being included in the boundaries of [the Zuni] reservation, Zuni

8

Salt Lake remains important to the Zuni people for contemporary religious and cultural activities." *Id*. at 1116-17 (internal punctuation omitted). Similarly, Taos Pueblo waged a decades-long legal battle to retain control over their most sacred place, Blue Lake. After the federal government designated the lake as national forest land in 1906, the area "became a popular camping area for outside recreation uses." R.C. Gordon-McCutchan, *The Battle for Blue Lake: A Struggle for Indian Religious Rights*, 33 J. Church & St. 785, 786 (1991). These "outsiders in the area seriously compromised the Indians' worship, because sacred rituals performed in the presence of non-Indians were thought to lose their power." *Id*. In response, the Pueblo commenced litigation before the Indian Claims Commission. *Id*.

Sacred places form the foundation of not only Tribal Nations' ancestral and contemporary religious practice, but that of their next generations. Tribal identity is "expressed as knowledge and participation with tribal heritage, history, traditions, activities and ceremonies." Claudia (We-La-La) Long et al., *Assessing Cultural Life Skills of American Indian Youth*, 35 Child Youth Care Forum 289, 299-300 (2006). Tribal communities ensure their survival by passing on these customs, values, and traditions from one generation to the next. *See* G.A. Res. 61/295, United Nations Declaration on the Rights of Indigenous Peoples, arts. 11-13 (Oct. 2, 2007) (recognizing, *e.g.*, the rights of Indigenous peoples to "practice and revitalize their cultural traditions and customs," "manifest, practice, develop and

teach their spiritual and religious traditions, customs and ceremonies," and to
"revitalize, use, develop and transmit to future generations their histories,
languages, oral traditions . . . ."). As such, the destruction of sacred places and
practices poses an existential threat to the very existence of Tribal Nations. *See*
Kristen A. Carpenter et al., *In Defense of Property*, 118 Yale L. J. 1022, 1051-52
(2009) ("As Cherokee claimants explained in litigation over a sacred site, 'When
this place is destroyed, the Cherokee people cease to exist as a people.' They may
not have meant that each individual tribal member would literally die, but rather
that the loss of such sacred sites would make it difficult or impossible to maintain
Cherokee worldviews and lifeways.").

### C. The Proposed Land Exchange Would Lead to Irreparable Damage of Oak Flat and Exacerbate Existing and Historic Suppression of Tribal Cultures and Religions

As recognized in the withdrawn FEIS, the proposed land exchange and mine
"would occur across a landscape that is important to many Tribes, has been for
many generations, and continues to be used for cultural and spiritual purposes." (3-
FEIS-820.) The record illustrates the importance of Oak Flat, the inseparability of
the land from the religious practices there observed, and the existential threat posed
by the proposed land exchange and mine. To reiterate, the ceremonies performed at
Oak Flat "'must take place there,' and cannot take place 'anywhere else.'" (OB at
9.) Because place and practice are inextricably linked, the destruction of a place at

which certain acts *must* be performed necessarily prohibits the exercise of religion. *C.f. Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014) ("[T]he 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts."). Consequently, if the Resolution Copper Mine is allowed to go forward, it will irreparably damage the land and resources at Oak Flat, stripping the impacted Tribal Nations of the ability to practice many of their religious ceremonies or to gather the sacred resources essential to the same. (OB at 9.) As the FEIS itself demonstrates, the identity, culture, and religion of many Tribal Nations are each woven into the landscape at Oak Flat and the loss of Oak Flat threatens them all. (*See generally* 3-FEIS-820, 826-830, 838-848; *see also* 1-ER-18 (conceding "that the government's mining plans on Oak Flat will have a devastating effect on the Apache people's religious practices").)

These impacts will exacerbate the grievous harms already visited on the impacted tribal communities. Tribal Nations have lived within, worshipped on, and cared for the area surrounding Oak Flat from time immemorial. (3-FEIS-826, *see also* OB at 9.) Over the last 150 years, however, many of these original stewards of Oak Flat's landscape have lost control over "large portions of their homelands" and the sacred places located within. (*See* 8-FIES-828.) For the Apache, these efforts dispossessed them of "some six million acres of their traditional homeland."

Lauren Redniss, *Oak Flat: A Fight for Sacred Land in the American West* 43 (2020).

The proposed land transfer and Resolution Copper Mine represent but the latest chapter in a shameful history of government-aided land dispossession for the benefit of extractive industry in the Southwest. To cite just one example: when silver was discovered in Globe, Arizona, in 1876, the "United States seized the area by executive order." Redniss, *supra*, at 45. Although Globe, located twenty miles east of Oak Flat, once sat in the heart of Western Apache territory, D.F. Briggs, *Geology and History of the Globe-Miami Mining Region, Gila and Pinal Counties, Arizona*, Arizona Geological Survey Contributed Report CR-22-B, 243, fig. 24 p. 43 (2022), the area effectively became public land. Redniss, *supra*, at 45.

These efforts have historically been perpetuated without regard for the sacred character of the land or the continuing relationship and responsibility to the land held by local Tribal Nations. So too, here: an analysis of the proposed Resolution Copper Mine commissioned by the San Carlos Apache found "that rather than attract economic activity, mining repels it: the spectacular [environmental] degradation combined with the instability associated with mining operations actually discourages individuals, families, and businesses from locating in mining towns." Redniss, *supra*, at 189, 192.

12

## II.     The Rule Applied by the District Court Deprives Tribal Nations and Tribal Citizens of RFRA's Protections

Whatever legal mechanisms may have historically enabled land seizure and mineral exploitation at the expense of Native religions, RFRA makes clear that such practices cannot now withstand the expansive protections provided by Congress absent a showing that satisfies strict scrutiny. RFRA "provide[s] a claim or defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. § 2000bb(b)(2). RFRA "provides protections to religious practices above and beyond those afforded by the Constitution." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 n.4 (9th Cir. 2015).

In holding that the destruction of the ability to practice at Oak Flat would not constitute a "substantial burden" under RFRA, the District Court relied primarily upon *Navajo Nation* and its definition of substantial burden, the so-called "*Sherbert/Yoder* framework." (1-ER-18, fn. 9.)[5] As interpreted by the District Court, a "substantial burden" exists ". . . *only when* individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat

---

[5] As Judge Fletcher previously observed, the Supreme Court's pre-RFRA decisions in *Sherbert* and *Yoder* "nowhere defined, or even used, the phrase 'substantial burden.'" *Navajo Nation*, 535 F.3d at 1089 (Fletcher, J., dissenting). The so-called "*Sherbert/Yoder* framework" is thus more accurately termed the "benefit/sanctions framework."

of civil or criminal sanctions (*Yoder*)." (1-ER-15 (quoting *Navajo Nation*, 535 F.3d at 1069-70) (emphasis in original).) This benefit/sanctions framework that prejudices place-based religious practices is grounded in an atextual reading of RFRA and misapplication of pre-*Smith* Supreme Court precedent. These errors produce a result inconsistent with subsequent decisions of this Circuit and the Supreme Court and are uniquely prejudicial to Tribal Nations and Indigenous peoples who observe place-based religious practices. Amici submit that the fractured reasoning and prejudicial holding of *Navajo Nation* must be reconsidered.

> ### A. The *Navajo Nation* Rule Should be Abandoned as Inconsistent with RFRA's Text and Foreclosed by Subsequent Caselaw

Beginning with Judge Fletcher's dissent, much has been written challenging the *Navajo Nation* majority's reading of RFRA and its subsequent application to this case. *See generally Navajo Nation*, 535 F.3d at 1096 (Fletcher, J., dissenting); *Apache Stronghold v. United* States, 38 F.4th 742, 774 (9th Cir. 2022) (Berzon, J., dissenting), *vacated* ___ F.4th ___, 2022 WL 16986232 (9th Cir. Nov. 17, 2022); Order Denying Emergency Mot. for Injunction Pending Appeal, *Apache Stronghold v. United States*, No. 21-15295 (9th Cir. Mar. 5, 2021) (Bumatay, J., dissenting), ECF No. 26. Amici join and incorporate these arguments, and highlight aspects of them below to illustrate the specific prejudice to Indian

religious freedom claims resulting from continued adherence to the benefit/sanctions framework.

1. The Benefit/Sanctions Framework is Inconsistent with the Text of RFRA

As noted above, the majority in *Navajo Nation* determined that RFRA, by "expressly adopt[ing] and restor[ing]" *Sherbert* and *Yoder*, confined "substantial burden" to governmental acts that fit within the benefit/sanctions framework. *Navajo Nation*, 535 F.3d at 1069, 1070. Relying on that determination, the District Court characterized RFRA as "expressly adopt[ing] . . . the Supreme Court's pre-*Smith* jurisprudence" to define substantial burden. (1-ER- 15, fn 8.) But the *Navajo Nation* majority's analysis on this point was internally inconsistent and relied on assumptions unsupported by RFRA's text.

The *Navajo Nation* majority acknowledged that statutory interpretation begins with the text, and that RFRA states that it restores *only* the "compelling interest" test as set forth in *Sherbert/Yoder*. *Navajo Nation*, 535 F.3d at 1068. But the text of RFRA does not state that it also restores a definition of "substantial burden." *See* 42 U.S.C. § 2000bb(b)(1). Quite the contrary, the statute expressly states that it "restore[s] the compelling interest test as set forth in [*Sherbert*] and [*Yoder*]" and "guarantee[s]" the application of that test "in *all* cases where free exercise of religion is substantially burdened." *Id*. Nevertheless, without any textual basis, the majority assumed that RFRA also intended to "restore" a

15

definition of "substantial burden" limited to the circumstances presented in the pre-

*Smith* cases. *Id*. at 1068-69. The text of the statute provides no support for the

conclusion that Congress intended to define "substantial burden" by reference to

*Sherbert* and *Yoder*, and thereby limit the application of the compelling interest test

to the subset of "all cases" remaining.

        2.     The Supreme Court Has Foreclosed Adherence to the
                Benefit/Sanctions Framework

Confining RFRA's application to the benefit/sanctions framework is not

merely a departure from the statute's text, but has also been foreclosed by

subsequent decisions of the United States Supreme Court. The Supreme Court

could not be clearer on this point: RFRA "provided even broader protection for

religious liberty than was available under" *Sherbert* and *Yoder*. *Burwell v. Hobby*

*Lobby*, 573 U.S. 682, 695 n.3 (2014). The Court observed that,

> . . . the results would be absurd if RFRA merely restored this Court's
> pre-*Smith* decisions in ossified form and did not allow a plaintiff to raise
> a RFRA claim unless that plaintiff fell within a category of plaintiffs
> one of whom had brought a free-exercise claim that this Court
> entertained in the years before *Smith*.

*Id*. at 715-16. While the Court's discussion focused on RFRA's definition of

"person," this logic applies equally to the definition of "substantial burden"

because the restrictions *Navajo Nation* read into "substantial burden" accomplish

the same end; they necessarily limit cognizable RFRA claims to only those claims

"that [the Supreme] Court entertained in the years before *Smith*." *Id.* at 716. It

16

would be absurd to conclude that Congress legislated "in favor of a broad protection of religious exercise, to the maximum extent," *id*. at 686 (quoting 42 U.S.C. § 2000cc–3(g)), and yet defined "substantial burden" to foreclose actions arising from *more burdensome* government action than those circumstances previously examined by the Supreme Court.

The Supreme Court's decisions in *Holt v. Hobbs* and *Ramirez v. Collier* further illustrate that RFRA's reach encompasses the destruction of sacred Native places. In *Holt*, the Supreme Court found that prohibiting a Muslim inmate from growing a half-inch-long beard imposed a substantial burden on religious exercise. 574 U.S. 352 (2015). In *Ramirez*, the Court recognized a "substantial burden" when prison officials refused to allow a death-row inmate to have his pastor lay hands upon him during his execution. 142 S. Ct. 1264 (2022). The finding of a substantial burden in these cases did not depend upon whether the plaintiff was coerced into acting against their beliefs by deprivation of a benefit or threat of penalty. Rather, the Court found a substantial burden because *the effect* of the government action would prevent the plaintiffs from practicing their religions. While *Holt* and *Ramirez* arose under RFRA's sister statute, the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc to 2000cc-5, the

meaning of "substantial burden" is the same in RLUIPA and RFRA.[6] *Navajo Nation*, 535 F.3d at 1086 (Fletcher, J., dissenting) (noting "[t]he Supreme Court has instructed us that RLUIPA employs the same analytic frame-work and standard as RFRA").

Amici appreciate that overruling the *en banc* majority's holding in *Navajo Nation* is no light matter. That said, it is both appropriate and necessary that this Court overrule its benefit/sanctions framework, as it is unwarranted by RFRA's text and inconsistent with Ninth Circuit and Supreme Court caselaw. It is particularly important to clarify the rule here, given the outsized impact of this Court's decisions on Tribal Nations and Tribal citizens and the prejudice against place-based religious practices that the rule visits on them.

### B. The Plain Meaning of "Substantial Burden" Encompasses the Destruction of the Ability to Practice at Oak Flat

Freed from the artificial constraints of the benefit/sanctions framework, 'substantially burdened' should bear its plain meaning. *Navajo Nation*, 535 F.3d at 1086 (Fletcher, J. dissenting) (citing *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)) (explaining that this Court has used

---

[6] The relationship between RFRA and RLUIPA was succinctly summarized by Judge Fletcher: RLUIPA was primarily a response to *City of Boerne v. Flores*, 521 U.S. 507 (1997), which held enforcement of RFRA against state and local governments unconstitutional. *Navajo Nation*, 535 F.3d at 1084 (Fletcher, J., dissenting). RLUIPA was passed to overcome this constitutional barrier. *Id*. at 1084-85.

18

dictionary definitions to define "substantial burden" under RLUIPA). As Judge Fletcher observed, the plain meaning of "burden" encompasses that which "oppresses" and the plain meaning of "substantial" includes that which is of "considerable . . . extent." *Id*. Furthermore, whether a government action constitutes a substantial burden depends on its effect on religious exercise, rather than particular mechanisms by which this effect is achieved. *Id*.; *see also Holt*, 574 U.S. 352; *Ramirez*, 142 S. Ct. 1264.

A plain meaning analysis of "substantial burden" in Native RFRA claims will necessarily take into account the unique adverse impact of colonization on Native religious freedom. This context is critical in understanding how Native religious practice is "oppressed" to a "considerable extent" when Native peoples are stripped of even more of their traditional homelands and sacred places. It is particularly important to acknowledge this cumulative and historical impact because *Navajo Nation* and its underlying authority justified their conclusions in part based on the glib assertion that the challenged government action took place on "what is, after all, [the government's] land." *Navajo Nation*, 535 F.3d at 1072-73 (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 453 (1988)). This claim ignores that Indigenous Peoples already must fight to practice their religions on what are, "after all," *their* aboriginal lands.

Factoring in the context of the religion at issue in determining whether governmental action constitutes a "substantial burden" is not a novel proposition. This Court has held that failing to provide Jewish services and a Kosher diet to a Jewish inmate, failing to provide a halal meat diet to a Muslim inmate, and recording a Catholic inmate's confession all constituted substantial burdens on religious exercise. *McElyea v. Babbitt*, 833 F.2d 196 (9th Cir. 1987); *Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008); *Mockaitis v. Harcleroad*, 104 F.3d 1522 (9th Cir. 1997) (*overruled on other grounds by City of Boerne*, 521 U.S. 507). In each case, this Court took into account the well-established practices of the religions at issue. That the religious practices and beliefs of Native peoples may not map onto mainstream beliefs and practices presents no justification for courts to sidestep the analysis.[7] *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1152-53 (10th Cir. 2013) (Gorsuch, J., concurring) ("[T]o know [that a religious belief is sincerely held] is to know the terms of the Religious Freedom Restoration Act apply"); *see also* Hoffman & Mills, *supra*, at 42 (observing the "universal truism" that those "with legal authority over sacred places . . . often struggle to

---

[7] RFRA exists because Congress felt the need to respond to this exact problem—*Smith*, after all, arose in the context of the Native American Church's sacramental use of peyote. *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 872 (1990); 42 U.S.C. § 2000bb(a)(4) (finding that, in *Smith*, "the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion").

understand the indigenous religions tied directly to them" because "indigenous religions do not resemble other major religious faiths, in practice or in theory").

Nor would considering context and history open the floodgates to "the personalized oversight of millions of citizens" as the *Navajo Nation* majority feared. 535 F.3d at 1063-64. As an initial matter, this claim ignores that Congress explicitly identified "a workable test for striking sensible balances between religious liberty and competing prior governmental interests" in RFRA: the compelling interest test. 42 U.S.C. § 2000bb(a)(5). Nor does anything about RFRA relieve plaintiffs of proving their claims. *Cf. Cruz v. Beto*, 405 U.S. 319, 322-23 (1972) (holding that a prisoner's claims, taken as true, violated the First and Fourteenth Amendments and remanding for further proceedings).

The self-evident burdens on religious exercise present here and in *Navajo Nation* further illustrate that "slippery slope" arguments are unavailing. *See Navajo Nation*, 535 F.3d at 1064-65. It remains uncontested that the land exchange in this case—designed specifically to enable the mining that will destroy land and resources at Oak Flat—would have an extensive, oppressive effect on Apache religious exercise. Both the undisputed burdens demonstrated below by Apache Stronghold and the record developed before the District Court in *Navajo Nation* prove that these cases arise on solid footing, far from any slippery slope. *See Navajo Nation*, 535 F.3d at 1097-1102 (Fletcher, J., dissenting) (summarizing the

robust evidence presented to the trial court of the unique sacredness of the San Francisco Peaks to the respective plaintiff Tribal Nations).

In the context of extensive religious oppression inflicted by colonization and removal of Native peoples from their homelands, slippery slope arguments ring particularly hollow. Even federal publications recognize that government action has already resulted in disappearance of many Native religious practices and sacred places. *See* Eric Hemenway, *Native Nations Face the Loss of Land and Traditions*, Nat'l Park Serv., https://www.nps.gov/articles/negotiating-identity.htm (Sept. 13, 2022) (explaining that westward-expansion policies and the attendant seizure of "Indian lands resulted in a loss of cultural identity"). As discussed at Part I, *supra*, the privatization and desecration of sacred places like Oak Flat perpetuates that despicable legacy and the oppression of Native peoples.

Using slippery slope arguments to rationalize governmental acts of desecration and the destruction of the ability to practice one's religion is both analytically unsound and fundamentally unjust. At best, the Supreme Court has already disapproved of exactly this practice. *Navajo Nation*, 535 F.3d at 1091 (Fletcher, J., dissenting) (pointing out that the *en banc* majority's approach places beyond judicial scrutiny many burdens on religious exercise on a slippery slope basis, contrary to *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430 (2006)). At worst, the embrasure of slippery slope arguments

acts to categorically bar an entire class of claims based on the very nature of the sincerely-held religious beliefs at issue. *See id.* (noting that the majority implied that "Indians consider virtually everything sacred" and that there would be "no stopping place" if the court were to find Native religious practice was substantially burdened); *see also Hobby Lobby*, 573 U.S. at 724-25 ("the federal courts have no business addressing . . . whether the religious belief asserted in a RFRA case is reasonable") (cleaned up).

### C. Continued Application of the Benefit/Sanctions Framework Will Lead to Unjust Results

The impact on Tribal Nations and Tribal citizens of the categorical refusal to recognize a substantial burden on religious practices arising from government action on government-owned land cannot be overstated. Given the importance of place-based practices to Native religions, the District Court's inability to find a cognizable burden on religious practices despite the acknowledged "devastating effect" on the same demonstrates that *Navajo Nation* effectively "wr[ites] American Indian religious claims out of RFRA." Jessica M. Wiles, *Have American Indians Been Written Out of the Religious Freedom Restoration Act?*, 71 Mont. L. Rev. 471, 474, 492-501 (2010); *see also Navajo Nation*, 535 F.3d at 1098 (Fletcher, J., dissenting) ("The majority's misunderstanding of the nature of religious belief and exercise as merely 'subjective' is an excuse for refusing to accept the Indians' religion as worthy of protection under RFRA.").

23

This exclusion is incompatible with RFRA's "broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc–3(g). As Justice Gorsuch once acknowledged, RFRA "does perhaps its most important work in protecting unpopular religious beliefs, vindicating this nation's long-held aspiration to serve as a refuge of religious tolerance." *Hobby Lobby*, 723 F.3d at 1152-53 (Gorsuch, J., concurring).

Nevertheless, the District Court's decision demonstrates that *Navajo Nation* continues to bar to Indian religious freedom claims. This results in unequal treatment of the Tribal Nations and Tribal citizens within the Ninth Circuit. After all, a functionally equivalent substantial burden resulting from the denial of access to a sweat lodge presents a cognizable free exercise claim in the Tenth Circuit, *see Yellowbear*, 741 F.3d 48 at 56, under the "same standard" applicable here. *O Centro*, 546 U.S. at 436. Amici submit that this result is unjust, and that government action burdening place-based religious practices arising on government land deserves the same level of scrutiny available to other practices under the "broad" and "maximum" protections of RFRA. *See Hobby Lobby*, 573 U.S. at 686 (quoting 42 U.S.C. § 2000cc–3(g)). This Court should overrule, or at a minimum clarify, *Navajo Nation*.

## <u>**CONCLUSION**</u>

Amici respectfully urge this Court to reverse the District Court's denial of a preliminary injunction preventing the transfer and destruction of Oak Flat, and to recognize the obvious burden on Indian religious practices resulting from the destruction of sacred places that are now located on government-owned land.

DATED:  January 9, 2022

By:  _____/s/ *April D. Youpee-Roll*_____
April D. Youpee-Roll
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
April.Youpee-Roll@mto.com

Jason Searle
Beth Wright
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302
Telephone: (303) 447-8760
Facsimile: (303) 443-7776
Searle@narf.org
Wright@narf.org

Counsel for *Amici* Tribal Nations and
Tribal Organizations

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule 32-1, I

certify that the attached brief is proportionally spaced, has a typeface of 14

points and contains 5,617 words.

DATED:  January 9, 2022

By:  /s/ *April D. Youpee-Roll*
April D. Youpee-Roll
Counsel for *Amici* Tribal Nations and
Tribal Organizations

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

DATED: January 9, 2022

By: _____/s/ *April D. Youpee-Roll*_____
April D. Youpee-Roll
Counsel for *Amici* Tribal Nations and
Tribal Organizations