No. 21-15295

In the

# United States Court of Appeals
## For the Ninth Circuit

———————————

APACHE STRONGHOLD,

*Plaintiff–Appellant,*

v.

UNITED STATES OF AMERICA, et al.,

*Defendants–Appellees.*

———————————

On Appeal from the United States District Court
for the District of Arizona (Phoenix)
Honorable Steven P. Logan, District Judge
Case No. 2:21-cv-00050-SPL

———————————

**BRIEF OF PINAL PARTNERSHIP, VALLEY PARTNERSHIP, PHX EAST VALLEY PARTNERSHIP, THE HONORABLE SCOTT J. DAVIS, THE HONORABLE MYRON LIZER, AND JOHN TAHSUDA, III AS AMICI CURIAE IN SUPPORT OF APPELLEES**

———————————

Kathryn M. Barber
Matthew A. Fitzgerald
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-1227
F: (804) 698-2227

January 23, 2023

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae Pinal Partnership hereby certifies that is a member-based nonprofit organization. Pinal Partnership is not publicly held. There is no parent corporation or any publicly held corporation that owns 10% or more of Pinal Partnership's member interests.

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae Valley Partnership hereby certifies that it is a member-based nonprofit organization. Valley Partnership is not publicly held. There is no parent corporation or any publicly held corporation that owns 10% or more of Valley Partnership's member interests.

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae PHX East Valley Partnership hereby certifies that it is a member-based nonprofit organization. PHX East Valley Partnership is not publicly held. There is no parent corporation or any publicly held corporation that owns 10% or more of PHX East Valley Partnership's member interests.

Dated: January 23, 2023        Respectfully submitted,

*/s/ Kathryn M. Barber*
Kathryn M. Barber

*Counsel for Amici Curiae*
*Pinal Partnership, Valley Partnership, PHX*
*East Valley Partnership, The Honorable Scott*
*J. Davis, The Honorable Myron Lizer, and*
*John Tahsuda, III*

i

# TABLE OF CONTENTS

Page

IDENTITY AND INTEREST OF AMICI CURIAE ....................................... 1

ARGUMENT ................................................................................................ 3

I.  Congress enacted the Southeast Arizona Land Exchange and
    Conservation Act to protect environmentally and culturally important
    lands and convey one of the world's largest copper deposits. ....................... 5

    A.  Arizona contains most of the country's copper—an ever-more-
        vital resource. ............................................................................... 5

    B.  Congress spent a decade negotiating a comprehensive land
        exchange on which all interested groups gave extensive input. ........ 10

    C.  Congress enacted a comprehensive land exchange that expands
        federal forest lands and protects culturally sensitive areas ............... 13

II. Congress's disposition of federal land does not qualify as a substantial
    burden under the Religious Freedom Restoration Act or the Free
    Exercise Clause. ........................................................................................ 16

    A.  The Government's use of its own land does not constitute a
        substantial burden on religious exercise. ......................................... 17

    B.  RFRA maintained this rule. ............................................................ 20

    C.  The Act—a federal statute disposing of the government's own
        land—does not create a substantial burden. ................................... 22

        1.  This Court need not decide the precise contours of a
            substantial burden under RFRA to decide this appeal. .......... 22

        2.  Even under a more expansive view of what constitutes a
            substantial burden, the Act does not qualify as one ............... 24

    D.  A decision treating the Act as substantially burdening religious
        exercise would subject all federal land management decisions to
        strict scrutiny. ............................................................................... 27

CONCLUSION ........................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Barnhart v. Sigmon Coal Co., Inc.,*
   534 U.S. 438 (2002) ................................................................. 12, 16

*Bowen v. Roy,*
   476 U.S. 693 (1986) ................................................................. 17, 30

*Cutter v. Wilkinson,*
   544 U.S. 709 (2005) ....................................................................... 25

*Employment Division v. Smith,*
   494 U.S. 872 (1990) ....................................................................... 20

*Guru Nanak Sikh Soc. of Yuba City v. Cty. of Sutter,*
   456 F.3d 978 (9th Cir. 2006) ......................................................... 25

*Holt v. Hobbs,*
   574 U.S. 352 (2015) ....................................................................... 26

*Johnson v. Baker,*
   23 F.4th 1209 (9th Cir. 2022) ........................................................ 26

*Jones v. Slade,*
   23 F.4th 1124 (9th Cir. 2022) ........................................................ 26

*Kleppe v. New Mexico,*
   426 U.S. 529 (1976) ....................................................................... 11

*Lyng v. Northwest Indian Cemetery Protective Association,*
   485 U.S. 439 (1988) ......................................... 17, 18, 19, 20, 24, 28

*Navajo Nation v. U.S. Forest Service,*
   535 F.3d 1058 (9th Cir. 2008) .................................................. 23, 24

*Sherbert v. Verner,*
   374 U.S. 398 (1963) ....................................................................... 20

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972).................................................................... 20

*Yellowbear v. Lampert*,
  741 F.3d 48 (10th Cir. 2014)...................................................... 25

## Constitutional Provisions

U.S. CONST. art. IV, § 3, cl. 2 ........................................................ 11

## Statutes

16 U.S.C. § 539p ............................................................... 13, 14, 15

42 U.S.C. § 2000bb ........................................................................ 20

42 U.S.C. § 2000cc *et seq.* ......................................................... 24

42 U.S.C. § 2000cc ........................................................................ 25

42 U.S.C. § 2000cc-5 ..................................................................... 25

National Defense Authorization Act for Fiscal Year 2015,
  Pub. L. No. 113-291, 128 Stat. 3282 (2014) .............................. 13

## Other Authorities

139 Cong. Rec. 26 (1993).............................................................. 21

139 Cong. Rec. S14 (daily ed. Oct. 27, 1993) ............................. 21

Bureau of Land Management,
  *Renewable Energy*, *available at* https://www.blm.gov/programs/energy-and-minerals/renewable-energy#:~:text=As%20of%20November%202021%2C%20permitted,than%2012%20gigawatts%20of%20power ...................... 29

Congressional Research Service,
  *Federal Land Ownership: Overview and Data* (Feb. 21, 2020),
  *available at* https://crsreports.congress.gov/product/pdf/R/R42346 ............... 27

H.R. 687/S. 339 (Southeast Arizona Land Exchange and Conservation
  Act of 2013)............................................................................... 12

iv

H.R. 1904 (Southeast Arizona Land Exchange and Conservation Act
of 2011)........................................................................................ 12

H.R. 2509/S. 409 (Southeast Arizona Land Exchange and Conservation
Act of 2009)............................................................................ 11, 12

H.R. 2618/S. 1122 (Southeast Land Exchange and Conservation Act
of 2005)........................................................................................ 11

H.R. 3301/S. 1862 (Southeast Arizona Land Exchange and Conservation
Act of 2007)................................................................................ 11

H.R. 3979, 113th Cong. (2014) ............................................................ 13

H.R. 4880 (Copper Basin Jobs Act) .................................................... 12

H.R. 6373/S. 2466 (Southeast Arizona Land Exchange and Conservation
Act of 2006)................................................................................ 11

*Hearing on H.R. 473 et al. before the Subcommittee on National Parks, Forests
and Public Lands,*
112th Cong. (2011) (*2011 Hearing*) ...................................... 6, 11, 14

*Hearing on H.R. 1603 et al. before the H. Subcommittee on Energy and Mineral
Resources, H. Comm. On Natural Resources,*
113th Cong. (2013) (*2013 Hearing*) ...................................... 6, 9, 10, 11, 12, 14

*Hearing on H.R. 1904 et al. before the S. Comm. On Energy and Natural Resources*,
112th Cong. (2012) (*2012 Hearing*) ...................................... 6, 7, 8, 9, 13

*Hearing on H.R. 3301, H. Comm. On Natural Resources, Subcommittee on
National Parks, Forest and Public Lands,*
110th Cong. (2007) ...................................................................... 10

D. Laycock & O. Thomas,
*Interpreting the Religious Freedom Restoration Act*,
73 TEX. L. REV. 209 (1994) .......................................................... 20

R. Randazzo,
AZCENTRAL.COM, *McCain was crucial backer of Superior copper mine for jobs and national security* (Aug. 31, 2018), *available at* https://www.azcentral.com/story/news/politics/arizona/2018/08/31/ sen-john-mccain-legacy-resolution-copper-project-near-superior-arizona/1110685002/ ........................................................................ 9

S. 3157 (Southeast Arizona Land Exchange and Conservation Act of 2008) ....... 11

S. Rep. 103-111, 103 Cong. 163 (1993) .......................................................... 20, 21

S&P Global,
*The Future of Copper* (July 14, 2022), *available at* https://cdn.ihsmarkit.com/ www/pdf/0722/The-Future-of-Copper_Full-Report_14July2022.pdf .......... 8, 9

P. Stevens,
CNBC, *A coming copper shortage could derail the energy transition, report finds* (July 14, 2022), *available at* https://www.cnbc.com/2022/07/14/ copper-is-key-to-electric-vehicles-wind-and-solar-power-were-short-supply.html ............................................................................................... 7

U.S. Geological Survey,
*Mineral Commodity Summaries 2022* (Jan. 31, 2022), *available at* https://pubs.usgs.gov/periodicals/mcs2022/mcs2022.pdf .............................. 6, 8

The World Bank,
*Minerals for Climate Action: The Mineral Intensity of the Clean Energy Transition* (2020), *available at* https://pubdocs.worldbank.org/en/961711588875536384/ Minerals-for-Climate-Action-The-Mineral-Intensity-of-the-Clean-Energy-Transition.pdf ............................................................................................... 7

## Other

A Christian Ministry in the National Parks, *About*,
https://acmnp.com/about/ .............................................................................. 29

Resolution Copper, *About Us*,
https://resolutioncopper.com/about-us/ ........................................................ 10

Resolution Copper, *Arizona & Copper*,
https://resolutioncopper.com/about-us/arizona-copper/ ................................... 6

Resolution Copper, *Cultural Heritage*,
https://resolutioncopper.com/cultural-heritage/ ............................................... 12

Resolution Copper, *Myth and Facts*,
https://resolutioncopper.com/myth-and-facts/ ................................................ 12

Resolution Copper, *Why Copper Matters*,
https://resolutioncopper.com/why-copper-matters/ .......................................... 6

## IDENTITY AND INTEREST OF AMICI CURIAE[1]

Amicus curiae Pinal Partnership is a member-based nonprofit organization advocating for economic development and responsible growth in Pinal County, Arizona. Pinal Partnership seeks to improve the lives of Pinal County's residents by promoting infrastructure development and the efficient use of Pinal County's valuable natural resources. Amicus curiae Valley Partnership is a member-based nonprofit organization that advocates for responsible development in Maricopa County and Pinal County, Arizona, on behalf of the commercial, industrial, multi-family, and master-planned real estate development industries. Amicus curiae PHX East Valley Partnership is a coalition of regional leaders who advocate to improve the business climate and promote related development in the region east of Phoenix, including in Pinal County. Amici support the Southeast Arizona Land Exchange and Conservation Act of 2013 (the Act) because it balances all stakeholder interests and facilitates responsible development.

Amicus curiae the Honorable Scott J. Davis is the former Indian Affairs Commissioner for North Dakota. Amicus curiae the Honorable Myron Lizer served

---

[1] Counsel for all parties consented to the filing of this brief. No counsel for a party authored this brief in whole or in part. No party, no party's counsel, and no person or entity other than amici, their members, and their counsel have made a monetary contribution to the preparation or submission of this brief.

as the tenth Vice President of the Navajo Nation.  Amicus curiae John Tahsuda, III previously served as Principal Deputy Assistant Secretary for Indian Affairs at the Department of the Interior and as Advisor to the Secretary of the Interior.  These former public officials agree with amici curiae Pinal Partnership, Valley Partnership, and PHX East Valley Partnership that the Act is a proper and successful legislative compromise that should be upheld against this challenge.

Pinal County's history is entwined with copper mining.  So is its future.  Pinal County is home to historical and present copper mines, as well as the third largest undeveloped copper deposit in the world.  Copper mining has driven Pinal County's development from its earliest days.  Today, the copper industry is the lifeblood of the county's most developed communities, including the towns of Superior, Florence, and Casa Grande.  Revenue from copper mining funds the county's education system and provides much needed employment for residents.  Pinal County's continued growth and vitality depends on the county's ability to use and benefit from its most valuable natural resource.

Unfortunately, around fifty percent of the county's residents must currently seek employment outside the county.  This situation burdens those residents and the county alike.  The Act will produce thousands of high paying jobs in the county and thereby allow Pinal County communities to create a more sustainable economy.

The Act represents a unique opportunity for Pinal County to capitalize on its foundational natural resource. Copper is increasingly rare and valuable. As technology continues to develop and the country promotes sustainable electric energy policies, demand for this highly conductive element is poised to explode. An adequate supply of copper is essential to ensure America's transition to renewable energy, as copper is a key component of electric vehicles, solar and wind power, and other aspects of energy infrastructure. Demand for this critical resource already outpaces supply, and this problem will only worsen as demand rapidly increases over the coming decades.

Pinal County—and the surrounding region—should stand at the forefront of a sustainable future. That role is possible only if this Court upholds the Act as a legitimate exercise of the federal government's authority to control its own land— one that does not constitute a substantial burden on plaintiff-appellant Apache Stronghold's religious exercise.

## ARGUMENT

This appeal challenges implementation of a federal law enacted with bipartisan support after a decade of debate. In that law, Congress ordered the Secretary of Agriculture to exchange some of the government's own land for land owned by a private mining company. That company's proposed mine will employ

3

thousands of Arizonans, generate tens of billions of dollars in economic growth and tax revenue, and provide a valuable domestic source of copper for decades to come— one critical to ensuring America's transition to renewable energy. Meanwhile, the land exchange will also protect more than 5,300 new acres of environmentally and culturally important sites in Arizona (including a net gain for the federal government of almost 3,000 acres of preserved lands) and create a unique special management area for an Apache cultural site.

Apache Stronghold contends that this law directing the disposition of federal land violates the Religious Freedom Restoration Act of 1993 (RFRA) and the First Amendment by substantially burdening its members' religious exercise on the land.

Well-established precedent refutes this view. The federal government's use and management of its own land has never qualified as a substantial burden under the Free Exercise Clause. RFRA did not change that rule. This is especially true in the unique scenario here, where the government action challenged is a federal statute specifically directing the conveyance of federal land, while preserving land that is culturally and environmentally important to the Apaches and many others.

Thus, this Court need not determine the precise contours of what counts as a substantial burden under RFRA. Whatever a substantial burden is, an incidental impact of the government's use of its own land on religious exercise (whatever the

magnitude) is not one.  This Court should affirm.

I.  **Congress enacted the Southeast Arizona Land Exchange and Conservation Act to protect environmentally and culturally important lands and convey one of the world's largest copper deposits.**

The Act reflects a decade of debate, public testimony by and consultation with affected groups, and, ultimately, the kind of negotiated compromise central to our democracy.  As enacted, it adds federal protection for 5,300 acres of environmentally sensitive and culturally important lands.  Newly protected lands include an 800-acre special management area enshrining a significant Apache cultural site.  At the same time, the Act calls for conveying 2,400 acres of federal land to a private entity that hopes to develop—and provide for the country's use and benefit—one of the world's largest copper deposits.  Nothing in RFRA or the Free Exercise Clause constrains the government's ability to manage and dispose of its own land in this way.

A.  **Arizona contains most of the country's copper—an ever-more-vital resource.**

Some 60 miles east of Phoenix sits Superior, Arizona, a small town nestled against the Apache Leap Mountains and surrounded by the Tonto National Forest.  Superior forms part of the Copper Triangle (sometimes called the Copper Corridor)—a region rich in copper ore deposits and other mineral resources.  *See Hearing on H.R. 1904 et al. before the S. Comm. On Energy and Natural Resources*,

5

112th Congress 2, 5 (2012) (*2012 Hearing*) (statement of Sen. Kyl).[2]  Mining has thus been the central economic activity in this area for over a century.  *See Hearing on H.R. 473 et al. before the Subcommittee on National Parks, Forests and Public Lands*, 112th Cong. 44 (2011) (*2011 Hearing*) (statement of J. Cherry) (On a map of the area, "you can see current and historic mining operations everywhere you look.").  In Superior, for example, the Magma Copper Mine operated from 1912 to 1996.  *2012 Hearing* at 25 (statement of J. Cherry).

The Copper Triangle helps make Arizona the leading U.S. copper producer by a wide margin:  the state produces 71% of all American copper.  U.S. Geological Survey, *Mineral Commodity Summaries 2022* 54 (Jan. 31, 2022);[3] *see also Hearing on H.R. 1603 et al. before the H. Subcommittee on Energy and Mineral Resources, H. Comm. On Natural Resources*, 113th Cong. 12 (2013) (*2013 Hearing*) (statement of Rep. Kirkpatrick) ("The Copper Corridor has played a major role in our State's early growth and economic development.").

Copper is an essential resource key to most facets of modern life.  *See 2012 Hearing* at 102 (Letter of R. Quick).  "Industry in the United States needs copper to

---

[2] Information on the history of copper mining in Arizona and the current uses of copper is available online at: https://resolutioncopper.com/about-us/arizona-copper/ and at https://resolutioncopper.com/why-copper-matters/.

[3] *Available at* https://pubs.usgs.gov/periodicals/mcs2022/mcs2022.pdf.

build houses, offices, cars, appliances, and electronics." *Id.*; *see also id.* at 103 (Letter of P. Yost) ("[C]opper is used in a number of manufacturing applications," meaning "its availability is important to manufacturers and the manufacturing process."). Copper helps plumbing run clean and provides wiring for mobile devices, and copper surfaces reduce infection rates in hospitals.

Copper also plays a central—and growing—role in the alternative and renewable energy sphere. *See, e.g.*, *2012 Hearing* at 102-03. Copper is "used in more than eight clean energy generation and storage technologies," with solar and wind energy accounting for 74.2% of all copper demand. The World Bank, *Minerals for Climate Action: The Mineral Intensity of the Clean Energy Transition* 12-13 (2020).[4] It already takes massive quantities of copper to satisfy this demand: 4.7 tons of copper go into constructing a single wind turbine, for example, while hybrid cars require twice as much copper as non-hybrids. *2012 Hearing* at 102 (letter of R. Quick). And by the World Bank's estimate, the demand for copper will grow by more than 200 percent in the next 30 years. The World Bank, *supra*, at 72; *see also* P. Stevens, CNBC, *A coming copper shortage could derail the energy transition, report finds* (July 14, 2022) ("S&P Global forecasts copper needed for EVs, wind, solar and

---

[4] *Available at* https://pubdocs.worldbank.org/en/961711588875536384/Minerals-for-Climate-Action-The-Mineral-Intensity-of-the-Clean-Energy-Transition.pdf.

batteries tripling by the middle of the next decade.")[5]

The demand for copper is so great that, even with Arizona's current contribution to the copper supply, America needs more. *See, e.g., 2012 Hearing* at 102 (Letter of R. Quick). The United States currently imports over 45% percent of its copper and could end up importing closer to 70% by 2035. U.S. Geological Survey, *supra,* at 7; S&P Global, *The Future of Copper* 59 (July 14, 2022).[6] Without more domestic copper production, the country will only depend more on imported copper as demand continues to increase. And this national shortage will impede (if not render impossible) America's efforts to transition to renewable energy systems.

The Copper Triangle presents a solution. Just outside Superior, in the footprint of the historic Magma Mine, where existing mine shafts and other infrastructure remain, lies the world's third-largest undeveloped copper deposit. 3-ER-271; *2012 Hearing* at 9, 25 (statements of Sen. Kyl & J. Cherry).

 If developed, this deposit alone could supply 25% of U.S. copper demand for over 40 years—copper the United States would not have to import from other countries to meet its critical need for the mineral. *2012 Hearing* at 25 (statement of

---

[5]    *Available at* https://www.cnbc.com/2022/07/14/copper-is-key-to-electric-vehicles-wind-and-solar-power-were-short-supply.html.

[6]    *Available at* https://cdn.ihsmarkit.com/www/pdf/0722/The-Future-of-Copper_Full-Report_14July2022.pdf.

J. Cherry). Mining this copper would thus enhance national security.[7] *2013 Hearing* at 7 (statement of Rep. Gosar); *see also* R. Randazzo, AZCENTRAL.COM, *McCain was crucial backer of Superior copper mine for jobs and national security* (Aug. 31, 2018) (quoting Sen. McCain's statement that "[t]his mine, when it's fully operational, will supply 25 percent of America's copper supply, and that is a national security issue");[8] S&P Global, *supra*, at 9 ("[C]opper scarcity may emerge as a key destabilizing threat to international security.").

Not only would developing the deposit give the United States a secure, domestic source of copper, but it would also greatly benefit Pinal County and the state of Arizona. Mining the deposit would create 3,700 local jobs in an area suffering from high unemployment. *2012 Hearing* at 29 (statement of J. Cherry); *see also 2013 Hearing* at 7 (statement of Rep. Gosar) ("These are high-paying jobs . . . in a region that is struggling economically."). And it would generate more than $61 billion in economic growth and $20 billion in federal, state, and local tax revenue. *Id.* at 3 (statement of Sen. McCain).

---

[7] It would also produce, as co- or by-products, other critical minerals that support national defense, semiconductor manufacturing, and renewable energy. *See, e.g.*, S&P Global, *supra*, at 10, 13.

[8] *Available at* https://www.azcentral.com/story/news/politics/arizona/2018/08/31/sen-john-mccain-legacy-resolution-copper-project-near-superior-arizona/1110685002/.

**B.  Congress spent a decade negotiating a comprehensive land exchange on which all interested groups gave extensive input.**

Recognizing the immense potential that Arizona's untapped copper reserves offer, Resolution Copper developed plans to extend the existing Magma Mine to mine the deposit.  3-ER-268; https://resolutioncopper.com/about-us/.  Much of the deposit, however, lies beneath the Tonto National Forest.  Among these federally held lands, located right off Magma Mine Road, is the Oak Flat Picnic and Camp Ground.  Oak Flat is a 760-acre parcel that members of the San Carlos Apache Tribe view as one of several "sacred and holy" lands in the area.  *Hearing on H.R. 3301, H. Comm. On Natural Resources, Subcommittee on National Parks, Forest and Public Lands*, 110th Cong. 18 (2007) (statement of W. Nosie).  In 1955, the federal government withdrew the parcel from mineral leasing and mining "to protect the Federal Government's interest in the capital improvement of the campground that exists there."  *Id.* at 9 (testimony of J. Holtrop).

While the federal government owns Oak Flat (and has withheld it from mining), Resolution Copper owns part of—and holds mining claims to land around—Apache Leap, another "holy," "sacred, and consecrated ground[]" for the Apaches.  *Id.* at 19 (statement of W. Nosie).  Resolution Copper also owns thousands of acres of "highly coveted recreational and conservation areas."  *2013 Hearing* at 8 (statement of Rep. Gosar).  This privately owned acreage includes "one

10

of the few remaining undammed rivers in Arizona," a "superb hiking and climbing location," "a riparian corridor," and "numerous" Native American ancestral sites. *Id.*

Arizona's congressional delegation believed that Congress could advance the interests of all affected groups through a land exchange, one that would enable Resolution Copper to develop the mine while also placing "highly desirable conservation" and culturally significant lands under federal protection. *2011 Hearing* at 44 (statement of J. Cherry). After all, the Constitution gives Congress the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONST. art. IV, § 3, cl. 2. And that power, the Supreme Court has "repeatedly observed," is "without limitations." *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976).

Beginning in 2005, Arizona representatives thus introduced bills proposing a land exchange between Resolution Copper and the federal government. *See, e.g.*, H.R. 2618/S. 1122 (Southeast Land Exchange and Conservation Act of 2005). Over the next nine years, representatives continued to propose similar bills that were extensively discussed and vetted, but not enacted. *See* H.R. 6373/S. 2466 (Southeast Arizona Land Exchange and Conservation Act of 2006); H.R. 3301/S. 1862 (Southeast Arizona Land Exchange and Conservation Act of 2007); S. 3157 (Southeast Arizona Land Exchange and Conservation Act of 2008); H.R. 2509/S.

11

409 (Southeast Arizona Land Exchange and Conservation Act of 2009); H.R. 4880 (Copper Basin Jobs Act); H.R. 1904 (Southeast Arizona Land Exchange and Conservation Act of 2011); H.R. 687/S. 339 (Southeast Arizona Land Exchange and Conservation Act of 2013).

Through this process of legislative debate and negotiation—a "typical story of legislative battle"—the proposed land exchange evolved as different stakeholders aired their views in private discussions and public testimony. *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461 (2002). Over the years, "extensive consultation" took place "between Resolution Copper, Federal agencies, and various non-governmental organizations like The Nature Conservancy and the Audubon Society to find the best lands to exchange for the Oak Flat Campground." *2013 Hearing* at 74-75 (statement of S. Miller). Hundreds of documented consultations with Native American Tribes and local communities also occurred. These discussions "drastically altered the project scope, including a complete change of technology and location of critical facilities, avoiding hundreds of ancestral sites."[9] Stakeholder input also led to reducing the land the government would convey by more than 900 acres to further minimize any impact on the Oak Flat area.[10]

---

[9] https://resolutioncopper.com/myth-and-facts/.
[10] https://resolutioncopper.com/cultural-heritage/.

C.   Congress enacted a comprehensive land exchange that expands federal forest lands and protects culturally sensitive areas.

Finally, in 2014, after "years [spent] analyzing, discussing, and evaluating this land exchange," *2012 Hearing* at 3 (statement of Sen. McCain), Congress enacted the Act as part of the National Defense Authorization Act for Fiscal Year 2015—reflecting the Act's national security import.  Pub. L. No. 113-291, 128 Stat. 3282 (2014).  The bill passed both chambers with bipartisan support and President Obama signed it into law.  H.R. 3979, 113th Cong. (2014) (enacted).

As enacted, the Act provides that (1) "if Resolution Copper offers to convey to the United States all right, title and interest of Resolution Copper" in roughly 5,300 acres of land across Arizona, then (2) the Secretary of Agriculture "is authorized and directed to convey to Resolution Copper, all right, title, and interest of the United States in and to" around 2,422 acres of land in Pinal County.  16 U.S.C. § 539p(c)(1).  The Secretary will also convey to Superior, for market value, several hundred acres of land and reserved mineral interests in Pinal County land. *Id.* § 539p(h).

The land the federal government acquires from Resolution Copper will "become part of the national forest" system, with several new or expanded conservation areas.  *Id.* § 539p(d)(2)(A)(i), (d)(2)(B).  All the land Resolution Copper conveys to the United States under the Act will also be withdrawn from all

13

mining and mineral leasing laws. *Id.* § 539p(f).

The Act goes one step further for Apache Leap—an area the Apaches consider "hallowed grounds." *2011 Hearing* at 59. The statute requires the Secretary to "establish a special management area" for the more than 800 acres of land that span Apache Leap. 16 U.S.C. § 539p(b)(1), (g)(1). That special management area will "preserve the natural character of Apache Leap," "allow for traditional uses of the area by Native American people," and "protect and conserve the cultural and archeological resources of the area." *Id.* § 539p(g)(2). To help effect these purposes, the Act requires Resolution Copper to "surrender to the United States, without compensation," all mineral rights related to Apache Leap. *Id.* § 539p(g)(3). The statute also calls for the Secretary to consult "affected Indian Tribes, the Town [of Superior], Resolution Copper, and other interested members of the public" and prepare a management plan for Apache Leap, with special focus on what is needed to protect Apache Leap's "cultural, archaeological, or historical resources." *Id.* § 539p(g)(5).

"[T]he Federal Government is the overwhelming beneficiary of this lands package." *2013 Hearing* at 75 (statement of S. Miller). The lands the government gives Resolution Copper will be used in ways that will serve national security and economic interests as well as support the renewable energy transition. *Supra* at 6-9.

14

But even setting that aside, while the Act makes land "available to Resolution Copper for mining and related activities," 16 U.S.C. § 539p(c)(1), (8), the law also carefully balances the competing interests at stake. The statute requires the Secretary to prepare an environmental impact statement before conveying the federal land to Resolution Copper. That statement must assess the potential impact of any mining on "cultural and archeological resources" and "identify measures that may be taken . . . to minimize" those potential impacts. *Id.* § 539p(c)(9)(B)-(C). The Secretary must also "engage in government-to-government consultation with affected Indian tribes" about any issues they see with the land exchange. *Id.* § 539p(c)(3)(A). And, having consulted with those tribes, the Secretary must also "consult with Resolution Copper and seek to find mutually acceptable measures" to address the tribes' concerns and "minimize" any "adverse effects" the planned mining may have on those tribes. *Id.* § 539p(c)(3)(B).

In sum, the Act contains a carefully crafted, extensively negotiated, long debated compromise enacted under Congress's broad power to manage federal property. That compromise places over 5,300 acres of environmentally and culturally important land under federal protection (including a net increase of almost 3,000 acres). It provides heightened protection for Apache Leap, a significant cultural and religious site. And it conveys federal land to Resolution Copper so that

entity can tap an enormous undeveloped copper deposit—work that will create 3,700 jobs, promote national security, support economic growth with billions of dollars in tax revenue, and provide essential support for the nation's transition to a renewable energy future.  At the same time, the law requires consultation with affected Native American tribes.

This statute is exactly the kind of legislative compromise that drives our democracy.  Unsurprisingly, not everyone is happy with the balance Congress struck. *See Barnhart*, 534 U.S. at 461 ("Dissatisfaction . . . is often the cost of legislative compromise.").  But nothing about that balance violates RFRA or the Free Exercise Clause—because the federal government's exercise of its power to manage federal land does not create a cognizable burden on religious exercise.

## II. Congress's disposition of federal land does not qualify as a substantial burden under the Religious Freedom Restoration Act or the Free Exercise Clause.

On rehearing, Apache Stronghold attacks the panel's view that a "substantial burden" exists in just two scenarios, and it urges adopting the panel dissent's view that a cognizable burden can arise under other circumstances.  But Apache Stronghold overlooks the key point: whether RFRA or the Free Exercise Clause recognize "substantial burdens" in more than two scenarios is irrelevant here. Neither RFRA nor the Free Exercise Clause considers the federal government's use of its own land to constitute a "substantial burden," whatever the incidental impacts

of that land use, and especially not when Congress orders that specific disposition by statute. *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988), made this rule clear, and RFRA did not change it. Apache Stronghold thus lacks any viable claim under RFRA or the Free Exercise Clause. Should this en banc Court decide otherwise, it would open the door to an expansive realm of religious exercise claims that neither provision was meant to encompass. This Court should affirm.

### A. The Government's use of its own land does not constitute a substantial burden on religious exercise.

The federal government's land management decisions—particularly when they come in the form of a statute disposing of federal property—do not create any cognizable burden on religious exercise, no matter how significant the incidental impacts of those decisions. Supreme Court precedent makes this point clear.

The Supreme Court has consistently held that the Free Exercise Clause "does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Bowen v. Roy*, 476 U.S. 693, 700 (1986). In *Roy*, the plaintiffs could not obtain federal welfare benefits because they refused, based on their religious beliefs, to allow use of a Social Security number for their daughter. *Id.* at 695-97. The Court held that the federal statutes requiring use of a Social Security number did not violate the Free Exercise Clause because the First Amendment does not

17

"require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development." *Id.* at 699 (emphasis in original). Just as the government could not require the plaintiffs to engage in a religious practice, the plaintiffs could not require the government to "join in their chosen religious practices" by altering its own internal workings to accord with their beliefs. *Id.* at 700.

The Court recognized the slippery slope that would ensue should it decide otherwise. What would stop a claimant from raising a "sincere religious objection to the size or color of the Government's filing cabinets" or any other aspect of the government's operations? *Id.* Individuals remain free to express and exercise their religion, the Court emphasized, but that freedom does not give them the right to control the government's conduct of its own affairs. *Id.*

In *Lyng*, the Court applied this principle to the land use context. *Lyng* centered on the federal government's plan to build a paved road through national forest lands "historically used for religious purposes" by three Native American tribes. 485 U.S. at 442. The planned road threatened "serious and irreparable damage" to these lands that the tribes viewed as "sacred" and "integral" to their belief systems. *Id.* It was undisputed that the government's conduct would "have severe adverse effects on the practice of their religion," as that practice was "intimately and

inextricably bound up with the unique features of the" land. *Id.* at 447, 451. The road might even "destroy" the "Indians' ability to practice their religion," *id.* at 451-52, by making that practice "impossible," *id.* at 459 (Brennan, J., dissenting). Yet the Court did not see this significant—or even total—interference with religious practice as a cognizable governmental burden on religious exercise.

Drawing on *Roy*, the Court held that although "the challenged Government action would interfere significantly with private persons' ability to pursue spiritual fulfillment," it would not "prohibit" that conduct in the way the First Amendment precludes. *Id.* at 449-51. Put differently, the burden imposed by the government's use of its land, however extreme or total, is not the kind of burden the First Amendment recognizes.

To decide otherwise would require the government to use its own property to facilitate the tribes' practice of their religion. *Id.* at 453. And the Free Exercise clause does not give individuals the right to so direct the government's management of its own land. Whatever the tribes' rights to use the land for their religious exercise, "those rights [did] not divest the Government of its right to use what is, after all, *its* land" in the manner it sees fit. *Id.* at 453 (emphasis in original).

The government *could*, of course, try to minimize the effects of its land management decisions on the tribes' religious practice (as the government did here,

*supra* at 13-15)—but the Court did not hold that it *must* do so. *See id.* at 454-55. Instead, as commentators have since observed, the Court made clear that the "government's refusal to practice a religion" by using (or not using) its land in some specific way "places no cognizable burden on that religion." D. Laycock & O. Thomas, *Interpreting the Religious Freedom Restoration Act*, 73 TEX. L. REV. 209, 229 (1994) (*Lyng* means that the "government does not have to preserve its property for religious use.").

### B. RFRA maintained this rule.

RFRA left intact *Lyng*'s rule that the government's use of its own land does not impermissibly burden the exercise of religion.

RFRA says nothing about what qualifies as a "substantial burden" on religion. Instead, RFRA was enacted to ensure that strict scrutiny, nothing less, would apply to substantial burdens on religion. 42 U.S.C. § 2000bb(a)(4). Congress wanted to abrogate *Employment Division v. Smith*, 494 U.S. 872, 883-84 (1990), which rejected strict scrutiny, and "restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)." *Id*; § 2000bb(b)(1); *see also* S. Rep. 103-111, 103 Cong. 163, 14 (1993) ("S. Rep.") (RFRA "is intended to restore the compelling interest test."). In other words, Congress did not change what qualified as a substantial burden—it sought only to

20

require that strict scrutiny apply when substantial burdens arise.

Thus, RFRA's drafters intended that pre-RFRA case law would continue to determine "whether the exercise of religion has been substantially burdened" in the first instance. S. Rep. at 8; *see also id.* at 9 ("The act thus would not require . . . justification for every government action that may have some incidental effect on religious institutions."). That case law, Congress recognized, made "clear that strict scrutiny does not apply to government actions involving only management of internal Government affairs or the use of the Government's own property or resources." *Id.* at 9; *see also id.* at 9 n.19 (noting that *Roy* and *Lyng* had ruled that the government's conduct in those cases did "not constitute a cognizable 'burden' on anyone's exercise of religion"). In fact, Senator Hatch, RFRA's principal Senate sponsor, repeatedly explained that "RFRA does not affect *Lyng*, . . . a case concerning the use and management of Government resources, because the incidental impact [of that kind of government conduct] on a religious practice does not constitute a cognizable burden on anyone's free exercise of religion." 139 Cong. Rec. 26, 193 (1993) (statement of Sen. Hatch); *see also* 139 Cong. Rec. S14, 470 (daily ed. Oct. 27, 1993) (colloquy of Senators Hatch and Grassley) ("RFRA would have no effect on cases like [*Roy*]" and "also does not effect *Lyng*.").

RFRA's enactment therefore did not impact the Supreme Court's controlling

21

decision in *Lyng*. Under RFRA, as under the Free Exercise Clause, the government's use of its own land does not create any cognizable burden on religious exercise.

### C. The Act—a federal statute disposing of the government's own land— does not create a substantial burden.

*Lyng* resolves this case in the government's favor. The Act not only concerns the government's use of its own land, but Congress directed that specific use by a statute enacted through bicameralism and presentment. The federal government's management of its own property is especially not a cognizable burden here, where Congress already assessed all the competing interests at stake and reached a negotiated compromise by which it is simply (1) disposing of its own land and (2) gaining new land to place under federal protection. No court has ever held that such an enactment can create a cognizable burden on religious exercise, and this Court should not be the first.

#### 1. This Court need not decide the precise contours of a substantial burden under RFRA to decide this appeal.

Because *Lyng* controls, this Court need not decide the exact parameters of what qualifies as a substantial burden under RFRA. The central dispute between the panel majority and dissent—whether RFRA encompasses more than two kinds of substantial burdens—distracts from the straightforward path to resolving this appeal and minimizes the unique nature of the government action at issue. This

22

Court should not get mired in a debate over the correctness of its "substantial burden" definition announced in *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008) (en banc). Although amici believe this Court correctly decided *Navajo Nation*, that decision is unnecessary to reach the correct result here.

*Navajo Nation* involved a challenge to the federal government's plan to use recycled wastewater for artificial snowmaking and fire suppression on land with "religious and cultural significance to Indian tribes." 535 F.3d at 1064-65. This en banc Court held that the plaintiffs failed to establish a RFRA violation because the government's conduct neither coerced them to act contrary to their religious beliefs nor conditioned a governmental benefit upon violating those beliefs. *Id.* at 1067. That is, the government's conduct was not like that in *Sherbert* or *Yoder*, and only that kind of government action makes for a substantial burden. *Id.* at 1069-70. From this framing stems the debate here over just how broad or narrow the definition of "substantial burden" is under RFRA.

But this Court only needed to apply that framework in *Navajo Nation* because no one argued there that "RFRA is inapplicable to the government's use and management of its own land." *Id.* at 1067 n.9. And at the same time, the *Navajo Nation* majority correctly recognized *Lyng*'s controlling view that the government's land management choices "d[o] not 'burden' the exercise of . . . religion." *Id.* at

23

1072-73. Under that reasoning, this Court rightly held, the *Navajo Nation* plaintiffs could not "dictate the decisions that the government makes in managing 'what is, after all, *its* land.'" *Id.* at 1073 (quoting *Lyng*, 485 U.S. at 453 (emphasis in original)).

*Lyng* established that however significant the effects of the government's use of its own land, those land management decisions cannot create a "substantial burden" under RFRA. And because that principle is true for ordinary, low-level decisions about paving a road, it carries even more force here, when Congress ordered specific land traded to a private company for the national good.

### 2. Even under a more expansive view of what constitutes a substantial burden, the Act does not qualify as one.

Apache Stronghold and the panel dissent argue that a RFRA-cognizable burden exists in more situations than just the two the panel majority (and *Navajo Nation*) describe. They assert that the government can substantially burden religion by "controlling access to religious resources." Op. at 59, 63 (Berzon, J., dissenting); *see* Pltf.'s Supp. Br. at 1. But even if that theory were correct in some cases, it would not apply to the government's use of its own land, especially when that use takes the form of a mere transfer of land to a private entity.

The panel dissent's argument stems from prison and zoning cases governed not by RFRA but by the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.* Even if the definition of "substantial burden"

24

is the same under the RLUIPA and RFRA (a view the panel majority rejected), decisions finding a substantial burden in the prison and zoning contexts say nothing about the government's use of its own land.

First, the government imposes zoning and land use regulations on *private* property. *See* 42 U.S.C. §§ 2000cc(a)(1), 2000cc-5(5); *see, e.g.*, *Guru Nanak Sikh Soc. of Yuba City v. Cty. of Sutter*, 456 F.3d 978, 980 (9th Cir. 2006) (county's denial of application to build temple on private land was a "substantial burden" under RLUIPA). The government telling people they cannot create a place to worship on their own land is far different from the government making decisions about its own property. And it is far removed from the idea that the government's use of its own land could substantially burden the religious exercise of people with no title to or property interest in that land.

Second, prisoner cases involve a unique context in which government officials already exercise "so much power over inmates' lives" that it is too "easy . . . to deny capriciously one more liberty to those who have already forfeited so many others." *Yellowbear v. Lampert*, 741 F.3d 48, 53 (10th Cir. 2014) (Gorsuch, J). The government, in confining prisoners on government property, controls almost every aspect of a prisoner's life. *See Cutter v. Wilkinson*, 544 U.S. 709, 720-21 (2005) (in prisons, "the government exerts a degree of control unparalleled in civilian society

and severely disabling to private religious exercise"). Were the prisoner not incarcerated, he would be free to exercise his religion on his own time and his own property. Because he is incarcerated, however, he may only engage in religious exercise to the extent the government allows.

As with zoning regulations, then, prisoner cases involve the government imposing rules on the prisoner that directly regulate his religious exercise, either by requiring the prisoner to act in certain ways that are contrary to his beliefs or by preventing the prisoner from acting in the ways his beliefs compel. *See, e.g.*, *Johnson v. Baker*, 23 F.4th 1209, 1212-14 (9th Cir. 2022) (state regulation governing "use of religious items" in prison and preventing prisoners from possessing scented oil in their cells substantially burdened Muslim prisoner's religious exercise). In these cases, the government controls the prisoner's conduct because it confines that person on government property. And that control may include expressly restricting what religious objects he may possess at what times or requiring him to take steps that violate his religious beliefs. *See id.*; *see also Holt v. Hobbs*, 574 U.S. 352, 355, 359 (2015) (prison's grooming policy prohibiting beards substantially burdened prisoner's exercise of religion requiring him to grow beard); *Jones v. Slade*, 23 F.4th 1124, 1130-31 (9th Cir. 2022) (Department of Corrections policy excluding specific texts as contraband substantially burdened prisoner's religious exercise).

These scenarios are wholly unlike the one here, where the government is simply managing its own land. The government is not forcing the plaintiff—whose members are private citizens with full autonomy to practice their religion—to do anything. Nor is it affirmatively controlling those individuals' conduct by directly regulating what religious texts they can possess or intruding into personal decisions about how they groom themselves. It is the plaintiff, in contrast, who wants to tell the government what to do. More specifically, the plaintiff wants to tell the government it cannot obey a federal statute disposing of its own property. There is no parallel to this scenario in the zoning or prisoner cases Apache Stronghold and the panel dissent invoke. *Lyng* makes clear that, in this situation, there is no cognizable burden on religious practice.

### D. A decision treating the Act as substantially burdening religious exercise would subject all federal land management decisions to strict scrutiny.

To adopt Apache Stronghold's position that the government's disposition of its own land can substantially burden religious exercise would have far-reaching consequences Congress did not intend in enacting RFRA.

The federal government owns more than a quarter of all land in the United States—roughly 640 million acres. Congressional Research Service, *Federal Land*

*Ownership: Overview and Data* 1 (Feb. 21, 2020).[11] These federal lands are concentrated in the country's Western half. *See id.* at 7-8, 12-14, 19. More than 28 million acres in Arizona are federally owned, for example, while the federal government controls over 56 million acres in Nevada and some 33 million in Utah. *Id.* at 8.

Native American tribes lived and worshipped across this land, meaning their collective members are likely to view much (if not all) of it as a central component of their religious exercise. Indeed, "[b]ecause of their perceptions of and relationship with the natural world, Native Americans consider *all* land sacred." *Lyng*, 485 U.S. at 475 (Brennan, J., dissenting) (emphasis added).

If Apache Stronghold's view prevails, this Court would open these vast swaths of federal land—and the panoply of federal operations related to them—to innumerable religious objections and even easement claims. *See* Br. Amicus Curiae of The Mennonite Church USA, et al., ECF No. 116 at 18-19 (arguing that at least on private land, "courts have recognized that [Native Americans'] ancient and continuous use of the land supports an easement for the purpose of religious exercise"). If any one member of a tribe objects to any decision the government makes about any of its millions of acres in Nevada, for example—whether that

---

[11] *Available at* https://crsreports.congress.gov/product/pdf/R/R42346.

decision is conveying the land to a private entity, carving out a hiking trail, putting up a sign, or modifying its operating hours—the federal government will have to justify that conduct under strict scrutiny. It may also have to rebuff easement claims seeking to use federal land for private religious practice rather than public benefit.

Such challenges to the minutiae of everyday operations would bog down the government's critical functions. They could also hamper projects crucial to meeting the country's national security and energy needs, including the installation of wind, solar, or other renewable energy generation projects on federal land. *See* Govt.'s Supp. Br. at 16; *see also* Bureau of Land Management, *Renewable Energy* (describing dozens of "permitted renewable energy projects" on lands managed by the Bureau of Land Management).[12]

And these challenges will not remain confined to tribal religious objections. A Christian Ministry in the National Parks, for example, "give[s] a Christian interpretation to the awe and grandeur of God's creation in the nation's national parks." A Christian Ministry in the National Parks, *About*, https://acmnp.com/about/. The organization conducts regular worship services in national parks attended by more than 30,000 worshippers each year. *Id.* Should the

---

[12] *Available at* https://www.blm.gov/programs/energy-and-minerals/renewable-energy#:~:text=As%20of%20November%202021%2C%20permitted,than%2012%2 0gigawatts%20of%20power.

government decide to alter one of the spaces used for those services or just alter the park itself, say by building a ranger station or paving a new road, members of the organization could lodge a RFRA challenge. It cannot be that every decision by the government about how to properly manage its own land to serve the public interest is subject to religious veto.

The government should decide how to use and manage its own land based on its view of the public good, especially if that view is negotiated and decided by congressional enactment. The (potentially competing) views of religious objectors should not prevent the government from operating federal land in the public interest. Apache Stronghold's contrary position would amount to a rule that the government must "conduct its own" land management operations "to comport with the religious beliefs of particular citizens." *Roy*, 476 U.S. at 699. The Supreme Court and Congress have rejected this rule, and this Court should too.

## CONCLUSION

For these reasons, the Court should affirm.

Dated: January 23, 2023

Respectfully submitted,

*/s/ Kathryn M. Barber*

Kathryn M. Barber
Matthew A. Fitzgerald
MCGUIREWOODS LLP
Gateway Plaza

30

800 East Canal Street
Richmond, VA 23219
T: (804) 775-1227
F: (804) 698-2227
kbarber@mcguirewoods.com
mfitzgerald@mcguirewoods.com

*Counsel for Amici Curiae*
*Pinal Partnership, Valley Partnership, PHX*
*East Valley Partnership, The Honorable Scott*
*J. Davis, The Honorable Myron Lizer, and*
*John Tahsuda, III*

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Ninth Circuit Rule 29-2(c)(3) because it contains no more than 6,717 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point size Adobe Caslon Pro font.

Dated: January 23, 2023      Respectfully submitted,

         */s/ Kathryn M. Barber*
         Kathryn M. Barber

         *Counsel for Amici Curiae*
         *Pinal Partnership, Valley Partnership, PHX*
         *East Valley Partnership, The Honorable Scott*
         *J. Davis, The Honorable Myron Lizer, and*
         *John Tahsuda, III*

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2023, the foregoing was filed with the Clerk of the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system, which will also serve counsel of record.

Dated: January 23, 2023        Respectfully submitted,

*/s/ Kathryn M. Barber*
Kathryn M. Barber

*Counsel for Amici Curiae*
*Pinal Partnership, Valley Partnership, PHX*
*East Valley Partnership, The Honorable Scott*
*J. Davis, The Honorable Myron Lizer, and*
*John Tahsuda, III*