No. 21-15295

# In the United States Court of Appeals for the Ninth Circuit

APACHE STRONGHOLD,

Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA, *ET AL.*,

Defendants-Appellees,

AND

RESOLUTION COPPER MINING, LLC,

Intervenor-Defendant-Appellee.

On Appeal from the United States District Court
for the District of Arizona
Case No. 2:21-cv-00050-PHX-SPL (Hon. Steven P. Logan)

**BRIEF OF *AMICI CURIAE* THE MENNONITE CHURCH
USA, THE PACIFIC SOUTHWEST MENNONITE
CONFERENCE, AND 19 ADDITIONAL MENNONITE
ORGANIZATIONS AS AMICI CURIAE
IN SUPPORT OF PLAINTIFF-APPELLANT'S PETITION
FOR REHEARING BEFORE THE FULL COURT**

Eric N. Kniffin
Ethics & Public Policy Center
1730 M Street, N.W.
 Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

*Counsel for* Amici Curiae

*Additional Amici Listed on Next Page*

## ADDITIONAL *AMICI CURIAE*

Allegheny Mennonite Conference

Albuquerque Mennonite Church, Albuquerque, NM

Belmont Mennonite Church, Elkhart, IN

Boulder Mennonite Church, Boulder, CO

Columbus Mennonite Church, Columbus, OH

Eighth Street Mennonite Church, Goshen, IN

Faith Mennonite Church, Minneapolis, MN

First Mennonite Church, San Francisco, CA

Germantown Mennonite Church, Philadelphia, PA

Hyde Park Mennonite Fellowship, Boise, ID

Just Peace Council, Seattle Mennonite Church, Seattle, WA

Mennonite Church of the Servant, Wichita, KS

Mennonite Men, Newton, KS

Mennonite Mission Network, Newton, KS

Peace Mennonite Church, Lawrence, KS

Portland Mennonite Church, Portland, OR

Sojourn Mennonite Church, Fort Collins, CO

Walnut Hill Mennonite Church, Goshen, IN

Waterford Mennonite Church, Goshen, IN

## CORPORATE DISCLOSURE STATEMENT

In compliance with Federal Rule of Appellate Procedure 26.1, I certify that amici have no parent corporation and no stock.

Dated: April 25, 2024          s/ Eric N. Kniffin
                               Eric N. Kniffin
                               *Counsel for* Amicus Curiae

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................. ii

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT OF INTEREST OF *AMICI CURIAE* ............................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 3

ARGUMENT ...................................................................................... 5

   I.  The court should not have let its fears about speculative
     harms infect its substantial burden analysis. ............................... 7

      A.  Concerns about nonbeneficiary harm are properly accounted
         for under the strict scrutiny test, not RFRA's substantial
         burden analysis. ..................................................................... 7

      B.  RFRA requires courts to focus on the case at hand and set
         aside "'slippery slope' arguments." ......................................... 8

      C.  Such speculations are particularly inappropriate given that
         the feared harms rarely materialize ...................................... 10

   II. The facts of this case undermine any concern that
     recognizing a substantial burden here would subject the
     government to "religious servitude" down the line. ..................... 12

      A.  The duration and continuity of the Apache's use of Oak Flat
         demonstrates their sincerity ................................................. 12

      B.  That the Apache's use of Oak Flat is limited is relevant to
         strict scrutiny analysis. ........................................................ 15

      C.  The proposed government action here—obliterating a holy
         site—makes the substantial burden question an easy case. . 16

CONCLUSION .................................................................................. 17

# TABLE OF AUTHORITIES

## Cases

*A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*,
611 F.3d 248 (5th Cir. 2010) ................................................................. 16

*Apache Stronghold v. United States*,
38 F.4th 742 (9th Cir. 2022) ......................................................... 15, 18

*Apache Stronghold v. United States*,
95 F.4th 608 (9th Cir. 2024) ...................................................... passim

*Burwell v. Hobby Lobby*,
573 U.S. 682 (2014) ................................................................. 8, 12, 13

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ............................................................................. 6

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006). ............................................................................ 9

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013) ............................................................ 14

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988) ............................................................................. 5

*Navajo Nation v. U.S. Forest Serv.*,
535 F.3d 1058 (9th Cir. 2008) (en banc) ........................................... 18

*Sherbert v. Verner*,
374 U.S. 398 (1963) ........................................................................... 10

*United States ex rel. Zuni Tribe of N.M. v. Platt*,
730 F. Supp. 318 (D. Ariz. 1990) ...................................................... 16

*United States v. Grady*,
18 F.4th 1275 (11th Cir. 2021) ......................................................... 11

*United States v. Zimmerman,*
    514 F.3d 851 (9th Cir. 2007) (per curiam) ................................... 14, 16

*Yellowbear v. Lampert,*
    741 F.3d 48 (10th Cir. 2014) ............................................................ 10

## Other Authorities

Douglas Laycock & Thomas C. Berg, *Protecting Free Exercise Under
    Smith and After Smith*, Cato Sup. Ct. Rev. (2020–21)). ..................... 11

Jon W. Bruce & James W. Ely, Jr., The Law of Easements and
    Licenses in Land ................................................................................. 17

Luke W. Goodrich & Rachel N. Busick, *Sex, Drugs, and Eagle
    Feathers: An Empirical Study of Federal Religious Freedom
    Cases*, 48 Seton Hall L. Rev. 353 (2018) ............................................. 12

Stephanie H. Barclay & Mark L. Rienzi, *Constitutional Anomalies
    or As-Applied Challenges? A Defense of Religious Exemptions*, 59
    B.C. L. Rev. 1595 (2018). .................................................................. 12

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici* are twenty-one Mennonite bodies from throughout the country.[1] *Amici* submit this brief to highlight the importance of protecting the religious rights of minority religious groups and land-based religious practices.

The Mennonite Church USA ("MC USA") is the largest Mennonite denomination in the United States, rooted in the Anabaptist movement, and committed to nonviolence, religious liberty, and social justice.

The Pacific Southwest Mennonite Conference ("PSMC") is a community of Mennonite congregations across Arizona and California and an area conference of the MC USA. Its mission is to create Spirit-filled healing community across boundaries, sharing God's love, justice, and peace with each other and with neighbors, including the Apache.

Mennonites resonate with the Apache's attachment to Oak Flat. Like the Apache, caring for creation and receiving care from God's natural world is woven into the Mennonite faith, from its heritage in

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4), *amici* state that no party's counsel authored this brief in part or in whole, and no person (other than *amici*, their members, and their counsel) has contributed money to fund the preparation or submission of this brief.

rural farming to its practice of planting peace gardens at the sites of urban gun violence. We know that God tends us through creation.

Mennonites from across the continent have made pilgrimage to Oak Flat to pray and to learn—from the land and from the Apache Stronghold. Mennonites have joined the Apache in prayer during sacred ceremonies and many have been transformed by the Holy that is alive and so very present at Oak Flat. Mennonites have also stood alongside the Apache Stronghold in their fight to save Oak Flat—praying with them outside court houses, through face-to-face meetings, and through nationwide prayer vigils.

Mennonites like *amici* have long suffered persecution for their religious beliefs. *Amici* and other Mennonites have thrived in the United States, after fleeing such persecution in other countries, because of the protections this country's laws provide for religious freedom. In the interest of justice, *amici* wish to see those same protections extended to their Native American brothers and sisters who seek to practice their religion on their ancestral lands.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For "at least a millennium,"[2] the Western Apache have been gathering at *Chi'chil Biłdagoteel*, or Oak Flat, to worship and conduct ceremonies. *Apache Stronghold v. United States*, 95 F.4th 608, 615 (9th Cir. 2024) ("*Apache*"). As the en banc court recognized, the Western Apache "believe that Oak Flat is a 'sacred place'" that "provides them 'a unique way . . . to communicate' with their Creator." *Id*. It is "indispensable to their religious worship." *Id*. at 614.

The United States wants to sell Oak Flat to Resolution Copper, which will mine this sacred ground until it turns into "a large surface crater . . . approximately 1.8 miles in diameter and . . . between 800 and 1,115 feet deep." *Id*. at 618. "It is undisputed that this subsidence will destroy the Apache's historical place of worship, preventing them from

---

[2] The dissent notes that "Apaches have held Oak Flat sacred since long before the United States government and is people ventured west of the Rio Grande." *Id*. at 702 (dissent). But the Western Apache have been making pilgrimages to this spot for much longer than that—since before the Mennonites, *amici's* religious tradition, was founded in Switzerland (1525), before the start of the Incan Empire (1438), before Genghis Kahn began his conquests (1206), and before William of Normandy invaded England (1066).

ever again engaging in religious exercise at their sacred site." *Id.* at 700 (Murguia, C.J., dissenting (hereinafter, dissent)).

The key question in this case is simple: *Would the United States' plans for Oak Flat, if allowed to proceed, "substantially burden" the Western Apache's religious exercise?* Given the undisputed facts above, it seems clear that the answer is yes. Indeed, six judges from the en banc sitting—what Apache Stronghold's Petition calls the "Murguia majority"—held that "the plain meaning of 'substantial burden' includes government actions 'preventing access to religious exercise.'" Pet. at 4. But a separate six-judge majority—the "Collins majority"[3]—held that the "plain meaning" of "substantial burden" is not what matters under the Religious Freedom Restoration Act ("RFRA"). *Id.*[4]

*Amici* offer this brief to support Apache Stronghold's petition, which argues that the en banc court got it wrong and that this error warrants full court review. But *amici's* broader concern is that the court's

---

[3] Judge VanDyke joined both Chief Justice Murguia's and Judge Collins' opinions. Each of the other ten judges signed only one of these opinions.

[4] This brief will refer to Judge Collins' opinion as the majority and Chief Justice Murguia's opinion as the dissent. Other opinions will be referred to by their authors.

results-oriented substantial burden analysis undermines RFRA, which has been a critical lifeline for minority religious groups, including Native Americans. For the reasons stated in Apache Stronghold's petition and set out below, *amici* urge the Ninth Circuit as a whole to revisit this en banc decision.

## ARGUMENT

To understand how the en banc court denied that turning Oak Flat into a crater would substantially burden the Apache Stronghold's religious exercise, one must understand the speculative fears that loom throughout the majority opinion and in Judge Bea's concurrence.

The majority opinion warns that recognizing a substantial burden on Apache religious exercise in this case would subject the government to "religious servitude," which would confer "de facto beneficial ownership of some rather spacious tracts of public property." *Apache*, 95 F.4th at 622 & 633 n.8 (9th Cir. 2024) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452-53 (1988)). Three of the six judges in the majority—Judge Bea, joined by Judges Forrest and Bennett—warned in a concurrence that recognizing a substantial burden here would cause a "[s]ea [c]hange" in RFRA jurisprudence with "no

limiting principle." *Id*. at 654, 655 (Bea, J., concurring). Courts "might be required to grant a religious easement to nearly any religious adherents who brought a land-based RFRA claim." *Id*. at 655. RFRA would require easements "for access to and use of vast expanses of federal land—perhaps even *all* federal land," including "sensitive federal facilities such as military installations." *Id*. Judge Bea found it untenable that "the government would be forced to face 'the most demanding test known to constitutional law' just to keep trespassers, albeit *devout* trespassers, off its land and out of its installations and buildings." *Id*. (quoting *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997)).

It was in the context of these concerns that the majority denied that that turning Oak Flat into a crater would substantially burden the Apache's religion under RFRA. Thus, understanding why the majority's parade of horribles is off-base is key to understanding why its RFRA analysis is incorrect, and why this Court should grant Apache Stronghold's petition.

This brief argues that the court was wrong to let its substantial burden analysis be driven by its fears about speculative harms that future RFRA cases might bring. It also argues that the court took

inadequate account of the powerful facts of this case, which will make it easier for future courts to distinguish other RFRA claims over federal land.

## I. The court should not have let its fears about speculative harms infect its substantial burden analysis.

As shown above, the en banc majority's substantial burden analysis is intertwined with its fears about what a plaintiff's judgment here would mean for RFRA claims down the road. But controlling caselaw is clear that speculations about the burdens that other RFRA cases might cause are not relevant to the substantial burden analysis. Indeed, they are antithetical to the "case-by-case" analysis RFRA requires. The en banc majority was wrong to let these concerns drive its ruling.

### A. Concerns about nonbeneficiary harm are properly accounted for under the strict scrutiny test, not RFRA's substantial burden analysis.

The majority erred by allowing its practical concerns to shape its substantial burden analysis. The dissent notes that the majority's claim that Apache Stronghold's view of substantial burden is "too 'broad'" is inextricably tied with its view that the compelling interest is too hard for the government to meet. *Id*. at 720 (dissent). "[T]he majority proceeds as if, once a religious adherent has satisfied the substantial burden test, the

outcome is a foregone conclusion." *Id.* at 721 (dissent). But the Supreme Court has made clear that this sort of thinking gets RFRA backward. Concerns regarding "the burdens" RFRA "may impose on nonbeneficiaries" should be analyzed under RFRA's strict scrutiny prong, not its substantial burden prong. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S 682, 730 n.37 (2014).

### B. RFRA requires courts to focus on the case at hand and set aside "'slippery slope' arguments."

But even when properly situated in the compelling interest analysis, the majority's and Judge Bea's concerns about what *other* RFRA claims *might* be brought over access to federal lands should not have been allowed to affect the court's valuation of *Apache Stronghold's* RFRA claim *here*. The dissent properly notes that the Supreme Court has rejected the use of "'slippery slope' argument[s]" as grounds to deny otherwise valid RFRA claims. *Apache*, 95 F.4th at 721 (dissent) (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006)).

The Supreme Court did so because it recognized that these sorts of "slippery-slope concerns . . . could be invoked in response to any RFRA claim." *O Centro*, 546 U.S. at 435–36. It is "the classic rejoinder of

bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions." *Id.* at 436.

This is why the Court has repeatedly affirmed the "feasibility of case-by-case consideration of religious exemptions," *id.*, while rejecting government rejoinders premised on fears of hypothetical future harms, *e.g.*, *Sherbert v. Verner*, 374 U.S. 398, 407 (1963) (rejecting as "no more than a possibility" the State's concern that granting the claim would lead to "the filing of fraudulent claims by unscrupulous claimants feigning religious objections to Saturday work" that would "dilute the unemployment compensation fund"). As then-Judge Gorsuch explained, "[i]t can't be the case that the speculative possibility that one exception conceivably might lead to others is *always* reason enough to reject a request for the first exception." *Yellowbear v. Lampert*, 741 F.3d 48, 62 (10th Cir. 2014) Instead, courts must assess "requested exceptions . . . on a 'case-by-case' basis, taking each request as it comes: accommodations to avoid substantial burdens must be made until and unless they impinge on a demonstrated compelling interest." *Id.*

**C.    Such speculations are particularly inappropriate given that the feared harms rarely materialize.**

As it turns out, there is good reason the Court looks with disfavor on such speculative claims: they frequently fail to materialize. As the dissent notes, "The compelling interest test has not proven fatal to the government." *Id*. at 721 n.16 (dissent) (citing Douglas Laycock & Thomas C. Berg, *Protecting Free Exercise Under Smith and After Smith*, Cato Sup. Ct. Rev. at 44–45 & n.66 (2020–21)).

> And if the majority were correct that my reading of RFRA would subject the government to 'religious servitude,' then we would necessarily have seen that concern play out in circuits that have long employed a broader reading of "substantial burden." But "[n]either the government nor the majority provide evidence that other circuits are inundated with such claims, and I have found no evidence hinting at that possibility.

*Id* (dissent).  On the rare occasions when such claims have arisen, other circuits have had no difficulty applying strict scrutiny under RFRA—and finding it satisfied in appropriate cases. *See, e.g., United States v. Grady*, 18 F.4th 1275 (11th Cir. 2021) (government satisfied strict scrutiny in prosecuting religious trespassers on a military base).

The same is true in other RFRA contexts. In the wake of the Supreme Court's decision in *Hobby Lobby*, 573 U.S. 682, many predicted

"a tidal wave of litigation by an endless line of religious objectors who [would] become a law unto themselves and strike down government action at every turn." Stephanie H. Barclay & Mark L. Rienzi, *Constitutional Anomalies or As-Applied Challenges? A Defense of Religious Exemptions*, 59 B.C. L. Rev. 1595, 1598 (2018). But as empirical analysis of cases in one federal circuit has subsequently shown, "[c]ontrary to predictions that *Hobby Lobby* would open the floodgates of religious liberty litigation, these cases remain scarce, making up only 0.6% of the federal docket." Luke W. Goodrich & Rachel N. Busick, *Sex, Drugs, and Eagle Feathers: An Empirical Study of Federal Religious Freedom Cases*, 48 Seton Hall L. Rev. 353, 356 (2018). And "successful cases are even scarcer"; fewer than half the plaintiffs in the Tenth Circuit obtained any form of relief. *Id.* at 356, 380; *see also* Barclay & Rienzi, *supra*, at 1599, 1633, 1639–44 (demonstrating in a survey of all federal cases that post-*Hobby Lobby*, "expressive claims [remained] much more pervasive than religious claims, both in absolute terms and as a percentage of all reported cases," and that "*Hobby Lobby* does not appear to have significantly changed the government's win rate"). The majority offered

no reason to believe the result would be any different with respect to its prognostications in the case at hand.

## II. The facts of this case undermine any concern that recognizing a substantial burden here would subject the government to "religious servitude" down the line.

Even if the majority's slippery slope was legally sound, the nature of the religious exercise here suggests that those concerns are misplaced. In this case, the Apache's have an unparalleled historical connection to Oak Flat, they seek to use this (now) federal land for limited purposes, and the government act they challenge would unquestionably destroy this sacred site. These characteristics are relevant to the RFRA analysis. They would help courts, in appropriate cases, distinguish between the Apache's RFRA claim here and other groups seeking access to federal land. As such, they should allay any concerns that finding a substantial burden in this case would leave the government powerless to defend future RFRA claims.

### A. The duration and continuity of the Apache's use of Oak Flat demonstrates their sincerity.

To prevail on a RFRA claim, a plaintiff must do more than simply show that his religious exercise has been substantially burdened: courts must additionally "[c]heck[] for sincerity" "to weed out sham claims,"

*Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013); *see also United States v. Zimmerman*, 514 F.3d 851, 854 (9th Cir. 2007) (per curiam) (remanding for a determination of whether the beliefs at issue were sincerely held).

Judge Bea's claim that the dissent's "substantial burden" analysis would usher in a "[s]ea [c]hange" in RFRA claims builds on his claim that the RFRA sincerity inquiry is toothless: "With so many traditional indicators of testing sincerity off the table, a district court might be required to grant a religious easement to nearly any religious adherents who brought a land-based RFRA claim." *Apache*, 95 F.4th at 654, 655 (Bea, J., concurring). But neither the majority nor the Bea concurrence offered any reason to believe there are thousands of potential litigants waiting in the wings with *sincere* religious objections to "[e]very new hiking path, ranger station, or 'Keep Off the Grass' sign in every National Park." *Apache Stronghold v. United States*, 38 F.4th 742, 767 (9th Cir. 2022), *reh'g en banc granted, opinion vacated*, No. 21-15295, 2022 WL 16986232 (9th Cir. Nov. 17, 2022).

Judge Bea is also wrong to claim that "traditional indicators of testing sincerity"—like whether "the religious adherent only recently

began to profess his beliefs"—are now "generally irrelevant." *Apache*, 95 F.4th at 655 (Bea, J., concurring). He cites three cases between 1971 and 1994, *id.*, but misses more recent cases that continue to inquire about duration and continuity as part of their sincerity analysis. *See, e.g.*, *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 262 (5th Cir. 2010) (noting consistency of practice as a marker of sincerity); *cf. Zimmerman*, 514 F.3d at 854 (noting reservations as to sincerity in light of inconsistent practice).

Indeed, in the context of Native religious practices occurring on private land, courts have recognized that such ancient and continuous use of the land supports an easement for the purpose of religious exercise. *See, e.g.*, *United States ex rel. Zuni Tribe of N.M. v. Platt*, 730 F. Supp. 318, 322–24 (D. Ariz. 1990). Contrary to Judge VanDyke's charge, asking the court to take account of "Native Americans['] special historical and religious need for government-owned land because the land once belonged to them" is not asking for "reparations." *Apache*, F.4th at 698 (VanDyke, J., concurring). It is wholly appropriate for a court to recognize this historical reality as part of its sincerity inquiry.

14

While cases involving federal lands may involve different considerations, the Apache's religious exercise at Oak Flat—like practices that may otherwise justify treatment as an easement—has been apparent, continuous, and necessary for their use and enjoyment of the land as a sacred site. *See, e.g.*, Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land* §§ 4:2, 4:15. The destruction of Oak Flat by government transfer thus imposes a burden on Apache religious exercise distinct from other claimants who cannot demonstrate prior continuous use.

Because the Bea concurrence understated the importance of duration and continuity in determining sincerity, these three judges also miss how the unparallelled duration and continuity of the Apache's use of Oak Flat—"at least a millennium," *Apache*, 95 F.4th at 615—would help future courts distinguish between this plaintiff and future RFRA plaintiffs. Few claimants could establish such a record of continuous practice at particular sites subject to federal land-use decisions.

## B.  That the Apache's use of Oak Flat is limited is relevant to strict scrutiny analysis.

Furthermore, the purpose for which the Apache seek to use the land itself is limited. All other things being equal, that makes it easier for the

15

government to satisfy strict scrutiny than a RFRA claimant seeking exclusive or at least continuous use of federal land. This factor, too, mitigates the majority's concerns that recognizing the Apache's substantial burden here would preclude the government from making other land-use decisions across the board. Recognizing a substantial burden in light of this historical record would not subject the federal government's land-use decisions to "religious servitude." *Id*. at 623.

### C.   The proposed government action here—obliterating a holy site—makes the substantial burden question an easy case.

Finally, the nature of the government action here—*wholesale destruction* of a place the Apache believe is "uniquely endowed with holiness and medicine," id. at 701 (dissent)—makes these facts categorically different from most any other hypothetical RFRA cases. This gives courts grounds to distinguish other burdens on religious exercise. Neither the hiking path, ranger station, and sign discussed in the panel decision, *Apache Stronghold*, 38 F.4th at 742, nor the artificial snow at issue in *Navajo Nation* rendered "places of worship" "inaccessible" or "obliterated," *id*. at 710–11 (dissent) (citing *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1063 (9th Cir. 2008) (en banc).

None of these fact patterns involve the objective and severe interference with a plaintiff's access to religious locations or resources as would the complete destruction of Oak Flat. The threatened total destruction of a unique holy site sets this case apart and mitigates the majority's concerns that recognizing a substantial burden this case would subject the government to "religious servitude" in future RFRA cases.

## CONCLUSION

The Court should grant the Apache Stronghold's petition for rehearing en banc before the full Court.

Respectfully submitted,

s/ Eric N. Kniffin
ERIC N. KNIFFIN
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
 Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

*Counsel for* Amicus Curiae

APRIL 25, 2024

17

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 29(a)(5) and 9th Circuit Rule 29-2(c)(2) because this brief contains 3,301 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word Version 2304 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: April 25, 2024

s/ Eric N. Kniffin
Eric N. Kniffin

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 25, 2024. I further certify that service was accomplished on all parties via the Court's CM/ECF system.

Dated: April 25, 2024

s/ Eric N. Kniffin
Eric N. Kniffin